**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| PGX HOLDINGS, INC., *et al.*,[1] | ) | Case No. 23-10718 (CTG) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**DECLARATION OF CHAD WALLACE,**
**CHIEF EXECUTIVE OFFICER OF PGX HOLDINGS, INC.,**
**IN SUPPORT OF DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Chad Wallace, hereby declare under penalty of perjury:

1.      I am the Chief Executive Officer and President of PGX Holdings, Inc. and certain of its affiliated debtors and debtors in possession (collectively, with their Debtor affiliates, the "Debtors" and, together with their non-Debtor affiliate CreditCo Limited, but excluding their Debtor affiliate Lexington Law Firm, "PGX").[2] PGX Holdings, Inc. is a private company based in Salt Lake City, Utah, organized under the laws of Delaware, and a debtor and debtor in possession in the above-captioned cases along with 11 of its direct and indirect subsidiaries.

2.      I joined PGX as Director of Finance and Accounting in February 2014 and was promoted to Vice President of Finance in 2018.  In April 2023, I became the Chief Executive Officer.  I have over 16 years of experience with public and private companies, have held an SEC

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  PGX Holdings, Inc. (2510); Credit Repair UK, Inc. (4798); Credit.com, Inc. (1580); Creditrepair.com Holdings, Inc. (7536); Creditrepair.com, Inc. (7680); eFolks Holdings, Inc. (5213); eFolks, LLC (5256); John C. Heath, Attorney At Law PC (8362); Progrexion ASG, Inc. (5153); Progrexion Holdings, Inc. (7123); Progrexion IP, Inc. (5179); Progrexion Marketing, Inc. (5073); and Progrexion Teleservices, Inc. (5110).  The location of the Debtors' service address for purposes of these chapter 11 cases is:  257 East 200 South, Suite 1200, Salt Lake City, Utah 84111.

[2]    Capitalized terms used but not immediately defined herein have the meanings given to them in other sections herein.

reporting position at Skullcandy, and prior to that, was a manager in assurance services at Ernst & Young.  I hold both a Bachelor's of Science and an MBA from Weber State University.

3.      Each of the Debtors filed voluntary petitions for relief under chapter 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), with the United States Bankruptcy Court for the District of Delaware (the "Court") on June 4, 2023 (the "Petition Date"). To minimize the adverse effects on their business, the Debtors filed motions and pleadings seeking various forms of relief (collectively, the "First Day Motions").  I submit this declaration (the "Declaration") to assist the Court and the parties in interest in understanding the circumstances that compelled the commencement of these chapter 11 cases and in support of the Debtors' chapter 11 petitions and the First Day Motions filed contemporaneously herewith.

4.      As Chief Executive Officer of PGX, I am familiar with the day-to-day operations, business and financial affairs, and books and records of PGX Holdings and its direct and indirect debtor subsidiaries.  I am also familiar with the main aspects of the business and financial affairs of affiliated Debtor Lexington Law Firm, to which PGX provides comprehensive operational support services under a set of Operating Agreements.  Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other members of the Debtors' management team and advisors (including the teams from Alvarez & Marsal North America, LLC ("A&M") and Greenhill & Co., LLC ("Greenhill") who are working under my supervision), my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, or my opinions based upon my experience and knowledge.  I am over the age of 18 and am authorized to submit this Declaration on behalf of the Debtors.  If called as a witness, I could and would testify competently to the facts set forth in this Declaration.

**Introduction**

5.      PGX is a technology and services company that specializes in credit report repair services and consumer credit education.  One of the nation's leading credit repair service providers, PGX helps customers repair their credit and achieve their credit goals.  Setting the industry standard for transparency, cutting edge technology-enabled solutions, and quality customer service, PGX assists consumers with accessing and understanding the information contained in their credit reports, ensures the information contained in those reports is fair, accurate, and substantiated, educates consumers to make better financial decisions and build positive credit, and helps to address other factors that may negatively impact customers' credit scores.

6.      PGX owns the consumer-facing brands and trademarks "Lexington Law," "CreditRepair.com," and "Credit.com."  The Lexington Law brand is licensed to Debtor John C. Heath, Attorney at Law P.C. ("Lexington Law Firm"), an independently-owned Utah professional corporation that provides credit repair legal services directly to its clients.  Through a set of Operating Agreements, PGX provides comprehensive operational support services to Lexington Law Firm, including marketing, custom proprietary software, technology, and administrative services.

7.      Consumers of credit nationwide have benefitted from the life-changing products and services delivered by the Debtors.  Today, the Debtors provide their products and services to their 130,000 current customers who seek options to understand and improve their credit profile. The Debtors' customers, on average, see five negative items removed from their credit reports in just six months.  Overall, 71% of consumers see a credit score increase when using PGX's products.  Of those consumers who saw a credit score increase, 79% saw an average improvement of 40 points in their TransUnion credit score.

8.      Notwithstanding significant growth of the Debtors' businesses in the period leading up to 2016, since that time, these businesses have faced an increasingly challenging operational environment, ongoing litigation with the Consumer Financial Protection Bureau (the "CFPB"), and, ultimately, severe liquidity constraints.

9.      On May 2, 2019, the CFPB filed a complaint against several PGX entities and Lexington Law Firm in the case styled *Bureau of Consumer Financial Protection v. Progrexion Marketing, Inc., et al.*, Case No. 2:19-CV-00298-BSJ (the "CFPB Litigation"), currently pending in the United States District Court for the District of Utah (the "District Court"). The CFPB Litigation alleges the following under five counts: (a) certain violations of 16 C.F.R. § 310.4(a)(2), which is the advance fee provision of the Telemarketing Services Rule (the "TSR"), under Count I, and (b) various unlawful deceptive acts or practices, under Counts II-V. Under Count I of the complaint, the CFPB alleges that the TSR makes it unlawful for the Debtors to bill for credit repair services until (a) the time frame represented for the delivery of all such services has expired and (b) the seller has provided the customer with a credit report demonstrating promised results issued more than six months after such results were achieved. Under Counts II-V, the CFPB alleges, among other things, that various unaffiliated third parties that refer customers to the Debtors have made misleading statements to such customers about the efficacy of the Debtors' services. The Debtors deny the allegations in the CFPB Litigation and for years have vigorously defended the lawsuit.

10.     On March 10, 2023, the District Court granted a partial summary judgment against the Debtors on Count I of the CFPB Litigation. In response to the ruling and upon the expiration of an administrative stay following the ruling, the Debtors shut down approximately 80% of their business, including their call center, and laid off approximately 900 employees, for the purpose of

bringing the business into compliance with the interpretation of the TSR reflected in the District Court's ruling. Although the District Court has not yet made a determination on the remedies resulting from its ruling on Count I, the CFPB has demanded nearly $3 billion in restitution or refunds and other monetary relief and has requested certain injunctive relief.

11.    In 2022, the Debtors had combined annual revenues of approximately $388 million. As of the Petition Date, the Debtors have approximately $4 million in cash on hand. PGX has approximately $423.5 million of funded debt, consisting of:

- approximately $243.5 million under a first lien credit facility secured by substantially all the assets of PGX; and

- approximately $180.0 million under a second lien credit facility secured by the same collateral.

Lexington Law Firm has no prepetition funded debt but it is a defendant to Count I in the CFPB Litigation. John C. Heath, the directing attorney at Lexington Law Firm, owns 99% of its equity, with the other 1% being owned by another attorney licensed in Utah.

12.    The adverse ruling on Count I of the CFPB Litigation and the resulting shuttering of a significant portion of the Debtors' businesses immediately put severe stress on the Debtors' operations. Accordingly, the Debtors retained Kirkland & Ellis LLP ("K&E"), Klehr Harrison Harvey Branzburg LLP, A&M, and Greenhill to assist with contingency planning for potential chapter 11 proceedings. Additionally, both PGX and Lexington Law Firm have appointed independent directors (in the case of Lexington Law Firm, a licensed attorney) to their respective boards and have hired Landis Rath & Cobb LLP ("Landis") and Pachulski Stang Ziehl & Jones LLP ("Pachulski") as conflicts counsel, respectively. The Debtors also retained a consumer privacy expert, Frejka PLLC, to address privacy issues and concerns related to potential business transactions. In particular, Frejka PLLC is reviewing the Debtors' privacy policies, terms and conditions, and related data collection and marketing practices, and interfacing with potential

third parties regarding the collection and permitted uses of personally identifiable information. The Debtors also immediately began engaging with the secured lenders regarding a holistic restructuring transaction to be effectuated through a chapter 11 process, which would include a potential debtor-in-possession financing facility and one or more stalking horse bids for substantially all the assets of PGX.

13.    To that end, shortly before the Petition Date, the Debtors entered into the following prepetition transactions to facilitate these chapter 11 cases:

- **DIP Facility.**  A commitment for a $19.925 million new money super-priority debtor-in-possession financing facility (the "DIP Facility"), including $12 million on an interim basis, to be provided by Blue Torch and Prospect, incurred on a joint and several basis by all Debtors, and secured by a priming lien on substantially all of their assets.  The DIP Facility will also feature a roll-up of prepetition debt in the amount (a) $2.9 million, which corresponds to the amount of the emergency bridge financing provided the week before the Petition Date, subject to entry of the Interim Order, and (b) $39.85 million, subject to entry of the Final Order.  The DIP Facility matures 105 days after the Petition Date.

- **Stalking Horse Bids.**  The Debtors have negotiated and will enter into two asset purchase agreements (together, the "APAs") for each of PGX and Lexington Law Firm.  Under the APAs, a new entity to be formed by the secured lenders will purchase substantially all the assets of PGX and a new entity to be formed by the current equity holders of Lexington Law will purchase substantially all the assets of Lexington Law Firm, subject in each case to a court-approved overbidding process.

- **Restructuring Support Agreement.**  The Debtors also entered into a restructuring support agreement (the "Restructuring Support Agreement") with the secured lenders and equity holders pursuant to which they agreed to contribute certain proceeds of the sale in order to effectuate an orderly wind-down of the Debtors' estates and support a liquidating chapter 11 plan if the Debtors determine that a liquidating chapter 11 plan is in the best interests of the estates.

14.    The DIP Facility, the APAs, and the Restructuring Support Agreement contain the following milestones, among others, for a sale process for substantially all the assets of the Debtors under section 363 of the Bankruptcy Code:[3]

- No later than two (2) calendar days after the Petition Date, the Debtors shall file an appropriate motion with the Bankruptcy Court for the sale of any of the Debtors' assets pursuant to Section 363 of the Bankruptcy Code and the bid procedures (the "Bid Procedures") that establishes a date that is no later than sixty (60) calendar days after the Petition Date as the deadline for the submission of binding bids with respect to their assets;

- No later than four (4) Business Days after the Petition Date, the Bankruptcy Court shall have entered the Interim DIP Order;

- No later than twenty-five (25) calendar days after the Petition Date, the Bankruptcy Court shall have entered the Final DIP Order, subject to the availability of the Bankruptcy Court to conduct the final hearing on the DIP Facility;

- No later than thirty (30) calendar days after the Petition Date, obtain entry by the Bankruptcy Court of an order approving the Bid Procedures (the "Bid Procedures Order"), which order shall be in form and substance acceptable to the DIP Agent at the direction of the Required DIP Lenders;

- No later than sixty-five (65) calendar days after the Petition Date, the Debtors shall commence an auction for the Acquired Assets, in accordance with the Bid Procedures Order; provided that if there is no higher or better offer submitted in comparison to the stalking horse bid(s), no auction shall be held;

- No later than seventy (70) calendar days after the Petition Date, the Bankruptcy Court shall have entered one or more sale order(s) (which shall be in form and substance acceptable to Required DIP Lenders) approving each of the winning bid(s) resulting from such sale(s); and

- Consummation of the sale and transactions contemplated thereby shall occur no later than the date that is one hundred and five (105) calendar days after the Petition Date.

---

[3]    Capitalized terms used but not immediately defined herein have the meanings given to them in the DIP Facility documents or Restructuring Support Agreement documents, as applicable.

15.     Pursuant to this sale process, the Debtors intend to seek court approval of a sale of substantially all of their assets free and clear of all claims, interests, and encumbrances, including obligations stemming from the CFPB Litigation.  Time is of the essence in consummating the sale. The Debtors' businesses, which have been significantly downsized, are rapidly burning cash and cannot afford an extended stay in chapter 11.  The Debtors vigorously negotiated for the largest postpetition financing commitment and longest maturity possible to afford enough time to market their assets, but ultimately were unable to obtain a larger committed amount, longer maturity, or longer milestones than those contained in the DIP Facility.  Absent consummation of a sale on the timeline contemplated by the DIP Facility, I believe the Debtors' businesses would be at significant risk of liquidating, which would cost jobs, erode recoveries for creditors, and prevent hard-working customers from receiving these vital services.

16.     Against that backdrop, the Debtors ultimately commenced these chapter 11 cases to fully and fairly resolve their liabilities in an effective, efficient, expeditious, and centralized forum under the Bankruptcy Code.  The Debtors are singularly focused on preserving value for stakeholders enterprise-wide, preserving jobs, and maintaining the ability to deliver best-in-class credit repair services to enable their customers to maximize their participation in society. The Debtors believe that commencing a sale process as expeditiously as possible and allowing potential purchasers, including the stalking horse bidder, to implement a refreshed strategy for a new business based on the updated interpretation of the law advanced by the CFPB through consummation of one or more in-court restructuring transactions and utilizing the tools of the Bankruptcy Code will maximize the value of the Debtors' estates.

17.    To familiarize the Court with the Debtors, their businesses, the circumstances leading to these chapter 11 cases, and the relief the Debtors seek in the First Day Motions, this Declaration is organized as follows:

- **Part I** provides an overview of the Debtors' corporate history, structure, and business operations;

- **Part II** describes the Debtors' prepetition capital structure;

- **Part III** describes the circumstances leading to the filing of these chapter 11 cases;

- **Part IV** describes the Debtors' proposed debtor-in-possession financing and use of cash collateral; and

- **Part V** and **Exhibit A** attached hereto provides the factual support for the Petitions and the First Day Motions.

<u>**Discussion**</u>

**I.    The Debtors' Corporate History, Structure, and Business Operations.**

**A.    PGX's Corporate History, Structure, and Business Operations.**

18.    There are few business records in a person's life more important than their credit reports with the three major credit reporting agencies, Experian, Equifax, and TransUnion. A spotless credit report and favorable credit score are "must-haves" for consumers looking for competitive car loans, mortgages, credit cards, insurance, and the multiplicity of other credit products consumers use every day to participate in the global economy and society and provide for their families. Credit reporting also impacts consumers' employment opportunities, as many employers run credit checks on potential employees. But despite the critical importance of fair and accurate credit reporting, as many as one in four American consumers carry on with a "potentially material error" on their credit report.[4] Correcting these errors may mean the difference

---

[4]    *See* Statement of Federal Trade Commissioner Julie Brill on the Federal Trade Commission's Sixth and Final Report to Congress Under Section 319 of the Fair and Accurate Credit Transactions Act of 2003, January 21,

between a lower and higher credit risk tier and resulting access to superior credit products, job opportunities, and other benefits for hard-working consumers who are otherwise safe credit risks.

19.     Enter the "credit repair" industry.  PGX was founded more than 20 years ago with three goals:  (a) to establish credit repair as a necessary and full participant in the credit risk analysis and reporting ecosystem; (b) to facilitate expeditious and accurate delivery of credit repair services to consumers through leveraging proprietary, industry-standard predictive technology; and (c) to crystallize credit repair businesses in the mind of the American consumer as an invaluable consumer advocacy service.  In short, PGX was founded to serve as the primary technology-enabled destination for hard working Americans seeking to improve their financial well-being.

20.     Over two decades later, PGX has largely delivered on these goals.  PGX has grown into the premier credit repair services provider in the United States.  In 2012, PGX established the "CreditRepair.com" brand to deliver direct-to-consumer credit report repair services.  In 2015, PGX acquired the "Credit.com" brand, adding to its business one of the first internet-based credit education, information, and products and services companies focused on consumer access to free credit scores and related educational content and tools.  Today, with its headquarters in Salt Lake City, Utah, PGX employs approximately 300 full-time employees, and generated approximately $335 million in revenue in 2022.

---

2015, *available at* https://www.ftc.gov/public-statements/2015/01/statement-commissioner-brill-federal-trade-commissions-sixth-final-report.

21.    PGX's business is divided into four segments, corresponding to products and services offered to consumers:

- ***Awareness and Education***.  PGX offers consumers access to financial products and numerous educational resources to help make smart financial decisions and build positive trade lines.

- ***Credit Repair***.  Credit repair is the principal business unit for PGX and its consumer-facing brand, CreditRepair.com.  The service leverages the Fair Credit Reporting Act and other consumer protection statutes to work directly with creditors and credit bureaus in verifying the information found in consumer credit reports.  Inaccurate or unverifiable information must be removed in accordance with applicable law.  PGX and Lexington Law Firm have been successful in empowering consumers to have consumer reporting agencies remove tens of millions of inaccurate or unverifiable negative items from consumer credit reports.

- ***Credit Care***.  In exchange for a fee, PGX helps consumers understand the information found in their credit reports, while monitoring and protecting that information to prevent the errors that can later require credit repair.  Care services also provide other protections for consumers including identity theft protection.

- ***Lexington Law Firm Services***.  Pursuant to the Operating Agreements, PGX provides Lexington Law Firm with vital non-legal operational support and services. PGX, among other things, advertises and helps engage clients for Lexington Law Firm's credit repair services, in compliance with the rules of professional conduct applicable to Lexington Law Firm.  PGX also provides proprietary software and administrative, operational, and technological support.  Lexington Law Firm pays PGX for these services pursuant to the Operating Agreements.  In the twelve-month period before the Petition Date, PGX derived approximately 87% of its revenue from provision of operating services to Lexington Law Firm.

22.    PGX offers many of its products and services to consumers at no cost, and for those products and services for which it charges, PGX may charge as little as $74.95 per month under contracts cancelable at any time without additional charge, and in all respects compliant with applicable laws and regulations.  The services PGX provides to consumers are hugely impactful: for example, consumers using PGX's CreditRepair.com branded services over the course of just a six-month period see an average of 5 negative items removed from their credit reports.  Overall, 71% of consumers see a credit score increase when using PGX's products.  Of

those consumers who saw a credit score increase, 79% saw an average improvement of 40 points in their TransUnion credit score.

23.     As set forth on the structure chart attached as **Exhibit B**, Debtor PGX Holdings, Inc. is the parent company of PGX, and has 12 wholly-owned direct and indirect subsidiaries, 11 of which are Debtors in these chapter 11 cases.  Non-Debtor PGX TopCo LLC, a subsidiary of non-Debtor publicly-traded closed-end investment company Prospect Capital Corporation ("Prospect"), owns the majority of the equity of Debtor PGX Holdings, Inc. pursuant to that certain Transfer Agreement (as defined below).

**B.     Lexington Law Firm's Corporate History, Structure, and Business Operations.**

24.     John C. Heath, Attorney at Law, P.C. is a Utah-based law firm, organized as a professional corporation under Utah state law, that does business as "Lexington Law."  Lexington Law Firm is independently owned by Utah-licensed attorneys John C. Heath and Eric Kamerath, who serves as the Chief Legal Officer of PGX.  Mr. Heath, who currently serves as the Chief Executive Officer and Directing Attorney at Lexington Law Firm, took on his leadership role at Lexington Law Firm in 2004 and reoriented the primary focus of the firm's practice to consumer credit report repair.  Since Mr. Heath's involvement with the firm, Lexington Law Firm has grown into one of the nation's top providers of legal representation in the consumer credit report repair field.  Servicing 50 states, Lexington Law Firm employs around 13-15 internal attorneys and currently around 50 additional personnel in support of the legal representation for clients.

25.     Lexington Law Firm offers customers a multi-tiered recurring service model, which at all levels of service includes representation and advice related to challenges with the major credit reporting agencies and creditors, assistance with credit inquiries, provision of identity theft insurance through insurance partners, and access to certain proprietary technology tools (many of

which are operated by PGX through the Operating Agreements) that provide customers with customized credit repair advice.

26.     Since 2004, PGX has provided Lexington Law Firm with vital operational support and services pursuant to certain contracts between PGX entities and Lexington Law Firm (collectively, as each may have been amended, restated, supplemented, or otherwise modified from time to time, the "Operating Agreements").  The Operating Agreements consist of the following:

- ***The Software Licensing Agreement.***  Pursuant to that certain Amended and Restated Intellectual Property Licensing and Custom Software Hosting Services Agreement, by and between Progrexion IP, Inc. and Lexington Law Firm, effective as of September 1, 2021 (the "Software Licensing Agreement"), PGX licenses to Lexington Law Firm the "Lexington Law" trademark and other intellectual property, and provides consulting, IT services, proprietary software services, and other services to Lexington Law Firm in furtherance of the operation of Lexington Law Firm's credit repair services business.

- ***The Advertising Agreement***.  Pursuant to that certain Amended and Restated Advertising and Marketing Agreement, by and between Progrexion Marketing, Inc. and Lexington Law Firm, effective as of September 1, 2021 (the "Advertising Agreement"), PGX provides Lexington Law Firm with comprehensive marketing and advertising services, including the provision of internet domain names, advertising and web site content development, web site design, development and hosting services, and other similar services.

- ***The Administrative Services Agreement***.  Pursuant to that certain Amended and Restated Administrative Services Agreement, by and between Progrexion ASG, Inc. and Lexington Law Firm, effective as of September 1, 2021 (the "Administrative Services Agreement"), PGX provides Lexington Law Firm with certain critical shared administrative operational services, including accounting, human resource management, benefits management, payment processing, payroll management, vendor management and negotiation, and intellectual technologies management services.

- ***The Teleservices Outsourcing Agreement***.  Pursuant to that certain Amended and Restated Teleservices Outsourcing Agreement, by and between Progrexion Teleservices, Inc. and Lexington Law Firm, effective as of September 1, 2021 (the "Teleservices Outsourcing Agreement"), PGX provided Lexington Law Firm with certain sales teleservices, including making telephone sales calls on Lexington Law Firm's behalf and in compliance with the rules of professional conduct applicable to Lexington Law Firm, sales script generation, and other supporting teleservices.  As described below, both PGX and Lexington Law Firm have ceased

all telemarketing operations in response to the District Court's recent decision in the CFPB Litigation.

27.     Through the Operating Agreements, Lexington Law Firm pays PGX substantial compensation for operational services based on different compensation formulas.  Compensation and other terms of the Operating Agreements, including the effective period of the Operating Agreements, were amended by the 2017 Amendments to Operating Agreements, by and between Progrexion Holdings, Inc., Progrexion IP, Inc., Progrexion Marketing, Inc., Progrexion ASG, Inc., and Progrexion Teleservices, Inc., and Lexington Law Firm.  In the twelve-month period before the Petition Date, Lexington Law Firm's payment obligations to PGX were $251.6 million on account of the Operating Agreements.  As of the Petition Date, Lexington Law owes PGX approximately $27.9 million on account of the Operating Agreements.  In the context of negotiations with Lenders regarding the DIP financing and sale, Lexington Law and PGX agreed upon certain temporary modifications to the payment terms under the Operating Agreements, while allowing time for the Debtors to figure out an optimal go-forward strategy.  At the closing of a sale, the entity purchasing Lexington Law will assume any amounts outstanding.

28.     As set forth on the structure chart attached as **Exhibit B**, Lexington Law Firm is owned 99% by attorney John C. Heath and 1% by attorney Eric Kamerath, who currently serves as the Chief Legal Officer at PGX.

### C.     Operational Restructuring Efforts in Response to the CFPB Litigation.

29.     Described in more detail below, on March 10, 2023, the United States District Court for the District of Utah granted partial summary judgment against certain of the Debtors, including Lexington Law Firm, finding that those Debtors had violated the advance fee provision of the TSR. Immediately following the ruling, the Debtors began to implement an operational restructuring based on the interpretation of the law advanced by the CFPB, immediately stopping all

telemarketing and closing call centers and instituting a review of billing practices across their businesses. With the assistance of their advisors, the Debtors are in the process of developing additional operational changes in response to the court's decision, with a refreshed focus on mass consumer marketing and development of additional business-to-business relationships.

## II.    The Debtors' Prepetition Capital Structure.

30.    As of the Petition Date, PGX had approximately $423.5 million in total funded debt obligations:

| Funded Debt | Approximate Principal Amount Outstanding |
|---|---|
| First Lien Term Loan | $243.5 million |
| Second Lien Term Loan | $180.0 million |
| **Total Funded Debt Obligations** | **$423.5 million** |

### A.    First Lien Facility.

31.    Debtor PGX Holdings, Inc., as parent and guarantor, and Debtors Progrexion Holdings, Inc., Credit.com, Inc., eFolks Holdings, Inc., and CreditRepair.com Holdings, Inc., as borrowers, and Debtors Progrexion Marketing, Inc., Progrexion Teleservices, Inc., Progrexion ASG, Inc., Progrexion IP, Inc., eFolks, LLC, CreditRepair.com, Inc., and Credit Repair UK, Inc., as guarantors, the lenders party thereto from time to time (the "First Lien Lenders"), and Blue Torch Finance LLC ("Blue Torch"), as administrative agent and collateral agent, are parties to that certain First Lien Financing Agreement, dated as of July 21, 2021,[5] providing for the PGX Debtors' first-lien term loan credit facility (the "First Lien Facility").

---

[5]    For the avoidance of doubt, such agreement was amended by Amendment No. 1 to First Lien Financing Agreement, dated as of July 20, 2022, as further amended by Amendment No. 2 to First Lien Financing Agreement, dated as of December 28, 2022, as further amended by Amendment No. 3 to First Lien Financing Agreement, dated as of March 31, 2023 and as may otherwise be amended, restated, supplemented, or otherwise modified from time to time (the "First Lien Credit Agreement").

32.    Pursuant to the First Lien Credit Agreement, the First Lien Facility is secured on a first-priority basis (subject to customary exceptions) by a lien on substantially all of the assets of the PGX Debtors and the equity of each of the subsidiaries of Debtor PGX Holdings, Inc. The maturity date of the First Lien Facility is July 21, 2026. As of the Petition Date, approximately $243.5 million of principal remains outstanding under the First Lien Facility.

**B.    Second Lien Facility.**

33.    Debtor PGX Holdings, Inc., as parent and guarantor, and Debtors Progrexion Holdings, Inc., Credit.com, Inc., eFolks Holdings, Inc., and CreditRepair.com Holdings, Inc., as borrowers, and Debtors Progrexion Marketing, Inc., Progrexion Teleservices, Inc., Progrexion ASG, Inc., Progrexion IP, Inc., eFolks, LLC, CreditRepair.com, Inc., and Credit Repair UK, Inc., as guarantors, the lenders party thereto from time to time (the "Second Lien Lenders" and, together with the First Lien Lenders, the "Prepetition Lenders"), and Prospect, as administrative agent and collateral agent, are parties to that certain Second Lien Financing Agreement, dated as of July 21, 2021,[6] providing for the PGX Debtors' second-lien term loan credit facility (the "Second Lien Facility" and, together with the First Lien Facility, the "Prepetition Facilities").

34.    Pursuant to the Second Lien Credit Agreement, and as subordinated to the First Lien Credit Agreement under that certain Intercreditor Agreement, dated as of July 21, 2021,[7] the Second Lien Facility is secured on a second-priority basis (subject to customary exceptions) relative to the First Lien Facility by a lien on substantially all of the assets of the PGX Debtors and

---

[6]    As amended by Amendment No. 1 to Second Lien Financing Agreement, dated as of December 28, 2022 and as may otherwise be amended, restated, supplemented, or otherwise modified from time to time (the "Second Lien Credit Agreement").

[7]    As amended by that certain Consent and Amendment No. 1 to Intercreditor Agreement, dated as of December 28, 2022, and as further amended, restated, supplemented or otherwise modified from time to time (the "Intercreditor Agreement").

the equity of each of the subsidiaries of Debtor PGX Holdings, Inc. The maturity date of the Second Lien Facility is July 21, 2027. As of the Petition Date, approximately $180 million of principal remains outstanding under the Second Lien Facility.

### C. PGX's Equity.

35. Before January 29, 2023, H.I.G. Capital, LLC, through its subsidiary H.I.G. Progrexion, LLC ("HIG"), was a majority stockholder of Debtor PGX Holdings, Inc. On December 28, 2022, PGX Holdings, Inc., H.I.G, Progrexion, LLC, and non-Debtor PGX TopCo LLC entered into that certain Transfer Agreement (the "Transfer Agreement"), pursuant to which, effective January 28, 2023, HIG transferred its shares to non-Debtor PGX TopCo LLC. Non-Debtor PGX TopCo LLC is a subsidiary of Prospect.

### III. Events Leading to the Commencement of the Chapter 11 Cases.

36. The Debtors do not take lightly the decision to commence these chapter 11 cases, and they have worked for several years to explore and execute alternative out-of-court restructuring transactions in an effort to maximize value for all stakeholders. The events leading to a restructuring process began in 2016, towards the conclusion of a period of substantial revenue growth at PGX and Lexington Law Firm and the simultaneous acceleration of investigation efforts by the CFPB into alleged unlawful and deceptive business practices. Notwithstanding these and other business challenges, the Debtors, with the assistance of their advisors, have engaged with their stakeholders every step of the way on potential out-of-court solutions, and now come to this Court only at the conclusion of (a) several years of exhaustive review of available pathways, (b) a recent adverse ruling in the CFPB Litigation, (c) a macroeconomic environment that remains difficult for the credit repair industry, and (d) pressure caused by the upcoming termination of the forbearance term under those Forbearance Agreements granted to the Debtors by the Prepetition Lenders. Simply put, these chapter 11 cases are the Debtors' best opportunity to fully and fairly

resolve their liabilities in a manner that preserves value and maintains the Debtors' ability to deliver their consumer-first products and services to their hard-working customer base.

**A.      The CFPB Litigation.**

37.      The principal long-term challenge facing the Debtors' businesses has been the management of potential liability in connection with the CFPB Litigation.

38.      In the years before the Petition Date, one component of the Debtors' sales lead generation process included transfer of telemarketed customer leads to the Debtors from third-party, unaffiliated, and independent financial products and services companies ("Hotswap Partners").  In addition to the Hotswap Partners lead generation process, the Debtors also telemarketed their products and services directly to consumers.  The CFPB has been reviewing these telemarketing operations and Hotswap Partners relationships for nearly a decade, as part of the CFPB's broader investigation efforts to determine whether credit repair companies have engaged in unlawful acts or practices related to the manner in which they market, advertise, or provide credit repair services.  On October 3, 2014, the CFPB issued a Civil Investigative Demand to Lexington Law Firm, seeking materials and information related to Lexington Law Firm's marketing and advertising.  In the years following issuance of the Civil Investigative Demand, Lexington Law Firm fully cooperated with the CFPB's investigation process.  On February 2, 2016, the CFPB sent an additional Civil Investigative Demand to Debtors PGX Holdings, Inc., Progrexion Marketing, Inc., Progrexion Teleservices, Inc., and eFolks, LLC.  The PGX entities likewise fully cooperated with the CFPB's investigation.

39.      Notwithstanding, in September 2017, PGX was notified that the CFPB's Office of Enforcement was considering recommending that the CFPB take legal action against both PGX and Lexington Law Firm.  Attempts to resolve the CFPB's concerns were unsuccessful and, on May 2, 2019, the CFPB filed a complaint in the District Court against Progrexion Marketing, Inc.,

PGX Holdings, Inc., Progrexion Teleservices, Inc., eFolks, LLC, CreditRepair.com, Inc., and Lexington Law Firm (collectively, the "Debtor Defendants"), amended by complaint filed on August 17, 2022, on five counts:

- ***Alleged Violation by the Debtor Defendants of the TSR Advance Fee Provision ("Count I")***. The CFPB alleges that the Debtor Defendants committed ongoing violations of 16 C.F.R. § 310.4(a)(2), the advance fee provision of the TSR, beginning on March 8, 2016, by their billing practices. The advance-fee provision of the TSR is a Federal Trade Commission rule that purports to prohibit an organization from billing for credit repair services until the time frame represented for the delivery of all such services has expired and the seller has provided the customer with a credit report demonstrating promised results, issued more than six months after such results were achieved.

- ***Alleged Deceptive Acts or Practices in Violation of the Consumer Financial Protection Act of 2010 ("Count II")***. The CFPB alleges that the Debtor Defendants (excluding Lexington Law Firm), through their marketing activities and conduct related to their Hotswap Partner relationships, engaged in deceptive acts or practices in violation of 12 U.S.C. §§ 5531 and 5536(a)(1)(B).

- ***Alleged False or Misleading Statements Made to Induce Payment for Goods or Services in Violation of the TSR ("Count III")***. The CFPB alleges that the Debtor Defendants (excluding Lexington Law Firm), in connection with their telemarketing of Lexington Law Firm and the CreditRepair.com branded services and arrangements with their Hotswap Partners made certain false or misleading statements in violation of 16 C.F.R. § 310.3(a)(4) of the TSR.

- ***Alleged Substantial Assistance of a Covered Person Engaged in Deceptive Acts or Practices in Violation of the Consumer Financial Protection Act of 2010 ("Count IV")***. The CFPB alleges that the Debtor Defendants (excluding Lexington Law Firm) unlawfully knowingly or recklessly provided substantial assistance to certain Hotswap Partners, allegedly covered persons or service providers under 12 U.S.C. § 5481(6)(A), in violations of the Consumer Financial Protection Act of 2010, 12 U.S.C. §§ 5531 and 5536(a)(1)(B).

- ***Alleged Assistance and Facilitation of Violations of the TSR ("Count V")***. The CFPB alleges that the Debtor Defendants (excluding Lexington Law Firm) engaged in a deceptive acts or practices by providing substantial assistance or support to certain Hotswap Partners, alleged "telemarketers" as defined by 16 C.F.R. § 310(ff), in violations of the TSR, 16 C.F.R. § 310.3(a)(4).

40.     The Debtors maintain that they have not violated any law or regulation and that the operation of their businesses has been fully consistent with applicable laws and regulations, as they

have been interpreted historically since before 2000.[8]  The CFPB Litigation has continued for nearly four years since the CFPB's initial complaint.  However, on March 10, 2023, the District Court granted the CFPB's motion for summary judgment on Count I, finding in favor of the CFPB and holding that the Debtor Defendants violated the advance fee provision of the TSR.

41.     While the Debtor Defendants appealed the partial summary judgment ruling to the United States Court of Appeals for the Tenth Circuit (the "Tenth Circuit"), the Tenth Circuit denied the Debtors Defendants' request for a stay on April 3, 2023, and the District Court followed on April 6, 2023.  The administrative stay on the District Court's judgment has been lifted, and the Debtors filed *Defendants' Notice of Withdrawal of Motion to Certify the Court's Order for Interlocutory Appeal*, withdrawing the interlocutory appeal and reserving all rights to appeal a final judgment or other future appealable order.  The District Court is currently considering the CFPB's *Motion for Award of Monetary and Injunctive Relief, Assessment of Civil Money Penalties, and Entry of Final Judgment Against All Defendants on Count I*, which seeks, among other things, prospective injunctive relief enjoining future violations of the advance fee provision and over $2.7 billion in monetary relief from the Debtor Defendants.  Litigation on Counts II-V is pending, and the parties are to report back to the Court in the coming weeks on their efforts to resolve those counts.

   **B.      Other Business Challenges.**

42.     ***Google's Ban on Paid Credit Repair Services Ads.***  One of the Debtors' primary and most effective tools to attract new consumers is online advertising.  Historically, a notable

---

[8]     While the "advance fee" provision was designed by the FTC over 25 years ago to protect against a breed of predatory credit repair companies, the rule has rarely been invoked in recent years.  A federal statute enacted a year later, the Credit Repair Organizations Act (15 U.S.C. § 1679 et seq.), provides the fundamental guidelines for how credit repair companies can charge consumers, and PGX and Lexington Law Firm have been in compliance with these fundamental guidelines.

percentage of the Debtors' new leads have come from paid advertising on Google.  In November 2019, Google announced that it would update its policies to restrict the advertisement of credit repair services.  Since then, paid ads for credit repair services are no longer allowed.  This policy applied globally to all accounts that advertised credit repair services directly, to lead generators, and to those who connect consumers with third-party services.  With more than 93% market share, Google consistently dominates the market shares of all search engines worldwide.  As a result of Google's new policy, the Debtors lost the opportunity to reach hundreds of thousands of potential consumers.  In June 2022, Google updated the enforcement procedures for repeat violations of the ban and began implementing a strike-based system for the credit repair services policies. In addition to penalties that progressively increase with each violation, businesses that continue to advertise credit repair services receive strikes.  When a business reaches three strikes, the three-strike system automatically puts it on a "red list," permanently prohibiting it from advertising its business.  The Google policy change has been significantly detrimental to the Debtors' business. Combined with the effects of the CFPB Litigation on the Debtors' sales and marketing processes, this policy has the effect of cutting off the Debtors from large swaths of the market for their products and services.

43.     ***Challenging Macroeconomic Conditions for the Credit Repair Industry.*** Macroeconomic conditions continue to contribute to challenging environment for the Debtors, placing pressure on core credit repair demand.  For example, in 2022, the average FICO credit score in the U.S. reached an all-time high of 726, following eleven consecutive years of increase. Unemployment is at its lowest level in fifty years.  And overall, demand for credit has softened: according to the January 2023 Senior Loan Officer Opinion Survey on Bank Lending Practices, banks reported that demand for loans to households, including credit card, auto, and other

consumer loans, has weakened relative to prior months.  Each of these trends has reduced demand for credit repair services, relative to prior years.

44.     ***Deteriorating Financial Performance at PGX.***  PGX operations have failed to rebound from continual declines that began in 2019, and the business model changes occasioned by the CFPB Litigation will accelerate this trend.  PGX's internal forecast of liquidity projects negative net operating cash flow for the next six months, and absent the debtor-in-possession financing discussed herein, the Debtors' existing liquidity is expected to be exhausted in early June.

45.     ***Challenging Contractual Obligations at Lexington Law Firm.***  The current internal forecast of liquidity for Lexington Law Firm projects that the firm will not be able in the near time to satisfy its contractual obligations to pay PGX for the support services PGX provides to the firm.  This will increase obligations owed to PGX over time.  Given that PGX derives approximately 87% of its revenue from the provision of operating services to Lexington Law Firm, changes in Lexington Law Firm's liquidity will have an immediate effect on PGX and the PGX Debtors.

### C.     Prepetition Negotiations and Transactions at PGX.

46.     The Debtors have been engaged for several years with advisors and stakeholders to address these business challenges and the uncertainty and potential liabilities associated with the CFPB Litigation.  In 2019, when the CFPB investigation intensified, the Debtors' businesses came under significant stress financially, with projections at the time showing a business at PGX unable to sustain its then-existing debt burden.  In response to these challenges, beginning in June 2019, PGX engaged restructuring advisors—including K&E as restructuring counsel and A&M as financial advisor—to begin initial evaluation of potential alternatives, including consideration of in-court and out-of-court transaction structures.  In September 2019, PGX and its advisors

determined that it was in the best interests of the company to appoint Mr. Neal Goldman as a disinterested director to the board of directors of Debtor PGX Holdings to assist in review and consideration of potential transactions and any potential conflict matters.

47.     ***The 2020 "Amend and Extend" Transaction.***   Through 2019 and early 2020, PGX's financial health continued to decline, which was largely compounded with the stress and uncertainty surrounding the beginning of the COVID-19 pandemic.   After extensive negotiations through 2019 and early 2020 with an *ad hoc* group of first lien lenders, Prospect (as PGX's principal second lien lender at the time), and HIG (as PGX's equity sponsor at the time), PGX consummated an "amend and extend" transaction whereby PGX obtained a three-year maturity extension of its credit facilities, $15.85 million of incremental liquidity through a new money "1.5 lien" credit facility provided by HIG used to fund existing debt paydown and general operations, amended covenants, and a decreased junior cash debt service burden through conversion of interest and amendment fees to payments in kind.   The amend and extend transaction was executed with unanimous lender consent and provided PGX with runway to navigate the uncertainties surrounding the ongoing high-stakes litigation and provided PGX a position of strength to continue to serve the hard-working customers during the pandemic.

48.     ***Interim Refinancing, Entry into the First and Second Lien Credit Facilities, and Continued Runway.***   Following the amend-and-extend in 2020, the PGX Debtors entered into the existing First Lien Facility and the existing Second Lien Facility as part of a comprehensive refinancing of PGX's capital structure in July 2021.   Through the refinancing transaction, PGX achieved certain interest expense savings and extended maturity dates relative to the previous first- and second- lien facilities.   The "1.5 lien" credit facility was paid down in full through proceeds

of the transaction.  The refinanced First Lien Facility and Second Lien Facility included additional liquidity tests to apply in the event of a judgment or resolution of the CFPB Litigation.

49.     ***COVID Stimulus Payment.***    In addition to the refinancing transaction, 2020 became a record-breaking year for PGX in terms of revenue and profitability due to the federal stimulus payments made pursuant to the Coronavirus Aid, Relief and Economic Security Act. However, the effect of the stimulus payment was temporary and by the latter half of 2021 the macroeconomic environment shifted again, creating challenges for the Debtors' business.

**D.    Recent Operational, Governance, and Financial Developments at the Debtors.**

50.     ***PGX's Prepetition Restructuring Transactions.***    By the fall of 2022, with persistent headwinds to the credit repair industry, as the temporary benefits of the COVID stimulus payments waned, and with the overhang of the ongoing CFPB Litigation, PGX again faced an imminent liquidity need and the likelihood of defaults under the First Lien Facility and the Second Lien Facility with respect to liquidity covenant tests and interest payments.  In September 2022, PGX re-engaged with its advisors to explore possible recapitalization or restructuring transactions. Following preliminary discussions with key stakeholders throughout the capital structure, Prospect approached PGX with a transaction proposal whereby, in exchange for amendments to the credit facilities that would provide certain covenant relief and additional liquidity to ameliorate the liquidity crunch, HIG would transfer its equity ownership in PGX to an entity formed for the benefit of the Second Lien Lenders.

51.     Negotiations surrounding this framework would eventually culminate in the December 28, 2022 transactions, which included (i) the Transfer Agreement discussed above, by which Prospect (through PGX TopCo, LLC) obtained majority equity ownership in PGX; (ii) the provision of $45 million of new liquidity by the First Lien and Second Lien Lenders, which included $15 million of an incremental term loan funded on December 28, 2022, and an additional

$30 million of incremental funding through a delayed draw term loan construct to provide additional liquidity for the business in the first quarter of 2023; and (iii) amendments to the terms of the Prepetition Facilities resulting in reduced debt-service costs.  The transactions also provided for a smaller, reconstituted board of directors at PGX Holdings, Inc., consisting of four members including Seb Cervinka, as Chairman; Michael DeVico, President and Chief Executive Officer of PGX; and the two existing disinterested directors at the time, Mr. Goldman and Mr. David Gibbons.

52.    ***Necessary Operational Pivots in Light of the CFPB Litigation Adverse Ruling.*** As described above, on March 10, 2023, the District Court entered summary judgment in favor of the CFPB on Count 1 in the CFPB Litigation, setting up a potential damages exposure for the Debtors of more than $2.7 billion, should the CFPB prevail on its requested relief in the near-term. While the Defendants evaluated all options in response to this adverse ruling, the Debtors ceased all telemarketing activities and monthly billing for over 80% of their credit repair clients, i.e. those who signed up for services over the phone.

53.    The resulting change to the Debtors' operations drastically altered the Debtors' liquidity outlook.  In addition to looming liabilities as a result of the CFPB Litigation, the PGX Debtors faced a $7.7 million interest payment under their existing Prepetition Facilities, due March 31, 2023.  PGX requested that Prospect fund the $30 million of delay draw term loans; however, Prospect did not fund, citing that the Company had not satisfied all conditions precedent to such advance.  The Company defaulted on March 31, 2023 but these developments brought all stakeholders back to the negotiating table.

54.    The Debtors engaged with First Lien Lenders and Prospect to chart a value-maximizing path forward.  Given the Debtors' need to right-size their operations and capital

structure to align with their revised business plan, obtain a much-needed capital infusion to implement this business plan, and emerge from the overhang of the CFPB Litigation, the Debtors and stakeholders determined that chapter 11 would be the best path forward.  Cognizant of the fact that the business could not withstand a long, protracted bankruptcy process, the Debtors worked to develop a path that will maximize value for all stakeholders and allow a potential purchaser to utilize the Company's assets to focus on helping hard-working Americans improve their credit.

55.    To conserve cash, the board of directors of PGX Holdings, Inc. determined, in its reasonable business judgment, that the prudent course of action was to not make the interest payment due on March 31, 2023, while comprehensive restructuring discussions commenced.  The PGX Debtors negotiated a short forbearance with the Prepetition Lenders, entering into successive forbearance agreements with respect to the Prepetition Facilities (collectively, the "<u>Forbearance Agreements</u>") effective through June 4, 2023.  With the Forbearance Agreements in hand, the PGX Debtors quickly pivoted to the larger task at hand, negotiating a comprehensive restructuring transaction.

### E.    The Proposed Restructuring Transaction.

56.    ***The Restructuring Support Agreement.***  Although aligned on the general guiding principles, the Debtors, First Lien Lenders, and Prospect engaged in a series of negotiations to implement a comprehensive restructuring transaction.  While tenuous at times, these hard-fought negotiations ultimately proved fruitful.  On June 4, 2023, the Debtors, each of the First Lien Lenders, and Prospect (in its capacity as Second Lien Lender and majority equityholder) executed a Restructuring Support Agreement, attached hereto as **<u>Exhibit C</u>**.  As contemplated by the Restructuring Support Agreement, the Debtors commenced these chapter 11 cases to execute a value-maximizing section 363 sale to sell these assets free and clear of all claims and interests, followed by a liquidating chapter 11 plan if the Debtors determine that a liquidating chapter 11

plan is in the best interests of the Debtors' estates. Time is of the essence. While the Debtors negotiated for as much runway as possible, the lenders emphasized the need for discipline given the Debtors' liquidity profile. Accordingly, the milestones set forth in the Restructuring Support Agreement and debtor-in-possession financing (as described further below) contemplate a brief but robust postpetition marketing process and sale.

57.     *The Bid Procedures*. In parallel with the negotiations for the Restructuring Support Agreement, the Debtors and their advisors negotiated entry into separate stalking horse purchase agreements with (a) PGX Asset-BidCo for substantially all of the assets of PGX Holdings, Inc. and its subsidiaries and (b) Lexington Law-BidCo for substantially all of the assets of Lexington Law Firm, against which higher or otherwise better offers may be sought, providing a clear path to consummate a transaction. The stalking horses, described in greater detail in the Bid Procedures Motion (filed substantially contemporaneously herewith), set the floor for a competitive bidding process, where topping bids could yield additional value that would inure to the benefit of all stakeholders. The Debtors have already begun engaging with interested parties and will market test the stalking horse bids to ensure that the Debtors obtain the highest or otherwise best offer or combination of offers for substantially all of the business assets or some or all of their assets. If approved, the proposed Bid Procedures will enable the Debtors to expeditiously sell their assets free and clear of liens, claims, rights, interests, pledges, obligations, restrictions, limitations, charges, encumbrances, and other interests and wind up the chapter 11 cases shortly thereafter.

58.     *Strengthening Corporate Governance*. To ensure that the entire restructuring process is fair and efficient, the Debtors have implemented strong governance protocols. Mr. Eugene Davis was appointed as a disinterested director to the board of PGX Holdings, Inc. in April 2023. He replaced prior disinterested directors at that entity. He has retained Landis as

conflicts counsel to advise on any matters where PGX may have an interest adverse to Lexington Law Firm.  At Lexington Law Firm, Mr. Roger Meltzer, licensed attorney, was appointed as a disinterested director in May 2023.  He has retained Pachulski as conflicts counsel to advise on any matters where Lexington Law Firm may be adverse to PGX.  With these governance safeguards in place, the Debtors are ready to navigate the chapter 11 process swiftly.

## IV.    The Proposed Debtor in Possession Financing.

59.    To provide the Debtors with liquidity to commence a smooth landing into these chapter 11 cases, the Prepetition First Lien Lenders agreed to provide the DIP Facility, following the funding of $2.9 million in emergency bridge financing the week prior to the Petition Date, as well as access to prepetition cash collateral (the "Cash Collateral").  The DIP Facility and access to Cash Collateral will provide the Debtors with the necessary liquidity to fund their business operations and administrative expenses during these chapter 11 cases.

### A.    Need for DIP Financing.

60.    As discussed throughout this Declaration, the Debtors' need for immediate liquidity in the form of the proposed DIP Facility is largely driven by operational challenges exacerbated by a potentially significant judgment liability in the CFPB Litigation.  The DIP Facility was carefully negotiated and will provide cash to administer these chapter 11 cases, fund the business, pay vendors in the ordinary course, and ensure that wages, taxes, and other obligations are paid. The DIP Facility is the best available financing under the circumstances.  Access to such financing at this time is mission critical for executing on the more comprehensive restructuring transactions discussed above.  The Roll-Up is an integral component of the DIP Facility and was required by the DIP Lenders as consideration for the extension of postpetition financing and the prepetition bridge financing.

### B.    The Debtors' Proposed Use of Cash Collateral.

61.    Pursuant to the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (the "DIP Motion"), the Debtors also seek the continued use of the Prepetition Lenders' Cash Collateral to provide sufficient liquidity for their operations during these chapter 11 cases.  Without access to Cash Collateral, the Debtors would be unable to operate their business and administer their estates, and their stakeholders would be immediately and irreparably harmed as a result.  Authorization to use Cash Collateral during the duration of these chapter 11 cases will provide the Debtors with sufficient liquidity to continue operating as a going-concern and to maintain relationships with key vendors and personnel, continue to provide services to their customers, and pay wages to employees.

62.    In consideration for the consensual use of Cash Collateral, the Debtors have agreed to provide the Prepetition Lenders with adequate protection as set forth in the DIP Motion and the accompanying proposed interim order.  The Debtors' use of Cash Collateral will generally be subject to the same milestones agreed upon in the DIP Facility.  In addition, the Debtors have agreed on additional reporting covenants for the benefit of the prepetition agent and DIP agent, including rights to participate in calls with the Debtors' management and cooperation with the Debtors' financial advisors.  During these calls, the confidentiality of the Lexington Law Firm clients will be fully protected.

## V.    Evidence in Support of First Day Motions.

63.    Contemporaneously herewith, the Debtors have filed a number of First Day Motions seeking orders granting various forms of relief intended to stabilize the Debtors' business

operations, facilitate the efficient administration of these chapter 11 cases, and expedite a swift and smooth restructuring of the Debtors' balance sheet.

64.     The First Day Motions request authority to pay certain prepetition claims.  I understand that Federal Rule of Bankruptcy Procedure 6003 provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first 21 days following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate and irreparable harm."  In light of this requirement, the Debtors have narrowly tailored their requests for immediate authority to pay certain prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates. Other relief will be deferred for consideration at a later hearing.

65.     I am familiar with the information contained in each First Day Motions and believe that the relief sought in each motion (a) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption or loss of productivity and value, (b) constitutes a critical element for the Debtors to successfully implement a chapter 11 strategy, and (c) best serves the Debtors' estates and creditors' interests.  A description of the relief requested and the facts supporting each of the First Day Motions is detailed in **Exhibit A**.

*[Remainder of Page Intentionally Left Blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing

statements are true and correct to the best of my knowledge, information, and belief.


Dated: June 4, 2023                    _/s/ Chad Wallace_____
Salt Lake City, Utah                   Name:  Chad Wallace
                                       Title:   Chief Executive Officer and President, PGX
                                                Holdings, Inc.

**<u>Exhibit A</u>**

**Evidentiary Support for First Day Motions**

## EVIDENTIARY SUPPORT FOR FIRST DAY MOTIONS[1]

I.    **Administrative and Procedural Motions.**

    A.    **Motion of Debtors for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief (the "Joint Administration Motion").**

    1.    Pursuant to the Joint Administration Motion, the Debtors seek entry of an order directing procedural consolidation and joint administration of these chapter 11 cases.  Given the integrated nature of the Debtors' operations, and the fact that each of the Debtors will be obligors on the Debtors' proposed DIP financing, joint administration of these chapter 11 cases will provide significant administrative convenience without harming the substantive rights of any party in interest.  Through a set of Operating Agreements, PGX provides comprehensive operational support services to Lexington Law Firm, including marketing, custom proprietary software, technology, and administrative services.  Many of the motions, hearings, and orders in these chapter 11 cases will affect each Debtor entity.  The entry of an order directing joint administration of these chapter 11 cases will reduce fees and costs by avoiding duplicative filings, objections, or multiple hearings on common issues.  Joint administration will also allow the United States Trustee and all parties in interest to monitor these chapter 11 cases with greater ease and efficiency.

    2.    Moreover, joint administration will not adversely affect the Debtors' respective constituencies because the Joint Administration Motion seeks only administrative, not substantive, consolidation of the Debtors' estates.  I believe that parties in interest will not be harmed by the relief requested; instead, parties in interest will benefit from the cost reductions associated with the joint administration of these chapter 11 cases.  Accordingly, I believe that the joint

---

[1]    Capitalized terms used but not defined have the meanings ascribed to them in the applicable First Day Motion filed contemporaneously herewith.  All exhibits attached to the applicable First Day Motion or interim or final order thereof are incorporated by reference herein.

administration of these chapter 11 cases is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.

**B.      Motion of Debtors for Entry of an Order (I) Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, Statements of Financial Affairs, and Rule 2015.3 Financial reports and (II) Granting Related Relief (the "SOFA Motion").**

3.      Pursuant to the SOFA Motion, the Debtors seek entry of an order (a) extending the deadline by which the Debtors must file their schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs as required by section 521 of  the Bankruptcy Code and rule 1007 of the Bankruptcy Rules (collectively, the "Schedules and Statements") by thirty days, in addition to the extension provided by rule 1007-1(b) of the Local Rules, for a total of fifty-eight days from the Petition Date, to and including August 1, 2023, without prejudice to the Debtors' ability to request additional extensions for cause shown, (b) extending the deadline by which the Debtors must file their initial reports of financial information with respect to entities in which the Debtors hold a controlling or substantial interest as set forth in Bankruptcy Rule 2015.3 (the "2015.3 Reports"), or to file a motion with the Court seeking a modification of such reporting requirements for cause, to the later of (i) thirty days after the meeting of creditors to be held pursuant to section 341 of the Bankruptcy Code (the "341 Meeting") or (ii) forty-four days from the Petition Date, without prejudice to the Debtors' ability to request additional extensions, and (c) granting related relief.

4.      Good and sufficient cause exists for granting an extension of time to file the Schedules and Statements.  The ordinary operation of the Debtors' business requires the Debtors to maintain voluminous books, records, and complex accounting systems.  To prepare the Schedules and Statements, the Debtors must compile information from books, records, and

documents relating to a myriad of claims of their creditors, many of whom are customers, and the Debtors' many assets and contracts. This information is extensive and located in numerous places throughout the Debtors' organization. Collecting the necessary information requires an enormous expenditure of time and effort on the part of the Debtors, their employees, and their professional advisors in the near term.

5.      Given the substantial burdens already imposed on the Debtors' management by the TSR ruling, the ongoing CFPB litigation, and commencement of these chapter 11 cases, the competing demands upon the Debtors' employees to collect information, and the time and attention the Debtors must devote to the restructuring process, the Debtors submit that good cause exists to extend the current deadline by thirty days, until fifty-eight days after the Petition Date. The requested extension will enhance the accuracy of the Schedules and Statements when filed and help avoid the potential necessity of substantial subsequent amendments. The Debtors request such an extension without prejudice to their rights to seek further extensions or waivers from the Court for cause shown. Moreover, an extension will not harm creditors or other parties in interest because, even under the extended deadline, the Debtors will file the Schedules and Statements in advance of any deadline for filing proofs of claim in these chapter 11 cases.

6.      Further, certain of the Debtors maintain an interest in a non-debtor subsidiary that is subject to Bankruptcy Rule 2015.3 and, as such, are required to file 2015.3 Reports. The Debtors are not in a position to complete the initial 2015.3 Report within the time required under Bankruptcy Rule 2015.3 due to (a) the size, complexity, and geographic scope of the Debtors' businesses, (b) the substantial burdens imposed by complying with Bankruptcy Rule 2015.3 in the early days of these chapter 11 cases, and (c) the same considerations supporting an extension of

the date by which to file the Schedules and Statements.  Cause accordingly exists to extend the deadline for filing the initial 2015.3 Report as requested in the SOFA Motion.

7.      Extending the deadline to file the initial 2015.3 Report will enable the Debtors to work with their advisors and the United States Trustee for the District of Delaware (the "U.S. Trustee") to determine the appropriate nature and scope of the reports and any proposed modifications to the reporting requirements established by Bankruptcy Rule 2015.3.  Accordingly, the Debtors respectfully request that the Court grant an extension of the time by which the Debtors must file their initial 2015.3 Reports to the later of (a) thirty days after the 341 Meeting, or (b) forty-four days from the Petition Date pursuant to Bankruptcy Rule 2015.3(d).

8.      Accordingly, I believe that the relief sought in the SOFA Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.

**C.      Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor, (B) File a Consolidated List of the Debtors' Thirty Largest Unsecured Creditors, (C) Serve Parties in Interest by Email, (D) Approve the Form and Manner of Service of the Notice of Commencement, (E) Redact or Withhold Certain Confidential Information, and (F) Redact Certain Personally Identifiable Information and (II) Granting Related Relief (the "Creditor Matrix Motion").**

9.      Pursuant to the Creditor Matrix Motion, the Debtors seek entry of interim and final orders (i) authorizing, but not directing, the Debtors to (a) file a consolidated list of creditors in lieu of submitting a separate mailing matrix for each Debtor, (b) file a consolidated list of the Debtors' thirty largest unsecured creditors in lieu of filing lists for each Debtor, (c) serve certain parties in interest by email, (d) approve the form and manner of service of the notice of commencement of these chapter 11 cases, (e) redact or withhold certain confidential information of customers, and (f) redact certain personally identifiable information and (ii) granting related relief.

10.     Requiring the Debtors to segregate and convert their computerized records to a Debtor-specific creditor matrix format would be an unnecessarily burdensome task and could result in duplicative mailings.

11.     Because the Top 20 Lists of the Debtors could overlap, and certain Debtors may have fewer than thirty significant unsecured creditors, filing separate Top 20 Lists for each Debtor would be of limited utility.  In addition, compiling separate Top 20 Lists for each individual Debtor could consume an excessive amount of the Debtors' and their advisors' limited time and resources. I believe that the consolidated Top 30 List will better aid the U.S. Trustee in its efforts to communicate with these creditors and form an official committee of general unsecured creditors.

12.     The Debtors currently serve approximately 130,000 customers and have provided services to a total of approximately two million customers over the last two years.  Thus, a significant portion of the parties that need to be provided notice in these chapter 11 cases consist of the Debtors' customer base.  Because the Debtors operate an e-commerce platform, the Debtors typically interact with their customers online through web-based applications and email. Specifically, customers agree to transact with the Debtors electronically as part of the terms of service, which includes customers certifying that they have access to the Internet and agreeing to receive important notices to a provided up-to-date, valid email address.  Accordingly, the Debtors request authority to serve their creditors by email, where an email address is available to the Debtors.

13.     Based on discussions with KCC, the Debtors understand that serving customers physical mailings solely of the Notice of Commencement would cost more than approximately $3 million.  I believe such mailings would be cost-prohibitive in light of the aggregate amount of the DIP financing for these chapter 11 cases.  Accordingly, the Debtors seek authority to provide

service of the Notice and other pleadings to customers via email, which was the customary form of communication with their customers prior to the Petition Date. In addition, email service will help alleviate administrative burdens. Not only is email service likely the most efficient and cost-effective manner by which service of all interested parties can be completed, it is also the most likely to facilitate creditor responses because, with only rare exceptions, the customer base currently receives all notices electronically from the Debtors.

14.     The Debtors and I believe that using KCC to promptly provide notices to all applicable parties will maximize efficiency in administering these chapter 11 cases and will ease administrative burdens that would otherwise fall upon the Court and the U.S. Trustee. Additionally, KCC will assist the Debtors in preparing creditor lists and mailing initial notices, and, therefore, it is more efficient to authorize KCC to mail the Notices. Accordingly, KCC should undertake such mailings and email service.

15.     Confidential commercial information, including the names and all associated identifying information of the Debtors' clients and customers, is the single most important asset of the Debtors' business, and publicly revealing that information risks the Debtors' relationships with their clients. The Debtors help customers repair their credit and achieve their credit goals. This is a relationship in which customers value their privacy. Revealing the identity of such customers at this critical junction may put these customer relationships at risk and jeopardize the Debtors' go-forward business. The Debtors' customer list, and related customer data, is an important and valuable asset of the Debtors, and it is vital that the Debtors maintain their customer list in strict confidence.

16.     The Debtors do business in California and the Debtors' annual gross revenue for 2022 was $388 million.

17.    The Debtors do business in Utah, had operations there within the last year, and, in 2022, controlled the personal data of 100,000 or more consumers and had annual gross revenue of $388 million.

18.    The Debtors in these chapter 11 cases are unique in that they operate a law firm with office locations in Salt Lake City, Utah, and Phoenix, Arizona, and service clients in all fifty states, which implicates certain obligations under legal ethical cannons and rules that mandate that client information be kept confidential.  The attorneys of Lexington Law are subject to legal ethical rules governing the confidentiality of client information.

19.    Accordingly, I believe that the relief sought in the Creditor Matrix Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.

**D.    Application of Debtors for Authorization to Employ and Retain Kurtzman Carson Consultants LLC as Claims and Noticing Agent Effective as of the Petition Date (the "<u>KCC Retention Application</u>").**

20.    Pursuant to the Kurtzman Carson Consultants LLC 156(c) Retention Application, the Debtors seek entry of an order appointing Kurtzman Carson Consultants LLC ("<u>KCC</u>") as claims, noticing, and solicitation agent (the "<u>Claims and Noticing Agent</u>") for the Debtors in their chapter 11 cases, effective as of the Petition Date to, among other things, (i) prepare and serve required notices and documents in these chapter 11 cases; (ii) maintain an official copy of the Debtors' schedules of assets and liabilities and statements of financial affairs; (iii) furnish a notice to all potential creditors of the last date for filing proofs of claim and a form for filing a proof of claim, after such notice and form are approved by the Court, and notify such potential creditors of the existence, amount and classification of their respective claims as set forth in the Schedules; (iv) maintain a post office box or address for the purpose of receiving claims and returned mail, and process all mail received; (v) prepare and file, or cause to be filed, with the Clerk an affidavit or certificate of service; (vii) process all proofs of claim received; and (viii) maintain the official

claims register for each Debtor, in each case, pursuant to the terms of the engagement agreement, dated May 4, 2023, between the Debtors and KCC.

21.     Based on my discussions with the Debtors' advisors, I believe that the Debtors' selection of KCC to act as the Claims and Noticing Agent is appropriate under the circumstances, is in the best interests of the estates, and satisfies the Claims Agent Protocol.  Moreover, it is my understanding, based on all engagement proposals obtained and reviewed, that KCC's rates are competitive and comparable to the rates charged by their competitors for similar services.

22.     The Debtors anticipate that there will be thousands of persons and entities to be noticed in these chapter 11 cases.  In light of the number of parties in interest and the complexity of the Debtors' business, the appointment of a claims and noticing agent is in the best interests of the Debtors' estates, their creditors, and all other parties in interest because it will provide the most effective and efficient means of, and relieve the Debtors and/or the Clerk's office of the administrative burden of, noticing and processing proofs of claim.

**E.**     **Motion of Debtors for Entry of Interim and Final Orders (I) Approving Notification and Hearing Procedures for Certain Transfers of and Declarations of Worthlessness with Respect to Common Stock and (II) Granting Related Relief (the "NOL Motion").**

23.     Pursuant to the NOL Motion, the Debtors seek entry of interim and final orders: (a) approving certain notification and hearing Procedures related to certain transfers of, or declarations of worthlessness with respect to, PGX Holdings, Inc.'s existing classes of Common Stock and with respect to John C. Heath, Attorney at Law PC's existing classes of Common Stock or any Beneficial Ownership therein; (b) directing that any purchase, sale, other transfer of, or declaration of worthlessness with respect to Common Stock in violation of the Procedures shall be null and void *ab initio*; and  (c) granting related relief.

24.     PGX currently estimates that, as of December 31, 2022, it had approximately $39.1 million of state NOLs and approximately $110 million of 163(j) Carryforwards.  Separately, Lexington Law currently estimates that, as of December 31, 2022, it had approximately $14 million of federal NOLs, approximately $8.7 million in state NOLs, and approximately $309,000 of general business credits (together, with PGX's tax attributes and certain other tax attributes, the "Tax Attributes").[2]  The Debtors may generate additional Tax Attributes in the 2023 tax year, including during the pendency of these chapter 11 cases.  The Tax Attributes are potentially of significant value to the Debtors and their estates because the Debtors may be able to utilize the Tax Attributes to offset any taxable income, including any such taxable income generated by transactions consummated during these chapter 11 cases (including with respect to any taxable disposition of some or all of the Debtors' assets).  Additionally, depending on the structure utilized in the Plan, in the event any of the Debtors' Tax Attributes were to survive, the Debtors may be able to carry forward certain of those Tax Attributes to offset federal taxable income or federal tax liability in future years.  The relief requested is expected to preserve the value of the Tax Attributes to the benefit of the Debtors' stakeholders.

25.     Additionally, the Debtors seek to establish procedures only to monitor those types of transactions that would pose a serious risk under the ownership change test pursuant to sections 382 and 383 of the IRC and to preserve the Debtors' ability to seek substantive relief if it appears that a proposed transfer or declaration of worthlessness could jeopardize the Debtors' utilization of the Tax Attributes.  Because the Tax Attributes are of significant value to the Debtors and their estates, an ownership change of Common Stock may negatively impact the Debtors' utilization of the Tax Attributes.  Accordingly, it is necessary to closely monitor certain

---

[2]     Amounts are estimates and subject to change.

transfers of Common Stock so as to be in a position to act expeditiously to prevent such transfers, if necessary, with the purpose of preserving the Tax Attributes.  The Debtors also propose that the Court direct that any purchase, sale, other transfer of, or declaration of worthlessness with respect to Common Stock in violation of the Procedures be null and void *ab initio*.

26.     For all of these reasons, I believe the relief in the NOL Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.

**II.     Operational Motions.**

**A.     Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs and (II) Granting Related Relief (the "<u>Wages Motion</u>").**

27.     Pursuant to the Wages Motion, the Debtors seek entry of interim and final orders: (i) authorizing, but not directing, the Debtors to:  (a) pay all prepetition wages, salaries, other compensation, and Reimbursable Expenses on account of the Employee Compensation and Benefits (as defined in the Wages Motion) and continue to administer the Employee Compensation and Benefits Programs in the ordinary course of business, including payment of prepetition obligations related thereto; and (b) granting related relief.

28.     As of the Petition Date, the Debtors employ approximately 370 employees (the "<u>Employees</u>"), each of which are employed on a full-time basis, other than four part-time Employees.   The Employees perform a wide variety of functions critical to the administration of these chapter 11 cases and the Debtors' restructuring.  Their skills, knowledge, and understanding of the Debtors' operations and infrastructure are essential to preserving operational stability and efficiency.   In many instances, the Employees include highly-trained personnel, including attorneys and paralegals, who are not easily replaced.   Without the continued, uninterrupted services of their Employees, the Debtors' business operations will be halted.

29.     The number of Employees who are salaried versus paid on an hourly basis is approximately 255 and 115 Employees, respectively.  None of the Employees are represented by a collective bargaining unit.  The Debtors' Employees perform a wide variety of functions critical to the Debtors' operations at both their headquarters and remotely.  In addition to the Employees, the Debtors also periodically retain specialized individuals, including certain of counsel attorneys, as independent contractors and temporary staff (collectively, the "Temporary Staff"), to complete discrete projects or fulfill certain duties on a short-term and extended basis.  The Debtors work with certain staffing agencies (the "Staffing Agencies") to satisfy their staffing and project requirements for Temporary Staff members on an as-needed basis.  As of the Petition Date, the Debtors retained approximately 210 personnel as Temporary Staff.  The Debtors' ability to maintain Temporary Staff is a critical supplement to the efforts of the Debtors' Employees.

30.     In many instances, the Debtors' Employees and Temporary Staff rely exclusively on their compensation and benefits to pay their daily living expenses and to support their families. Employees and Temporary Staff will be exposed to significant financial hardship and may leave the employ of the company to the detriment of the estates in the event the Debtors are not permitted to continue paying wages and salaries, providing employee benefits, and maintaining existing employee programs in the ordinary course of business.  Consequently, the relief requested in the Wages Motion is necessary and appropriate under the facts and circumstances of these chapter 11 cases.

| Employee Compensation and Benefits | Approximate Interim Amount | Approximate Final Amount |
|---|---|---|
| **Compensation and Withholding Obligations** | | |
| Unpaid Wages | $600,000 | $600,000 |
| Unpaid Temporary Staff Obligations | $2,116,000 | $2,116,000 |
| Payroll Fees | $88,000 | $88,000 |
| Withholding Obligations | $305,000 | $305,000 |
| Expenses | $29,000 | $29,000 |
| Non-Insider Quarterly Incentive Plan | $0 | $592,000 |
| Non-Insider PROPs Bonus | $0 | $10,000 |
| Non-Insider Quarterly Retention Program | $0 | $0 |
| **Benefits and Entitlements** | | |
| Health Insurance Programs | $105,000 | $105,000 |
| Life and AD&D Insurance and Disability Benefits | $4,000 | $4,000 |
| Workers' Compensation Program | $0 | $0 |
| 401(k) Plans | $283,000 | $283,000 |
| **Other Employee Benefits** | | |
| Employee Assistance Program | $37,000 | $37,000 |
| Vacation Obligations | $348,000 | $348,000 |
| Total | **$3,915,000** | **$4,517,000** |

31.     Subject to the Court's approval of the relief requested in the Wages Motion, the Debtors intend to continue their prepetition Employee Compensation and Benefits in the ordinary course of business.  In light of the Debtors' recent operational updates and the need to align employment practices with operational goals due to the adverse ruling in the CFPB Litigation (as further described in the First Day Declaration), the Debtors request the right to modify, change, and discontinue any of their Employee Compensation and Benefits and to implement new programs, policies, and benefits, in the ordinary course of business during these chapter 11 cases and without the need for further Court approval, subject to applicable law.

32.     Pursuant to the Wages Motion, the Debtors seek authority to pay the aggregate prepetition amounts owed on account of the Employee Compensation and Benefits Programs set forth in the table above.

33.     For all of these reasons, the Debtors would suffer immediate and irreparable harm to their business without the relief sought in the Wages Motion.  The Debtors' Employees are critical to their operations and restructuring efforts.  Accordingly, I believe such relief is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11 without disruption.

**B.**     **Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Payment of Certain Taxes and Fees and (II) Granting Related Relief (the "Taxes Motion").**

34.     Pursuant to the Taxes Motion, the Debtors seek entry of interim and final orders (i) authorizing, but not directing, the Debtors, to remit and pay (or use tax credits to offset) certain prepetition obligations accrued in the ordinary course of business on account of undisputed Taxes and Fees (as defined below), in an aggregate amount not to exceed $150,000 on an interim basis, and (ii) granting related relief.

35.     The Debtors collect, withhold, and incur sales, use, withholding, income, franchise, and property taxes, as well as other business and regulatory fees, and pay fees owed to various tax service providers on account of tax consulting services provided to the Debtors and license, permit, annual report, and limited liability company fees.[3]  The Debtors remit the Taxes and Fees to various federal, state, and local governments, including taxing authorities.  Taxes and Fees are remitted and paid by the Debtors through checks and electronic funds transfers that are processed

---

[3]     By the Taxes Motion, the Debtors do not seek the authority to collect and remit state and federal employee-related taxes and withholdings.  Such relief is instead requested in the Wages Motion.

through their banks and other financial institutions.  From time to time, the Debtors may also receive tax credits for overpayments or refunds in respect of Taxes and Fees.  The Debtors generally use these credits to offset against future Taxes and Fees or have the amount of such credits refunded to the Debtors.  The Debtors estimate that approximately $350,000 in Taxes and Fees are outstanding as of the Petition Date, of which $150,000 is currently payable or will become due and owing to the Authorities within the first 30 days of these chapter 11 cases in the ordinary course.

36.    Additionally, the Debtors may become subject to routine audit investigations on account of tax returns and/or tax obligations in respect of prior years ("Audits") during these chapter 11 cases, including as a result of any voluntary disclosure agreements or similar procedural mechanisms (if applicable).  Audits may result in additional prepetition Taxes and Fees being assessed against the Debtors (such additional Taxes and Fees, "Assessments").[4]  Accordingly, the Debtors seek authority, but not direction, to pay or remit tax obligations on account of the Assessments as they arise, including as a result of any resolutions of issues addressed in an Audit, including with respect to kinds of Taxes and Fees otherwise addressed in the Wages Motion.

37.    The Debtors pay the Taxes and Fees to the Authorities on a periodic basis, remitting them monthly, quarterly, semi-annually, or annually depending on the nature and incurrence of the particular category of Taxes and Fees, each of which is further discussed below.  Although the Debtors believe that they are substantially current with respect to their payment of Taxes and Fees, the Debtors seek authority pursuant to this motion to make such payments where:  (a) Taxes and Fees accrue or are incurred postpetition; (b) Taxes and Fees accrued or were incurred prepetition

---

[4]    Nothing in the Taxes Motion or any related order constitutes, or should be construed, as an admission of liability by the Debtors with respect to any Audit or Assessment.  The Debtors expressly reserve all rights with respect to any Audit and the right to contest any Assessments claimed to be due as a result of any Audit.

but were not paid prepetition or were paid in an amount less than actually owed; (c) Taxes and Fees paid prepetition by the Debtors were lost or otherwise not received in full by any of the Authorities; or (d) Taxes and Fees incurred for prepetition periods may become due after the commencement of these chapter 11 cases.  In addition, for the avoidance of doubt, the Debtors seek authority, but not direction, to pay Taxes and Fees for so-called "straddle" periods (*i.e.*, periods that include the Petition Date).[5]

38.    In addition, the Debtors collect and hold certain outstanding tax liabilities in trust for the benefit of the applicable Authorities, and these funds may not constitute property of the Debtors' estates.

39.    The Debtors estimate that approximately $350,000, in the aggregate, in Taxes and Fees is outstanding as of the Petition Date, approximately $150,000 of which will become due and owning within twenty-one days of the Petition Date.

| Category | Description | Approximate Amount Accrued and Unpaid as of Petition Date | Approximate Amount Due During Interim Period |
|---|---|---|---|
| **Sales and Use Taxes** | Taxes imposed on the sale and use of certain goods and services. | $160,000 | $60,000 |
| **Income and Franchise Taxes** | Taxes imposed on the Debtors' income and taxes imposed upon the Debtors to operate their businesses pursuant to state laws. | $60,000 | $40,000 |
| **Property Taxes** | Taxes and obligations related to real and personal property holdings. | $80,000 | $0 |

---

[5]    The Debtors reserve their rights with respect to the proper characterization of any "straddle" Taxes and Fees and to seek reimbursement of any portion of any payment made that ultimately is not entitled to administrative or priority treatment.

| Category | Description | Approximate Amount Accrued and Unpaid as of Petition Date | Approximate Amount Due During Interim Period |
|---|---|---|---|
| **Business License and Other Taxes and Fees** | Fees related to compliance with state licensing and registration related to teleservice, including permits, surety bonds,[6] reporting, and other fees paid to state and local agencies. | $50,000 | $50,000 |
| **Total** | | **$350,000** | **$150,000** |

40.     For all of these reasons, the Debtors would suffer immediate and irreparable harm to their business without the relief sought in the Taxes Motion.  Accordingly, I believe such relief is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11 without disruption.

**C.      Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Maintain Insurance and Surety Coverage Entered into Prepetition and Pay Related Prepetition Obligations and (B) Renew, Supplement, Modify, or Purchase Insurance Coverage and (II) Granting Related Relief (the "Insurance Motion").**

41.     Pursuant to the Insurance Motion, the Debtors seek entry of interim and final orders (a) authorizing, but not directing, the Debtors to (i) maintain coverage under the Insurance Policies and Surety Bonds and pay any related obligations and (ii) renew, supplement, modify, or purchase insurance and surety coverage in the ordinary course of business and (b) granting related relief.

42.     The Debtors' ability to maintain the Insurance Policies and Surety Bonds, to renew, supplement, and modify the same as needed, and to enter into new insurance policies and surety bonds as needed in the ordinary course of business, is essential to preserving the value of the Debtors' estates.  Moreover, in many instances, insurance or surety coverage is required by

---

[6]    For the avoidance of doubt, the Debtors seek relief in connection with such surety bonds solely to the extent not duplicative of the relief sought on account of surety bonds in favor of certain taxing authorities, as set forth in the Insurance Motion.

statutes, rules, regulations, and contracts that govern the Debtors' commercial activities, including the requirements of the United States Trustee for the District of Delaware that a debtor maintain adequate coverage given the circumstances of its chapter 11 case. The Debtors are required to maintain the Surety Bonds under certain state law in order to lawfully conduct their business and operations in the applicable jurisdictions.

43. In the ordinary course of business, the Debtors maintain approximately 29 Insurance Policies administered by various third-party insurance carriers, as well as 69 Surety Bonds issued by Capital Indemnity Corporation. The Insurance Policies provide the Debtors and non-Debtor entities[7] coverage for, among other things, the Debtors' property, general liability, employee benefits liability, earthquake, flood, automobile liability, technology errors & omission, cyber liability, workers' compensation,[8] umbrella coverage, crime, kidnap & ransom, business travel accident, and directors' and officers' liability. The Surety Bonds are issued in favor of various federal, state, and industry regulatory agencies to guarantee certain obligations related to various state licenses and permits.

44. The Insurance Policies and Surety Bonds are essential to the ongoing operation of the Debtors' business. The Insurance Policies generally are one year in length, with no affirmative obligation to renew upon expiration. The total annual premiums for the Insurance Policies was approximately $1.5 million in the aggregate for the 2022-23 term, not including applicable

---

[7]  In some instances, the Debtors are insured under an insurance policy that also provides coverage to a certain non-Debtor too. For example, certain Insurance Policies related to director and officer liability also provide coverage to non-Debtor PGX TopCo, LLC. Intercompany transactions are described, and relief is requested, in the Cash Management Motion.

[8]  For the avoidance of doubt, the Debtors' workers' compensation policies are reflected on <u>Exhibit C</u> to the Insurance Motion and throughout the Insurance Motion to the extent the relief requested in the Wages Motion is not coextensive with the relief sought in the Insurance Motion. This motion asks the Court to authorize, but not direct, the Debtors' payment of any prepetition obligations on account of the related Insurance Policies.

deductibles or self-insured retentions.[9]   The total annual premiums for the Surety Bonds is approximately $67,950 in the aggregate.  The premiums for the Insurance Policies are paid in a single lump sum shortly after the Insurance Policy inception date.  The premiums associated with the Debtors' workers' compensation policy are subject to adjustments at the end of the term. The Debtors estimate that, as of the Petition Date, there are no outstanding premiums due on account of the Insurance Policies (other than, potentially on account of the workers' compensation policy).[10]   Nevertheless, out of an abundance of caution, the Debtors seek authority, but not direction, to pay any prepetition obligations owing on account of the Insurance Policies and the Surety Bonds in the ordinary course of business as they become due to ensure uninterrupted coverage thereunder.

45.     The Debtors obtain most of their Insurance Policies and Surety Bonds through Diversified Insurance Inc.[11]   The Broker, among other things:  (a) assists the Debtors in obtaining comprehensive insurance and surety coverage for their operations in a cost-effective manner; (b) manages renewal data; and (c) provides ongoing support throughout the applicable policy periods for the Insurance Policies and the Surety Bonds.  In exchange for these services, the Debtors pay

---

[9]     Some of the Insurance Policies require the Debtors to pay a per-incident deductible.  Generally, if a claim is made against such Insurance Policies, the applicable Insurance Carrier will administer the claim and make payments in connection therewith in accordance with the terms of such policy, and the Insurance Carrier will have a claim against the Debtors in the amount of the applicable Deductible.  Alternatively, certain of the Insurance Policies use self-insured retentions on a per-claim basis instead of Deductibles.  If a claim is made under such Insurance Policies, the Debtors must make payments in the first instance (whether related to defense costs or on account of the underlying liability) up to the amount of the SIR and, once the Debtors have made payments to satisfy such amount, the carrier becomes obligated to cover remaining costs in accordance with the terms of such policy.  Out of an abundance of caution, the Debtors seek authority, but not direction, to pay all prepetition amounts that may be due and owing on account of the Deductibles and to continue honoring all payment obligations under the Deductibles in the ordinary course of business to ensure uninterrupted coverage thereunder.

[10]    In light of the Debtors recently reducing their employee headcount, the Debtors anticipate that the annual true-up of the workers' compensation policy premium will result in a refund of a portion of the annual premium.

[11]    For the avoidance of doubt, Diversified Insurance, an IMA, Inc. Company, is the broker for the Debtors' workers' compensation policy, for which relief is requested in the Wages Motion.

broker commissions and brokerage fees, usually at the same time the Debtors pay their premiums. As of the Petition Date, the Debtors do not believe that they owe any amounts to the Broker on account of Broker Fees. Out of an abundance of caution, however, the Debtors seek authority, but not direction, to pay any prepetition obligations owed to the Broker and continue to pay the Broker for services rendered in the ordinary course of business to ensure uninterrupted coverage under their Insurance Policies and Surety Bonds.

46.     Accordingly, I believe the relief requested in the Insurance Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11 without disruption.

     **D.**     **Motion of Debtors for Entry of Interim and Final Orders (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Approving the Debtors' Proposed Procedures for Resolving Additional Assurance Requests, (III) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services, and (IV) Granting Related Relief (the "<u>Utilities Motion</u>").**

47.     Pursuant to the Utilities Motion, the Debtors seek entry of interim and final orders, (a) approving the Debtors' proposed adequate assurance of payment for future utility services, (b) approving the Debtors' proposed procedures for resolving additional adequate assurance requests, (c) prohibiting utility providers from altering, refusing, or discontinuing services, and (d) granting related relief.

48.     In the ordinary course of their business, the Debtors obtain electricity, gas, telecommunications, cable/television, water, waste management (including sewer and trash), internet, and other similar services (collectively, the "<u>Utility Services</u>") from a number of utility providers or brokers (each, a "<u>Utility Provider</u>" and collectively, the "<u>Utility Providers</u>").

49.     Pursuant to the leases for several of the Debtors' rental properties, certain Utility Services are billed directly to the Debtors' landlords and passed through to the Debtors as part of the Debtors' lease payments in accordance with the applicable lease agreements.

50.     Uninterrupted Utility Services are essential to the Debtors' ongoing business operations and, hence, the overall success of these chapter 11 cases.  The Debtors' business operations require uninterrupted electricity, telecommunications, internet, heat, water, and other utility services to operate.  Specifically, the Debtors must maintain constant communication with their customers to properly serve their needs, which requires a dependable provision of Utility Services.  Additionally, the Debtors are a services provider and require workable office space with continued utility services to properly operate their business.  Should any Utility Provider refuse or discontinue service, even for a brief period, the Debtors' business operations would be severely disrupted.  Such disruption would adversely affect customer goodwill and employee relations, which, in turn, would jeopardize the Debtors' reorganization efforts.

51.     The Debtors are not in default or arrearages with respect to their obligations for prepetition Utility Services.  The Debtors pay approximately $154,000 each month for Utility Services, calculated as a historical average payment for the 12-month period ended March 31, 2023.

52.     The Debtors intend to satisfy postpetition obligations owed to the Utility Providers in a timely manner.  Cash held by the Debtors, cash generated in the ordinary course of business, and the Debtors' anticipated access to cash collateral and debtor-in-possession financing will provide sufficient liquidity to pay the Debtors' Utility Service obligations in accordance with their prepetition practice.  To provide additional assurance of payment, the Debtors propose to deposit $76,534 (the "Adequate Assurance Deposit") into a segregated account (the "Adequate Assurance

Account"). The Adequate Assurance Deposit represents an amount equal to approximately one-half of the Debtors' average monthly cost of Utility Services, calculated as the historical average payment for the 12-month period ending March 31, 2023.

53.     The Adequate Assurance Deposit will be held in a segregated account that is maintained by the Debtors for the duration of these chapter 11 cases, for the benefit of each Utility Provider, subject to the Debtors' right to terminate or discontinue the applicable Utility Services, and it may be applied to any postpetition defaults in payment to the Utility Providers. The Adequate Assurance Deposit will be held by the Debtors, and the Debtors' creditors will have no lien on any of the Adequate Assurance Deposit to the extent not returned to the Debtors, pursuant to the terms set forth in the Orders or the Adequate Assurance Account.

54.     Any Utility Provider that is not satisfied with the Proposed Adequate Assurance may make an Additional Assurance Request pursuant to the Adequate Assurance Procedures.

55.     The Adequate Assurance Procedures provide a streamlined process for Utility Providers to address potential concerns with respect to the Proposed Adequate Assurance. Specifically, the Adequate Assurance Procedures permit a Utility Provider to object to the Proposed Adequate Assurance by filing and serving an Additional Assurance Request upon certain notice parties.

56.     The Debtors may, in their discretion, resolve any Additional Assurance Request by mutual agreement with the applicable Utility Provider and without further order of the Court. If the Debtors determine that the Additional Assurance Request cannot be resolved by mutual agreement, the Debtors may seek Court resolution of the Additional Assurance Request.

57.     The Debtors have made an extensive and good-faith effort to identify all Utility Providers and include them on the Utility Providers List. Nonetheless, to the extent the Debtors

identify new or additional Utility Providers or discontinue services from existing Utility Providers, the Debtors seek authority to add or remove such parties from the Utility Providers List.

58.     I believe such relief sought in the Utilities Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11 without disruption.

**E.     Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate the Cash Management Systems, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, (D) Continue to Perform Intercompany Transactions, and (II) Granting Related Relief (the "<u>Cash Management Motion</u>").**

59.     Pursuant to the Cash Management Motion, the Debtors seek entry of interim and final orders:  (a) authorizing the Debtors to continue to operate their Cash Management Systems, illustrated on <u>Exhibit 1</u> annexed to the Interim Order and Final Order of the Cash Management Motion, honor certain prepetition obligations related thereto, maintain existing business forms in the ordinary course of business, continue to perform intercompany transactions consistent with historical practice, and grant administrative expense status to postpetition intercompany balances; and (b) granting related relief.

60.     In the ordinary course of business, the Debtors maintain the Cash Management Systems to facilitate the efficient operation of their business, as illustrated on <u>Exhibit 1</u> annexed to the Interim Order and Final Order attached to the Cash Management Motion.  The Cash Management Systems are comparable to the centralized cash management systems used by similarly situated companies to manage the cash of operating units in a cost-effective manner and ensure the availability of adequate funds at each Debtor entity.  The Debtors use the Cash Management Systems in the ordinary course of their business to collect, transfer, and disburse funds generated from their operations and to facilitate cash monitoring, forecasting, and reporting.

61.     The Debtors' Cash Management Systems are comprised of two systems: the Progrexion Cash Management System and the Lexington Law Cash Management System.

62.     The Progrexion Cash Management System is centralized around the Master Concentration Account held at Bank of America, N.A. ("BofA"). The Progrexion Cash Management System includes a total of 15 bank accounts, each of which is identified on Exhibit 2 annexed to the Interim Order and Final Order attached to the Cash Management Motion and consist of the following:

- ten Bank Accounts held at BofA;

- four Bank Accounts held at JPMorgan Chase Bank ("JPM"); and

- one Bank Account held at Comerica Incorporated ("Comerica").

63.     The Progrexion Debtors' accounting department manages the Progrexion Bank Accounts, including the opening, closing, and day-to-day maintenance of the Progrexion Cash Management System and implements controls for entering, processing, and releasing funds in the ordinary course of the Progrexion Debtors' business, including in connection with the intercompany transactions and performs weekly reconciliations of the Progrexion Bank Accounts to the Progrexion Debtors' books and records to ensure that all transfers are accounted for properly.

64.     The Progrexion Debtors have used the Progrexion Cash Management System without substantial modification since October 2014. The Progrexion Cash Management System consists of two discrete systems, corresponding to the time period before and after the adoption of the current Progrexion Cash Management System. The Progrexion Debtors' cash receipts related to recurring customer subscription services from prior to October 2014 (such customers, the "Legacy Customers") utilize the Progrexion Bank Accounts held at JPM. Additionally, the Progrexion Debtors have used the Progrexion Bank Account held at Comerica to adjust refunds and payment disputes with Legacy Customers and to fund certain employee incentive payments

(the Accounts held at JPM and Comerica being the "<u>Legacy Accounts</u>").  The remainder of the Progrexion Debtors' receipts from operations utilize the Progrexion Bank Accounts at BofA.

65.    The Lexington Law Cash Management System includes a total of 7 bank accounts, each of which is identified on <u>Exhibit 3</u> annexed to the Interim Order and Final Order of the Cash Management Motion and consist of the following:

- two Lexington Law Bank Accounts held at BofA;

- four Lexington Law Bank Accounts held at JPM; and

- one Lexington Law Bank Account held at Comerica.

66.    The Lexington Law Cash Management System includes an attorney operating account and an Interest on Lawyers' Trust Account ("<u>IOLTA</u>").  The IOLTA account is used to deposit client funds that are unrelated to Lexington Law's credit repair work.  Funds held in the IOLTA account are maintained by Debtor Lexington Law for the benefit of or on account of its clients.  The IOLTA account, and the funds maintained therein, is segregated from the Debtors' other accounts and funds at all times, and not comingled.  Client funds are from time to time manually transferred to Debtor Lexington Law's attorney operating account when and solely to the extent such funds are earned by Debtor Lexington Law in consideration for services provided and invoiced to its clients.  The IOLTA account complies with rule 14-1001 of the Utah Supreme Court Rules of Professional Practice.  The Lexington Law Cash Management System interacts periodically with the Progrexion Cash Management System.

67.    The Progrexion Debtors pay the Cash Management Banks approximately $9,800 per month in the aggregate in Bank Fees, and Lexington Law pays the Cash Management Banks approximately $2,600 per month in the aggregate in Bank Fees.  The Debtors estimate that they owe approximately $12,400 in the aggregate on account of Bank Fees as of the Petition Date.

68.     As part of the Cash Management System, the Debtors provide certain employees with access to corporate credit cards through American Express and Chase Bank on arm's-length terms.  The Progrexion Debtors maintain 60 Credit Cards with American Express and Lexington Law maintains eight Credit Cards with American Express and one Credit Card with Chase Bank. The Progrexion Credit Cards are reimbursed from the BofA account ending 8312 while the Lexington Law Credit Cards (both American Express and Chase) are reimbursed from the BofA account ending 8510.  The Credit Cards are used by the Debtors' employees to pay for certain work-related expenses, such as work-related travel, meals, office supplies, employee incentives, vendor payments, and small, non-recurring purchases made on behalf of the Progrexion Debtors. The Debtors estimate that there are no amounts outstanding on account of the Credit Card Program as of the Petition Date.

69.     Intercompany Transactions occur as part of the ordinary course operation of the Progrexion Cash Management System, and at any given time, there may be Intercompany Claims owing by one Debtor to another Debtor.  Specifically, at the end of each day, the Master Concentration Account receives excess cash swept from the Zero Balance Accounts.  Conversely, where subsidiaries of Debtor PGX Holdings, Inc. need to make certain disbursements, such subsidiaries may from time to time draw cash from the Master Concentration Account. Intercompany Transactions are recorded at such occasions.  Intercompany Transactions are also frequently conducted pursuant to prepetition shared services and intercompany trade arrangements, among others.  As such, at any given time there may be Intercompany Claims owing by one Progrexion Debtor to another Progrexion Debtor.  The Intercompany Claims are reflected as journal entry receivables and payables, as applicable, in the respective Progrexion Debtors' accounting systems, and no settlement of these Intercompany Claims are typically made in cash.

70.     The Progrexion Cash Management System and the Lexington Law Cash Management System regularly interact with each other in the ordinary course of business on account of services that certain Progrexion Debtors provide to Lexington Law as well as in connection with the reimbursement of certain costs paid on another Debtors' behalf.  Specifically, Debtors Progrexion Marketing, Inc., Progrexion Teleservices, Inc., Progrexion ASG, Inc., and Progrexion IP, Inc. (collectively, the "Progrexion Providers"), provide Debtor Lexington Law administrative, support, marketing, credit repair services, and intellectual property licenses pursuant to certain operating agreements (as may be amended, supplemented, or modified from time to time, the "Operating Agreements").  The consideration owed for these services is calculated on a monthly basis, usually within 15 days after the end of the month where such services are rendered. Lexington Law historically made estimated progress payments on a weekly basis to the Progrexion Providers for services rendered during that same month.  Historically, such progress payment were made based on a percentage of the prior month's invoiced amount.  Once the total payments owed for the month is known (*i.e.*, approximately 15 days after the end of the month), the remaining consideration owed for the month that was not already paid through such estimated progress payments are billed to Lexington Law and due 30 days in arrears from the end of the month where such services were delivered.  As such, the Debtors may have outstanding prepetition Intercompany Claims that may only become known postpetition.  As further described in the First Day Declaration, in the twelve-month period before the Petition Date, the Progrexion Debtors derived approximately 87 percent of their revenue from provision of operating services to Lexington Law.  As of the Petition Date, Debtor Lexington Law owes the Progrexion Providers approximately $27.9 million for services rendered under the Operating Agreements.  Per the Cash

Management Motion, the Debtors do not intend to pay such amounts owed under the Operating Agreements.

71.     It is crucial for the continued operations of the Progrexion Debtors, including for the provision of services under the Operating Agreements, which in turn is crucial for the continued operations of Lexington Law to continue to make payments under the Operating Agreements following the commencement of these chapter 11 cases, even though the prepetition intercompany claim will remain outstanding until cured in the context of the proposed sale process.  The Debtors' compliance with the terms of the DIP Facility and their ability to obtain postpetition financing are dependent upon the payment of amounts owed under the Operating Agreements on a go-forward basis.

72.     Separately, certain invoices charged by Lexington Law to a PGX Debtor or by a PGX Debtor to Lexington Law are for the reimbursement of certain costs that may be paid by one Debtor on behalf of another Debtor.  For example, Lexington Law and a PGX Debtor may both receive services from the same credit bureau or office supply vendor, in which case Lexington Law may be invoiced for expenses incurred by both Debtors.  In that instance, Lexington Law would pay for such expenses on behalf of the PGX Debtor, at which point an intercompany payable is created for the corresponding amount, and Lexington Law would then bill the applicable PGX Debtor for reimbursement of such costs in cash.  Such reimbursement payments are generally made approximately 30 days in arrears.

73.     The Debtors closely track all fund transfers in their respective accounting systems and can ascertain, trace, and account for all Intercompany Transactions.  The Debtors, with the assistance of their advisors, have also put in place monitoring systems to be able to track postpetition intercompany transfers.

74.      As part of the Cash Management System, the Debtors utilize numerous business forms in the ordinary course of their business, including letterhead, purchase orders, invoices, and checks.  With respect to any checks that are generated electronically after the Petition Date, the Debtors will update such checks to indicate their status as "Debtor in Possession" and the bankruptcy case numbers.  The Debtors do not believe they currently have preprinted checks. However, out of an abundance of caution, the Debtors request that, to the extent there are any pre-printed checks and other Business Forms, the Court authorize the Debtors' continued use of all such Business Forms in existence immediately before the Petition Date, without reference to the Debtors' status as debtors in possession to minimize expenses to their estates and avoid confusion on the part of employees, customers, vendors, and suppliers during the pendency of these chapter 11 cases.

75.      For all of these reasons, the Debtors would suffer immediate and irreparable harm to their business without the relief sought in the Cash Management Motion.  Accordingly, I believe such relief is in the best interests of the Debtors' estates and their creditors and stakeholders and will enable the Debtors to continue to operate their business in chapter 11 without disruption.

F.     **Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to Pay Certain Prepetition Claims of Critical Vendors and (II) Granting Related Relief (the "Critical Vendors Motion").**

76.      Pursuant to the Critical Vendors Motion, the Debtors seek entry of an order: (a) authorizing, but not directing, the Debtors to pay Critical Vendors Claims in an amount not to exceed $4.64 million on an interim basis and $5.74 million on a final basis and (b) granting related relief.

77.      Prior to the Petition Date, the Debtors, with the assistance of their advisors, spent significant time reviewing and analyzing their books and records, consulting operations management and purchasing personnel, reviewing contracts, and analyzing applicable laws,

regulations, and historical practice to identify certain critical business relationships—the loss of which could materially harm their business, reduce their enterprise value, and/or impair going-concern viability.  In this process, the Debtors considered a variety of factors, including:

- whether a vendor is a sole- or limited-source of services critical to the Debtors' business operations;

- whether alternative vendors are available that can provide requisite volumes of similar goods or services on equal (or better) terms and, if so, whether the Debtors would be able to continue operating while transitioning business thereto;

- whether an agreement exists by which the Debtors could compel a vendor to continue performing on prepetition terms;

- whether certain specifications or contract requirements prevent, directly or indirectly, the Debtors from obtaining services from alternative sources; and

- whether failure to pay all or part of a particular vendor's claim could cause the vendor to refuse to provide critical services on a postpetition basis.

78.     Following this analysis, the Debtors and their advisors examined the health of each vendor relationship, the vendor's familiarity with the chapter 11 process, and the extent to which each vendor's prepetition claims could be satisfied elsewhere in the chapter 11 process. The Debtors identified certain critical vendors utilized in the ordinary course—that likely would be impossible to replace at this critical juncture in these chapter 11 cases—as potential beneficiaries of the relief requested in the Critical Vendors Motion (the "Critical Vendors"). The Debtors submit that the relief requested in the Critical Vendors Motion will allow the Debtors to preserve stakeholder value by paying the prepetition claims of certain counterparties that are critical to the Debtors' business enterprise.  Failure to pay these counterparties would result in a severe negative effect on the value of the Debtors' estates and the recoveries available to stakeholders.

79.     The Debtors, through online platforms, offer credit report repair services to customers who believe their credit scores have been erroneously downgraded due to various reporting errors.  In order to provide its customers with this valuable service, the Debtors rely on certain vendors, who support the operations of the Debtors.  The services provided by the Critical Vendors are crucial in enabling the Debtors to successfully maintain operations and to preserve value of the estates.

80.     The Debtors have two main groups of critical service providers:  (a) marketing partners and (b) marketing agencies.  Each of these groups of Critical Vendors provide essential services, including lead generation and other marketing efforts, upon which the Debtors' businesses depend.  Accordingly, the failure to pay these critical vendors would result in a severe negative effect on the value of the Debtors' estates and the recoveries available to stakeholders.

81.     Lead generation is critical to the Debtors business as a driver for new customer acquisition, which is key to the continued cash generation of the Debtors, especially as the Debtors navigate the operational changes in response to the TSR ruling.  On average, the Debtors maintain relationships with each individual customer for approximately six to seven months, meaning that the Debtors' customer base has a high turnover rate.  Historically, the Debtors have completely "turned" (completely refilled their customer base with new customers) more than once each fiscal year.  This high customer turnover rate is an intrinsic component of the Debtors' business and must be maintained if the Debtors are to successfully continue operations.  Together, the relatively low tenure of the average customer combined with the high turn rate for the Debtors' business model displays the necessity of new lead generators to replenish, grow, and simply maintain the Debtors' business.

82.     The Debtors engage various small businesses and individuals to market their services to customers as the Debtors' affiliate marketing partners (the "Marketing Partners"). The Marketing Partners market the Debtors' services through their online platform accounts and earn a commission for every sale the Debtors make through their accounts.  Given this business model, the Marketing Partners' services are crucial to the Debtors' continued operations by continuing to drive new customers to the business, creating the ultimate source of revenue and liquidity that the Debtors need to emerge successfully from this reorganization process. The Marketing Partners Claims account for approximately 13 percent of the Critical Vendors Claims.

83.     To further facilitate this crucial acquisition of new customers, the Debtors also engage various marketing agency platforms that enable the Debtors to advertise their businesses. These agencies include online marketers, who use branded and non-branded terms to direct customers to the Debtors' business, as well as other offline marketers who provide radio and television commercials to drive traffic towards the Debtors' business (together, the "Marketing Agencies").  The Marketing Agencies typically have only short-term or non-binding contracts and engage with the Debtors on an at-will basis.  The continued services from the Marketing Agencies are crucial to the Debtors operations due to the high customer turnover rate that is inherent to the Debtors' business.  The Marketing Agencies Claims account for approximately 70 percent of the Critical Vendors Claims.

84.     Finally, the Debtors rely on a limited number of other Critical Vendors to provide various types of services that are critical to the Debtors' business such as, branding, content writing, consulting services, corporate and compliance services, delivery and shipping services, payment platform services, and payment processing solutions (the "Other Critical Vendors").

The Other Critical Vendors Claims account for approximately 17 percent of the Critical Vendors Claims.

85.     I believe the Debtors' estates could be materially, if not irreparably, harmed if they were to lose access to the services provided by the Critical Vendors.  The Debtors therefore seek authority, but not direction, to honor prepetition obligations to Critical Vendors.  The Debtors submit that the requested relief will allow the Debtors to preserve stakeholder value by paying the prepetition claims of certain counterparties that are critical to the Debtors' business enterprise. Moreover, the relief requested is necessary because many of the Critical Vendors have no obligation to continue providing services under the relevant contracts, if any exist.  Additionally, the Debtors do not seek authorization to honor prepetition obligations arising under contract, except where the Debtors determine, in their business judgment, such parties may be capable of terminating their contracts notwithstanding section 362(a) of the Bankruptcy Code or may otherwise inflict immediate and irreparable harm on the Debtors by their refusal to comply with their contractual obligations.

86.     I believe that the relief requested in the Critical Vendors Motion will allow the Debtors to preserve stakeholder value by paying the prepetition claims of certain counterparties that are critical to the Debtors' business enterprise.  I believe that the relief requested in the Critical Vendors Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11. Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Critical Vendors Motion.

**G.**   **Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Maintain and Administer Their Existing Customer Programs and Honor Certain Prepetition Obligations Related Thereto and (II) Granting Related Relief (the "Customer Programs Motion").**

87.    Pursuant to the Customer Programs Motion, the Debtors seek entry of interim and final orders:  (a) authorizing, but not directing, the Debtors to maintain and administer their customer-related programs and honor certain prepetition obligations related thereto; and (b) granting related relief.

88.    The Debtors provide services to customers across the United States who seek to access and understand the information contained in their credit reports and to ensure such information contained is fair, accurate, and substantiated.  In the twelve-month period ending in March 2023, the Debtors provided such services to more than 2.18 million customers.  These customers fall into the following categories:

- **Lexington Law.**  John C. Heath, Attorney At Law PC (d/b/a Lexington Law) ("Lexington Law"), a law firm, provides credit-related legal counseling to clients. The Debtors (other than Lexington Law) support Lexington Law by providing certain sales and marketing, custom software, technology, and administrative services.  In the twelve-month period ending in March 2023, Debtor Lexington Law provided services to more than 1.13 million clients.  Such services provided by the Debtors accounted for approximately eighty-eight percent of revenue over the same time period.

- **Creditrepair.com.**  The Debtors provide certain credit report repair and monitoring services to customers on a direct-to-consumer basis through Creditrepair.com. In the twelve-month period ending in March 2023, the Debtors provided such services to approximately 110,000 customers that, collectively, accounted for approximately ten percent of the Debtors' revenue during that timeframe.

- **Credit.com.**  The Debtors provide certain services directly to customers through Credit.com, a website that matches customers to a financial product such as a credit card or loan and provides consumers access to free credit scores, educational content, and other tools.  The Debtors provided such services to approximately 940,000 customers in the twelve-month period ending in March 2023, accounting for approximately two percent of the Debtors' revenue over that same period. In addition, Credit.com has attracted website traffic of approximately 549,000 visitors per month for the twelve months ending April 2023.

33

89.     Consistent with common industry practice, the Debtors have historically provided certain Customer Programs including incentives, discounts, and accommodations to their customers to attract and maintain positive customer relationships.  I believe that the Debtors' ability to continue the Customer Programs and to honor their obligations thereunder in the ordinary course of business is necessary to retain their reputation for reliability, to meet competitive market pressures, and to ensure customer satisfaction, thereby retaining current customers, attracting new ones, and, ultimately, enhancing revenue and profitability for the benefit of all of the Debtors' stakeholders.    The Debtors estimate that, of their prepetition obligations under the Customer Programs, they owe approximately $165,000 on account of customer refunds,[12] but have no other accrued adjustments, discounts, or other similar obligations owing to their customers.

90.     It is my understanding that the Debtors comply with "right-to-rescission" laws around the country in connection with the sale of their credit report repair and monitoring services.

91.     Separately, through their Refund Program, the Debtors provide refunds to customers who are dissatisfied with the services or products they have purchased.[13]  The Debtors also provide a goodwill refund in certain situations, such as if a customer incurred an overdraft fee when a payment was attempted.  Pursuant to the Refund Program, customers are generally refunded the full purchase price in the manner in which they purchased the services or, if the Debtors are not able to refund the amount to the customer's payment information on file, customers are generally issued checks to refund the purchase price.  There is no time limit in which customers

---

[12]    Approximately $46,000 of such amount is owing based on outstanding checks.  The remaining balance consists of refunds to be made on credit cards and debit cards.

[13]    For the avoidance of doubt, in light of the nature of legal services, Debtor Lexington Law has historically considered providing refunds to clients on a case-by-case basis in light of the particular facts and circumstances, but Lexington Law has no standard refund policy or satisfaction guarantee.

can receive a refund. From April 2022 to March 2023, the Debtors issued approximately $6.65 million in the aggregate to customers on account of the Refund Program.

92.     In the ordinary course of business, the Debtors also offer certain special-rate pricing discounts to their customers. From April 2022 to March 2023, the market value of the Debtors' discounts to customers was approximately $50 million in the aggregate. For example, the Debtors (other than Lexington Law) have historically offered preferred pricing to customers who purchase multiple services for other members in the same household or certain one-time price discounts, historically at rates no greater than fifteen percent off the non-discounted price. Lexington Law has historically offered certain price discounts to incentivize signups, such as when a client's engagement includes their spouse or significant other (historically no more than fifty percent off the non-discounted price), along with other discount structures.

93.     In addition to cash, the Debtors accept the following methods of payment from customers via online points of sale: (i) Visa, MasterCard, and Discover credit cards; (ii) debit cards; and (iii) checks (the "Non-Cash Payments"). To process Non-Cash Payments, the Debtors are party to certain agreements (the "Payment Processing Agreements") with payment processors (the "Payment Processing Companies"). Pursuant to the Payment Processing Agreements, the Debtors generally receive the net customer sales less any chargebacks and processing fees charged (the "Processing Fees"). The fees owing to these companies are set off from the funds that are remitted to the Debtors on account of the Non-Cash Payments on a daily basis.

94.     When customers dispute charges with a Payment Processing Company, the Debtors typically refund to such Payment Processing Company the purchase price of the disputed product or service, subject to certain adjustments (collectively, "Chargebacks," and together with the Processing Fees, the "Processing Obligations"). Generally, Chargebacks are satisfied by netting

the amount charged against pending payments owed by a Payment Processing Company to the Debtors. It is possible that certain Processing Obligations incurred by the Debtors immediately prior to the Petition Date may not have been fully netted out against the payments received by the Debtors prior to the Petition Date.

95.     The Debtors' continued acceptance of Non-Cash Payments is essential to the operation of the Debtors' businesses because the majority of the Debtors' sales are made using Non-Cash Payments. Declining to accept Non-Cash Payments would have a severe negative effect on the Debtors' ongoing operations, the cost of which would be borne by their estates. To avoid disrupting these vital payment processing services, the Debtors seek authority to continue paying the Processing Obligations in the ordinary course of their business pursuant to the terms of the Payment Processing Agreements, and request that the Court authorize the Payment Processing Companies to continue to set off the Processing Obligations against amounts remitted to the Debtors, whether arising before or after the Petition Date, in a manner consistent with past practices.

96.     In light of the importance of the Customer Programs to the Debtors' businesses, I believe that obtaining authority to continue to honor obligations related to these programs in the ordinary course of business is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.

H.     **Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief (the "DIP Motion").**

97.     Pursuant to the DIP Motion, the Debtors seek entry of interim and final orders authorizing the Debtors to receive senior secured postpetition financing, use cash collateral, enter

into the DIP Loan Agreement, grant senior liens and superpriority administrative expense status to the DIP Lenders, modify the automatic stay, and schedule a final hearing to consider entry of the Final Order.  Additional evidentiary support for the DIP Motion is provided in the Augustine Declaration filed contemporaneously herewith.

98.     The DIP Facility is necessary to fund these chapter 11 cases, including a value-maximizing sale process pursuant to section 363 of the Bankruptcy Code.  The DIP Facility includes a $19.925 million new-money commitment, including $12 million on an interim basis, and has a 105-day maturity.  The Restructuring Support Agreement commits the lenders to support a liquidating plan thereafter and the DIP Facility includes a wind-down budget in an amount of no less than $2.625 million to support implementation of that plan, which will be automatically increased to a maximum of $3 million to the extent the Debtors have capital in excess of that listed in the then-current Budget.  The DIP Facility, the APAs, and the RSAs are all conditioned on effectuation of a sale within 105 days of the Petition Date, including a bid deadline with 60 days, an auction with 65 days, a sale order within 70 days, and a closing within 105 days.

99.     The DIP Facility also features a roll-up of prepetition debt belonging to Blue Torch Finance LLC ("Blue Torch") into the DIP Obligations.  The DIP Lenders requested, and the Debtors agreed to, the Roll-Up in the amount of (a) $2.9 million, which corresponds to the amount of the emergency bridge financing provided the week before the Petition Date, subject to entry of the Interim Order, and (b) $39.85 million, subject to entry of the Final Order.  The Roll-Up constitutes a key aspect of the DIP Facility, and I understand that the DIP Lenders would not accept to provide the DIP Facility absent the Roll-Up.  The Roll-Up of the emergency bridge financing is also critical as the DIP Lenders would not have agreed to provide such bridge financing absent such Roll-Up subject to entry of the Interim Order.  Additionally, as security for the DIP

Obligations, the Debtors granted the DIP Agent a first lien on unencumbered property (including all of the previously unencumbered assets of the Lexington Law Firm) and a priming lien on prepetition collateral.

100.    In parallel with discussions with their Prepetition Secured Lenders, the Debtors re-engaged Greenhill & Co., LLC ("Greenhill") as their investment bankers to conduct a marketing process designed to identify other parties that may be interested in providing postpetition financing to the Debtors. I understand that Greenhill contacted approximately thirty third party financial institutions, of which seven executed an NDA. I understand that the Prepetition Secured Lenders would not consent to being primed by a third party, and no party other than the Prepetition Secured Lenders provided the Debtors with an out-of-court or debtor-in-possession financing facility.

101.    Once it became clear that a debtor-in-possession financing facility would only be attainable from the Prepetition Secured Lenders, the Debtors and their advisors engaged in hard-fought negotiations on the terms of the DIP Facility in order to obtain the best possible terms. As part of these discussions, the Debtors and their advisors pressed the Prepetition Secured Lenders for a greater amount of postpetition financing and a longer term of the DIP Facility, among other material terms. Following weeks of extensive negotiations, the DIP Facility as presented to the Court today represents the best possible debtor-in-possession financing facility that the Debtors could obtain.

102.    The DIP Facility is critical to the Debtors' ability to fund their operations and the marketing process while providing sufficient liquidity at the outset of these chapter 11 cases. The DIP Facility is an essential component to providing a successful path forward while the Debtors expeditiously conduct their chapter 11 sale process. The proposed DIP Facility is

therefore in the best interests of the Debtors, is necessary to avoid irreparable harm to the Debtors and their estates, and therefore should be approved.

[*Remainder of Page Intentionally Left Blank*]

**<u>Exhibit B</u>**

**Corporate Structure Chart**



## Exhibit C

**Restructuring Support Agreement**

*Execution Version*

**THIS RESTRUCTURING SUPPORT AGREEMENT AND THE DOCUMENTS ATTACHED HERETO COLLECTIVELY DESCRIBE A PROPOSED RESTRUCTURING OF THE COMPANY PARTIES THAT WILL BE EFFECTUATED THROUGH CHAPTER 11 CASES IN THE BANKRUPTCY COURT ON THE TERMS DESCRIBED HEREIN.**

**THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER OR ACCEPTANCE WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE.  ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.  NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON ANY OF THE PARTIES HERETO.**

**THIS RESTRUCTURING SUPPORT AGREEMENT IS THE PRODUCT OF SETTLEMENT DISCUSSIONS AMONG THE PARTIES HERETO.  ACCORDINGLY, THIS RESTRUCTURING SUPPORT AGREEMENT IS PROTECTED BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER APPLICABLE STATUTES OR DOCTRINES PROTECTING THE USE OR DISCLOSURE OF CONFIDENTIAL SETTLEMENT DISCUSSIONS.**

**THIS RESTRUCTURING SUPPORT AGREEMENT DOES NOT PURPORT TO SUMMARIZE ALL OF THE TERMS, CONDITIONS, REPRESENTATIONS, WARRANTIES, AND OTHER PROVISIONS WITH RESPECT TO THE RESTRUCTURING TRANSACTIONS DESCRIBED HEREIN, WHICH TRANSACTIONS WILL BE SUBJECT TO THE COMPLETION OF DEFINITIVE DOCUMENTS INCORPORATING THE TERMS SET FORTH HEREIN. THE CLOSING OF ANY TRANSACTION SHALL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH DEFINITIVE DOCUMENTS AND THE APPROVAL RIGHTS OF THE PARTIES SET FORTH HEREIN AND IN SUCH DEFINITIVE DOCUMENTS.**

### *RESTRUCTURING SUPPORT AGREEMENT*

This RESTRUCTURING SUPPORT AGREEMENT (including all exhibits, annexes, and schedules hereto in accordance with Section 16.02, this "**Agreement**") is made and entered into as of June 4, 2023 (the "**Agreement Effective Date**"), by and among the following parties (each of the following described in sub-clauses (i) through (iv) of this preamble, a "**Party**," and collectively, the "**Parties**"):[1]

    i.    (A) PGX Holdings, Inc., a company incorporated under the Laws of Delaware ("**PGX**"), and each of its direct and indirect subsidiaries that have executed and

---

[1]    Capitalized terms used but not defined in the preamble and recitals to this Agreement have the meanings ascribed to them in Section 1.

delivered counterpart signature pages to this Agreement, and (B) John C. Heath, Attorney At Law PC (d/b/a Lexington Law Firm), a professional corporation incorporated under the Laws of Utah ("**Lexington Law**" and, together with the Entities in clause (i)(A), as listed on **Exhibit A**, collectively, the "**Company Parties**" and, each, a "**Company Party**");

ii.     the undersigned holders of, or investment advisors, sub-advisors, or managers of discretionary accounts that hold First Lien Claims (as defined herein) that have executed and delivered counterpart signature pages to this Agreement, a Joinder, or a Transfer Agreement, as applicable, to counsel to the Company Parties (the Entities in this clause (ii), collectively, the "**Consenting First Lien Lenders**");

iii.    the undersigned holders of, or investment advisors, sub-advisors, or managers of discretionary accounts that hold Second Lien Claims (as defined herein) that have executed and delivered counterpart signature pages to this Agreement, a Joinder, or a Transfer Agreement, as applicable, to counsel to the Company Parties (the Entities in this clause (iii), collectively, the "**Consenting Second Lien Lender**" and, together with the other entities in clause (ii), the "**Consenting Lenders**"); and

iv.    PGX TopCo, LLC (the "**Sponsor**" and, together with the other Entities in clauses (ii) and (iii), the "**Consenting Stakeholders**").

### *RECITALS*

**WHEREAS**, the Company Parties and the Consenting Stakeholders have in good faith and at arms' length negotiated or been apprised of certain restructuring and recapitalization transactions with respect to the Company Parties' capital structure on the terms set forth in this Agreement and the exhibits hereto, including the term sheet attached as **Exhibit B** hereto (as may be amended, supplemented, or otherwise modified from time to time pursuant to this Agreement, the "**Restructuring Term Sheet**" and the Stalking Horse APA (as defined herein), such transactions as described in this Agreement and the exhibits hereto, the "**Restructuring Transactions**");

**WHEREAS**, the Company Parties intend to implement the Restructuring Transactions, including through the commencement by the Debtors of voluntary cases under chapter 11 of the Bankruptcy Code in the Bankruptcy Court (the cases commenced, the "**Chapter 11 Cases**");

**WHEREAS**, the Parties have agreed to take certain actions in support of the Restructuring Transactions on the terms and conditions set forth in this Agreement and the Restructuring Term Sheet.

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

***AGREEMENT***

**Section 1.**     ***Definitions and Interpretation***.

    1.01.   <u>Definitions</u>.  The following terms shall have the following definitions:

"**Acceptable Plan**" has the meaning set forth in the Restructuring Term Sheet.

"**Affiliate**" has the meaning set forth in section 101(2) of the Bankruptcy Code as if such entity was a debtor in a case under the Bankruptcy Code.

"**Agent**" means each of, and in each case in its capacity as such, the First Lien Agent, the Second Lien Agent, and the DIP Agent.

"**Agreement**" has the meaning set forth in the preamble to this Agreement and, for the avoidance of doubt, includes all the exhibits, annexes, and schedules hereto in accordance with Section 16.02 (including the Restructuring Term Sheet).

"**Agreement Effective Period**" means, with respect to a Party, the period from the Agreement Effective Date to the Termination Date applicable to that Party.

"**Alternative Restructuring Proposal**" means any inquiry, proposal, offer, bid, term sheet, discussion, or agreement with respect to a sale, disposition, new-money investment, restructuring, reorganization, merger, amalgamation, acquisition, consolidation, dissolution, debt investment, equity investment, liquidation, tender offer, recapitalization, plan of reorganization, share exchange, business combination, or similar transaction involving any one or more Company Parties or the debt, equity, or other interests in any one or more Company Parties that is an alternative to one or more of the Restructuring Transactions.

"**Avoidance Actions**" means any and all actual or potential avoidance, recovery, subordination, or other Claims, causes of action, or remedies that may be brought by or on behalf of the Company Parties, their estates, or other parties in interest under sections 502, 510, 542, 544, 545, 547 through 553, and 724(a) or other applicable sections of the Bankruptcy Code or under similar or related local, state, federal, or foreign statutes and common law, including fraudulent transfer laws.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court, each, as amended from time to time.

"**Bidding Procedures**" means the procedures governing the sale and marketing process for the Sale Transaction.

"**Bidding Procedures Motion**" means the motion seeking approval of the Bidding Procedures.

"**Bidding Procedures Order**" means the order entered by the Bankruptcy Court approving the Bidding Procedures, which Bidding Procedures Order shall be consistent with this Agreement and the Restructuring Term Sheet.

"**Business Day**" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state of New York.

"**Causes of Action**" means any action, Claim, cause of action, Avoidance Action, controversy, demand, right, action, lien, indemnity, equity interest, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, whether known, unknown, contingent or noncontingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, in contract or in tort, in law or in equity, or pursuant to any other theory of law.

"**Chapter 11 Cases**" has the meaning set forth in the recitals of this Agreement.

"**Claim**" has the meaning ascribed to it in section 101(5) of the Bankruptcy Code.

"**Company Claims/Interests**" means any Claim against, or Equity Interest in, a Company Party, including the First Lien Claims and Second Lien Claims.

"**Company Parties**" has the meaning set forth in the recitals to this Agreement.

"**Company Releasing Party**" means each of the Company Parties, and, to the maximum extent permitted by Law, each of the Company Parties, on behalf of their respective Affiliates and Related Parties.

"**Confidentiality Agreement**" means an executed confidentiality agreement, including with respect to the issuance of a "cleansing letter" or other public disclosure of material non-public information agreement, in connection with any proposed Restructuring Transactions.

"**Confirmation Date**" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

"**Confirmation Order**" means the confirmation order with respect to the Plan.

"**Consenting First Lien Lenders Advisors**" means, collectively, (a) King & Spalding LLP, and (b) one local counsel, in each case, in their capacity as professional advisors to the administrative agent and the Consenting First Lien Lenders.

4

"**Consenting Second Lien Lender Advisors**" means, collectively, (a) Proskauer Rose LLP, and (b) one local counsel, in each case, in their capacity as professional advisors to the administrative agent and the Consenting Second Lien Lender.

"**Consenting Stakeholder Releasing Party**" means, each of, and in each case in its capacity as such: (a) the Consenting First Lien Lenders; (b) the Consenting Second Lien Lender; (c) the Sponsor, (d) the Agent; (e) to the maximum extent permitted by Law, each current and former Affiliate of each Entity in clause (a) through the following clause (f); and (f) to the maximum extent permitted by Law, each Related Party of each Entity in clause (a) through this clause (f).

"**Consenting Stakeholders**" has the meaning set forth in the preamble to this Agreement.

"**Debtors**" means the Company Parties that commence Chapter 11 Cases.

"**Definitive Documents**" means the documents listed in Section 3.01.

"**DIP Agent**" means Blue Torch Finance LLC (in such capacity, together with its successors and assigns).

"**DIP Credit Agreement**" means that certain DIP Credit Agreement, dated as of June [●], 2023, by and among PGX, the First Lien Lenders, and the First Lien Agent.

"**DIP Lenders**" means First Lien Lenders that, either directly or through one or more affiliates (or funds or accounts advised or sub-advised by such person) finance the DIP Facility.

"**DIP Orders**" means the Interim DIP Order and Final DIP Order.

"**DIP Facility**" means a secured superpriority priming debtor-in-possession non-amortizing facility comprised of (i) a new money term loan facility available in multiple draws for an aggregate maximum principal amount of $19,925,000 and (ii) a roll-up facility in an aggregate maximum principal amount of $42,750,000, each as set forth in the DIP Credit Agreement and related documents.

"**Direction Letter**" means the Credit Bid Direction Letter, dated as of June 4, 2023, executed by the First Lien Lenders, the DIP Lenders and the Second Lien Lenders.

"**Entity**" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

"**Equity Interests**" means any common stock, limited liability company interest, equity security (as defined in section 101(16) of the Bankruptcy Code), equity, ownership, profit interests, unit, or share in a Company Party, including all issued, unissued, authorized, or outstanding shares of capital stock of the Company Parties and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable or exchangeable securities or other agreements, arrangements or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Company Party.

"**Event of Default**" has the meaning set forth in the DIP Credit Agreement.

"**First Day Pleadings**" means the first-day pleadings that the Company Parties file with the Bankruptcy Court upon the commencement of the Chapter 11 Cases.

"**Final DIP Order**" means the order entered by the Bankruptcy Court approving the DIP Facility on a final basis.

"**Final Order**" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, vacated, stayed, modified, or amended, and as to which the time to appeal, seek certiorari, or move for a new trial, reargument, or rehearing has expired and no appeal, petition for certiorari, or other proceeding for a new trial, reargument, or rehearing thereof has been timely sought, or if an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari, or move for a new trial, reargument, or rehearing shall have expired; provided, however, that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion under Rules 59 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in another court of competent jurisdiction) or sections 502(j) or 1144 of the Bankruptcy Code has been or may be filed with respect to such order or judgment.

"**First Lien Agent**" means Blue Torch Finance LLC, in its capacity as administrative agent and collateral agent under the First Lien Credit Agreement, or any successor administrative agent or collateral agent as permitted by the terms set forth in the First Lien Credit Agreement.

"**First Lien Claims**" means any Claims against any Company Party arising under, derived from, or based upon the First Lien Loans under the First Lien Credit Agreement.

"**First Lien Credit Agreement**" means that certain First Lien Credit Agreement, dated as of September 29, 2014, as amended, supplemented, or modified from time to time, by and among PGX, the First Lien Lenders, and the First Lien Agent.

"**First Lien Lenders**" means, collectively, the banks, financial institutions, and other lenders party to the First Lien Credit Agreement from time to time, each solely in their capacity as such.

"**First Lien Loans**" means loans outstanding under the First Lien Credit Agreement.

"**Governmental Regulatory Authority**" means any federal, state, local, or other governmental regulatory authority having jurisdiction over any of the Company Parties or otherwise required to approve or clear any aspect of the Restructuring Transactions.

"**Interim DIP Order**" means the order entered by the Bankruptcy Court approving the interim DIP order.

"**Joinder**" means a joinder to this Agreement substantially in the form attached to this Agreement as **Exhibit C**.

"**Law**" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

"**Milestones**" have the meaning set forth in Section 4.01 of this Agreement.

"**Parties**" has the meaning set forth in the preamble to this Agreement.

"**Permitted Transferee**" means each transferee of any Company Claims/Interests who meets the requirements of Section 11.01.

"**Person**" means an individual, corporation, limited liability company, partnership, association, joint-stock company, trust, unincorporated organization, joint venture or other enterprise or entity or Governmental Regulatory Authority.

"**Petition Date**" means the first date any of the Company Parties commences a Chapter 11 Case.

"**Plan**" means a joint plan of liquidation filed by the Debtors under chapter 11 of the Bankruptcy Code.

"**Plan Effective Date**" means the occurrence of the effective date of the Plan according to its terms.

"**Purchase Agreement**" means the purchase agreement pursuant to which the Company Parties will effectuate the Sale Transaction.

"**Qualified Marketmaker**" means an entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers Company Claims/Interests (or enter with customers into long and short positions in Company Claims/Interests), in its capacity as a dealer or market maker in Company Claims/Interests and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

"**Related Party**" means each of, and in each case in its capacity as such, current and former directors, managers, officers, committee members, members of any governing body, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, Affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), accountants, investment bankers, consultants, representatives, and other professionals and advisors and any such Person's or Entity's respective heirs, executors, estates, and nominees.

7

"**Released Claim**" means, with respect to any Releasing Party, any Claim, or Cause of Action that is released by such Releasing Party under Section 13 of this Agreement.

"**Released Company Parties**" means each of, and in each case in its capacity as such: (a) Company Party; (b) current and former Affiliates of each Entity in clause (a) through the following clause (c); and (c) each Related Party of each Entity in clause (a) through this clause (c).

"**Released Parties**" means each Released Company party and each Released Stakeholder Party.

"**Released Stakeholder Parties**" means, each of, and in each case in its capacity as such: (a) the Consenting First Lien Lenders; (b) the Consenting Second Lien Lender; (c) the Sponsor, (d) the Agent; (e) current and former Affiliates of each Entity in clause (a) through the following clause (f); and (f) each Related Party of each Entity in clause (a) through this clause (f).

"**Releases**" means the releases contained in Section 13 of this Agreement.

"**Releasing Parties**" means, collectively, each Company Releasing Party and each Consenting Stakeholder Releasing Party.

"**Required Consenting Lenders**" means, as of the relevant date, Consenting Lenders holding at least 50.01% of the aggregate outstanding principal amount of the First Lien Loans and the Second Lien Loans that are held by all Consenting Lenders.

"**Required Consenting Stakeholders**" means the Required Consenting Lenders and the Sponsor.

"**Required DIP Lender**" has the meaning ascribed to such term in the DIP Credit Agreement.

"**Rules**" means Rule 501(a)(1), (2), (3), and (7) of the Securities Act.

"**Sale Documents**" means all motions, filings, documents, and agreements related to the Sale Transaction, including the Purchase Agreement(s), the Bidding Procedures Motion, the Bidding Procedures, the Bidding Procedures Order, and the Sale Order.

"**Sale Motion**" means the motion seeking approval of the Sale Order.

"**Sale Order**" means the order of the Bankruptcy Court authorizing the Debtors to enter into the Purchase Agreement(s).

"**Sale Transaction**" means a sale involving all or substantially all of the assets of the Company Parties to a purchaser formed by the Consenting Lenders or a higher or otherwise better bidder pursuant to section 363 of the Bankruptcy Code.

"**Second Lien Agent**" means Prospect Capital Corporation, in its capacity as administrative agent and collateral agent under the Second Lien Credit Agreement, or any

successor administrative agent or collateral agent as permitted by the terms set forth in the Second Lien Credit Agreement.

"**Second Lien Claims**" means any Claims against any Company Party arising under, derived from, or based upon the Second Lien Loans under the Second Lien Credit Agreement.

"**Second Lien Credit Agreement**" means that certain Second Lien Credit Agreement, dated as of September 29, 2014, as amended, supplemented, or modified from time to time, by and among PGX, the Second Lien Lender, and the Second Lien Agent.

"**Second Lien Lenders**" means, collectively, the banks, financial institutions, and other lenders party to the Second Lien Credit Agreement from time to time, each solely in their capacity as such.

"**Second Lien Loans**" means loans outstanding under the Second Lien Credit Agreement.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Stalking Horse APA**" has the meaning set forth in the Restructuring Term Sheet.

"**Termination Date**" means the date on which termination of this Agreement as to a Party is effective in accordance with Sections 14.01, 14.02, 14.03, 14.04, 14.05, or 14.06.

"**Transfer**" has the meaning set forth in section 101(54) of the Bankruptcy Code.

"**Transfer Agreement**" means an executed form of the transfer agreement providing, among other things, that a transferee is bound by the terms of this Agreement and substantially in the form attached hereto as **Exhibit D**.

1.02.    Interpretation.  For purposes of this Agreement:

(a)    in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender;

(b)    capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form;

(c)    unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document (other than a Definitive Document) being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions;

(d)    unless otherwise specified, any reference herein to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, supplemented, or otherwise modified from time to time; provided that any capitalized terms herein which are defined with reference to another agreement, are defined with reference to such other agreement as of the date of this Agreement, without giving effect to any termination of

such other agreement or amendments to such capitalized terms in any such other agreement following the date hereof;

(e)  unless otherwise specified, all references herein to "Sections" are references to Sections of this Agreement;

(f)  the words "herein," "hereof," and "hereto" refer to this Agreement in its entirety rather than to any particular portion of this Agreement;

(g)  captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Agreement;

(h)  references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company Laws;

(i)  the use of "include" or "including" is without limitation, whether stated or not;

(j)  the phrase "counsel to the Consenting Stakeholders" refers in this Agreement to each counsel specified in Section 16.09 other than counsel to the Company Parties.

**Section 2.**  *Effectiveness of this Agreement*.  This Agreement shall become effective and binding upon each of the Parties at 12:00 a.m., prevailing Eastern Time, on the Agreement Effective Date, which is the date on which each of the following conditions have been satisfied or waived in accordance with this Agreement:

(a)  each of the Company Parties shall have executed and delivered counterpart signature pages of this Agreement to counsel to each of the Parties;

(b)  holders of at least two-thirds of the aggregate outstanding principal amount of the First Lien Loans and holders of at least two-thirds of the aggregate outstanding principal amount of the Second Lien Loans shall have executed and delivered counterpart signature pages of this Agreement to each of the Parties;

(c)  the Sponsor shall have executed and delivered counterpart signature pages of this Agreement to counsel to each of the Parties; and

(d)  counsel to the Company Parties shall have given notice to counsel to the Consenting Stakeholders in the manner set forth in Section 16.09 hereof (by email or otherwise) that the other conditions to the Agreement Effective Date set forth in this Section 2(a) have occurred.

**Section 3.**  *Definitive Documents*.

3.01.  The Definitive Documents governing the Restructuring Transactions shall include the following:

(a)  the Confirmation Order;

(b)      the DIP Orders;

(c)      all motions, filings, documents, and agreements related to the Sale Transaction, including without limitation, the Sale Order, the Bidding Procedures, the Bidding Procedures Motion, and the Bidding Procedures Order;

(d)      all material pleadings filed by the Company Parties in connection with the Chapter 11 Cases (or related order), including the First Day Pleadings and all orders sought pursuant thereto; *provided*, however, that monthly or quarterly operating reports, retention applications, fee applications, fee statements, and any declarations in support thereof or related thereto shall not constitute material pleadings; and

(e)      any and all other deeds, agreements, filings, notifications, pleadings, orders, certificates, letters, instruments or other documents reasonably necessary or desirable to consummate and document the transactions contemplated by this Agreement or the Restructuring Transactions (including any exhibits, amendments, modifications, or supplements from time to time).

3.02.    The Definitive Documents not executed or in a form attached to this Agreement as of the Agreement Effective Date remain subject to negotiation and completion. Upon completion, the Definitive Documents and every other document, deed, agreement, filing, notification, letter, or instrument related to the Restructuring Transactions shall contain terms, conditions, representations, warranties, and covenants, as applicable, consistent with the terms of this Agreement, as they may be modified, amended, or supplemented in accordance with Section 15. Further, the Definitive Documents not executed or in a form attached to this Agreement as of the Agreement Effective Date shall otherwise be in form and substance reasonably acceptable to the Company Parties and the Required Consenting Lenders.

**Section 4.**    *Milestones.*

4.01.    The Company Parties shall implement the Restructuring Transactions in accordance with the following milestones (the "**Milestones**"), unless extended or waived in writing in advance by the DIP Agent at the direction of the Required DIP Lenders; provided that if any such Milestone falls on a date which is not a Business Day, such Milestone shall be automatically extended to the first Business Day thereafter:

(a)      No later than 2 Business Days after the Petition Date, the Debtors shall file an appropriate motion with the Bankruptcy Court for entry of an order providing for bidding procedures for the sale of the Debtors' assets that establishes a date that is no later than 60 calendar days after the Petition Date as the deadline for the submission of binding bids with respect to their assets;

(b)      No later than 4 Business Days after the Petition Date, the Bankruptcy Court shall have entered the Interim DIP Order;

(c)      No later than 25 calendar days after the Petition Date, the Bankruptcy Court shall have entered the Final DIP Order, subject to the availability of the Bankruptcy Court to conduct the final hearing on the DIP Facility;

(d)      No later than 30 calendar days after the Petition Date, obtain entry of the Bidding Procedures Order, which order shall be in form and substance acceptable to the DIP Agent at the direction of the Required DIP Lenders;

(e)      No later than 60 calendar days after the Petition Date, parties shall submit binding bids to the Debtors for the acquired assets.

(f)      No later than 65 calendar days after the Petition Date, the Debtors shall commence an auction for the acquired assets, in accordance with the Bidding Procedures Order; provided that if there is no higher or better offer submitted in comparison to the stalking horse bid(s), no auction shall be held;

(g)      No later than 70 calendar days after the Petition Date, the Bankruptcy Court shall have entered one or more Sale Order(s) (which shall be in form and substance acceptable to Required DIP Lenders) approving each of the winning bid(s) resulting from such sale(s); and

(h)      Consummation of the sale and transactions contemplated thereby shall occur no later than the date that is 105 calendar days after the Petition Date.

**Section 5.**      *Commitments of the Consenting Lenders*.

5.01.    <u>General Commitments, Forbearances, and Waivers</u>.

(a)      <u>Affirmative Commitments</u>.    During the Agreement Effective Period, each Consenting Lender agrees, severally and not jointly, subject to Section 6, in respect of all of its Company Claims/Interests, to:

(i)      support the Restructuring Transactions and vote and exercise any powers or rights available to it (including in any board, shareholders', or creditors' meeting or in any process requiring voting or approval to which they are legally entitled to participate) in each case in favor of any matter requiring approval to the extent necessary to implement the Restructuring Transactions;

(ii)      use commercially reasonable efforts to cooperate with and assist the Company Parties in obtaining additional support for the Restructuring Transactions from the Company Parties' other stakeholders;

(iii)      use commercially reasonable efforts to oppose any party or person from taking any actions contemplated in Section 5.02(a);

(iv)      give any notice, order, instruction, or direction to the Agent necessary to give effect to the Restructuring Transactions; and

(v)      negotiate in good faith and use commercially reasonable efforts to execute and implement the Definitive Documents that are consistent with this Agreement to which it is required to be a party.

(b)    Negative Commitments.  During the Agreement Effective Period, each Consenting Lender agrees, severally and not jointly, in respect of all of its Company Claims/Interests, that it shall not directly or indirectly:

(i)    object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(ii)    propose, file, support, or vote for any Alternative Restructuring Proposal;

(iii)    file or join in any motion, objection, pleading, or other document with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is inconsistent with this Agreement;

(iv)    initiate, or have initiated on its behalf, any litigation or proceeding of any kind with respect to the Chapter 11 Cases, this Agreement, or the other Restructuring Transactions contemplated herein against the Company Parties or the other Parties other than to enforce this Agreement or any Definitive Document or as otherwise permitted under this Agreement; *provided,* that any Consenting Lender may file motions, pleadings, or other documents with the Bankruptcy Court or any other court (including any modifications or amendments thereof) with respect to its or their rights under any Definitive Document and relating to or arising from matters and rights not specifically set forth in this Agreement, including the Restructuring Term Sheet;

(v)    exercise, or direct any other person to exercise, any right or remedy for the enforcement, collection, or recovery of any of Claims against or Equity Interests in the Company Parties; or

(vi)    object to, delay, impede, or take any other action to interfere with the Company Parties' ownership and possession of their assets, wherever located, or interfere with the automatic stay arising under section 362 of the Bankruptcy Code.

5.02.    Commitments with Respect to Chapter 11 Cases.

(a)    During the Agreement Effective Period, in the event that the Company Parties determine it is in the best interests of the estates to seek confirmation of a Plan, each Consenting Lender that is entitled to vote to accept or reject such Plan pursuant to its terms agrees, severally and not jointly, that it shall

(i)    support, and vote in favor of, an Acceptable Plan,

(ii)    to the extent it is permitted to elect whether to opt out of the releases set forth in any Acceptable Plan, elect not to opt out of the releases set forth in the Plan by timely delivering its duly executed and completed ballot(s) indicating such election; and

(iii)    not change, withdraw, amend, or revoke (or cause to be changed, withdrawn, amended, or revoked) any vote or election referred to in clauses (i) and (ii) above; provided that, nothing in this Agreement shall prevent any Consenting Lender from changing,

withholding, amending, or revoking (or causing the same) its vote, election, or consent with respect to an Acceptable Plan if this Agreement has been terminated as in accordance with its terms.

(a)    During the Agreement Effective Period, each Consenting Stakeholder, in respect of each of its Company Claims/Interests, will support, and will not directly or indirectly object to, delay, impede, or take any other action in violation of this Agreement to interfere with any motion or other pleading or document filed by a Company Party in the Bankruptcy Court that is consistent with this Agreement.

**Section 6.**    ***Additional Provisions Regarding the Consenting Lenders' Commitments***.

6.01.    Notwithstanding anything contained in this Agreement, nothing in this Agreement shall:

(a)    affect the ability of any Consenting Lender to consult with any other Consenting Lender, the Company Parties, their related Affiliates or any other party in interest in the Chapter 11 Cases (including, but not limited to, any official committee and the United States Trustee);

(b)    impair or waive the rights of any Consenting Lender to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions;

(c)    constitute a waiver or amendment of any provision of the First Lien Credit Agreement or Second Lien Credit Agreement or similar agreements executed in connection with the First Lien Credit Agreement or Second Lien Credit Agreement;

(d)    be construed to prevent any Consenting Lender from exercising any consent or consultation rights provided with respect to the Required Consenting Lenders in the Definitive Documents;

(e)    prevent any Consenting Lender from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement;

(f)    require any Consenting Lender to (1) incur any material expenses, liabilities or other obligations, or agree to any commitments, undertakings, concessions, indemnities or other arrangements that could result in expenses, liabilities, or other obligations to any Consenting Lender or its affiliates or (2) provide any information that it reasonably determines to be sensitive or confidential;

(g)    prohibit any Consenting Lender from taking any action to prepare, commence, or support any action or other legal proceeding that seeks to establish, or defend from challenge, the amount, validity, allowance, character, enforceability, liens or encumbrances securing, or priority of any Company Claim/Interest of any Consenting Lender; or

(h)    limit the right of any Party to exercise any right or remedy provided under this Agreement, the Confirmation Order, or any other Definitive Document.

**Section 7.**    ***Commitments of the Company Parties***.

7.01.    <u>Affirmative Commitments</u>.  Except as set forth in Section 8, during the Agreement Effective Period, the Company Parties agree to:

(a)    support and take all steps reasonably necessary and desirable to consummate the Restructuring Transactions in accordance with this Agreement;

(b)    to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring Transactions contemplated herein, take all steps reasonably necessary and desirable to address any such impediment;

(c)    use commercially reasonable efforts to obtain any and all required regulatory and/or third-party approvals for the Restructuring Transactions;

(d)    negotiate in good faith and use commercially reasonable efforts to execute and deliver the Definitive Documents and any other required agreements to effectuate and consummate the Restructuring Transactions as contemplated by this Agreement;

(e)    use commercially reasonable efforts to seek additional support for the Restructuring Transactions from their other material stakeholders to the extent reasonably prudent; and

(f)    (1) provide counsel for the Consenting Stakeholders a reasonable opportunity to review draft copies of all First Day Pleadings and, (2) to the extent reasonably practicable, provide a reasonable opportunity to counsel to any Consenting Stakeholders materially affected by such filing to review draft copies of other documents that the Company Parties intend to file with Bankruptcy Court, as applicable.

7.02.    <u>Negative Commitments</u>.  Except as set forth in Section 8, during the Agreement Effective Period, each of the Company Parties shall not directly or indirectly:

(a)    object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(b)    take any action that is inconsistent in any material respect with, or is intended to frustrate or impede approval, implementation and consummation of the Restructuring Transactions described in, this Agreement; or

(c)    file any motion, pleading, or Definitive Documents with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this Agreement.

**Section 8.    *Additional Provisions Regarding Company Parties' Commitments*.**

8.01.    Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require a Company Party or the board of directors, board of managers, or similar governing body of a Company Party, after consulting with counsel, to take any action or to refrain from taking any action with respect to the Restructuring Transactions to the extent taking or failing to take such action would be inconsistent with applicable Law or its fiduciary obligations under

applicable Law, and any such action or inaction pursuant to this Section 8.01 shall not be deemed to constitute a breach of this Agreement.

8.02.    Notwithstanding anything to the contrary in this Agreement (but subject to Section 8.01), each Company Party and their respective directors, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall have the rights to:  (a) consider, respond to, and facilitate Alternative Restructuring Proposals; (b) provide access to non-public information concerning any Company Party to any Entity or enter into Confidentiality Agreements or nondisclosure agreements with any Entity; (c) maintain or continue discussions or negotiations with respect to Alternative Restructuring Proposals; (d) otherwise cooperate with, assist, participate in, or facilitate any inquiries, proposals, discussions, or negotiation of Alternative Restructuring Proposals; and (e) enter into or continue discussions or negotiations with holders of Claims against or Equity Interests in a Company Party (including any Consenting Stakeholder), any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee), or any other Entity regarding the Restructuring Transactions or Alternative Restructuring Proposals.

8.03.    Except as otherwise set forth in any order of the Bankruptcy Court, at all times prior to the date on which the Company Parties enter into a definitive agreement in respect of an Alternative Restructuring Proposal, the Company Parties shall provide the Consenting First Lien Lenders Advisors and the Consenting Second Lien Lender Advisors reasonably detailed updates on the status of discussions or negotiations regarding any Alternative Restructuring Proposal (including the terms thereof subject to any applicable confidentiality restrictions) within three (3) Business Days of the Company Parties' or their advisors' receipt of any such Alternative Restructuring Proposal.  The Company Parties and/or the Company Parties' advisors will make themselves reasonably available for separate weekly status update calls with the Consenting First Lien Lenders Advisors and the Consenting Second Lien Lender Advisors.

8.04.    Nothing in this Agreement shall: (a) impair or waive the rights of any Company Party to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; or (b) prevent any Company Party from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

**Section 9.**    *Commitments of the Sponsor*.

9.01.    <u>Affirmative Commitments</u>.  During the Agreement Effective Period (subject to Section 10), the Sponsor agrees to:

(a)    act in good faith to support, approve, implement, reasonably cooperate with each of the Parties, and take all commercially reasonable actions necessary, or reasonably requested by any other Party to facilitate the implementation and consummation of the Restructuring Transactions as contemplated by this Agreement and the Restructuring Term Sheet;

(b)    vote and exercise any powers or rights available to it (including in any meeting or process requiring voting or approval in which it is legal entitled to participate) in favor of any matter requiring approval to the extent necessary to implement the Restructuring Transactions;

(c)    consent to, support, and participate in all of the releases and exculpation provisions contained herein or described in the Restructuring Term Sheet and, to the extent it is permitted to elect whether to opt in or out of the release and exculpation provisions set forth in the Restructuring Term Sheet, elect to opt in or not to opt out (as applicable) of such release and exculpation provisions by timely delivering its duly executed and completed ballot(s) designating that it opts in or does not opt out (as applicable) of the releases and exculpations to the extent permitted to elect whether to opt out of the releases set forth in the Acceptable Plan, not to elect to opt out of the releases set forth in the Acceptable Plan;

(d)    use commercially reasonable efforts to cooperate with and assist the Company Parties in obtaining additional support for the Restructuring Transactions from the Company Parties' other stakeholders;

(e)    use commercially reasonable efforts to oppose, if requested by the Company Parties or Required Consenting Lenders, the efforts of any person or Entity (including any other Party) with respect to any action contemplated in Section 9.02 or any other action that would have the direct or indirect effect of adversely impacting the consummation of the Restructuring Transactions; and

(f)    negotiate in good faith and use commercially reasonable efforts to execute and implement the Definitive Documents that are consistent with this Agreement to which it is required to be a party.

9.02.    <u>Negative Commitments</u>.   During the Agreement Effective Period (subject to Section 10), the Sponsor shall not, directly or indirectly, and shall not direct any other Entity to:

(a)    object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(b)    file or join in any motion, objection, pleading, or other document with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is inconsistent with this Agreement;

(c)    initiate, or have initiated on its behalf, any litigation or proceeding of any kind with respect to the Chapter 11 Cases, this Agreement, or the other Restructuring Transactions contemplated herein against the Company Parties or the other Parties other than to enforce this Agreement or any Definitive Document or as otherwise permitted under this Agreement; *provided* that the Sponsor may file motions, pleadings, or other documents with the Bankruptcy Court or any other court (including any modifications or amendments thereof) with respect to its rights under any Definitive Document and relating to or arising from matters and rights not specifically set forth in this Agreement, including the Restructuring Term Sheet;

(d)    file or otherwise support, encourage, seek, solicit, pursue, initiate, assist, join or participate in any challenge to the validity, enforceability, perfection or priority of, or any action seeking avoidance, claw-back, recharacterization or subordination of, any portion of the First Lien Claims, Second Lien Claims, or any liens or collateral securing the First Lien Claims or Second Lien Claims; or

17

(e)    object to, join in any objection to, delay, impede, or take any other action to interfere with the Company Parties' ownership and possession of their assets, wherever located, or interfere with the automatic stay arising under section 362 of the Bankruptcy Code.

**Section 10.    *Additional Provisions Regarding the Sponsor's Commitments*.**  Notwithstanding anything contained in this Agreement to the contrary, nothing in this Agreement shall:

(a)    affect the ability of the Sponsor to consult with any Consenting Lender, the Company Parties, their related Affiliates or any other party in interest in the Chapter 11 Cases (including, but not limited to, any official committee and the United States Trustee);

(b)    impair or waive the rights of the Sponsor to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions;

(c)    prevent the Sponsor from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement; or

(d)    limit the right of any Party to exercise any right or remedy provided under this Agreement, the Confirmation Order, or any other Definitive Document.

**Section 11.    *Transfer of Equity Interests and Securities*.**

11.01.  During the Agreement Effective Period, no Consenting Stakeholder shall Transfer any ownership (including any beneficial ownership as defined in the Rule 13d-3 under the Securities Exchange Act of 1934, as amended) in any Company Claims/Interests to any affiliated or unaffiliated party, including any party in which it may hold a direct or indirect beneficial interest, unless:

(a)    in the case of any Company Claims/Interests, the authorized transferee is either (1) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (2) a non-U.S. person in an offshore transaction as defined under Regulation S under the Securities Act, (3) an institutional accredited investor (as defined in the Rules), or (4) a Consenting Stakeholder; and

(b)    either (i) the transferee executes and delivers to counsel to the Company Parties, at or before the time of the proposed Transfer, a Transfer Agreement or (ii) the transferee is a Consenting Stakeholder and the transferee provides notice of such Transfer (including the amount and type of Company Claims/Interests Transferred) to counsel to (i) the Company Parties and (ii) the Consenting Lenders at or before the time of the proposed Transfer.

11.02.  Upon compliance with the requirements of Section 11.01, the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of the rights and obligations in respect of such transferred Company Claims/Interests.  Any Transfer in violation of Section 11.01 shall be void *ab initio*.

11.03.  This Agreement shall in no way be construed to preclude the Consenting Stakeholders from acquiring additional Company Claims/Interests; provided*, however*, that (a) such additional Company Claims/Interests shall automatically and immediately upon acquisition by a Consenting Stakeholder be deemed subject to the terms of this Agreement

(regardless of when or whether notice of such acquisition is given to counsel to the Company Parties or counsel to the Consenting Stakeholders) and (b) such Consenting Stakeholder must provide notice of such acquisition (including the amount and type of Company Claim/Interest acquired) to counsel to (i) the Company Parties and (ii) Consenting Lenders within five (5) Business Days of such acquisition.

11.04.  This Section 10(a) shall not impose any obligation on any Company Party to issue any "cleansing letter" or otherwise publicly disclose information for the purpose of enabling a Consenting Stakeholder to Transfer any of its Company Claims/Interests.  Notwithstanding anything to the contrary herein, to the extent a Company Party and another Party have entered into a Confidentiality Agreement, the terms of such Confidentiality Agreement shall continue to apply and remain in full force and effect according to its terms, and this Agreement does not supersede any rights or obligations otherwise arising under such Confidentiality Agreements.

11.05.  Notwithstanding Section 11.01, a Qualified Marketmaker that acquires any Company Claims/Interests with the purpose and intent of acting as a Qualified Marketmaker for such Company Claims/Interests shall not be required to execute and deliver a Transfer Agreement in respect of such Company Claims/Interests if (i) such Qualified Marketmaker subsequently transfers such Company Claims/Interests (by purchase, sale assignment, participation, or otherwise) within five (5) Business Days of its acquisition to a transferee that is an entity that is not an affiliate, affiliated fund, or affiliated entity with a common investment advisor; (ii) the transferee otherwise is a Permitted Transferee under Section 11.01; and (iii) the Transfer otherwise is a permitted Transfer under Section 11.01.  To the extent that a Consenting Stakeholder is acting in its capacity as a Qualified Marketmaker, it may Transfer (by purchase, sale, assignment, participation, or otherwise) any right, title or interests in Company Claims/Interests that the Qualified Marketmaker acquires from a holder of the Company Claims/Interests who is not a Consenting Stakeholder without the requirement that the transferee be a Permitted Transferee.

11.06.  Notwithstanding anything to the contrary in this Section 11, the restrictions on Transfer set forth in this Section 11 shall not apply to the grant of any liens or encumbrances on any claims and interests in favor of a bank or broker-dealer holding custody of such claims and interests in the ordinary course of business and which lien or encumbrance is released upon the Transfer of such claims and interests.

**Section 12.**    *Representations and Warranties of Consenting Stakeholders*.  Each Consenting Stakeholder severally, and not jointly, represents and warrants that, as of the date such Consenting Stakeholder executes and delivers this Agreement:

(a)    it is the beneficial or record owner of the face amount of the Company Claims/Interests or is the nominee, investment manager, or advisor for beneficial holders of the Company Claims/Interests reflected in, and, having made reasonable inquiry, is not the beneficial or record owner of any Company Claims/Interests other than those reflected in, such Consenting Stakeholder's signature page to this Agreement or a Transfer Agreement, as applicable (as may be updated pursuant to Section 11);

(b)    it has the full power and authority to act on behalf of, vote and consent to matters concerning, such Company Claims/Interests;

(c)    such Company Claims/Interests are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition, transfer, or encumbrances of any kind, that would adversely affect in any way such Consenting Stakeholder's ability to perform any of its obligations under this Agreement at the time such obligations are required to be performed;

(d)    it has the full power to vote, approve changes to, and transfer all of its Company Claims/Interests referable to it as contemplated by this Agreement subject to applicable Law; and

(e)    solely with respect to holders of Company Claims/Interests, (i) it is either (A) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (B) not a U.S. person (as defined in Regulation S of the Securities Act), or (C) an institutional accredited investor (as defined in the Rules), and (ii) any securities acquired by the Consenting Stakeholder in connection with the Restructuring Transactions will have been acquired for investment and not with a view to distribution or resale in violation of the Securities Act.

**Section 13.**    ***Mutual Representations, Warranties, and Covenants***.    Each of the Parties represents, warrants, and covenants to each other Party, as of the date such Party executed and delivers this Agreement:

(a)    it is validly existing and in good standing under the Laws of the state of its organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(b)    except as expressly provided in this Agreement and the Bankruptcy Code, no consent or approval is required by any other person or entity in order for it to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement;

(c)    the entry into and performance by it of, and the transactions contemplated by, this Agreement do not, and will not, conflict in any material respect with any Law or regulation applicable to it or with any of its articles of association, memorandum of association or other constitutional documents;

(d)    it has not assigned, conveyed, sold, hypothecated or otherwise transferred all, any part of or any interest in any claim or Cause of Action that would be released pursuant to the releases set forth in the Restructuring Term Sheet or the Acceptable Plan;

(e)    except as expressly provided in this Agreement, it has (or will have, at the relevant time) all requisite corporate or other power and authority to enter into, execute, and deliver this Agreement and to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement; and

(f)    except as expressly provided by this Agreement, it is not party to any restructuring or similar agreements or arrangements with the other Parties to this Agreement that have not been disclosed to all Parties to this Agreement.

**Section 14.**    *Termination Events*.

14.01.    <u>Consenting First Lien Lenders Termination Events</u>.  This Agreement may be terminated with respect to the Consenting First Lien Lenders, by the Required Consenting Lenders, by the delivery to the Company Parties of a written notice in accordance with Section 16.09 hereof upon the occurrence of the following events:

(a)    the breach in any material respect by a Company Party, the Consenting Second Lien Lender or the Sponsor of any of the representations, warranties, or covenants of the Company Parties set forth in this Agreement that (i) is adverse to the Consenting First Lien Lenders seeking termination pursuant to this provision and (ii) remains uncured for seven (7) calendar days;

(b)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for thirty (30) calendar days after such terminating Consenting Lender transmit a written notice in accordance with Section 16.09 hereof detailing any such issuance; <u>provided</u>, that this termination right may not be exercised by any Party that sought or requested such ruling or order in contravention of any obligation set out in this Agreement;

(c)    [reserved]

(d)    the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Company Party or the Sponsor seeking an order (without the prior written consent of the Required Consenting Lenders, not to be unreasonably withheld), (i) converting one or more of the Chapter 11 Cases of a Company Party to a case under chapter 7 of the Bankruptcy Code, (ii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in one or more of the Chapter 11 Cases of a Company Party, or (iii) rejecting this Agreement;

(e)    the failure to meet any Milestone, which has not been waived or extended in a manner consistent with this Agreement; *provided* that, if the failure to achieve such Milestone is caused by, or results from, the breach by any Consenting First Lien Lender, as applicable, of its covenants, agreements, or other obligations under this Agreement, such Consenting First Lien Lender(s) shall may not assert the right to terminate this Agreement pursuant to this Section 14.01(e);

(f)    any Company Party, the Consenting Second Lien Lender, or the Sponsor (i) files, waives, amends or modifies, or files a pleading seeking approval of any Definitive Document or authority to waive, amend, or modify any Definitive Document (including any waiver of any term or condition therein) in a manner that is materially inconsistent with, or constitutes a material breach of, this Agreement (including with respect to the consent rights afforded the Consenting Lenders under this Agreement), without the prior written consent of the Required Consenting Lenders, (ii) files or supports any plan of reorganization or liquidation that prevents, prohibits or otherwise restricts consummation of the Sale Transaction, or (iii) publicly announces its intention to take any such acts listed in the foregoing clause (i) or (ii), in the case of each of the foregoing clauses (i) through (iii), which remains uncured for seven (7) calendar days;

(g)     any Sponsor or the Consenting Second Lien Lender files, proposes, or otherwise supports any plan of reorganization or liquidation other than an Acceptable Plan or an asset sale of all or substantially all of a Company Party's assets, as and to the extent contemplated under this Agreement;

(h)     any Company Party (i) voluntarily commences any case or files any petition seeking bankruptcy, winding up, dissolution, liquidation, administration, moratorium, reorganization, or other relief under any federal, state, or foreign bankruptcy, insolvency, administrative receivership, or similar law now or hereafter in effect, except as provided for in this Agreement, (ii) consents to the institution of, or fails to contest in a timely and appropriate manner, any involuntary proceeding or petition, (iii) applies for or consents to the appointment of a receiver, administrator, administrative receiver, trustee, custodian, sequestrator, conservator, or similar official for an Company Party or for a substantial part of any Company Party's assets, (iv) files an answer admitting the material allegations of a petition filed against it in any such proceeding, (v) makes a general assignment or arrangement for the benefit of creditors or (vi) takes any corporate action for the purpose of authorizing any of the foregoing;

(i)     any Company Party, the Consenting Second Lien Lender or the Sponsor files or supports another party in filing (i) a motion or pleading challenging the amount, validity, or priority of any Claims held by any Consenting Lender (or any liens securing such Claims) or (ii) a motion or pleading asserting (or seeking standing to assert) any purported claims or causes of action against any of the Consenting Lenders;

(j)     the Bankruptcy Court enters an order terminating the Debtors' exclusive right to file or solicit acceptances of a plan of reorganization (including an Acceptable Plan);

(k)     the Company Parties fail to pay any fees and expenses of the Consenting First Lien Lenders Advisors in accordance with the terms of this Agreement or any order approving postpetition financing (unless such failure to pay was required by the Bankruptcy Court), which breach remains uncured for seven (7) calendar days after receipt by the Company Parties of notice of such breach;

(l)     any of the Definitive Documents (i) shall have been materially and adversely amended or modified or (ii) shall have been withdrawn, in each case, without the consent of the Required Consenting Lenders, in each case, unless cured (to the extent curable) within seven (7) calendar days after receipt by the Company Parties of notice of any event described in this clause (l);

(m)     breach of the Direction Letter by the Consenting Second Lien Lender or the Second Lien Agent;

(n)     the termination of the Stalking Horse APA on account of any breach by the Debtors under the terms of the Stalking Horse APA;

(o)     the termination of the DIP Credit Agreement on account of any Event of Default by the Debtors under the terms of the DIP Credit Agreement;

(p)     the termination of the DIP Order;

(q)    any Company Party proposes, affirmatively pursues or approves any Alternative Restructuring Proposal;  or

(r)    any event, development, state of facts, change, circumstance, occurrence, condition or effect occurring after the Agreement Effective Date and prior to the closing of the Sale Transaction, including, without limitation, the entry of an order by a court of competent jurisdiction, that relates to or arises from the CFPB Action (as defined in the DIP Credit Agreement) and that, either individually or in the aggregate, could reasonably be expected to have an adverse effect on any of (i) the operations, assets, liabilities or financial condition of the Company Parties taken as a whole, (ii) the ability of the Company Parties to perform any of their payment obligations, or any other obligation, under any Loan Document (as defined in the DIP Credit Agreement) or the DIP Orders, (iii) the closing of the Sale Transaction, (iv) the legality, validity or enforceability of the DIP Facility, (v) the rights and remedies of any DIP Agent or any DIP Lender under the DIP Facility or the DIP Orders and (vi) the validity, perfection or priority of a Lien in favor of the DIP Agent for the benefit of the DIP Lenders.

14.02.  <u>Consenting Second Lien Lender Termination Events</u>.  This Agreement may be terminated with respect to the Consenting Second Lien Lender by the delivery to the Company Parties of a written notice in accordance with Section 16.09 hereof upon the occurrence of the following events:

(a)    the breach in any material respect by a Company Party or the Sponsor of any of the representations, warranties, or covenants of the Company Parties set forth in this Agreement that (i) is adverse to the Consenting Second Lien Lender seeking termination pursuant to this provision and (ii) remains uncured for seven (7) calendar days;

(b)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for thirty (30) calendar days after such terminating Consenting Lender transmit a written notice in accordance with Section 16.09 hereof detailing any such issuance; <u>provided</u>, that this termination right may not be exercised by any Party that sought or requested such ruling or order in contravention of any obligation set out in this Agreement;

(c)    [reserved]

(d)    the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Company Party or the Sponsor seeking an order (without the prior written consent of the Required Consenting Lenders, not to be unreasonably withheld), (i) converting one or more of the Chapter 11 Cases of a Company Party to a case under chapter 7 of the Bankruptcy Code, (ii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in one or more of the Chapter 11 Cases of a Company Party, or (iii) rejecting this Agreement;

(e)    the failure to meet any Milestone, which has not been waived or extended in a manner consistent with this Agreement; *provided* that, if the failure to achieve such Milestone is caused by, or results from, the breach by the Consenting Second Lien Lender, as applicable, of its

covenants, agreements, or other obligations under this Agreement, the Consenting Second Lien Lender(s) may not assert the right to terminate this Agreement pursuant to this Section 14.02(e);

(f)     any Company Party, the first Lien Lender, or the Sponsor (i) files, waives, amends or modifies, or files a pleading seeking approval of any Definitive Document or authority to waive, amend, or modify any Definitive Document (including any waiver of any term or condition therein) in a manner that is materially inconsistent with, or constitutes a material breach of, this Agreement (including with respect to the consent rights afforded the Consenting Lenders under this Agreement), without the prior written consent of the Required Consenting Lenders, (ii) files or supports any plan of reorganization or liquidation that prevents, prohibits or otherwise restricts consummation of the Sale Transaction, or (iii) publicly announces its intention to take any such acts listed in the foregoing clause (i) or (ii), in the case of each of the foregoing clauses (i) through (iii), which remains uncured for seven (7) calendar days;

(g)     any Sponsor or First Lien Lender files, proposes, or otherwise supports any plan of reorganization or liquidation other than an Acceptable Plan or an asset sale of all or substantially all of a Company Party's assets, as and to the extent contemplated under this Agreement;

(h)     any Company Party (i) voluntarily commences any case or files any petition seeking bankruptcy, winding up, dissolution, liquidation, administration, moratorium, reorganization, or other relief under any federal, state, or foreign bankruptcy, insolvency, administrative receivership, or similar law now or hereafter in effect, except as provided for in this Agreement, (ii) consents to the institution of, or fails to contest in a timely and appropriate manner, any involuntary proceeding or petition, (iii) applies for or consents to the appointment of a receiver, administrator, administrative receiver, trustee, custodian, sequestrator, conservator, or similar official for an Company Party or for a substantial part of any Company Party's assets, (iv) files an answer admitting the material allegations of a petition filed against it in any such proceeding, (v) makes a general assignment or arrangement for the benefit of creditors or (vi) takes any corporate action for the purpose of authorizing any of the foregoing;

(i)     any Company Party, First Lien Lender or the Sponsor files or supports another party in filing (i) a motion or pleading challenging the amount, validity, or priority of any Claims held by any Consenting Lender (or any liens securing such Claims) or (ii) a motion or pleading asserting (or seeking standing to assert) any purported claims or causes of action against any of the Consenting Lenders;

(j)     the Bankruptcy Court enters an order terminating the Debtors' exclusive right to file or solicit acceptances of a plan of reorganization (including an Acceptable Plan);

(k)     the Company Parties fail to pay any fees and expenses of the Consenting Second Lien Lender Advisors in accordance with the terms of this Agreement or any order approving postpetition financing (unless such failure to pay was required by the Bankruptcy Court), which breach remains uncured for seven (7) calendar days after receipt by the Company Parties of notice of such breach;

(l)     any of the Definitive Documents (i) shall have been materially and adversely amended or modified or (ii) shall have been withdrawn, in each case, without the consent of the

Required Consenting Lenders, in each case, unless cured (to the extent curable) within seven (7) calendar days after receipt by the Company Parties of notice of any event described in this clause (l);

(m)     breach of the Direction Letter by any First Lien Lender or the First Lien Agent;

(n)     the termination of the Stalking Horse APA on account of any breach by the Debtors under the terms of the Stalking Horse APA; or

(o)     the termination of the DIP Credit Agreement on account of any Event of Default by the Debtors under the terms of the DIP Credit Agreement.

(p)     the termination of the DIP Order;

(q)     any Company Party proposes, affirmatively pursues or approves any Alternative Restructuring Proposal; or

(r)     any event, development, state of facts, change, circumstance, occurrence, condition or effect occurring after the Agreement Effective Date and prior to the closing of the Sale Transaction, including, without limitation, the entry of an order by a court of competent jurisdiction, that relates to or arises from the CFPB Action (as defined in the DIP Credit Agreement) and that, either individually or in the aggregate, could reasonably be expected to have an adverse effect on any of (i) the operations, assets, liabilities or financial condition of the Company Parties taken as a whole, (ii) the ability of the Company Parties to perform any of their payment obligations, or any other obligation, under any Loan Document (as defined in the DIP Credit Agreement) or the DIP Orders, (iii) the closing of the Sale Transaction, (iv) the legality, validity or enforceability of the DIP Facility, (v) the rights and remedies of any DIP Agent or any DIP Lender under the DIP Facility or the DIP Orders and (vi) the validity, perfection or priority of a Lien in favor of the DIP Agent for the benefit of the DIP Lenders.

14.03.  <u>Company Party Termination Events</u>.  Any Company Party may terminate this Agreement as to all Parties upon prior written notice to all Parties in accordance with Section 16.09 hereof upon the occurrence of any of the following events:

(a)     the breach in any material respect by one or more of the Consenting Stakeholders of any provision set forth in this Agreement that remains uncured for a period of fifteen (15) Business Days after the receipt by the Consenting Stakeholders of notice of such breach;

(b)     the board of directors, board of managers, or such similar governing body of any Company Party determines, after consulting with counsel, (i) that proceeding with any of the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties or applicable Law or (ii) in the exercise of its fiduciary duties, to pursue an Alternative Restructuring Proposal; or

(c)     the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for thirty (30) Business Days after such terminating Company Party transmits a written notice in

accordance with Section 16.09 hereof detailing any such issuance; provided, that this termination right shall not apply to or be exercised by any Company Party that sought or requested such ruling or order in contravention of any obligation or restriction set out in this Agreement.

14.04.  Sponsor Termination Events.  The Sponsor may terminate this Agreement as to all Parties upon prior written notice to all Parties in accordance with Section 16.09 hereof upon the occurrence of any of the following events:

(a)    the breach in any material respect by one or more of the Company Party or Consenting Lender of any provision set forth in this Agreement that remains uncured for a period of seven (7) calendar days after the receipt by the Company Parties and Consenting Lenders of notice of such breach;

(b)    the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Company Party or Consenting Lender seeking an order (i) converting one or more of the Chapter 11 Cases of a Company Party to a case under chapter 7 of the Bankruptcy Code or dismissing any of the Chapter 11 Cases or (ii) appointing an examiner with expanded powers, a trustee or a receiver; provided that this termination right may not be exercised if the Consenting Lender sought, requested or supported such order or failed to oppose such ruling or order;

(c)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for thirty (30) calendar days after such terminating Company Party transmits a written notice in accordance with Section 16.09 hereof detailing any such issuance; provided, that this termination right shall not apply to or be exercised by any Company Party that sought or requested such ruling or order in contravention of any obligation or restriction set out in this Agreement;

(d)    any Definitive Document, without each respective Party's express written agreement (i) modifies or affects the release provisions related the Sponsor as identified in the Restructuring Term Sheet or (ii) modifies or affects the rights or obligations of the Sponsor pursuant to or identified in this Agreement or the Restructuring Term Sheet or implemented pursuant to the Restructuring Transactions; or

14.05.  Mutual Termination.  This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement among all of the following:  (a) the Required Consenting Lenders; (b) the Sponsor; and (c) each Company Party.

14.06.  Automatic Termination.  This Agreement shall terminate automatically without any further required action or notice immediately (i) on the date that is sixty (60) days following consummation of the Sale Transaction, or (ii) in the event the Debtors file a Plan with the Bankruptcy Court, the earlier of (a) ninety (90) days following the filing thereof and (b) the Plan Effective Date.

14.07.  Effect of Termination.  Upon the occurrence of a Termination Date as to a Party, this Agreement shall be of no further force and effect as to such Party and each Party subject to such termination shall be released from its commitments, undertakings, and agreements under or

related to this Agreement and shall have the rights and remedies that it would have had, had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Restructuring Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement, including with respect to any and all Claims or causes of action.  Upon the occurrence of a Termination Date prior to the Confirmation Order being entered by a Bankruptcy Court, any and all consents or ballots tendered by the Parties subject to such termination before a Termination Date shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring Transactions and this Agreement or otherwise; provided, however, any Consenting Stakeholder withdrawing or changing its vote pursuant to this Section 14.07 shall promptly provide written notice of such withdrawal or change to each other Parties to this Agreement and, if such withdrawal or change occurs on or after the Petition Date, file notice of such withdrawal or change with the Bankruptcy Court.  Nothing in this Agreement shall be construed as prohibiting a Company Party or any of the Consenting Stakeholders from contesting whether any such termination is in accordance with its terms or to seek enforcement of any rights under this Agreement that arose or existed before a Termination Date.  Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict (a) any right of any Company Party or the ability of any Company Party to protect and reserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Consenting Stakeholder, and (b) any right of any Consenting Stakeholder, or the ability of any Consenting Stakeholder, to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Company Party or Consenting Stakeholder.  No purported termination of this Agreement shall be effective under this Section 14.07 or otherwise if the Party seeking to terminate this Agreement is in material breach of this Agreement, except a termination pursuant to Section 14.03(b).  Nothing in this Section 14.07 shall restrict any Company Party's right to terminate this Agreement in accordance with Section 14.03(b).

**Section 15.**    *Amendments and Waivers*.

(a)    This Agreement may not be modified, amended, or supplemented, and no condition or requirement of this Agreement may be waived, in any manner except in accordance with this Section 15.

(b)    This Agreement may be modified, amended, or supplemented, or a condition or requirement of this Agreement may be waived, in a writing signed by  (a) each Company Party, (b) the Required Consenting Lenders, and (c) the Sponsor; *provided, however*, that if the proposed modification, amendment, waiver, or supplement has a material, disproportionate, and adverse effect on any Consenting Stakeholder, then the consent of each such affected Consenting Stakeholder shall also be required to effectuate such modification, amendment, waiver or supplement.

(c)    Any proposed modification, amendment, waiver or supplement that does not comply with this Section 15 shall be ineffective and void *ab initio*.

(d)    The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other

or subsequent breach.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy under this Agreement shall operate as a waiver of any such right, power or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise of such right, power or remedy or the exercise of any other right, power or remedy.  All remedies under this Agreement are cumulative and are not exclusive of any other remedies provided by Law.

**Section 16.**    *Miscellaneous*.

16.01.  <u>Acknowledgement</u>.  Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise.  Any such offer or solicitation will be made only in compliance with all applicable securities Laws, provisions of the Bankruptcy Code, and/or other applicable Law.

16.02.  <u>Exhibits Incorporated by Reference; Conflicts</u>.  Each of the exhibits, annexes, signatures pages, and schedules attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include such exhibits, annexes, and schedules.  In the event of any inconsistency between this Agreement (without reference to the exhibits, annexes, and schedules hereto) and the exhibits, annexes, and schedules hereto, this Agreement (without reference to the exhibits, annexes, and schedules thereto) shall govern.

16.03.  <u>Further Assurances</u>.  Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, or as may be required by order of the Bankruptcy Court, from time to time, to effectuate the Restructuring Transactions, as applicable.

16.04.  <u>Complete Agreement</u>.  Except as otherwise explicitly provided herein, this Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, among the Parties with respect thereto, other than any Confidentiality Agreement.

16.05.  <u>GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM; TRIAL BY JURY WAIVER</u>.  THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF.  Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, to the extent possible, in the Bankruptcy Court, and solely in connection with claims arising under this Agreement:  (a) irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court; (b) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court; and (c) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any Party hereto.  EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY

LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

16.06. <u>Execution of Agreement</u>. This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement. Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

16.07. <u>Rules of Construction</u>. This Agreement is the product of negotiations among the Company Parties and the Consenting Stakeholders, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof. The Company Parties and the Consenting Stakeholders were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel.

16.08. <u>Successors and Assigns; Third Parties</u>. This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable. There are no third-party beneficiaries under this Agreement, and the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other person or entity.

16.09. <u>Notices</u>. All notices hereunder shall be deemed given if in writing and delivered, by electronic mail, courier, or registered or certified mail (return receipt requested), to the following addresses (or at such other addresses as shall be specified by like notice):

(a)     if to a Company Party, to:

PGX Holdings, Inc.
257 East 200 South, Suite 1200
Salt Lake City, Utah 84111
Attention:             Eric Kamerath
E-mail address:       ekamerath@ekamlaw.com

and

John C. Heath, Attorney At Law PC
P.O. Box 1173
Salt Lake City, Utah 84110
Attention:             John C. Heath
E-mail address:       jch@johnheathlaw.com

with copies to:

Kirkland & Ellis LLP
300 North LaSalle Street

Chicago, Illinois 60654
Attention:            Spencer A. Winters
                      Whitney Fogelberg
                      Alison J. Wirtz
E-mail address:       spencer.winters@kirkland.com
                      whitney.fogelberg@kirkland.com
                      alison.wirtz@kirkland.com

and

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attention:            Joshua A. Sussberg, P.C.
E-mail address:       joshua.sussberg@kirkland.com

(b)    if to the First Lien Lender, to:

Blue Torch Finance LLC
c/o Blue Torch Capital LP
150 East 58th Street, 39th Floor
New York, New York 10155
E-mail address:       BlueTorchAgency@alterdomus.com

with copies to:

King & Spalding LLP
1185 Avenue of the Americas, 34th Floor
New York, New York 10036
Attention:            Roger Schwartz
E-mail address:       rschwartz@kslaw.com

and

King & Spalding LLP
110 N. Wacker Drive, Suite 3800
Chicago, IL 60606
Attention:            Geoffrey King
Email address:        gking@kslaw.com

(c)    if to the Consenting Second Lien Lender or Sponsor, to:

Prospect Capital Corporation
10 East 40th Street, 42nd Floor
New York, New York 10016
Attention:            General Counsel
                      Jason Wilson
E-mail address:       fax@prospectcap.com

pl@prospectcap.com
pacct@prospectcap.com
jwilson@prospectcap.com

with copies to:

Proskauer Rose LLP
One International Place
Boston, Massachusetts 02110-2600
Attention:          Peter Antoszyk
                    David M. Hillman
E-mail address:     pantoszyk@proskauer.com
                    dhillman@proskauer.com

Any notice given by delivery, mail, or courier shall be effective when received.

16.10.  Independent Due Diligence and Decision Making.  Each Consenting Stakeholder hereby confirms that its decision to execute this Agreement has been based upon its independent investigation of the operations, businesses, financial and other conditions, and prospects of the Company Parties.

16.11.  Enforceability of Agreement.  Each of the Parties to the extent enforceable waives any right to assert that the exercise of termination rights under this Agreement is subject to the automatic stay provisions of the Bankruptcy Code, and expressly stipulates and consents hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for purposes of exercising termination rights under this Agreement, to the extent the Bankruptcy Court determines that such relief is required.

16.12.  Waiver.  If the Restructuring Transactions are not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights. Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms or the payment of damages to which a Party may be entitled under this Agreement.

16.13.  Specific Performance.  It is understood and agreed by the Parties that money damages be an insufficient remedy for any breach of this Agreement by any Party, and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

16.14.  Several, Not Joint, Claims.  Except where otherwise specified, the agreements, representations, warranties, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

16.15.  Severability and Construction.  If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions

shall remain in full force and effect if essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

16.16.  <u>Remedies Cumulative</u>.  All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at Law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

16.17.  <u>Capacities of Consenting Stakeholders</u>.  Each Consenting Stakeholder has entered into this agreement on account of all Company Claims/Interests that it holds (directly or through discretionary accounts that it manages or advises) and, except where otherwise specified in this Agreement, shall take or refrain from taking all actions that it is obligated to take or refrain from taking under this Agreement with respect to all such Company Claims/Interests.

16.18.  <u>Survival</u>.  Notwithstanding (i) any Transfer of any Company Claims/Interests in accordance with this Agreement or (ii) the termination of this Agreement in accordance with its terms, the agreements and obligations of the Parties in Section 14 and the Confidentiality Agreements shall survive such Transfer and/or termination and shall continue in full force and effect for the benefit of the Parties in accordance with the terms hereof and thereof.  For the avoidance of doubt, the Parties acknowledge and agree that if this Agreement is terminated, Section 13 shall survive such termination, and any and all Releases shall remain in full force and effect.

16.19.  <u>Email Consents</u>.  Where a written consent, acceptance, approval, or waiver is required pursuant to or contemplated by this Agreement, pursuant to Section 3.02, Section 15, or otherwise, including a written approval by the Company Parties or the Required Consenting Stakeholders, such written consent, acceptance, approval, or waiver shall be deemed to have occurred if, by agreement between counsel to the Parties submitting and receiving such consent, acceptance, approval, or waiver, it is conveyed in writing (including electronic mail) between each such counsel without representations or warranties of any kind on behalf of such counsel.  Notwithstanding the foregoing, this Section 16.19 shall not apply to amendments of this Agreement in accordance with Section 15.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement on the day and year first above written.

*[Signature pages follow]*

## **EXHIBIT A**

### **Company Parties**

1. PGX Holdings, Inc.

2. Credit Repair UK, Inc.

3. CreditCo Limited

4. Credit.com, Inc.

5. Creditrepair.com Holdings, Inc.

6. Creditrepair.com, Inc.

7. eFolks Holdings, Inc.

8. eFolks, LLC

9. John C. Heath, Attorney At Law PC

10. Progrexion ASG, Inc.

11. Progrexion Holdings, Inc.

12. Progrexion IP, Inc.

13. Progrexion Marketing, Inc.

14. Progrexion Teleservices, Inc.

## **EXHIBIT B**

**Restructuring Term Sheet**

*Execution Version*

## PGX HOLDINGS, INC., *ET AL.*

## RESTRUCTURING TERM SHEET[1]

This term sheet (the "Restructuring Term Sheet") sets forth the principal terms of the Restructuring Transactions and certain related transactions concerning the Company Parties agreed to by the Consenting Stakeholders and the Company Parties.   This Restructuring Term Sheet does not contain a complete list of all terms and conditions of the potential transactions described herein.

This Restructuring Term Sheet has been produced for discussion and settlement purposes only. Accordingly, this Restructuring Term Sheet and the information contained herein are entitled to protection from any use or disclosure to any party or person pursuant to Rule 408 of the Federal Rules of Evidence and any other applicable rule, statute, or doctrine of similar import protecting the use or disclosure of confidential settlement discussions.    This Restructuring Term Sheet is confidential and subject to applicable confidentiality provisions and agreements.

The transactions described herein will be subject to the negotiation and completion of definitive documents incorporating the terms set forth herein and the closing of any transaction shall be subject to the terms and conditions set forth in such agreed and executed definitive documents.    The regulatory, tax, accounting, and other legal and financial matters and effects related to the Restructuring Transactions or any related restructuring or similar transaction have not been fully evaluated and any such evaluation may affect the terms and structure of any Restructuring Transactions or related transactions.

THIS RESTRUCTURING TERM SHEET DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES, LOANS OR OTHER INSTRUMENTS OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY PLAN, IT BEING UNDERSTOOD THAT SUCH AN OFFER OR SOLICITATION, IF ANY, WILL BE MADE ONLY IN COMPLIANCE WITH APPLICABLE LAW.

| Restructuring Transactions Overview | |
|---|---|
| **Implementation** | The restructuring will be implemented through prearranged cases commenced by certain of the Company Parties under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (as amended, the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court" and, such cases, the "Chapter 11 Cases"). |
| | The Restructuring Transactions will be subject to the Definitive Documents, the terms of the Restructuring Support Agreement (including the exhibits thereto), the Stalking Horse APA, and the consent rights set forth in each of the foregoing. |
| | The Restructuring Transactions will be effectuated pursuant to a sale involving all or substantially all of the Debtors' assets to a purchaser formed by the Consenting Lenders or a higher or otherwise better bidder pursuant to section 363 of the Bankruptcy Code (the "Sale Transaction") followed by a wind-down of the estates by the Debtors |

---

[1]   Capitalized terms used but otherwise not defined herein shall have the meaning ascribed to such terms in the Restructuring Support Agreement or the Stalking Horse APA, as applicable.

| | |
|---|---|
| | through the Plan, if applicable, and based on a budget to be agreed upon between the Purchaser, the Consenting Lenders and the Debtors. |
| **Sale Transaction** | The Sale Transaction will be accomplished pursuant to a competitive bidding process to be conducted in accordance with the Bidding Procedures on the timeline contemplated by the milestones set forth in the Restructuring Support Agreement (the "Milestones"). |
| | The DIP Agent, at the direction of the Required DIP Lenders, shall, pursuant to the terms of this term sheet, (i) designate the buyer as the purchaser of the Acquired Assets (as defined herein) and (ii) contribute certain obligations owed to the lenders to the buyer, in order for the buyer to credit bid some or all of the obligations as consideration for the Acquired Assets as set forth below and/or designate the buyer to receive the Acquired Assets in exchange for the issuance of debt and equity to the lenders. |
| | The DIP Lenders[2] and the Debtors shall, subject to the terms of the Restructuring Support Agreement, enter into a stalking horse credit bid asset purchase agreement for the sale of all or substantially all of their assets (collectively, the "Acquired Assets") to an acquisition entity formed by the DIP Lenders (the "Purchaser") pursuant to definitive transaction documents, including an asset purchase agreement (the "Stalking Horse APA" and together with all definitive transaction documentation, the "Sale Transaction Documentation"), pursuant to which DIP Lenders will agree to purchase the Acquired Assets, subject to the terms and conditions therein.  The DIP Lenders acknowledge that their offer to purchase the Acquired Assets pursuant to the Stalking Horse APA shall be subject to higher and better offers proposed in accordance with the Bidding Procedures. |
| | The Debtors and the Required Consenting Lenders shall mutually agree upon the terms and conditions of such sale process and, following consummation of the Sale Transaction, a wind-down budget funding the wind-down of the Debtors estates in an amount no less than $2.625 million acceptable to the Debtors and the DIP Lenders, to be held in escrow by the DIP Agent and to be released only upon the closing of the Sale Transaction, which shall automatically be increased on a dollar for dollar basis to the extent, as of the date of the consummation of the Sale Transaction, the Debtors have capital in excess of the amount set forth in the then-Approved Budget; *provided, however*, such that in no event shall the wind-down budget exceed $3,000,000 (the "Wind-Down Budget"). |
| **DIP Facility** | Pursuant to the DIP Orders, the DIP Lenders will finance a secured superpriority priming debtor-in-possession term loan facility available in multiple draws as set forth herein in (i) a new money term loan facility available in multiple draws for an aggregate maximum principal |

---

[2]    "DIP Lenders" means First Lien Lenders that, either directly or through one or more affiliates (or funds or accounts advised or sub-advised by such person) finance the DIP Facility.

| | |
|---|---|
| | amount of $19,925,000 and (ii) a roll-up facility in an aggregate maximum principal amount of $42,750,000, each as set forth in the DIP Credit Agreement and related documents. The DIP Orders shall provide for the Debtors' consensual use of cash collateral of the Prepetition Lenders.[3] |
| **Plan of Liquidation** | In the event that the Debtors determine it is in the best interests of the estates to seek confirmation of a Plan following consummation of the Sale Transaction, the Consenting Lenders agree that they will not object to the confirmation of a Plan and will opt in to any release provisions provided in the Plan of Liquidation provided that such Plan will (i) provide for payment in full in cash of any remaining DIP Facility claims or otherwise render any such DIP Facility Claim unimpaired under section 1124 of the Bankruptcy Code, (ii) provide that First Lien Secured Claims and Second Lien Secured Claims receive a pro rata share of any distributable proceeds, in accordance with the Intercreditor Agreement and the Bankruptcy Code, up to the allowed amount of the First Lien Secured Claims and Second Lien Secured Claims, respectively, after taking into account any Credit Bid, (iii) include release and exculpation provisions in favor of the DIP Lenders, First Lien Lenders, First Lien Agent, Second Lien Agent and Second Lien Lenders (and their affiliates and related parties) substantially in form set forth in **Annex 1** to this Restructuring Term Sheet, and (iv) be otherwise in form and substance acceptable to the Consenting Lenders (an "Acceptable Plan") |
| **Other Terms** | |
| **Plan Administrator** | The person or Entity, or any successor thereto, designated by the Debtors, to be appointed on the Plan Effective Date and who will serve as the administrator for the Wind-Down Debtor as set forth in the Plan (the "Plan Administrator"). |
| **Wind-Down Debtor** | At least one Debtor shall continue in existence after the Plan Effective Date (the "Wind-Down Debtor") for the purpose of (1) winding down the Debtors' business and affairs as expeditiously as reasonably possible, conducting any going out of business sales, and liquidating any assets held by the Wind-Down Debtor after the Plan Effective Date, (2) performing any obligations under any transition services agreement entered into on or after the Plan Effective Date, (3) resolving any disputed Claims, (4) paying Allowed Claims, (5) filing appropriate tax returns, and (6) administering the Plan, if applicable, in an efficacious manner. |
| | The Wind-Down Debtor shall be deemed to be substituted as the party-in-lieu of the Debtors in all matters, including (1) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court, and (2) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court, |

---

[3]    "Prepetition Lenders" means the First Lien Lenders and the Second Lien Lenders.

| | |
|---|---|
| | in each case without the need or requirement for the Plan Administrator to file motions or substitutions of parties or counsel in each such matter. |
| **Tax Structure** | The terms of the Restructuring Transactions will be structured to maximize tax efficiencies for each of the Debtors and the Consenting Stakeholders, as agreed to by the Debtors and the Required Consenting Lenders. |
| **Plan Releases and Exculpation** | Any Acceptable Plan shall include release and exculpation provisions (and related definitions) substantially in the form set forth in **Annex 1** to this Restructuring Term Sheet. |
| **Definitive Documents** | This Restructuring Term Sheet does not include a description of all of the terms, conditions, and other provisions that will be contained in the Definitive Documents, which shall be in form and substance subject to the consent rights set forth herein and in the Restructuring Support Agreement. |

**<u>Annex 1</u>**

**Plan Release and Exculpation Provisions[4]**

---

[4]    Capitalized terms used but otherwise not defined herein shall have the meaning ascribed to such terms in the Plan.

"*Agent*" means, collectively, the First Lien Agent, the Second Lien Agent, and the DIP Agent.

"*Exculpated Parties*" means, collectively, and in each case in its capacity as such: (a) each of the Debtors; (b) each independent director or manager of any Debtor; and (c) any official committee of unsecured creditors appointed in the Chapter 11 Cases.

"*Governing Body*" means, in each case in its capacity as such, the board of directors, board of managers, manager, general partner, investment committee, special committee, or such similar governing body of any of the Debtors or the Wind-Down Debtor, as applicable.

"*Related Party*" means, each of, and in each case in its capacity as such, current and former directors, managers, officers, investment committee members, special committee members, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals and advisors.   For the avoidance of doubt, the members of each Governing Body are Related Parties of the Debtors.

"*Released Party*" means, each of, and in each case in its capacity as such:   (a) the Debtors; (b) the Wind-Down Debtor; (c) the Plan Administrator; (d) each Consenting Stakeholder; (e) each Consenting Lender; (f) each Company Party; (g) the Sponsor; (h) the Agent; (i) all holders of Equity Interests; (j) the Purchaser; (k) each current and former Affiliate of each Entity in clause (a) through the following clause (l); and (l) each Related Party of each Entity in clause (a) through this clause (l).

"*Releasing Party*" means, each of, and in each case in its capacity as such:   (a) the Debtors; (b) the Wind-Down Debtor; (c) the Plan Administrator; (d) each Consenting Stakeholder; (e) each Consenting Lender; (f) each Company Party; (g) the Sponsor; (h) the Agent; (i) all holders of Claims; (j) all holders of Equity Interests; (k) the Purchaser; (l) each current and former Affiliate of each Entity in clause (a) through the following clause (m); and (m) each Related Party of each Entity in clause (a) through this clause (m) for which such Entity is legally entitled to bind such Related Party to the releases contained in the Plan under applicable law; *provided*, *however*, that in each case, an Entity shall not be a Releasing Party if it: (x) elects to opt out of the release contained in the Plan; or (y) timely objects to the Third-Party Release and such objection is not withdrawn before Confirmation.

**Releases by the Debtors.**

Notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, upon entry of the Confirmation Order and effective as of the Plan Effective Date, to the fullest extent permitted by applicable law, each Released Party is, and is deemed hereby to be, fully, conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors, the Wind-Down Debtor, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, including any Estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, including any derivative claims, asserted or assertable on behalf of any of the Debtors, the Wind-Down Debtor, or their Estates, that any such Entity would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against or Interest in a Debtor or other Entity, or that any Holder of any Claim against or Interest in a Debtor or other Entity could have asserted on behalf of the

Debtors, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the Debtors' capital structure, management, ownership, or operation thereof or otherwise), the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, the purchase, sale, or rescission of any security of the Debtors, or the Wind-Down Debtor, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors), intercompany transactions between or among a Debtor or an affiliate of a Debtor and another Debtor or affiliate of a Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Plan Supplement, the Sale Transaction any other Definitive Document or any Restructuring Transaction, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Plan Supplement, the Sale Transaction, any other Definitive Document, any of the Restructuring Transactions, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release: (1) any obligations arising on or after the Plan Effective Date of any party or Entity under the Plan, the Confirmation Order, or any post-Effective Date transaction contemplated by the Plan or the Restructuring Transactions, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the Restructuring Transactions; or (2) any matters retained by the Debtors, and the Wind-Down Debtor pursuant to the Schedule of Retained Causes of Action.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is:  (1) in exchange for the good and valuable consideration provided by the Released Parties, including, the Released Parties' contribution to facilitating the Restructuring Transactions and implementing the Plan; (2) a good faith settlement and compromise of the Claims released by the Debtor Release; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for a hearing; and (6) a bar to any of the Debtors, the Wind-Down Debtor, or the Debtors' Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release.

**Releases by the Releasing Parties.**

Except as otherwise expressly set forth in this Plan or the Confirmation Order, effective as of the Plan Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is, and is deemed hereby to be, fully, conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each Releasing Party from any and all claims and Causes of Action, whether known or unknown, including any derivative claims, asserted or assertable on behalf of any of the Debtors, the Wind-Down Debtor, or the Estates, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to or in any manner arising from, in whole or in part, the Debtors (including the Debtors' capital structure, management, ownership, or operation thereof or otherwise), the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, the purchase, sale, or rescission of any security of the Debtors, or the Wind-Down Debtor, any Avoidance Actions (but excluding

2

Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors), intercompany transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Plan Supplement, the Sale Transaction, any other Definitive Document or any Restructuring Transaction, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Plan Supplement, the Sale Transaction, any other Definitive Document, any of the Restructuring Transactions, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date.

Notwithstanding anything to the contrary in the foregoing, the Third-Party Release does not release (1) any obligations arising on or after the Plan Effective Date of any party or Entity under the Plan, the Confirmation Order, or any post-Effective Date transaction contemplated by the Plan or the Restructuring Transactions, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the Restructuring Transactions; or (2) the rights of any Holder of Allowed Claims to receive distributions under the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is:   (1) consensual; (2) essential to the Confirmation of the Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties; (4) a good faith settlement and compromise of the Claims released by the Third-Party Release; (5) in the best interests of the Debtors and their Estates; (6) fair, equitable, and reasonable; (7) given and made after due notice and opportunity for a hearing; and (8) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the Third-Party Release.

**Exculpation.**

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur any liability for, and each Exculpated Party shall be released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to or arising out of the Chapter 11 Cases prior to the Plan Effective Date, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the Sale Transaction, the Plan, the Plan Supplement, any other Definitive Document, or any Restructuring Transaction, or any contract, instrument, release or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Plan Supplement, the Sale Transaction, any other Definitive Document, any of the Restructuring Transactions, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of the Sale Transaction, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a Final Order to have constituted gross negligence, willful misconduct, or actual fraud.   The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.   Notwithstanding anything to the contrary in the foregoing, the

exculpation set forth above does not exculpate any obligations arising on or after the Plan Effective Date of any Person or Entity under the Plan, any post-Effective Date transaction contemplated by the Restructuring Transactions, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

**Injunction.**

Effective as of the Plan Effective Date, all Entities that have held, hold, or may hold Claims, Interests, or Causes of Actions that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Plan Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Wind-Down Debtor, the Exculpated Parties, or the Released Parties: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Actions; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Actions; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Actions; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Actions unless such Holder has filed a motion requesting the right to perform such setoff on or before the Plan Effective Date, and notwithstanding an indication of a claim or interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Actions released, settled or subject to exculpation pursuant to the Plan.   Notwithstanding anything to the contrary in the foregoing, the injunction set forth above does not enjoin the enforcement of any obligations arising on or after the Plan Effective Date of any Person or Entity under the Plan, any post-Effective Date transaction contemplated by the Restructuring Transactions, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, managers, principals, and direct and indirect Affiliates, in their capacities as such, shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan.   Each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in this [**Error! Reference source not found.**.F].

No Person or Entity may commence or pursue a Claim or Cause of Action of any kind against the Debtors, the Wind-Down Debtor, the Exculpated Parties, or the Released Parties that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Claim or Cause of Action subject to [Article VIII.C, Article VIII.D, and Article VIII.E] hereof, without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable Claim of any kind, and (ii) specifically authorizing such Person or Entity to bring such Claim or Cause of Action against any such Debtor, Wind-Down Debtor, Exculpated Party, or Released Party.

The Bankruptcy Court will have sole and exclusive jurisdiction to adjudicate the underlying colorable Claim or Causes of Action.

## <u>EXHIBIT C</u>

### Form of Joinder

The undersigned ("**<u>Joinder Party</u>**") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of June [●], 2023 (the "**<u>Agreement</u>**")[1] by and among PGX Holdings, Inc. ("**<u>PGX</u>**"), John C. Heath, Attorney At Law PC (d/b/a Lexington Law Firm), the other Company Parties, and the Consenting Stakeholders and agrees to be bound by the terms and conditions of the Agreement as a Consenting Stakeholder, and shall be deemed a "**<u>Consenting Stakeholder</u>**" and a "**<u>Party</u>**" under the terms of the Agreement.

The Joinder Party specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained in the Agreement as of the date of this Joinder and any further date specified in the Agreement.

This Joinder shall be governed by the governing law set forth in the Agreement.

Date Executed:

**[JOINDER PARTY]**

_____
Name:
Title:

Address:

E-mail address(es):

| *Aggregate Amounts Beneficially Owned or Managed on Account of:* | |
| --- | --- |
| First Lien Claims | |
| Second Lien Claims | |
| Equity Interests | |

---

[1]    Capitalized terms not used but not otherwise defined in this joinder shall have the meanings ascribed to such terms in the Agreement.

## <u>EXHIBIT D</u>

**Provision for Transfer Agreement**

The undersigned ("**Transferee**") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of June ___, 2023 (the "**Agreement**"),[1] by and among PGX Holdings, Inc. and its affiliates and subsidiaries bound thereto (including John C. Heath, Attorney At Law PC (d/b/a Lexington Law Firm)), and the Consenting Stakeholders, including the transferor to the Transferee of any Company Claims/Interests (each such transferor, a "**Transferor**"), and agrees to be bound by the terms and conditions thereof to the extent the Transferor was thereby bound, and shall be deemed a "Consenting Stakeholder" and a "Consenting Lender" under the terms of the Agreement.

The Transferee specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date of the Transfer, including the agreement to be bound by the vote of the Transferor if such vote was cast before the effectiveness of the Transfer discussed herein.

Date Executed:

_____
Name:
Title:
Address:
E-mail address(es):

| Aggregate Amounts Beneficially Owned or Managed on Account of: | |
|---|---|
| First Lien Claims | |
| Second Lien Claims | |
| Equity Interests | |

---

[1]  Capitalized terms used but not otherwise defined herein shall having the meaning ascribed to such terms in the Agreement.