## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| PGX HOLDINGS, INC., *et al.*[1], <br><br> Debtors. | Chapter 11 <br><br> Case No. 23-10718 (CTG) <br><br> (Joint Administration Pending) |
| KIRSTEN HANSEN on behalf of herself and all others similarly situated, <br><br><div align="center">Plaintiff,</div><br> v. <br><br> PGX HOLDINGS, INC.; PROGREXION HOLDINGS, INC.; PROGREXION TELESERVICES, INC.; PROGREXION MARKETING, INC.; PROGREXION ASG, INC.; PROGREXION IP, INC.; EFOLKS, LLC; CREDITREPAIR.COM, INC.; CREDIT.COM, INC.; and JOHN C. HEATH, ATTORNEY AT LAW PC, <br><br><div align="center">Defendants.</div> | Adv. Proc. No. |

## CLASS ACTION ADVERSARY PROCEEDING COMPLAINT
## FOR VIOLATION OF WARN ACT 29 U.S.C. § 2101, ET SEQ.

Plaintiff Kirsten Hansen ("Plaintiff") alleges on behalf of herself and a putative class of

similarly situated former employees by way of this Class Action Adversary Proceeding Complaint

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: PGX Holdings, Inc. (2510); Credit Repair UK, Inc. (4798); Credit.com, Inc. (1580); Creditrepair.com Holdings, Inc. (7536); Creditrepair.com, Inc. (7680); eFolks Holdings, Inc. (5213); eFolks, LLC (5256); John C. Heath, Attorney at Law PC (8362); Progrexion ASG, Inc. (5153); Progrexion Holdings, Inc. (7123); Progrexion IP, Inc. (5179); Progrexion Marketing, Inc. (5073); and Progrexion Teleservices, Inc. (5110). The location of the Debtors' service address for purposes of these chapter 11 cases is: 257 East 200 South, Suite 1200, Salt Lake City, Utah 84111.

against PGX Holdings, Inc. ("PGX"), and its subsidiaries, Progrexion Holdings, Inc. (Progrexion Holdings"), Progrexion Teleservices, Inc. ("Progrexion Teleservices"), Progrexion Marketing, Inc. ("Progrexion Marketing"), Progrexion ASG, Inc. ("Progrexion ASG"), Progrexion IP, Inc., eFolks, LLC ("eFolks"), Creditrepair.com, Inc. ("Creditrepair.com"), Credit.Com, Inc., ("Credit.com") and John C. Heath, Attorney at Law PC (Heath PC), d/b/a Lexington Law Firm or Lexington Law (referred to collectively as "Defendants") as follows:

## **NATURE OF THE ACTION**

1.      Plaintiff was terminated along with an estimated 900 other similarly situated employees as part of, or as the foreseeable result of mass layoffs or plant closings ordered by Defendants on April 5, 2023, and within 90 days of that date.

2.      Defendants failed to give Plaintiff and other similarly situated employees of Defendants at least 60 days' advance notice of their terminations, as required by the Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 *et seq*. (the "WARN Act").  Plaintiff and other similarly situated employees of Defendant seek their statutory remedies, pursuant to 29 U.S.C. § 2104.

3.      Plaintiff seeks to enforce the WARN Act's statutory remedy of 60 days' back pay and benefits for herself and those similarly situated, pursuant to 29 U.S.C. § 2104, for the Defendants' failure to provide WARN notice prior to their termination.

4.      On May 24, 2023, Plaintiff filed a Class Action Complaint on behalf of herself and a putative class against Defendants in the U.S. District Court for the District of Utah (Central Division), alleging violation of the WARN Act (the "District Court Complaint"). The District Court Complaint contains substantially similar allegations to those alleged herein.

5.      On June 4, 2023, each of the Debtors filed voluntary petitions for relief under

chapter 11 of the United States Code, 11 U.S.C. §§ 101–1532, with the United States Bankruptcy

Court for the District of Delaware. Joint administration of these cases is pending.

<div align="center">**JURISDICTION AND VENUE**</div>

6.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1334,

and 29 U.S.C. § 2104(a)(5).

7.      This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B) and (O).

8.      Venue is proper in this District pursuant to 28 U.S.C. § 1409 and 29 U.S.C. §

2104(a)(5).

<div align="center">**THE PARTIES**</div>

*__Plaintiff__*

9.      Plaintiff Kirsten Hansen was employed by PGX and Progrexion Teleservices, as a

Senior Director of Operational Support -Teleservices, from February 2013 until April 5, 2023.

10.     Plaintiff Hansen is a resident of the state of Utah.

11.     Plaintiff worked at or reported to two of Defendants' facilities at various times, the

corporate office located at 257 East 200 South, Salt Lake City, Utah (the "Headquarters Facility")

and 2850 South Decker Lake Drive, West Valley City, Utah (the "Decker Lake Facility").

12.     On or about April 5, 2023, Plaintiff was notified of her termination effective

immediately.

13.     At no time prior to April 5, 2023, did Plaintiff receive written notice that her

employment would be terminated.

14.     Plaintiff was terminated without cause.

15.     Along with Plaintiff, an estimated 900 other employees of Defendants who worked

at, reported to, or received assignments from the facilities were terminated on or about April 5,

2023, without 60 days' advance written notice.

<div align="center">3</div>

***Defendants***

16.     Defendants operated two of the nation's largest credit repair brands, Lexington Law and CreditRepair.com.  The brands were the public face of Defendants' interconnected entities, which employed 1,000-or-so telemarketing and customer service employee-agents. The common enterprise offered to help consumers remove disparaging information from their credit reports and improve their credit scores.

17.     PGX Holdings, Inc. is a Delaware corporation with its principal place of business in Salt Lake City, Utah. PGX is the holding company that wholly owns and controls Defendants Progrexion Holdings, Progrexion ASG, Progrexion Teleservices, Progrexion Marketing, Progrexion IP, Inc., eFolks, Credit.Com and CreditRepair.com (referred to collectively, with PGX, as the "Progrexion Defendants"). An affiliate, Defendant John C. Heath, Attorney at Law PC (Heath PC), d/b/a Lexington Law Firm, provided among other things, necessary credentials for certain registrations and bonds (referred to collectively, with Progrexion Defendants, as "Defendants" of the "Company").

18.     Progrexion Teleservices is a Delaware corporation with its principal place of business in Salt Lake City, Utah. It telemarketed and sold Lexington Law credit repair services on behalf of Defendants. Progrexion Teleservices employed an estimated 1,000 people before the layoffs on April 5, 2023, most of whom were "telephone service representatives."

19.     Progrexion Marketing is a Delaware corporation with its principal place of business in Salt Lake City, Utah. It provides advertising and marketing services, including identifying consumer leads through telemarketing, to Heath PC and CreditRepair.com.  It also provides key parts of the credit repair services marketed and sold to consumers under the brand names Lexington Law and CreditRepair.com.

20.     Progrexion ASG, Inc. is a Delaware corporation located in Salt Lake City, Utah, and it housed certain corporate and administrative functions serving the Progrexion entities and affiliates.

21.     Creditrepair.com, Inc. is a Delaware corporation located in Salt Lake City, Utah.

22.     Credit.com, Inc. is a Delaware corporation located in Salt Lake City, Utah.

23.     Progrexion Defendants' Headquarters and the Decker Lake Facility were its central sites ("Hub Facilities").

24.     The Company employed concentrations of remote employees in New Mexico, Ohio and elsewhere who reported to and received assignments from its Hub Facilities.

25.     The Company also maintained facilities at 2155 Freedom Blvd 200 W, Provo, Utah, 7 E Main St, Rexburg, Idaho, 1935 International Way, Idaho Falls, Idaho, 7725 W Reno Ave #393, Oklahoma City, Oklahoma and 20620 N 19th Ave, Phoenix, Arizona, (referred to collectively with the Hub Facilities, as the "Facilities").

26.     All of the Facilities employed 50 or more full time employees up until April 5, 2023.

## FACTUAL ALLEGATIONS

27.     Progrexion Defendants relied on three closely affiliated entities to brand, market, and provide credit repair services: Lexington Law, Credit.Com, and CreditRepair.com.  Together these entities formed and operated as a common enterprise, along with Heath PC.

28.     The Company operated as a common "business enterprise" as defined by 29 U.S.C. § 2101(a)(1).   The Defendants operated under common control, shared a common business purpose, shared officers, employees, and office locations, shared advertising and marketing, and performed day-to-day functions with or for each other without reference to legal or nominal

distinctions.  None of the Progrexion Defendants or its affiliates acted independently of parent PGX in any material respect regarding its business practices, policies, finances, management, or employees.

29.    The board of Progrexion Defendants managed operations with the same Executive Team.

30.    Mike DeVico led all the Progrexion Defendant entities, as did Executive Team members Chad Wallace, Vice President Finance & Corporate Controller Eric Cameron, Chief Legal Officer Judy Morris, Chief Human Resources Officer and Chief Operations Officer, Ty Weston, who was responsible for call center operations and strategy for Progrexion Teleservices and CreditRepair.com.

31.    Upon information and belief, the decisions to terminate Plaintiff and 900 others and shut down were made by Defendants' upper-level corporate management, approved by the board of directors, and executed by Mike DeVico and the Executive Team.

32.    The Company touted the efficacy of its services, claiming success in raising credit scores.  The Company claimed their clients saw an average of 10 negative items removed within the first few months from their credit reports.

33.    The Company's 1,000 or so telemarketing agents, on average, made 115,000 telephone calls each day to potential customers, which yielded on average 2,500 sales per day.

34.    The Company's telemarketers asked specific questions of customers and input the answers into Progrexion's software program.  Each month, the program then automatically generated and sent the letters to various creditors and credit bureaus.  The number of letters sent each month was dictated by the price the customer paid.

35.    Most sales required the customer to make a first payment of $149.99 for which

Defendants sent a certain number of letters over the customer's own signature. Defendants then charged the customer's credit card $149.99 for each subsequent month for more letters until the customer cancelled (most continued for 5-6 months).

36.     The Company cast itself to the public, regulators, customers, and employees as a company with a specific mission and culture. It claimed to be "committed to fighting for the Hardest Working Americans" ™ who "need to navigate the credit ecosystem with confidence and expertise." It claims to be "the destination" for these people "to improve and navigate the path of financial wellbeing."

37.     The Company sought to inculcate its enterprise's mission, vision, and values in its recruitment ads and throughout its employment relationship with its staff, emphasizing a "dream job" image, characterized by consumer advocacy, responsibility, excellence, development, inspiration, and teamwork.

38.     The Company sought to demonstrate its deeply-held values when it conducted two employee layoffs in 2022. It provided generous severance packages to the 100 or so employees in each layoff to enable to them to find new work without financial distress.

39.     On information and belief, the Company cleared its peak profit of about $65 million in 2000. Its profit was $40 million and $30 million in 2021 and 2022, respectively. In the first quarter of 2023, it was on track to record $23 million in profit.

40.     In the spring of 2022, Defendants' leadership became increasingly concerned that its money-making business model was being threatened. The federal Bureau of Consumer Financial Protection ("CFPB") filed a complaint in the United States District Court for the District of Utah in 2019. The complaint alleged various improper practices on the part of certain Defendant entities, one of which was the violation of the CFPB's Telemarketing Sales Rule ("TSR") found

at 16 C.F.R. § 310.4(a)(2).  The CFPB alleged that certain Defendants ("CFPB Defendants") had been receiving payment of fees for their credit repair services upfront upon the sending of letters. Under the TSR, companies can only charge fees for tele-marketed credit repair services *after* the promised results have been achieved.  Once the promised results have been achieved, the provider must observe a six-month waiting period, and then provide the customer with documentation of the results.  Only when the documentation has been furnished can the provider first charge the customer for its fees.

41.     In the winter of 2021-22, the CFPB moved for partial summary judgment on the issue of the CFPB Defendants' failure to meet the TSR's precondition given the evidence that they did not wait for results when charging customers.

42.     In early 2022, Defendants' chief officers became increasingly concerned that an adverse ruling by the court on CFPB's motion would jeopardize its business.  They were aware that the TSR rule ran headlong into their practice of generating revenue upfront.  They quickly sought to determine whether there was a viable path for the company to remain financially sound. They brainstormed to formulate alternative practices and business models that would not violate the TSR.   Over the spring and summer of 2022, they beta-tested several concepts by arming a cohort of telemarketers with new pitches and methods to see if they could generate sufficient sales to save the company.

43.     After analyzing the data, over the summer and into the fall of 2022, the corporate leadership realized that none of the experiments had worked.

44.     Upon information and belief, in the fall of 2022, Defendants' equity sponsor/owner H.I.G. walked away, wanting nothing more to do with the company.  Upon information and belief, ownership was assumed by Defendants' two secured lenders, Prospect Partners and Blue Torch,

and within months Blue Torch replaced Prospect Partners as the senior lender.

45.     Over the course of 2022, the awaited District Court decision on the summary judgment motion caused intensified unease.  By year's end, top management was in disarray about the path forward and dysfunctional in terms of taking constructive steps to avert disaster.  There was full awareness that the legal and financial issues were dire. "We're f***ked," some said.

46.     By late-2022, reductions in the ranks of the Executive Team were taking place, leaving only four by early 2023.

47.     Upon information and belief, the executives who left had been paid large severances and bonuses.  Those who stayed also received hefty incentive awards.

48.     On information and belief, by early 2023, the remaining Executive Team members were quietly planning for significant headcount reductions.  At the same time, they assured employees that there was nothing to fear, that the situation was under control, and that backup plans were being put in place so that, regardless of the CFPB lawsuit, the Company would endure and continue treating employees with the characteristic dignity, respect, and care.

49.     On March 10, 2023, the District Court granted summary judgment on the TSR violation, finding that the undisputed facts show a violation of the TSR because "no attempt was made to comply with the express payment preconditions."   The Court did not reach the issue of damages, nor did it enjoin the Company's activities, as the CFPB had sought in its Amended Complaint.

50.     Defendants sought stays from the District Court and Tenth Circuit Court Appeals, and remained unswerving in reassuring employees of their financial security because their jobs would remain unaffected and secure.

51.     Between April 3 and April 6, both Courts denied the stay requests.  In its denial on

April 6, the District Court grounded its denial by finding that defendants had not met the burden of showing a likelihood of success, given the TSR set preconditions for payment that defendants never tried to meet.

52.     On April 5, 2023, with no advance notice, Defendants shut down, terminating approximately 80% of its employees.  The employees were paid no severance. They were told their health insurance would stop at the end of the month.  Managers with incentive compensation agreements were not paid first quarter bonuses.  The sudden loss of compensation, security and healthcare access caused significant hardships.

53.     Employees were stunned not by the Courts' decisions, but rather how abruptly the Company betrayed its practices of decency that it had sought to instill in its valued employees.

54.     Defendants describe themselves relentlessly as providers of "vital" services to "hard-working" customers.  *Declaration of Chad Wallace in Support of Debtors' Chapter 11 Petitions and First Day Motions*, 23-10718-CTG, D.I. 12, at 15, 19, 38, 47, 55.  Having made hundreds of millions of dollars from the hard work of its 900 employees, Defendants put them out on the curb.

### FEDERAL WARN CLASS ALLEGATIONS, 29 U.S.C. § 2104(a)(5)

55.     Plaintiff brings this representative action for relief for violation of 29 U.S.C. § 2101 *et seq*., suing "for" herself and all other similarly situated former employees, pursuant to 29 U.S.C. § 2104(a)(5).  Those others are similarly situated in that they worked at, received assignments from, or reported to the Facilities, were terminated without cause within 90 days of April 5, 2023, as the reasonably foreseeable consequence of the mass layoff and/or plant closing ordered by Defendants and were "affected employees" within the meaning of 29 U.S.C. § 2101(a)(5).

56.     Plaintiff seeks to bring forward these claims utilizing the Federal Rules of Civil

Procedure, Rule 23(a) and (b)(3), to seek certification of an opt-out class (the "WARN Class").

57.    The persons in the WARN Class identified above ("WARN Class Members") are so numerous that joinder of all members is impracticable.  Although the precise number of such persons is unknown, it is estimated at approximately 900 individuals. On information and belief, the facts on which the calculation of that number can be based are presently within the sole control of Defendants.

58.    On information and belief, the identity of the members of the class and the recent residence address of each of the WARN Class Members is contained in Defendants' books and records.

59.    On information and belief, the rate of pay and benefits that were being paid by Defendants to each WARN Class Member at the time of his/her termination is contained in the books and records of Defendants.

60.    Common questions of law and facts exist as to members of the WARN Class, including, but not limited to, the following:

(a)    whether the members of the WARN Class were employees of Defendants who worked at, received assignments from, or reported to the Facilities;

(b)    whether Defendants unlawfully terminated the employment of the members of the WARN Class without cause on their part and without giving them 60 days advance written notice in violation of the WARN Act;

(c)    whether Defendants unlawfully failed to pay the WARN Class members 60 days wages and benefits as required by the WARN Act; and

(d) whether Defendants, as a single employer, violated the WARN Act and are jointly and severally liable for the violation.

61.    Plaintiff's claims are typical of those of the WARN Class. Plaintiff, like other WARN Class members, worked at, received assignments from, or reported to the Facilities and was terminated without cause within 90 days of April 5, 2023, due to the mass layoff and/or plant

closing ordered by Defendants.

62.     At all relevant times, Defendants were an "employer," as that term is defined in 29 U.S.C. § 2101 (a)(1) and 20 C.F.R. § 639(a) and continued to operate as a business until Defendants decided to order a mass layoff or plant closing at the Facility.

63.     Plaintiff will fairly and adequately protect the interests of the WARN Class. Plaintiff has retained counsel competent and experienced in complex class actions, including the WARN Act and employment litigation.

64.     Class certification of these claims is appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and facts common to the WARN Class predominate over questions affecting only individual members of the WARN Class, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation – particularly in the context of WARN Act litigation, where individual plaintiff may lack the financial resources to vigorously prosecute a lawsuit in federal court against a corporate Defendants, and damages suffered by individual WARN Class members are small compared to the expense and burden of individual prosecution of this litigation.

65.     Concentrating all the potential litigation concerning the WARN Act rights of the members of the Class in this Court will obviate the need for unduly duplicative litigation that might result in inconsistent judgments, will conserve the judicial resources and the resources of the parties and is the most efficient means of resolving the WARN Act rights of all the members of the Class.

66.     Plaintiff intends to send notice to all members of the WARN Class to the extent required by Rule 23.

**CLAIM FOR RELIEF**
**VIOLATION OF THE FEDERAL WARN ACT, 29 U.S.C. § 2104, *et seq.***

67.    Plaintiff realleges and incorporates by reference all allegations in all preceding paragraphs.

68.    At all relevant times, Defendants employed more than 100 employees who in the aggregate worked at least 4,000 hours per week, exclusive of hours of overtime, within the United States.

69.    At all relevant times, Defendants were an "employer," as that term is defined in 29 U.S.C. § 2101 (a)(1) and 20 C.F.R. § 639(a) and continued to operate as a business until it decided to order a mass layoff or plant closing at the Facilities.

70.    At all relevant times, Plaintiff and the other similarly situated former employees were employees of Defendants as that term is defined by 29 U.S.C. §2101.

71.    On or around April 5, 2023, Defendants ordered mass layoff or plant closing at the Facilities, as that term is defined by 29 U.S.C. § 210l(a)(2).

72.    The mass layoff or plant closing at the Facilities resulted in "employment losses," as that term is defined by 29 U.S.C. §2101(a)(2) for at least fifty of Defendants' employees as well as thirty-three percent of Defendants' workforce at the Facilities, excluding "part-time employees," as that term is defined by 29 U.S.C. § 2l01(a)(8).

73.    Plaintiff and the Class Members were terminated by Defendants without cause on their part, as part of or as the reasonably foreseeable consequence of the mass layoff or plant closing ordered by Defendants at the Facility.

74.    Plaintiff and the Class Members are "affected employees" of Defendants, within the meaning of 29 U.S.C. § 2101(a)(5).

75.    Defendants were required by the WARN Act to give Plaintiff and the Class

Members at least 60 days advance written notice of their terminations.

76.     Defendants failed to give Plaintiff and the Class members written notice that complied with the requirements of the WARN Act.

77.     Plaintiff and each of the Class Members are "aggrieved employees" of the Defendants as that term is defined in 29 U.S.C. § 2104(a)(7).

78.     Defendants failed to pay Plaintiff and each of the Class Members their respective wages, salary, commissions, bonuses, health and life insurance premiums, accrued holiday pay and accrued paid time off for 60 days following their respective terminations, and failed to provide employee benefits including health insurance, for 60 days from and after the dates of their respective terminations.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all other similarly situated persons, prays for the following relief as against Defendant:

A.     Certification of this action as a class action;

B.     Designation of Plaintiff as the Class Representative;

C.     Appointment of the undersigned attorneys as Class Counsel;

D.     A judgment in favor of Plaintiff and each of the affected employees equal to the sum of:  their unpaid wages, salaries, commissions, bonuses, accrued holiday pay, accrued vacation pay, pension and 401(k) contributions and other ERISA benefits, for up to 60 days, that would have been covered and paid under the then-applicable employee benefit plans had that coverage continued for that period all determined in accordance with the WARN Act, 29 U.S.C. §2104(a)(1)(A), with the first $15,150.00 of each Class member's allowed claim entitled to wage priority claim

treatment under 11 U.S.C. § 507(a)(4) and (5), and any remainder as a general

unsecured claim and the remainder as a general unsecured claim.

E.      An allowed administrative priority claim against Defendants under 11 U.S.C. § 503

        for the reasonable attorneys' fees and the costs and disbursements that Plaintiff

        incur in prosecuting this action, as authorized by the WARN Act, 29 U.S.C. §

        2104(a)(6);

F.      Interest as allowed by law on the amounts owed under the preceding paragraphs;

        and

G.      Such other and further relief as this Court may deem just and proper.

Dated: June 5, 2023

                                        Respectfully submitted,

                                By:     /s/ Christopher D. Loizides
                                        Christopher D. Loizides (No. 3968)
                                        **LOIZIDES, P.A.**
                                        1225 King Street, Suite 800
                                        Wilmington, Delaware 19801
                                        Telephone: (302) 654-0248
                                        Facsimile: (302) 654-0728
                                        E-mail: loizides@loizides.com

OF COUNSEL:

Jack A. Raisner
René S. Roupinian
**RAISNER ROUPINIAN LLP**
270 Madison Avenue, Suite 1801
New York, New York 10016
Telephone: (212) 221-1747
Facsimile: (212) 221-1747
Email: rsr@raisnerroupinian.com
Email: jar@raisnerroupinian.com

*Attorneys for Plaintiff and the putative class*