## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| PGX HOLDINGS, INC., *et al.*, | Case No. 23-10718 (CTG) |
| Debtors.[1] | (Jointly Administered) |

## MOTION OF THE UNITED STATES OF AMERICA
## TO CONVERT CHAPTER 11 CASES TO CHAPTER 7

The United States of America (the "United States"), on behalf of the Consumer Financial Protection Bureau ("CFPB"), hereby moves the Court (the "Motion") for entry of an order, substantially in the form attached as **Exhibit A**, pursuant to section 1112(b) of the Bankruptcy Code, converting the above-captioned chapter 11 cases to cases under chapter 7 of the Bankruptcy Code. In further support of its Motion, the United States respectfully sets forth as follows:

### PRELIMINARY STATEMENT

1. The Debtors have no intention of reorganizing under these chapter 11 proceedings as a going concern. In their own words, the Debtors seek to "allow[] potential purchasers"—i.e., their insiders and prepetition lenders—"to implement a refreshed strategy for a *new business . . .* through consummation of one or more in-court restructuring transactions[.]" *Declaration of Chad*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  PGX Holdings, Inc. (2510); Credit Repair UK, Inc. (4798); Credit.com, Inc. (1580); Creditrepair.com Holdings, Inc. (7536); Creditrepair.com, Inc. (7680); eFolks Holdings, Inc. (5213); eFolks, LLC (5256); John C. Heath, Attorney At Law PC (8362); Progrexion ASG, Inc. (5153); Progrexion Holdings, Inc. (7123); Progrexion IP, Inc. (5179); Progrexion Marketing, Inc. (5073); and Progrexion Teleservices, Inc. (5110).  The location of the Debtors' service address for purposes of these chapter 11 cases is:  257 East 200 South, Suite 1200, Salt Lake City, Utah 84111.

*Wallace, Chief Executive Officer of PGX Holdings, Inc., in Support of Debtors' Chapter 11 Petitions and First Day Motions* (ECF No. 12) (the "Wallace Decl.") ¶ 16; *infra* at ¶ 36, n.3.

2.      On March 10, 2023, the United States District Court for the District of Utah (the "Utah District Court") granted partial summary judgment in favor of the CFPB in the CFPB Litigation (defined below)—the sole cause for the Debtors' filing these chapter 11 cases.  In the Utah District Court, the CFPB seeks over $2.6 billion in consumer redress, over $52 million in civil money penalties, and injunctive relief to remedy the Debtors' violations of the Telemarketing Sales Rule ("TSR"), 16 C.F.R. § 310.4(a)(2), as well as further monetary and injunctive relief for deceptive practices that violate various consumer protection laws. In granting summary judgment, the Utah District Court found that the overwhelming majority of the Debtors' revenues come from activities that violate the TSR.  *See Bureau of Consumer Financial Protection v. Progrexion Marketing, Inc. et al.*, Case No. 2:19-cv-00298-BSJ, Order (ECF No. 508) (the "Summary Judgment Order") at 11.  In response to the summary judgment decision, the Debtors severely scaled back their business. Of what remains, the Debtors' representatives have suggested in the CFPB Litigation that that business is unviable.  *See infra* at ¶ 36, n.3.

3.      Faced with the Utah District Court entering the CFPB's proposed monetary and injunctive relief and finding the Debtors' remaining business violated additional consumer protection laws, the Debtors sought bankruptcy protection.  The Debtors seek to expeditiously sell substantially all of the remaining business in two credit bid transactions: a sale of the PGX Holdings, Inc. assets to their prepetition first-lien lenders, and a sale of the Lexington Law Firm assets to the Firm's principal. The Debtors seek transfer their assets free and clear of the CFPB's remaining claims to preserve any business value for only the Debtors' insiders and prepetition lenders.  *See* Wallace Decl. at ¶ 15.

4.      These cases were filed to gain a tactical litigation advantage to avoid the CFPB-sought injunctive and monetary relief.  Thus, this Court should convert these chapter 11 cases to cases under chapter 7 of the Bankruptcy Code.  Alternatively, cause exists to convert these cases to chapter 7, because the Debtors have no reasonable likelihood of rehabilitation and are suffering substantial or continuing losses and diminution of the estate.  Conversion would benefit the creditors and the estate, as a trustee could orderly liquidate the Debtors' assets and pursue any avoidance actions.

## JURISDICTION AND VENUE

5.      The Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") on June 4, 2023 (the "Petition Date").

6.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware dated February 29, 2012.

7.      This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

8.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

9.      The statutory basis for the relief requested in this Motion is section 1112(b) of the Bankruptcy Code.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.      The CFPB Litigation

10.      On May 2, 2019, the CFPB sued the Debtors in the United States District Court for the District of Utah, alleging various deceptive business practices in violation of the Consumer Financial Protection Act of 2010, 12 U.S.C. §§ 5531 and 5536, and the Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. §§ 6101 et seq., and its implementing rule,

the TSR, 16 C.F.R. § 310.3 (collectively, "Counts II-V"), and abusive telemarketing practices in violation of the TSR, 16 C.F.R. § 310.4 ("Count I") (the "CFPB Litigation"). *See* Case No. 2:19-cv-00298-BSJ, Complaint (ECF No. 2), Amended Complaint (ECF No. 457) (the "CFPB Complaint").

11.     In moving for partial summary judgment, the CFPB argued that "[t]he undisputed material facts establish that from March 8, 2016 to the present, [the Debtors], through the brands Lexington Law and CreditRepair.com, have unlawfully telemarketed and sold credit repair services to millions of consumers in violation of the Telemarketing Sales Rule's credit repair provision[.]" *See* Mot. for Summary Judgment, Case No. 2:19-cv-00298-BSJ, ECF No. 257 at 1.

12.     On March 10, 2023, the Utah District Court granted partial summary judgment on Count I in the CFPB's favor, holding that the Debtors violated the TSR and rejecting the Debtors' argument that "they are excused from compliance with the advance-fee provision [of the TSR] because they offer no promised results, or 'any result whatsoever' to their customers." Case No. 2:19-cv-00298-BSJ, Summary Judgment Order at 11.  The Utah District Court found this argument both unpersuasive and contradicted by the evidence.  *See id.* at 11-12.

13.     The CFPB continues to litigate the scope of monetary and injunctive relief attributable to Count I.  Critically here, the CFPB continues to pursue additional monetary and injunctive relief for allegedly deceptive practices beyond § 310.4(a)(2) of the TSR set forth in Counts II through V of the CFPB Complaint.  *See* Amended Complaint at ¶¶ 136-168.

## II.     The Debtors' Conduct Following the Summary Judgment Order

14.     As a result of the adverse summary judgment ruling, the Debtors chose to "cease all telemarketing activities and monthly billing for over 80% of their credit repair clients[.]"

Wallace Decl. at ¶ 52.  The Debtors also "shut down approximately 80% of their business, including their call center, and laid off approximately 900 employees." *Id.* at ¶ 10.

15.     Despite these purported changes to their business practices, the Debtors continue to collect fees from tens of thousands of consumers originally recruited through telemarketing. Because the CFPB contends these collections violate the TSR, the CFPB Litigation may result in future injunctions that would curtail the Debtors' current business activities, and the revenues generated from them.

16.     Discovery in the CFPB Litigation closed in summer 2021, and, due to the recency of these chapter 11 cases, the United States has not had an opportunity to obtain discovery under the Bankruptcy Rules about the Debtors' current business and financial affairs or inquire into the propriety of the Debtors' ongoing business practices.

**III.     The Chapter 11 Cases**

17.     Three months following the Summary Judgment Order, the Debtors commenced these chapter 11 cases with the brazen intent to use section 363 of the Bankruptcy Code to continue the Debtors' operations free of the CFPB Litigation—regardless of whether that business violates consumer protection laws—under the ownership of their insiders and prepetition lenders.  Wallace Decl. at ¶ 15 (stating that the Debtors intend to sell substantially all of their assets free and clear of "obligations stemming from the CFPB Litigation").  The Debtors' proposed sale process benefits only their insiders and prepetition lenders and attempts to strip away the Debtors' obligations arising from the CFPB Litigation.  By the Debtors' own admission, the proposed sale

process "will enable the Debtors to expeditiously sell their assets free and clear of . . . any and all obligations or restrictions related to or resulting from the CFPB Litigation." *See* ECF No. 66 at 5.[2]

## RELIEF REQUESTED

18.     By this Motion, the United States respectfully asks the Court to enter an order pursuant to section 1112(b) of the Bankruptcy Code converting the above-captioned chapter 11 cases to cases under chapter 7 of the Bankruptcy Code or, in the alternative, dismissing these chapter 11 cases.

## BASIS FOR RELIEF

19.     Section 1112(b) of the Bankruptcy Code provides, among other things, that: "On request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause . . . ."  Given the "the equitable nature of bankruptcy proceedings, and the purposes behind Chapter 11," the Third Circuit has held that, "a Chapter 11 petition is subject to dismissal for 'cause' under 11 U.S.C. § 1112(b) unless it is filed in good faith."  *Official Comm. of Unsecured Creditors v. Nucor Corp. (In re SGL Carbon Corp.)*, 200 F.3d 154, 162 (3d Cir. 1999).

### I.     The Chapter 11 Cases Were Not Filed in Good Faith.

20.     To determine whether a chapter 11 petition was not filed in good faith, courts engage in a "fact intensive" examination of the "totality of the circumstances" to determine "where a petition falls along the spectrum ranging from the clearly acceptable to the patently abusive." *Id.*; *see also, 15375 Memorial Corp. v. BEPCO, LP (In re 15375 Mem'l Corp.)*, 589 F.3d 605, 618

---

[2] The CFPB questions whether section 363 of the Bankruptcy Code authorizes a sale free and clear of regulatory actions seeking injunctive relief, and will raise that objection at the appropriate time during the sale process if these chapter 11 cases are permitted to continue.

(3d Cir. 2009); *NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc. (In re Integrated Telecom Express, Inc.)*, 384 F.3d 108, 118 (3d Cir. 2004).

21.     The Debtors bear the burden to establish that they filed for bankruptcy in good faith. *Integrated Telecom*, 384 F.3d at 118; *In re Tamecki*, 229 F.3d 205, 207 (3d Cir. 2000).  That a chapter 11 case must be filed in furtherance of some "valid reorganization purpose," is axiomatic. *SGL Carbon Corp.*, 200 F.3d at 165.  "[B]ecause filing a Chapter 11 petition merely to obtain tactical litigation advantages is not within 'the legitimate scope of the bankruptcy laws,' courts have typically dismissed Chapter 11 petitions under these circumstances as well." *See id.* (internal citation omitted); *see also In re Argus Group 1700, Inc.*, 206 B.R. 757, 765–66 (E.D.Pa.1997); *Furness v. Lilienfield*, 35 B.R. 1006, 1013 (D.Md.1983) ("The Bankruptcy provisions are intended to benefit those in genuine financial distress. They are not intended to be used as a mechanism to orchestrate pending litigation."); *In re HBA East, Inc*., 87 B.R. 248, 259–60 (Bankr. E.D.N.Y.1988) ("As a general rule where, as here, the timing of the filing of a Chapter 11 petition is such that there can be no doubt that the primary, if not sole, purpose of the filing was a litigation tactic, the petition may be dismissed as not being filed in good faith."); *In re Martin*, 51 B.R. 490, 495 (Bankr.M.D.Fla.1985); *In re Derma Pen, LLC*, Case No. 14-11894 (KJC), 2014 WL 7269762, at *9 (Bankr. D. Del. Dec. 19, 2004).

22.     The Debtors filed these chapter 11 cases to obtain a tactical litigation advantage. The CFPB Litigation continues to threaten the remaining 20% of the Debtors' business (*see* Wallace Decl. at ¶ 15).  To sidestep the risk of monetary and injunctive relief from the CFPB Litigation, insiders and prepetition lenders desire to use a chapter 11 sale process to improperly launder the Debtors' business of the CFPB Litigation so that the government is left to prosecute its consumer protection claims against an empty shell.  If permitted to proceed, insiders and

7

prepetition lenders could operate a new business free of the CFPB Litigation's risk of monetary and injunctive relief, while the CFPB is forced to investigate and litigate its claims anew.

23.     Moreover, filing a chapter 11 case merely to conduct a non-cash accretive fire sale to insiders and pre-petition lenders is not a valid reorganizational purpose.  A bankruptcy case filed to effectuate a sale "must be designed to realize some value that would not be available outside of bankruptcy."  *In re JER/Jameson Mezz Borrower II, LLC*, 461 B.R. 293, 303 (Bankr. D. Del. 2011).  Here, the estate will realize no real value if the Debtors are allowed to proceed with the proposed stalking horse sales.

24.     Accordingly, because these cases were filed solely to obtain a tactical litigation advantage, and not for a valid reorganizational purpose, cause exists to convert or dismiss these chapter 11 cases.

## II.     A Substantial or Continuing Loss to or Diminution of the Estate and an Absence of a Reasonable Likelihood of Rehabilitation Justifies Conversion.

25.     Cause also exists to convert or dismiss a chapter 11 case if the estate suffers "substantial or continuing loss[es] or … diminution" and an "absence of a reasonable likelihood of rehabilitation" exists.  11 U.S.C. § 1112(b)(4)(A).

26.     "Under section 1112(b)(4)(A), the Court must determine (1) whether, post-petition, the debtor has continued to experience a negative cash flow or declining asset values and (2) whether there is any reasonable likelihood that the debtor, or another party, will be able to stop the losses and regain solid financial footing within a reasonable amount of time. Both tests must be satisfied."  *In re AIG Fin. Prod. Corp.*, Case No. 22-11309, 2023 WL 3360562, at *9 (Bankr. D. Del. May 10, 2023) (citing 7 Collier on Bankruptcy ¶ 1112.04 [6][a][i] (16th ed. 2022)).

**A.     The Estate is Suffering Substantial or Continuing Losses or Diminution.**

27.     The Third Circuit recognizes that a debtor's negative cash flow is sufficient to establish a substantial or continuing loss to or diminution of the estate. *In re Alston*, 765 Fed.App'x 160, 164 (3d Cir. 2019) (citing *Loop Corp. v. U.S. Tr.*, 379 F.3d 511, 515-16 (8th Cir. 2004)).

28.     Here, the Debtors readily admit that, in response to the Summary Judgment Order, the Debtors "shut down approximately 80% of their business, including their call center, and laid off approximately 900 employees for the purpose of bringing the business into compliance with" the District Court's ruling. Wallace Decl. at ¶ 10.

29.     Likewise, the Debtors admit that "PGX operations have failed to rebound from continual declines that began in 2019" and that "PGX's internal forecast of liquidity projects negative operating cash flow for the next six months" absent the DIP financing in this case. *Id.* ¶ 44.  The DIP financing, however, does not cure the negative cash flow.  The approved interim DIP budget projects a net operating loss of $3.857 million during the first 15 weeks of these cases. ECF No. 70 at Ex. B.

30.     Thus, unquestionably, the estate is suffering substantial and continuing losses and diminution.

**B.     These Debtors have no Reasonable Likelihood of Rehabilitation.**

31.     "[R]ehabilitation is not just another word for reorganization, it means more. Rehabilitation does not include liquidation. Rehabilitation means to reestablish a business." *In re 15375 Memorial Corp.*, 386 B.R. 548, 552 (Bankr. D. Del. 2008), *rev'd on other grounds* 400 B.R. 420 (D. Del. 2009); *see also Loop Corp. v. U.S.*, 379 F.3d 511, 515–16 (8th Cir.2004) ("Courts have consistently understood "rehabilitation" to refer to the debtor's ability to restore the viability

of its business."); *In re Macon Prestressed Concrete Co.*, 61 B.R. 432, 436 (Bankr. M.D. Ga. 1986)

("If it is apparent that the debtor has no profitable core around which to structure a plan of

reorganization, if the debtor is faced with continuing losses, and if the debtor's assets are declining

in value, the best interest of creditors may require the court to order liquidation of the debtor's

estate under Chapter 7.").

32.     If the Debtors have no reasonable likelihood of rehabilitation, the Court need not

wait until the Debtors propose a plan to find that cause to convert or dismiss a case. *JER/Jameson*

*Mezz Borrower II*, 461 B.R. at 302.

33.     Here, the Debtors have no business to salvage. *See infra* at ¶ 36, n.3.  These cases

are simply being run for the benefit of the Debtors' insiders and pre-petition lenders to shed the

CFPB Litigation.

34.     The Utah District Court found that the Debtors' telemarketing-based service model

was operating in violation of § 310.4(a)(2) of the TSR. As a result, the Debtors chose to wind down

80% of their operations rather than conform their billing practices to the requirements of §

310.4(a)(2).   While the Debtors contend that they are "in the process of developing additional

operational changes in response to the [Utah District Court]'s decision," in reality, the necessary

"operational changes" to save this business require developing an entirely new, untested business

model.  *See* 7 Collier on Bankruptcy ¶ 1112.04 ("Visionary schemes that entail risk to creditors

without any reasonable probability of success usually warrant prompt conversion to chapter 7. As

noted by the Supreme Court, '[h]owever honest in its efforts the debtor may be, and however

sincere its motives, the District Court is not bound to clog its docket with visionary or impractical

schemes for resuscitation.'" (quoting *Tennessee Publ'g Co. v. Am. Nat'l Bank*, 299 U.S. 18, 22

(1930)).

35.    Moreover, the Debtors admit that their problems are not limited to the CFPB Litigation.  The Debtors are also facing restrictions on their ability to advertise online on Google.  Wallace Decl. at ¶ 42.  The Debtors inability to advertise on Google and decision to stop telemarketing in the wake of the Utah District Court's ruling raises substantial questions about their viability.  Furthermore, the Debtors continue to face the prospect of additional restrictions or injunctions against their little remaining business, as the CFPB continues to pursue its deceptive practices claims in Counts II through V of the CFPB Complaint.

36.    The record here is clear: the Debtors' viability as an operating business depended on its ability to telemarket.[3]  Faced with the reality that any future telemarketing must comply with the requirements of § 310.4(a)(2) the TSR, Defendants chose instead to wind down the telemarketing business.  Without their telemarketing business—which the Utah District Court found to be operating unlawfully—the Debtors have no "profitable core" around which to possibly reorganize.

37.    Accordingly, cause exists to convert these chapter 11 cases to cases under chapter 7 of the Bankruptcy Code pursuant to section 1112(b)(4)(A).

---

[3] *See, e.g.*, D. Utah Case No. 2:19-cv-00298-BSJ, Decl. of John Heath in Support of Defs.' Motion for Stay of the March 10 Order (ECF No. 510-1) (attached as **Exhibit B**) ("Lexington Law cannot afford to wait to bill its clients until six months after achieving results.  Nor is it likely to survive if it is unable to use the telephone in the engagement process."); D. Utah Case No. 2:19-cv-00298-BSJ, Decl. of Chad Wallace In Support of Defs.' Motion for Stay of the March 10 Order (ECF No. 510-2) (attached as **Exhibit C**) ("The Court's Order poses a serious, immediate threat to Lexington Law and Progrexion's existence which cannot be meaningfully remedied after a final judgment.  Even if the Court's Order were ultimately overturned on appeal months in the future, the harm to Lexington Law and Progrexion in the interim would be irreparable, absent a stay.").

III.     **Conversion, Rather than Dismissal, is in the Best Interests of Creditors and the Estate.**

38.     Once "cause" is established under section 1112(b), this Court must decide whether conversion or dismissal is "in the best interests of creditors and the estate." 11 U.S.C. § 1112(b)(1).

39.     Here, due to the CFPB Litigation raising substantial allegations about the Debtors' deceptive and otherwise unlawful consumer business practices, converting the case to chapter 7 is in the creditors' and estate's best interests. An independent chapter 7 trustee will be able to orderly liquidate the Debtors' assets and pursue avoidance actions for the benefit of all creditors. *Cf., e.g.*, *In re Camden Ordnance Mfg. Co. of Arkansas, Inc.*, 245 B.R. 794, 803 (E.D. Pa. 2000) (affirming the bankruptcy court's order converting a case because, among other reasons, there were "possible environmental and safety concerns" raised by state and federal regulators).

## <u>CONCLUSION</u>

40.     For the forgoing reasons, the Court should grant the Motion and convert the above-captioned chapter 11 cases to cases under chapter 7 of the Bankruptcy Code.

*[Signature Page Follows]*

12

Dated: July 24, 2023

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General
Civil Division

/s/  J. Zachary Balasko
KIRK MANHARDT
RODNEY A. MORRIS
J. ZACHARY BALASKO
VICTOR S. LEUNG
United States Department of Justice
Civil Division, Commercial Litigation Branch
1100 L Street, NW
Washington, DC 20005
Tel: (202) 514-7162
Fax: (202) 514-9163
E-mail: john.z.balasko@usdoj.gov
        victor.leung@usdoj.gov

*Attorneys for the United States*

## **CERTIFICATE OF SERVICE**

I certify that on July 24, 2022, a true and correct copy of the foregoing Motion was served via electronic means through transmission facilities from the Court upon those parties authorized to participate and access the Electronic Filing System in the above-captioned case.

/s/ J. Zachary Balasko
J. ZACHARY BALASKO