# EXHIBIT B

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION**

<table>
<tr>
<td>
BUREAU OF CONSUMER FINANCIAL<br>
PROTECTION,<br><br>
        Plaintiff,<br><br>
        v.<br><br>
PROGREXION MARKETING, INC., et al.,<br><br>
        Defendants.
</td>
<td>
Case No. 2:19-CV-00298-BSJ
</td>
</tr>
</table>

**DECLARATION OF JOHN C. HEATH IN SUPPORT OF DEFENDANTS'
MOTION TO STAY THE EFFECT OF THE COURT'S MARCH 10, 2023 ORDER
GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

I, John Heath, declare and state as follows:

1.     The following facts are known to me personally and, if called as a witness, I could and would competently testify thereto.

2.     Since 2004, I have been the Principal and Directing Attorney of defendant/appellant John C. Heath, Attorney at Law P.C. (known as "Lexington Law").   I am a member in good standing of the bars of Colorado, Georgia, Idaho, New York, Texas, Utah, the District of Columbia, and the United States District Court for the District of Utah.  I am generally familiar with Lexington Law's revenues, expenses, and financial condition.

3.     Lexington Law is the largest credit repair firm in the country, and it makes legal representation available to consumers on a mass basis at affordable monthly rates.  Rates for its services range from $9 to $140 per month.  Lexington Law currently has approximately 420,000 clients located in 50 states.  Each client has signed an engagement agreement specifically setting

1

forth Lexington Law's obligations to the client. Lexington Law owes fiduciary duties to those clients.

4. There is an acute need for Lexington Law's services. The Bureau of Consumer Financial Protection Bureau ("Bureau") and the Federal Trade Commission ("FTC") both acknowledge that material errors on credit reports are prevalant—according to a 2012 study commissioned by the FTC, more than 26% of credit reports carry at least one potentially material error. A poor credit rating negatively affects a consumer's access to credit products like mortgages, car loans, and personal loans. As the Bureau has explained, inaccuracies in credit reports can have devastating consequences for consumers.

5. Lexington Law assists clients by providing a range of services including to help them verify or challenge negative information on their credit reports. Unlike many other credit repair firms, Lexington Law does not sell clients' information or otherwise turn their clients into unwitting profit centers. Over 30% of Lexington Law's clients are repeat clients, a testament to the value that consumers see in our services.

6. On March 10, 2023, the United States District Court for the District of Utah entered an order concluding that Defendants violated the Advance Fee Provision of the Telemarketing Sales Rule, 16 C.F.R. § 310.4(a)(2) ("AFP"), by charging fees to clients on a monthly basis without waiting until all services have been provided and without furnishing a consumer report that was issued more than six months after promised results have been achieved ("the Order"). ECF No. 508 at 11. Lexington Law disagrees with the Order on numerous bases, including that every client's signed engagement agreement expressly disclaims any promised results. Nonetheless, I have instructed my team to devise a comprehensive compliance plan to take effect as soon as reasonably possible consistent with our obligations to both our clients and the Court.

2

7.      The Order will cause grave and irreparable harm to Lexington Law, its clients, and its employees.

8.      Approximately 84% of Lexington Law's credit repair clients originate from telemarketing efforts.  If Lexington Law is barred as a result of the Order from continuing to bill those current clients for credit repair services and from obtaining new paying clients for such services by use of the telephone, its revenues would immediately drop by more than 80%. Meanwhile, operating expenses would remain high in servicing its large client base and workforce. With only so much cash on hand and limited access to additional capital, Lexington Law simply could not satisfy its obligations for any sustained period without revenues from existing credit repair clients.  Simply stated, if Lexington Law must immediately cease billing in this way, it likely would become insolvent within 12 days.

9.      Even if it could somehow survive the immediate cash crunch, Lexington Law's business likely would not be viable based on the interpretation of the AFP set forth in the Order. Lexington Law cannot afford to wait to bill its clients until six months after achieving results.  Nor is it likely to survive if it is unable to use the telephone in the engagement process.

10.     Likewise, if the Court's Order is not stayed, and Lexington Law becomes insolvent, its 199 employees (located in West Valley City, Utah, and Phoenix, Arizona) would be out of a job.

11.     The demise of Lexington Law would itself have far-reaching consequences.  The countless American consumers who have errors on their credit reports would be left without the opportunity to find professional help.  Lexington Law's current 420,000 clients would be cut off from the help they need, left to manage the potentially "devastating" consequences of credit-reporting errors on their own—and many will simply give up because the dispute process is

3

onerous. No other service provider in the credit repair industry has the scale to step into Lexington Law's shoes while complying with the terms of the Order.

12.     In short, if the Order is not stayed while Lexington Law pursues an appeal, Lexington Law likely will be shuttered, employees will lose their jobs, and consumers will be forced to fend for themselves in a confusing and complex credit reporting industry.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge and belief.

EXECUTED this 13th day of March, 2023 in Salt Lake City, Utah.


_____
John Heath