## **EXHIBIT D**

**Redlined Revised Lexington Law APA**

**ASSET PURCHASE AGREEMENT**

by and among

[ACQUISITIONCO],

as Buyer,

and

JOHN C. HEATH, ATTORNEY AT LAW PC D/B/A LEXINGTON LAW,

as Seller

Dated as of [   ], 2023

# TABLE OF CONTENTS

## ARTICLE I
## DEFINITIONS

| | | |
|---|---|---|
| 1.1 | Defined Terms | 4 |
| 1.2 | Index of Defined Terms | 16 |
| 1.3 | Other Definitional Provisions and Rules of Interpretation | 17~~8~~ |

## ARTICLE II

## TRANSFER OF ASSETS AND LIABILITIES

| | | |
|---|---|---|
| 2.1 | Purchased Assets | 19 |
| 2.2 | Excluded Assets | 20~~1~~ |
| 2.3 | Assumed Liabilities | 22 |
| 2.4 | Excluded Liabilities | 23 |
| 2.5 | Assumption and Assignment of Assumed Contracts | 23 |

## ARTICLE III
## CLOSING AND PURCHASE PRICE

| | | |
|---|---|---|
| 3.1 | Closing; Transfer of Possession; Certain Deliveries | 25~~6~~ |
| 3.2 | Purchase Price; Related Matters | 26~~7~~ |
| 3.3 | Allocation of Purchase Consideration | 27 |
| 3.4 | Withholding | 27~~8~~ |

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF SELLER

| | | |
|---|---|---|
| 4.1 | Organization and Good Standing | 27~~8~~ |
| 4.2 | Power and Authority | 27~~8~~ |
| 4.3 | Litigation | 28 |
| 4.4 | No Contravention | 28~~9~~ |
| 4.5 | Consents and Approvals | 28~~9~~ |
| 4.6 | Title to Purchased Assets; Sufficiency | 28~~9~~ |
| 4.7 | Validity of Available Contracts | 29 |
| 4.8 | Intellectual Property | ~~29~~30 |
| 4.9 | Employee Benefits | 30 |
| 4.10 | Labor Matters | 30~~1~~ |
| 4.11 | Conduct of Business | 31 |
| 4.12 | Compliance with Laws; Permits | 31 |
| 4.13 | Financial Statements | 31~~2~~ |
| 4.14 | Financial Advisors | 32 |
| 4.15 | Tax Matters | 32 |
| 4.16 | Related Party Transactions | 32~~3~~ |

4.17    Disclaimer of Other Representations and Warranties .................................. 33

ARTICLE V
REPRESENTATIONS AND WARRANTIES OF BUYER

5.1    Organization and Good Standing .................................................. 33~~4~~
5.2    Power and Authority ...................................................................... 33~~4~~
5.3    No Contravention ............................................................................ 33~~4~~
5.4    Consents and Approvals ................................................................. 33~~4~~
5.5    Litigation ......................................................................................... 34
5.6    Financial Advisors .......................................................................... 34
5.7    Sufficient Funds; Adequate Assurances ........................................ 34
5.8    Acknowledgements; "As Is" "Where Is" Transaction .................. 34

ARTICLE VI
COVENANTS OF THE PARTIES

6.1    Conduct of Business Pending the Closing ..................................... 36
6.2    Negative Covenants ........................................................................ 36~~7~~
6.3    Access ............................................................................................. 38
6.4    Confidentiality ................................................................................ 39
6.5    Public Announcements ................................................................... ~~39~~40
6.6    Employment Matters ...................................................................... 40
6.7    Reasonable Efforts; Approvals ...................................................... 42
6.8    Corporate Name Change ................................................................ 42~~3~~
6.9    Assignment of Contracts and Rights ............................................. 43
6.10   Tax Matters ..................................................................................... 43~~4~~
6.11   Available Contracts List ................................................................. 44
6.12   HSR Act; Antitrust Laws ............................................................... 44~~5~~

ARTICLE VII
BANKRUPTCY PROVISIONS

7.1    Bankruptcy Court Orders and Related Matters ............................. 45
7.2    Bankruptcy Milestones ................................................................... 47

ARTICLE VIII
CONDITIONS TO OBLIGATIONS OF THE PARTIES

8.1    Conditions Precedent to Obligations of Buyer .............................. 48
8.2    Conditions Precedent to the Obligations of Seller ........................ 49
8.3    Conditions Precedent to Obligations of Buyer and Seller ............ ~~49~~50
8.4    Frustration of Closing Conditions ................................................. ~~49~~50

ARTICLE IX
TERMINATION

9.1    Termination of Agreement .......................................................................... 50
9.2    Consequences of Termination ................................................................... 51

ARTICLE X
MISCELLANEOUS

10.1   Expenses ...................................................................................................... 52
10.2   Assignment ................................................................................................. 52
10.3   Parties in Interest ....................................................................................... 52
10.4   Risk of Loss ............................................................................................... 52
10.5   Notices ........................................................................................................ 52
10.6   Entire Agreement; Amendments and Waivers ................................... 5~~3~~4
10.7   Counterparts ............................................................................................... 54
10.8   Invalidity .................................................................................................... 54
10.9   Governing Law ........................................................................................... 54
10.10  Dispute Resolution; Consent to Jurisdiction ........................................... 54
10.11  WAIVER OF RIGHT TO TRIAL BY JURY .......................................... 55
10.12  Specific Performance ................................................................................. 55
10.13  Third Party Beneficiaries .......................................................................... 55
10.14  Counting ..................................................................................................... 55
10.15  Survival ...................................................................................................... 55
10.16  Non-Recourse ........................................................................................ 5~~5~~6
10.17  Preparation of this Agreement .................................................................. 56
10.18  Schedules .................................................................................................... 56
10.19  Fiduciary Obligation .................................................................................. 57

**Exhibits**

Exhibit A       Bidding Procedures
Exhibit B       Bidding Procedures Order
Exhibit C       Form of Bill of Sale, Assignment and Assumption Agreement

**ASSET PURCHASE AGREEMENT**

This ASSET PURCHASE AGREEMENT (the "<u>Agreement</u>"), dated as of [  ], 2023 (the "<u>Agreement Date</u>"), is made and entered into by and among [AcquisitionCo], a Utah professional corporation (together with any assignee(s) or designee(s) pursuant to <u>Section 10.2</u>, "<u>Buyer</u>") and John C. Heath, Attorney at Law PC d/b/a Lexington Law, a Utah professional corporation ("<u>Seller</u>"). Buyer and Seller are collectively referred to herein as the "<u>Parties</u>" and each, a "<u>Party.</u>"

<u>RECITALS</u>:

A.      Seller is <u>a law firm</u> engaged in the business of providing ~~credit repair~~ legal services<u>, advice, and representation ("Legal Services")</u> directly to third-party clients <u>primarily</u>

for the purpose of credit repair, and PGX (as defined below) provides Seller with operational support services pursuant to the PGX Operating Agreements (as defined below) (the "Business").

B.      Prior to the execution of this Agreement, the Seller and the PGX Debtors filed voluntary petitions for relief under chapter 11 of Title 11 of the United States Code, 11 U.S.C. Sections 101 et seq. (as amended, the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") (such cases, the "Cases").

C.      This Agreement is being delivered in connection with that certain Asset Purchase Agreement, dated on or around the date hereof, by and among [Lender Acquisition Co LLC], a [Delaware limited liability company], the PGX Debtors and, solely with respect to certain sections as referenced therein, Blue Torch Finance LLC, a Delaware limited liability company (the "PGX Agreement").

D.      Upon the terms and subject to the conditions set forth in this Agreement, and as authorized under sections 105, 363 and 365 of the Bankruptcy Code as relates to Seller, Seller proposes to sell, transfer and assign to Buyer, and Buyer proposes to purchase, acquire and assume from Seller the Purchased Assets (as defined below) and Assumed Liabilities (as defined below).

NOW, THEREFORE, in consideration of the mutual representations, warranties, covenants and agreements contained herein, and upon the terms and subject to the conditions hereof, the Parties, intending to be legally bound, hereby agree as follows:

## ARTICLE I
## DEFINITIONS

1.1     Defined Terms. As used herein, the terms below shall have the following respective meanings:

"Acquired Bank Accounts" shall mean any bank accounts of Seller that Buyer elects to acquire by written notice to Seller on or before the date that is ten (10) days prior to Closing; provided that the Parties shall agree in good faith as to one or more bank accounts that Seller and/or the PGX Debtors shall retain in connection with the wind down and liquidation of the Seller and PGX Debtor entities and businesses following the Closing.

"Acquired Intellectual Property" shall mean, collectively, all Owned Intellectual Property and Licensed Intellectual Property.

"Administrative Expenses" shall mean, collectively, the administrative expenses incurred by Seller and/or the PGX Debtors in the Cases, including expenses of the kind specified in Sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 546(c), 546(d), or 726 (to the extent permitted by Law) of the Bankruptcy Code, and any other provision of the Bankruptcy Code (including, subject to entry of the Interim and Final DIP Orders, Section 506(c) of the Bankruptcy Code).

"Affiliate" shall mean, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"Allocation Schedule" shall mean the schedule allocating the Purchase Price and the Assumed Liabilities in accordance with Section 1060 of the Code and the Treasury Regulations thereunder and any corresponding requirements of any state, local, or foreign Tax Laws, as applicable.

"Alternate Transaction" shall mean a transaction or transactions pursuant to which Seller or any of its Affiliates, in one or a series of transactions, sells, transfers, exchanges, leases or otherwise disposes of, directly or indirectly, all or any material portion of the Purchased Assets, including any transaction effected in connection with the Auction or through any other asset sale, stock sale, share exchange, debt-for-equity swap, joint venture, credit bid, financing, merger, amalgamation, business combination, reorganization, restructuring or recapitalization, a plan of reorganization, a plan of arrangement or any similar transaction, in each case that would not involve a sale or disposition of all or any material portion of the Purchased Assets or the Business to Buyer; provided that neither any disposition of Purchased Assets that is expressly permitted by Section 6.2 of this Agreement, nor the liquidation, dismissal or conversion of the Cases and the dissolution of the Seller, shall be deemed an Alternate Transaction.

"Approved Budget" shall have the meaning ascribed thereto in the DIP Documents.

"Auction" shall mean the auction for the Purchased Assets to be conducted on the Auction Date in accordance with the terms and provisions of the Bidding Procedures Order and as defined in the Bidding Procedures.

"Auction Date" shall mean the date of the Auction scheduled by the Bankruptcy Court and set forth in the Bidding Procedures Order or such later date as shall be announced by Seller and the PGX Debtors in accordance with the Bidding Procedures Order.

"Avoidance Actions" shall mean thoseany and all actual and/or potential claims and causes of action under sectionschapter 502(d), 544, 545, 547, 548 and 550 of the Bankruptcy Code or state fraudulent conveyance, fraudulent transfer, or similar Laws, or any other avoidance actions under the Bankruptcy Code.

"Bankruptcy Rules" shall mean the Federal Rules of Bankruptcy Procedure originally promulgated pursuant to 28 U.S.C. § 2075.

"Benefit Plan" shall mean any "employee benefit plan" (within the meaning of Section 3(3) of ERISA), and all pension, severance, retirement, consulting, compensation, profit sharing, commission, employment, change in control, retention, fringe benefit, bonus, stock or other equity, equitybasedequity based, option, incentive compensation, restricted stock, stock appreciation right or similar right, phantom equity, profits interests, deferred compensation,

5

employee loan, vacation, paid time off, welfare, medical, dental, vision, flexible benefit, cafeteria, dependent care, disability or wage continuation benefits during periods of absence from work (including short-term disability, long-term disability and worker's compensation benefits), supplemental unemployment, hospitalization, life insurance, death or survivor benefits, employment insurance, and all other employee benefit plans, programs, policies, practices, agreements and other arrangements, and any funding vehicle therefor now in effect, in each case, whether or not subject to ERISA, whether formal or informal, written or oral, insured or self-insured, funded or unfunded, binding or not, that (i) provides benefits or compensation to, or which has any application to, any present or former employee, director, independent contractor or other individual service provider of Seller or any beneficiary or dependent of such persons, (ii) is adopted, maintained, sponsored, contributed to, or required to be contributed to by Seller, or (iii) with respect to which Seller is a party, is bound, participates in, or has or could reasonably be expected to have any Liability.

"Bid" shall have the meaning ascribed to such term in the Bidding Procedures.

"Bidding Procedures" shall mean the Bidding Procedures filed with the Bankruptcy Court in the form attached hereto as Exhibit A or otherwise in form and substance reasonably acceptable to Buyer.

"Bidding Procedures Motion" shall mean the motion filed in the Cases, which motion shall be in form and substance satisfactory to Buyer (together with all exhibits thereto), (i) seeking approval of (A) this Agreement and the Transactions and (B) the Bidding Procedures and scheduling certain dates, deadlines and forms of notice in connection therewith, and (ii) granting other related relief, in each case, in form and substance acceptable to Buyer.

"Bidding Procedures Order" shall mean the order entered by the Bankruptcy Court approving the Bidding Procedures Motion, the Bidding Procedures and granting the relief requested therein in the form set forth in Exhibit B and with such modifications or supplements reasonably satisfactory to Buyer.

"Business Day" shall mean any day other than a Saturday, Sunday or a legal holiday on which banking institutions in New York City, New York are authorized or obligated by Law or executive order to close.

"Business Employee" means each employee of Seller as of immediately prior to the Closing.

"Buyer Avoidance Actions" shall mean any actual and/or potential Avoidance Actions or other Claim by Seller against John C. Heath and Eric Kamerath.

"Buyer Group" means Buyer, any Affiliate of Buyer and each of their respective former, current or future Affiliates, officers, directors, employees, partners, members, managers, agents, advisors, successors or permitted assigns.

"Claims" shall have the meaning as defined in the Bankruptcy Code.

"Client Agreements" shall mean, collectively, each agreement in effect as of the [Agreement Date] between the Seller and a client, whether an individual or a corporate or governmental entity (a "Client"), to create a relationship for the primary purpose of Legal Services rendered by the Seller, regardless of the nature of such Legal Services and notwithstanding whether such agreement is styled as a certain Engagement Agreement and Limited Designation of Agency or otherwise.

"Closing" shall mean the consummation of the Transactions.

"Code" shall mean the Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder.

"Confidential Information" shall mean all information in any form or medium that relates to the Business, the Purchased Assets or the Assumed Liabilities, including financial information, projections, pricing structures, technical data, Trade Secrets, know-how, ideas, inventions, designs, research, development plans, identities of, and arrangements with, customers and suppliers, software and databases, but shall not include any information that (i) at the time of disclosure thereof is generally available to the public (other than as a result of disclosure in violation of this Agreement), or (ii) is independently developed by the receiving party following the Closing Date without reliance on or use of any Confidential Information.

"Contract" shall mean any lease, sublease, license, sublicense, agreement, contract, contract right, obligation, trust, purchase order, sale order, instrument and other similar arrangements, whether or not in written form, that is binding upon a Person or its property (including any commitment to enter into any of the foregoing).

"Cure Amounts" shall mean all amounts payable that must be paid or otherwise satisfied to cure all of Seller's monetary defaults under the Assumed Contracts at the time of the assumption thereof and assignment to Buyer pursuant to section 365 of the Bankruptcy Code.

"Dataroom" shall mean that certain data site administered by Box.

"Debt" shall mean, without duplication, (i) indebtedness or other obligations for borrowed money or in respect of loans or advances or issued in substitution for or exchange of indebtedness for borrowed money or loans or advances, whether short-term or long-term, secured or unsecured, (ii) any indebtedness or other obligations evidenced by any note, bond, debenture or other debt security or instrument, (iii) all obligations to pay the deferred purchase price of property or services, contingent or otherwise (including all "earn-out" obligations), (iv) all obligations under interest rate and currency hedging agreements, including swap breakage or associated fees, (v) all obligations arising from bankers' acceptances, letters of credit (to the extent drawn) and cash/book overdrafts or similar facilities, (vi) all obligations for the payment of which a Person is responsible or liable, directly or indirectly, as obligor, guarantor or otherwise, including guarantees of such obligations, (vii) any obligations under leases that have been or are required to be, in accordance with GAAP, recorded as capital leases, (viii) any indebtedness or other obligations secured by an Encumbrance on Seller's interest in any assets,

and (ix) all accrued interest, premiums, penalties (including any prepayment penalties or premiums) and other obligations related to any of the foregoing.

"DIP Documents" shall mean that certain Superpriority Secured Debtor-in-Possession Credit Facility by and among the DIP Lenders, the PGX Debtors, the Seller, the Guarantors (as defined therein) and the Administrative Agent (as defined therein), together with the schedules and exhibits attached thereto and all agreements, documents, orders, instruments and/or amendments executed, delivered or entered in connection therewith.

"DIP Facility" shall mean the debtor-in-possession term loan facility pursuant to which the DIP Lenders agreed to provide debtor-in-possession financing commitments on the terms set forth in the DIP Documents.

"DIP Lenders" shall mean the lenders providing the DIP Facility.

"Documents" means all of Seller's written files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, plans, operating records, safety and environmental reports, data, studies, and documents, Tax Returns, ledgers, journals, title policies, customer lists, regulatory filings, operating data and plans, research material, technical documentation (design specifications, engineering information, test results, maintenance schedules, functional requirements, operating instructions, logic manuals, processes, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials, in each case whether or not in electronic form.

"Encumbrance" means any lien (as defined in section 101(37) of the Bankruptcy Code), encumbrance, claim (as defined in section 101(5) of the Bankruptcy Code), charge, mortgage, deed of trust, option, pledge, security interest or similar interests, title defects, hypothecations, easements, rights of way, encroachments, Orders, conditional sale or other title retention agreements and other similar impositions, imperfections or defects of title or restrictions on transfer or use.

"Equity Interests" of any Person shall mean all (i) shares of capital stock, rights to purchase shares of capital stock, warrants, options, calls or restricted stock (whether or not currently exercisable), (ii) equity appreciation, phantom stock, stock plans, profit participation plans, profit units, profit interests, equity plans or similar rights, (iii) participations or other equivalents of or interests in (however designated, including units thereof) the equity (including common stock, preferred stock and limited liability company, partnership and joint venture interests) of such Person and (iv) securities exchangeable for or convertible or exercisable into any of the foregoing.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated thereunder.

"Excluded Cash" shall mean, collectively, all cash on hand and cash drawn by Seller under the DIP Facility to the extent necessary to, subject to the terms of the DIP Orders and

Approved Budget (each as approved by the Bankruptcy Court in connection with the DIP Facility), (a) satisfy the allowed Professional Fees and Expenses payable by Seller, if any, that have accrued, are undisputed and are unpaid as of the Closing Date, (b) pay all Administrative Expenses of the Seller that are accrued, unpaid, allowed and undisputed as of the effective date in the Cases, subject to the DIP Orders and Approved Budget and (c) fund an orderly liquidation, dismissal or conversion of the Cases and the dissolution of the Seller (which amount shall be equal to [$2,625,000] (the "Wind Down Amount")), to be used in accordance with a budget acceptable to the Debtors and Buyer (the "Wind Down Budget") (to be finalized prior to the Sale Hearing and attached as an exhibit to the Sale Order).

"Final DIP Order" shall mean an Order of the Bankruptcy Court acceptable to the Administrative Agent in its sole discretion, authorizing and approving on a final basis, among other things, the DIP Documents and the DIP Facility on a final basis (as the same may be amended, supplemented, or modified from time to time after entry thereof with the consent of Administrative Agent, in its sole discretion) as to which no stay has been entered.

"Final Order" shall mean an Order of the Bankruptcy Court or other applicable court (a) that is not the subject of a pending appeal, petition for certiorari, motion for reconsideration or leave to appeal or other proceeding for review, rehearing or reargument, (b) that has not been reversed, vacated, modified or amended, is not stayed and remains in full force and effect, and (c) with respect to which the time to appeal, to petition for certiorari, to move for reconsideration or to seek review, rehearing or reargument shall have expired, as a result of which such order shall have become final in accordance with Rule 8002 of the Federal Rules of Bankruptcy Procedure or other applicable Laws, as applicable.

"GAAP" shall mean United States generally accepted accounting principles.

"Governmental Entity" shall mean any (i) federal, state, provincial, local, municipal, foreign or other government, (ii) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or entity and any court, arbitrator or other tribunal) or (iii) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature, including any arbitral tribunal.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"Insider Avoidance Actions" shall mean any actual and/or potential Avoidance Actions or other Claim by Seller against the individuals listed on Schedule 1.1(a) as of the Petition Date.

"Intellectual Property" shall mean all intellectual property and industrial property, whether protected, created or arising under the Laws of the United States or any other jurisdiction, including all: (i) patents and patent applications, all continuations, divisionals, and continuations-in-part of any of the foregoing, all patents issuing on any of the foregoing, and all reissues, renewals, substitutions, reexaminations and extensions of any of the foregoing; (ii) trademarks, service marks, trade names, service names, brand names, trade dress rights, logos, corporate names, trade styles, logos and other source or business identifiers and general

intangibles of a like nature, together with the goodwill associated with any of the foregoing, and all applications, registrations, renewals and extensions of any of the foregoing (collectively, "Marks"); (iii) internet domain names; (iv) copyrights, works of authorship, and all mask work, database and design rights, whether or not registered or published, all applications, registrations, reversions, extensions and renewals of any of the foregoing, and all moral rights, however denominated (collectively, "Copyrights"); (v) trade secrets and other confidential or proprietary information (collectively, "Trade Secrets"); (vi) rights of publicity, persona rights or other rights to use indicia of any Person's personality; and (vii) Technology and other intellectual property or industrial property rights arising from or relating to any Technology.

"Interim DIP Order" shall mean an Order of the Bankruptcy Court (as the same may be amended, supplemented, or modified from time to time after entry thereof in accordance with the terms thereof), in form and substance acceptable to the Administrative Agent in its sole discretion, authorizing on an interim basis, among other things, the DIP Documents and the DIP Facility.

"Knowledge of Seller" shall mean, as to a particular matter, the actual knowledge of John C. Heath, Esq.

"Law" shall mean any federal, state, provincial, local or foreign statute, law, ordinance, regulation, rule, code, order, treaty, administrative interpretation, guideline, principle of common law or equity, judgment enacted, promulgated, issued, enforced or entered by any Governmental Entity.

"Leased Real Property" shall mean each parcel of real property leased by Seller, together with all rights, title and interest of Seller in and to leasehold improvements relating thereto.

"Leases" shall mean all leases, subleases, licenses, concessions and other agreements pursuant to which Seller holds any Leased Real Property.

"Liabilities" shall mean, as to any Person, all debts, adverse claims, liabilities, commitments, responsibilities, and obligations of any kind or nature whatsoever, direct, indirect, asserted or unasserted, absolute or contingent, of such Person, whether accrued, vested or otherwise, whether known or unknown, and whether or not actually reflected, or required to be reflected, in such Person's balance sheets or other books and records, including any liability for Taxes.

"Licensed Intellectual Property" shall mean all Intellectual Property (other than Owned Intellectual Property) used, held for use or practiced in connection with the Business.

"Liquidating Plan" shall mean a liquidating plan of reorganization permissible under chapter 11 of the Bankruptcy Code, to be implemented in the Cases.

"Material Adverse Effect" shall mean any matter, event, change, occurrence, circumstance, development, condition, fact or effect (each an "Effect"), which, when considered either individually or in the aggregate together with other Effects is materially adverse to the Business, the Purchased Assets and the Assumed Liabilities, taken as a whole; provided that

none of the following (or the consequences thereof), either alone or in combination, shall constitute or be taken into account in determining whether or not there has been, a Material Adverse Effect: (i) any Effect arising out of, resulting from or attributable to general business or economic conditions affecting (A) the United States or those countries within which Seller operates, or (B) the industries in which Seller operates, including Effects arising from or relating to competition or ordinary course matters and other Effects within such industry, new entrants into such industry, new products from other participants in such industry, changes in product pricing due to competition, changes in market share or financial results due to such competition, and other related changes resulting from such competition; (ii) Effects in, arising from, or relating to any change in GAAP or regulatory accounting principles or interpretations thereof after the date hereof, or a change in applicable Laws or other binding directives or determinations issued or made by or agreements with or consents of any Governmental Entity (including, for the avoidance of doubt, any such items related to Section 6.5) and any increase (or decrease) in the terms or enforcement of (or negotiations or disputes with respect to) any of the foregoing after the date hereof; (iii) Effects in, arising from or relating to national or international political or social conditions, including tariffs, riots, protests, the engagement by the United States or another country in hostilities or the escalation thereof, whether or not pursuant to the declaration of a national emergency or war, or the occurrence or the escalation of any military, cyber or terrorist (whether or not state-sponsored) terrorist act or attack upon the United States or any other country, or any of its territories, possessions, or diplomatic or consular offices or upon any military installation, asset, equipment or personnel of the United States or any other country; (iv) Effects in, arising from or relating to any global or national health concern, pandemic, or epidemic, (whether or not declared as such by any Governmental Entity), viral outbreak (including "Coronavirus" or "COVID-19" or the worsening thereof) or any quarantine or trade restrictions related thereto; (v) Effects in, arising from or relating to any natural disaster, fire, flood, hurricane, earthquake, tornado, windstorm, other calamity or act of God or any other *force majeure*; (vi) Effects in, arising from or relating to the decline or rise in price of any currency or any equipment, machines, computers, furniture, furnishings, fixtures, supplies, vehicles or other fixed assets necessary to or used in the provision of services by Seller or its Affiliates (including any resulting inability to meet customer demands and any resulting breaches of Contracts); (vii) Effects in, arising from, or relating to financial, banking, or securities markets (including (A) any disruption of any of the foregoing markets, (B) any change in currency exchange rates, (C) any decline or rise in the price of any security, commodity, Contract, or index, and (D) any increased cost, or decreased availability, of capital or pricing or terms related to any financing for the Transactions); (viii) Effects in, arising from or relating to (A) the taking of any action permitted or contemplated by this Agreement or at the request of Buyer or its Affiliates, (B) the failure to take any action if such action is prohibited by this Agreement, (C) Buyer's failure to consent to any of the actions restricted in Section 6.1, or (D) the negotiation, announcement, or pendency of this Agreement or the Transactions, the identity, nature, or ownership of Buyer or Buyer's plans with respect to the Purchased Assets and Assumed Liabilities, including the impact thereof on the relationships, contractual or otherwise, of the business of Seller or its Affiliates with employees, customers, lessors, suppliers, vendors, or other commercial partners or litigation arising from or relating to this Agreement or the Transactions; (ix) Effects in, arising from, or relating to any existing event, occurrence or circumstance that is publicly known or disclosed or with respect to which Buyer has knowledge as of the date hereof, including any matter set forth in the Seller's Disclosure Schedules (as

defined below); (x) Effects in, arising from or relating to any action required to be taken under any existing Contract to which Seller or its Affiliates (or any of their assets or properties) is bound; (xi) Effects that arise from any seasonal fluctuations in the Business; (xii) any failure, in and of itself, to achieve any budgets, projections, forecasts, estimates, plans, predictions, performance metrics or operating statistics or the inputs into such items (whether or not shared with Buyer or its Affiliates or Representatives) and any other failure to win or maintain customers or business; (xiii) the Effect of any action taken by Buyer or its Affiliates with respect to the Transactions or the financing thereof or any breach by Buyer of this Agreement; (xiv) the matters set forth on the Seller's Disclosure Schedules and any changes or developments in, or Effects or results arising from or relating to, matters set forth on the Seller's Disclosure Schedules; or (xv) (A) the commencement or pendency of the Cases; (B) any objections in the Bankruptcy Court to (1) this Agreement or any of the Transactions, (2) the Sale Order or the reorganization or liquidation of Seller or its Affiliates, or (3) the assumption or rejection of any Available Contract; or (C) any Order of the Bankruptcy Court or any actions or omissions of Seller or its Affiliates in compliance therewith.

"Opt-Out Notices" shall mean, collectively, the Notice of Sale of Lexington Law, the form of which was approved by that certain order of the Bankruptcy Court entered at Docket No. 64 of the procedurally-consolidated Cases, provided to each Client.

"Order" shall mean any judgment, order, injunction, writ, ruling, decree, stipulation, award or other binding obligation, pronouncement or determination of any Governmental Entity or arbitration tribunal.

"Ordinary Course of Business" shall mean the conduct and operation of the Business, taken as a whole, in the ordinary course, taken as a whole, consistent with past practice and taking into account the contemplation, commencement and pendency of the Cases and past practice in light of the current pandemic, epidemic or disease outbreak; provided that any action taken, or omitted to be taken, that relates to, or arises out of, any pandemic, epidemic or disease outbreak shall be deemed to be in the Ordinary Course of Business.

"Organizational Documents" shall mean, with respect to any Person (other than a natural Person), (i) the certificate or articles of incorporation, formation or organization and any limited liability company, operating or partnership agreement, or similar organizational document adopted or filed in connection with the creation, formation or organization of such Person and (ii) all bylaws and equity holders agreements or similar arrangements to which such Person (or holders of its Equity Interests) is a party relating to the organization or governance of such Person, in each case, as amended or supplemented.

"Owned Intellectual Property" shall mean all Intellectual Property owned or purported to be owned by Seller.

["Owned Real Property" shall mean each parcel of real property owned by Seller and used in or necessary for the conduct of the Business as currently conducted, together with all buildings, fixtures, structures and improvements situated thereon and all easements, rights-of-way and other rights and privileges appurtenant thereto.]

"Permits" shall mean all licenses, certificates, consents, permits, registrations, quotas, and other authorizations of any Governmental Entity relating to the Purchased Assets or used by Seller in connection with the Business, and all pending applications therefor.

"Permitted Encumbrances" shall mean (i) liens for utilities and Taxes, assessments or other governmental charges not yet due and payable, the amount or validity of which is being contested in good faith, or the nonpayment of which is permitted or required by the Bankruptcy Code, (ii) building codes, zoning Laws, entitlement and other land use restrictions, environmental regulations and other similar restrictions imposed by Law or by any Governmental Entity having jurisdiction over any Real Property which are not violated by the current use, occupancy or operation of any Real Property, (iii) easements, rights of way, restrictive covenants, encroachments, and similar non-monetary encumbrances or non-monetary impediments against any of the Purchased Assets which do not, individually or in the aggregate, adversely affect the operation of the Purchased Assets and, in the case of the Leased Real Property, which do not, individually or in the aggregate, adversely affect the use or occupancy of such Leased Real Property as it relates to the operation of the Purchased Assets, (iv) materialmans', mechanics', artisans', shippers', warehousemans' or other similar common law or statutory liens incurred in the Ordinary Course of Business for amounts not yet due and payable, (v) licenses granted on a non-exclusive basis, (vi) such other defects, exceptions, restrictions, imperfections in title, charges, easements, restrictions and encumbrances which do not, individually or in the aggregate, materially and adversely affect the operation of the Purchased Assets, (vii) title of a lessor under a capital or operating lease if such lease is an Assumed Contract; and (viii) solely prior to the Closing, any Encumbrances that will be removed or released by operation of the Sale Order.

"Person" shall mean an individual, partnership, joint venture, corporation, business trust, limited liability company, trust, unincorporated organization, association, joint stock company, estate, Governmental Entity or other entity.

"Personal Information" shall mean, in addition to any definition for any similar term (e.g., "personal data" or "personally identifiable information" or "PII") provided by applicable Law or by Seller in any of their privacy policies, notices or contracts, all information that identifies, could be used to identify or is otherwise associated with an individual person or device, whether or not such information is associated with an identified individual. Personal Information may relate to any individual, including a current, prospective, or former customer, end user or employee of any Person, and includes information in any form or media, whether paper, electronic, or otherwise.

"Petition Date" shall mean the date on which Seller and the PGX Debtors file voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

"PGX" shall mean, collectively, Progrexion Holdings, Inc., a Delaware corporation ("Progrexion"), Progrexion IP, Inc., a Delaware corporation ("PGX IP"), Progrexion Marketing, Inc., a Delaware corporation ("PMT"), Progrexion ASG, Inc., a Delaware corporation ("PXGX ASG") and Progrexion Teleservices, Inc., a Delaware corporation ("PTI").

"PGX Debtors" shall mean, collectively, PGX, PGX Holdings, Inc., a Delaware corporation, ProgrexionPGX Holdings, Inc., a Delaware corporation, Credit.com, Inc., a Delaware corporation, eFolks Holdings, Inc., a Delaware corporation, eFolks, LLC, a Delaware limited liability company, creditrepair.com, Inc., a Florida corporation, Credit Repair UK, Inc., a Delaware corporation, and Creditrepair.com Holdings, Inc., a Delaware corporation.

"PGX Operating Agreements" shall mean, collectively, that certain (i) Software Licensing Agreement by and between PGX IP and Seller, effective September 1, 2014, (ii) Advertising Agreement by and between PMI and Seller, effective as of September 1, 2014, (iii) Administrative Services Agreement by and between PGX ASG and Seller and (iv) Cross Default Agreement by and between PGX and Seller, effective July 1, 2012, in each case, together with all applicable amendments, documents and agreements related thereto.

"PGX Sale" shall mean the sale of assets of the PGX Debtors pursuant to the PGX Agreement.

"Post-Closing Tax Period" shall mean all taxable years or other taxable periods that end after the Closing Date and, with respect to any taxable year or other taxable period beginning on or before and ending after the Closing Date, the portion of such taxable year or period beginning after the Closing Date.

"Pre-Closing Tax Period" shall mean all taxable years or other taxable periods that end on or before the Closing Date and, with respect to any taxable year or other taxable period beginning on or before and ending after the Closing Date, the portion of such taxable year or period ending on and including the Closing Date.

"Privacy Laws" shall mean any and all applicable Laws, legal requirements and self-regulatory guidelines (including of any applicable foreign jurisdiction) relating to the receipt, collection, compilation, use, storage, processing, sharing, safeguarding, security (technical, physical or administrative), disposal, destruction, disclosure or transfer (including cross-border) of any Personal Information, including the Federal Trade Commission Act, Health Insurance Portability and Accountability Act (HIPAA), California Consumer Privacy Act (CCPA), Payment Card Industry Data Security Standard (PCI-DSS), and any and all applicable Laws relating to breach notification or marketing in connection with any Personal Information.

"Proceeding" shall mean any action, claim complaint, arbitration, governmental investigation, prosecution, order, litigation, proceeding, or suit (whether civil, criminal, administrative, investigative, appellate, or informal) of any kind whatsoever, regardless of the legal theory under which such Liability or obligation may be sought to be imposed, whether sounding in Contract or tort, or whether at law or in equity, or otherwise under any legal or equitable theory, commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Entity or arbitrator.

"Professional Fees and Expenses" shall mean the reasonable and documented fees and expenses of professionals of Seller and any committee appointed in the Cases pursuant to section 1102 of the Bankruptcy Code that are accrued and unpaid as of the Closing Date, whether or not

14

included in a fee statement or fee application at such time and whether or not allowed by the Bankruptcy Court at such time.

"Purchased Assets" shall mean all right, title and interest of Seller, as of the Closing, in, to and under all of the assets, properties, interests, rights and claims of Seller as of the Closing (whether owned, leased, licensed, used or held for use by the Seller), wherever situated and of whatever kind and nature, real or personal, tangible or intangible, and whether or not reflected on the books and records of the Seller, including the assets, properties, rights and claims as of the Closing described in Section 2.1, other than the Excluded Assets.

"Real Property" shall mean ~~Owned Real Property and~~ Leased Real Property.

"Representative" shall mean, with respect to any Person, such Person's officers, managers, directors, employees, agents and representatives (including any investment banker, financial advisor, accountant, legal counsel or expert retained by or acting on behalf of such Person or its Affiliates).

"Sale Order" shall mean, collectively, the Order or Orders which shall be in a form and substance acceptable to Buyer and Seller in their sole discretion and which shall, among other things: (i) approve, pursuant to sections 105, 363 and 365 of the Bankruptcy Code (A) the execution, delivery and performance by Seller of this Agreement, including each and every term and condition hereof, and the other instruments and agreements contemplated hereby, (B) the sale of the applicable Purchased Assets of Seller to Buyer free and clear of all Encumbrances and Liabilities (other than Permitted Encumbrances), on the terms set forth herein and (C) the assumption of the Assumed Liabilities of Seller by Buyer on the terms set forth herein; (ii) authorize Seller to assume and assign to Buyer the Assumed Contracts; (iii) find that Buyer has provided adequate assurance of future performance with respect to the Assumed Contracts to which Seller is a party; (iv) find that Buyer is a "good faith" buyer within the meaning of section 363(m) of the Bankruptcy Code; (v) provide that neither Buyer nor any of its Affiliates or equityholders will have any derivative, successor, transferee or vicarious liability of any kind or character, whether fixed or contingent, for Liabilities of Seller (whether under federal or state Law or otherwise), including on account of any Taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the operation of the Business prior to the Closing (except for such Taxes that constitute Assumed Liabilities); (vi) waive in all necessary jurisdictions, (A) the so-called "bulk sales," "bulk transfer" and similar Laws, including those related to Taxes and (B) the imposition of any Taxes incurred in connection with the Transactions and the Sale Order; (vii) enjoin all Persons from commencing any proceeding or taking any action against Buyer or any of its Affiliates to recover any claim that such Person has solely against Seller or its Affiliates; and (viii) provide that the obligations of Seller relating to Taxes, whether arising under Law, by this Agreement (except as specifically set forth in this Agreement), or otherwise, shall be fulfilled by Seller.

"Seller's Disclosure Schedules" shall have the meaning ascribed to such term in the opening paragraph of Article IV.

"Software" shall mean, collectively, any and all (i) computer programs, including any and all software implementations of algorithms, models and methodologies, whether in source

code or object code, (ii) databases and compilations, including any and all data and collections of data, whether machine readable or otherwise, (iii) descriptions, flow-charts and other work product used to design, plan, organize and develop any of the foregoing, screens, user interfaces, report formats, firmware, development tools, templates, menus, buttons and icons, and (iv) all documentation including user manuals and other training documentation related to any of the foregoing.

"Successful Bidder" shall mean the winning bidder at the Auction.

"Tax" or "Taxes" shall mean (i) all U.S. federal, state, local, foreign and other taxes, assessments, duties or charges of any kind whatsoever, including, income, profits, gains, net worth, sales and use, *ad valorem,* gross receipts, sales, use, business and occupation, license, premium, minimum, alternative or add-on minimum, environmental, estimated, stamp, customs duties, occupation, property (real or personal), franchise, capital stock, license, excise, value added, payroll, employment, social security (or similar), escheat, unclaimed property, unemployment, transfer, severance, registration, lease, service, recording, documentary, permit or authorization, intangibles or other tax (whether payable directly or by withholding), together with any penalty, fine, addition to tax or interest on the foregoing; (ii) any liability in respect of any items described in clause (i) payable by reason of contract, assumption, transferee or successor liability, operation of Law, Treasury Regulations Section 1.1502-6(a) or any analogous or similar provision of Law (or any predecessor or successor thereof) or otherwise; and (iii) any Liability in respect of any items described in clause (i) as a result of being a "transferee" of the taxpayer or entity or a number of a related, non-arm's length, affiliated or combined group.

"Tax Return" shall mean any return, declaration, report, claim for refund, or information return or statement (including elections, declarations, disclaimers, notices, disclosures, schedules, estimates) relating to Taxes, including any schedule or attachment thereto, and including any amendment or supplement thereof.

"Technology" shall mean all technology, formulae, algorithms, procedures, processes, methods, techniques, ideas, know-how, creations, inventions (whether patentable or unpatentable and whether or not reduced to practice), discoveries, improvements, product, servicing, business, financial and supplier information and materials, specifications, designs, models, devices, prototypes, schematics and development tools, Software, websites, recordings, graphs, drawings, reports, analyses and other writings and other tangible embodiments of any of the foregoing, in any form or media whether or not specifically listed in this definition.

"Transactions" shall mean the sale of the Purchased Assets pursuant to this Agreement and the other transactions contemplated by this Agreement.

"Transfer Tax" or "Transfer Taxes" shall mean any stamp, sales, use, transfer, conveyance, recording, registration, filing or other similar non-income Tax, fee, duty or charge imposed upon the sale, transfer or assignment of property or any interest therein or the recording thereof, and any penalty, addition to Tax or interest with respect thereto.

"Transferred Client Agreements" shall mean, collectively, each of the Client Agreements other than any such agreement corresponding to a client that timely opted out from the transfer from Seller to Buyer of such client's relationship for Legal Services in accordance with the terms of the applicable Opt Out Notice.

"Treasury Regulations" shall mean the regulations promulgated under the Code, as such regulations may be amended from time to time.

"WARN Act" shall mean the Worker Adjustment and Retraining Notification Act of 1988, as amended.

1.2    Index of Defined Terms.

Agreement ............................................................................................................. 3
Agreement Date ................................................................................................... 3
Antitrust Laws .................................................................................................. 456
Assumed Benefit Plans ..................................................................................... 223
Assumed Contracts ............................................................................................ 23
Assumed Liabilities ........................................................................................... 22
Assumption Notice ............................................................................................. 24
Audited Financial Statements ........................................................................... 312
Available Contracts ........................................................................................... 23
Balance Sheets ................................................................................................. 312
Bankruptcy Code ................................................................................................. 4
Bankruptcy Court ................................................................................................ 4
Bankruptcy Milestones ..................................................................................... 478
Bill of Sale and Assignment and Assumption Agreement ................................ 26
Business .............................................................................................................. 3
Buyer .................................................................................................................. 3
Cases .................................................................................................................. 4
Closing Date .................................................................................................... 256
Contracting Parties ........................................................................................... 56
Copyrights .......................................................................................................... 9
Designation Notice ............................................................................................ 23
Determination Date ........................................................................................... 23
Disclosure Schedules ......................................................................................... 27
Effect ................................................................................................................ 10
Enforceability Exceptions ................................................................................. 28
Excluded Assets .............................................................................................. 201
Excluded Contracts ............................................................................................ 21
Excluded Liabilities ........................................................................................... 23
Express Representations ................................................................................... 356
Extended Contract Period ................................................................................ 234
Financial Statements ........................................................................................ 312
Interim Financial Statements ........................................................................... 312
Key Employee Agreements ............................................................................. 223
Marks ................................................................................................................. 9

Non-Recourse Persons .................................................................................................... 56
Notices .................................................................................................................... 5~~2~~3
Outside Date ............................................................................................................ 5~~0~~1
Parties ......................................................................................................................... 3
Party ........................................................................................................................... 3
PGX Agreement .......................................................................................................... 4
PGX IP ...................................................................................................................... 13
PMT .......................................................................................................................... 13
Pre-Closing Taxes ...................................................................................................... 44
Previously Omitted Contract ..................................................................................... 25
Previously Omitted Contract Notice .......................................................................... 25
Progrexion ................................................................................................................. 13
Projections .............................................................................................................. 3~~4~~5
PTI ............................................................................................................................ 13
Purchase Price ......................................................................................................... 2~~6~~7
PXG ASG ................................................................................................................. 13
Related Party ........................................................................................................... 3~~2~~3
Related Party Transaction ....................................................................................... 3~~2~~3
Seller ........................................................................................................................... 3
Seller's Disclosure Schedules .................................................................................... 28
Third Party Consents ............................................................................................... 4~~2~~3
Trade Secrets .............................................................................................................. 9
Transaction Dispute ................................................................................................ 5~~4~~5
Transfer Offer ........................................................................................................... 40
Transferred Employees .............................................................................................. 40
Wind Down Amount ................................................................................................... 8
Wind Down Budget ..................................................................................................... 8

1.3    <u>Other Definitional Provisions and Rules of Interpretation</u>.

(a)    The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section, Schedule and Exhibit references are to this Agreement unless otherwise specified. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. ~~The preliminary draft of the Disclosure Schedules shall be prepared by Seller and furnished to Buyer no later than twenty-one (21) days following the Petition Date. The Parties shall thereafter negotiate the final Disclosure Schedules in good faith. Upon agreement by the Parties of the final Disclosure Schedules, the Disclosure Schedules shall be deemed incorporated and made a part hereof (and an integral part of this Agreement).~~ Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(b)    The meanings given to terms defined herein shall be equally applicable to both singular and plural forms of such terms.

(c)     Whenever the words "include," "includes" or "including" are used in this Agreement they shall be deemed to be followed by the words "without limitation." Where the context permits, the use of the term "or" will be equivalent to the use of the term "and/or."

(d)     Words denoting any gender shall include all genders. Where a word or phrase is defined herein, each of its other grammatical forms shall have a corresponding meaning.

(e)     A reference to any Party to this Agreement shall include such Party's successors and permitted assigns.

(f)     The word "extent" in the phrase "to the extent" means the degree to which a subject or other thing extends, and such phrase does not mean simply "if".

(g)     References herein to any Law shall be deemed to refer to such Law as amended, modified, codified, reenacted, replaced, supplemented or superseded in whole or in part and in effect from time to time, including any successor legislation thereto, and also to all rules and regulations promulgated thereunder, and references to any section or other provision of a Law means that section or provision of such Law in effect from time to time and constituting the substantive amendment, modification, codification, reenactment, replacement or supplement of such section or other provision; provided that for purposes of any representation or warranty set forth herein, with respect to any violation of or non-compliance with, or alleged violation of or non-compliance, with any Law, the reference to such Law means such as in effect at the time of such violation or non-compliance or alleged violation or non-compliance.

(h)     All references to "$" and dollars shall be deemed to refer to the currency of the United States of America.

(i)     The provision of a table of contents, the division into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement. References to the terms "Article," "Section," "clause," "Schedule" and "Exhibit" are references to the Articles, Sections, clauses, Schedules and Exhibits to this Agreement unless otherwise specified.

(j)     References to "days" means calendar days unless Business Days are expressly specified. When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period will be excluded. If the last day of such period is a day other than a Business Day, the period in question will end on the next succeeding Business Day.

(k)     References to "written" or "in writing" include in electronic form (including by e-mail transmission or electronic communication by portable document format (.pdf)).

(l)    The word "will" will be construed to have the same meaning and effect as the word "shall". The words "shall," "will," or "agree(s)" are mandatory, and "may" is permissive.

(m)    Any document or item will be deemed "delivered," "provided" or "made available" by Seller, within the meaning of this Agreement if such document or item (a) is included in the Dataroom, (b) actually delivered or provided to Buyer or any of Buyer's Representatives or (c) made available upon request, including at Seller's office(s).

(n)    Any reference to any agreement or Contract will be a reference to such agreement or Contract, as amended, modified, supplemented or waived.

## ARTICLE II
## TRANSFER OF ASSETS AND LIABILITIES

2.1    <u>Purchased Assets</u>. At the Closing, and upon the terms and subject to the conditions set forth herein and in the Sale Order and, with respect to Seller, subject to the approval of the Bankruptcy Court pursuant to sections 105, 363 and 365 of the Bankruptcy Code, Seller shall sell, convey, assign, transfer and deliver to Buyer, and Buyer shall purchase, acquire and accept from Seller, all of the right, title and interest of Seller, free and clear of any Encumbrances (other than Permitted Encumbrances), in, to and under, all of the Purchased Assets. The Purchased Assets shall include Seller's right, title and interest in, to and under each of the following of Seller:

(a)    other than the Excluded Cash, (i) all cash, money orders, third-party checks, wire transfers and any other funds of Seller, commercial paper, marketable securities, demand deposits, reserves for Taxes, certificates of deposit and other bank deposits, deposits of Seller with any third-party (including any vendor, manufacturer, customer, utility or landlord or other cash deposits for rent, electricity, telephone or otherwise), treasury bills, and other cash equivalents and liquid investments (in each case, net of bank overdrafts, issued but uncleared checks, wire transfers and drafts, and negative cash balances in other accounts), and (ii) the Acquired Bank Accounts;

(b)    all deposits, credits, and prepaid charges and expenses from whatever source paid;

(c)    all accounts receivable;

(d)    all Avoidance Actions ~~(including the Buyer Avoidance Actions but, for the avoidance of doubt, excluding the Insider Avoidance Actions) with respect to the Purchased Assets;~~<u>and all of the rights, claims or causes of action of the Seller of any kind, including those available under the Bankruptcy Code, against any officer, director, employee, manager or Affiliate of, or lender to Seller or any of its respective Affiliates (and the proceeds of any insurance policies related to any such rights, claims or causes of action) arising at any time prior to the Closing; provided that neither the Buyer nor any Person claiming by, through or on behalf of the Buyer (including by operation of law, sale, assignment, conveyance or otherwise) shall pursue, prosecute, litigate, institute or commence any Proceeding based on, assert, sell, convey,</u>

20

assign or file any Claim that relates to any rights, claims or causes of action transferred under this Section 2.1(d) against Seller, or any officer, director, employee, manager, adviser, or other Representative of Seller;

(e)    all Claims that Seller may have against any Person (including Governmental Entities) for refund or credit, rebate, abatement, deposit, prepayment, or other recovery of any type, together with any refund of interest due thereon or penalty rebate arising therefrom, in each case solely with respect to Taxes accrued with respect to periods ending on or prior to the Closing Date;

(f)    all royalties, advances, prepaid assets, and other current assets;

(g)    all machinery, furniture, fixtures, furnishings, equipment, and other tangible personal property owned or used or held for use by Seller in the conduct of the Business, including all artwork, desks, chairs, tables, hardware, copiers, telephone lines and numbers, facsimile machines and other telecommunication equipment, cubicles and miscellaneous office furnishings and supplies;

(h)    all rights of Seller under or pursuant to all warranties, representations and guarantees, including those made by suppliers, manufacturers and contractors or any other third party to and for the benefit of Seller;

(i)    all current and prior insurance policies, to the extent transferable, and any proceeds therefrom, other than any directors and officers insurance policies;

(j)    all Permits, including those listed on Schedule 2.1(j), to the extent transferable or assignable under Law;

(k)    all Assumed Contracts;

(l)    all Documents;

(m)    all Acquired Intellectual Property and all of Seller's rights to institute and pursue Proceedings against third parties for past, present and future infringement, misappropriation or dilution of any of the foregoing, or other conflict therewith, and all of Seller's rights to recover damages or lost profits in connection with any of the foregoing;

(n) [all Owned Real Property;]

(n)    (o) all rights under non-disclosure or confidentiality, non-compete or non-solicitation agreements with employees and non-employee agents of Seller or with third parties (including any non-disclosure or confidentiality, non-compete, or non-solicitation agreement entered into in connection with the Auction);

(o)    (p) any interest in any internet websites, URLs or internet domain names, and any applications and registrations pertaining thereto;

(p) ~~(q)~~ any loans owed to Seller by any current or former employee, officer or director of Seller;

(q) ~~(r)~~ the sponsorship of all Assumed Benefit Plans and all right, title and interest in any assets thereof or relating thereto;

(r) ~~(s)~~ all other assets or rights of every kind and description of Seller related to the Business, wherever located, whether real, personal or mixed, tangible or intangible; and

(s) ~~(t)~~ all goodwill related to the foregoing.

2.2    Excluded Assets. Notwithstanding anything herein contained to the contrary, from and after the Closing, Seller shall retain, and Buyer shall not purchase, Seller's right, title and interest in and to (and the Purchased Assets shall not include any of) the following assets and properties of Seller (collectively, the "Excluded Assets"), all of which shall remain the exclusive property of the Seller:

(a)    any Contract other than (i) any Assumed Contract, or (ii) any Contract otherwise included as a Purchased Asset under Section 2.1(h), Section 2.1(k), or Section ~~2.1(o)~~2.1(n) (collectively, the "Excluded Contracts"); *provided* that, for the avoidance of doubt, all Client Agreements other than Transferred Client Agreements shall constitute Excluded Contracts;

(b)    any Contract or arrangement (including any loan or similar arrangement) with or binding upon any of Seller and any Related Party (as defined below);

(c)    all Claims which Seller may have against any Person (other than Avoidance Actions ~~with respect to the Purchased Assets~~or any of the other rights, claims or causes of action described in Section 2.1(d)), including (i) all other rights, claims, causes of action, rights of recovery, rights of set-off, and rights of recoupment as of the Closing of Seller, in each case, arising out of or relating to events occurring on or prior to the Closing Date, and (ii) all claims that Seller may have against any Person with respect to any other Excluded Assets or any Excluded Liabilities;

(d)    all rights of Seller under this Agreement and the agreements and instruments delivered to Seller by Buyer pursuant to this Agreement;

(e)    all Documents (i) to the extent they relate to any of the Excluded Assets or Excluded Liabilities (including information stored on the computer systems, data networks or servers of Seller); (ii) that are Seller's financial accounting Documents, all minute books, organizational documents, stock registers and such other books and records of Seller as pertaining to ownership, organization or existence of Seller, Tax Returns (and any related work papers), corporate seal, checkbooks, and canceled checks; (iii) that Seller is required by Law to retain; or (iv) that are governed under GDPR or collected from natural persons with addresses in the European Union or European Economic Area; provided that, to the extent not prohibited by

applicable Law, Buyer shall have the right to make copies of any portions or all of such Documents;

(f)    all privileged materials, documents and records of Seller or any of its Affiliates;

(g)    the Seller's directors and officers liability insurance policies, if any, and all rights and benefits of any nature of Seller with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries;

(h)    all assets owned or used by Seller that are specifically identified in Schedule 2.2(h);

(i)    every asset of Seller that would otherwise constitute a Purchased Asset (if owned immediately prior to the Closing) if conveyed or otherwise disposed of during the period from the date hereof until the Closing Date (i) in the Ordinary Course of Business, (ii) at the direction of the Bankruptcy Court or (iii) as otherwise permitted by the terms of this Agreement;

(j)    all deposits, credits, prepaid charges and expenses, and other similar amounts, to the extent related to any Excluded Liability;

(k)    all Permits other than those ~~listed on~~set forth in Schedule 2.1(j);

(l)    the sponsorship of all Benefit Plans that are not Assumed Benefit Plans and all right, title and interest in any assets thereof or relating thereto; and

(m)    the Excluded Cash.

2.3    Assumed Liabilities. Upon the terms and subject to the conditions set forth in this Agreement and the Sale Order, and subject to the exclusions set forth in Section 2.4 (and in the event of any conflict between the exclusions set forth in Section 2.4 and the provisions of this Section 2.3, the exclusions set forth in Section 2.4 shall prevail), as partial consideration for the Purchased Assets, Buyer shall, on and after the Closing, assume only the following Liabilities of Seller (the "Assumed Liabilities"):

(a)    all Liabilities under the Assumed Contracts to the extent that any such Liabilities under such Assumed Contracts: (i) arise out of or relate to events, occurrences, acts or omissions occurring solely after the Closing Date, (ii) do not arise from a breach, violation or default of such Assumed Contract by Seller prior to the Closing; and (iii) are not required to be performed prior to the Closing;

(b)    all Liabilities relating to Buyer's ownership or operation of the Purchased Assets to the extent arising out of or relating to events, occurrences, acts or omissions occurring solely after the Closing Date;

(c)    all Cure Amounts;

(d)    all accrued and unpaid Administrative Expenses incurred by Seller prior to the Closing Date (other than Professional Fees and Expenses) and those listed on Schedule 2.3(d), not to exceed $[45,4100,000] in the aggregate;

(e)    all current Liabilities, including all accounts payable and trade payables existing on the Closing Date (including, for the avoidance of doubt, (i) invoiced accounts payable and (ii) accrued but uninvoiced accounts payable) of Seller;

(f)    (e) all Liabilities in respect of wages and other compensation of Business Employees for periods prior to the Closing Date;

(g)    (f) all Liabilities of Seller under the employment agreements set forth on Schedule 2.3(g) (the "Key Employee Agreements");

(h)    (g) all Liabilities relating to Transferred Employees accruing on or after the Closing Date;

(i)    (h) all Liabilities relating to Transferred Employees' vacation and other paid time off to the extent set forth in Section 6.6;

(j)    (i) all Liabilities with respect to the Benefit Plans listed on Schedule 2.3(i)2.3(j) (the "Assumed Benefit Plans");

(k)    (j) all Liabilities for Transfer Taxes pursuant to Section 6.10(a); and

(l)    (k) those Tax Liabilities specifically set forth on Schedule 2.3(l); and(l).

(l) any Claim in connection with or arising from or relating to any Excluded Asset, including any Taxes associated therewith.

2.4    Excluded Liabilities. Notwithstanding anything to the contrary set forth herein, Buyer shall not assume, and shall not be deemed to have assumed, and Seller shall be solely and exclusively liable with respect to, all Liabilities of Seller or any of its Affiliates or any of their respective predecessors other than the Assumed Liabilities (collectively, the "Excluded Liabilities"). For the avoidance of doubt, and without limiting the foregoing, Buyer shall not be obligated to assume, nor assumes, and Buyer hereby disclaims, all of the Excluded Liabilities., including the following Liabilities of Seller or any of its Affiliates (or any of its respective predecessors) (which shall constitute an Excluded Liability hereunder):

(a)    any Claim in connection with or arising from or relating to any Excluded Asset, including any Taxes associated therewith.

2.5    Assumption and Assignment of Assumed Contracts.

(a)    At the Closing Seller shall assume and assign, or cause to be assigned, to Buyer, and Buyer shall accept assignment of, each of the PGX Operating Agreements and Transferred Client Agreements.

(b)      Schedule 2.5(b) sets forth a list of the executory Contracts other than the PGX Operating Agreement to which Seller is a party, together with estimated Cure Amounts for each Assumed Contract (such Contracts other than the Client Agreements, the "Available Contracts"), which Schedule 2.5(b) may be updated from time to time prior to the date that is fifteen (15) days following the Agreement Date to add any Contracts inadvertently excluded from such schedule. By the date that is two (2) Business Days prior to the Closing (such date, the "Determination Date"), Buyer shall designate in writing (each such writing, a "Designation Notice") which Available Contracts from Schedule 2.5(b) Buyer wishes for Seller to assume and assign to Buyer at the Closing (such contracts, together with the PGX Operating Agreements and, the Key Employee Agreements and the Transferred Client Agreements, the "Assumed Contracts"). Buyer shall have the right to amend a Designation Notice in any respect at any time prior to the Determination Date. All Contracts of Seller that are listed on Schedule 2.5(b) and which Buyer does not designate in writing pursuant to a Designation Notice for assumption shall not constitute Assumed Contracts or Purchased Assets and shall automatically be deemed Excluded Assets; provided, however, that if an Available Contract is subject to a Cure Amount dispute or other dispute as to the assumption or assignment of such Available Contract that has not been resolved to the mutual satisfaction of Buyer and Seller prior to the Determination Date, then the Determination Date shall be extended (but only with respect to such Available Contract) to no later than the earlier of (A) the date on which such dispute has been resolved to the mutual satisfaction of Buyer and Seller, (B) the date on which such Available Contract is deemed rejected by operation of section 365 of the Bankruptcy Code and (C) the date upon which such dispute is finally determined by the Bankruptcy Court (the "Extended Contract Period"). If a Designation Notice with respect to such Available Contract is not delivered by Buyer in writing by the date which is three (3) Business Days following the expiration of such Extended Contract Period, such Available Contract shall be automatically deemed an Excluded Asset. For the avoidance of doubt, except as set forth in Section 2.3, Buyer shall not assume or otherwise have any Liability with respect to any Excluded Asset. At Buyer's reasonable request, Seller shall make reasonably available to Buyer the appropriate employees of Seller necessary to discuss the outstanding Available Contracts. Notwithstanding the foregoing, for the avoidance of doubt, the Key Employee Agreements and the PGX Operating Agreements shall, in any event, be Assumed Contracts.

(c)      Seller shall use commercially reasonable efforts to take all actions required by the Bankruptcy Court to obtain an Order (which may be the Sale Order) containing a finding that the proposed assumption and assignment of the Assumed Contracts to Buyer satisfies all applicable requirements of section 365 of the Bankruptcy Code.

(d)      At the Closing, Seller shall, pursuant to the Sale Order and the Bill of Sale and Assignment and Assumption Agreement, assume and assign, or cause to be assigned, to Buyer, each of the Assumed Contracts that is capable of being assumed and assigned as of such date.

(e)      Buyer will cooperate with Seller in communicating with third parties to Available Contracts as may be reasonably necessary to assist Seller in establishing that Buyer has satisfied the requirement of adequate assurance of future performance contained in sections

365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the applicable Available Contracts.

(f)    In the event Seller is unable to assign any such Assumed Contract to Buyer without the consent of another Person, then the Parties shall use their commercially reasonable efforts to obtain, and to cooperate in obtaining, all required consents necessary to assume and assign such Assumed Contracts to Buyer; provided that Seller's administration of the process with the Opt Out Notices shall be sufficient to satisfy Seller's obligations under this Section 2.5(f) solely in connection with Client Agreements.

(g)    As soon as practicable after the Agreement Date (and in no event later than three (3) Business Days after entry of the Bidding Procedures Order), Seller shall file a list of the Available Contracts (the "Assumption Notice") with the Bankruptcy Court and shall serve such Assumption Notice via first class mail on each counterparty to an Available Contract listed thereon. The Assumption Notice shall identify all Available Contracts and set forth a good faith estimate of the amount of the Cure Amounts applicable to each such Contract.

(h)    Not later than one (1) Business Day following the Determination Date, Seller shall file with the Bankruptcy Court an amended and restated Assumption Notice, which notice shall set forth only the Assumed Contracts (and exclude all other Available Contracts).

(i)    On the Closing Date, with respect to Cure Amounts not disputed as of the Closing Date, Buyer shall pay all Cure Amounts to the applicable counterparty and Seller shall have no Liability therefor. With respect to Cure Amounts that are disputed as of the Closing Date, the Parties shall cooperate and diligently pursue resolution of such disputes. Upon the resolution of any disputed Cure Amount following the Closing, Buyer shall pay such Cure Amount promptly, and in no event later than two (2) Business Days following such resolution.

(j)    Upon payment by Buyer of the Cure Amounts, all defaults under the Assumed Contracts (monetary or otherwise) and all actual or pecuniary losses that have or may have resulted from such defaults shall be deemed cured, including any Tax, rental obligation, common area maintenance, percentage rent, base rent or utility payments, whether or not such obligation became due, or accrued, after the effective date of the assignment of such Assumed Contracts, as the case may be.

(k)    Notwithstanding anything in this Agreement to the contrary, from and after the date hereof through the Closing, Seller will not reject or take any action (or fail to take any action that would result in rejection by operation of Law) to reject, repudiate or disclaim any Contract without the prior written consent of Buyer; provided that the Seller's administration of the process for Opt Out Notices shall not violate this Section 2.5(k).

(l)    Previously Omitted Contracts.

(i)    If prior to or following the date which is thirty (30) days following the Agreement Date, it is discovered by any Party that a Contract should have been listed on Schedule 2.5(b) but was not listed on Schedule 2.5(b) and has not been rejected by the Seller (any such Contract, a "Previously Omitted Contract"), the discovering Party shall,

promptly following the discovery thereof (but in no event later than two (2) Business Days following the discovery thereof), notify the other Parties in writing of such Previously Omitted Contract and then the Seller shall, promptly following such notification (but in no event later than two (2) Business Days following such notification), notify Buyer of Seller's good faith estimate of all Cure Amounts (if any) for such Previously Omitted Contract. Buyer may thereafter deliver a Designation Notice to Seller, no later than the earlier of (x) the Determination Date or the expiration of the Extended Contract Period, as applicable, and (y) five (5) Business Days following notification of such Previously Omitted Contract from the Seller with respect to such Previously Omitted Contract and, if such Designation notice is so delivered, such contract shall be an Assumed Contract under this Agreement. All Previously Omitted Contracts with respect to which Buyer fails to timely deliver a Designation Notice, shall be an Excluded Asset.

(ii)    If Buyer delivers a Designation Notice in accordance with Section 2.5(l)(i), the Seller shall serve a notice (the "Previously Omitted Contract Notice") on the counterparties to such Previously Omitted Contract notifying such counterparties of the Cure Amounts with respect to such Previously Omitted Contract and Seller's intention to assume and assign such Previously Omitted Contract in accordance with this Section 2.5. The Previously Omitted Contract Notice shall provide the counterparties to such Previously Omitted Contract with fourteen (14) Business Days to object, in writing to Seller and Buyer, to the Cure Amounts or the assumption of its Contract. If the counterparties, Seller and Buyer are unable to reach a consensual resolution with respect to the objection, Seller shall seek an expedited hearing before the Bankruptcy Court to determine the Cure Amounts and approve the assumption. If no objection is served on Seller and Buyer, Seller shall obtain an order of the Bankruptcy Court fixing the Cure Amounts and approving the assumption of the Previously Omitted Contract. Buyer shall be responsible for all Cure Amounts relating to such Previously Omitted Contracts and for any obligations or Liabilities relating to such Previously Omitted Contracts arising during the Extended Contract Period.

(m)    For the avoidance of doubt and notwithstanding anything to the contrary herein, neither Party shall have any obligation to comply with the terms of Sections 2.5(b), 2.5(d) (e), 2.5(g) (j) and 2.5(l) solely with respect to Client Agreements.

## ARTICLE III
## CLOSING AND PURCHASE PRICE

3.1    Closing; Transfer of Possession; Certain Deliveries.

(a)    Unless this Agreement shall have been terminated and the Transactions shall have been abandoned pursuant to Article IX, the Closing shall take place at 10:00 a.m. (prevailing Eastern Time) on the date (the "Closing Date") that is two (2) Business Days after all the conditions set forth in Article VIII shall have been satisfied or waived (excluding, but subject to the satisfaction or waiver of, conditions that, by their nature, are to be satisfied at the Closing),

or such other time or date as agreed to in writing by the Parties. The Closing shall take place by telephone or video conference and electronic exchange of documents, unless otherwise mutually agreed to by the Parties. The Closing shall be effective as of 12:01 a.m. (prevailing Eastern Time) on the Closing Date.

(b)    At the Closing, Seller shall deliver, or shall cause to be delivered, to Buyer the following:

(i)    a counterpart to the Bill of Sale and Assignment and Assumption Agreement in substantially the form attached hereto as Exhibit C (the "Bill of Sale and Assignment and Assumption Agreement"), duly executed by Seller;

(ii)    one (1) or more assignments of the Owned Intellectual Property, in a form reasonably acceptable to Buyer and Seller, duly executed by the applicable Seller(s);

(iii)    a certificate of a duly authorized officer of Seller dated the Closing Date certifying as to the matters set forth in Section 8.1(a), Section 8.1(b) and Section 8.1(d);

(iv)    [customary quitclaim deed(s) with respect to the Owned Real Property, and] terminations and/or assignments of the Leases, in each case, as reasonably requested by Buyer with respect to the Real Property;

(v)    a certification of non-foreign status from Seller, duly completed and executed in compliance with Treasury Regulation Section 1.1445-2(b); and

(vi)    such other closing instruments and certificates as may be reasonably requested by Buyer, in each case in form and substance reasonably acceptable to Buyer and Seller.

(c)    At the Closing, Buyer shall deliver, or shall cause to be delivered to Seller, the following:

(i)    a counterpart to the Bill of Sale and Assignment and Assumption Agreement, duly executed by Buyer;

(ii)    a certificate of a duly authorized officer of Buyer dated the Closing Date, certifying as to the matters set forth in Section 8.2(a) and Section 8.2(b); and

(iii)    such other closing instruments and certificates as may be reasonably requested by the Seller, in each case, in form and substance reasonably acceptable to the Seller and Buyer.

3.2    Purchase Price; Related Matters.

(a)    Purchase Price. The aggregate consideration for the Purchased Assets shall be (i) the assumption and cure of the PGX Operating Agreements, *plus* (ii) the assumption by Buyer of the Assumed Liabilities (collectively, the "Purchase Price").

(b)    Bulk Sales Laws. Buyer acknowledges that Seller will not comply with the provisions of any "bulk-transfer" Laws of any jurisdiction in connection with the sale and transfer of the Purchased Assets and Buyer hereby waives all Claims related to the non-compliance therewith. Pursuant to section 363(f) of the Bankruptcy Code, the transfer of the Purchased Assets of the Seller shall be free and clear of any Encumbrances, other than Permitted Encumbrances, in each case pursuant to the Bankruptcy Code, whether arising prior to or subsequent to the Petition Date, including any Encumbrances or claims arising out of the "bulk-transfer" Laws.

3.3    Allocation of Purchase Consideration. Seller and Buyer agree to allocate the Purchase Price among the Purchased Assets for all purposes (including tax and financial accounting) in accordance with the allocation methodology set forth in Schedule 3.3 attached hereto. Within ninety (90) days following the Closing Date, [Buyer] will provide to Seller an Allocation Schedule prepared in accordance with such allocation methodology. Buyer and Seller shall file all applicable Tax Returns (including Form 8594, any amended Tax Returns, and any claims for refund) consistent with the Allocation Schedule and shall take no position contrary thereto or inconsistent therewith (including in any audits or examinations by any taxing authority or any other proceedings) absent a contrary "determination" (within the meaning of Section 1313(a) of the Code).

3.4    Withholding. Buyer or any other paying agent (as applicable) shall be entitled to deduct and withhold from the amounts payable under this Agreement such amounts as may be required to be deducted and withheld under the Code and any other applicable Tax Laws. Any such withheld amount shall be treated as though it had been paid to the Person in respect of which such withholding was required.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF SELLER

Except as set forth in the Disclosure Schedules delivered to Buyer in connection with this Agreement (the "Seller's Disclosure Schedules" ) and subject to Section 10.18 (the "Disclosure Schedules"), the Seller hereby makes the following representations and warranties to Buyer as of the Agreement Date:

4.1     <u>Organization and Good Standing</u>. Seller (a) is an entity duly formed, validly existing and in good standing under the Laws of its jurisdiction of incorporation or formation, and (b) subject to any limitations that may be imposed on such Seller as a result of filing a petition for relief under the Bankruptcy Code, has full organizational power and authority to own, lease and operate its properties, to perform all of its obligations under the Available Contracts, and carry on the Business as it is now being conducted.

4.2     <u>Power and Authority</u>. Subject to entry and effectiveness of the Sale Order in respect of Seller, Seller has the requisite organizational power and authority to enter into this Agreement and to perform its obligations hereunder, and the execution and delivery of this Agreement by Seller and, subject to the approval of this Agreement by the Bankruptcy Court, the consummation by Seller of the Transactions and the performance of Seller's obligations hereunder have been duly authorized by all requisite organizational action on the part of Seller. This Agreement has been duly executed and delivered by Seller and (assuming the due and valid authorization, execution and delivery thereof by Buyer), following the approval of this Agreement and the Transactions by the Bankruptcy Court pursuant to the Sale Order, will constitute the legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms, except that such enforceability (a) may be limited by bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and other similar Laws of general application affecting or relating to the enforcement of creditors' rights generally and (b) is subject to general principles of equity, whether considered in a proceeding at law or in equity (collectively, the "<u>Enforceability Exceptions</u>"). Seller has the requisite organizational power to operate its business with respect to the Purchased Assets that it owns as now conducted and is duly qualified as a foreign entity to do business, and to the extent legally applicable, is in good standing, with respect to the Business, in each jurisdiction in which the character of its owned, operated or leased properties or the nature of its activities makes such qualification necessary, except where the failure to be so qualified or in good standing has not had a Material Adverse Effect.

4.3     <u>Litigation</u>. Except for Orders or Proceedings that do not have, and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, as of the date of this Agreement, there are no outstanding Orders or Proceedings pending, or, to the Knowledge of Seller, threatened against Seller relating to the ownership or use of the Purchased Assets or conduct of the Business by Seller or otherwise affecting the Purchased Assets or the Business.

4.4    <u>No Contravention</u>. Subject to the entry and effectiveness of the Sale Order by the Bankruptcy Court, and except as set forth on <u>Schedule 4.4</u>, neither the execution and delivery of this Agreement and compliance by Seller with any provisions hereof, nor the consummation of the Transactions, will (a) violate or conflict with any provision of Seller's Organizational Documents, (b) with or without the giving of notice or the lapse of time or both violate, or result in a breach of, or constitute a default under, or conflict with, or accelerate the performance required by, any of the terms of any Available Contract or Lease, (c) violate or conflict with any Order, or any Law or Permit that is required to be discharged prior to Closing applicable to Seller, or (d) result in the creation of any Encumbrance upon any of the Purchased Assets (other than a Permitted Encumbrance); except, in the case of above clauses (b), (c), and (d), for compliance with the applicable requirements of the HSR Act or other Antitrust Laws if required, or as would not, individually or in the aggregate, reasonably be expected to be material to the Business, taken as a whole.

4.5    <u>Consents and Approvals</u>. Except (a) to the extent excused or made unenforceable as a result of the filing of the Cases, (b) to the extent not required if the Sale Order is entered, or (c) as set forth on <u>Schedule 4.5</u>, the execution, delivery and performance by Seller of this Agreement and the Transactions, and the legality, validity, binding effect or enforceability of this Agreement and any agreements contemplated hereby, do not require any consents, waivers, authorizations or approvals of, or filings with, any (i) Governmental Entities or (ii) other third Persons, except with respect to clause (ii) as would not reasonably be expected to have a Material Adverse Effect, or, with respect to clause (i), for any filings required to be made under the HSR Act or any applicable Antitrust Laws, or as would not reasonably be expected to be material to the Business, taken as a whole.

4.6    <u>Title to Purchased Assets; Sufficiency</u>.

(a)    Seller has, and subject to the entry and effectiveness of the Sale Order in respect of the Purchased Assets, at the Closing, Buyer will have, good and valid title to each of the Purchased Assets (except for those Purchased Assets that are leased or licensed to Seller, as to which Seller has, and at the Closing, Buyer will have, valid licensed or leasehold interests), free and clear of any Encumbrances, other than (i) Permitted Encumbrances, (ii) liens or other Encumbrances upon Buyer's assets, if any, securing any loan made directly to Buyer or expressly assumed by Buyer as of the Closing Date, (iii) as subject to <u>Section 2.5</u>, or (iv) the Enforceability Exceptions.

(a)    Other than the Excluded Assets, the Purchased Assets constitute all of the assets used in or held for use in the Business by Seller and are sufficient for Buyer to conduct the Business from and after the Closing Date without interruption and in the Ordinary Course of Business as it has been conducted by Seller prior to the Closing Date, in each case, except as would not be material to the Business taken as a whole.

4.7    <u>Validity of Available Contracts</u>. As of the date of this Agreement, subject to requisite Bankruptcy Court approvals, and assumption by the applicable Seller of the applicable Contract in accordance with applicable Law (including satisfaction of any applicable Cure Amounts) and except (i) as a result of the commencement of the Cases, and (ii) with respect to any Contract that has previously expired in accordance with its terms, been terminated, restated, or replaced: (a) each Available Contract is a legal, valid and binding obligation of the Seller that is a party thereto, and is enforceable against such Seller in accordance with its terms and, to the Knowledge of Seller, is a legal, valid and binding obligation of each other party to such Contract and is enforceable against such other party thereto in accordance with its terms, subject to the Enforceability Exceptions, (b) Seller is not in default or breach of an Available Contract, (c) to the Knowledge of Seller, during the twelve (12) months preceding the date hereof, no other party to any Available Contract has materially breached such Contract, (d) to the Knowledge of Seller, there does not exist any event, condition or omission that would constitute a material default or breach (or event which, with the giving of notice or lapse of time or both would become such a default or breach) under any Available Contract, (e) to the Knowledge of Seller, Seller has not received any written notice of termination or cancellation with respect to any Available Contract, and (f) with respect to the Assumed Contracts, upon entry of the Sale Order and payment of the Cure Amounts, Seller will not be in breach or default of its obligations thereunder, except, in each case, as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

4.8    <u>Intellectual Property</u>. Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (a) Seller owns all right, title and interest in, or has the right to use, pursuant to a license or otherwise, all Intellectual Property required to operate the Business as presently conducted, in each case, (i) free and clear of any Encumbrances except Permitted Encumbrances, and (ii) other than non-exclusive licenses of, or covenants with respect to, Intellectual Property granted in the Ordinary Course of Business, and (b) as of the date of this Agreement, (i) there are no pending, and Seller has not received, since December 31, 2021, any written notice of any actual or threatened Proceedings alleging a violation, misappropriation or infringement of the Intellectual Property of any other Person by Seller except for any of the foregoing that have since been resolved, (ii) to the Knowledge of Seller, the operation of the Business as currently conducted does not violate, misappropriate or infringe the Intellectual Property of any other Person, and (iii) to the Knowledge of Seller, no other Person has violated, misappropriated or infringed any Intellectual Property of Seller.

4.9    <u>Employee Benefits</u>.

(a)    <u>Schedule 4.9(a)</u> lists all material Benefit Plans

(b)    True, correct and complete copies of the following documents, with respect to each of the Benefit Plans, have been made available to Buyer: (i) any plan documents and all material amendments thereto, (ii) the most recent Form 5500, if applicable, and (iii) the most recent summary plan descriptions (including letters or other documents updating such descriptions).

(c)     Except as would not, individually or in the aggregate, have a Material Adverse Effect:

(i)     Each Benefit Plan is in material compliance with all applicable Laws, including ERISA and the Code.

(ii)     Each Benefit Plan that is intended to be a qualified plan under Section 401(a) of the Code has received a favorable determination or opinion letter to that effect from the IRS and, to the Knowledge of Seller, no event has occurred since the date of such determination or opinion that would reasonably be expected to adversely affect such determination or opinion.

(iii)     No condition exists that is reasonably likely to subject Seller to any direct or indirect liability under Title IV of ERISA.

(iv)     No Proceeding (other than routine claims for benefits in the Ordinary Course of Business) are pending or, to the Knowledge of Seller, threatened with respect to any Benefit Plan.

4.10     Labor Matters.

(a)     Schedule 4.10(a) sets forth a complete list of all Business Employees and, based on the Seller's records as of the Agreement Date, correctly reflects, with respect to each individual, as applicable: (i) date of hire; (ii) job title; (iii) hourly pay rate or annual salary; (iv) exempt versus non-exempt status (as applicable); (v) accrued paid time off balance; and (vi) to the extent known, leave of absence status.

(b)     Seller is not, with respect to the Business, a party to any labor or collective bargaining agreement and there are no labor or collective bargaining agreements which pertain to any Business Employees, and no such agreements are being negotiated as of the date of this Agreement. No Business Employees are represented by a labor or trade union or works council, no labor organization or group of Business Employees has made a pending demand for recognition, and there are no representation proceedings or petitions seeking a representation proceeding presently pending or, to the Knowledge of Seller, threatened to be brought or filed, with the U.S. National Labor Relations Board with respect to the Business. There is no organizing activity pending or, to the Knowledge of Seller, threatened by any labor organization with respect to the Business Employees.

(c)     Seller has not taken any actions relating to the Business at any single site of employment in the ninety (90)-day period prior to the Closing Date that would, individually or in the aggregate, constitute a "mass layoff" or "plant closing" within the meaning of the WARN Act, or any similar applicable Law.

4.11    Conduct of Business. Except as set forth on Schedule 4.11, and except as would not reasonably be expected, individually or in the aggregate, to be material to the Business taken as a whole and except for the Cases, the DIP Documents, all negotiation and preparation therefor, and the negotiation, execution, delivery and performance of this Agreement, from January 1, 2023 to the Agreement Date, (a) the Business has been conducted in the Ordinary Course of Business consistent with past practice and Seller has not entered into any transaction (including any transfer or sale of assets) out of the ordinary course of business consistent with past practice, (b) Seller has owned and operated the Purchased Assets in the Ordinary Course of Business consistent with past practice, and (c) there has been no Material Adverse Effect.

4.12    Compliance with Laws; Permits.

(a)    Except as disclosed on Schedule 4.12(a), Seller is conducting, and to the Knowledge of Seller has conducted since [——]January 1, 2023, the Business and Purchased Assets in compliance, in all material respects, with all applicable Laws, notices, approvals and Orders, except for failures to comply or violations that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(b)    Seller has all material Permits which are required for the lawful operation of the Business as presently conducted and the ownership and operation of the Purchased Assets, and each such Permit is valid, binding and in full force and effect, in each case except as would not reasonably be expected to have a Material Adverse Effect. Except as set forth on Schedule 4.12(b), to the Knowledge of Seller, Seller is not and has not been in material default or violation (and no event has occurred which, with notice or the lapse of time or both, would constitute a default or violation) of any term, condition or provision of any Permit to which it is a party.

4.13    Financial Statements. Seller has delivered to Buyer (a) the audited consolidated balance sheet of the Business dated as of December 31, 2021 and the audited consolidated statements of operations and income, shareholders' equity and cash flow of the Business for the year then ended (the "Audited Financial Statements"), and (b) the unaudited consolidated balance sheets of the Business dated as of AprilMay 301, 2023 (the "Balance Sheets") and the unaudited consolidated statements of operations and income, shareholders' equity and cash flow of the Business for the year ended December 31, 2022 and the four (4) month period ended April 30, 2023, respectively (the "Interim Financial Statements" and together with the Audited Financial Statements, the "Financial Statements"). Except as set forth on Schedule 4.13, the Financial Statements present fairly in all material respects the consolidated financial position, results of operations and cash flows of each of Seller on the basis stated therein as of the dates and for the applicable periods stated therein, subject, in the case of the Interim Financial Statements, to normal year-end audit adjustments and the absence of related notes.

4.14    Financial Advisors. Except as set forth on Schedule 4.14, no Person has acted, directly or indirectly, as a broker, finder or financial advisor for Seller in connection with the Transactions and no Person is entitled to any fee or commission or like payment in respect thereof.

4.15    Tax Matters.

(a)    Except as set forth in Schedule 4.15(a), Seller has timely filed (taking into account any valid extensions of time to file) all income and other material Tax Returns which are required to be filed by Seller, all such Tax Returns are true, correct and complete in all material respects, and all Taxes due and payable by Seller prior to the date hereof have been timely and fully paid.

(b)    Except as set forth on Schedule 4.15(b), there are no liens for Taxes upon the Purchased Assets other than for Permitted Encumbrances.

(c)    Except as set forth on Schedule 4.15(c), to the Knowledge of Seller, Seller has complied in all material respects with all applicable Laws relating to the withholding, collection and payment of Taxes and have duly and timely withheld, collected and paid over to the appropriate Governmental Entity all amounts required to be so withheld, collected and paid under all applicable Laws.

(d)    Seller has not received any notice in writing from any taxing authority or Governmental Entity asserting that Seller may be subject to Tax in any jurisdiction in which Seller does not file Tax Returns.

(e)    No action, suit, proceeding or audit is pending against or with respect to Seller regarding Taxes.

(f)    Seller has not waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency, other than any waiver or exclusion which has expired.

35

(g)    None of the Purchased Assets is an interest (other than indebtedness within the meaning of Section 163 of the Code) in an entity taxable as a corporation, partnership, trust or real estate mortgage investment conduit for U.S. federal income tax purposes.

4.16    <u>Related Party Transactions</u>.

(a)    To the Knowledge of Seller, neither Seller nor any executive officer, director, member, manager, equityholder or Affiliate of Seller nor any individual who is a lineal descendant, sibling, parent or spouse of any such Person (each, a "<u>Related Party</u>") is a party to any Contract or arrangement (including any loan or similar arrangement) with or binding upon any of Seller or the Purchased Assets or has any interest in any asset (each, a "<u>Related Party Transaction</u>") other than as set forth on <u>Schedule 4.16(a)</u>. Except as set forth on <u>Schedule 4.16(a)</u>, Seller has not made any payments to or on behalf of any Related Party (including by exercise of set-off rights, cancellation of intercompany indebtedness, or otherwise).

(b)    Except as disclosed on <u>Schedule 4.16(b)</u>, to the Knowledge of Seller, no Related Party will, immediately following the Closing, hold any asset (tangible or intangible), property, right, claim, cause of action (including any counterclaim) or defense used in or related to the Business.

4.17    <u>Disclaimer of Other Representations and Warranties</u>. Except for the representations and warranties expressly set forth in this <u>Article IV</u> (as modified by the <u>Seller's</u> Disclosure Schedules hereto), the Seller does not make and has not made, nor has any other Person made, and Buyer and the Buyer Group have not relied, are not relying, and will not rely on, any representation and warranty, express or implied, in respect of Seller, the Purchased Assets, the Business or the Assumed Liabilities, and any such other representations or warranties, express or implied, are hereby expressly disclaimed.

**ARTICLE V**
**REPRESENTATIONS AND WARRANTIES OF BUYER**

Buyer hereby represents and warrants to Seller as follows:

5.1     <u>Organization and Good Standing</u>. Buyer is a limited liability company duly organized, validly existing and in good standing under the Laws of its jurisdiction of formation, and has full power and authority to own, lease and operate its properties and carry on its business as it is now being conducted.

5.2     <u>Power and Authority</u>. Buyer has the requisite power and authority to enter into this Agreement and to perform its obligations hereunder, and the execution and delivery of this Agreement and the consummation of the Transactions and the performance of Buyer's obligations hereunder have been duly authorized by all requisite company action on the part of Buyer. This Agreement has been duly executed and delivered by Buyer and constitutes (assuming the due and valid authorization, execution and delivery thereof by the other parties thereto and the entry of approval of this Agreement and the Transactions by the Bankruptcy Court pursuant to the Sale Order) the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms.

5.3     <u>No Contravention</u>. Neither the execution and delivery of this Agreement nor the consummation of the Transactions will (a) violate or conflict with any provision of Buyer's Organizational Documents, or (b) violate or conflict with any Order, Governmental Entity or arbitrator, or any Law applicable to Buyer; other than, in the case of clause (b), compliance with the applicable requirements of the HSR Act or other Antitrust Laws if required.

5.4     <u>Consents and Approvals</u>. Except for (a) entry of the Sale Order, and (b) any consents or approvals as are reflected on <u>Schedule 5.4</u>, the execution, delivery and performance by Buyer of this Agreement and the Transactions, and the legality, validity, binding effect or enforceability of this Agreement and any agreements contemplated hereby, do not require any consents, waivers, authorizations or approvals of, or filings with, any third Persons or Governmental Entities, other than any filings required to be made under the HSR Act or applicable Antitrust Laws.

5.5     <u>Litigation.</u> There are no Proceedings pending or, to the knowledge of Buyer, threatened, that would reasonably be expected to adversely affect the ability of Buyer to consummate the Transactions in any material respect.

5.6     <u>Financial Advisors</u>. No Person has acted, directly or indirectly, as a broker, finder or financial advisor for Buyer in connection with the Transactions and no Person is entitled to any fee or commission or like payment in respect thereof.

5.7     <u>Sufficient Funds; Adequate Assurances</u>. Buyer has or will have as of the Closing, immediately available funds sufficient for the satisfaction of all of Buyer's obligations under this Agreement, including all fees, expenses of, and other amounts required to be paid by, Buyer in connection with the transactions contemplated hereby. As of the Closing, Buyer shall be capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code with respect to the Assumed Contracts and the related Assumed Liabilities.

5.8     <u>Acknowledgements; "As Is" "Where Is" Transaction</u>.

(a)     BUYER, ON ITS OWN BEHALF AND ON BEHALF OF THE BUYER GROUP, HEREBY ACKNOWLEDGES AND AGREES THAT IT HAS CONDUCTED TO ITS FULL SATISFACTION AN INDEPENDENT INVESTIGATION AND VERIFICATION OF THE BUSINESS, INCLUDING ITS FINANCIAL CONDITION, RESULTS OF OPERATIONS, ASSETS, LIABILITIES, PROPERTIES, CONTRACTS, ENVIRONMENTAL COMPLIANCE, EMPLOYEE MATTERS, REGULATORY COMPLIANCE, BUSINESS RISKS AND PROSPECTS OF SELLER, ITS AFFILIATES, AND THEIR RESPECTIVE BUSINESSES AND SUBSIDIARIES (AS APPLICABLE) AND THE PURCHASED ASSETS AND THE ASSUMED LIABILITIES, AND, IN MAKING ITS DETERMINATION TO PROCEED WITH THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, BUYER AND THE BUYER GROUP HAVE RELIED SOLELY ON THE RESULTS OF THEIR OWN INDEPENDENT INVESTIGATION.

(b)     BUYER, ON ITS OWN BEHALF AND ON BEHALF OF THE BUYER GROUP, HEREBY ACKNOWLEDGES AND AGREES THAT BUYER AND THE BUYER GROUP HAVE RECEIVED FROM SELLER CERTAIN PROJECTIONS, FORWARD-LOOKING STATEMENTS AND OTHER FORECASTS, AND PROSPECTIVE FORWARD-LOOKING STATEMENTS AND OTHER FORECASTS OR THIRD-PARTY INFORMATION RELATING TO SELLER, THE BUSINESS, THE PURCHASED ASSETS AND THE ASSUMED LIABILITIES (WHETHER IN WRITTEN, ELECTRONIC, OR ORAL FORM, AND INCLUDING IN THE DATAROOM, MANAGEMENT MEETINGS, ETC.) (COLLECTIVELY, "<u>PROJECTIONS</u>"). BUYER, ON BEHALF OF ITSELF AND ON BEHALF OF THE BUYER GROUP, ACKNOWLEDGES THAT (I) SUCH PROJECTIONS ARE BEING PROVIDED SOLELY FOR THE CONVENIENCE OF BUYER AND THE BUYER GROUP TO FACILITATE THEIR OWN INDEPENDENT INVESTIGATION OF SELLER, (II) THERE ARE UNCERTAINTIES INHERENT IN ATTEMPTING TO MAKE SUCH PROJECTIONS AND FORECASTS AND IN SUCH INFORMATION; (III) BUYER AND THE BUYER GROUP ARE FAMILIAR WITH SUCH UNCERTAINTIES, AND (IV) BUYER AND THE BUYER GROUP ARE TAKING FULL RESPONSIBILITY FOR MAKING THEIR OWN EVALUATION OF THE ADEQUACY AND ACCURACY OF ALL SUCH PROJECTIONS, FORECASTS, AND INFORMATION SO FURNISHED (INCLUDING THE REASONABLENESS OF THE ASSUMPTIONS UNDERLYING SUCH PROJECTIONS AND FORECASTS); AND (V) NEITHER SELLER NOR ANY OTHER PERSON MAKES ANY REPRESENTATIONS OR WARRANTIES WITH RESPECT TO SUCH PROJECTIONS AND FORECASTS. BUYER, ON ITS OWN BEHALF AND ON BEHALF OF THE BUYER GROUP, HEREBY DISCLAIMS RELIANCE ON ANY OF SUCH PROJECTIONS OR FORECASTS.

(c)     BUYER, ON ITS OWN BEHALF AND ON BEHALF OF THE BUYER GROUP, FURTHER ACKNOWLEDGES AND AGREES THAT (I) THE REPRESENTATIONS AND WARRANTIES MADE BY SELLER TO BUYER IN <u>Article IV</u> (AS QUALIFIED BY <u>THE SELLER'S</u> DISCLOSURE SCHEDULES) OR IN THE DOCUMENTS DELIVERED BY SELLER TO BUYER IN ACCORDANCE WITH <u>SECTION 3.1(b)</u> AT THE CLOSING (COLLECTIVELY, THE "<u>EXPRESS REPRESENTATIONS</u>") ARE THE SOLE AND EXCLUSIVE REPRESENTATIONS, WARRANTIES AND STATEMENTS OF ANY KIND MADE TO BUYER AND ON WHICH BUYER OR THE BUYER GROUP

MAY RELY IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT AND (II) ALL OTHER REPRESENTATIONS, WARRANTIES AND STATEMENTS OF ANY KIND OR NATURE EXPRESSED OR IMPLIED, WHETHER IN WRITTEN, ELECTRONIC OR ORAL FORM, INCLUDING (A) THE COMPLETENESS OR ACCURACY OF, OR ANY OMISSION TO STATE OR TO DISCLOSE, ANY INFORMATION (OTHER THAN SOLELY TO THE EXTENT OF THE EXPRESS REPRESENTATIONS), INCLUDING IN THE DATAROOM, PROJECTIONS, MEETINGS, CALLS OR CORRESPONDENCE WITH MANAGEMENT OF SELLER OR ANY OTHER PERSON ON BEHALF OF SELLER OR ANY OF ITS AFFILIATES OR REPRESENTATIVES, AND (B) ANY OTHER STATEMENT RELATING TO THE HISTORICAL, CURRENT OR FUTURE BUSINESS, FINANCIAL CONDITION, RESULTS OF OPERATIONS, ASSETS, LIABILITIES, PROPERTIES, CONTRACTS, ENVIRONMENTAL COMPLIANCE, EMPLOYEE MATTERS, REGULATORY COMPLIANCE, BUSINESS RISKS AND PROSPECTS OF SELLER OR ANY OF ITS AFFILIATES OR SUBSIDIARIES, OR THE QUALITY, QUANTITY OR CONDITION OF SELLER'S ASSETS, ARE, IN EACH CASE, EXPRESSLY DISCLAIMED BY SELLER, INCLUDING WITH RESPECT TO (I) ANY WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AS TO ANY PORTION OF THE PURCHASED ASSETS, AND (II) WITH RESPECT TO THE BUSINESS, FINANCIAL CONDITION, RESULTS OF OPERATIONS, ASSETS, LIABILITIES, AND PROSPECTS OF SELLER OR THE BUSINESS OF SELLER, THE MERCHANTABILITY OR FITNESS OF THE PERSONAL PROPERTY OR ANY OTHER PORTION OF THE PURCHASED ASSETS FOR ANY PARTICULAR PURPOSE, OR ANY OTHER MATTER RELATING TO THE PURCHASED ASSETS OR ANY PORTION THEREOF.

(d)    UPON THE CLOSING DATE, SUBJECT TO THE EXPRESS REPRESENTATIONS AND THE PROVISIONS OF SECTION 10.4, BUYER WILL ACCEPT THE PURCHASED ASSETS AT THE CLOSING "AS IS," "WHERE IS," AND "WITH ALL FAULTS."

## ARTICLE VI
## COVENANTS OF THE PARTIES

6.1    <u>Conduct of Business Pending the Closing</u>. Except (a) as required by applicable Law or by order of the Bankruptcy Court, (b) as otherwise expressly contemplated by this Agreement, (c) as limited by the terms of the DIP Documents, or (c) with the prior written consent of Buyer (not to be unreasonably withheld, conditioned, or delayed), during the period from the Agreement Date and continuing until the earlier of the termination of this Agreement in accordance with its terms or the Closing, Seller shall (taking into account the commencement of the Cases, the anticipated liquidation and shut-down of operations of Seller other than the Purchased Assets and the Business and other changes, facts and circumstances that customarily result from the events leading up to and following the commencement of bankruptcy proceedings) carry on the Business in the Ordinary Course of Business (subject to the requirements of the Bankruptcy Code and Bankruptcy Court) and use commercially reasonable efforts to preserve in all material respects (a) the operations, organization and goodwill of the Business intact (including by maintaining and renewing its Permits) and (b) relationships with Governmental Entities, customers, suppliers, partners, lessors, licensors, licensees, vendors, contractors, distributors, agents, officers and employees and others having business dealings with the Business. Seller shall notify Buyer in writing of any event, occurrence, fact, condition or change in the Business, assets, operations or prospects of Seller that results in, or would reasonably be expected to result in, a Material Adverse Effect, promptly upon the occurrence of any such event, occurrence, fact, condition or change.

6.2    <u>Negative Covenants</u>. Except as otherwise expressly provided by this Agreement or consented to in writing by Buyer (such consent not to be unreasonably withheld, conditioned or delayed), or as may be required by order of the Bankruptcy Court or the DIP Documents, or as may be limited by the terms of the DIP Documents, during the period from the date of this Agreement until the earlier of the termination of this Agreement in accordance with its terms or the Closing, Seller shall not take any of the following actions:

(a)    incur or commit to incur any capital expenditures other than as expressly contemplated under the Approved Budget;

(b)    acquire or agree to acquire (by merging or consolidating with, or by purchasing any portion of the stock of, or other ownership interests in, or substantial portion of assets of, or by any other manner), any business or division or any corporation, partnership, association, limited liability company or other entity;

(c)    ~~sell, lease, mortgage, pledge, transfer, license, sublease, or terminate or surrender any [Owned Real Property] or~~ grant any lien on or otherwise encumber or dispose of (or consent to the disposition of) any of the Purchased Assets (including any Available Contract), including the capital stock or equity interests of Seller, other than Permitted Encumbrances or inventory sold in the Ordinary Course of Business;

(d)      sell, assign, transfer, license, sublicense, covenant not to sue with respect to, abandon, cancel, terminate, permit to lapse or expire, or otherwise dispose of any Acquired Intellectual Property;

(e)      adjust, split, combine, redeem, repurchase or reclassify any capital stock or equity interests or issue or propose or authorize the issuance of any other securities (including Debt securities, options, profits interests, warrants or any similar security exercisable for, or convertible into, such other security);

(f)      incur or assume any Debt (other than in connection with the DIP Documents);

(g)      guarantee any Debt of any Person or enter into any "keep well" or other agreement to maintain any financial condition of another Person or enter into any arrangement having the economic effect of any of the foregoing (other than pursuant to the DIP Documents);

(h)      enter into, amend, restate, supplement, modify, waive or terminate any Available Contract that would reasonably be expected to be material to the business, taken as a whole;

(i)      adopt any amendments to the articles of incorporation, bylaws or other Organizational Documents of Seller;

(j)      initiate, compromise, settle or agree to settle any Claim, complaint, or Proceeding, other than compromises or settlements in the Ordinary Course of Business that (i) involve only the payment of money damages not in excess of $[  ] individually or $[  ] in the aggregate, (ii) do not impose ongoing limits on the conduct of the Business, and (iii) result in a full release of Seller with regard to the Claims or complaint giving rise to such Proceeding;

(k)      make, change or revoke any material Tax election (including entity classification elections), change any financial or Tax accounting method, except insofar as may have been required by applicable Law or a change in GAAP, consent to an extension or waiver of the limitation period applicable to any Tax claim or assessment, or surrender any right to claim a refund of a material amount of Taxes;

(l)      except as required by Law, enter into, amend, negotiate or terminate any collective bargaining agreement or similar agreement with any labor union or labor organization representing any employees;

(m)      except as required by Law, by the terms of any Benefit Plan or in the Ordinary Course of Business, (i) increase the compensation payable to or to become payable to, or the benefits provided to, pay any bonus to, or grant any equity or equity-based award to, any current or former employee, director, independent contractor or other individual service provider of Seller; (ii) grant, increase, pay, provide or modify any severance, retention, change in control or termination payment or benefit to, or loan or advance or accelerate any amount to, any current or former employee, director, independent contractor or other individual service provider of Seller; (iii) accelerate the vesting or payment, or fund or in any other way secure the payment, of

41

any compensation or benefit for any current or former employee, director, independent contractor or other individual service provider of Seller; (iv) approve, establish, adopt, enter into, amend or terminate any Assumed Benefit Plan; or (v) hire or terminate (other than for cause) any Business Employee, or independent contractor or other individual service provider of the Business with annual target cash compensation greater than $100,000;

       (n)    implement any employee layoffs that would result in an obligation to give notice at or before the Closing Date under the WARN Act or other similar law;

       (o)    (i) enter into any Contract or arrangement (including any loan or similar arrangement) with a related party or that would be a related party transaction if it existed on the Agreement Date or (ii) make payments to or on behalf of any related party (including by exercise of set-off rights or otherwise), other than in accordance with the terms of an existing, disclosed related party transaction;

       (p)    receive, collect, compile, use, store, process, share, safeguard, secure (technically, physically and administratively), dispose of, destroy, disclose, or transfer (including cross-border) Personal Information (or fail to do any of the foregoing, as applicable) in violation of any (i) applicable Privacy Laws, (ii) privacy policies or notices of Seller, or (iii) the Seller's contractual obligations with respect to Personal Information; or

       (q)    commit to take any of the foregoing actions.

6.3    <u>Access</u>.

       (a)    Subject to applicable Law, until the Closing Date, Seller (i) shall give Buyer and its Representatives reasonable access during normal business hours to the offices, assets, contracts, properties, officers, employees, accountants, auditors, financial advisors, counsel (other than counsel to Seller in connection with the Cases) and other representatives, books and records, of Seller and its Affiliates, (ii) shall furnish to Buyer and its Representatives such financial, operating and property related data and other information as such Persons reasonably request, (iii) shall instruct the employees, accountants, counsel and financial advisors of Seller and its Affiliates to cooperate reasonably with Buyer in its investigation of the Business; and (iv) shall, upon reasonable request of Buyer, use commercially reasonable efforts to provide Buyer with access to their customers, suppliers, vendors, distributors, manufacturers and other Persons with whom the Business has had material dealings; <u>provided</u>, <u>however</u>, that Buyer will not, and will not permit any of its Representatives to, contact any officer, manager, director, employee, customer, supplier, lessee, lessor, lender, licensee, licensor, distributor, noteholder or other material business relation of Seller prior to the Closing with respect to Seller, their business or the transactions contemplated by this Agreement without the prior written consent of Seller for each such contact. No investigation by Buyer prior to or after the date of this Agreement shall diminish or obviate any of the representations, warranties, covenants or agreements of Seller contained in this Agreement. For the avoidance of doubt, nothing in this <u>Section 6.3(a)</u> shall require Seller to take any such action if (i) such action may result in a waiver or breach of any attorney/client privilege or (ii) such action could reasonably be expected to result in violation of any applicable Law or Order.

(b)     From and after the Closing Date until the conclusion of the Cases and dissolution of Seller, Buyer shall give Seller and Seller's Representatives reasonable access during normal business hours to the books and records, including work papers, schedules, memoranda, Tax Returns, Tax schedules, Tax rulings, and other documents (for the purpose of examining and copying) relating to the Purchased Assets, the Excluded Assets, the Assumed Liabilities or the Excluded Liabilities with respect to periods or occurrences prior to the Closing Date, for the purposes of (i) the preparation or amendment of Tax Returns, (ii) the determination of any matter relating to the rights or obligations of Seller under this Agreement, or (iii) as is necessary to administer, or satisfy their obligations in connection with, the Cases. Buyer shall, and shall cause each of its controlled Affiliates to, cooperate with Seller as may reasonably be requested by Seller for such purposes. For the avoidance of doubt, nothing in this Section 6.3(b) shall require Buyer to take any such action if (i) such action may result in a waiver or breach of any attorney/client privilege, (ii) such action could reasonably be expected to result in violation of any applicable Law or Order, or (iii) providing such access or information would be reasonably expected to be disruptive to its normal business operations. Unless otherwise consented to in writing by Seller, Buyer will not, for a period of three (3) years following the Closing Date, destroy, alter or otherwise dispose of any of the books and records without first offering to surrender to Seller such books and records or any portion thereof that Buyer may intend to destroy, alter or dispose of. From and after the Closing, Buyer will, and will cause its employees to, provide Seller with reasonable assistance, support and cooperation with Seller's wind-down and related activities (*e.g.*, helping to locate documents or information related to preparation of Tax Returns or prosecution or processing of insurance/benefit claims).

(c)     The information provided pursuant to this Section 6.3 will be used solely for the purpose of consummating the transactions contemplated hereby. Seller does not make any representation or warranty as to the accuracy of any information, if any, provided pursuant to this Section 6.3, and Buyer may not rely on the accuracy of any such information, in each case, other than the Express Representations.

6.4     Confidentiality. From and after the Closing Date:

(a)     Seller will treat and hold as confidential all of the Confidential Information, and will not, directly or indirectly, without the prior written consent of Buyer, disclose or use any Confidential Information. Seller's obligation not to disclose Confidential Information shall not apply to Confidential Information that it shall be required to disclose by Law; provided, however, that, prior to making such disclosure, Seller shall notify Buyer promptly to the extent not prohibited by Law so that Buyer may seek confidential treatment or protection of such Confidential Information at Buyer's sole cost and expense.

(b)     In the event that Seller is required in any Proceeding to disclose any Confidential Information, Seller will notify Buyer promptly of the requirement to the extent not prohibited by Law so that Buyer may seek an appropriate protective order at Buyer's sole cost and expense or waive compliance with the provisions of this Section 6.4.

6.5     <u>Public Announcements</u>. From the Agreement Date, Buyer and Seller will consult with each other before issuing, and provide each other the reasonable opportunity to review and comment upon, any press release, any court filing or pleading filed with the Bankruptcy Court relating primarily to this Agreement or the Transactions, or other public statements with respect to the Transactions, and neither Buyer nor Seller shall issue any such press release or make any such public statement without the prior written approval of the other Party, in each case except as may be required by Law, or by obligations pursuant to any listing agreement with any national securities exchange. Seller shall use its commercially reasonable efforts to cause its Affiliates, employees, officers and directors to comply with this <u>Section 6.5</u>.

6.6     <u>Employment Matters</u>.

(a)     At least ten (10) days prior to Closing, Buyer shall extend to each Business Employee a written offer of employment, which shall have been first reviewed by Seller, and which Seller shall have had an opportunity to comment upon, providing for a position that is the same or no less favorable than such employee's position immediately prior to the Closing (including level of responsibility, primary location of employment and authority) on the terms set forth in this <u>Section 6.6</u> (each offer, a "<u>Transfer Offer</u>") and that, if accepted, shall become effective immediately after the Closing. Business Employees who accept such Transfer Offers and begin active employment with Buyer in accordance with this <u>Section 6.6</u> shall be referred to herein as "<u>Transferred Employees.</u>" For a period of no less than one (1) year or, if sooner, the Transferred Employee's termination of employment with Buyer or its Affiliates, Buyer or its affiliates shall provide each Transferred Employee (i) at least the same base salary or hourly wage rate and target incentive cash bonus opportunities applicable to such Transferred Employee as of the Closing Date and (ii) other material employee benefits (but excluding any equity based compensation, defined benefit plan benefits or long-term deferred compensation) that are comparable in the aggregate to the benefits such Transferred Employee received under the Benefit Plans as of the Closing Date. Buyer shall notify Seller in a reasonable timeframe with respect to whether each such offer has been accepted or rejected. Nothing herein shall be construed as a representation or guarantee by Seller or any of its respective Affiliates that any or all of the employees of Seller will accept the Transfer Offer or will continue in employment with Buyer following the Closing for any period of time. Buyer shall carry out all necessary actions to effect the timely transfer of employment to it of each such Transferred Employee who has accepted a Transfer Offer. Effective as of the Closing, each Transferred Employee shall cease to be an employee of the Seller or its respective Affiliate(s).

(b)     Solely to the extent required by applicable Law, Seller shall pay each Transferred Employee all accrued but unused vacation or paid time-off for periods prior to the Closing Date as soon as administratively practicable following the Closing Date or as required by applicable Law. Buyer shall promptly (and, in any event, within ten (10) Business Days following the later of the Closing Date and the date of the applicable payment) reimburse Seller for any payments made by Seller to any Transferred Employees in respect of earned but unused vacation, sick leave and personal time paid to Transferred Employees in accordance with this <u>Section 6.6(b)</u>. To the extent that applicable Law does not require Seller to pay any accrued but unused vacation, sick leave and personal time to any Transferred Employee in accordance with this <u>Section 6.6(b)</u>, Buyer shall recognize and assume all Liabilities with respect to such Transferred Employee's accrued but unused vacation, sick leave and personal time. In addition,

44

Buyer shall allow Transferred Employees to take any vacation, sick leave and personal time that was scheduled prior to the Closing.

(c)     Following the Closing, Buyer shall give each Transferred Employee full credit for prior service with Seller for purposes of (i) eligibility and vesting under any health or welfare Benefit Plans of Buyer (for the avoidance of doubt, excluding defined benefit pension accruals, deferred compensation, or equity or equity-based incentive plans, or any plan under which such crediting would be prohibited), and (ii) determination of benefit levels under any employee benefit plans of Buyer relating to paid time off, in each case, for which the Transferred Employee is otherwise eligible and in which the Transferred Employee is offered participation, except where such credit would result in a duplication of benefits. Buyer shall use commercially reasonable efforts to waive, or cause to be waived, any limitations on benefits relating to pre-existing conditions to the same extent such limitations are waived under any comparable plan of Seller and use commercially reasonable efforts to recognize for purposes of annual deductible and out-of-pocket limits under its medical and dental plans, deductible and out-of-pocket expenses paid by Transferred Employees in the calendar year in which the Closing Date occurs.

(d)     Without limiting the generality of Section 2.4, Seller shall retain responsibility for, and satisfy all Liabilities with respect to, all payments and benefits of the employees (and their spouses, dependents and beneficiaries, and all former employees, agents and representatives) under Benefit Plans that are not Assumed Benefit Plans accrued up to the Closing Date or which relate to events prior to the Closing Date in accordance with the terms thereof and applicable Laws. Seller and Buyer shall work in good faith to transfer sponsorship of any Assumed Benefit Plan (including any third-party insurance contracts or services agreements thereto) from Seller to Buyer or its Affiliates.

(e)     Without limiting the generality of Article II, Seller shall be responsible for the following claims or benefit payments of all employees (and their spouses, dependents and beneficiaries, and all former employees, agents and representatives) accrued up to the Closing Date or which related to events prior to the Closing Date regardless of whether such claims are filed before or after the Closing Date under each Benefit Plan that is not an Assumed Benefit Plan:

(i)     with respect to death or dismemberment claims, those in respect of which the event occurred prior to the Closing Date;

(ii)     with respect to health claims, those in respect of which the services were provided or the supplies were purchased prior to the Closing Date; and

(iii)     with respect to short term and/or long term disability claims and workers' compensation claims, for those claims resulting from events that occurred prior to the Closing Date, including, to the extent covered under the Benefit Plans, for recurring illnesses which first originated with events occurring prior to the Closing Date, whether or not such claims continue after the Closing Date.

(f)    This <u>Section 6.6</u> shall operate exclusively for the benefit of Seller and Buyer and not for the benefit of any other Person, including any current or former employees of the Seller or the Transferred Employees, which Persons shall have no rights to enforce this <u>Section 6.6</u>. Nothing in this <u>Section 6.6</u> shall: (i) entitle any Transferred Employee to employment with Buyer; (ii) change such Transferred Employee's status as an employee-at-will or restrict the ability of Buyer to terminate the service of any Transferred Employee at any time or for any reason; (iii) create any third party rights in any current or former service provider of Seller (including any beneficiary or dependent thereof); or (iv) be treated as an amendment of any Benefit Plan or other employee benefit plan or arrangement or restrict the ability of Buyer, Seller or any of its Affiliates to amend, modify, discontinue or terminate any Benefit Plan or other employee benefit plan or arrangement.

(g)    Buyer shall be solely responsible for any and all obligations and Liabilities arising under Section 4980B of the Tax Code with respect to all "M&A qualified beneficiaries" as defined in 26 C.F.R. § 54.4980B-9.

(h)    For any Transferred Employees who are principally based outside the United States, the provisions of this <u>Section 6.6</u> shall apply to such employees *mutatis mutandis* to the maximum extent permitted by applicable Law.

6.7    <u>Reasonable Efforts; Approvals</u>.

(a)    Buyer and Seller will use reasonable best efforts to take, or cause to be taken, all actions and use reasonable best efforts to do, or cause to be done, and to assist and cooperate with the other Parties in doing, all things which are necessary, proper or advisable to consummate and make effective the Transactions including: (i) the transfer, modification or reissuance of all Permits, (ii) the obtaining or taking of all other necessary actions, non-actions or waivers from Governmental Entities and the making of all other necessary registrations and filings with Governmental Entities (including any regulatory authorizations), and (iii) the execution and delivery of any additional certificates, agreements, instruments, reports, schedules, statements, consents, documents and information necessary to consummate the Transactions. The covenants in this <u>Section 6.7(a)</u> shall survive the Closing.

(b)    In furtherance of the foregoing, Buyer and Seller shall use their commercially reasonable efforts to obtain any consents and approvals from any third party other than a Governmental Entity that may be required in connection with the Transactions (the "<u>Third Party Consents</u>"). Without limiting the generality of the foregoing sentence, Seller shall not be required to compensate any applicable third party, commence or participate in any Proceeding or offer or grant any accommodation (financial or otherwise, including any accommodation or arrangement to indemnify, remain primarily, secondarily or contingently liable for any Assumed Liability) to any applicable third party in connection with Seller's obligations under this <u>Section 6.7(b)</u>; <u>provided</u> that Seller shall obtain the written consent of Buyer prior to Seller paying any such compensation, commencing or participating in any Proceeding, or offering or granting any such accommodation. The covenants in this <u>Section 6.7(b)</u> shall survive the Closing.

(c)    The obligations of Seller pursuant to this Agreement, including this <u>Section 6.7</u>, shall be subject to any Orders entered, or approvals or authorizations granted or

required, by or under the Bankruptcy Court or the Bankruptcy Code (including in connection with the Cases), Seller's DIP Facility, Seller's obligations as a debtor-in-possession to comply with any Order of the Bankruptcy Court (including the Bidding Procedures Order and the Sale Order) and Seller's duty to seek and obtain the highest or otherwise best price for the Purchased Assets as required by the Bankruptcy Code.

6.8    <u>Corporate Name Change</u>. Within 30 days following the Closing, Seller shall deliver to Buyer (a) duly executed and acknowledged articles of amendment to Seller's articles of incorporation or other Organizational Document which is required to change Seller's corporate or other entity name to a new name that is, in Buyer's reasonable judgment, sufficiently dissimilar to such Seller's present name and, in all cases, does not include the name "Lexington Law" so as to avoid confusion and to make Seller's present name available to Buyer, and (b) appropriate documents, duly executed and acknowledged, which are required to change such Seller's name to such new name in any jurisdiction in which such Seller is qualified to do business, in forms reasonably satisfactory to Buyer. Buyer and any Affiliate of Buyer are hereby authorized (but not obligated) to file such certificates or other documents (at Buyer's expense) with the applicable Governmental Entities in order to effectuate such change of name at or after the Closing as Buyer may elect.

6.9    <u>Assignment of Contracts and Rights</u>. To the maximum extent permitted by the Bankruptcy Code, the Purchased Assets of Seller shall be assumed and assigned to Buyer pursuant to section 365 of the Bankruptcy Code as of the Closing Date or such other date as specified in the Sale Order or this Agreement, as applicable. Notwithstanding any other provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign any asset or any right thereunder if, after giving effect to the Sale Order, an attempted assignment without the consent of a third party (including any Governmental Entity) would constitute a breach or in any way adversely affect the rights of Buyer following the Closing. If, as of the Closing Date, such consent is not obtained or such assignment is not attainable pursuant to sections 105, 363 or 365 of the Bankruptcy Code other than as a result of the failure by Buyer to pay or otherwise satisfy the Cure Amounts, then Seller and Buyer will cooperate in a mutually agreeable arrangement, to the extent feasible (without infringing upon the legal rights of any third party or violating any Law), under which Buyer would obtain the benefits and assume the obligations (to the extent otherwise constituting Assumed Liabilities hereunder, as if such asset were transferred to the Buyer at Closing) thereunder in accordance with this Agreement, including subcontracting, sublicensing or subleasing to Buyer, or under which Seller would enforce for the benefit of, and at the direction of, Buyer, with Buyer assuming all of Seller's obligations (to the extent constituting Assumed Liabilities hereunder as if such asset were transferred to the Buyer at Closing), and any and all rights of Seller thereunder.

6.10    <u>Tax Matters</u>.

(a)    Subject to Section ~~2.3(j)~~2.3(k), all Transfer Taxes arising out of the transfer of the Purchased Assets and any Transfer Taxes required to effect any recording or filing with respect thereto shall be borne by Buyer. The Transfer Taxes shall be calculated assuming that no exemption from Transfer Taxes is available, unless otherwise indicated in the Sale Order or, at Closing, Seller or Buyer, as appropriate, provide an appropriate resale exemption certificate or other evidence acceptable to Buyer or Seller, as appropriate, of exemption from

such Transfer Taxes. Seller and Buyer shall cooperate to timely prepare and file any Tax Returns relating to such Transfer Taxes, including any claim for exemption or exclusion from the application or imposition of any Transfer Taxes. Seller shall file all necessary documentation and returns with respect to such Transfer Taxes when due, and shall promptly, following the filing thereof, furnish a copy of such return or other filing and a copy of a receipt showing payment of any such Transfer Tax to Buyer. Each Party shall furnish or cause to be furnished to the other, upon request, as promptly as practicable, such information and assistance relating to the Purchased Assets and the Business as is reasonably necessary for filing of all Tax Returns, including any claim for exemption or exclusion from the application or imposition of any Taxes or making of any election related to Taxes, the preparation for any audit by any taxing authority and the prosecution or defense of any claim, suit or proceeding relating to any Tax Return.

(b)    Other than Transfer Taxes or those Taxes assumed pursuant to Section 2.3, all Liability for Taxes with respect to the Purchased Assets attributable to the Pre-Closing Tax Period (the "Pre-Closing Taxes") shall be borne by Seller, and all Liability for Taxes with respect to the Purchased Assets attributable to the Post-Closing Tax Period, shall be borne by Buyer. For the purposes of this Agreement, with respect to Taxes attributable to any taxable year or other taxable period beginning on or before and ending after the Closing Date, the portion of any such Taxes that are treated as Pre-Closing Taxes shall be: (i) in the case of Taxes based upon, or related to income, receipts, profits, or wages or imposed in connection with the sale, transfer or assignment of property, or required to be withheld, deemed equal to the amount which would be payable if such taxable year or other taxable period ended on the Closing Date, and (ii) in the case of other Taxes deemed to be the amount of such Taxes for the entire period multiplied by a fraction the numerator of which is the number of days in the period ending on the Closing Date and the denominator of which is the number of days in the entire period.

(c)    The Parties agree that the transfer of the Purchased Assets to the Buyer is intended to be treated as a taxable acquisition of assets and the Parties shall prepare and file all relevant U.S. federal income Tax Returns consistent with such intended treatment and Section 3.3, respectively, absent a contrary "determination" (within the meaning of Section 1313(a) of the Code).

(d)    The obligations set forth in this Section 6.10 with respect to Taxes shall survive until the date that is thirty (30) days following the expiration of the applicable statute of limitations.

6.11    Available Contracts List. Seller shall use commercially reasonable efforts to provide Buyer with a true and correct list of all Available Contracts (and copies thereof) promptly following the date hereof and in no event later than thirty (30) days from the Agreement Date.

6.12    HSR Act; Antitrust Laws.

(a)    Seller and Buyer shall, if required in connection with the transactions contemplated hereby, (i) promptly make the filings required by any Governmental Entity, including under the HSR Act or any other Antitrust Laws and, in any event, within ten (10) Business Days after the Agreement Date in the case of all filings required under the HSR Act

and all other filings required by other Antitrust Laws, (ii) comply at the earliest practicable date with any request for additional information, documents or other materials received from any Governmental Entity, whether such request is formal or informal, (iii) cooperate with the other Parties in connection with resolving any investigation or other inquiry concerning the transactions contemplated by this Agreement commenced by any Governmental Entity, and (iv) cooperate with the other Parties in connection with any other Party's filing. Each Party shall be responsible for the payment of its respective fees and expenses, including legal fees and expenses, in complying with any request for additional information or documentary material from any Governmental Entity; *provided* that all filing fees required to be paid in connection with any filings hereunder shall be borne equally by Seller and Buyer. Except where prohibited by applicable Law or any Governmental Entity, and subject to Section 6.4, each Party shall promptly inform the other Parties of any oral communication with, and provide copies of written communications with, any Governmental Entity regarding any such filing. No Party shall agree to participate in any formal meeting with any Governmental Entity in respect of any such filings, investigation, or other inquiry without giving the other Parties prior notice of the meeting and, to the extent permitted by such Governmental Entity, the opportunity to attend and/or participate. Subject to applicable Laws and any Governmental Entity, the Parties will coordinate, consult and cooperate with one another in connection with any analyses, appearances, presentations, memoranda, briefs, arguments, opinions and proposals made or submitted by or on behalf of any Party relating to proceedings under the HSR Act or any other Antitrust Law, if any. Except where prohibited by applicable Law or any Governmental Entity, and subject to Section 6.4, the Parties will provide each other with copies of all correspondence, filings or communications, including any documents, information and data contained therewith, between them or any of their representatives, on the one hand, and any Governmental Entity or members of its staff, on the other hand, with respect to this Agreement and the transactions contemplated hereby.

(b)    Buyer and Seller shall use their respective reasonable best efforts to obtain any required approval from any Governmental Entity and to resolve such objections, if any, as may be asserted by any Governmental Entity with respect to the transactions contemplated by this Agreement under the HSR Act, the Sherman Act, as amended, the Clayton Act, as amended, the Federal Trade Commission Act, as amended, and any other United States federal or state or foreign Laws that are designed to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade (collectively, the "Antitrust Laws"). Buyer and Seller shall use their respective reasonable best efforts to take such action as may be required to cause the expiration of the notice periods under the HSR Act or other Antitrust Laws with respect to such transactions as promptly as practicable after the execution of this Agreement.

## ARTICLE VII
## BANKRUPTCY PROVISIONS

7.1    Bankruptcy Court Orders and Related Matters.

(a)    Seller and Buyer acknowledge that this Agreement and the Transactions are subject to entry of, as applicable, the Bidding Procedures Order and the Sale Order. In the event of any discrepancy between this Agreement and the Bidding Procedures Order and the Sale Order, the Bidding Procedures Order and the Sale Order shall govern. In the event the entry of the Sale Order or the Bidding Procedures Order is appealed, Seller shall use commercially

reasonable efforts to defend such appeal, and Buyer shall cooperate in such efforts. Buyer and Seller acknowledge that Seller must take reasonable steps to demonstrate that it has sought to obtain the highest or otherwise best offer for the Purchased Assets, including giving notice thereof to the creditors of Seller and other interested parties, providing information about the Business to prospective bidders, entertaining higher or otherwise better offers from such prospective bidders, and, in the event that additional qualified prospective bidders desire to bid for the Purchased Assets, conducting the Auction. Buyer agrees and acknowledges that Seller and its Affiliates will be permitted, and will be permitted to cause their Representatives, to initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, respond to any unsolicited inquiries, proposals or offers submitted by, and enter into any discussions or negotiations regarding any of the foregoing with, any Person (in addition to Buyer and its Affiliates, agents and Representatives).

(b)    The bidding procedures to be employed with respect to this Agreement and the Auction will be those reflected in the Bidding Procedures Order, which shall be in a form mutually agreed between Buyer and Seller.

(c)    Buyer will provide adequate evidence and assurance under the Bankruptcy Code of the future performance by Buyer of each Assumed Contract. Buyer will, and will cause its Affiliates to, reasonably and promptly take all actions reasonably required or requested by Seller to assist in obtaining a Bankruptcy Court finding that there has been an adequate demonstration of adequate assurance of future performance under the Assumed Contracts, such as furnishing affidavits, non-confidential financial information and other documents or information for filing with the Bankruptcy Court and making Buyer's Representatives available to testify before the Bankruptcy Court. Subject to the other terms and conditions of this Agreement, Buyer will, from and after the Closing Date, (i) assume all Liabilities of Seller under the Assumed Contracts and (ii) satisfy and perform all of the Liabilities related to each of the Assumed Contracts when the same are due thereunder.

(d)    If this Agreement and the sale of the Purchased Assets to Buyer on the terms and conditions hereof are determined to be the "highest or otherwise best offer" in accordance with the Bidding Procedures Order, Buyer and Seller agree to use commercially reasonable efforts to cause the Bankruptcy Court to enter the Sale Order in a form mutually agreed between Buyer and Seller.

(e)    Seller shall, consistent with its obligations as a fiduciary under the Bankruptcy Code, cooperate with Buyer concerning the Bidding Procedures Order, the Sale Order, and any other orders of the Bankruptcy Court relating to the Transactions. Seller shall give notice under the Bankruptcy Code of the request for the relief specified in the Bidding Procedures Motion to all creditors and parties in interest entitled to notice thereof pursuant to the Bidding Procedures Order, the Bankruptcy Code, the Bankruptcy Rules, the local rules of the Bankruptcy Court, and any other applicable orders of the Bankruptcy Court, including all Persons that have asserted Encumbrances on any of Seller's assets, and all non-debtor parties to the Available Contracts of Seller and other appropriate notice, including such additional notice as the Bankruptcy Court shall direct or as Buyer may reasonably request, and provide appropriate opportunity for hearing, to all parties entitled thereto, of all motions, orders,

hearings, or other Proceedings in the Bankruptcy Court relating to this Agreement, the Transactions and the Bidding Procedures Motion.

(f)    Seller shall provide draft copies of all orders, motions, pleadings, applications and other material documents it intends to file with the Bankruptcy Court in connection with the sale of the Purchased Assets or the Transactions not less than three (3) Business Days prior to the date when Seller plans to file such document (provided that if the delivery of such drafts at least three (3) Business Days prior to the date when Seller plans to file such document is not reasonably practicable, such drafts shall be delivered to Buyer as soon as reasonably practicable prior to filing). The form and substance of any such document hereunder shall be mutually acceptable to Buyer and Seller, provided that no Party shall unreasonably withhold, condition or delay its consent.

(g)    Seller covenants and agrees that if the Sale Order is entered, the terms of any plan submitted by Seller to the Bankruptcy Court for confirmation, or the terms of any other sale of (including the Liquidating Plan) Seller's or its Affiliates' assets (or any other Order) submitted by Seller to the Bankruptcy Court, for approval, will not conflict with, supersede, abrogate, nullify, modify or restrict the terms of this Agreement and the rights of Buyer hereunder, or in any way prevent or interfere with the consummation or performance of the Transactions including any transaction that is contemplated by or approved pursuant to the Sale Order.

(h)    For the avoidance of doubt, nothing in this Agreement will restrict Seller or its Affiliates from selling, disposing of or otherwise transferring any Excluded Assets (other than Available Contracts, which Seller may not terminate, amend, or otherwise dispose of, or reject in the Cases, without Buyer's consent) or from settling, delegating or otherwise transferring any Excluded Liabilities, or from entering into discussions or agreements with respect to the foregoing.

7.2    Bankruptcy Milestones. The Parties shall achieve the following milestones by the dates set forth below (or such later date as may be agreed between the Parties, such agreement not to be unreasonably withheld, conditioned or delayed) (collectively, the "Bankruptcy Milestones"):

(a)    On the Petition Date, Seller and the PGX Debtors shall file a motion with the Bankruptcy Court seeking approval of the DIP Facility.

(b)    On or before the date that is two (2) days after the Petition Date, Seller and the PGX Debtors shall have filed the Bidding Procedures Motion in the Bankruptcy Court.

(c)    On or before the date that is four (4) days after the Petition Date, the Bankruptcy Court shall have entered the Interim DIP Order.

(d)    On or before the date that is twenty-fiveforty-seven (2547) days after the Petition Date, the Bankruptcy Court shall have entered the Final DIP Order.

(e)     On or before the date that is ~~thirty~~forty-seven (~~30~~47) days after the Petition Date, the Bankruptcy Court shall have entered the Bidding Procedures Order.

(f)     On or before the date that is no later than fifty-eight (58) days after the Petition Date, Seller shall have filed schedules and statements of financial affairs pursuant to rule 1007 of the Federal Rules of Bankruptcy Procedure.

(g)     On or before the date that is sixty (60) days after the Petition Date, the Bid Deadline (as defined in the Bidding Procedures Order) shall have occurred.

(h)     On or before the date that is sixty-five (65) days after the Petition Date, Seller shall have commenced the Auction, if necessary.

(i)     On or before the date that is seventy (70) days after the Petition Date, the Bankruptcy Court shall have entered the Sale Order.

(j)     On or before the date that is one hundred and five (105) days after the Petition Date, the Closing shall have occurred.

## ARTICLE VIII
## CONDITIONS TO OBLIGATIONS OF THE PARTIES

8.1     <u>Conditions Precedent to Obligations of Buyer</u>. The obligation of Buyer to consummate the Transactions is subject to the satisfaction (or waiver by Buyer in Buyer's sole discretion) on or prior to the Closing Date of each of the following conditions:

(a)     <u>Accuracy of Representations and Warranties</u>. The representations and warranties of Seller contained in <u>Section 4.1</u> (Organization and Good Standing), <u>Section 4.2</u> (Power and Authority), <u>Section 4.14</u> (Financial Advisors) and <u>Section 4.16</u> (Related Party Transactions) shall be true and correct on the date hereof and on and as of the Closing Date, with the same force and effect as though such representations and warranties had been made on and as of the Closing Date (except to the extent that any such representation or warranty is expressly made as of a specified date). The representations and warranties of Seller contained in <u>Section 4.6</u> (Title to Purchased Assets) shall be true and correct in all material respects on the date hereof and on and as of the Closing Date, with the same force and effect as though such representations and warranties had been made on and as of the Closing Date (except to the extent that any such representation or warranty is expressly made as of a specified date). All other representations and warranties of Seller contained in <u>Article IV</u> shall be true and correct on the date hereof and as of the Closing Date (except to the extent that any such representation or warranty is expressly made as of a specified date), except where the failure of any such representations or warranties to be true and correct (without giving effect to any limitations to "material" or "Material Adverse Effect"), either individually or in the aggregate, has resulted in or would reasonably be expected to result in a Material Adverse Effect.

(b)     <u>Performance of Obligations</u>. Seller shall have performed in all material respects all obligations and agreements contained in this Agreement required to be performed by it on or prior to the Closing Date.

(c)  Third Party Consents. Seller shall have obtained all consents and approvals set forth in Schedule 4.5.

(d)  No Material Adverse Effect. There shall have been no Material Adverse Effect from the Agreement Date through the Closing Date.

(e)  Deliverables. Seller shall have delivered, or caused to be delivered, to Buyer each deliverable required pursuant to Section 3.1(b).

(f)  Bidding Procedures Order. The Bankruptcy Court shall have entered the Bidding Procedures Order, which Order shall have become a Final Order.

(g)  Sale Order. The Bankruptcy Court shall have entered the Sale Order, which Order shall have become a Final Order.

(h)  PGX Sale Transaction. The PGX Debtors shall have entered into or shall concurrently herewith enter into the PGX Agreement, and shall have consummated or shall concurrently herewith consummate the PGX Sale.

8.2  Conditions Precedent to the Obligations of Seller. The obligation of Seller to consummate the Transactions is subject to the satisfaction (or waiver by the Seller) at or prior to the Closing Date of each of the following conditions:

(a)  Accuracy of Representations and Warranties. The representations of Buyer contained in Section 5.1 (Organization and Good Standing), Section 5.2 (Power and Authority), Section 5.3 (No Contravention) and Section 5.6 (Financial Advisors) shall be true and correct on the date hereof and on and as of the Closing Date, with the same force and effect as though such representations and warranties had been made on and as of the Closing Date (except to the extent that any such representation or warranty is expressly made as of a specified date). All other representations and warranties contained in Article V shall be true and correct on the date hereof and as of the Closing Date (except to the extent that any such representation or warranty is expressly made as of a specified date), except where the failure of any such representations or warranties to be true and correct (without giving effect to any limitations to "material" or similar qualifier), either individually or in the aggregate, has resulted in or would reasonably be expected to have an adverse effect on Buyer's ability to perform its obligations under this Agreement in any material respect.

(b)  Performance of Obligations. Buyer shall have performed in all material respects all obligations and agreements contained in this Agreement required to be performed by it prior to or on the Closing Date.

(c)  Deliverables. Buyer shall have delivered to Seller each deliverable required pursuant to Section 3.1(c).

(d)  Bidding Procedures Order. The Bankruptcy Court shall have entered the Bidding Procedures Order, which Order shall not be subject to a stay or otherwise have been vacated.

(e) <u>Sale Order</u>. The Bankruptcy Court shall have entered the Sale Order, which Order shall not be subject to a stay or otherwise have been vacated.

8.3 <u>Conditions Precedent to Obligations of Buyer and Seller</u>. The respective obligations of Buyer and Seller to consummate the Transactions are subject to the fulfillment, on or prior to the Closing Date, of the condition (which may be waived by the Parties in whole or in part to the extent permitted by applicable Law) that (a) no provision of any applicable Law or Order enacted, entered, promulgated, enforced or issued by any Governmental Entity shall be in effect that prevents, renders illegal or otherwise prohibits the sale and purchase of the Purchased Assets or any of the other Transactions, and (b) the waiting period applicable to the transactions contemplated by this Agreement under the HSR Act and any other applicable Antitrust Laws, if required, shall have expired or early termination shall have been granted.

8.4 <u>Frustration of Closing Conditions</u>. Upon the occurrence of the Closing, any condition set forth in this <u>Article VIII</u> that was not satisfied as of the Closing will be deemed to have been waived for all purposes by the Party having the benefit of such condition as of and after the Closing. Neither Seller nor Buyer may rely on the failure of any condition to their respective obligations to consummate the Transactions set forth in <u>Section 8.1</u>, <u>Section 8.2</u> or <u>Section 8.3</u>, as the case may be, to be satisfied if such failure was caused by such Party's failure to comply with or breach of any provision of this Agreement.

# ARTICLE IX
# TERMINATION

9.1 <u>Termination of Agreement</u>. This Agreement may be terminated and the Transactions abandoned at any time prior to the Closing:

(a) by written agreement of Seller and Buyer;

(b) by Buyer, if:

(i) there shall have been a breach by Seller of any of its representations, warranties, covenants or agreements contained in this Agreement, which breach would result in the failure to satisfy one or more of the conditions set forth in <u>Section 8.1</u>, and such breach shall be incapable of being cured or, if capable of being cured, shall not have been cured by the earlier of (A) [September 1~~7~~8, 2023] (or such later date as the Parties may agree upon in writing, the "<u>Outside Date</u>") or (B) five (5) Business Days after written notice thereof shall have been received by Seller, <u>provided</u> that the right to terminate this Agreement pursuant to this <u>Section 9.1(b)(i)</u> will not be available to Buyer at any time that Buyer is in material breach of, any covenant, representation or warranty hereunder;

(ii) the Cases are (A) converted to cases under chapter 7 of the Bankruptcy Code or (B) dismissed prior to the Closing;

(iii) a trustee or examiner is appointed under section 1104 of the Bankruptcy Code;

(iv) Buyer is not the Successful Bidder at the Auction for any of the Purchased Assets;

(v) Seller enters into a definitive agreement with respect to an Alternate Transaction or an Order of the Bankruptcy Court or other court of competent jurisdiction is entered approving an Alternate Transaction, in each case, other than with the Successful Bidder;

(vi) if the Closing shall not have occurred by the Outside Date; provided that the right to terminate this Agreement pursuant to this Section 9.1(b)(vi) will not be available to Buyer at any time that Buyer is in material breach of, any covenant, representation or warranty hereunder; or

(vii) if Buyer is not the Successful Bidder at the Auction.

(c) by Seller, if:

(i) there shall have been a breach by Buyer of any of its representations, warranties, covenants or agreements contained in this Agreement, which breach would result in the failure to satisfy one or more of the conditions set forth in Section 8.2, and such breach shall be incapable of being cured or, if capable of being cured, shall not have been cured within the earlier of (A) the Outside Date or (B) ten (10) Business Days after written notice thereof shall have been received by Buyer;

(ii) the PGX Agreement is terminated;

(iii) Seller enters into a definitive agreement with respect to an Alternate Transaction, or an Order of the Bankruptcy Court or other court of competent jurisdiction is entered approving an Alternate Transaction;

(iv) Seller or the board of directors (or similar governing body) of Seller determines that proceeding with the transactions contemplated by this Agreement or failing to terminate this Agreement would be inconsistent with its or such Person's or body's fiduciary duties; or

(v) if Buyer is not the Successful Bidder at the Auction.

(d) by either Buyer or Seller, if any Governmental Entity shall have enacted or issued a Law or Order or taken other action permanently restraining, prohibiting or enjoining any of the Parties from consummating the Transactions.

9.2 Consequences of Termination.

(a) If either Buyer, on the one hand, or Seller, on the other hand, desire to terminate this Agreement pursuant to Section 9.1, such Party (or Parties, as applicable) shall give written notice of such termination to the other Parties. Upon delivery of such notice of termination, this Agreement will become void and have no further force and effect and all further

obligations of the Parties to each other under this Agreement will terminate without further obligation or liability of the Parties.

(b)     Notwithstanding anything to the contrary in this Agreement, if this Agreement is terminated for any reason, no expense reimbursement of any nature is or shall be owed to Buyer.

(c)     Notwithstanding the foregoing set forth in this <u>Section 9.2</u>, <u>Section 1.1</u> (Defined Terms), <u>Section 6.5</u> (Public Announcements), this <u>Section 9.2</u> (Consequences of Termination) and <u>Article X</u> (Miscellaneous) shall survive any termination of this Agreement.

(d)     Nothing in this <u>Section 9.2</u> shall relieve Buyer or Seller of any liability for a breach of this Agreement prior to the date of termination.

## ARTICLE X
## MISCELLANEOUS

10.1    <u>Expenses</u>. Except as set forth in this Agreement or the Sale Order, and whether or not the Transactions are consummated, each Party shall bear all costs and expenses incurred or to be incurred by such Party in connection with this Agreement and the consummation of the Transactions.

10.2    <u>Assignment</u>. Neither this Agreement nor any of the rights or obligations hereunder may be assigned by Seller without the prior written consent of Buyer, or by Buyer without the prior written consent of Seller. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.

10.3    <u>Parties in Interest</u>. This Agreement shall be binding upon and inure solely to the benefit of Seller and Buyer, and nothing in this Agreement, express or implied, is intended to or shall confer upon any other Person any rights, benefits or remedies of any nature whatsoever under or by reason of this Agreement except as expressly set forth herein. Without limiting the foregoing, no direct or indirect holder of any equity interests or securities of either Seller or Buyer (whether such holder is a limited or general partner, member, stockholder or otherwise), nor any Affiliate of either Seller or Buyer, nor any Representative, or controlling Person of each of the Parties and their respective Affiliates, shall have any liability or obligation arising under this Agreement or the Transactions.

10.4    <u>Risk of Loss</u>. Seller will bear all risk of loss occurring to or upon any portion of the Purchased Assets prior to the Closing Date. In the event that any material portion of any Purchased Assets is damaged or destroyed prior to the Closing Date, then, with respect to such Purchased Assets, Buyer may, at Buyer's option, either (i) proceed to close notwithstanding the damage or destruction of such Purchased Assets or (ii) exclude such Purchased Assets, in which event Buyer shall have no obligation to close if as a consequence of the exclusion of such Purchased Assets any condition to Closing in <u>Section 8.1</u> would not be satisfied. If Buyer closes notwithstanding an unrepaired or unrestored loss to a Purchased Asset, Seller will deliver and/or assign to Buyer any insurance proceeds with respect to such damage or destruction, and all claims against third parties relating thereto, and the adjustment to the Purchase Price shall be limited to the amount of any deductible or self-insured retention under the applicable policies of insurance.

10.5   <u>Notices</u>. All notices, demands, requests, waivers, consents, approvals or other communications (collectively, "<u>Notices</u>") required or permitted to be given hereunder or that are given with respect to this Agreement shall be in writing and shall be personally served, delivered by a nationally recognized overnight delivery service with charges prepaid, or transmitted by hand delivery or electronic mail, addressed as set forth below, or to such other address as such Party shall have specified most recently by written Notice. Notice shall be deemed given on the date of service or transmission if personally served or transmitted by electronic mail with confirmation of receipt (excluding "out of office" or similar automated replies); <u>provided</u>, <u>however</u>, that, if delivered or transmitted on a day other than a Business Day (or if transmitted by email after 5:00pm Eastern Time), notice shall be deemed given on the next Business Day. Notice otherwise sent as provided herein shall be deemed given on the next Business Day following timely deposit of such Notice with an overnight delivery service:

|  |  |
|---|---|
| If to the Seller: | John C. Heath, Attorney at Law PC<br>P.O. Box 1173<br>Salt Lake City, UT 84110<br><u>Attention</u>: John C. Heath<br><u>Email</u>: jch@johnheathlaw.com |
| With a copy to: | Kirkland & Ellis LLP<br>300 North LaSalle<br>Chicago, IL 60654<br><u>Attention</u>: Steve Toth<br>          Dan Daines<br>          Spencer A. Winters<br>          Whitney C. Fogelberg<br><u>Email</u>:   steve.toth@kirkland.com<br>          daniel.daines@kirkland.com<br>          spencer.winters@kirkland.com<br>          whitney.fogelberg@kirkland.com |
| If to Buyer: | John C. Heath<br>██████████████<br><br><u>Email</u>: jch@johnheathlaw.com |
| With a copy to: | Young Conaway Stargatt & Taylor, LLP<br>1000 North King Street<br>Wilmington Delaware, 19801<br><br><u>Attention</u>: Joseph Barry, Joseph M. Mulvihill, and Lauren McCrery<br><u>Email</u>: jbarry@ycst.com, jmulvihill@ycst.com, lmccrery@ycst.com |

Rejection of or refusal to accept any Notice, or the inability to deliver any Notice because of changed address of which no Notice was given, shall be deemed to be receipt of the Notice as of the date of such rejection, refusal or inability to deliver.

10.6    Entire Agreement; Amendments and Waivers. This Agreement and all agreements entered into pursuant hereto and thereto and all certificates and instruments delivered pursuant hereto and thereto constitute the entire agreement between the Parties pertaining to the subject matter hereof and supersede all prior agreements, understandings, negotiations, and discussions, whether oral or written, of the Parties; provided that nothing herein shall modify or alter the terms, rights or obligations of the Seller under the DIP Documents prior to Closing. This Agreement may be amended, supplemented or modified, and any of the terms, covenants, representations, warranties or conditions may be waived, only by a written instrument executed by Buyer and Seller, or in the case of a waiver, by the Party waiving compliance. No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof (whether or not similar), and no such waiver shall constitute a continuing waiver unless otherwise expressly provided. No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

10.7    Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument. Counterparts to this Agreement may be delivered via electronic delivery, "pdf" or facsimile. In proving this Agreement, it shall not be necessary to produce or account for more than one such counterpart signed by the Party against whom enforcement is sought.

10.8    Invalidity. If any one or more of the provisions contained in this Agreement or in any other instrument referred to herein, shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, the Parties shall negotiate in good faith to modify this Agreement, to ensure that this Agreement shall reflect as closely as practicable the intent of the Parties on the date hereof. If the final judgment of a court of competent jurisdiction or other Governmental Entity declares that any term or provision hereof is invalid, illegal or unenforceable, the Parties agree that the court making such determination will have the power to reduce the scope, duration, area or applicability of the term or provision, to delete specific words or phrases, or to replace any invalid, illegal or unenforceable term or provision with a term or provision that is valid, legal and enforceable and that comes closest to expressing the intention of the invalid, illegal or unenforceable term or provision.

10.9    Governing Law. This Agreement, and any Proceeding that may be based upon, arise out of or relate or be incidental to the Transactions, this Agreement, the negotiation, execution, performance or consummation of the foregoing or the inducement of any Party to enter into the foregoing, whether for breach of Contract, tortious conduct or otherwise, and whether now existing or hereafter arising (each, a "Transaction Dispute"), will be exclusively governed by and construed and enforced in accordance with the internal Laws of the State of Delaware, without giving effect to any Law or rule that would cause the Laws of any jurisdiction other than the State of Delaware to be applied, except to the extent that such Laws are superseded by the Bankruptcy Code.

10.10    Dispute Resolution; Consent to Jurisdiction.

(a)        Without limiting any Party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any Transaction Dispute, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 10.5; provided, however, upon the closing of the Cases (except for any matter(s) with respect to Seller and/or the Cases in which the Bankruptcy Court retains jurisdiction with respect to such matter with respect to Seller and/or the Cases), or if the Bankruptcy Court is unwilling or unable to hear such Transaction Dispute, then, the Parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the U.S. District Court for the [District of Delaware] sitting in [ ]New Castle County or the courts of the State of [Delaware] sitting in [ ]New Castle County and any appellate court from any jurisdiction thereof, for the resolution of any such Transaction Dispute. In that context, and without limiting the generality of the foregoing, each Party irrevocably and unconditionally: (i) submits for itself and its property to the exclusive jurisdiction of such courts with respect to any Transaction Dispute and for recognition and enforcement of any judgment in respect thereof, and agrees that all claims in respect of any Transaction Dispute shall be heard and determined in such courts; (ii) agrees that venue would be proper in such courts, and waives any objection that it may now or hereafter have that any such court is an improper or inconvenient forum for the resolution of any Transaction Dispute; and (iii) agrees that Notice demand in accordance with Section 10.5, will be effective service of process; provided, however, that nothing herein will be deemed to prevent a Party from making service of process by any means authorized by the Laws of the State of [Delaware].

(b)        The foregoing consent to jurisdiction will not constitute submission to jurisdiction or general consent to service of process in the State of [Delaware] for any purpose except with respect to any Transaction Dispute.

10.11 <u>WAIVER OF RIGHT TO TRIAL BY JURY</u>. EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY PROCEEDING IN CONNECTION WITH A TRANSACTION DISPUTE.

10.12 <u>Specific Performance</u>. Each Party acknowledges and agrees that the other Party would be damaged irreparably in the event that a Party does not perform its obligations under this Agreement in accordance with its specific terms or otherwise breaches this Agreement, so that, in addition to any other remedy that Buyer or Seller may have under law or equity, each Party shall be entitled to injunctive relief to prevent any breaches of the provisions of this Agreement by the other Parties and to enforce specifically this Agreement and the terms and provisions hereof.

10.13 <u>Third Party Beneficiaries</u>. Nothing in this Agreement, express or implied, is intended to confer upon any other Person any rights or remedies of any nature under or by reason of this Agreement, except as expressly provided herein, including <u>Section 10.16</u>.

10.14 <u>Counting</u>. If the due date for any action to be taken under this Agreement (including the delivery of Notices) is not a Business Day, then such action shall be considered timely taken if performed on or prior to the next Business Day following such due date.

10.15 <u>Survival</u>. Except as expressly set forth in this Agreement to the contrary, all representations and warranties and covenants of Buyer and Seller, respectively, contained in this Agreement or in any document delivered pursuant hereto shall not survive the Closing Date and thereafter shall be of no further force and effect. Notwithstanding the foregoing, all covenants and agreements set forth in this Agreement, which by their terms would require performance after the Closing Date, shall survive until fully performed or until such covenant or agreement expires by its terms.

10.16 <u>Non-Recourse</u>. All claims, Liabilities, Proceedings, or causes of action (whether in contract or in tort, in law or in equity, or granted by statute) that may be based upon, in respect of, arise under, out or by reason of, be connected with, or relate in any manner to a Transaction Dispute, may be made only against (and are expressly limited to) the entities that are expressly identified as parties hereto in the preamble to this Agreement or, if applicable, their permitted assignees (collectively, the "<u>Contracting Parties</u>"). No Person who is not a Contracting Party, including any past, present or future director, officer, employee, incorporator, member, partner, manager, equityholder, Affiliate, agent, attorney, or representative of, and any financial advisor or lender to, any Contracting Party (other than the Persons listed on <u>Schedule 10.16)</u>, or any director, officer, employee, incorporator, member, partner, manager, equityholder, Affiliate, agent, attorney, or representative of, and any financial advisor or lender to, any of the foregoing (collectively, the "<u>Non-Recourse Persons</u>"), shall have any Liability (whether in contract or in tort, in law or in equity, or granted by statute) for any claims, Liabilities, or causes of action, arising under, out of, in connection with, or related in any manner to a Transaction Dispute; and, to the maximum extent permitted by Law, each Contracting Party hereby waives and releases all such claims, Liabilities, and causes of action, against any such Non-Recourse Persons.

10.17    <u>Preparation of this Agreement</u>. Buyer and Seller hereby acknowledge that (a) Buyer and Seller jointly and equally participated in the drafting of this Agreement and all other agreements contemplated hereby, (b) Buyer and Seller have been adequately represented and advised by legal counsel with respect to this Agreement and the Transactions, and (c) no presumption shall be made that any provision of this Agreement shall be construed against either Party by reason of such role in the drafting of this Agreement and any other agreement contemplated hereby.

10.18    <u>Schedules</u>. The Seller's Disclosure Schedules have been arranged for purposes of convenience in separately numbered sections corresponding to the sections of this Agreement; provided that each section of the Seller's Disclosure Schedules will be deemed to incorporate by reference all information disclosed in any other section of the Seller's Disclosure Schedules, and any disclosure in the Seller's Disclosure Schedules will be deemed a disclosure against any representation or warranty set forth in this Agreement. Capitalized terms used in the Seller's Disclosure Schedules and not otherwise defined therein have the meanings given to them in this Agreement. The specification of any dollar amount or the inclusion of any item in the representations and warranties contained in this Agreement, the Seller's Disclosure Schedules or the attached exhibits is not intended to imply that the amounts, or higher or lower amounts, or the items so included, or other items, are or are not required to be disclosed (including whether such amounts or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course of Business, and no Party will use the fact of the setting of the amounts or the fact of the inclusion of any item in this Agreement, the Seller's Disclosure Schedules or exhibits in any dispute or controversy between the Parties as to whether any obligation, item or matter not set forth or included in this Agreement, the Seller's Disclosure Schedules or exhibits is or is not required to be disclosed (including whether the amount or items are required to be disclosed as material or threatened) or are within or outside of the Ordinary Course of Business. In addition, matters reflected in the Seller's Disclosure Schedules are not necessarily limited to matters required by this Agreement to be reflected in the Seller's Disclosure Schedules. Such additional matters are set forth for informational purposes only and do not necessarily include other matters of a similar nature. No information set forth in the Seller's Disclosure Schedules will be deemed to broaden in any way the scope of the Parties' representations and warranties. Any description of any agreement, document, instrument, plan, arrangement or other item set forth on the Seller's Disclosure Schedules is qualified in its entirety by the terms of such agreement, document, instrument, plan, arrangement, or item which terms will be deemed disclosed for all purposes of this Agreement. The information contained in this Agreement, in the Seller's Disclosure Schedules and exhibits hereto is disclosed solely for purposes of this Agreement, and no information contained herein or therein will be deemed to be an admission by any Party to any third party of any matter whatsoever, including any violation of Law or breach of Contract.

10.19    <u>Fiduciary Obligation</u>. Nothing in this Agreement, or any document related to the transactions contemplated hereby, will require Seller or any of its managers, officers or members, in each case, in their capacity as such, to take any action, or to refrain from taking any action, to the extent inconsistent with their fiduciary obligations or applicable Law. For the avoidance of doubt, Seller retains the right to pursue any transaction or restructuring strategy that, in Seller's business judgment, will maximize the value of their estates.

[*Remainder of Page Intentionally Left Blank*]

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by the duly authorized officers of Seller and Buyer as of the date first above written.

<u>**SELLER:**</u>

**John C. Heath, Attorney At Law PC d/b/a Lexington Law**

By:_____
Name:
Title:

**BUYER:**

**[AcquisitionCo]**


By:_____
Name:
Title: