## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| PGX HOLDINGS, INC., *et al.*,[1] | ) | Case No. 23-10718 (CTG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Related to Docket Nos.: 66-68, 331,** |
| | ) | **335-36, 356, 360, 362, 367-68,** |
| | ) | **370-71, 374-75, 383** |

### OMNIBUS REPLY OF DEBTORS
### IN SUPPORT OF THE PROPOSED SALE TRANSACTIONS

The debtors and debtors in possession (collectively, the "Debtors") submit this reply (the "Reply"[2]) in support of the *Motion of the Debtors for Entry of Orders (I)(A) Approving Bidding Procedures for Substantially All of the Debtors' Assets, (B) Authorizing the Debtors to Enter into One or More Stalking Horse Agreements and to Provide Bidding Protections Thereunder, (C) Scheduling an Auction and Approving the Form and Manner of Notice Thereof, (D) Approving Assumption and Assignment Procedures, and (E) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof; (II)(A) Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances and (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases; and (III) Granting Related Relief* [Docket No. 66] (the "Sale Motion")[3] and in response to the sale objection filed

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  PGX Holdings, Inc. (2510); Credit Repair UK, Inc. (4798); Credit.com, Inc. (1580); Creditrepair.com Holdings, Inc. (7536); Creditrepair.com, Inc. (7680); eFolks Holdings, Inc. (5213); eFolks, LLC (5256); John C. Heath, Attorney At Law PC (8362); Progrexion ASG, Inc. (5153); Progrexion Holdings, Inc. (7123); Progrexion IP, Inc. (5179); Progrexion Marketing, Inc. (5073); and Progrexion Teleservices, Inc. (5110).  The location of the Debtors' service address for purposes of these chapter 11 cases is:  257 East 200 South, Suite 1200, Salt Lake City, Utah 84111.

[2]   The Debtors and the CFPB consensually agreed to extend the Debtors' reply deadline through August 22, 2023.

by the United States on behalf of the U.S. Consumer Financial Protection Bureau (the "CFPB") [Docket No. 375] (the "CFPB Objection") and the other objections and the reservation of rights with respect to the sale filed at Docket Nos. 360, 368 and 383 (together with the CFPB Objection, the "Sale Objections"), and all other objections and reservation of rights, each of which relates solely to an Assumption Notice (the "Contract Objections" and, together with the Sale Objections, the "Objections"), listed on **Exhibit A** attached hereto.  In further support of the Motion and this Reply, the Debtors incorporate by reference the Augustine Declaration [Docket No. 67] and the Frejka Declaration [Docket No. 68], and submit the supplemental declaration of Neil Augustine, which was filed contemporaneously herewith, and state as follows:

## Preliminary Statement

1.        Since the Petition Date, the Debtors have conducted a robust marketing process for substantially all of their assets against the backdrop of constrained liquidity, operational uncertainty, and limited funding available under the DIP Facility.  The outcome of this process confirmed that the Stalking Horse Agreements were indeed the highest and best offers available, a point no party has disputed.  Approval of the Sale Transactions has the support of the Debtors' first lien lenders, second lien lender and majority equity holder, and Official Committee of Unsecured Creditors.  Seeking approval of the Sale Transactions is the value-maximizing path forward for these cases.  Moreover, the Sale Transactions will preserve hundreds of jobs and the company's ability to continue to provide credit-repair services to hundreds of thousands of Americans—services that can be life-altering for individuals and families in the modern

---

3    Capitalized terms used but not defined herein shall have the meanings given such terms in the Sale Motion, the *Declaration of Chad Wallace, Chief Executive Officer of PGX Holdings, Inc., in Support of Chapter 11 Filing and First Day Motions* [Docket No. 12] (the "First Day Declaration") or the order approving certain relief sought in the Sale Motion [Docket No. 331] (the "Bidding Procedures Order"), as applicable.

economy.   Accordingly, the Sale Transactions are a sound exercise of the Debtors' business judgment.

2.      Only one party objects to the Sale Transactions outright:  the CFPB.  Contrary to the CFPB's assertions, the Debtors are not running an unlawful business.  On March 10, 2023, the CFPB successfully obtained a partial summary judgment ruling from the United States District Court for the District of Utah, finding that roughly 80% of the Debtors' then-existing business—the portion of their services sold through telemarketing channels—violated a federal telemarketing regulation.   In response, the Debtors promptly shut down that portion of the business, including their call centers.   The business that remains complies with all applicable law.

3.      In its sale objection (and its conversion and dismissal motion), the CFPB makes bare allegations that the Debtors' remaining business continues to violate the law.   These allegations are false.   More to the point, neither a sale objection nor a dismissal or conversion motion is the appropriate vehicle through which to litigate allegations of this nature.   If the CFPB believes either the Debtors or the purchasers are violating the law, it can seek to enjoin such conduct through a lawsuit.   Neither the chapter 11 cases nor the Sale Transactions preclude the government   from   enforcing   the   law   against   the   Debtors   or   the   purchasers. *See, e.g.*, 11 U.S.C. § 362(b)(4); 28 U.S.C. § 959.  Accordingly, converting the cases, dismissing the cases, or denying the Sale Transactions because of unproven allegations of ongoing violations of the law would solve a problem that does not exist.   And it would do so while destroying any remaining value available for the Debtors' secured lenders, vendors, contract counterparties, employees, and customers.

4.      Likewise unavailing are the CFPB's arguments that the Sale Transactions cannot be approved free and clear of the CFPB's existing lawsuit under section 363(f) of the Bankruptcy Code.  The monetary relief requested by the CFPB plainly falls within section 363(f)(5), and the CFPB does not say otherwise.  The assertion that the requested injunctive relief is not an "interest in property" within the meaning of that provision proves too much:  if it is not an interest in property, then it has no reason to follow the Debtors' property to a new purchaser. In that case, it follows that a free-and-clear finding is appropriate.

5.      On the other hand, assuming the lawsuit is an "interest in property"—and the case law says that it is—then the Sale Transactions can proceed free and clear of such interest under both section 363(f)(4) and section 363(f)(5) of the Bankruptcy Code.  For one, contrary to the CFPB's assertions, the injunctive relief requested by the CFPB is "in bona fide dispute" within the meaning of section 363(f)(4).  Indeed, no injunction has been issued, and one may never be issued, given it continues to be vigorously contested by the Debtors.  The Utah District Court has granted no remedies whatsoever and has ordered an evidentiary hearing as to what remedies, if any, the Utah District Court should issue.  That qualifies as an interest in bona fide dispute.  Case law providing that unstayed, final judgments on appeal are not "in bona fide dispute" is inapposite to these circumstances because no final judgment has been issued in the CFPB litigation.

6.      Moreover, the Sale Transactions can proceed free and clear of the CFPB's requested injunctive relief because the CFPB "could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest" within the meaning of section 363(f)(5).  The CFPB Litigation alleges that consumers were billed for services earlier than they should have been.  If any customers have been harmed, past violations of these billing

regulations can be remedied by monetary redress where appropriate.  Future violations can be remedied by a future lawsuit, a lawsuit neither the chapter 11 cases nor the Sale Transactions preclude.  Indeed, in an analogous case, the Third Circuit held that "EEOC discrimination claims are reducible to, and can be satisfied by, monetary awards even if the relief sought is injunctive in nature."  *In re Trans World Airlines, Inc.*, 322 F.3d 283, 291 (3d Cir. 2003).  Accordingly, the CFPB Objection should be overruled in its entirety.

7.      All other Sale Objections have been substantively resolved through revisions to the proposed orders approving the Sale Transactions.  Further, the Debtors are working to consensually resolve the Contract Objections, which need not be addressed at the hearing on the Sale Transactions.  The Debtors intend to set an omnibus hearing, if necessary, to resolve any outstanding Contract Objections in the future, in accordance with the Bidding Procedures Order. For the reasons set forth herein and in the Sale Motion, this Court should overrule the Sale Objections to the extent not mooted or resolved, adjourn all Contract Objections, and approve and authorize the Debtors' consummation of the Stalking Horse Agreements and the Sale Transactions and the transfer of assets free and clear.

### Background

**I.      The Stalking Horse Bids and Marketing Process.**

8.      Prior to filing these chapter 11 cases, on March 10, 2023, the District Court entered summary judgment in favor of the CFPB on Count 1 in the CFPB Litigation—exposing the Debtors to damages of potentially more than $2.7 billion should the CFPB prevail on its requested relief in the near-term—the Debtors redoubled their efforts to evaluate potential paths forward.  Due to the Debtors ceasing all telemarketing activities and monthly billing for many of their clients and looming interest payments on prepetition facilities, the Debtors had to consider a comprehensive in-court solution.

9.     The Debtors worked with their investment banker, Greenhill & Co., LLC ("Greenhill") and other advisors with respect to a potential in-court transaction, including negotiating and securing the $2.9 million bridge financing, the multi-draw DIP Facility in an aggregate amount of up to $19.9 million of new money, and a $257.5 million credit bid for substantially all of the assets of PGX, which served as the basis of the Progrexion Stalking Horse Bid.  The Debtors, with the assistance of Greenhill and other advisors, also negotiated with the Lexington Law Stalking Horse Bidder regarding a bid for the assets of Lexington Law in exchange for the assumption of (i) the PGX Operating Agreements (as defined in the Lexington Law APA), including the corresponding cure obligations (the prepetition balance thereof being approximately $24 million in the aggregate), and (ii) certain cure obligations owed to third parties, capped at approximately $5.1 million in the aggregate.  The Progrexion Stalking Horse Bidder insisted that its bid be conditioned on the bid of the Lexington Law Stalking Horse Bidder to enable both the PGX Debtors and the Lexington Law Debtors to continue operations as going concerns.

10.     Prior to the Petition Date, Greenhill worked with the Debtors to prepare for a robust postpetition marketing process to meet the milestones provided for in the Restructuring Support Agreement and required by the DIP Facility, including identifying hundreds of parties, including strategic and financial parties, as potential bidders for the Debtors' assets.  Greenhill worked with the Debtors to assemble diligence materials for inclusion in a virtual data room, access to which was provided to interested parties that executed a nondisclosure agreement and participated in the process.

11.     On June 6, 2023, the Debtors filed the Sale Motion seeking, among other things, approval of the Bidding Procedures to effectuate a sale of substantially all of their assets through

going concern sales, the scheduling of a sale hearing, and approval of the sale of substantially all of the Debtors' assets pursuant to the Stalking Horse Agreements filed with the Sale Motion (or an asset purchase agreement of an alternative winning bidder).

12.     On July 28, 2023, the Debtors filed revised Stalking Horse Agreements which included, among other things, the schedules to each Stalking Horse Agreement.  *See* Docket No. 250.  The revised Progrexion Stalking Horse Agreement also reflected the Progrexion Stalking Horse Bidder's agreement to eliminate the expense reimbursement in the prior version of the Progrexion Stalking Horse Agreement.  On August 4, 2023, the Court entered the Bidding Procedures Order.  *See* Docket No. 331.

13.     In accordance with the Bidding Procedures Order, the Debtors promptly filed on the docket and provided service of the *Notice of Auction and Sale Hearing*, and the Debtors supplemented with service on their remaining known creditors set forth in their schedules of assets and liabilities filed with the Bankruptcy Court.  *See* Docket Nos. 335, 350.  The Debtors also filed on the docket and served the Assumption and Assignment Notice, which provided notice to non-Debtor contract counterparties that the Debtors may assume and assign certain contracts to the Successful Bidder together with the associated Cure Amounts.  *See* Docket No. 336, 354.  The Debtors may file a supplemental Assumption and Assignment Notice in the near term.  Additionally, on August 8, 2023, the Debtors published the Publication Notice in *The New York Times* in accordance with the Bidding Procedures Order.  *See* Docket No. 341.

14.     Following the Petition Date, Greenhill conducted an exhaustive, months-long marketing process for the Debtors' assets.  Greenhill worked with potential bidders to develop proposals prior the Bid Deadline and regularly followed up with each interested party until they affirmatively declined to continue in the process.  In total, Greenhill contacted 137 third parties,

including seventy-one (71) potential financial third parties and sixty-six (66) potential strategic third parties, of which twelve (12) executed nondisclosure agreements and were provided access to the virtual data room.   Supp. Augustine Declaration ¶¶ 13–14.   Greenhill maintained consistent engagement with all active parties while they reviewed the provided diligence, including regarding the diligence, timelines, and preliminary feedback.   Supp. Augustine Declaration ¶ 14.  To foster a competitive bidding environment, Greenhill encouraged interested parties to explore various bid configurations for different asset packages, including standalone or combination bids, as well as to submit a bid below that of the initial Stalking Horse Bids.  Supp. Augustine Declaration ¶ 15.

15.      Throughout the marketing process, Greenhill provided regular updates through presentations, phone calls, Zoom meetings, emails, and other modes of communication to the board of the PGX Debtors and the independent director of Lexington Law regarding outreach efforts and the status of Greenhill's discussions with certain third parties.   Supp. Augustine Declaration ¶ 10.  The board of the PGX Debtors and the independent director of Lexington Law provided guidance and direction regarding the marketing process to Greenhill and the Debtors' other advisors.  Supp. Augustine Declaration ¶ 10.

16.      Despite the Debtors' efforts and robust postpetition marketing process, no party submitted a Bid prior to the bid deadline, let alone a Qualified Bid, other than the Progrexion Stalking Horse Bid and the Lexington Law Stalking Horse Bid.[4]  In the absence of any Bid, the PGX Debtors and the independent director of Lexington Law consulted with their advisors (including independent legal counsel for the independent director of Lexington Law) and

---

[4]     The Debtors received one initial indication of interest for the acquisition of certain assets of Lexington Law. At the direction of the independent director of Lexington Law, Greenhill worked with the interested party in an effort to understand and improve their indication of interest.  Ultimately, the interested party declined to submit a Qualified Bid.

determined that the Debtors should proceed in seeking approval of the Progrexion APA and the Lexington Law APA, respectively, at the Sale Hearing. Accordingly, on August 14, 2023, the Debtors filed a notice indicating that the Auction was cancelled, designating the Stalking Horse Bidders as the Successful Bidders to be presented to the Court, and including proposed Sale Orders for the Sale Transactions. *See* Docket No. 356.

17. In short, the postpetition marketing process confirmed that the Debtors' Stalking Horse Agreements negotiated prepetition indeed yielded the highest or otherwise best offer for the Debtors' Assets. Accordingly, the Debtors now seek approval of the Sale Transactions pursuant to the Progrexion APA and Lexington Law APA.

## II. The CFPB Litigation and Requested Monetary and Injunctive Relief.

18. On May 2, 2019, the CFPB initiated the CFPB Litigation in the United States District Court for the District of Utah. The CFPB has made the following allegations in the CFPB Litigation.

- *Alleged Violation by the Debtor Defendants of the TSR Advance Fee Provision ("Count I")*. The CFPB alleges that the billing practices of the Debtor defendants violated 16 C.F.R. § 310.4(a)(2), the advance fee provision of the TSR, beginning on March 8, 2016. The advance-fee provision of the TSR is a U.S. Federal Trade Commission rule that purports to prohibit an organization from billing for credit repair services until the time frame represented for the delivery of all such services has expired and the seller has provided the customer with a credit report demonstrating promised results, issued more than six months after such results were achieved.

- *Alleged Deceptive Acts or Practices in Violation of the Consumer Financial Protection Act of 2010 ("Count II")*. The CFPB alleges that the Debtor defendants (excluding Lexington Law), through their marketing activities and conduct related to their Hotswap Partner relationships, engaged in deceptive acts or practices in violation of 12 U.S.C. §§ 5531 and 5536(a)(1)(B).

- *Alleged False or Misleading Statements Made to Induce Payment for Goods or Services in Violation of the TSR ("Count III")*. The CFPB alleges that the Debtor defendants (excluding Lexington Law), in connection with their telemarketing of Lexington Law and the CreditRepair.com branded services and arrangements with their Hotswap Partners made certain false or misleading statements in violation of 16 C.F.R. § 310.3(a)(4) of the TSR.

- *Alleged Substantial Assistance of a Covered Person Engaged in Deceptive Acts or Practices in Violation of the Consumer Financial Protection Act of 2010 ("Count IV")*. The CFPB alleges that the Debtor defendants (excluding Lexington Law) unlawfully knowingly or recklessly provided substantial assistance to certain Hotswap Partners, allegedly covered persons or service providers under 12 U.S.C. § 5481(6)(A), in violation of the Consumer Financial Protection Act of 2010, 12 U.S.C. §§ 5531 and 5536(a)(1)(B).

- *Alleged Assistance and Facilitation of Violations of the TSR ("Count V")*. The CFPB alleges that the Debtor defendants (excluding Lexington Law) engaged in deceptive acts or practices by providing substantial assistance or support to certain Hotswap Partners, alleged "telemarketers" as defined by 16 C.F.R. § 310(ff), in violation of the TSR, 16 C.F.R. § 310.3(a)(4).

19.      On March 10, 2023, the District Court granted summary judgment against the Debtors solely as to Count I, finding in favor of the CFPB and holding that the Debtor defendants violated the advance fee provision of the TSR. As previously mentioned, in response to the ruling, the Debtors instituted major operational changes to bring the business into compliance with the District Court's ruling, including shutting down their call centers and laying off approximately 900 employees.

20.      Although the District Court has not yet made a determination on the remedies resulting from its ruling on Count I, the CFPB filed its remedies motion that demanded nearly $3 billion in restitution, refunds, or other monetary relief and has requested certain injunctive relief. The requested injunctive relief includes a prohibition on (i) the Debtors requesting or receiving payment for credit repair services until certain conditions are met or (ii) even performing credit repair services for a period of ten years unless the Debtors have entered into a written agreement containing specific terms as described in the proposed injunction. The Debtors decided not to proceed with the interlocutory appeal after the United States Court of Appeals for the Tenth Circuit denied the Debtors' request for administrative stay, but the Debtors reserved all rights to appeal a final judgment or other future appealable order.

21.    On July 19, 2023, the District Court ordered that an evidentiary hearing shall be held regarding whether any injunctive relief should issue at all.  That hearing date has not been set, but another pre-hearing conference is currently scheduled for August 30, 2023.

## **Omnibus Reply**

II.    **The Sale Transactions Satisfy Section 363 of the Bankruptcy Code and Should Be Approved.**

A.    **A Compelling Business Purpose Justifies the Sale Transactions.**

22.    Section 363(b) of the Bankruptcy Code provides that "[t]he [debtor-in-possession], after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  In determining whether to authorize the use, sale or lease of property of the estates under Section 363 of the Bankruptcy Code, "courts require the debtor to show that a sound business purpose justifies such actions."  *The Dai-Ichi Kangyo Bank Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (Bankr. D. Del. 1999); *see, e.g.*, *In re ICL Holding Co., Inc.*, 802 F.3d 547, 551 (3d Cir. 2015); *In re Lionel Corp.*, 722 F.2d 1063, 1070-71 (2d Cir. 1983).  The "sound business purpose" test requires a debtor to establish that: "(1) a sound business purpose [for the sale] exists; (2) the [total consideration] is fair; (3) the debtor has provided adequate and reasonable notice; and (4) the purchaser has acted in good faith."  *In re Decora Indus., Inc.*, No. 00-4459 (JJF), 2002 WL 32332749, at *2 (D. Del. May 20, 2002) (citing *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991)).  The Debtors submit that the Sale Transactions satisfy each of these elements.

23.    ***First***, a sound business purpose exists for the Sales Transactions.  After shutting down approximately 80% of their business to comply with the March 10, 2023 ruling in the CFPB Litigation, the Debtors experienced severe financial distress.  The Debtors could not

afford to service their funded debt or to pay their trade claims, their employee obligations, or their contractual obligations. Cash was rapidly approaching zero.

24.     To address this situation, the Debtors entered into negotiations with their first lien lenders, second lien lender, and majority equity holder. After extensive negotiations, the parties agreed that the Debtors would commence these chapter 11 cases to utilize the Bankruptcy Code to address their unsustainable liabilities, including funded debt, trade claims, contract claims, and litigation claims. The lenders would provide debtor-in-possession financing and serve as the stalking horse bidder for PGX, the existing Lexington Law principals would serve as the stalking horse bidder for Lexington Law and assume the existing operating agreements, and the assets would be marketed over a roughly 60-day period (which was eventually extended) to determine if higher or otherwise better bids were available.

25.     These Sale Transactions, followed by the contemplated liquidating plan, will allow the Debtors to right-size their balance sheets (including by rejecting multiple unsustainable contracts) and emerge as a viable going concern. Consummating the Sale Transactions and the plan will deliver value to the Debtors' secured lenders, continuing trade vendors and contract counterparties, employees, customers, and general unsecured creditors. This is a valid business purpose.

26.     ***Second***, the total consideration packages are fair for the Debtors' assets in the current circumstances and resulted from good-faith, arm's-length negotiations between the Debtors and the Stalking Horse Bidders, each of which are sophisticated parties represented by their own competent counsel. Supp. Augustine Declaration ¶ 19. In accordance with the Progrexion APA, the Progrexion Stalking Horse Bidder will (a) credit bid $257.5 million for substantially all of the assets of PGX and (b) assume the Assumed Liabilities—including

ordinary course trade payables, substantially all employee-related liabilities and accrued expenses, and operating business contracts.  Supp. Augustine Declaration ¶ 7.  In accordance with the Lexington Law APA, the Lexington Law Stalking Horse Bidder will assume (a) the PGX Operating Agreements, including the corresponding cure obligations as referenced above, and (b) the Assumed Liabilities, which are certain cure obligations owed to third parties, capped at approximately $5.1 million in the aggregate.  Supp. Augustine Declaration ¶ 8. Importantly, the consideration packages under the Progrexion APA and Lexington Law APA have been thoroughly vetted by the market, and the market has spoken, confirming that the Debtors have obtained a fair value for their assets.  Supp. Augustine Declaration ¶ 17.

27.    *Third*, as described above, the Debtors complied with the notice provisions set forth in the Bidding Procedures, with respect to both the marketing and sale process and the contract designation and assumption and assignment process, providing notice via first-class mail, email, publication, and the public docket, as required by the Bidding Procedures.  For the avoidance of doubt, the contract designation process will continue beyond the sale hearing in accordance with the Bidding Procedures Order and the terms of the Progrexion APA and Lexington Law APA.

28.    *Fourth*, throughout the Sale Process, the Stalking Horse Bidders conducted themselves in good faith, and at arm's length.  Supp. Augustine Declaration ¶ 19.  The Debtors negotiated the Progrexion APA and the Lexington Law APA with the applicable Stalking Horse Bidder through intensive, arm's-length negotiations during which the applicable Stalking Horse Bidder was treated at all times in the same manner as all other third parties.  The Debtors and the Stalking Horse Bidders are sophisticated parties and were represented by competent counsel.

*See* Supp. Augustine Declaration ¶ 19.   Accordingly, the Sale Transactions satisfy all four elements required to approve a section 363 sale in this District.

29.    In rebuttal, the CFPB offers only the uncontroversial proposition that a debtor must comply with applicable non-bankruptcy law during their cases.   The authorities that the CFPB cites, however, do not support the proposition that a bare allegation of a regulatory violation is a basis to object to a section 363 sale, let alone imperil these cases.   To the contrary, the statute says that the debtor "may be sued" for such a violation.   28 U.S.C. § 959(a).   Likewise, the police power exception to the automatic stay permits enforcement actions to continue.   11 U.S.C. § 362(b)(4).   The Debtors have never disputed that the CFPB litigation is subject to this exception and, in fact, that lawsuit is continuing today unimpeded by these chapter 11 cases.

30.    Likewise, none of the cases cited by the CFPB involved reviewing, let alone denying, a section 363 sale because of newly alleged regulatory violations.   *See Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 136 S.Ct. 1652 (2019) (involving a trademark license rejection dispute); *Midlantic Nat'l Bank v. N.J. Dept. of Env't Prot.*, 474 U.S. 494 (1986) (same); *In re Am. Coastal Energy Inc.*, 399 B.R. 805 (Bankr. S.D. Tex. 2009) (involving claim dispute regarding administrative priority); *In re H.L.S. Energy Co., Inc.*, 151 F.3d 434 (5th Cir. 1998) (same); *In re St. Mary Hosp.*, 86 B.R. 393 (Bankr. E.D. Penn. 1988) (involving the debtor's plan to cease providing emergency health care).

31.    This is unsurprising.   The Bankruptcy Code does not prevent the CFPB from suing the Debtors for ongoing regulatory violations.   And the proposed orders approving the Sale Transactions do not prevent the CFPB from suing the purchasers for ongoing regulatory violations arising from their operation of the acquired assets.   It follows that the proper

procedural mechanism to address alleged regulatory violations is through a lawsuit against the Debtors or the purchasers, not through a sale objection (or a conversion or dismissal motion). For these reasons, the CFPB Objection to the Sale Transactions should be overruled.

      **B.**    **The Assets Should Transfer Free and Clear of All Liens, Claims, Encumbrances and Interests, Including Injunctive Relief Not Yet Awarded in Favor of the CFPB, as Section 363(f) is Satisfied.**

      32.    Section 363(f) of the Bankruptcy Code permits the Debtors to sell the Acquired Assets free and clear of third-party interests if:

> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interests;
>
> (2) such entity consents;
>
> (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4) such interest is in bona fide dispute; or
>
> (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).  Section 363(f) of the Bankruptcy Code is written in the disjunctive, and any of the five conditions provides authority to sell free and clear of interests.  *See In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002).  The Debtors submit that each lien or interest in the Acquired Assets (other than an Assumed Liability or Permitted Encumbrance) satisfies at least one of the five conditions of section 363(f) of the Bankruptcy Code.  Moreover, any party asserting a lien or interest that has not timely objected to the Sale Motion should be deemed to have consented to the Sale Transactions.  *See* Bidding Procedures Order at ¶ 27.

      33.    The Sale Transactions can be authorized free and clear of the CFPB litigation in its entirety, including the monetary and injunctive relief requested therein.  The CFPB cannot, and does not, dispute that the Sale Transactions can be authorized free and clear of the nearly

$3 billion in monetary relief requested by the CFPB. This component of the lawsuit plainly fits within section 363(f)(5) of the Bankruptcy Code.

34.     A free and clear finding is likewise appropriate with respect to the CFPB's requested injunctive relief. If it is true, as the CFPB asserts, that the requested injunctive relief is not an "interest in property" under section 363(f), then such relief has no basis to follow the property to a purchaser of the assets under section 363(b). The Third Circuit has held as much in an analogous context. *See In re Trans World Airlines*, 322 F.3d at 291 ("Even were we to conclude that the claims at issue are not interests in property, the priority scheme of the Bankruptcy Code supports the transfer of TWA's assets free and clear of the claims.").

35.     In any case, the better interpretation is that the requested injunctive relief is an "interest in property," and is subject to a free-and-clear finding under multiple prongs of section 363(f). Courts, including the Third Circuit, construe "interest in such property" broadly to mean both in *rem interests* and "other obligations that may flow from ownership of the property." *See In re Trans World Airlines*, 322 F.3d at 289 (quoting *Folger Adam Sec., Inc. v. Dematteis/MacGregor, JV*, 209 F.3d 252, 259 (3d Cir. 2000)); *see also PBBPC, Inc. v. OPK Biotech, LLC (In re PBBPC, Inc.)*, 484 B.R. 860, 869 (1st Cir. BAP 2013) (concluding that "the more expansive reading of the term 'any interest' . . . is more consistent with the language of the Bankruptcy Code and the policy expressed" in Section 363) (citing cases).

36.     Indeed, the Third Circuit has found that a section 363(f) "interest in property" includes any interest that could potentially travel with such property being sold and any successor liability claims relating to or arising from the debtor's business or the operation of its assets. *See Trans World Airlines*, at 283, 287–90. Courts in other circuits have adopted a similarly broad definition. *See, e.g.*, *In re Qualitech Steel SBQ, LLC*, 327 F.3d 537 (7th Cir.

2003) (holding that a lessee's possessory interest constituted a section 363(f) "interest in property" despite section 365(h) generally protecting a lessee's rights upon lease rejection); *Futuresource LLC v. Reuters Ltd.*, 312 F.3d 281, 286 (7th Cir. 2002) (holding that a certain license of the debtor's intellectual property acquired constituted a Section 363(f) "interest in property"); *In re Leckie Smokeless Coal Co.*, 99 F.3d 573 (4th Cir. 1996) (holding that the debtor could sell operating coal assets free and clear of successor liability for actions to collect Coal Act premium payments brought by two employer-sponsored benefit plans); *see also In re Gen. Motors Corp.*, 407 B.R. 463, 505-06 (Bankr. S.D.N.Y. 2009) (holding that "the Court will permit GM's assets to pass to the purchaser free and clear of successor liability claims"). Courts in this District have also recognized that an "interest in property" may include any "restrictions [or] limitations." *See In re FB Debt Fin. Guar., LLC*, No. 23-10025 (KBO) (Bankr. D. Del. Mar. 23, 2023) [ECF No. 427].

37.     Assuming it is an "interest in property," the requested injunctive relief is subject to a free-and clear finding under section 363(f)(4) because it is "in bona fide dispute." No injunction or other remedies have issued in the CFPB litigation. The Utah District Court issued a partial summary judgment ruling on one of five counts, finding that certain past practices violated a federal regulation. And the Utah District Court has stated that a yet-scheduled evidentiary hearing, a trial-like proceeding with live witness testimony, will be necessary to determine what, if any, injunctive relief should issue. CFPB Litigation July 11, 2023 Hr'g Tr. 111:10–113:19 ("[I]t's a question of whether an injunction should issue at all if purportedly the reason for the injunction has been extinguished."). The Debtors vigorously dispute that any injunctive relief should issue because there is no "cognizable danger of recurrent violation," *Metzler v. IBP*, 127 F.3d 959, 963 (10th Cir. 1997), and because factors such as the Debtors'

history of good faith and intent to comply with the law counsel against the necessity of an injunction.  The CFPB, on the other hand, contends that an injunction is warranted because the Debtors are currently non-compliant with the regulation and have a history of noncompliance. This qualifies as a bona fide dispute.  *See In re Daufuskie Island Props. LLC*, 431 B.R. 626, 646 (Bankr. D.S.C. 2010) (finding an objective basis for numerous factual and legal disputes existed based on a pending adversary proceeding regarding a creditors' interests in the property sold); *In re Nine Point Energy Holdings, Inc.*, No. 21-50243 (MFW), 2021 WL 2212007 (Bankr. D. Del. June 1, 2021) (same); *In re PME Mortgage Fund, Inc.*, No. 5:18-cv-01458, 2019 WL 8011737, at *5 (C.D. Cal. Sept. 30, 2019) ("[A]t the commencement of the bankruptcy action, Mathis's state court action against the Debtor for ownership rights to the Property was pending, and therefore, Mathis's claim to the Property was subject to a bona fide dispute.").  The only case the CFPB cites to the contrary is a case involving an unstayed final judgment on appeal. *See In re Drexler*, 56 B.R. 960, 967 (Bankr. S.D.N.Y. 1986).  There is no final judgment imposing an injunction in the CFPB Litigation—and in fact no injunction at all.

38.    The CFPB asserts that, even if the requested injunctive relief is an interest in property that is in bona fide dispute (it is), then its interest lacks adequate protection.  The CFPB's claims for redress of past regulatory violations are reducible to money claims and subject to treatment as general unsecured claims in the bankruptcy process.  No further adequate protection of an unsecured claim is needed.  The CFPB's claims for redress of any future regulatory violations are unimpaired and can be brought against the purchaser.  To that end, the CFPB says that "a monetary recovery cannot prevent future violations of consumer protection laws."  But the CFPB's right to bring an enforcement action for future violations of consumer protection laws is entirely unimpeded by any aspect of these chapter 11 cases, the Sale

Transactions, or the proposed Sale Orders.  Accordingly, the CFPB's interests are adequately protected.

39.     The CFPB's requested injunctive relief is also subject to a free-and-clear finding under section 363(f)(5) of the Bankruptcy Code because it "could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest."  In *Trans World Airlines*, the court found that the EEOC claims were "reducible to, and can be satisfied by, monetary awards even if the relief sought is injunctive in nature."  322 F.3d at 291.  In that case, both the bankruptcy court and the appellate court noted that if the government got what it wanted, the sale would not close and the debtors would liquidate, rendering the injunctive relief worthless. *See id.* at 293.

40.     Here, the core of the relief sought by the CFPB is redress for allegedly unlawful historical billing practices, which can be remedied by monetary redress where appropriate.  The balance of the relief sought by the CFPB, by its own description, is "injunctive relief to require the Debtors to stop violating consumer protection laws, and to protect consumers from future violations."  CFPB Objection ¶ 39.  An injunction to stop violating the law is duplicative and has no value in the hypothetical liquidation that the Third Circuit analyzed in *Trans World Airlines*.

41.     Contrary to the CFPB's position, which is similar to the EEOC's position in *Trans World Airlines*, and as the bankruptcy court there explained, the sale order issued did not prevent the EEOC from enforcing federal anti-discrimination statutes as the EEOC claimed.  No. 01-0056 (PJW), 2001 WL 1820325, at *11 (Bankr. D. Del. Mar. 27, 2001).  Rather, the debtor's lack of standalone viability—where the alternative to a sale was liquidation—prevented enforcement of certain terms of injunctive relief and this effect did not somehow suspend the usual rules or circumvent federal anti-discrimination statutes.  *See id.*  Nor would it encourage

gamesmanship, as other courts have emphasized that seeking bankruptcy protection has significant costs. *See In Shopmen's Local Union No. 455 v. Kevin Steel Prods., Inc.*, 519 F.2d 698, 705-06 (2d Cir. 1975); *Forde v. Kee-Lox Mfg. Co.*, 437 F.Supp. 631, 634-35 (W.D.N.Y. 1977).

42.     For the foregoing reasons, the Debtors' request the Court overrule the CFPB Objection and enter the proposed Sale Orders.

> **C.     The Progrexion Stalking Horse Bidder and Lexington Law Stalking Horse Bidder Acted in Good Faith and Are Entitled to the Protections of Section 363(m) of the Bankruptcy Code.**

43.     Within the Third Circuit, a good faith purchaser is one who purchases assets for value and in good faith.  "The requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings.  Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *In re Abbotts Dairies of Pennsylvania,* 788 F.2d 143, 147 (3d Cir. 1986).

44.     The Progrexion Stalking Horse Bidder and Lexington Law Stalking Horse Bidder easily satisfy this standard.  There is no evidence of fraud, misconduct or any lack of integrity by the stalking horse bidders in the sale process.  Rather, the record clearly demonstrates that the Progrexion APA and Lexington Law APA resulted from intense arm's-length negotiations between sophisticated parties represented by experienced advisors.  Nor is there evidence of any efforts to take unfair advantage of other bidders.  In fact, despite the Debtors' extensive, transparent marketing of their assets, there were no other bidders for the Debtors' assets, further demonstrating the significant value provided by the Progrexion APA and Lexington Law APA.

45.     The CFPB's insinuations that the Sale Transactions are somehow tainted insider transactions miss the mark.  Blue Torch, along with lenders other than Prospect, holds roughly

70% of the DIP and first lien loan that are being credit bid to purchase the PGX assets. Blue Torch and the other lenders are third-party commercial lenders that are not equity holders, insiders, or otherwise affiliated with the Debtors. Moreover, Blue Torch, as the DIP Agent and the Prepetition First Lien Agent, has been involved in all aspects of the negotiations of, and signed off on all aspects of, the Sale Transactions.

46.    It is true that the existing owners of Lexington Law are serving as its Stalking Horse Bidder. The PGX lenders insisted this be the case, and it is a condition of the PGX Stalking Horse Bid, because PGX and Lexington Law are dependent on one another, lawyers need to own the Lexington Law business, and there are no other lawyers better positioned to do so on superior terms. This was proved out by the open and transparent marketing process for the Lexington Law assets, through which no other party submitted a Qualified Bid. Moreover, the entire process has been reviewed and supervised by Roger Meltzer, the Lexington Law independent director, in consultation with Lexington Law's conflicts counsel.

47.    Accordingly, the Progrexion Stalking Horse Bidder and Lexington Law Stalking Horse Bidder have conducted themselves in good faith and are entitled to the protections of section 363(m) of the Bankruptcy Code.

**III.    The Court Should Adjourn the Contract Objections Until After the Sale Hearing in Accordance with the Bidding Procedures Order.**

48.    The Contract Objections do not challenge the Sale Transactions themselves, but rather, among other things, (a) contest the Debtors' proposed Cure Amounts, or (b) seek other specific relief, in each case in connection with specific assumed contracts identified in the Assumption Notice. The contract designation process described in the Stalking Horse Agreements is still ongoing, and the Debtors may file supplemental Assumption and Assignment Notices as needed. In accordance with the Assumption and Assignment Procedures in the

Case 23-10718-CTG   Doc 391   Filed 08/22/23   Page 22 of 27

Bidding Procedures Order, the Debtors will continue to work with the applicable contract counterparties regarding outstanding Contract Objections or any forthcoming Contract Objections in efforts to achieve a mutual resolution.

49.     The Stalking Horse Agreements include protections to ensure that non-Debtor counterparties to assumed and assigned contracts will receive all cure amounts payable under section 365 of the Bankruptcy Code.  The Stalking Horse Agreements contemplate that the Debtors will pay all undisputed Cure Amounts at the Closing of the Sale Transactions. Progrexion APA § 2.5(i); Lexington Law APA § 2.5(i).  Accordingly, the Stalking Horse Agreements provide the necessary protections to ensure that the Cure Objections are resolved and Cure Amounts satisfied without delaying the approval of the Sale.  For these reasons, each of the Contract Objections should be adjourned until the appropriate time as set forth in the Bidding Procedures Order.

## IV.     The Court Should Deny the CFPB's Conversion and Dismissal Motion.

50.     In addition to objecting to the Sale Motion, the CFPB Objection restates its view that these cases should be converted from chapter 11 cases to chapter 7, which the Debtors addressed in the *Debtors' Objection to Motion of the United States of America to Convert Chapter 11 Cases to Chapter 7* [Docket No. 369] (the "Conversion Objection"), incorporated by reference herein.  The Debtors will not restate here the arguments set forth in the Conversion Objection.

51.     In its objection, however, the CFPB newly cites a line of inapposite case law in support of its conversion arguments.  These cases, however, involved debtors whose core businesses violated federal criminal law prohibiting marijuana sales.  *See, e.g.*, *In re Way to Grow, Inc.*, 610 B.R. 338 (D. Colo. 2019) (involving a debtor whose core business involved selling marijuana growing equipment); *In re Burton*, 610 B.R. 633, 637–38 (B.A.P. 9th Cir.

2020) (involving an individual debtor with connections to the marijuana industry). These cases are inapposite—and in fact even cases in this line of jurisprudence have noted that debtors subject to past and even ongoing allegations of regulatory violations are common and appropriate in chapter 11. *See In re Hacienda Co., LLC*, 647 B.R. 748, 754-55 (Bankr. C.D. Cal. 2023) (taking judicial notice of the fact that many business bankruptcies "have at least some ongoing level of [regulatory] violations"); *In re CWNevada LLC*, 602 B.R. 7171, 728 n. 25 (Bankr. D. Nev. 2019) ("[B]ankruptcy courts have a long history of considering cases whose activities and operations have included past, present and possibly ongoing violations of applicable non-bankruptcy, civil *and criminal* laws.") (emphasis added).

52.     Here, the Debtors have taken drastic action to comply with the new interpretation of law reflected in the Utah District Court's partial summary judgment ruling. The allegations of ongoing violation are untrue, unproven, and at best based on speculation and novel interpretations of federal regulations. Neither conversion or dismissal or disapproval of the Sale Transaction is the appropriate remedy for these allegations. For these reasons and the reasons set forth in the Conversion Objection, the Court should deny the CFPB's Conversion and Dismissal Motion.

## **Reservation of Rights**

53.     The Debtors are continuing their review of certain aspects of the Objections and are engaged in discussions with most of the parties thereto. The Debtors reserve their rights to present additional evidence and legal argument at the Sale Hearing in response to any of the matters raised in the Objections (including the Contract Objections).

WHEREFORE, the Debtors respectfully request that the Court overrule the CFPB Objection, grant the relief requested in the Sale Motion, approve the Sale Transactions, enter the Sale Orders, waive the stay provided for by each of Bankruptcy Rules 6004(h) and 6006(d), and grant the Debtors such other and further relief as this Court deems just and proper.

Dated: August 22, 2023
Wilmington, Delaware

/s/ Michael W. Yurkewicz

**KLEHR HARRISON HARVEY BRANZBURG LLP**
Domenic E. Pacitti (DE Bar No. 3989)
Michael W. Yurkewicz (DE Bar No. 4165)
919 North Market Street, Suite 1000
Wilmington, Delaware 19801
Telephone:     (302) 426-1189
Facsimile:      (302) 426-9193
Email:           dpacitti@klehr.com
                     myurkewicz@klehr.com

- and -

Morton R. Branzburg (*pro hac vice* pending)
1835 Market Street, Suite 1400
Philadelphia, Pennsylvania 19103
Telephone:     (215) 569-3007
Facsimile:      (215) 568-6603
Email:           mbranzburg@klehr.com

*Co-Counsel to the Debtors and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
601 Lexington Ave
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900
Email:           joshua.sussberg@kirkland.com

- and -

Spencer Winters (admitted *pro hac vice*)
Whitney C. Fogelberg (admitted *pro hac vice*)
Alison J. Wirtz (admitted *pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:      (312) 862-2200
Email:           spencer.winters@kirkland.com
                     whitney.fogelberg@kirkland.com
                     alison.wirtz@kirkland.com

*Co-Counsel to the Debtors and Debtors in Possession*

**Exhibit A**

**Objections**

| Objection | Objection Summary | Status / Debtors' Response |
|---|---|---|
| *Sale Objections* | | |
| United States of America, on Behalf of the CFPB<br><br>[Dkt No. 375] | 1. The CFPB objects on grounds the cases should be converted due to the Debtors' alleged bad faith and, accordingly, the court should not approve any sales. The CFPB alleges that substantial questions exist regarding the continued legality of the Debtors' business under the consumer protection laws, barring the Debtors from availing themselves of the protections of the Bankruptcy Code.<br><br>2. The CFPB objects to the extent the Sale Transactions purport to sell the Debtors' assets free and clear of any potential injunctive relief that may be granted in favor of the CFPB in the future in the CFPB Litigation. | See Reply and Conversion Objection. |
| United States Trustee<br><br>[Dkt. No. 383] | The U.S. Trustee filed a reservation of rights to object to the evidentiary bases for entry of the proposed Sale Orders and provided other comments to the proposed Sale Orders. | The Debtors expect to consensually resolve points raised in the reservation of rights with the addition of certain agreed language to the revised proposed Sale Orders. |
| Maricopa County Treasurer<br><br>[Dkt No. 360] | The Maricopa County Treasurer objected to (a) the sale of the Debtors' assets free and clear of its liens, (b) the failure of the Sales Transactions to provide for the assumption of its liens, and (c) the lack of sale proceeds with which to satisfy its liens. | The Debtors expect to consensually resolve the objection with the addition of certain agreed language to the revised proposed Sale Orders. |
| Capitol Indemnity Corp.<br><br>[Dkt No. 368] | Capitol Indemnity Corp. objected to the extent the Debtors purport to assume and assign certain surety bonds and indemnity agreements between the parties under the sale orders or purchase agreements. | Same as above. |

| Objection | Objection Summary | Status / Debtors' Response |
|---|---|---|
| *Contract Objections* | | |
| iSpot.tv  [Dkt No. 347] | iSpot.tv objected to the Debtors' proposed cure amount. | iSpot.tv withdrew its objection.  *See* Docket No. 348. |
| ServiceNow, Inc.<br><br>[Dkt No. 362] | ServiceNow, Inc. objected to (a) the Debtors' proposed cure amount and (b) the extent the Debtors attempted to characterize the Ordering Agreement and accompanying Order Forms as separate executory contracts. | The Debtors and the objecting party are working towards a consensual resolution of outstanding issues.  This objection should be adjourned and administered in accordance with the Bidding Procedures Order. |
| TransUnion Interactive, Inc.<br><br>[Dkt No. 370] | TransUnion Interactive, Inc. objected to the Debtors' proposed cure amount. | Same as above. |
| Fair Isaac Corp.<br><br>[Dkt No. 371] | Fair Isaac Corp. objected to (a) the Debtors' proposed cure amount and (b) to the extent the Debtors have not provided adequate assurance. | Same as above. |
| HooDoo Digital, LLC<br><br>[Dkt No. 374] | HooDoo Digital, LLC objected to (a) the Debtors' proposed cure amount and (b) the extent the Debtors attempted to characterize the agreements between the parties as separate executory contracts. | Same as above. |
| Experian Marketing Solutions, LLC<br><br>[Dkt No. 367] | Experian Marketing Solutions, LLC objected to the Debtors' proposed cure amount. | Same as above. |
| Capitol Indemnity Corp.<br><br>[Dkt No. 389] | Capitol Indemnity Corp. objected on grounds it needed a copy of each of the two agreements listed on the potential assume and assigned notice, and that its indemnity agreement could not be assumed and assignment without its consent. | The Debtors and the objecting party are working towards a consensual resolution of outstanding issues. |

| Objection | Objection Summary | Status / Debtors' Response |
|---|---|---|
| Equifax Enterprise Services LLC<br><br>Informal Objection | Equifax Enterprise Services LLC objected to the Debtors' proposed cure amount. | Same as above. |
| CenturyLink Comms., LLC d/b/a Lumen Technologies Group ("Lumen")<br><br>Informal Objection | Lumen objected to the Debtors' proposed cure amount. | Same as above. |
| 257 East Salt Lake, LLC<br><br>Informal Objection | 257 East Salt Lake, LLC reserves its rights to object to the Sale Transactions pending the outcome of the lease amendment negotiations. | The parties are negotiating the terms of an amendment to the lease with effectiveness expressly conditioned on assumption and assignment of the agreements, as amended. |