*SOLICITATION VERSION*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| PGX HOLDINGS, INC., *et al.*,[1] | ) Case No. 23-10718 (CTG) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

**FIRST AMENDED DISCLOSURE STATEMENT FOR THE
FIRST AMENDED JOINT CHAPTER 11 PLAN OF PGX HOLDINGS, INC. AND ITS
DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

**KLEHR HARRISON HARVEY
BRANZBURG LLP**
Domenic E. Pacitti (DE Bar No. 3989)
Michael W. Yurkewicz (DE Bar No. 4165)
919 North Market Street, Suite 1000
Wilmington, Delaware 19801
Telephone:    (302) 426-1189
Facsimile:    (302) 426-9193
Email:    dpacitti@klehr.com
         myurkewicz@klehr.com


- and -

Morton R. Branzburg (*pro hac vice* pending)
1835 Market Street, Suite 1400
Philadelphia, Pennsylvania 19103
Telephone:    (215) 569-3007
Facsimile:    (215) 568-6603
Email:    mbranzburg@klehr.com

**KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
601 Lexington Ave
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:    joshua.sussberg@kirkland.com

- and -

Spencer Winters (admitted *pro hac vice*)
Whitney C. Fogelberg (admitted *pro hac vice*)
Alison J. Wirtz (admitted *pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:    spencer.winters@kirkland.com
         whitney.fogelberg@kirkland.com
         alison.wirtz@kirkland.com

*Co-Counsel to the Debtors and Debtors in Possession*          *Co-Counsel to the Debtors and Debtors in Possession*

Dated:  September 20, 2023

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are:  PGX Holdings, Inc. (2510); Credit Repair UK, Inc. (4798); Credit.com, Inc. (1580); Creditrepair.com Holdings, Inc. (7536); Creditrepair.com, Inc. (7680); eFolks Holdings, Inc. (5213); eFolks, LLC (5256); John C. Heath, Attorney At Law PC (8362); Progrexion ASG, Inc. (5153); Progrexion Holdings, Inc. (7123); Progrexion IP, Inc. (5179); Progrexion Marketing, Inc. (5073); and Progrexion Teleservices, Inc. (5110).  The location of the Debtors' service address for purposes of these Chapter 11 Cases is:  257 East 200 South, Suite 1200, Salt Lake City, Utah 84111.

---

**IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT**

---

THE DEADLINE TO VOTE ON THE PLAN IS
October 20, 2023, at 4:00 p.m. (prevailing Eastern Time)

FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE <u>ACTUALLY</u> <u>RECEIVED</u> BY KURTZMAN CARSON CONSULTANTS LLC ON OR BEFORE THE VOTING DEADLINE AS DESCRIBED HEREIN.

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO CERTAIN HOLDERS OF CLAIMS OR INTERESTS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE *FIRST AMENDED JOINT CHAPTER 11 PLAN OF PGX HOLDINGS, INC. AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE.* NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE. PRIOR TO DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE VIII HEREIN.

THE PLAN IS SUPPORTED BY THE DEBTORS AND CERTAIN CREDITORS OF THE DEBTORS, INCLUDING THE CONSENTING STAKEHOLDERS WHO ARE PARTY TO THAT CERTAIN RESTRUCTURING SUPPORT AGREEMENT AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS.

THE DEBTORS, THE CONSENTING STAKEHOLDERS, AND THE COMMITTEE URGE HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED TO VOTE TO <u>ACCEPT</u> THE PLAN.

THE DEBTORS URGE EACH HOLDER OF A CLAIM TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE TRANSACTIONS CONTEMPLATED THEREBY. FURTHER, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN ANTICIPATED EVENTS IN THE CHAPTER 11 CASES, AND CERTAIN DOCUMENTS RELATED TO THE PLAN THAT ARE INCORPORATED BY REFERENCE HEREIN. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH ANTICIPATED EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THEIR BOOKS AND RECORDS OR THAT WAS OTHERWISE MADE AVAILABLE TO THEM AT THE TIME OF SUCH PREPARATION AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS. WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS. THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER.  THE DEBTORS OR THE PLAN ADMINISTRATOR MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED, AND THERE IS NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE.  ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE.  HOLDERS OF CLAIMS AND INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED.  INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT.  THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AND INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS OR INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, WHO VOTE TO REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED HEREIN AND SET FORTH IN ARTICLE IX OF THE PLAN.  THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED, OR IF CONFIRMED, THAT THE CONDITIONS REQUIRED TO BE SATISFIED FOR THE PLAN TO GO EFFECTIVE WILL BE SATISFIED (OR WAIVED).

YOU ARE ENCOURAGED TO READ THE PLAN AND THIS DISCLOSURE STATEMENT IN ITS ENTIRETY, INCLUDING ARTICLE VIII, ENTITLED "RISK FACTORS," BEFORE SUBMITTING YOUR BALLOT TO VOTE ON THE PLAN.

THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTEE BY THE BANKRUPTCY COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.  THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN REGULATORY AGENCY, NOR HAS THE SEC OR ANY OTHER AGENCY PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT.

THE DEBTORS HAVE SOUGHT TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT; HOWEVER, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR INCORPORATED HEREIN BY REFERENCE HAS NOT BEEN, AND WILL NOT BE, AUDITED OR REVIEWED BY THE DEBTORS' INDEPENDENT AUDITORS UNLESS EXPLICITLY PROVIDED OTHERWISE.

THE DEBTORS MAKE STATEMENTS IN THIS DISCLOSURE STATEMENT THAT ARE CONSIDERED FORWARD-LOOKING STATEMENTS UNDER FEDERAL SECURITIES LAWS.  THE DEBTORS CONSIDER ALL

STATEMENTS REGARDING ANTICIPATED OR FUTURE MATTERS TO BE FORWARD-LOOKING STATEMENTS.  FORWARD-LOOKING STATEMENTS MAY INCLUDE STATEMENTS ABOUT THE DEBTORS':

- BUSINESS STRATEGY;

- FINANCIAL CONDITION, REVENUES, CASH FLOWS, AND EXPENSES;

- LEVELS OF INDEBTEDNESS, LIQUIDITY, AND COMPLIANCE WITH DEBT COVENANTS;

- FINANCIAL STRATEGY, BUDGET, PROJECTIONS, AND OPERATING RESULTS;

- SUCCESSFUL RESULTS FROM THE DEBTORS' OPERATIONS;

- GENERAL ECONOMIC AND BUSINESS CONDITIONS;

- ADVERSE TAX CHANGES;

- COUNTERPARTY CREDIT RISK;

- THE OUTCOME OF PENDING AND FUTURE LITIGATION;

- UNCERTAINTY REGARDING FUTURE OPERATING RESULTS; AND

- PLANS, OBJECTIVES, AND EXPECTATIONS.

STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES OF THE DEBTORS AND THE WIND-DOWN DEBTOR'S FUTURE PERFORMANCE.  THERE ARE RISKS, UNCERTAINTIES, AND OTHER IMPORTANT FACTORS THAT COULD CAUSE THE DEBTORS' AND THE WIND-DOWN DEBTOR'S ACTUAL PERFORMANCE OR ACHIEVEMENTS TO BE DIFFERENT FROM THOSE THEY MAY PROJECT, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE THE PROJECTIONS MADE HEREIN.  THESE RISKS, UNCERTAINTIES, AND FACTORS MAY INCLUDE THE FOLLOWING:  THE DEBTORS' ABILITY TO CONFIRM AND CONSUMMATE THE PLAN; THE POTENTIAL THAT THE DEBTORS MAY NEED TO PURSUE AN ALTERNATIVE TRANSACTION IF THE PLAN IS NOT CONFIRMED; THE DEBTORS' ABILITY TO REDUCE THEIR OVERALL FINANCIAL LEVERAGE; THE POTENTIAL ADVERSE IMPACT OF THE CHAPTER 11 CASES ON THE DEBTORS' OPERATIONS, MANAGEMENT, AND EMPLOYEES; THE RISKS ASSOCIATED WITH OPERATING THE DEBTORS' BUSINESS DURING THE CHAPTER 11 CASES; CUSTOMER RESPONSES TO THE CHAPTER 11 CASES; THE DEBTORS' INABILITY TO DISCHARGE OR SETTLE CLAIMS DURING THE CHAPTER 11 CASES; GENERAL ECONOMIC, BUSINESS, AND MARKET CONDITIONS; EXPOSURE TO LITIGATION; THE DEBTORS' ABILITY TO IMPLEMENT COST REDUCTION INITIATIVES IN A TIMELY MANNER; THE DEBTORS' ABILITY TO DIVEST EXISTING BUSINESSES; AND ADVERSE TAX CHANGES.

THIS DISCLOSURE STATEMENT IS SUBJECT TO FURTHER REVISION AND MAY BE AMENDED TO, AMONG OTHER THINGS, TAKE INTO ACCOUNT FURTHER SPECIFICS OF ANY RESTRUCTURING TRANSACTION TO BE CONSUMMATED PURSUANT TO THE PLAN, AND TO ACCOMMODATE ADDITIONAL REQUESTS                                    FOR                                    DISCLOSURE.

# TABLE OF CONTENTS

Page

I.     INTRODUCTION ........................................................................................................................... 1

II.    PRELIMINARY STATEMENT ................................................................................................... 1

III.   QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND
       THE PLAN .................................................................................................................................... 4

       A.    What is chapter 11? ........................................................................................................... 4
       B.    Why are the Debtors sending me this Disclosure Statement? ........................................... 4
       C.    Am I entitled to vote on the Plan? ..................................................................................... 4
       D.    What will I receive from the Debtors if the Plan is consummated? ................................... 5
       E.    What happens to my recovery if the Plan is not confirmed or does not go effective? ..... 10
       F.    If the Plan provides that I get a distribution, do I get it upon Confirmation or when the
             Plan goes effective, and what is meant by "Confirmation," "Effective Date," and
             "Consummation?" ............................................................................................................ 10
       G.    What are the sources of Cash and other consideration required to fund the Plan? ......... 10
       H.    Is there potential litigation related to the Plan? .............................................................. 10
       I.    Will the final amount of Allowed Other General Unsecured Claims affect the recovery of
             Holders of Allowed Other General Unsecured Claims under the Plan? .......................... 10
       J.    Will there be releases and exculpation granted to parties in interest as part of the Plan? .. 11
       K.    What is the deadline to vote on the Plan? ........................................................................ 12
       L.    How do I vote for or against the Plan? ............................................................................ 12
       M.    Why is the Bankruptcy Court holding a Confirmation Hearing? ..................................... 12
       N.    When is the Confirmation Hearing set to occur? ............................................................ 12
       O.    What is the purpose of the Confirmation Hearing? ......................................................... 13
       P.    What is the effect of the Plan on the Debtors' ongoing business? ................................... 13
       Q.    Who do I contact if I have additional questions with respect to this Disclosure Statement
             or the Plan? ..................................................................................................................... 13
       R.    Could subsequent events potentially affect recoveries under the Plan? .......................... 14
       S.    Do the Debtors recommend voting in favor of the Plan? ................................................ 14

IV.    THE DEBTORS' PLAN ............................................................................................................ 14

       A.    The Plan ........................................................................................................................... 14
       B.    Means for Implementation of the Plan. ........................................................................... 25

V.     THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW .......... 36

       A.    PGX's Corporate History and Business Operations ........................................................ 36
       B.    Lexington Law's Corporate History and Business Operations ........................................ 37
       C.    The Debtors' Prepetition Capital Structure ..................................................................... 38

VI.    EVENTS LEADING TO THE CHAPTER 11 FILINGS ......................................................... 39

       A.    CFPB Litigation .............................................................................................................. 39
       B.    Other Business Challenges .............................................................................................. 41
       C.    Exploration of Strategic Alternatives .............................................................................. 42

VII.   MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11
       CASES ........................................................................................................................................ 42

       A.    First Day Relief ............................................................................................................... 42
       B.    Appointment of Official Committee of Unsecured Creditors .......................................... 43
       C.    Other Procedural and Administrative Motions ................................................................ 43
       D.    Retention of Debtor Professionals ................................................................................... 44

|  | E. | Approval of Debtor-in-Possession Financing | 45 |
|  | F. | Bidding Procedures and Marketing Process | 46 |
|  | G. | Litigation Matters | 47 |
|  | H. | Assumption and Rejection of Executory Contracts and Unexpired Leases | 48 |
|  | I. | Claims Based on Rejection of Executory Contracts or Unexpired Leases | 50 |
|  | J. | Cure of Defaults | 50 |

**VIII.    RISK FACTORS** .......................................................................................................... **51**

|  | A. | Certain Bankruptcy Law Considerations | 51 |
|  | B. | Disclosure Statement Disclaimer | 54 |

**IX.    SOLICITATION AND VOTING PROCEDURES** .................................................. **56**

|  | A. | Holders of Claims Entitled to Vote on the Plan | 57 |
|  | B. | Voting Record Date | 57 |
|  | C. | Voting on the Plan | 57 |
|  | D. | Ballots Not Counted | 58 |

**X.    CONFIRMATION OF THE PLAN** ........................................................................ **58**

|  | A. | Requirements for Confirmation of the Plan | 58 |
|  | B. | Best Interests of Creditors/Liquidation Analysis | 59 |
|  | C. | Feasibility | 60 |
|  | D. | Acceptance by Impaired Classes | 60 |
|  | E. | Confirmation Without Acceptance by All Impaired Classes | 60 |

**XI.    MATERIAL UNITED STATES FEDERAL INCOME TAX CONSEQUENCES** .............................. **61**

|  | A. | Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors and Parent | 63 |
|  | B. | Certain U.S. Federal Income Tax Consequences of the Plan to Holders of Allowed Class 4 Prepetition First Lien Claims | 63 |
|  | C. | Certain U.S. Federal Income Tax Consequences of the Plan to Holders of Allowed Class 5 Prepetition Second Lien Claims | 64 |
|  | D. | Certain U.S. Federal Income Tax Consequences of the Plan to Holders of Allowed Class 6B Other General Unsecured Claims | 64 |
|  | E. | Certain U.S. Federal Income Tax Consequences of the Plan to Holders of Allowed Class 6A Continuing Trade Claims, Class 6C Litigation Claims, and Class 6D CFPB Claims | 65 |
|  | F. | Character of Gain or Loss | 66 |
|  | G. | Market Discount | 66 |
|  | H. | Accrued Interest | 66 |
|  | I. | Limitation on Use of Capital Losses | 67 |
|  | J. | Information Reporting and Backup Withholding | 67 |
|  | K. | U.S. Federal Income Tax Treatment of the Creditor Trust | 68 |

**XII.    RECOMMENDATION** ........................................................................................... **71**

**EXHIBITS**

**EXHIBIT A**    First Amended Chapter 11 Plan (Solicitation Version)

**EXHIBIT B**    Liquidation Analysis

I.    **INTRODUCTION**

PGX Holdings, Inc. and the above-captioned debtors and debtors in possession (collectively, with their Debtor affiliates, the "<u>Debtors</u>," and, together with their non-Debtor affiliate CreditCo Limited, but excluding their Debtor affiliate Lexington Law, "<u>PGX</u>"), submit this disclosure statement (this "<u>Disclosure Statement</u>"), pursuant to section 1125 of the Bankruptcy Code, to Holders of Claims against and Interests in the Debtors in connection with the solicitation of votes for acceptance of the *First Amended Joint Chapter 11 Plan of PGX Holdings, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, Filed contemporaneously herewith (as may be amended, supplemented, or modified from time to time, the "<u>Plan</u>").[1]   A copy of the Plan is attached hereto as **<u>Exhibit A</u>** and incorporated herein by reference.   The Plan constitutes a separate chapter 11 plan for each of the other Debtors.   The rules of interpretation set forth in Article I.B of the Plan govern the interpretation of this Disclosure Statement.

**THE DEBTORS SUPPORT THE PLAN AND BELIEVE THAT THE COMPROMISES AND SETTLEMENTS CONTEMPLATED BY THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND PROVIDE THE BEST RECOVERY TO HOLDERS OF CLAIMS AND INTERESTS.   AT THIS TIME, THE DEBTORS BELIEVE THE PLAN REPRESENTS THE BEST AVAILABLE OPTION FOR COMPLETING THE CHAPTER 11 CASES.   THE DEBTORS RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

II.    **PRELIMINARY STATEMENT**

PGX is one of the nation's leading credit repair service providers, helping customers repair their credit and achieve their credit goals.   Setting the industry standard for transparency, cutting edge technology-enabled solutions, and quality customer service, PGX helps consumers access and understand the information contained in their credit reports, ensure that the information contained in those reports is fair, accurate, and complete, and address other factors that may negatively impact their credit scores. PGX is headquartered in Salt Lake City, Utah and has employees in nine other states.

PGX owns the consumer-facing brands and trademarks "CreditRepair.com" and "Credit.com." Debtor John C. Heath, Attorney At Law PC ("<u>Lexington Law</u>") is an independently owned Utah professional corporation that provides credit repair legal services directly to its clients.   Through a set of operating agreements with Lexington Law (the "<u>Operating Agreements</u>"), PGX provides comprehensive operational support services to the law firm, including marketing, custom proprietary software, technology, and administrative services.

Notwithstanding significant growth of the Debtors' businesses in the period leading up to 2016, since that time, the Debtors' businesses have faced an increasingly challenging operational environment, litigation with the U.S. Consumer Financial Protection Bureau (the "<u>CFPB</u>") that culminated in an adverse ruling on summary judgment, and, ultimately, severe liquidity constraints.

On June 4, 2023 (the "<u>Petition Date</u>"), the Debtors commenced the Chapter 11 Cases in the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>").   The Debtors did not take lightly the decision to commence these Chapter 11 Cases, and they have worked for several years to explore and execute alternative out-of-court restructuring transactions in an effort to maximize value for all stakeholders.

---

[1]    Capitalized terms used but not otherwise defined in this Disclosure Statement have the meaning given to them in the Plan.

Once the Debtors realized that Filing for chapter 11 protection was inevitable, they immediately began engaging with their secured lenders regarding holistic restructuring transactions to be effectuated through a chapter 11 process, which would include a potential debtor-in-possession financing facility and stalking horse bids for substantially all the assets of each of PGX and Lexington Law.

Although aligned on the general guiding principles, the Debtors, Prepetition First Lien Lenders, and Prospect Capital Corporation ("Prospect"), in its capacity as a majority equity holder and agent to the Prepetition Second Lien Lenders, engaged in a series of negotiations to implement a comprehensive restructuring transaction. While tenuous at times, these hard-fought negotiations ultimately proved fruitful. On June 4, 2023, the Debtors, each of the Prepetition First Lien Lenders, and Prospect (in its capacity as agent to the Prepetition Second Lien Lenders and majority equity holder) executed a restructuring support agreement (the "Restructuring Support Agreement"). As contemplated by the Restructuring Support Agreement, the Debtors commenced these Chapter 11 Cases to execute value-maximizing section 363 sales to sell the Debtors' assets free and clear of all Claims and Interests, followed by a liquidating chapter 11 plan.

As contemplated by the Restructuring Support Agreement, on June 6, 2023, the Debtors Filed a motion seeking Bankruptcy Court approval of the Bidding Procedures for a sale of all or substantially all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code. The Committee initially objected to the Bidding Procedures, but with withdrew its objection after reaching a Global Settlement with the Debtors, Prepetition First Lien Lenders, and Prepetition Second Lien Lenders, which provides mechanisms for unsecured creditors to receive value from a portion of the prepetition lenders' collateral under the Plan. The Bankruptcy Court approved the Bidding Procedures on August 4, 2023 [Docket No. 331] (the "Bidding Procedures Order"), which, among other things, established the Bid Deadline (as defined in the Bidding Procedures) as August 11, 2023 at 5:00 p.m., prevailing Eastern Time and set the Auction (as defined in the Bidding Procedures), if necessary, for August 15, 2023 at 5:00 p.m., prevailing Eastern Time. Additionally, the Bidding Procedures Order approved the entry into two separate stalking horse purchase agreements with (a) Progrexion Purchaser for substantially all of the assets of PGX; and (b) Lexington Law Purchaser for substantially all of the assets of Lexington Law, against which higher or otherwise better offers may be sought, providing a clear path to consummate a transaction. The stalking horse purchase agreements were a part of a market-tested sale process as they set the floor for a competitive bidding process and ensured that the Debtors obtained the highest or otherwise best offer, or combination of offers, for the business or some or all of their assets. Ultimately, however, despite the efforts of the Debtors and their advisors, the Debtors did not receive any Bids that were more favorable than the stalking horse purchase agreements. Accordingly, the Debtors cancelled the auction and sought approval of the sale transactions contemplated by the stalking horse agreements. *See* Docket No. 365.

A hearing was set on August 25, 2023 before the Bankruptcy Court to consider approval of the Debtors' entry into and performance under both stalking horse purchase agreements (the "Sale Hearing"). The CFPB Filed an objection to the proposed sales and a motion to convert the Chapter 11 Cases to a chapter 7 liquidation under the Bankruptcy Code. *See* Docket Nos. 233, 375. The Debtors Filed responsive pleadings to the CFPB's conversion motion and sale objection. *See* Docket Nos. 369, 391. After extensive negotiations with the CFPB by the Debtors, Prepetition First Lien Lenders, Prepetition Second Lien Lenders, and the DIP Lenders, a consensual settlement was reached to resolve the CFPB's sale objection, conversion motion, and the prepetition CFPB Litigation. This CFPB Settlement was announced at the Sale Hearing and memorialized in the CFPB Settlement Order that was entered by the United States District Court for the District of Utah (the "District Court"). *See* CFPB Docket No. 600. Accordingly, the Bankruptcy Court approved the Debtors' entry into and performance under both stalking horse agreements, along with the terms of the Sale Orders. *See* Docket Nos. 422–423. Since the entry of the Sale Orders, the Debtors, the Purchasers, and their respective professionals have been working to

consummate the contemplated sales for substantially all of the Debtors' assets (together, the "Sale Transaction").

Subsequent to the consummation of the Sale Transaction, subject to Bankruptcy Court approval, the Debtors propose to liquidate their remaining assets under chapter 11 of the Bankruptcy Code.  Under chapter 11, a debtor may reorganize or liquidate its business for the benefit of its stakeholders.  The consummation of a going-concern transaction followed by an orderly liquidation is the principal objective of these Chapter 11 Cases.

The primary objective of the Plan is to maximize value for all Holders of Allowed Claims and Allowed Interests and generally to distribute all property of the Estates that is or becomes available for distribution generally in accordance with the priorities established by the Bankruptcy Code.  The Debtors believe that the Plan accomplishes this objective and is in the best interest of the Estates.

Generally speaking, the Plan:

- provides the vesting of certain assets following the Sale Transaction in the Wind-Down Debtor or Creditor Trust, as applicable, for the purpose of distribution to Holders of Claims;

- provides for distributions to go-forward trade creditors from the Prepetition First Lien and Second Lien Lenders' collateral;

- provides for the issuance of PIK Notes by the Purchaser of PGX's assets for the benefit of general unsecured creditors;

- designates a Plan Administrator to wind down the Debtors' affairs, pay, and reconcile Claims, and administer the Plan in an efficient manner; and

- contemplates recoveries to Holders of Administrative Claims and Other Priority Claims as is necessary to satisfy section 1129 of the Bankruptcy Code.

The Debtors believe that Confirmation of the Plan will avoid the lengthy delay and significant cost of liquidation under chapter 7 of the Bankruptcy Code.

The Debtors believe that the Plan maximizes stakeholder recoveries in the Chapter 11 Cases as any alternative to a going-concern sale would materially reduce recoveries to Holders of Claims.  Accordingly, the Debtors urge all Holders of Claims entitled to vote to accept the Plan by returning their ballots so that Kurtzman Carson Consultants LLC,[2] the Debtors' claims and noticing agent (the "Claims and Noticing Agent"), actually receives such ballots by October 20, 2023, at 4:00 p.m. prevailing Eastern Time (the "Voting Deadline").  Assuming the Plan receives the requisite acceptances, the Debtors will seek the Bankruptcy Court's approval of the Plan at the Confirmation Hearing.

---

[2]    The Bankruptcy Court approved the Debtors' retention of Kurtzman Carson Consultants LLC as the Claims and Noticing Agent on June 6, 2023 [Docket No. 56].

III.    **QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN**

A.    **What is chapter 11?**

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for similarly-situated creditors and similarly-situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a chapter 11 plan is the principal objective of a chapter 11 case.  A bankruptcy court's confirmation of a chapter 11 plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor (whether or not such creditor or equity interest holder voted to accept the plan), and any other entity as may be ordered by the bankruptcy court.  Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

B.    **Why are the Debtors sending me this Disclosure Statement?**

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan.  Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such disclosure statement with all holders of claims or interests whose votes on the Plan are being solicited. This Disclosure Statement is being submitted in accordance with these requirements.

C.    **Am I entitled to vote on the Plan?**

Your ability to vote on, and your distribution (if any) under, the Plan depends on what type of Claim or Interest you hold and whether you held that Claim or Interest as of the Voting Record Date. Each category of Holders of Claims or Interests, as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "<u>Class</u>."  Each Class's respective voting status is set forth below:

| Class | Claim/Interest | Status | Voting Rights |
|-------|----------------|--------|---------------|
| 1 | Secured Tax Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 3 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 4 | Prepetition First Lien Claims | Impaired | Entitled to Vote |
| 5 | Prepetition Second Lien Claims | Impaired | Entitled to Vote |
| 6A | Continuing Trade Claims | Impaired | Entitled to Vote |

| 6B | Other General Unsecured Claims | Impaired | Entitled to Vote |
| 6C | Litigation Claims | Impaired | Entitled to Vote |
| 6D | CFPB Claim | Impaired | Entitled to Vote |
| 7 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| 8 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| 9 | Interests in PGX | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 10 | Interests in Lexington Law Firm | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 11 | 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

### D.    What will I receive from the Debtors if the Plan is consummated?

The following chart provides a summary of the anticipated recovery to Holders of Claims or Interests under the Plan.  Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court.  Your ability to receive distributions under the Plan depends on the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

Each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan, except to the extent that such Holder agrees to less favorable treatment, the treatment described below in full and final satisfaction, compromise, settlement, and release of, and in exchange for, such Holder's Allowed Claim or Allowed Interest.  Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the later of the Effective Date and the date such Holder's Claim or Interest becomes an Allowed Claim or Allowed Interest or as soon as reasonably practicable thereafter.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE.  FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.**

| SUMMARY OF EXPECTED RECOVERIES | | | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery |
| 1 | Secured Tax Claims | Except to the extent that a Holder of an Allowed Secured Tax Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, and release of and in exchange for such Secured Tax Claim, on or as soon as reasonably practicable after the later to occur of (i) the Effective Date and (ii) the date such Claim becomes Allowed (or as otherwise set forth in the Plan), each Holder of a Secured Tax Claim shall receive, at the option of the Plan Administrator:  (i) payment in full in Cash | N/A | N/A |

| SUMMARY OF EXPECTED RECOVERIES | | | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery |
|  |  | of such Holder's Allowed Secured Tax Claim, or (ii) equal semi-annual Cash payments commencing as of the Effective Date or as soon as reasonably practicable thereafter and continuing for five years, in an aggregate amount equal to such Allowed Secured Tax Claim, together with interest at the applicable non-default rate under non-bankruptcy law, subject to the option of the Plan Administrator to prepay the entire amount of such Allowed Secured Tax Claim during such time period. |  |  |
| 2 | Other Secured Claims | Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, and release of and in exchange for such Allowed Other Secured Claim, on or as soon as reasonably practicable after the Effective Date, in full and final satisfaction, compromise, settlement, and release of and in exchange for such Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim shall receive, at the option of the applicable Debtor or Wind-Down Debtor:  (i) payment in full in Cash of such Holder's Allowed Other Secured Claim; (ii) the collateral securing such Holder's Allowed Other Secured Claim; (iii) Reinstatement of such Holder's Allowed Other Secured Claim;  or  (iv) such  other  treatment rendering such Holder's Allowed Other Secured Claim Unimpaired. | N/A | N/A |
| 3 | Other Priority Claims | Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, and release of and in exchange for such Allowed Other Priority Claim, on or as soon as reasonably practicable after the later to occur of (i) the Effective Date and (ii) the date such Claim becomes Allowed (or as otherwise set forth in the Plan), each Holder of an Administrative, Priority or Priority Tax Claim will either be satisfied in full, in Cash, or otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. | N/A | N/A |
| 4 | Prepetition First | After payment in full in Cash of all Administrative | 219.8 million[3] | 88.6%[4] |

[3]    The projected amount of Class 4 Prepetition First Lien Claims has been adjusted from the original total prepetition amount of approximately $262.6 million to $219.8 million to account for (i) the $39.9 million roll-up into the superpriority DIP and (ii) the $2.9 million transfer of bridge loan principal and related prepetition interest into the superpriority DIP.

[4]    For the avoidance of doubt, the projected recovery for Holders of Class 4 Prepetition First Lien Claims reflects the Prepetition First Lien Lenders' approximately $194.8 million portion of the aggregate purchase price (calculated by subtracting the approximately $62.7 million credit bid related to the DIP from the aggregate purchase price of $257.5 million).

| SUMMARY OF EXPECTED RECOVERIES | | | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery |
| | Lien Claims | and Priority Claims and Other Priority Claims and funding of the Wind-Down Budget, in full and final satisfaction, compromise, settlement, release and discharge of its Claim (unless the applicable Holder agrees to less favorable treatment), the Holders of Prepetition First Lien Claims shall be entitled to their Pro Rata share of the Distributable Proceeds, if any, up to the Allowed amount of such Prepetition First Lien Claims, less the Credit Bid Amount; *provided* that the Prepetition First Lien Deficiency Claims shall be subordinated and junior to all Allowed General Unsecured Claims for purposes of distributions under the Plan; *provided, further* that such subordination shall be capped at $10 million distributed to Holders of Allowed General Unsecured Claims under the Plan (which distribution shall include, for the avoidance of doubt, the GUC Trade Settlement Cash Reserve and any Other Assets subsequently monetized pursuant to the terms and conditions of the Creditor Trust), after which the Prepetition Secured Lenders shall receive their Pro Rata share of any distribution to Holders of Other General Unsecured Claims on account of such Deficiency Claims (except for any distribution on account of the PIK Notes) and shall constitute Other GUC Claimants on account of such Prepetition First Lien Deficiency Claims. | | |
| 5 | Prepetition Second Lien Claims | After payment in full in Cash of all Administrative and Priority Claims, Other Priority Claims, and Prepetition First Lien Claims, and funding of the Wind-Down Budget, in full and final satisfaction, compromise, settlement, release and discharge of its Claim (unless the applicable Holder agrees to less favorable treatment), the Holders of Prepetition Second Lien Claims shall be entitled to their Pro Rata share of the Distributable Proceeds, if any, up to the Allowed amount of such Prepetition Second Lien Claims, less the Credit Bid Amount; *provided* that the Prepetition Second Lien Deficiency Claims shall be subordinated and junior to all Allowed General Unsecured Claims for purposes of distributions under the Plan; *provided, further* that such subordination shall be capped at $10 million distributed to Holders of Allowed General Unsecured Claims under the Plan (which distribution shall include, for the avoidance of doubt, the GUC Trade Settlement Cash Reserve and including any Other Assets subsequently monetized pursuant to the terms and conditions of the Creditor Trust), after which the Prepetition Secured Lenders shall receive | $184.5 million | 0% |

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery |
| | | their Pro Rata share of any distribution to Holders of Other General Unsecured Claims on account of such Deficiency Claims (except for any distribution on account of the PIK Notes) and shall constitute Other GUC Claimants on account of such Deficiency Claims. | | |
| 6A | Continuing Trade Claims | Except to the extent that a Holder of a Continuing Trade Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, compromise, settlement, and release of and in exchange for such Allowed Continuing Trade Claim, each Holder of an Allowed Continuing Trade Claim who has not otherwise been paid in full under the Critical Vendor Order shall be paid in Cash its Pro Rata share of (i) cash in the amount of $3.25 million; (ii) the unused Wind-Down Budget; and (iii) Unused Critical Vendor Cash. | $2.9 million – $6.4 million | 51% – 100% |
| 6B | Other General Unsecured Claims | Except to the extent that a Holder of an Other General Unsecured Claim agrees to less favorable treatment (including but not limited to the subordination of Deficiency Claims, as set forth in the Plan), in full and final satisfaction, compromise, settlement, and release of and in exchange for such Other General Unsecured Claim, each Holder of an Allowed Other General Unsecured Claim shall receive its Pro Rata share of the beneficial interest in the Creditor Trust and as beneficiary of the Creditor Trust shall receive, on a distribution date, its Pro Rata share of net Cash derived from the Creditor Trust Assets available for distribution on each such distribution data as provided under the Plan and Creditor Trust Agreement, including: (i) a portion of the GUC Litigation Claims Settlement Cash (as allocated by the Committee in its sole discretion and to be disclosed in the Plan Supplement); (ii) the PIK Notes; (iii) proceeds of Other Assets; and (iv) the Excess Distributable Cash, if any (collectively, the "Other General Unsecured Claim Proceeds"); *provided* that if Class 6C (Litigation Claims) is an accepting Class, the Committee, in its sole discretion, may allocate to Holders of such claims a portion of the GUC Litigation Claims Settlement Cash that would otherwise have been distributed to Class 6B (Other General Unsecured Claims). | $6.3 million – $189.6 million | <1% – 11% |
| 6C | Litigation Claims | If Class 6C is an accepting Class, except to the extent that a Holder of a Litigation Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, and release of and in exchange for such Litigation Claim, each Holder of a Litigation Claim shall receive its Pro Rata share of | $18.5 million | 1% – 4% |

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery |
| | | up to a portion of the GUC Litigation Claims Settlement Cash (as allocated by the Committee in its sole discretion and to be disclosed in the Plan Supplement); *provided* that, if the Class of Litigation Claims is not an accepting Class, then such Holders of Litigation Claims shall receive their Pro Rata share of the Other General Unsecured Claim Proceeds on a *pari passu* basis as Holders of Other General Unsecured Claims. | | |
| 6D | CFPB Claim | Except to the extent that the Holder of the CFPB Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, and release of and in exchange for such CFPB Claim, the Holder of the CFPB Claim shall receive $50,000 of the GUC Litigation Claims Settlement Cash. | $2.7 billion | <1% |
| 7 | Intercompany Claims | Allowed Intercompany Claims, to the extent not assumed pursuant to the terms of the Sale Orders, shall, at the election of the applicable Debtor, be (a) Reinstated, (b) converted to equity, (c) otherwise set off, settled, distributed, contributed, cancelled, or released, or (d) otherwise addressed at the option of the Wind Down Debtor without any distribution; *provided*, *however*, that such election shall not adversely affect the treatment provided to Classes 6A, 6B, 6C, and 6D. | N/A | 0% or 100% |
| 8 | Intercompany Interests | Allowed Intercompany Interests shall, at the election of the applicable Debtor, be (a) Reinstated or (b) set off, settled, addressed, distributed, contributed, merged, cancelled, or released, or (c) otherwise addressed at the option of the Wind Down Debtor without any distribution; *provided*, *however*, such election shall not adversely affect the treatment provided to Classes 6A, 6B, 6C, and 6D. | N/A | 0% or 100% |
| 9 | Interests in PGX | Interests in PGX shall be discharged, canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and Holders of Interests in PGX will not receive any distribution on account of such Interests. | N/A | 0% |
| 10 | Interests in Lexington Law Firm | Interests in Lexington Law Firm shall be discharged, canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and Holders of Interests in Lexington Law Firm will not receive any distribution on account of such Interests. | N/A | 0% |
| 11 | 510(b) Claims | Allowed Section 510(b) Claims, if any, shall be discharged, canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and Holders of Allowed Section 510(b) Claims will not receive any distribution on account of such Allowed Section 510(b) Claims. | N/A | 0% |

**E.      What happens to my recovery if the Plan is not confirmed or does not go effective?**

In the event that the Plan is not confirmed or does not go effective, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code, and in the alternative, the Chapter 11 Cases may be dismissed. Conversion to chapter 7 would require the Debtors to incur expenses related to the chapter 7 trustee and additional retained professionals, and such expenses may decrease recoveries for Holders of Allowed Claims in the Voting Classes. *See, e.g.*, 11 U.S.C. §§ 326(a); 503(b)(2). The conversion to chapter 7 would require entry of a new bar date, which may increase the amount of Allowed Claims and thereby reduce Pro Rata recoveries. *See* Fed. R. Bankr. P. 1019(2), 3002(c). Either alternative will bring additional risks and uncertainties.

**F.      If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?"**

"Confirmation" of the Plan refers to the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases approving the Plan. Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan. After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can "go effective." Distributions to Holders of Allowed Claims will only be made on the date the Plan becomes effective—the "Effective Date"—or as soon as reasonably practicable thereafter, as specified in the Plan. *See* Article X of this Disclosure Statement, entitled "Confirmation of the Plan," for a discussion of the conditions precedent to consummation of the Plan. "Consummation" means the occurrence of the Effective Date.

**G.      What are the sources of Cash and other consideration required to fund the Plan?**

As part of the Global Settlement, the Debtors and Wind-Down Debtor, as applicable, shall fund the distributions and obligations under the Plan with Available Cash set forth in the Wind-Down Budget and proceeds of certain assets, as applicable, on the Effective Date. Pursuant to the Sale Orders, the DIP Claims have been satisfied in full in connection with the Sale Transaction.

**H.      Is there potential litigation related to the Plan?**

Parties in interest may object to Confirmation of the Plan, which objections potentially could give rise to litigation.

In the event that it becomes necessary to confirm the Plan over the rejection of certain Classes, the Debtors may seek confirmation of the Plan notwithstanding the dissent of such rejecting Classes. The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class if it determines that the Plan satisfies section 1129(b) of the Bankruptcy Code. *See* Article VIII.A.4 of this Disclosure Statement, entitled "The Debtors May Not Be Able to Secure Confirmation of the Plan."

**I.      Will the final amount of Allowed Other General Unsecured Claims affect the recovery of Holders of Allowed Other General Unsecured Claims under the Plan?**

The Debtors' estimate of aggregate Allowed Other General Unsecured Claims ranges from approximately $2.7 million to $13.7 million.

Although the Debtors' estimate of Allowed Other General Unsecured Claims is generally the result of the Debtors' and their advisors' analysis of reasonably available information, the projected amount of Other General Unsecured Claims set forth herein is subject to material change (either higher or lower), which difference could materially affect Class 6B recoveries, and reflects the Debtors' current view on potential rejection damages.  Any change in the number, identity, or timing of actual rejected Executory Contracts and Unexpired Leases could have a material impact on the amount of Other General Unsecured Claims.  To the extent that the actual amount of rejection damages Claims changes, the value of recoveries to Holders of Other General Unsecured Claims could change as well, and such changes could be material.

As of the Petition Date, certain Debtors were parties to the litigation initiated by CFPB before the District Court, where the CFPB alleged that certain Debtors committed certain violations of federal consumer protection law through operation of their consumer assistance and credit repair business.  The Debtors could also become parties to additional litigation in the future.  Although the Debtors have disputed, are disputing, or will dispute in the future the amounts asserted by the CFPB and other litigation counterparties, to the extent these parties are ultimately entitled to a higher amount than is reflected in the amounts estimated by the Debtors herein, the value of recoveries to Holders of General Unsecured Claims could change as well, and such changes could be material.

The Debtors may also reject Executory Contracts and Unexpired Leases, which may result in parties asserting General Unsecured Claims for rejection damages.  Finally, the Debtors may object to certain Proofs of Claim, and any such objections ultimately could cause the total amount of Allowed Other General Unsecured Claims to change.  These changes could affect recoveries to Holders of Other General Unsecured Claims, and such changes could be material.

**J.      Will there be releases and exculpation granted to parties in interest as part of the Plan?**

Yes.  The Plan proposes to release the Released Parties and to exculpate the Exculpated Parties. The Debtors' releases, third-party releases, and exculpation provisions included in the Plan are an integral part of the Debtors' chapter 11 efforts and were an essential element of the negotiations among the Debtors, the Consenting Lenders, the DIP Lenders, and the statutory committee of unsecured creditors (the "Committee") in obtaining their support for the Plan.

The Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' chapter 11 process through efforts to negotiate and implement the Plan, which will maximize the value of the Debtors' estates for the benefit of all parties in interest.  Accordingly, each of the Released Parties and the Exculpated Parties warrants the benefit of the release and exculpation provisions.  Importantly, each of the Releasing Parties will be deemed to have expressly, unconditionally, generally, individually, and collectively released and discharged all Claims and Causes of Action against the Debtors and the Released Parties.

The Releasing Parties are each of, and in each case in its capacity as such:  (a) the Debtors; (b) the Wind-Down Debtor; (c) the Plan Administrator; (d) each Consenting Stakeholder; (e) the Agent; (f) all Holders of Claims; (g) all Holders of Interests; (h) the Purchasers; (i) the Committee and its members (in their capacity as Committee members); (j) the Creditor Trust (including the Creditor Trustee on behalf of the Creditor Trust); (k) each current and former Affiliate of each Entity in clause (a) through the following clause (l); and (l) each Related Party of each Entity in clause (a) through this clause (l) for which such Affiliate or Entity is legally entitled to bind such Related Party to the releases contained in the Plan under applicable law; *provided, however*, that in each case, an Entity shall not be a Releasing Party if

it: (x) elects to opt out of the release contained in the Plan; or (y) timely objects to the Third-Party Release and such objection is not withdrawn before Confirmation.

The Released Parties are each of, and in each case in its capacity as such: (a) the Debtors; (b) the Wind-Down Debtor; (c) the Plan Administrator; (d) each Consenting Stakeholder; (e) the Agent; (f) all Holders of Claims; (g) all Holders of Interests; (h) the Purchaser; (i) the Committee and its members (in their capacity as Committee members); (j) the Creditor Trust (including the Creditor Trustee on behalf of the Creditor Trust); (k) each current and former Affiliate of each Entity in clause (a) through the following clause (l); and (l) each Related Party of each Entity in clause (a) through this clause (l); *provided* that any Holder of a Claim or Interest that opts out of the releases contained in the Plan shall not be a Released Party.

The Exculpated Parties are:  (a) each of the Debtors; (b) the Independent Directors; (c) the Committee and each of its respective members; (d) the Plan Administrator; (e) the Creditor Trustee; (f) each Related Party of the Debtors and (g) with respect to (c), (d), and (e), their respective attorneys, financial advisors, consultants, or other professionals or advisors.

The Debtors believe that the releases and exculpations in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Third Circuit.  Moreover, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions.  The release, exculpation, and injunction provisions that are contained in the Plan are copied in Article IV.A.5 of this Disclosure Statement, entitled "Releases."

**K.     What is the deadline to vote on the Plan?**

The Voting Deadline is October 20, 2023, at 4:00 p.m. (prevailing Eastern Time).

**L.     How do I vote for or against the Plan?**

Detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to Holders of Claims that are entitled to vote on the Plan.  For your vote to be counted, your ballot must be properly completed, executed, and delivered as directed, so that your ballot including your vote is **actually received** by the Debtors' Claims and Noticing Agent **on or before the Voting Deadline, which is October 20, 2023, at 4:00 p.m. prevailing Eastern Time**.  *See* Article IX of this Disclosure Statement, entitled "Solicitation and Voting Procedures."

**M.     Why is the Bankruptcy Court holding a Confirmation Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Plan and recognizes that any party in interest may object to Confirmation of the Plan.

**N.     When is the Confirmation Hearing set to occur?**

The Confirmation Hearing is scheduled for October 27, 2023 at 10:00 a.m. (prevailing Eastern Time), or such other time as may be scheduled by the Bankruptcy Court.  The Confirmation Hearing may be adjourned from time to time without further notice.  The Confirmation Hearing is being held on the same day as the hearing to approve the adequacy of this Disclosure Statement.

Objections to Confirmation must be Filed and served on the Debtors, and certain other parties, by no later than October 20, 2023, at 4:00 p.m. (prevailing Eastern Time) in accordance with the notice of

the Confirmation Hearing that accompanies this Disclosure Statement and the Disclosure Statement Order incorporated herein by reference.

### O.    What is the purpose of the Confirmation Hearing?

The confirmation of a chapter 11 plan by a bankruptcy court binds the debtor, any person acquiring property under a chapter 11 plan, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code. Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a chapter 11 plan discharges a debtor from any debt that arose before the confirmation of such chapter 11 plan and provides for the treatment of such debt in accordance with the terms of the confirmed chapter 11 plan.

### P.    What is the effect of the Plan on the Debtors' ongoing business?

The Debtors are liquidating under chapter 11 of the Bankruptcy Code. Following Confirmation, the Plan will be consummated on the Effective Date, which is a date that is the first Business Day after the Confirmation Date on which (i) no stay of the Confirmation Order is in effect and (ii) all conditions precedent to the occurrence of the Effective Date set forth in Article IX of the Plan have been satisfied or waived. On or after the Effective Date, and unless otherwise provided in the Plan, the Plan Administrator will commence the wind down of the Wind-Down Debtor in accordance with the terms of the Plan. Additionally, upon the Effective Date, all actions contemplated by the Plan will be deemed authorized and approved.

### Q.    Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Debtors' Claims and Noticing Agent, Kurtzman Carson Consultants LLC, via one of the following methods:

*By regular mail, hand delivery, or overnight mail at:*
Kurtzman Carson Consultants LLC
Re: PGX Holdings, Inc., et al.
222 N. Pacific Coast Highway,
Suite 300
El Segundo, CA 90245

*By electronic mail at:*
PGXHoldingsInfo@kccllc.com

*By telephone (toll free) at:*
(888) 249-2721 (Domestic) or +1 (310) 751-2604 (International)

Copies of the Plan, this Disclosure Statement, and any other publicly Filed documents in the Chapter 11 Cases are available upon written request to the Claims and Noticing Agent at the address above or by downloading the exhibits and documents from the website of the Claims and Noticing Agent at https://www.kccllc.net/pgx (free of charge) or the Bankruptcy Court's website at http://www.deb.uscourts.gov/bankruptcy (for a fee).

**R.      Could subsequent events potentially affect recoveries under the Plan?**

Potentially, yes.  Recoveries under the Plan are only guaranteed after the Plan is Confirmed and the Effective Date is reached.  Any number of subsequent events may interfere with Plan recoveries.

**S.      Do the Debtors recommend voting in favor of the Plan?**

Yes.  The Debtors believe that the Plan provides for a larger distribution to the Debtors' creditors and equity holders than would otherwise result from any other available alternative.  The Debtors believe that the Plan is in the best interest of all Holders of Claims or Interests, and that any other alternatives (to the extent they exist) fail to realize or recognize the value inherent under the Plan.

## IV.     THE DEBTORS' PLAN

### A.      The Plan

As discussed in Article III herein, the Plan contemplates liquidating the Debtors' business and remaining assets under chapter 11 of the Bankruptcy Code.  The Plan contemplates the following key terms, among others described herein and therein:

#### 1.      General Settlement of Claims and Interests

Pursuant to section 1123 of the Bankruptcy Code, Bankruptcy Rule 9019 (as applicable), and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, or otherwise resolved pursuant to the Plan, including the terms of the Global Settlement (as defined below) and incorporates the terms of the Global Settlement Term Sheet, as further modified herein.  The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, including the Global Settlement, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates.  Subject to Article VI of the Plan, all distributions made to Holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

#### 2.      Global Settlement with the Committee

Since the appointment of the Committee on June 16, 2023, the Debtors have worked with the Committee, the Consenting Lenders, and the DIP Lenders in extensive negotiations in an attempt to reach a global settlement of certain issues raised by the Committee that are central to these Chapter 11 Cases (the "Global Settlement").  To a significant extent, these issues were embodied in the Committee's objections to the entry of the Bidding Procedures Order, the DIP Order, and the retention of Greenhill. *See* Docket Nos. 322, 331, 332.  After several weeks of discovery and negotiations, the parties reached a global settlement in principle that was announced at a hearing before the Bankruptcy Court on July 31, 2023, the term sheet of which was attached as Exhibit C to the DIP Order.  For the avoidance of doubt, the Global Settlement, as implemented in the terms of the Plan, is subject to the Bankruptcy Court's approval.

The main points of the Global Settlement are as follows:

***Payments for Continuing Trade Claimants.***   First, the Global Settlement provides that prepetition Claims held by the Company's go-forward vendors, trade Claimants, service providers, and professionals that are not fully paid as Critical Vendors (as defined in the *Final Order (I) Authorizing Debtors to Pay Certain Prepetition Claims of Critical Vendors and (II) Granting Related Relief* [Docket No. 225]) (collectively, the "Continuing Trade Claimants"), will be paid and satisfied on a pro rata basis from the aggregate of (i) $3.25 million Cash consideration contributed by the Prepetition First and Second Lien Lenders from their collateral following the Sale (the "GUC Trade Settlement Cash") and (ii) the unused Wind-Down Budget.  Further, the Debtors shall make all payments under the Critical Vendor Order as set forth in the Approved Budget in the amount of $3.624 million, provided that, any amount of the $3.624 million not used will be available for distribution to the Continuing Trade Claimants.

***Payments for Litigation Claimants.***   The Global Settlement also provides that a portion of the $750,000 that constitutes the GUC Litigation Claims Settlement Cash (of which $50,000 will be paid on account of the CFPB Claim as set forth in Article III of the Plan) will be available as recovery for Litigation Claimants (the "Litigation Portion").

***Payments for Other GUC Claimants.***   Any GUC Trade Settlement Cash left over after Continuing Trade Claimants are paid, and a portion of the GUC Litigation Claims Settlement Cash which will be allocated by the Committee, will be used to satisfy Allowed Claims of those Holders of General Unsecured Claims who are not Continuing Trade Claimants or Litigation Claimants (the "Other GUC Claimants").  Moreover, Other GUC Claimants will also receive their Pro Rata share of the beneficial interest in the Creditor Trust and as beneficiary of the Creditor Trust shall receive, on a distribution date, their pro rata share of net Cash derived from the Creditor Trust Assets available for distribution on each such distribution date as provided under the Plan and Creditor Trust Agreement, including:  (i) their pro rata share of the PIK Notes held for their benefit in the Creditor Trust, which are two tranches of subordinated, unsecured notes to be issued by the Progrexion Purchaser or a subsidiary thereto pursuant to the Sale Transaction related to the Progrexion APA, and each of which will be in the principal amount of $250,000 and accruing at a 5% yearly PIK interest, and (ii) their pro rata share of the proceeds of the Sellers' assets that are excluded from the Sale Transaction (the "Other Assets").

***Establishment of a Creditor Trust.***   To monetize these assets and maximize recoveries available to Other GUC Claimants resulting from these assets, the Debtors will also establish a creditor trust (the "Creditor Trust") with $100,000 of their Cash on hand, the PIK Notes discussed above, the Other Assets, any Excess Distributable Cash, and GUC Litigation Claims Settlement Cash (as allocated by the Committee).   The Creditor Trust will be responsible for taking such measures as pursuing the monetization of the Other Assets and collecting amounts due under or realizing upon the PIK Notes and will hold the PIK Notes for distribution.   The specific terms governing the Creditor Trust will be determined by the Committee, and the responsibilities of the Creditor Trust and the Creditor Trustee are further described in Article IV.B.5 of this Disclosure Statement.

***Plan Treatment of Certain Deficiency Claim*s.**   The Global Settlement provides that all deficiency Claims of the Consenting Lenders, including all Claims of the Consenting Prepetition Second Lien Lenders (collectively, the "Deficiency Claims"), will be subordinated and junior to the Claims of all Other GUC Claimants for purposes of distributions under the Plan; *provided* that such subordination shall be capped at $10 million (including the assets that will be subsequently monetized pursuant to the terms and conditions of the Creditor Trust) distributed to General Unsecured Creditors under the Plan, after which the Consenting Prepetition Second Lien Lenders will receive their Pro Rata share of any distribution to a Holder of Other General Unsecured Claims on account of such Deficiency Claims (except for any distribution on account of the PIK Notes) and shall constitute Other GUC Claimants on account of such Deficiency Claims..

*Settlement of Litigation Claims.*  Any settlement of Litigation Claims under the WARN Act, class action, or other Claims shall be subject to consent of the Committee (not to be unreasonably withheld).

*Staying of Committee Litigation.*  The Global Settlement required the Committee to immediately stay prosecution of all formal and informal discovery and deposition requests that were pending against the Debtors, the Consenting Lenders, the DIP Lenders, or the buyers when the term sheet was executed. The Global Settlement also prevents the Committee from initiating any new formal or informal discovery and/or deposition requests with respect to the Bidding Procedures, sale to the current stalking horse bidders, DIP Motion, and Greenhill Retention Application, with the understanding that the Committee's rights to reasonable requests for information are not impaired or diminished.

*Funding of the Wind-Down Budget.*  The Global Settlement provides that the wind-down of the Debtors' Estates shall be funded in accordance with the budget Filed at [Docket No. 255].  The use of such Wind-Down Budget, however, must be consistent with the Restructuring Support Agreement, consistent with the term sheet of the Global Settlement, and subject to the Committee's consent.

*Increase in Committee's Professional Fees.*  The Global Settlement increased the Professional Fee Escrow Amount for Committee professionals to $1.6 million through August 1, 2023 (the "Budgeted Amount"), after which the Committee's Professional Fee Escrow Amount is to be (i) $300,000 plus (ii) any unused amounts from the Budgeted Amount for the remainder of these Chapter 11 Cases, solely for the purposes of establishing and funding the Carve-Out and paying the Professional Fee Claim to the Committee's Professionals.

*No Distribution on Account of Intercompany Claims.*  Pursuant to the Global Settlement, no distributions will be made under the Plan on account of Intercompany Claims.

In addition to the above core issues, the Global Settlement also provides for terms relating to the drafting and negotiation of the Plan and Disclosure Statement, the Debtors' emergence from bankruptcy, the terms of the DIP Order, the distribution scheme to be followed, and the nature of the support that the Committee would provide to these Chapter 11 Cases.

The Debtors believe that the Global Settlement, and the resolution it provides will facilitate a prompt emergence from the Chapter 11 Cases and a more efficient wind down of the Debtors.

### 3.   The Sale Transaction

On June 6, 2023, the Debtors Filed the Bidding Procedures Motion, a motion seeking, in part, approval of the Bidding Procedures for a sale of all or substantially all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code.  After weeks of negotiations with their stakeholders and the resulting Global Settlement, as described above, the Debtors were able to File a certification of counsel on August 3, 2023 [Docket No. 329] describing the objections the Debtors had received with respect to the Bidding Procedures Motion and the resolution of those issues.  On August 4, 2023, the Bankruptcy Court entered the order approving the Bidding Procedures Motion [Docket No. 331].

The Debtors, led by Greenhill & Co., LLC ("Greenhill"), engaged in a thorough marketing process for the sales of all or substantially all of the Debtors' assets in accordance with the Bidding Procedures.  The Debtors' marketing process is described in Article VII.F of this Disclosure Statement, entitled "Bidding Procedures and Marketing Process."  The Debtors and their advisors negotiated entry into separate stalking horse purchase agreements with (a) Progrexion Purchaser for substantially all of the assets of PGX; and (b) Lexington Law Purchaser for substantially all of the assets of Lexington Law, against which higher or otherwise better offers were sought, providing a clear path to consummate a

transaction. The stalking horses set the floor for a competitive bidding process, where topping bids could yield additional value that would inure to the benefit of all stakeholders.

The Debtors believe that the Bidding Procedures allowed the Debtors to seek and elicit the highest or otherwise best Sale Transaction offers.

On August 14, 2023, the Debtors Filed a notice cancelling the Auction, and Filed the proposed Sale Orders with respect to both asset purchase agreements. *See* Docket No. 356. In advance of a hearing to approve the Sale Transaction, the Debtors negotiated with stakeholders to resolve issues related to the purchase agreements and Sale Orders. On August 25, 2023, the Debtors Filed revised proposed Sale Orders [Docket No. 418], and following the Sale Hearing that same day, the Bankruptcy Court approved ethe Debtors' entry into and performance under both stalking horse purchase agreements and the terms of the Sale Orders. *See* Docket Nos. 422–423.

### 4. CFPB Settlement[5]

On July 24, 2023, the CFPB Filed the *Motion of the United States of America to Convert Chapter 11 Cases to Chapter 7* [Docket No. 233] (the "CFPB Motion to Convert"). Therein, the CFPB argued that cause existed to convert these Chapter 11 Cases to chapter 7 under the Bankruptcy Code on grounds the Debtors Filed for chapter 11 protection to "gain a tactical advantage to avoid" the injunctive and monetary relief sought in the CFPB Litigation and "because the Debtors have no reasonable likelihood of rehabilitation and are suffering substantial or continuing losses and diminution of the estate."[6] As discussed in Article II and Article VI.A of this Disclosure Statement, the CFPB Litigation resulted in an adverse ruling on summary judgment as to Count I thereof, which, due to the immediate operational changes made by the Debtors thereafter (*e.g.*, closing all call centers), led to both severe liquidity constraints and an unsustainable capital structure given the Debtors' reduced operations. On August 18, 2023, the CFPB also Filed *The United States of America's Objection to the Sale of Substantially All of the Debtors' Assets and Memorandum of Law in Support of Its Motion to Convert Chapter 11 Cases to Chapter 7* [Docket No. 375] (the "CFPB Sale Objection"). On the same day, the Debtors Filed the *Debtors' Objection to Motion of the United States of America to Convert Chapter 11 Cases to Chapter 7* [Docket No. 369], to which the CFPB Filed a reply on August 22, 2023 [Docket No. 388].

Throughout this process, however, the Debtors, the CFPB, and other parties in interest continued to negotiate in the hope of reaching a comprehensive settlement to resolve the CFPB's outstanding claims and to ultimately allow the Debtors to move forward with their Chapter 11 Cases and the Sale Transaction.

At the Sale Hearing on August 25, 2023, the Debtors announced to the Bankruptcy Court that they had reached a settlement with the CFPB (the "CFPB Settlement").[7] On August 28, 2023, the Debtors and the CFPB filed, in the District Court, the *Joint Motion for Entry of Stipulated Final Judgment and Order* [CFPB Docket No. 599] memorializing the CFPB Settlement, which the Utah District Court entered on August 30, 2023 [CFPB Docket No. 600] (the "CFPB Settlement Order"). Broadly, the CFPB Settlement provides for the resolution of the CFPB Sale Objection, the withdrawal of the CFPB Motion to Convert, and certain injunctive and monetary terms, including compliance monitoring, reporting

---

[5]   Capitalized terms used but not otherwise defined in this section have the meaning given to them in Article VI.A of this Disclosure Statement.

[6]   *See* CFPB Motion to Convert ¶ 4.

[7]   *See generally* Aug. 25, 2023 Hr'g Tr.

requirements, and setting aside $50,000 under the Plan for distributions on account of the CFPB's claims.[8]

The material terms of the CFPB Settlement Order are as follows.  Except as explicitly noted in this summary, all obligations owed by the Debtors will also be owed by the go-forward companies after the Sale Transaction is consummated.

***Prohibition on Telemarketing***.[9]   For a period of ten years following the entry of the CFPB Settlement Order, the Debtors are prohibited from any telemarketing of "Credit Repair Services"[10] directly or through an intermediary, or from offering for sale, selling, or providing Credit Repair Services that are advertised, marketed, promoted or sold through telemarketing, whether indirectly or through an intermediary.  The Debtors and their officers, agents, and employees, among others, are also permanently prohibited from assisting others to offer for sale, sell, or provide Credit Repair Services that are advertised, marketed, promoted, or sold through telemarketing and for which Debtors know (or consciously avoid knowing) billing is conducted in a manner that does not comply with the advance-fee provision, 16 C.F.R. § 310.4(a)(2).  The Debtors are also permanently prohibited from contracting with certain parties, including rent-to-own or unlicensed real estate companies or lenders, for certain advertising, marketing, or lead generation activities.

***Monetary Redress Payments and Civil Penalties***.[11]   In settlement of Count I of the CFPB Litigation, the Debtors are required to satisfy a claim of the CFPB in the aggregate amount of approximately $2.6 billion in monetary redress.  In settlement of Count II-V of the CFPB Litigation, the Debtors are required to satisfy monetary redress in the aggregate amount of $19 million.  The CFPB will administer the distribution of these payments to affected consumers, and if it determines that it is not possible to provide redress to consumers, the CFPB will deposit any remaining funds in the United States Treasury.  PGX is also required to satisfy certain civil money penalties in settlement of Counts I-V of the CFPB Litigation in the aggregate amount of approximately $45.8 million.  Lexington Law is required to satisfy certain civil money penalties in the aggregate amount of approximately $18.4 million in settlement of Count I of the CFPB Litigation.  These monetary obligations, however, are subject to the Bankruptcy Court approval of the Plan and will be treated as an unsecured claim in accordance with the Bankruptcy Code rather than as an administrative expense or other priority claim.[12]   For the avoidance of doubt, these monetary obligations will not be owed by the go-forward companies after the consummation of the Sale Transaction.

***Compliance Monitoring of Lead Generators***.[13]   The Debtors are obligated to conduct regular monitoring of their top twenty-five lead generators for material misrepresentations in their advertising, marketing, or lead generation materials at least two times per year.  If the Debtors find that any such lead generator made material misrepresentations or other representations that materially conflict with the

---

[8]    *See id.*; *see also* CFPB Settlement Order.

[9]    *See* CFPB Settlement Order ¶¶ 35–39.

[10]    "Credit Repair Services" means any good or service represented to remove derogatory information from, or improve, a person's credit history, credit record, or credit rating.  For clarity, Credit Repair Services do not include legitimate credit monitoring services purchased and billed separately from any credit repair component, feature, or offer.  *Id.* ¶ 15.

[11]    *See id.* ¶¶ 45–53.

[12]    *See id.* ¶ 79.

[13]    *See id.* ¶¶ 40–49.

CFPB Settlement Order to induce a consumer to purchase or enroll in the Debtors' products or services, the Debtors must immediately undertake certain corrective action, including halting the processing of any payments generated by the marketing affiliate or issuing refunds within forty-five days on or after the date the marketing affiliate engaged in deceptive practices, and immediately terminating the marketing affiliate unless it is the first occurrence of misrepresentation in an eighteen-month period and the marketing affiliate cures the misrepresentation and refunds affected customers within seven days.  The Debtors must also generally investigate any complaints they receive about their lead generators.  The Debtors are also required to, for a period of three years following the entry of the CFPB Settlement Order, retain independent consultants or auditors to conduct an annual independent audit of the Debtors' compliance with the CFPB Settlement Order and Debtors' use of lead generators in connection with advertising, marketing, or generating leads for Credit Repair Services.

     ***Compliance of Board and Executives***.[14]  The Debtors' executives are required to acknowledge in writing their receipt of the CFPB Settlement Order and responsibility for ensuring that the Debtors comply therewith.  Annually for four years, the Debtors must submit a report to the CFPB affirming that they have complied with the CFPB Settlement Order, among other things.  The boards of directors of PGX and Lexington Law must also authorize whatever actions are necessary for PGX and Lexington Law to comply with the CFPB Settlement Order, and the boards must require their respective management teams to timely report to the executives on the status of efforts to comply with the CFPB Settlement Order.

     ***Reporting Requirements***.  The Debtors must notify the CFPB of any development that may materially affect compliance with the CFPB Settlement Order and provide the CFPB with certain information about their ownership structures.[15]  The Debtors are further required to comply with any CFPB request for additional information and must permit the CFPB to interview any employees or other persons affiliated with the Debtors who have agreed to such interview.[16]

     ***Recordkeeping***.[17]  For at least five years following the entry of the CFPB Settlement Order, the Debtors are required to create or retain records including documents demonstrating compliance with the CFPB Settlement Order, lead generators' marketing materials and contracts with the same, audited financial statements, telemarketing registrations and licenses, among others.

     ***CFPB Settlement Order Distribution and Acknowledgement***.[18]  Seven days after entry of the CFPB Settlement Order, the Debtors were required to acknowledge their receipt of the CFPB Settlement Order by submitting an acknowledgment thereof to the CFPB.  Thirty days after entry of the CFPB Settlement Order, the Debtors must deliver a copy of the same to their board members, executive officers, lead generators, managers, employees, and others.  For five years following the entry of the CFPB Settlement Order, the Debtors must deliver a copy of the same to any successor company, subsidiary, parent, or affiliate, as well as any future board members, officers, attorneys, and others, before they assume their responsibilities.

---

[14]  *See id.* ¶¶ 58–64.

[15]  *See id.* ¶¶ 65–67.

[16]  *See id.* ¶¶ 75–76.

[17]  *See id.* ¶ 73.

[18]  *See id.* ¶¶ 68–72.

*Transfer or Assignment of Operations*.[19]  In the event that the Debtors seek to transfer or assign all or part of their operations that are subject to the CFPB Settlement Order, they must obtain the written agreement of the transferee or assignee to comply with the CFPB Settlement Order (other than in connection with the Sale Transaction).  If such transfer or assignment is subject to approval by a court, any effectuating document submitted for court approval must set forth or incorporate all relevant obligations required by the CFPB Settlement Order, except for the provisions with respect to monetary redress, for which no transferee or assignee shall be liable.

*Noticing of Customers*.[20]  Within ten days of entry of the CFPB Settlement Order, the Debtors were required to send a certain notice to their customers to inform them of the CFPB Litigation and the CFPB Settlement, reminding them that they have a right to cancel any services they receive from the Debtors, and providing a link and phone number for cancellation.

*Bankruptcy Court Jurisdiction*.  The Bankruptcy Court will have exclusive jurisdiction over all matters arising from or related to the implementation, interpretation, or enforcement of any orders approving a plan or sale in the Chapter 11 Cases, including, without limitation, the allowance or treatment of monetary obligations discussed above.[21]  The Utah District Court will retain jurisdiction, however, for the purpose of construction, modification, and enforcement of the CFPB Settlement Order.[22]

### 5.    Recoveries to Certain Holders of Claims and Interests

The recoveries to Holders of Claims and Interests are described in Article III.D of this Disclosure Statement, entitled "What will I receive from the Debtors if the Plan is consummated?"

### 6.    Releases

The Plan contains certain releases, as described in Article III.J of this Disclosure Statement, entitled "Will there be releases and exculpation granted to parties in interest as part of the Plan?"  The release, exculpation, and injunction provisions that are contained in the Plan are copied in pertinent part below.

### (a)    Release of Liens

**Except as otherwise provided in the Plan, the Plan Supplement, Confirmation Order, or any contract, instrument, release, or other agreement or document created pursuant to the Plan or Confirmation Order, immediately following the making of all distributions to be made to an applicable Holder pursuant to the Plan and, in the case of a Secured Claim, including, for the avoidance of doubt, any Prepetition Loan Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to reinstate in accordance with Article III.B.4 of the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, compromised, and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert automatically to the applicable Debtor and its successors and assigns.  Any Holder of such Secured Claim (and the**

---

[19]  *See id.* ¶ 78.

[20]  *See id.* ¶ 44.

[21]  *See id.* ¶ 80.

[22]  *See id.* ¶ 83.

applicable agents for such Holder) shall be authorized and directed to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Wind-Down Debtor to evidence the release of such Lien and/or security interest, including the execution, delivery, and Filing or recording of such releases. The presentation or Filing of the Confirmation Order to or with any federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

To the extent that any Holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan or the Confirmation Order, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, then as soon as reasonably practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Debtors or the Wind-Down Debtor that are necessary or desirable to record or effectuate the cancelation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Wind-Down Debtor shall be entitled to make any such filings or recordings on such Holder's behalf.

(b)        Releases by the Debtors

Notwithstanding anything contained in the Plan or the Confirmation Order to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, upon entry of the Confirmation Order and effective as of the Effective Date, to the fullest extent permitted by applicable law, each Released Party is, and is deemed hereby to be, fully, conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors, the Wind-Down Debtor, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, including any Estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, including any derivative claims, asserted or assertable on behalf of any of the Debtors, the Wind-Down Debtor, or their Estates, that any such Entity would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against or Interest in a Debtor, the Wind-Down Debtor, or other Entity, or that any Holder of any Claim against or Interest in a Debtor, the Wind-Down Debtor, or other Entity could have asserted on behalf of the Debtors or the Wind-Down Debtor, based on or relating to, or in any manner arising from, in whole or in part, the Debtors or the Wind Down Debtor (including the Debtors' and the Wind-Down Debtor's capital structure, management, ownership, or operation thereof or otherwise), the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor or the Wind-Down Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, the purchase, sale, or rescission of any security of the Debtors or the Wind-Down Debtor, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors or the Wind-Down Debtor), intercompany transactions between or among a Debtor, the Wind-Down Debtor, or an affiliate of a Debtor and another Debtor, the Wind-Down Debtor, or affiliate of a Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Plan Supplement, the Sale Transaction, the DIP Credit Agreement, the Prepetition First Lien Credit Agreement, the Prepetition Second Lien Credit Agreement, any other Definitive Document or any Restructuring Transaction, or any contract, instrument, release, or other agreement or

21

document created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Plan Supplement, the Sale Transaction, any other Definitive Document, any of the Restructuring Transactions, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release: (1) any obligations arising on or after the Effective Date (solely to the extent such obligation does not arise from any acts or omissions prior to the Effective Date) of any party or Entity under the Plan, the Confirmation Order, or any post-Effective Date transaction contemplated by the Plan or the Restructuring Transactions, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the Restructuring Transactions; or (2) any matters retained by the Debtors and the Wind-Down Debtor pursuant to the Schedule of Retained Causes of Action.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (1) in exchange for the good and valuable consideration provided by the Released Parties, including, the Released Parties' contribution to facilitating the Restructuring Transactions and implementing the Plan; (2) a good faith settlement and compromise of the Claims released by the Debtor Release; (3) in the best interests of the Debtors, the Wind-Down Debtor, and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for a hearing; and (6) a bar to any of the Debtors, the Wind-Down Debtor, or the Debtors' Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release.

(c)      Releases by the Releasing Parties

Except as otherwise expressly set forth in this Plan or the Confirmation Order, effective as of the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is, and is deemed hereby to be, fully, conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each Releasing Party from any and all claims and Causes of Action, whether known or unknown, including any derivative claims, asserted or assertable on behalf of any of the Debtors, the Wind-Down Debtor, or the Estates, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to or in any manner arising from, in whole or in part, the Debtors or the Wind-Down Debtor (including the Debtors' and the Wind-Down Debtor's capital structure, management, ownership, or operation thereof or otherwise), the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor or the Wind-Down Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, the purchase, sale, or rescission of any security of the Debtors or the Wind-Down Debtor, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted by the Debtors or the Wind-Down Debtor), intercompany transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Plan Supplement, the Sale Transaction, any other Definitive Document or any Restructuring Transaction, or any contract, instrument, release, or other agreement or document created or entered into in connection with the

Restructuring Support Agreement, the Disclosure Statement, the Plan, the Plan Supplement, the Sale Transaction, the DIP Credit Agreement, the Prepetition First Lien Credit Agreement, the Prepetition Second Lien Agreement, any other Definitive Document, any of the Restructuring Transactions, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

Notwithstanding anything to the contrary in the foregoing, the Third-Party Release does not release (1) any obligations arising on or after the Effective Date (solely to the extent such obligation does not arise from any acts or omissions prior to the Effective Date) of any party or Entity under the Plan, the Confirmation Order, or any post-Effective Date transaction contemplated by the Plan or the Restructuring Transactions, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the Restructuring Transactions; or (2) the rights of any Holder of Allowed Claims to receive distributions under the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is:  (1) consensual; (2) essential to the Confirmation of the Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties; (4) a good faith settlement and compromise of the Claims released by the Third-Party Release; (5) in the best interests of the Debtors, the Wind-Down Debtor, and the Estates; (6) fair, equitable, and reasonable; (7) given and made after due notice and opportunity for a hearing; and (8) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the Third Party Release.

(d)      Exculpation

Except as otherwise specifically provided in the Plan or the Confirmation Order, no Exculpated Party shall have or incur any liability for, and each Exculpated Party shall be released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to or arising out of the Chapter 11 Cases prior to the Effective Date, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the Sale Transaction, the Plan, the Plan Supplement, any other Definitive Document, or any Restructuring Transaction, or any contract, instrument, release or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Plan Supplement, the Sale Transaction, any other Definitive Document, any of the Restructuring Transactions, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of the Sale Transaction, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a Final Order to have constituted gross negligence, willful misconduct, or actual fraud.  The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions

made pursuant to the Plan.  Notwithstanding anything to the contrary in the foregoing, the exculpation set forth above does not exculpate any obligations arising on or after the Effective Date of any Person or Entity under the Plan, any post-Effective Date transaction contemplated by the Restructuring Transactions, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

(e)      Injunction

Effective as of the Effective Date, all Entities that have held, hold, or may hold Claims, Interests, or Causes of Actions that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Wind-Down Debtor, the Exculpated Parties, or the Released Parties:  (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Actions; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Actions; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Actions; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Actions unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a claim or interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Actions released, settled or subject to exculpation pursuant to the Plan.  Notwithstanding anything to the contrary in the foregoing, the injunction set forth above does not enjoin the enforcement of any obligations arising on or after the Effective Date of any Person or Entity under the Plan, any post-Effective Date transaction contemplated by the Restructuring Transactions, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, managers, principals, and direct and indirect Affiliates, in their capacities as such, shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan.  Each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in Article VIII.F of the Plan.

No Person or Entity may commence or pursue a Claim or Cause of Action of any kind against the Debtors, the Wind-Down Debtor, the Exculpated Parties, or the Released Parties that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Claim or Cause of Action subject to Article VIII.C, Article VIII.D, and Article VIII.E of the Plan, without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable Claim of any kind, and (ii) specifically authorizing such Person or Entity to bring such Claim or Cause of Action against any such Debtor, Wind-Down Debtor, Exculpated Party, or Released Party.

The Bankruptcy Court will have sole and exclusive jurisdiction to adjudicate the underlying colorable Claim or Causes of Action.

For more detail, see Article VIII of the Plan, entitled "Settlement, Release, Injunction, and Related Provisions," which is incorporated herein by reference.

**B.    Means for Implementation of the Plan.**

**1.    Sources of Consideration for Plan Distributions**

The Debtors and Wind-Down Debtor, as applicable, shall fund the distributions and obligations under the Plan with Available Cash from the Wind-Down Budget held in the Wind-Down Debtor Account, as applicable, on the Effective Date.  Sources to fund the distributions and obligations under the Plan include cash from the Creditor Trust in the amount of $100,000, from the GUC Trade Settlement Cash in the amount of $3.25 million, and from the GUC Litigation Claims Settlement Cash in the amount of $750,000 (of which $50,000 will be paid to the Holder of the Allowed CFPB Claim on account of the CFPB Claim as set forth in Article III of the Plan).  As indicated in Article II of the Plan, pursuant to the Sale Orders, the DIP Claims have been satisfied in full in connection with the Sale Transaction.

**2.    Wind-Down Debtor**

The Debtors shall continue in existence after the Effective Date as the Wind-Down Debtor solely for the purposes of (l) winding down the Debtors' businesses and affairs as expeditiously as reasonably possible and liquidating any assets held by the Wind-Down Debtor, if any, (2) resolving any Disputed Claims, (3) paying or otherwise satisfying Allowed Claims, (4) filing appropriate tax returns, and (5) administering the Plan in an efficacious manner.  The Wind-Down Debtor shall be deemed to be substituted as the party-in-lieu of the Debtors in all matters, including (x) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court and (y) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court, in each case without the need or requirement for the Plan Administrator to File motions or substitutions of parties or counsel in each such matter; *provided, however,* that the Creditor Trustee shall have the rights, powers, and authority as provided in Article IV.G of the Plan and in the Creditor Trust Agreement, and shall be substituted as the party-in-lieu of the Debtors in all matters as provided in Article IV.G of the Plan and in the Creditor Trust Agreement.

On the Effective Date, the Wind-Down Debtor Assets shall vest in the Wind-Down Debtor for the primary purpose of liquidating the Wind-Down Debtor Assets and winding down the Debtors' Estates, with no objective to continue or engage in the conduct of a trade or business.  The Wind-Down Debtor will, in an expeditious but orderly manner, liquidate and convert to Cash the Wind-Down Debtor Assets, make timely distributions pursuant to the Plan and Confirmation Order, and not unduly prolong its duration.  Such assets shall be held free and clear of all Liens, Claims, and interests of Holders of Claims and Interests, except as otherwise provided in the Plan.  The Wind-Down Debtor shall be deemed to be fully bound by the terms of the Plan and the Confirmation Order.

**3.    Liquidating Trust**

Notwithstanding anything to the contrary in the Plan, the Plan Administrator, in his or her discretion, may transfer all or any portion of the assets of the Wind-Down Debtor to the Liquidating Trust, which shall be a "liquidating trust" as that term is used under section 301.7701-4(d) of the Treasury Regulations.  For the avoidance of doubt, in the event of a Permitted Transfer, the provisions set forth in Article IV.Q of the Plan shall continue to govern all matters associated with the prosecution, settlement, or collection upon any Retained Causes of Action transferred to the Liquidating Trust.  The Liquidating Trust shall be established for the primary purpose of liquidating the Liquidating Trust's assets, reconciling claims asserted against the Wind-Down Debtor, and distributing the proceeds thereof in accordance with the Plan, with no objective to continue or engage in the conduct of a trade or business,

except to the extent reasonably necessary to, and consistent with, the purpose of the Liquidating Trust. Upon the transfer of the Wind-Down Debtor's assets to the Liquidating Trust, the Wind-Down Debtor will have no reversionary or further interest in or with respect to the assets of the Liquidating Trust. To the extent beneficial interests in the Liquidating Trust are deemed to be "securities" as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and applicable state securities laws, the Debtors intend that the exemption provisions of section 1145 of the Bankruptcy Code will apply to such beneficial interests. Prior to any Permitted Transfer, the Plan Administrator may designate trustee(s) for the Liquidating Trust for the purposes of administering the Liquidating Trust. The reasonable costs and expenses of the trustee(s) shall be paid from the Liquidating Trust.

(a)      **Liquidating Trust Treatment**

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, the Debtors expect to treat the Liquidating Trust as a "liquidating trust" under section 301.7701-4(d) of the Treasury Regulations and a grantor trust under section 671 of the Tax Code, and the trustee of any Liquidating Trust will take a position on the Liquidating Trust's tax return accordingly. For U.S. federal income tax purposes, the transfer of assets to the Liquidating Trust will be deemed to occur as (a) a first-step transfer of the Liquidating Trust Assets to the Holders of the applicable Claims, and (b) a second-step transfer by such Holders to the Liquidating Trust.

No request for a ruling from the IRS will be sought on the classification of the Liquidating Trust. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the Liquidating Trust. If the IRS were to successfully challenge the classification of the Liquidating Trust as a grantor trust, the federal income tax consequences to the Liquidating Trust and the Liquidating Trust beneficiaries could vary from those discussed in the Plan (including the potential for an entity-level tax). For example, the IRS could characterize the Liquidating Trust as a so-called "complex trust" subject to a separate entity-level tax on its earnings, except to the extent that such earnings are distributed during the taxable year.

As soon as possible after the transfer of the Liquidating Trust Assets to the Liquidating Trust, the trustee(s) of the Liquidating Trust shall make a good faith valuation of the Liquidating Trust Assets. This valuation will be made available from time to time, as relevant for tax reporting purposes. Each of the Debtors, the trustee(s) of the Liquidating Trust, and the holders of Claims receiving interests in the Liquidating Trust shall take consistent positions with respect to the valuation of the Liquidating Trust Assets, and such valuations shall be utilized for all U.S. federal income tax purposes.

Allocations of taxable income of the Liquidating Trust among the Liquidating Trust beneficiaries shall be determined by reference to the manner in which an amount of cash equal to such taxable income would be distributed (were such cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Liquidating Trust had distributed all its assets (valued at their tax book value) to the Liquidating Trust beneficiaries, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Liquidating Trust. Similarly, taxable loss of the Liquidating Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining Liquidating Trust Assets. The tax book value of the Liquidating Trust Assets shall equal their fair market value on the date of the transfer of the Liquidating Trust Assets to the Liquidating Trust, adjusted in accordance with tax accounting principles prescribed by the Tax Code, applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

The Liquidating Trust shall in no event be dissolved later than five (5) years from the creation of such Liquidating Trust unless the Bankruptcy Court, upon motion within the six (6) month period prior to

the fifth (5th) anniversary (or within the six (6) month period prior to the end of an extension period), determines that a fixed period extension (not to exceed five (5) years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to the trustee(s) of the Liquidating Trust that any further extension would not adversely affect the status of the trust as a liquidating trust for U.S. federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Liquidating Trust Assets.

The Liquidating Trust will file annual information tax returns with the IRS as a grantor trust pursuant to section 1.671-4(a) of the Treasury Regulations that will include information concerning certain items relating to the holding or disposition (or deemed disposition) of the Liquidating Trust Assets (e.g., income, gain, loss, deduction and credit). Each Liquidating Trust beneficiary holding a beneficial interest in the Liquidating Trust will receive a copy of the information returns and must report on its federal income tax return its share of all such items. The information provided by the Liquidating Trust will pertain to Liquidating Trust beneficiaries who receive their interests in the Liquidating Trust in connection with the Plan.

**(b)      Disputed Ownership Fund Treatment**

With respect to any of the assets of the Liquidating Trust that are subject to potential disputed claims of ownership or uncertain distributions, or to the extent "liquidating trust" treatment is otherwise unavailable or not elected to be applied with respect to the Liquidating Trust, the Debtors intend that such assets will be subject to disputed ownership fund treatment under section 1.468B-9 of the Treasury Regulations, that any appropriate elections with respect thereto shall be made, and that such treatment will also be applied to the extent possible for state and local tax purposes. Under such treatment, a separate federal income tax return shall be filed with the IRS for any such account. Any taxes (including with respect to interest, if any, earned in the account) imposed on such account shall be paid out of the assets of the respective account (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes).

**4.   Plan Administrator**

On the Effective Date, the authority, power, and incumbency of the persons acting as directors and officers of each of the Debtors shall be deemed to have been terminated and such persons shall be deemed to have resigned, solely in their capacities as such, and the Plan Administrator shall be appointed by each Debtor as the sole director and the sole officer of such Wind-Down Debtor and shall succeed to the powers of such Debtor's directors and officers. The Plan Administrator shall be the sole representative of, and shall act for each Wind-Down Debtor in the same fiduciary capacity as applicable to a board of managers and officers, subject to the provisions hereof (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same), except as applicable to the Creditor Trustee as provided in Article IV.G of the Plan and in the Creditor Trust Agreement. For the avoidance of doubt, the foregoing shall not limit the authority of each Wind-Down Debtor or the Plan Administrator, as applicable, to continue the employment of any former director or officer.

The Plan Administrator shall have the right to retain the services of attorneys, accountants, and other professionals that, in the discretion of the Plan Administrator, are necessary to assist the Plan Administrator in the performance of his or her duties. The reasonable fees and expenses of such professionals shall be paid by the Wind-Down Debtor, upon the monthly submission of statements to the Plan Administrator and in accordance with the Wind-Down Budget. The payment of the reasonable fees and expenses of the Plan Administrator's retained professionals shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court.

### 5.  The Creditor Trust

#### (c)  Creation and Governance

On the Effective Date, to the extent the Committee establishes the Creditor Trust, the Debtors, Committee, and the Creditor Trustee shall execute the Creditor Trust Agreement and shall take all steps necessary to establish the Creditor Trust in accordance with the Plan.  The Committee shall have the right in its sole discretion, but not the obligation, to select the Creditor Trustee at any time prior to the Plan Supplement Filing Date.   Additionally, on the Effective Date, the Debtors or Wind-Down Debtor, as applicable, shall irrevocably transfer and assign and shall be deemed to have irrevocably transferred and assigned to the Creditor Trust all of their respective rights, title, and interest in and to all of the Creditor Trust Assets in accordance with Bankruptcy Code section 1141, except as specifically provided in the Plan or the Confirmation Order.  The Creditor Trust Assets will include cash from the Debtors' cash on hand in the amount of $100,000, any Excess Distributable Cash, the PIK Notes, and any Other Assets, free and clear of all Claims, Liens, encumbrances, charges, and other interests without any further action of any of the Debtors, the Plan Administrator on behalf of the Wind-Down Debtor, the Committee, the Creditor Trustee, or any employees, officers, directors, members, partners, shareholders, agents, advisors, or representatives of the Debtors or the Wind-Down Debtor. Transfer of the Creditor Trust Assets to the Creditor Trust shall be exempt from any stamp, real estate transfer, other transfer, mortgage reporting, sales, use, or other similar tax.

The Creditor Trustee's duties, powers, responsibilities, and compensation will be established by the Creditor Trust Agreement.   The Creditor Trustee shall be the exclusive trustee of the Creditor Trust Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estates appointed pursuant to Bankruptcy Code section 1123(b)(3)(B).  Pursuant to Bankruptcy Code section 1123(b)(3), the Creditor Trustee shall be deemed the appointed representative to liquidate and/or monetize the Other Assets, collect amounts due under or realize upon the PIK Notes, and effectuate distributions as detailed in the Creditor Trust Agreement, and the Creditor Trustee shall be granted standing, authority, power and right to assert, prosecute and/or settle or take any other actions necessary to effectuate those duties and all other duties as detailed in the Creditor Trust Agreement based upon its powers as a bankruptcy appointed representative of the Debtors' Estates with the same or similar abilities possessed by bankruptcy or insolvency trustees, receivers, examiners, conservators, liquidators, rehabilitators, creditors' committees, or similar officials or entities.

The Creditor Trust will terminate no later than the fifth (5th) anniversary of the Effective Date, provided, however, that, on or prior to such termination, the Bankruptcy Court, upon motion by the Creditor Trustee or a party in interest, may within six (6) months of the beginning of such extended term, extend the term of the Creditor Trust for a fixed period if it is necessary to facilitate or complete the liquidation and distribution of the Creditor Trust Assets,  provided, however, that the aggregate of all such extensions shall not exceed three (3) years (i.e. for a maximum total of eight (8) years from the Effective Date), unless the Creditor Trustee receives a favorable ruling from the Internal Revenue Service that any further extension would not adversely affect the status of the Creditor Trust as a liquidating trust for federal income tax purposes.

#### (d)  Purpose of the Creditor Trust

The Creditor Trust shall be established for the purpose of pursuing or liquidating the Creditor Trust Assets; prosecuting any Retained Causes of Action to maximize recoveries for the benefit of its beneficiaries; and making distributions to beneficiaries, all in accordance with the provisions of Treasury Regulation section 301.7701-4(d) and Revenue Procedure 94-45, with no objective to continue or engage in the conduct of a trade or business.

(e)        **The Creditor Trust Agreement**

The Creditor Trustee shall have the power and authority to perform the acts described in the Creditor Trust Agreement (subject to approval by the Bankruptcy Court where applicable), in addition to any powers granted by law or conferred to it by any other provision of the Plan.  The Creditor Trust Agreement shall provide that Creditor Trustee's powers shall include, without limitation, the following: (i) the power (but not the express obligation) to invest funds, in accordance with section 345 of the Bankruptcy Code, and withdraw, make Distributions and pay taxes and other obligations owed by the Creditor Trust from funds held by the Creditor Trust in accordance with the Plan as set forth below and Creditor Trust Agreement as set forth therein; (ii) the power to engage and compensate, without prior Bankruptcy Court order or approval, employees and professionals (including but not limited to professionals who are members of the Creditor Trustee's own firm) to assist the Creditor Trustee with respect to the Creditor Trustee's responsibilities; (iii)  the power to pursue, prosecute, resolve and compromise and settle any Retained Causes of Action on behalf of the Creditor Trust without prior Bankruptcy Court approval but in accordance with the Creditor Trust Agreement; and (iv) such other powers as may be vested in or assumed by the Creditor Trustee pursuant to the Plan, Bankruptcy Court order, or as may be necessary and proper to carry out the provisions of the Plan.

Except as expressly set forth in the Plan and in the Creditor Trust Agreement, the Creditor Trustee, on behalf of the Creditor Trust, shall have absolute discretion to pursue or not to pursue any Retained Causes of Action as it determines is in the best interests of beneficiaries and consistent with the purposes of the Creditor Trust, and shall have no liability for the outcome of such determination, other than those determinations constituting gross negligence or willful misconduct.  The Creditor Trustee may incur any reasonable and necessary expenses in liquidating and converting the Creditor Trust Assets to Cash.  Subject to the other terms and provisions of the Plan, the Creditor Trustee shall be granted standing, authority, power and right to assert, prosecute or settle the Retained Causes of Action based upon its powers as a bankruptcy appointed representative of the Debtors' Estates with the same or similar abilities possessed by insolvency trustees, receivers, examiners, conservators, liquidators, rehabilitators or similar officials. The salient terms of the Creditor Trustee's employment, including the Creditor Trustee's duties and compensation, shall be set forth in the Creditor Trust Agreement and shall be consistent with the terms of the Plan.

Cash in the Creditor Trust's accounts and any other amounts contemplated by the Plan and the Creditor Trust Agreement shall be maintained in United States dollars or shall be invested by the Creditor Trustee in (i) direct obligations of, or obligations guaranteed by, the United States of America, including Government Money Market Funds, (ii) obligations of any agency or corporation that is or may hereafter be created by or pursuant to an act of Congress of the United States of America as an agency or instrumentality thereof, or (iii) such other obligations or instruments as may from time to time be permitted under section 345 of the Bankruptcy Code; provided that the Creditor Trustee may, to the extent necessary to implement the provisions of the Plan and the Creditor Trust Agreement, deposit moneys in demand deposits, time accounts or checking accounts at any banking institution or trust company having combined capital stock and surplus in excess of $100,000,000 based upon its most recently available audited financial statements, regardless of whether such investments and deposits are insured.  Such investments shall mature in such amounts and at such times as the Creditor Trustee, in the Creditor Trustee's business judgment, shall deem appropriate to provide funds when needed to transfer funds in accordance with the Plan and Confirmation Order, make payments to the Trust Accounts or make Distributions in accordance with the Plan, Confirmation Order and Creditor Trust Agreement.  The Creditor Trust may not retain cash or cash equivalents in excess of a reasonable amount as determined by the Creditor Trustee in its sole discretion needed to meet claims and contingent liabilities or to maintain the value of the Creditor Trust Assets in liquidation or maintain or fund an adequate and sufficient reserve.  Notwithstanding anything to the contrary herein, the scope of any such investment shall be

limited to include only those investments that a liquidating trust, within the meaning of Treasury Regulations Section 301.7701-4(d), may be permitted to hold, pursuant to Section 3.09 of Internal Revenue Service Revenue Procedure 94-45 or the Treasury Regulations, or any modification in the IRS guidelines, whether set forth in IRS rulings, other IRS pronouncements or otherwise. For the avoidance of doubt, notwithstanding any permission or obligations (in either case, whether express or implied) under section 345 of the Bankruptcy Code, the Creditor Trustee shall have no duty or obligation to invest any of the Creditor Trust Assets, and failure to invest any such assets shall not constitute a breach of duty on behalf of the Creditor Trust or the Creditor Trustee.

**(f)      Compensation and Duties of the Creditor Trustee**

On and after the Effective Date, the Creditor Trustee shall have the power and responsibility to do all acts contemplated by the Plan and the Creditor Trust Agreement to be done by the Creditor Trustee and all other acts that may be necessary or appropriate in connection with the disposition of the Creditor Trust Assets and the distribution of the proceeds thereof, as contemplated by the Plan and in accordance with the Creditor Trust Agreement.

In all circumstances, the Creditor Trustee shall act in its reasonable discretion in the best interests of beneficiaries pursuant to the terms of the Plan and the Creditor Trust Agreement.

The Creditor Trustee shall be indemnified by and receive reimbursement from the Creditor Trust Assets against and from any and all loss, liability, expense (including reasonable attorneys' fees), or damage which the Creditor Trustee incurs or sustains, in good faith and without willful misconduct, gross negligence, or fraud, acting as Creditor Trustee under or in connection with the Plan.

The Creditor Trustee may employ, without further order of the Bankruptcy Court, professionals (including those previously retained by the Committee or who are members of the Creditor Trustee's own firm) to assist in carrying out the Creditor Trustee's duties under the Plan and Creditor Trust Agreement and may compensate and reimburse the reasonable expenses of these professionals up to $100,000 without further Order of the Bankruptcy Court from the Debtors' Cash in accordance with the Plan.

The Creditor Trustee shall be entitled to reasonable compensation up to $100,000, consistent with that of similar functionaries in similar types of bankruptcy cases.  The Creditor Trustee shall also be reimbursed for all documented, actual, reasonable, and necessary out-of-pocket expenses incurred in the performance of its duties under the Creditor Trust Agreement. The Creditor Trustee shall not be required to file a fee application with the Bankruptcy Court in order to receive compensation.

**(g)      Abandonment, Disposal, and Destruction of Records**

The Creditor Trustee shall be authorized pursuant to Bankruptcy Code section 554, in its sole discretion, without any further notice to any party or action, order or approval of the Bankruptcy Court, to abandon, dispose of, or destroy in any commercially reasonable manner all originals and/or copies of any documents, books and records, including any electronic records, of the Debtors that are transferred to the Creditor Trust and which they reasonably conclude are burdensome or of inconsequential value and benefit to the Creditor Trust.

**(h)      Distributions by the Creditor Trustee**

Following the vesting of the Creditor Trust Assets in the Creditor Trust, the Creditor Trustee shall make continuing efforts to liquidate all Creditor Trust Assets in accordance with the Plan and the Creditor Trust Agreement, provided that the timing of all Distributions made by the Creditor Trustee shall be made as follows:

- The Creditor Trust, through or as the Disbursing Agent, as applicable, will make Distributions to Holders of Allowed Class 6C Claims, to the extent that the foregoing Claims have not been paid in full on or prior to the Effective Date or otherwise in accordance with the Plan.  Except as otherwise provided by the Plan, Confirmation Order, or the Creditor Trust Agreement, the Creditor Trust shall be required to distribute at least annually (or more frequently as the Creditor Trustee may determine, in his or her sole discretion) to the Beneficiaries its net income plus all net proceeds from the sale or other disposition of Creditor Trust Assets, except that the Creditor Trust may retain an amount of net proceeds or net income reasonably necessary to maintain the value of its assets or to meet claims and contingent liabilities (including disputed claims), within the meaning of Internal Revenue Service Revenue Procedure 94-45.

- The Creditor Trust will make the Distributions either from such accounts or reserves as the Creditor Trustee, in his or her business judgment, may determine to establish in accordance with the provisions of the Plan and the Creditor Trust Agreement.

- The Creditor Trust will make Distributions from the Creditor Trust Assets to each beneficiary holding an Allowed Claim in accordance with each Beneficiary's Pro Rata share of net Cash derived from the Creditor Trust Assets being made available for such Distribution, and in accordance with the terms of the Plan and the Creditor Trust Agreement.

- Distributions to be made by the Creditor Trust may be made by any Person(s) designated or retained to serve as the Disbursing Agent(s) without the need for any further order of the Bankruptcy Court, in accordance with the terms of the Plan and the Creditor Trust Agreement.

- The Creditor Trustee shall be authorized, in his or her business judgment, to delay Distributions to holders of Beneficial Interests or otherwise determine reasonable distribution dates for such holders, including, without limitation, based upon the status and progress of the liquidation of Creditor Trust Assets, the total number of and/or asserted claim amounts of Disputed Claims, and any other relevant factors.

(i)     **Dissolution of the Creditor Trust**

The Creditor Trustee shall be discharged and the Creditor Trust shall be terminated, at such time as: (a) (i) all Disputed Claims have been resolved, (ii) all of the Creditor Trust Assets have been liquidated, (iii) all duties and obligations of the Creditor Trustee under the Creditor Trust Agreement have been fulfilled, and (iv) all Distributions required under the Plan and the Creditor Trust Agreement have been made; or (b) as otherwise provided in the Creditor Trust Agreement.  Upon dissolution of the Creditor Trust, any remaining assets of the Creditor Trust revert to the Wind-Down Debtor.

(j)     **Control Provisions**

Except to the extent required, as determined by the Creditor Trustee in its reasonable discretion, for the Creditor Trust to qualify as a liquidating trust within the meaning of Revenue Procedure 94-45, to the extent there is any inconsistency between the Plan as it relates to the Creditor Trust and/or the Creditor Trust Agreement, the terms of the Plan shall control unless otherwise indicated herein.

(k)    **Limitation of Liability; Indemnification**

To the maximum extent permitted by law, the Creditor Trustee, its employees, officers, directors, agents, members or representatives, or professionals employed or retained by the Creditor Trustee (including without limitation, any professionals who are members of the Creditor Trustee's own firm) (collectively, the "Creditor Trustee Agents"), will not have or incur liability to any Person or Entity for any act taken, or omission made, in good faith in connection with or related to Distributions made under the Plan or the Creditor Trust Agreement, the administration of the Creditor Trust and the implementation of the Plan.  The Creditor Trustee and the Creditor Trustee Agents will in all respects be entitled to reasonably rely on the advice of counsel and tax accounting professionals with respect to their duties and responsibilities under the Plan and the Creditor Trust Agreement.  Notwithstanding the foregoing, nothing herein will alter any provision of the Creditor Trust Agreement that provides for the potential liability of the Creditor Trustee to any Person or Entity. The Creditor Trust shall indemnify and hold harmless the Creditor Trustee and its designees and professionals, and all duly designated agents and representatives thereof (in their capacity as such), from and against and in respect of all liabilities, losses, damages, claims, costs and expenses, including, but not limited to attorneys' fees and costs arising out of or due to such actions or omissions, or consequences of their actions or omissions with respect or related to the performance of their duties or the implementation or administration of the Plan; *provided*, *however*, that no such indemnification will be made to such persons for such actions or omissions as a result of willful misconduct, gross negligence or fraud.

## 6.   Exculpation, Indemnification, Insurance, and Liability Limitation

The Plan Administrator, the Creditor Trustee, and all professionals retained by the Plan Administrator and the Creditor Trustee, each in their capacities as such, shall be deemed exculpated and indemnified, except for fraud, willful misconduct, or gross negligence, in all respects by each Wind-Down Debtor.  The Plan Administrator and the Creditor Trustee may each obtain, at the expense of the Wind-Down Debtor, commercially reasonable liability or other appropriate insurance with respect to the indemnification obligations of the Wind-Down Debtor.  The Plan Administrator and the Creditor Trustee may rely upon written information previously generated by the Debtors.

## 7.   Tax Returns

After the Effective Date, the Plan Administrator shall complete and file all final or otherwise required federal, state, and local tax returns for each of the Debtors and the Wind-Down Debtors, and, pursuant to section 505(b) of the Bankruptcy Code, may request an expedited determination of any unpaid tax liability of such Debtor or its Estate for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws.

## 8.   Dissolution of the Wind-Down Debtor

Upon a certification to be Filed with the Bankruptcy Court by the Plan Administrator of all distributions having been made and completion of all its duties under the Plan and entry of a final decree closing the last of the Chapter 11 Cases, each Wind-Down Debtor shall be deemed to be dissolved without any further action by such Wind-Down Debtor, including the Filing of any documents with the secretary of state for the state in which each such Wind-Down Debtor is formed or any other jurisdiction. The Plan Administrator, however, shall have authority to take all necessary actions to dissolve each Wind-Down Debtor in and withdraw each Wind-Down Debtor from applicable states.

### 9. Statutory Committee and Cessation of Fee and Expense Payment

On the Effective Date, any statutory committee appointed in the Chapter 11 Cases, including the Committee, shall dissolve and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases, except in connection with applications for compensation and objections thereto. The Wind-Down Debtor shall no longer be responsible for paying any fees or expenses incurred by any statutory committee, including the Committee, after the Effective Date, except in connection with (a) applications for payment of any fees or expenses for services rendered prior to the Effective Date that are Allowed by the Bankruptcy Court; and (b) objections to applications for payment of fees and expenses rendered prior to the Effective Date.

### 10. Cancellation of Securities and Agreements

On the Effective Date, except as otherwise specifically provided for in the Plan: (1) the obligations of the Debtors under the Prepetition Loan Documents and any other certificate, Security, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Interest (except (i) such certificates, notes, or other instruments or documents evidencing indebtedness or obligation of or ownership interest in the Debtors that are Reinstated pursuant to the Plan and (ii) any indemnification obligations set forth in Article V.B of the Plan shall be cancelled solely as to the Debtors and their affiliates, and the Wind-Down Debtor shall not have any continuing obligations thereunder; and (2) the obligations of the Debtors and their affiliates pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, indentures, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligation of or ownership interest in the Debtors that are specifically Reinstated pursuant to the Plan) shall be released and discharged. Notwithstanding the foregoing, no executory contract or unexpired lease that (i) has been, or will be, assumed pursuant to Section 365 of the Bankruptcy Code or (ii) relating to a Claim that was paid in full prior to the Effective Date, shall be terminated or cancelled on the Effective Date.

### 11. Corporate Action

Upon the Effective Date, all actions contemplated under the Plan, regardless of whether taken before, on or after the Effective Date, shall be deemed authorized and approved in all respects, including: (1) selection of the Plan Administrator and Creditor Trustee; (2) implementation of the Restructuring Transactions; (3) consummation of the Sale Transaction under the Asset Purchase Agreements; (4) funding of all applicable escrows and accounts; and (5) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan or deemed necessary or desirable by the Debtors before, on, or after the Effective Date involving the corporate structure of the Debtors or the Wind-Down Debtor, and any corporate action required by the Debtors or the Wind-Down Debtor in connection with the Plan or corporate structure of the Debtors or Wind-Down Debtor shall be deemed to have occurred and shall be in effect on the Effective Date, without any requirement of further action by the security holders, directors, managers, or officers of the Debtors or the Wind-Down Debtor. Before, on, or after the Effective Date, the appropriate officers of the Debtors or the Wind-Down Debtor, as applicable, shall be authorized to issue, execute, and deliver the agreements and documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Wind-Down Debtor. The authorizations and approvals contemplated by Article IV.M of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

### 12. Effectuating Documents; Further Transactions

On and after the Effective Date, the Plan Administrator, the DIP Agent, the Prepetition First Lien Agent, and the Prepetition Second Lien Agent may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, the Confirmation Order, and the Restructuring Transactions, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan or the Confirmation Order.

### 13. Section 1146 Exemption

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to the Wind-Down Debtor, the Creditor Trust, or to any other Person or from the Wind-Down Debtor to the Liquidating Trust or any other Person) of property under the Plan or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, equity security, property, or other interest in the Debtors or the Wind-Down Debtor; (2) the Restructuring Transactions; (3) any Sale Transaction; (4) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (5) the making, assignment, or recording of any lease or sublease; or (6) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate or bulk transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forgo the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### 14. Director and Officer Liability Insurance; Other Insurance

On or before the Effective Date, the Debtors shall purchase (to the extent not already purchased) and maintain directors, officers, managers, and employee liability tail coverage for the six-year period following the Effective Date on terms no less favorable than the Debtors' existing director, officer, manager, and employee coverage and with an aggregate limit of liability upon the Effective Date of no less than the aggregate limit of liability under the existing director, officer, manager, and employee coverage upon placement. Reasonable directors and officers insurance policies shall remain in place in the ordinary course during the Chapter 11 Cases and from and after the Effective Date.

Any directors and officers insurance policies shall be assumed by the Debtors on behalf of the applicable Debtor and assigned to the Wind-Down Debtor effective as of the Effective Date, pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such insurance policy previously was rejected by the Debtors or the Debtors' Estates pursuant to a Bankruptcy Court order or is the subject of a motion to reject pending on the Effective Date, and coverage for defense and indemnity under any such policies shall remain available to all individuals within the definition of "Insured" in any such policies.

In addition, on and after the Effective Date, all officers, directors, agents, or employees who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of any directors and officers insurance policy in effect or purchased as of the Effective Date for the full term of such policy regardless of whether such officers, directors, agents, and/or employees remain in such positions on or after the Effective Date, in each case, to the extent set forth in such policies.

### 15. Causes of Action

Pursuant to the Sale Transaction Documentation, the Debtors assigned and transferred to the Purchasers all of the Transferred Causes of Action pursuant to the Sale Transaction Documentation in connection with the Sale Transactions and in accordance with the Sale Orders. For the avoidance of doubt, the Debtors or the Plan Administrator, as applicable, will retain the right to enforce the terms of the Sale Transaction Documentation. Retained Causes of Action shall initially remain with the Debtors and shall immediately vest with the Creditor Trust as of the Effective Date.

### 16. Section 1145 Exemption

Pursuant to section 1145 of the Bankruptcy Code and, to the extent that section 1145 of the Bankruptcy Code is inapplicable, section 4(a)(2) of the Securities Act, the issuance of any Interests pursuant to the Plan is exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable United States, state, or local law requiring registration for offer or sale of a security or registration or licensing of an issuer of, underwriter of, or broker or dealer in, a security. As long as the exemption to registration under section 1145 of the Bankruptcy Code is applicable, Interests issued pursuant to the Plan are not "restricted securities" (as defined in rule 144(a)(3) under the Securities Act) and are freely tradable and transferable by any initial recipient thereof that (x) is not an "affiliate" of the Wind-Down Debtor (as defined in rule 144(a)(1) under the Securities Act), (y) has not been such an "affiliate" within 90 days of such transfer, and (z) is not an entity that is an "underwriter" as defined in section 1145(b) of the Bankruptcy Code.

### 17. Global Settlement

The Plan implements the Global Settlement and incorporates the terms of the Global Settlement Term Sheet by reference as though fully stated in the Plan. The Global Settlement is a compromise and settlement of numerous issues and disputes between and among the Debtors, the Committee, the DIP Lenders, and the Prepetition First and Second Lien Lenders, designed to achieve a reasonable and effective resolution of the Chapter 11 Cases. Except as otherwise expressly set forth herein, the Global Settlement constitutes a settlement of all potential issues and Claims between and among the Debtors, the Committee, the DIP Lenders, and the Prepetition First and Second Lien Lenders. The Global Settlement shall be effectuated in accordance with the following terms. Continuing Trade Claims, Litigation Claims, and Other General Unsecured Claims shall receive the treatment set forth in Article III of the Plan. The Debtors shall establish the Creditor Trust which, for the avoidance of doubt, shall be funded solely with cash from the Debtors' cash on hand in the amount of $100,000 and which shall have the right to pursue the monetization of the Other Assets (including collecting amounts due under or realizing upon, the PIK Notes). The Creditor Trust shall also hold the PIK Notes for beneficial distribution in accordance with Article IV.S of the Plan. The identity of the Creditor Trustee and the terms of the governing agreement of the Creditor Trust shall be determined by the Committee and provided in the Plan Supplement.

## V.    THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW

### A.    PGX's Corporate History and Business Operations

PGX was founded more than 20 years ago with three goals:  (a) to establish credit repair's importance in the credit risk analysis and reporting ecosystem; (b) to quickly deliver accurate credit repair services to consumers by leveraging predictive technology; and (c) to establish to consumers the importance of credit repair business as an invaluable consumer advocacy service.  In short, PGX was founded to serve as the primary technology-enabled destination for hard-working Americans seeking to improve their financial well-being.

Over two decades later, PGX has delivered on these goals and grown into the premier credit repair services provider in the United States.  In 2012, PGX established the "CreditRepair.com" brand to deliver direct-to-consumer credit report repair services.  In 2015, PGX acquired the "Credit.com" brand, adding to its business one of the first internet-based companies providing credit education, information, and products and services focused on consumer access ranging from free credit scores to related educational content and tools.  Headquartered in Salt Lake City, Utah, PGX employed approximately 300 full-time employees as of the Petition Date, and generated approximately $47 million in revenue in 2022 (not including revenue from services under the Operating Agreements with Lexington Law).

PGX's business is divided into four segments, corresponding to products and services offered to consumers:

- *Awareness and Education*.  PGX offers consumers access to financial products and numerous educational resources to help make smart financial decisions and build positive trade lines.

- *Credit Repair*.   Credit repair is the principal business unit for PGX and its consumer-facing brand, CreditRepair.com.   The service leverages the Fair Credit Reporting Act and other consumer protection statutes to work directly with creditors and credit bureaus in verifying the information found in consumer credit reports.  Inaccurate or unverifiable information must be removed in accordance with applicable law.  PGX and Lexington Law have been successful in empowering consumers to have consumer reporting agencies remove tens of millions of inaccurate or unverifiable negative items from consumer credit reports.

- *Credit Care*.  In exchange for a fee, PGX helps consumers understand the information found in their credit reports while monitoring and protecting that information to prevent the errors that can later require credit repair.  These care services also provide other protections for consumers including identity theft protection.

- *Lexington Law Services*.  Pursuant to the Operating Agreements, PGX provides Lexington Law with vital non-legal operational support and services.  PGX, among other things, advertises and helps engage clients for Lexington Law's credit repair services, in compliance with the rules of professional conduct applicable to Lexington Law.  PGX also provides proprietary software and administrative, operational, and technological support.   Lexington Law pays PGX for these services pursuant to the Operating Agreements.   In the twelve-month period before the Petition Date, PGX derived approximately 87% of its revenue from provision of operating services to Lexington Law.

Today, the Debtors provide their products and services to their 130,000 current customers located 50 states who seek options to understand and improve their credit profile.  PGX offers many of its products and services to consumers at no cost, and for those products and services for which it charges, PGX may charge as little as $74.95 per month under contracts cancelable at any time without additional charge, and in all respects compliant with applicable laws and regulations.  The services PGX provides to consumers are hugely impactful: for example, consumers using PGX's CreditRepair.com branded services over the course of just a six-month period see an average of five negative items removed from their credit reports.  Overall, 71% of consumers see a credit score increase when using PGX's products.  Of those consumers who saw a credit score increase, 79% saw an average improvement of 40 points in their TransUnion credit score.

Debtor PGX Holdings, Inc. has twelve wholly-owned direct and indirect subsidiaries, eleven of which are Debtors in these Chapter 11 Cases.  Non-Debtor PGX TopCo LLC, a subsidiary of non-Debtor Prospect, owns the majority of the equity of Debtor PGX Holdings, Inc.

## B.    Lexington Law's Corporate History and Business Operations

John C. Heath, Attorney At Law PC is a law firm, organized as a professional corporation under Utah state law, that does business as "Lexington Law."  Lexington Law is independently owned by Utah licensed attorneys John C. Heath and Eric Kamerath.  Mr. Heath, who currently serves as the Chief Executive Officer and Directing Attorney at Lexington Law, took on his leadership role at Lexington Law in 2004 and reoriented the primary focus of the firm's practice to consumer credit report repair.  Since Mr. Heath's involvement with the firm, Lexington Law has grown into one of the nation's top providers of legal representation in the consumer credit report repair field.  Servicing fifty states, Lexington Law employs around thirteen to fifteen internal attorneys and around 50 additional personnel in support of the legal representation for clients.  In 2022, Lexington Law generated approximately $341 million in revenue.

Lexington Law offers customers a multi-tiered recurring service model, which at all levels of service includes representation and advice related to challenges with the major credit reporting agencies and creditors, assistance with credit inquiries, provision of identity theft insurance through insurance partners, and access to certain proprietary technology tools (many of which are operated by PGX through the Operating Agreements) that provide customers with customized credit repair advice.

Since 2004, PGX has provided Lexington Law with vital operational support and services pursuant to the Operating Agreements between PGX entities and Lexington Law, which consisted of the Software Licensing, Advertising, Administrative Services, and Teleservices Outsourcing Agreements. Both PGX and Lexington Law have ceased all telemarketing operations in response to the District Court's decision in the CFPB Litigation (as defined herein).

Through the Operating Agreements, Lexington Law pays PGX for operational services based on different compensation formulas.  Compensation and other terms of the Operating Agreements, including the effective period of the Operating Agreements, were amended in 2017.  In the twelve-month period before the Petition Date, Lexington Law's payment obligations to PGX were $251.6 million on account of the Operating Agreements.

As of the Petition Date, Lexington Law owed PGX approximately $27.9 million on account of the Operating Agreements.  In the context of negotiations with Lenders regarding the DIP financing and sale, Lexington Law and PGX agreed upon certain temporary modifications to the payment terms under the Operating Agreements, while allowing time for the Debtors to figure out an optimal go-forward

strategy.  At the closing of a sale, the entity purchasing Lexington Law will assume any amounts outstanding.

### C.    The Debtors' Prepetition Capital Structure

As of the Petition Date, the Debtors had approximately $423.5 million in total funded debt obligations.  The table below summarizes the Debtors' prepetition capital structure:

| *Funded Debt* | *Maturity* | *Principal Amount (in USD millions)* |
|---|---|---|
| Prepetition First Lien Credit Facility | July 21, 2026 | $243.5 |
| Prepetition Second Lien Credit Facility | July 21, 2027 | $180.0 |
| *Total Funded Debt Obligations* | | $423.5 |

### 1.    First Lien Facility

On July 21, 2021, Debtor PGX Holdings, Inc., as parent and guarantor and all other PGX Debtors as borrowers or guarantors, entered into the Prepetition First Lien Credit Agreement with the lender parties thereto (the "Prepetition First Lien Lenders") and Blue Torch Finance LLC ("Blue Torch"), as administrative agent and collateral agent.  The Prepetition First Lien Credit Agreement, as subsequently amended and modified, provided the PGX Debtors' first lien term loan credit facility (the "First Lien Facility") consisting of a term loan in the aggregate principal amount of $253.2 million on the First Lien Facility effective date.  Pursuant to the Prepetition First Lien Credit Agreement, the First Lien Facility is secured on a first priority basis (subject to customary exceptions) by a lien on substantially all of the assets of the PGX Debtors and the equity of each of the subsidiaries of Debtor PGX Holdings, Inc.  The maturity date of the First Lien Facility is July 21, 2026.  As of the Petition Date, approximately $243.5 million of principal remained outstanding on account of the First Lien Facility.

### 2.    Second Lien Facility

On July 21, 2021, Debtor PGX Holdings, Inc., as parent and guarantor and all other PGX Debtors as borrowers or guarantor, entered into the Prepetition Second Lien Credit Agreement with the lenders party thereto from time to time (the "Prepetition Second Lien Lenders"), and Prospect, as administrative agent and collateral agent.  The Prepetition Second Lien Credit Agreement, as subsequently amended and modified, provided the PGX Debtors the second lien term loan credit facility (the "Second Lien Facility" and, together with the First Lien Facility, the "Prepetition Facilities"), consisting of a term loan in the aggregate principal amount of $153.9 million on the Second Lien Facility effective date.  Pursuant to the Prepetition Second Lien Credit Agreement, and as subordinated to the Prepetition First Lien Credit Agreement under that certain Intercreditor Agreement, dated as of July 21, 2021, the Second Lien Facility is secured on a second priority basis (subject to customary exceptions) relative to the First Lien Facility by a lien on substantially all of the assets of the PGX Debtors and the equity of each of the subsidiaries of Debtor PGX Holdings, Inc.  The maturity date of the Second Lien Facility is July 21, 2027.  As of the Petition Date, approximately $180 million of principal remained outstanding under the Second Lien Facility.

### 3.    PGX's Equity

Before January 29, 2023, H.I.G. Capital, LLC, through its subsidiary H.I.G. Progrexion, LLC ("HIG"), was a majority stockholder of Debtor PGX Holdings, Inc.  On December 28, 2022, PGX

Holdings, Inc., HIG, and non-Debtor PGX TopCo LLC entered into that certain transfer agreement (the "Transfer Agreement"), pursuant to which, effective January 28, 2023, HIG transferred its shares to non-Debtor PGX TopCo LLC.  Non-Debtor PGX TopCo LLC is a subsidiary of Prospect.  Lexington Law is owned 99% by attorney John C. Heath and 1% by attorney Eric Kamerath.

## VI.    EVENTS LEADING TO THE CHAPTER 11 FILINGS

### A.    CFPB Litigation

The principal long-term challenge facing the Debtors' businesses has been the management of potential liabilities in connection with the case styled *Bureau of Consumer Financial Protection v. Progrexion Marketing, Inc., et al.*, Case No. 2:19-CV-00298-BSJ (the "CFPB Litigation" and, such docket, the "CFPB Docket").

In the years before the Petition Date, one component of the Debtors' sales lead generation process included the transfer of telemarketed customer leads to the Debtors from third-party, unaffiliated, and independent financial products and services companies (each such company, a "Hotswap Partner," and collectively, the "Hotswap Partners").  In addition to the Hotswap Partners lead generation process, the Debtors also telemarketed their products and services directly to consumers.  The CFPB has been reviewing these telemarketing operations and Hotswap Partners relationships for nearly a decade, as part of the CFPB's broader investigation efforts to determine whether credit repair companies have engaged in unlawful acts or practices related to the manner in which they market, advertise, or provide credit repair services.  On October 3, 2014, the CFPB issued a Civil Investigative Demand to Lexington Law, seeking materials and information related to Lexington Law's marketing and advertising.  In the years following issuance of the Civil Investigative Demand, Lexington Law fully cooperated with the CFPB's investigation process.  On February 2, 2016, the CFPB sent an additional Civil Investigative Demand to Debtors PGX Holdings, Inc., Progrexion Marketing, Inc., Progrexion Teleservices, Inc., and eFolks, LLC. The PGX entities likewise fully cooperated with the CFPB's investigation.

In September 2017, PGX was notified that the CFPB's Office of Enforcement was considering recommending that the CFPB take legal action against both PGX and Lexington Law.  Attempts to resolve the CFPB's concerns were unsuccessful and, on May 2, 2019, the CFPB filed a complaint in the District Court against Progrexion Marketing, Inc., PGX Holdings, Inc., Progrexion Teleservices, Inc., eFolks, LLC, CreditRepair.com, Inc., and Lexington Law (collectively, the "Debtor Defendants"), amended by complaint filed on August 17, 2022, in the District Court.  The CFPB made the following allegations in the complaint.

- ***Alleged Violation by the Debtor Defendants of the TSR Advance Fee Provision ("Count I")***.  The CFPB alleged that the Debtor Defendants committed ongoing violations of 16 C.F.R. § 310.4(a)(2), the advance fee provision of the TSR, beginning on March 8, 2016, by their billing practices.  The advance-fee provision of the TSR is a U.S. Federal Trade Commission ("FTC") rule that purports to prohibit an organization from billing for credit repair services until the time frame represented for the delivery of all such services has expired and the seller has provided the customer with a credit report demonstrating promised results, issued more than six months after such results were achieved.

- ***Alleged Deceptive Acts or Practices in Violation of the Consumer Financial Protection Act of 2010 ("Count II")***.  The CFPB alleged that the Debtor Defendants (excluding Lexington Law), through their marketing activities and conduct related to their Hotswap Partner relationships, engaged in deceptive acts or practices in violation of 12 U.S.C. §§ 5531 and 5536(a)(1)(B).

- ***Alleged False or Misleading Statements Made to Induce Payment for Goods or Services in Violation of the TSR ("Count III")***.  The CFPB alleged that the Debtor Defendants (excluding Lexington Law), in connection with their telemarketing of Lexington Law and the CreditRepair.com branded services and arrangements with their Hotswap Partners made certain false or misleading statements in violation of 16 C.F.R. § 310.3(a)(4) of the TSR.

- ***Alleged Substantial Assistance of a Covered Person Engaged in Deceptive Acts or Practices in Violation of the Consumer Financial Protection Act of 2010 ("Count IV")***.  The CFPB alleged that the Debtor Defendants (excluding Lexington Law) unlawfully knowingly or recklessly provided substantial assistance to certain Hotswap Partners, allegedly covered persons or service providers under 12 U.S.C. § 5481(6)(A), in violations of the Consumer Financial Protection Act of 2010, 12 U.S.C. §§ 5531 and 5536(a)(1)(B).

- ***Alleged Assistance and Facilitation of Violations of the TSR ("Count V")***.  The CFPB alleged that the Debtor Defendants (excluding Lexington Law) engaged in a deceptive acts or practices by providing substantial assistance or support to certain Hotswap Partners, alleged "telemarketers" as defined by 16 C.F.R. § 310(ff), in violations of the TSR, 16 C.F.R. § 310.3(a)(4).

The Debtors maintain that they have not violated any law or regulation and that the operation of their businesses has been fully consistent with applicable laws and regulations, as they have been interpreted historically since before 2000.[23]  The CFPB Litigation continued for nearly four years from the CFPB's initial complaint.

On March 10, 2023, the District Court granted summary judgment against the Debtors solely as to Count I, finding in favor of the CFPB and holding that the Debtor Defendants violated the advance fee provision of the TSR.  In response to the ruling and upon the expiration of an administrative stay following the ruling, the Debtors shut down approximately 80% of their business, including their call centers, and laid off approximately 900 employees, for the purpose of bringing the business into compliance with the interpretation of the TSR reflected in the District Court's ruling.  The CFPB demanded nearly $3 billion in restitution or refunds and other monetary relief and requested certain injunctive relief in connection with the adverse ruling as to Count I.  The Debtors decided not to proceed with the interlocutory appeal after the United States Court of Appeals for the Tenth Circuit denied the Debtors' request for administrative stay, but the Debtors reserved all rights to appeal a final judgment or other future appealable order.

The District Court was considering the CFPB's *Motion for Award of Monetary and Injunctive Relief, Assessment of Civil Money Penalties, and Entry of Final Judgment Against All Defendants on*

---

[23]   While the "advance fee" provision was designed by the FTC over 25 years ago to protect against a breed of predatory credit repair companies, the rule has rarely been invoked in recent years.  A federal statute enacted a year later, the Credit Repair Organizations Act (15 U.S.C. § 1679 et seq.), provides the fundamental guidelines for how credit repair companies can charge consumers, and PGX and Lexington Law have been in compliance with these fundamental guidelines.

*Count I*, which sought, among other things, prospective injunctive relief enjoining future violations of the advance fee provision and over $2.7 billion in monetary relief from the Debtor Defendants.  On June 7, 2023, the District Court denied the CFPB motion for relief without prejudice, reasoning that outstanding issues of fact precluded the District Court from entering the requested relief [CFPB Docket No. 574].  On August 1, 2023, the parties filed a joint proposed pretrial order regarding the CFPB's request for monetary and injunctive relief under Count I [CFPB Docket No. 591].

As discussed in detail in Article IV.3 of this Disclosure Statement, the Debtors successfully negotiated a global settlement with the CFPB resolving all outstanding claims against the Debtors as well as the CFPB Litigation and the CFPB's sale objection and conversion motion in the Chapter 11 Cases, and the terms of the CFPB Settlement were memorialized in the CFPB Settlement Order entered by the District Court.  *See* CFPB Docket No. 600.

### B.    Other Business Challenges

#### 1.    Google's Ban on Paid Credit Repair Services Ads

One of the Debtors' primary and most effective tools to attract new consumers is online advertising.  Historically, a notable percentage of the Debtors' new leads have come from paid advertising on Google.  In November 2019, Google announced that it would update its policies to restrict the advertisement of credit repair services.  Since then, paid ads for credit repair services are no longer allowed.  This policy applied globally to all accounts that advertised credit repair services directly, to lead generators, and to those who connect consumers with third-party services.  With more than 93% market share, Google consistently dominates the market shares of all search engines worldwide.  As a result of Google's new policy, the Debtors lost the opportunity to reach hundreds of thousands of potential consumers.  In June 2022, Google updated the enforcement procedures for repeat violations of the ban and began implementing a strike-based system for the credit repair services policies.  In addition to penalties that progressively increase with each violation, businesses that continue to advertise credit repair services receive strikes.  When a business reaches three strikes, the system automatically puts it on a "red list," permanently prohibiting it from advertising its business.  The Google policy change has been significantly detrimental to the Debtors' business.  Combined with the effects of the CFPB Litigation on the Debtors' sales and marketing processes, this policy has had the effect of cutting off the Debtors from large swaths of the market for their products and services.

#### 2.    Challenging Macroeconomic Conditions for the Credit Repair Industry

Macroeconomic conditions continue to contribute to a challenging environment for the Debtors, placing pressure on core credit repair demand.  For example, in 2022, the average FICO credit score in the U.S. reached an all-time high of 726, following eleven consecutive years of increases.  Unemployment is at its lowest level in fifty years.  And overall, demand for credit has softened: according to the January 2023 Senior Loan Officer Opinion Survey on Bank Lending Practices, banks reported that demand for loans to households, including credit card, auto, and other consumer loans, has weakened relative to prior months.  Each of these trends has reduced demand for credit repair services relative to prior years.

#### 3.    Deteriorating Financial Performance at PGX

PGX operations have failed to rebound from continual declines that began in 2019, and the business model changes occasioned by the CFPB Litigation will accelerate this trend.

### 4. Challenging Contractual Obligations at Lexington Law

The current internal forecast of liquidity for Lexington Law projects that the firm will not be able in the near term to satisfy its contractual obligations to pay PGX for the support services PGX provides to the firm. This will increase obligations owed to PGX over time. Given that PGX derives approximately 87% of its revenue from the provision of operating services to Lexington Law, changes in Lexington Law's liquidity will have an immediate effect on PGX and the PGX Debtors.

### C. Exploration of Strategic Alternatives

The Debtors have been engaged for several years with advisors and stakeholders to address these business challenges and the uncertainty and potential liabilities associated with the CFPB Litigation. The events leading to a restructuring process began in 2019, and the Debtors have worked for several years to explore and execute alternative out-of-court restructuring transactions in an effort to maximize value for all stakeholders. Several months before the Petition Date, the Debtors' Prepetition Lenders, DIP Lenders, and other key stakeholders agreed to an out-of-court transaction and certain forbearances and waivers to provide runway for the Debtors to pursue a value-maximizing transaction. Ultimately, however, those efforts could not provide them the long-term relief the Debtors needed, and the Debtors determined that it was necessary to pivot towards discussions regarding an in-court restructuring process.

Thus, the Debtors, with the assistance of their advisors, have engaged with their stakeholders every step of the way on potential out-of-court solutions, and the Debtors Filed for chapter 11 protection only at the conclusion of (a) several years of exhaustive review of available pathways, (b) a recent adverse ruling in the CFPB Litigation, (c) a macroeconomic environment that remains difficult for the credit repair industry, (d) pressure caused by the upcoming termination of the forbearance term under those Forbearance Agreements granted to the Debtors by the Prepetition Lenders, and (e) the exhaustion of near-term liquidity. The Chapter 11 Cases are the Debtors' best opportunity to fully and fairly resolve their liabilities in a manner that preserves value and maintains the Debtors' ability to deliver their consumer-first products and services to their hard-working customer base.

## VII. MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11 CASES

### A. First Day Relief

On the Petition Date, along with their voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Petitions"), the Debtors Filed several motions (the "First Day Motions") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations, by, among other things, easing the strain on the Debtors' relationships with employees, vendors, and customers following the commencement of the Chapter 11 Cases. On June 6–7, 2023, the Bankruptcy Court entered orders approving the First Day Motions on either an interim or final basis. From July 19–21, 2023, the Bankruptcy Court entered orders approving certain of the First Day Motions on a final basis.

A brief description of each of the First Day Motions and the evidence in support thereof is set forth in the *Declaration of Chad Wallace, Chief Executive Officer of PGX Holdings, Inc., in Support of Chapter 11 Filing and First Day Motions* [Docket No. 12] (the "First Day Declaration"), Filed on June 4, 2023. The First Day Motions, the First Day Declaration, and all orders for relief granted in the Chapter 11 Cases, can be viewed free of charge at https://www.kccllc.net/pgx.

### B.    Appointment of Official Committee of Unsecured Creditors

On June 14, 2023, the U.S. Trustee Filed the *Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 90], notifying parties in interest that the U.S. Trustee had appointed the Committee in these Chapter 11 Cases. The Committee is currently comprised of: (a) Hawthorne Direct, LLC; (b) Site Selection Group, LLC; and (c) Argano, LLC.

On June 16, 2023, the Committee Filed the *Notice of Appearance and Request for Service of Papers* [Docket No. 95], identifying their proposed counsel as ArentFox Shiff LLP and Morris James LLP. The Committee subsequently retained FTI Consulting, Inc. as its financial advisor. The Debtors held a meeting of creditors pursuant to section 341 of the Bankruptcy Code on July 13, 2023.

### C.    Other Procedural and Administrative Motions

During these Chapter 11 Cases, the Debtors also Filed several other motions to further facilitate the smooth and efficient administration of the Chapter 11 Cases and reduce the administrative burdens associated therewith, including:

- Bidding Procedures Motion. Please see Article IV.A.2 and Article IV.A.3 of this Disclosure Statement for a discussion of the Bidding Procedures Motion.

- SOFA Extension Motion. The *Motion of Debtors for Entry of an Order (I) Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, Statements of Financial Affairs, and Rule 2015.3 Financial Reports and (II) Granting Related Relief* [Docket No. 15] (the "SOFA Extension Motion"), seeking an extension of the deadlines by which the Debtors must File certain schedules of assets and liabilities and statements of financial affairs for each Debtor (the "Schedules and SOFAs") to and including August 1, 2023. On July 18, 2023, the Debtors Filed a certification of counsel stating that no objections to the SOFA Extension Motion had been Filed and asking the Bankruptcy Court to enter an order granting the SOFA Extension Motion [Docket No. 174]. On July 19, 2023, the Bankruptcy Court entered an order approving the SOFA Extension Motion on a final basis [Docket No. 197]. The Debtors Filed the Schedules and SOFAs on July 31 and August 1, 2023. *See* Docket Nos. 278–290, 293–300, 302–306.

- Ordinary Course Professionals Motion. The *Debtors' Motion for Entry of an Order Authorizing the Debtors to Retain and Compensate Professionals Utilized in the Ordinary Course of Business* [Docket No. 122] (the "OCP Motion"), Filed on June 30, 2023, seeking authorization for the Debtors to retain and compensate certain professionals utilized in the ordinary course of business. On July 18, 2023, the Debtors Filed a certificate of no objection stating that no objections to the OCP Motion had been Filed and asking the Bankruptcy Court to enter an order granting the OCP Motion [Docket No. 168]. On July 19, 2023, the Bankruptcy Court entered an order approving the OCP Motion on a final basis [Docket No. 209].

- Interim Compensation Procedures Motion. The *Motion of Debtors for Entry of an Order (I) Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals and (II) Granting Related Relief* [Docket No. 127] (the "Interim Compensation Procedures Motion"), Filed on June 30, 2023, seeking approval of procedures for the interim compensation and reimbursement of expenses of retained Professionals in the Chapter 11 Cases. On July 19, 2023, the Debtors

Filed a certification of counsel stating that no formal objections to the Interim Compensation Motion had been Filed and asking the Bankruptcy Court to enter an order granting the Interim Compensation Motion [Docket No. 186]. On July 19, 2023, the Bankruptcy Court entered an order approving the Interim Compensation Motion on a final basis [Docket No. 208].

- *De Minimis* Asset Sales Motion. The *Debtors' Motion for Entry of an Order Approving Procedures for the Sale, Transfer, and/or Abandonment of* De Minimis *Assets* [Docket No. 136] (the "*De Minimis* Asset Sales Motion"), Filed on July 7, 2023, seeking authority to sell certain obsolete, excess, burdensome, non-core, or otherwise *de minimis* assets in individual transactions or a series of transactions with an aggregate sale price equal to or less than $150,000. On July 18, 2023, the Debtors Filed a certification of counsel stating that no formal objections to the *De Minimis* Asset Sales Motion had been Filed and asking the Bankruptcy Court to enter an order granting the *De Minimis* Asset Sale Motion [Docket No. 170]. On July 19, 2023, the Bankruptcy Court entered an order approving the *De Minimis* Asset Sale Motion on a final basis [Docket No. 212].

- Claims Bar Date Motion. The *Debtors' Motion for Entry of an Order (A) Establishing Bar Dates for Filing Proofs of Claim, Including Claims Under 11 U.S.C. § 503(b)(9) and Administrative Expense Requests; (B) Approving the Form of and Manner for Filing Proofs of Claim and Administrative Expense Requests; and (C) Approving Notice Thereof; and (D) Granting Related Relief* [Docket No. 138] (the "Claims Bar Date Motion"), Filed on July 7, 2023, seeking to establish bar dates for filing proofs of claims, amended schedules, and rejection damages, and approving the form and manner for filing proofs of claims. On July 18, 2023, the Debtors Filed a certificate of no objection stating that no objections to the Claims Bar Date Motion had been Filed and asking the Bankruptcy Court to enter an order granting the Claims Bar Date Motion [Docket No. 172]. On July 19, 2023, the Bankruptcy Court entered an order approving the Claims Bar Date Motion on a final basis [Docket No. 194]. On August 3, 2023, the Debtors filed notice of the bar dates [Docket No. 323]. On August 9, 2023, the Debtors caused notice of the bar dates to be published in the *USA Today* (National Edition) [Docket No. 342].

### D.    Retention of Debtor Professionals

The Debtors Filed applications for, and the Bankruptcy Court entered orders approving, the retention of various professionals to assist the Debtors in carrying out their duties as debtors in possession and to represent their interests in the Chapter 11 Cases:

- Kirkland & Ellis, LLP, as primary restructuring counsel [Docket No. 125],

- Klehr Harrison Harvey Branzburg LLP, LLP, as co-counsel [Docket No. 115],

- Greenhill & Co., LLC, as investment banker [Docket No. 124],

- Alvarez & Marsal North America, LLC, as financial advisor [Docket No. 123],

- Landis Rath & Cobb LLP, as conflicts counsel for PGX Holdings Inc. [Docket No. 121],

- Pachulski Stang Ziehl & Jones LLP, as conflicts counsel for Lexington Law [Docket No. 120],

- Kurtzman Carson Consultants LLC, as claims and noticing agent and administrative advisor [Docket Nos. 4, 116],

- Williams & Connolly LLP, as special counsel [Docket No. 119], and

- Holland & Hart, as special counsel [Docket No. 118].

In conjunction with the Retention Applications, the Debtors also Filed the *Motion of Debtors for Entry of an Order Authorizing the Debtors to File Under Seal the Names of Certain Confidential Parties in Interest Related to the Debtors' Professional Retention Applications* [Docket No. 126] (the "Motion to Seal"), seeking authority for the Debtors' professionals to redact and File under seal the names of certain confidential parties that were potential bidders in the Debtors' marketing process.

The Retention Applications, with the exception of the Greenhill Retention Application, were approved under certification of counsel, and orders were entered authorizing the Retention Applications. [Docket Nos. 56, 199, 202, 204, 205, 207, 214, 223]. The Greenhill Application was approved and the order entered following the Global Settlement on August 2, 2023 [Docket No. 322].  The Motion to Seal was also approved and the order entered on July 20, 2023 [Docket No. 226].

The foregoing professionals are, in part, responsible for the administration of the Chapter 11 Cases.  The postpetition compensation of all of the Debtors' professionals retained pursuant to sections 327 and 328 of the Bankruptcy Code is subject to the approval of the Bankruptcy Court.

E.    **Approval of Debtor-in-Possession Financing**

On June 5, 2023, the Debtors Filed the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 17] (the "DIP Motion"), requesting that the Bankruptcy Court authorize the Debtors to receive senior secured postpetition financing on a superpriority basis in the form of a senior secured, super priority multiple draw term loan facility in an aggregate principal amount of $19.925 million and to continue using the Prepetition Lenders' Cash Collateral to provide sufficient liquidity for their operations during these Chapter 11 Cases.  The DIP Facility also featured a roll-up of prepetition debt in the amount (a) $2.9 million, which corresponded to the amount of the emergency bridge financing provided the week before the Petition Date, subject to entry of the Interim Order, and (b) $39.85 million, subject to entry of the Final Order. The DIP Facility matures 105 days after the Petition Date.  In consideration for the consensual use of Cash Collateral, the Debtors agreed to provide the Prepetition Lenders with adequate protection as set forth in the DIP Motion and the accompanying proposed interim order.  The Committee initially objected to the DIP Motion but withdrew its objection after reaching the Global Settlement, which was memorialized in a term sheet attached to the DIP Order.  On June 6, 2023, the Bankruptcy Court entered an order approving the DIP Motion on an interim basis [Docket No. 70].  On August 3, 2023, the Debtors Filed a certification of counsel describing the objections they had received with respect to the DIP Motion, and the resolutions thereof [Docket No. 330].  On August 4, 2023, the Bankruptcy Court entered the DIP Order on a final basis [Docket No. 332].

F.    **Bidding Procedures and Marketing Process**[24]

As described above, the Debtors conducted a marketing process for all of substantially all of their assets.  In the period leading up to the Petition Date, Greenhill worked to prepare for a robust postpetition marketing process on an expedited basis that aligned with the milestones provided in the Restructuring Support Agreement and required by the DIP Facility.  Greenhill, with the assistance of the Debtors, identified more than 120 parties, including strategic and financial partners, as potential bidders for the Debtors' assets.

In May 2023, the Prepetition First and Second Lien Lenders provided the Debtors with a purchase offer proposal comprised of two components—the provision of the DIP Facility to fund these Chapter 11 Cases and an agreement to serve as the stalking horse bidder and to credit-bid for substantially all of the assets of PGX in tandem with the sale of the Lexington Law assets.  After extensive arm's-length negotiations with the Debtors' Prepetition First and Second Lien Lenders, the Debtors were able to secure the proposed multi-draw DIP Facility in an aggregate amount of up to $19.925 million, coupled with a going-concern credit bid for substantially all of the assets of PGX.  This proposal formed the basis for the DIP Financing and the Progrexion Stalking Horse Bid.  The liquidity provided by the DIP Financing, and the support of the Progrexion Stalking Horse Bid, will facilitate a fulsome and value-maximizing postpetition marketing process for the sale of all or substantially all of the Debtors' assets.

The Debtors and their advisors negotiated entry into two separate stalking horse purchase agreements:

- *Progrexion APA* between PGX Holdings, Inc., Progrexion Holdings, Inc., Credit.com, Inc., eFolks Holdings, Inc., Creditrepair.com Holdings, Inc., Progrexion ASG, Inc., Progrexion IP, Inc., Progrexion Marketing, Inc., Progrexion Teleservices, Inc., eFolks, LLC, Creditrepair.com, Inc., Credit Repair UK, Inc. and the Progrexion Purchaser.  As consideration for the purchase of the PGX assets, the PGX APA includes a credit bid of the amount of the DIP Facility, plus a portion of the first lien credit facility, for a total purchase amount of approximately $237.5 million.

- *Lexington Law APA* between John C. Heath, Attorney at Law PC d/b/a Lexington Law, a Utah professional corporation and the Lexington Purchaser.  As consideration for the purchase of the Lexington Law assets, the Lexington Law APA provides for the assumption and cure of the Operating Agreements with PGX, including (i) prepetition cure amounts of approximately $28 million, (ii) payment of up to $5.1 million of administrative expenses, and (iii) the assumption of the nearly 150,000 engagement agreements between Lexington Law and its direct clients (subject to compliance with applicable legal ethics rules related to the transfer of client files upon sale of a law firm).

The dual stalking horse bids are conditioned on each other and intended to permit the Debtors' underlying businesses, which are dependent on each other, to continue to operate as a going concern post-closing.

A number of factors necessitated the separate Lexington Law APA.  First, because it is a law firm, certain assets of Lexington Law can only be owned by licensed attorneys in accordance with certain legal ethics rules.  Second, John Heath, the principal attorney at Lexington Law, has decades of experience with the underlying business model and is uniquely positioned to continue to provide those services on a go-forward basis.  The Lexington Law APA was ultimately a condition of both the PGX

---

[24]    Capitalized terms used but not otherwise defined in this section have the meaning given to them in the Bidding Procedures.

stalking horse agreement and the DIP Facility, and was reviewed and approved by the independent director of Lexington Law in consultation with independent counsel.

While the transfer of the nearly 150,000 engagement agreements between Lexington Law and its direct clients is consideration for the purchase of the Lexington Law assets, each Lexington Law client was given an opportunity to opt-out of the transfer of their representation to the Lexington Purchaser in the Sale Transaction by completing a form on the Claim and Noticing Agent website at www.kccllc.net/Lex. Only records relating to the clients of Lexington Law that did not opt out of the Sale Transaction by September 10, 2023 will be transferred from Lexington Law to the Successful Bidder for the Lexington Law Assets. In connection with such Sale Transaction, the Lexington Law records relating to the clients will be maintained and transferred in accordance with any and all applicable rules of professional conduct, and all the clients' rights under the engagement letters will be preserved.

Under the Bidding Procedures approved by the Bankruptcy Court, the deadline for interested parties to submit binding Bids was August 11, 2023, at 5:00 p.m., prevailing Eastern Time. Qualified Bids were required to satisfy the general Bid Requirements set forth in the Bidding Procedures. The deadline to object to the Sale Transaction was August 14, 2023, at 5:00 p.m., prevailing Eastern Time. In accordance with the Bidding Procedures Order, the contract counterparties received notice of potentially assumed executory contracts and unexpired leases on August 4, 2023. *See Notice to Contract Parties to Potentially Assumed Executory Contracts and Unexpired Leases* [Docket No. 336]. While the Auction was scheduled for August 15, 2023, at 5:00 p.m., prevailing Eastern Time, via Zoom, the Debtors did not receive any Bids that were more favorable than the stalking horse purchase agreements. Accordingly, the Debtors cancelled the auction and sought approval of the Sale Transaction contemplated by the stalking horse agreements. *See* Docket No. 356.

On August 25, 2023, the Bankruptcy Court approved the Sale Transaction and entered the Sale Orders. *See* Docket Nos. 422–423.

### G.    Litigation Matters

In the ordinary course of business, the Debtors are parties to certain lawsuits, legal proceedings, collection proceedings, and claims arising out of their business operations. The Debtors cannot predict with certainty the outcome of these lawsuits, legal proceedings, and claims.

On June 5, 2023, Kirsten Hansen, on behalf of herself and others similarly situated, Filed a class action complaint against some of the Debtors in the Bankruptcy Court, alleging violations of the Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 *et seq.* (the "<u>WARN Act</u>") [Docket No. 34]. In particular, the plaintiff alleges that the Debtors failed to provide advance notice of the termination as required by the WARN Act. The Debtors are working to resolve this litigation matter during the Chapter 11 Cases.

With certain exceptions, the filing of the Chapter 11 Cases operates as a stay with respect to the commencement or continuation of litigation against the Debtors that was or could have been commenced before the commencement of the Chapter 11 Cases. In addition, the Debtors' liability with respect to litigation stayed by the commencement of the Chapter 11 Cases generally is subject to discharge, settlement, and release upon confirmation of a plan under chapter 11, with certain exceptions. Therefore, certain litigation Claims against the Debtors may be subject to discharge in connection with the Chapter 11 Cases.

Pursuant to section 362(b)(4) of the Bankruptcy Code, the automatic stay does not apply to the commencement or continuation of an action or proceeding by a governmental unit, among others, to enforce such governmental unit's police and regulatory power, including the enforcement of a judgment

other than a money judgment, obtained in an action or proceeding by the governmental unit to enforce such governmental unit's police or regulatory power.  Therefore, the CFPB Litigation is excepted from the automatic stay as and to the extent set forth in section 362(b)(4) of the Bankruptcy Code.  As explained in greater detail in Article IV.3 of this Disclosure Statement, however, the Debtors negotiated a settlement with the CFPB that resolves all outstanding claims against the Debtors.

**H.**     **Assumption and Rejection of Executory Contracts and Unexpired Leases**

The Debtors are party to a substantial number of executory contracts.  The Debtors, with the assistance of their advisors, have reviewed and will continue to review the Executory Contracts and Unexpired Leases to identify contracts and leases to either assume or reject pursuant to sections 365 or 1123 of the Bankruptcy Code.  To facilitate this process, the Debtors have Filed the following motions:

- First Omnibus Rejection Motion.  The *First Omnibus Motion of Debtors for Entry of an Order (I) Authorizing the Rejection of Certain Unexpired Leases and Executory Contracts, (II) Authorizing Abandonment of Certain Personal Property, Each Effective as of the Petition Date, and (III) Granting Related Relief* [Docket No. 10] (the "First Omnibus Rejection Motion"), Filed on the Petition Date, seeking authority to reject certain unexpired leases and executory contracts and abandonment of certain equipment, fixtures, furniture, or other personal property.  On July 18, 2023, the Debtors Filed a certificate of no objection stating that no formal objections to the First Omnibus Rejection Motion had been Filed and asking the Bankruptcy Court to enter an order granting the First Omnibus Rejection Motion [Docket No. 162].  On July 19, 2023, the Bankruptcy Court entered an order approving the First Omnibus Rejection Motion on a final basis [Docket No. 216].

- Second Omnibus Rejection Motion.  The *Second Omnibus Motion of Debtors for Entry of an Order Authorizing the Rejection of Certain Executory Contracts, Effective as of the Petition Date, and Granting Related Relief* [Docket No. 75] (the "Second Omnibus Rejection Motion"), Filed on June 8, 2023, seeking authority to reject certain executory contracts.  On July 18, 2023, the Debtors Filed a certificate of no objection stating that no formal objections to the Second Omnibus Rejection Motion had been Filed and asking the Bankruptcy Court to enter an order granting the Second Omnibus Rejection Motion [Docket No. 163].  On July 19, 2023, the Bankruptcy Court entered an order approving the Second Omnibus Rejection Motion on a final basis [Docket No. 196].

- Third Omnibus Rejection Motion.  The *Third Omnibus Motion of Debtors for Entry of an Order Authorizing the Rejection of Certain Executory Contracts, Effective as of the Rejection Date, and Granting Related Relief* [Docket No. 135] (the "Third Omnibus Rejection Motion"), Filed on July 7, 2023, seeking authority to reject certain executory contracts.  On July 18, 2023, the Debtors Filed a certificate of no objection stating that no formal objections to the Third Omnibus Rejection Motion had been Filed and asking the Bankruptcy Court to enter an order granting the Third Omnibus Rejection Motion [Docket No. 169].  On July 19, 2023, the Bankruptcy Court entered an order approving the Third Omnibus Rejection Motion on a final basis [Docket No. 211].

- Fourth Omnibus Rejection Motion.  The *Fourth Omnibus Motion of Debtors for Entry of an Order Authorizing the Rejection of Certain Executory Contracts, Effective as of the Rejection Date, and Granting Related Relief* [Docket No. 340] (the "Fourth Omnibus Rejection Motion"), Filed on August 8, 2023, seeking

authority to reject certain executory contracts. On August 23, 2023, the Debtors Filed a certificate of no objection stating that no formal objections to the Third Omnibus Rejection Motion had been Filed and asking the Bankruptcy Court to enter an order granting the Fourth Omnibus Rejection Motion [Docket No. 396]. On August 23, 2023, the Bankruptcy Court entered an order approving the Third Omnibus Rejection Motion on a final basis [Docket No. 401].

- Fifth Omnibus Rejection Motion. The *Fifth Omnibus Motion of Debtors for Entry of an Order Authorizing the Rejection of Certain Executory Contracts, Effective as of the Petition Date, and Granting Related Relief* [Docket No. 345] (the "Fifth Omnibus Rejection Motion"), Filed on August 9, 2023, seeking authority to reject certain executory contracts. On August 23, 2023, the Debtors Filed a certificate of no objection stating that no formal objections to the Fifth Omnibus Rejection Motion had been Filed and asking the Bankruptcy Court to enter an order granting the Third Omnibus Rejection Motion [Docket No. 397]. On August 23, 2023, the Bankruptcy Court entered an order approving the Third Omnibus Rejection Motion on a final basis [Docket No. 402].

Additionally, the Debtors Filed the *Debtors' Motion Seeking Entry of an Order (I) Authorizing and Approving Procedures to Reject Executory Contracts and Unexpired Leases and (II) Granting Related Relief* [Docket No. 137] (the "Rejection Procedures Motion") on July 7, 2023, seeking approval of procedures for rejecting executory contracts and unexpired leases. On July 18, 2023, the Debtors Filed a certificate of no objection stating that no objections to the Rejection Procedures Motion had been Filed and asking the Bankruptcy Court to enter an order granting the Rejection Procedures Motion [Docket No. 171]. On July 19, 2023, the Bankruptcy Court entered an order approving the Rejection Procedures Motion on a final basis [Docket No. 217]. On August 29, 2023, the Debtors also Filed the *Debtors' Motion for Entry of an Order, Pursuant to Section 365(d)(4) of the Bankruptcy Code, Extending Time to Assume or Reject Unexpired Leases of Residential Property* [Docket No. 428].

On the Effective Date, except as otherwise provided in the Plan or in the Sale Orders, each Executory Contract or Unexpired Lease not previously assumed, assumed and assigned, or rejected shall be deemed automatically rejected, pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease: (1) is identified on the Assumed Executory Contracts and Unexpired Leases Schedule; (2) is the subject of a motion to assume (or assume and assign) such Executory Contract that is pending on the Confirmation Date; (3) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan; (4) is a directors and officers insurance policy; (5) is the Asset Purchase Agreements; or (6) is to be assumed by the Debtors and assigned to the Purchasers in connection with the Sale Transaction and pursuant to the Sale Transaction Documents.

Entry of the Confirmation Order by the Bankruptcy Court shall constitute a Final Order approving the assumptions, assumptions and assignments, or rejections of the Executory Contracts or Unexpired Leases pursuant to the Plan; *provided* that neither the Plan nor the Confirmation Order is intended to or shall be construed as limiting the Debtors' authority under the Sale Orders to assume and assign Executory Contracts and Unexpired Leases to the Purchasers pursuant to the Asset Purchase Agreements. Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date by a Final Order but may be withdrawn, settled, or otherwise prosecuted by the Wind-Down Debtor. Each Executory Contract and Unexpired Lease assumed pursuant to Article V.A of the Plan or by any order of the Bankruptcy Court, which has not been assigned to a third party prior to the Confirmation Date, shall revest in and be fully enforceable by the Wind-Down Debtor in accordance with its terms, except as such

terms are modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law.

Notwithstanding anything to the contrary in the Plan or the Sale Transaction Documents, the Debtors, the Wind-Down Debtor, the Purchasers, and the Plan Administrator, as applicable, reserve the right to alter, amend, modify, or supplement the Assumed Executory Contracts and Unexpired Leases Schedule and the Rejected Executory Contracts and Unexpired Leases Schedule identified in Article V of the Plan and in the Plan Supplement at any time through and including ninety (90) days after the Effective Date. The Debtors or the Wind-Down Debtor, as applicable, shall provide notice of any amendments to the Rejected Executory Contracts and Unexpired Leases Schedule or the Assumed Executory Contracts and Unexpired Leases Schedule to the parties to the Executory Contracts or Unexpired Leases affected thereby. For the avoidance of doubt, Article V relates to Executory Contracts or Unexpired Leases other than such agreements assumed, assumed and assigned, or rejected in accordance with the terms of the Sale Orders.

Although their analysis is ongoing, the Debtors currently estimate that the aggregate amount of Claims on account of rejection of Executory Contracts and Unexpired Leases may be significant.

## I.    Claims Based on Rejection of Executory Contracts or Unexpired Leases

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court within thirty (30) days after the later of (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, (2) the effective date of such rejection, or (3) the Effective Date. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Wind-Down Debtor, the Estates, the Creditor Trust, the Liquidating Trust (if any), the Purchasers, or their respective property without the need for any objection by the Wind-Down Debtor or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in a Proof of Claim to the contrary, unless otherwise ordered by the Bankruptcy Court.** All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III of the Plan or such other treatment as agreed to by the Wind-Down Debtor and the Holder of such Claim.

## J.    Cure of Defaults

Any monetary defaults under an assumed Executory Contract or Unexpired Lease, as reflected on the Cure Notice, shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Claim in Cash on the Effective Date, subject to the limitations described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. In the event of a dispute regarding (1) the amount of any payments to cure such a default, (2) the ability of the Wind-Down Debtors or any assignee, as applicable, to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving the assumption.

At least fourteen (14) days before the Confirmation Hearing, the Debtors shall distribute, or cause to be distributed, Cure Notices of proposed assumption or assumption and assignment and proposed amounts of Cure Claims to the applicable third parties.  **Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or assumption and assignment or related cure amount must be Filed, served, and actually received by the Debtors at least seven days before the Confirmation Hearing.**  Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption or assumption and assignment or cure amount will be deemed to have assented to such assumption or assumption and assignment and cure amount. Notwithstanding anything herein to the contrary, in the event that any Executory Contract or Unexpired Lease is removed from the Rejected Executory Contracts and Unexpired Leases Schedule after such 14-day deadline, a Cure Notice of proposed assumption or assumption and assignment and proposed amounts of Cure Claims with respect to such Executory Contract or Unexpired Lease will be sent promptly to the counterparty thereof and a noticed hearing set to consider whether such Executory Contract or Unexpired Lease can be assumed or assumed and assigned.

If the Bankruptcy Court determines that the Allowed Cure Claim with respect to any Executory Contract or Unexpired Lease is greater than the amount set forth in the applicable Cure Notice, the Debtors or Wind-Down Debtors, as applicable, may add such Executory Contract or Unexpired Lease to the Rejected Executory Contracts and Unexpired Leases Schedule, in which case such Executory Contract or Unexpired Lease will be deemed rejected as the Effective Date.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary (solely to the extent agreed between the Debtors and the counterparty to an applicable Executory Contract or Unexpired Lease), including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the date that the Debtors assume such Executory Contract or Unexpired Lease.  Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

## VIII.    RISK FACTORS

Holders of Claims should read and consider carefully the risk factors set forth, as well as the other information set forth in this Disclosure Statement and the documents delivered together with this Disclosure Statement, referred to or incorporated by reference in this Disclosure Statement, below before voting to accept or reject the Plan.  Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtors' business or the Plan and its implementation.

### A.    Certain Bankruptcy Law Considerations

The occurrence or nonoccurrence of any or all of the following contingencies, and any others, may affect distributions available to Holders of Allowed Claims and Allowed Interests under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims in such Impaired Classes.

#### 1.    Parties in Interest May Object to the Plan's Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or

equity interests in such class. The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### 2. The Conditions Precedent to the Effective Date of the Plan May Not Occur

As more fully set forth in Article IX of the Plan, the Effective Date of the Plan is subject to a number of conditions precedent. If such conditions precedent are waived or not met, the Effective Date will not take place.

### 3. The Debtors May Fail to Satisfy Vote Requirements

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. In the event that sufficient votes are not received, the Debtors may seek to pursue another strategy to wind down the Estates, such as confirm an alternative chapter 11 plan, a dismissal of the Chapter 11 Cases and an out-of-court dissolution, an assignment for the benefit of creditors, a conversion to a chapter 7 case, or other strategies. There can be no assurance that the terms of any such alternative strategies would be similar or as favorable to the Holders of Interests and Allowed Claims as those proposed in the Plan.

### 4. The Debtors May Not Be Able to Secure Confirmation of the Plan

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims or equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and the voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met. If the Plan is not confirmed by the Bankruptcy Court, it is unclear what distributions, if any, Holders of Allowed Claims and Allowed Interests will receive with respect to their Allowed Claims and Allowed Interests. The Bankruptcy Court, as a court of equity, may exercise substantial discretion.

The Debtors, after consultation with the Committee, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation, provided that such modification is consistent with the Global Settlement Term Sheet or does not adversely impact the treatment of Classes 6A, 6B, 6C, or 6D. Except as provided in the preceding sentence, any such modifications may result in a less favorable treatment of any Class, as well as any class junior to such non-accepting class, than the treatment currently provided in the Plan. Such a less favorable treatment may include a distribution of property to

the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.

### 5.  Nonconsensual Confirmation

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es).  The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion.  In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

### 6.  Plan Exclusivity Period

In addition, at the outset of the Chapter 11 Cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan.  The Debtors will have retained the exclusive right to propose the Plan upon filing their Petitions.  If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Plan in order to achieve the Debtors' stated goals.

### 7.  The Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code

If a bankruptcy court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the bankruptcy court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code.  In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code.  The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of the additional expenses the Debtors would necessarily incur related to the chapter 7 trustee and additional retained professionals.  Such expenses may decrease recoveries for Holders of Allowed Claims in the Voting Classes.  *See, e.g.*, 11 U.S.C. §§ 326(a), 503(b)(2).  The conversion to chapter 7 would require entry of a new bar date, which may increase the amount of Allowed Claims and thereby reduce Pro Rata recoveries.  *See* Fed. R. Bankr. P. 1019(2), 3002(c).

### 8.  The Debtors May Object to the Amount or Classification of a Claim

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan.  The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to an objection.  Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

### 9. Risk of Non-Occurrence of the Effective Date

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

### 10. Contingencies May Affect Votes of Impaired Classes to Accept or Reject the Plan

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies, which may affect distributions available to Holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

### 11. Releases, Injunctions, and Exculpations Provisions May Not Be Approved

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Debtors, Wind-Down Debtor, or Released Parties, as applicable. The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved. If the releases are not approved, certain Released Parties may withdraw their support for the Plan.

### 12. The Total Amount of Allowed Other General Unsecured Claims May Be Higher Than Anticipated by the Debtors

With respect to Holders of Allowed Other General Unsecured Claims, the Claims Filed against the Debtors' Estates may be materially higher than the Debtors have estimated.

### 13. Certain Tax Implications of the Plan

Holders of Allowed Claims should carefully review Article XI of this Disclosure Statement, entitled "MATERIAL UNITED STATES FEDERAL INCOME TAX CONSEQUENCES," to determine how the tax implications of the Plan and the Chapter 11 Cases may adversely affect the Wind-Down Debtor, Creditor Trust, and Holders of Claims and Interests.

### B. Disclosure Statement Disclaimer

### 1. The Financial Information Contained in this Disclosure Statement Has Not Been Audited

In preparing this Disclosure Statement, the Debtors and their advisors relied on financial data derived from their books and records that was available at the time of such preparation. Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information,

and any conclusions or estimates drawn from such financial information, provided in this Disclosure Statement, and while the Debtors believe that such financial information fairly reflects the financial condition of the Debtors, the Debtors are unable to warrant that the financial information contained herein, or any such conclusions or estimates drawn therefrom, is without inaccuracies.

### 2.  Information Contained in this Disclosure Statement Is for Soliciting Votes

The information contained in this Disclosure Statement is for the purposes of soliciting acceptances of the Plan and may not be relied upon for any other purpose.

### 3.  This Disclosure Statement Was Not Reviewed or Approved by the United States Securities and Exchange Commission

This Disclosure Statement was not filed with the United States Securities and Exchange Commission under the Securities Act or applicable state securities laws.  Neither the United States Securities and Exchange Commission nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibit or the statements contained in this Disclosure Statement.

### 4.  This Disclosure Statement May Contain Forward Looking Statements

This Disclosure Statement may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995.  Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "will," "might," "expect," "believe," "anticipate," "could," "would," "estimate," "continue," "pursue," or the negative thereof or comparable terminology.  All forward looking statements are necessarily speculative, and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements.  The information contained herein is an estimate only, based upon information currently available to the Debtors.

### 5.  No Legal or Tax Advice Is Provided to You by this Disclosure Statement

***This Disclosure Statement does not constitute legal advice to you.***  The contents of this Disclosure Statement should not be construed as legal, business, or tax advice.  Each Holder of a Claim or an Interest should consult his or her own legal counsel, accountant, or other applicable advisor with regard to any legal, tax, and other matters concerning his or her Claim or Interest.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

### 6.  No Admissions Made

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any entity (including, without limitation, the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, Holders of Allowed Claims or Allowed Interests, or any other parties in interest.

### 7.  Failure to Identify Litigation Claims or Projected Objections

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement.  The Debtors or the Plan Administrator may seek to investigate, File, and prosecute Claims and Interests and may object to

Claims or Interests after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Claims or Interests or objections to such Claims or Interests.

### 8.   No Waiver of Right to Object to Claim or Interest

The vote by a Holder of a Claim or Interest for or against the Plan does not constitute a waiver or release of any claims, causes of action, or rights of the Debtors (or any entity, as the case may be) to object to that Holder's Claim or Interest, regardless of whether any claims or causes of action of the Debtors or their respective Estates are specifically or generally identified in this Disclosure Statement.

### 9.   Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors

The Debtors' advisors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement.  Although the Debtors' advisors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not independently verified the information contained in this Disclosure Statement.

### 10.  Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update

The statements contained in this Disclosure Statement are made by the Debtors as of the date of this Disclosure Statement, unless otherwise specified in this Disclosure Statement, and the delivery of this Disclosure Statement after the date of this Disclosure Statement does not imply that there has not been a change in the information set forth in this Disclosure Statement since that date.  While the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement.  Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

### 11.  No Representations Outside this Disclosure Statement Are Authorized

No representations concerning or relating to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision.  You should promptly report unauthorized representations or inducements to the counsel to the Debtors and the U.S. Trustee.

## IX.    SOLICITATION AND VOTING PROCEDURES

This Disclosure Statement, which is accompanied by a ballot or ballots to be used for voting on the Plan, is being distributed to the Holders of Claims or Interests in those Classes that are entitled to vote to accept or reject the Plan.  The procedures and instructions for voting and related deadlines are set forth in the exhibits annexed to the Disclosure Statement Order.

***The Disclosure Statement Order is incorporated herein by reference and should be read in conjunction with this Disclosure Statement in formulating a decision to vote to accept or reject the Plan***.

> **THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY**.
>
> PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER ATTACHED HERETO FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.

### A.    Holders of Claims Entitled to Vote on the Plan

Under the provisions of the Bankruptcy Code, not all holders of claims against or interests in a debtor are entitled to vote on a chapter 11 plan. The table in Article III.C of this Disclosure Statement, entitled "Am I entitled to vote on the Plan?" provides a summary of the status and voting rights of each Class (and, therefore, of each Holder within such Class absent an objection to the Holder's Claim or Interest) under the Plan.

As shown in the table, the Debtors are soliciting votes to accept or reject the Plan only from Holders of Claims in Classes 4, 5, 6A, 6B, 6C, and 6D (collectively, the "Voting Classes"). The Holders of Claims in the Voting Classes are Impaired under the Plan and may, in certain circumstances, receive a distribution under the Plan. Accordingly, Holders of Claims in the Voting Classes have the right to vote to accept or reject the Plan.

The Debtors are *not* soliciting votes from Holders of Claims or Interests in Classes 1, 2, 3, and 7 through 11. Additionally, the Disclosure Statement Order provides that certain Holders of Claims in the Voting Classes, such as those Holders whose Claims have been disallowed or are subject to a pending objection, are not entitled to vote to accept or reject the Plan.

### B.    Voting Record Date

**The Voting Record Date is September 15, 2023**. The Voting Record Date is the date on which it will be determined which Holders of Claims or Interests in the Voting Classes are entitled to vote to accept or reject the Plan and whether Claims or Interests have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee or transferee, as applicable, can vote to accept or reject the Plan as the Holder of a Claim or Interest.

### C.    Voting on the Plan

**The Voting Deadline is October 20, 2023, at 4:00 p.m. (prevailing Eastern Time)**. To be counted as votes to accept or reject the Plan, all ballots must be properly executed, completed, and delivered as directed, so that your ballot containing your vote is **actually received** by the Claims and Noticing Agent on or before the Voting Deadline.

To vote, complete, sign, and date your ballot and return it (with an original signature) *promptly* in the enclosed reply envelope or to one of the below addresses.

<div style="border:1px solid black; text-align:center;">

**By regular mail, overnight mail, or hand delivery at:**

**PGX Holdings, Inc. Ballot Processing**
**c/o Kurtzman Carson Consultants LLC**
**222 N. Pacific Coast Highway,**
**Suite 300**
**El Segundo, CA 90245**

</div>

**OR**

**SUBMIT VIA AN ELECTRONIC BALLOT THROUGH THE CLAIMS AND NOTICING AGENT'S ONLINE ELECTRONIC BALLOT SUBMISSION PORTAL AT HTTPS://WWW.KCCLLC.NET/PGX.**

**PLEASE SELECT JUST ONE OPTION TO VOTE.**

**IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE CLAIMS AND NOTICING AGENT TOLL FREE AT (888) 249-2721 (DOMESTIC) or +1 (310) 751-2604 (INTERNATIONAL) OR VIA ELECTRONIC MAIL TO WWW.KCCLLC.NET/PGX/INQUIRY.**

D.    **Ballots Not Counted**

<u>**No ballot will be counted toward Confirmation if, among other things**</u>:  (1) it is illegible or contains insufficient information to permit the identification of the Holder of the Claim or Interest; (2) it was transmitted by means other than as specifically set forth in the ballots; (3) it was cast by an entity that is not entitled to vote on the Plan; (4) it was cast for a Claim listed in the Debtors' schedules as contingent, unliquidated, or disputed for which the applicable bar date has passed and no proof of claim was filed; (5) it was cast for a Claim that is subject to an objection pending as of the Voting Record Date (unless temporarily allowed in accordance with the Disclosure Statement Order); (6) it was sent to the Debtors, the Debtors' agents/representatives (other than the Claims and Noticing Agent), or the Debtors' financial or legal advisors instead of the Claims and Noticing Agent; (7) it is unsigned; or (8) it is not clearly marked to either accept or reject the Plan or it is marked both to accept and reject the Plan.  **Please refer to the Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Plan.**

**ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR THAT IS OTHERWISE NOT IN COMPLIANCE WITH THE DISCLOSURE STATEMENT ORDER WILL <u>NOT</u> BE COUNTED.**

X.    **CONFIRMATION OF THE PLAN**

A.    **Requirements for Confirmation of the Plan**

Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are:  (1) the Plan is accepted by all Impaired Classes of Claims or Interests, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (2) the Plan is feasible; and (3) the Plan is in the "best interests" of Holders of Claims or Interests.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code. The Debtors believe that: (1) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11 for plan confirmation; (2) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11 for plan confirmation; and (3) the Plan has been proposed in good faith.

### B.   Best Interests of Creditors/Liquidation Analysis

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each holder of a claim or an equity interest in such impaired class either (1) has accepted the plan or (2) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting holder would receive or retain if the debtors liquidated under chapter 7.

Attached hereto as **<u>Exhibit B</u>** and incorporated herein by reference is a liquidation analysis (the "<u>Liquidation Analysis</u>") prepared by the Debtors with the assistance of the Debtors' advisors. As reflected in the Liquidation Analysis, the Debtors believe that liquidation of the Debtors' business under chapter 7 of the Bankruptcy Code would result in substantial diminution in the value to be realized by Holders of Allowed Claims or Interests as compared to distributions contemplated under the Plan. Consequently, the Debtors and their management believe that Confirmation of the Plan will provide a substantially greater return to Holders of Allowed Claims or Interests than would a liquidation under chapter 7 of the Bankruptcy Code.

In a typical chapter 7 case, a trustee is elected or appointed to liquidate a debtor's assets and to make distributions to creditors in accordance with the priorities established in the Bankruptcy Code. Generally, secured creditors are paid first from the proceeds of sales of their collateral. If any assets remain in the bankruptcy estate after satisfaction of secured creditors' claims from their collateral, administrative expenses are next to be paid. Unsecured creditors are paid from any remaining sale proceeds, according to their respective priorities. Unsecured creditors with the same priority share in proportion to the amount of their allowed claims in relationship to the total amount of allowed claims held by all unsecured creditors with the same priority. Finally, interest holders receive the balance that remains, if any, after all creditors are paid.

All or substantially all of the assets of the Debtors' business will have been liquidated through the Sale Transaction and the Plan effects a wind down of the Debtors' remaining assets not otherwise acquired in the Sale Transaction. Although a chapter 7 liquidation would achieve the same goal, the Debtors believe that the Plan provides a greater recovery to Holders of Allowed Claims than would a chapter 7 liquidation.

Liquidating the Debtors' Estates under the Plan likely provides Holders of Allowed Claims with a larger, more timely recovery in part because of the increased expenses that would be incurred in a chapter 7 liquidation, with the appointment of the chapter 7 trustee. The delay of the chapter 7 trustee becoming familiar with the assets could easily cause bids already obtained to be lost, and the chapter 7 trustee will not have the technical expertise and knowledge of the Debtors' business that the Debtors had when they proposed to sell their assets pursuant to the Plan. Moreover, the distributable proceeds under a chapter 7 liquidation will be lower because of the chapter 7 trustee's fees and expenses. Therefore, the appointment of a chapter 7 trustee would potentially delay distributions to creditors and reduce the present value of any recover for Holders. *See, e.g.*, 11 U.S.C. § 326(a) (providing for compensation of a chapter 7 trustee); 11 U.S.C. 503(b)(2) (providing administrative expense status for compensation and expenses of a chapter 7 trustee and such trustee's professionals). Additionally, the Debtors' Estates would continue to be

obligated to pay all unpaid expenses incurred by the Debtors during the Chapter 11 Cases (such as compensation for Professionals), which may constitute Allowed Claims in any chapter 11 case.

The conversion to chapter 7 would also require entry of a new bar date.  *See* Fed. R. Bankr. P. 1019(2); 3002(c).  Thus, the amount of Claims ultimately Filed and Allowed against the Debtors could materially increase, thereby further reducing creditor recoveries versus those available under the Plan.

In light of the foregoing, the Debtors submit that a chapter 7 liquidation would result in reduced sale proceeds and recoveries, increased expenses, delayed distributions, and the prospect of additional claims that were not asserted in the Chapter 11 Cases.  Accordingly, the Debtors believe that the Plan provides an opportunity to bring the highest return for creditors.

### C.    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a chapter 11 plan is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization).

The Plan provides for the liquidation and distribution of the Debtors' assets.  Accordingly, the Debtors believe that all Plan obligations will be satisfied without the need for further reorganization of the Debtors.

### D.    Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accept the plan.  A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in a number of allowed claims in that class, counting only those claims that have *actually* voted to accept or to reject the plan.  Thus, a class of Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number of the Allowed Claims in such class that vote on the Plan actually cast their ballots in favor of acceptance.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired equity interests as acceptance by holders of at least two-thirds in amount of allowed interests in that class, counting only those interests that have *actually* voted to accept or to reject the plan.  Thus, a Class of Interests will have voted to accept the Plan only if two-thirds in amount of the Allowed Interests in such class that vote on the Plan actually cast their ballots in favor of acceptance.

Pursuant to Article III.F of the Plan, if a Class contains Claims or Interests is eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

### E.    Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; *provided* that the plan has been accepted by at least one impaired

class.  Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code.  To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors may request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.  The Debtors, subject to the consent right of the Committee as set forth in the Global Settlement Term Sheet, reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

### 1.  No Unfair Discrimination

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan.  The test does not require that the treatment be the same or equivalent, but that treatment be "fair."  In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims or interests of equal rank (*e.g.*, classes of the same legal character).  Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly.  A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

### 2.  Fair and Equitable Test

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in the class.  As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class.

The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement.  With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other classes that have equal rank.  With respect to the fair and equitable requirement, no Class under the Plan will receive more than 100 percent of the amount of Allowed Claims or Interests in that Class.  The Debtors believe that the Plan and the treatment of all Classes of Claims or Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

## XI.    MATERIAL UNITED STATES FEDERAL INCOME TAX CONSEQUENCES

The following discussion summarizes certain United States ("U.S.") federal income tax consequences of the implementation of the Plan to the Debtors and beneficial owners of Claims (each, a "Holder").  This summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial decisions and published administrative rules, and pronouncements of the Internal Revenue Service (the "IRS"), all as in effect on the date hereof (collectively, "Applicable Tax Law").  Changes in Applicable Tax Law may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below.  The Debtors have not requested, and will not request, any ruling or

determination from the IRS or any other taxing authority with respect to the tax consequences discussed herein, and the discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

Except as specifically set forth below, this summary does not apply to Holders that are not U.S. Persons (as such term is defined in the Tax Code) and does not address foreign, state, or local tax consequences of the Plan, nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a Holder in light of its individual circumstances or to a Holder that may be subject to special tax rules (such as Persons who are related to the Debtors within the meaning of the Tax Code, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax exempt organizations, governmental authorities or agencies, pass-through entities, beneficial owners of pass-through entities, subchapter S corporations, employees or persons who received their Claims pursuant to the exercise of an employee stock option or otherwise as compensation, persons who hold Claims as part of a straddle, hedge, conversion transaction, or other integrated investment, persons using a mark-to-market method of accounting, and Holders of Claims who are themselves in bankruptcy), unless otherwise specifically stated herein. Furthermore, this summary assumes that a Holder holds only Claims in a single Class and holds a Claim only as a "capital asset" (within the meaning of section 1221 of the Tax Code). This summary also assumes that the various debt and other arrangements to which any of the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form, and that the Claims constitute interests in the Debtors "solely as a creditor" for purposes of section 897 of the Tax Code. This summary does not discuss differences in tax consequences to a Holder that acts or receives consideration in a capacity other than as a Holder of a Claim of the same Class, and the tax consequences for such Holders may differ materially from that described below.

For purposes of this discussion, a "U.S. Holder" is a holder of a Claim that is: (1) an individual citizen or resident of the United States for U.S. federal income tax purposes; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (A) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons have authority to control all substantial decisions of the trust or (B) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person. For purposes of this discussion, a "non-U.S. Holder" is any Holder of a Claim that is not a U.S. Holder other than any partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the entity. Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders should consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR INTEREST. ALL HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL, AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.**

### A.     Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors and Parent

The tax consequences to the Debtors depend on whether the Sale Transaction is structured as a Credit Bid Transaction.  If the Sale Transaction is not structured as a Credit Bid Transaction, then such transaction is expected to be treated as a taxable sale of assets to the Purchaser with the Debtors recognizing gain or loss equal to the difference between the purchase price paid and the Debtors tax basis in their assets.  If the Sale Transaction is structured as a Credit Bid Transaction, then such transaction is expected to be treated as a tax-free "G" reorganization under section 368(a)(1)(G) of the Tax Code ("G Reorganization") and Purchaser will succeed to the Tax Attributes of the Debtors.

### 1.     COD Income

In general, absent an exception, a taxpayer will realize and recognize cancellation of indebtedness income ("COD Income") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness.  The amount of COD Income, in general, is the excess of (1) the adjusted issue price of the indebtedness satisfied, over (2) the fair market value of any consideration given in satisfaction of such indebtedness at the time of the exchange.

Under section 108 of the Tax Code, a taxpayer is not required to include COD Income in gross income (a) if the taxpayer is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that case (the "Bankruptcy Exception"), or (b), to the extent that the taxpayer is insolvent immediately before the discharge (the "Insolvency Exception").  Instead, as a consequence of such exclusion, a taxpayer-debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income.  In general, tax attributes will be reduced in the following order:  (a) net operating losses ("NOLs"); (b) most tax credits; (c) capital loss carryovers; (d) tax basis in assets (but not below the amount of liabilities to which the debtor (or in the case of a G Reorganization, the Purchaser) remains subject); (e) passive activity loss and credit carryovers; and (f) foreign tax credits.  Alternatively, the taxpayer can elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the Tax Code.

The Debtors expect to realize significant COD Income as a result of the consummation of the Plan.  The exact amount of any COD Income that will be realized by the Debtors will not be determinable until the consummation of the Plan.

### B.     Certain U.S. Federal Income Tax Consequences of the Plan to Holders of Allowed Class 4 Prepetition First Lien Claims

In the event the Sale Transaction is not treated as a Credit Bid Transaction, Holders of Prepetition First Lien Claims will be treated as exchanging a portion of such Claims for Cash.  Pursuant to the Plan, each Holder of a Class 4 Claim will receive its Pro Rata share of  the Distributable Proceeds, up to the Allowed amount of such Prepetition First Lien Claims.  Such Holder will recognize gain or loss equal to the (a) the amount of any Cash received minus (b) the Holder's adjusted tax basis in their Class 4 Claims.

In the event the Sale Transaction is treated as a Credit Bid Transaction, Holders of Prepetition First Lien Claims will be treated as exchanging such Claims for stock and debt of the Purchaser in a G Reorganization and, potentially Cash from the Distributable Proceeds  A Holder should obtain a tax basis in the stock and debt of the Purchaser equal to the adjusted tax basis in the Prepetition First Lien Claim surrendered by the Holder, increased by any gain recognized and decreased by the amount of any Cash received.

C.      **Certain U.S. Federal Income Tax Consequences of the Plan to Holders of Allowed Class 5 Prepetition Second Lien Claims**

Regardless of whether the Sale Transaction is treated as a Credit Bid Transaction, Holders of Prepetition Second Lien Claims will be treated as exchanging a portion of such Claims in exchange for Cash. Pursuant to the Plan, each Holder of a Class 5 Claim will receive its Pro Rata share of the Distributable Proceeds, up to the Allowed amount of such Prepetition Second Lien Claims. Such Holder will recognize gain or loss equal to the (a) the sum of any Cash received minus (b) the Holder's adjusted tax basis in their Class 5 Claims.

D.      **Certain U.S. Federal Income Tax Consequences of the Plan to Holders of Allowed Class 6B Other General Unsecured Claims**

1.      **U.S. Federal Income Tax Treatment of Holders of Allowed Class 6B Other General Unsecured Claims**

Pursuant to the Plan, in exchange for full and final satisfaction, settlement, release, and discharge of their Claims, each Holder of an Other General Unsecured Claim shall receive, in full and final satisfaction of such Other General Unsecured Claim, its Pro Rata share of the PIK Notes and its Pro Rata share of a portion of the GUC Litigation Claims Settlement Cash (as allocated by the Committee in its sole discretion and to be disclosed in the Plan Supplement) as well as the proceeds of the Other Assets and the Excess Distributable Cash.

If (a) an Other General Unsecured Claim constitutes a "security," and (b) the PIK Notes constitute "securities," then a Holder of such a Claim is expected to be treated as receiving its distribution under the Plan in a transaction treated as a "reorganization" for U.S. federal income tax purposes with the receipt of Cash treated as "boot" in such recapitalization. The Holder should not recognize loss but would recognize gain in an amount equal to the lessor of (a) the amount of Cash received and (b) the excess if any of (i) the issue price of the PIK Notes and Cash received, over (ii) the Holder's adjusted tax basis in its Claim. The character of any such gain as capital or ordinary will be determined by a number of factors including the tax status of the Holder, whether the Claim constitutes a capital asset in the hands of the Holder, whether and to what extent the Holder had previously claimed a bad-debt deduction with respect to its Claim, and the potential application of the accrued interest and market discount rules discussed below. If any such recognized gain is capital in nature, it generally would be long-term capital gain if the Holder held its Claim for more than one year at the time of the exchange. A Holder's holding period for any such Claim would carry over to the PIK Notes received in the exchange. A Holder should obtain a tax basis in the PIK Notes equal to the adjusted tax basis in the Claim surrendered by the Holder, increased by any gain recognized and decreased by the amount of any Cash received.

If either the General Unsecured Claims or the PIK Notes do not constitute "securities," then a Holder of such a Claim is expected to be treated as receiving its distribution under the Plan in a taxable exchange under section 1001 of the IRC. The Holder should recognize gain or loss in an amount equal to the difference, if any, between the sum of (a) the issue price of the PIK Notes and (b) any Cash received, over the Holder's adjusted tax basis in its Claim. The character of any such gain or loss as capital or ordinary will be determined by a number of factors including the tax status of the Holder, whether the Claim constitutes a capital asset in the hands of the Holder, whether and to what extent the Holder had previously claimed a bad-debt deduction with respect to its Claim, and the potential application of the accrued interest and market discount rules discussed below. If any such recognized gain or loss is capital in nature, it generally would be long-term capital gain if the Holder held its Claim for more than one year at the time of the exchange. The holding period for any interest in the PIK Notes received in the

exchange should begin on the day following the date the Holder receives such interest. A Holder should obtain a tax basis in the PIK Notes equal to its issue price.

### 2. U.S. Federal Income Tax Consequences to Holders of Ownership and Disposition of the PIK Notes

#### (a)    Original Issue Discount

A debt instrument will be treated as issued with OID for U.S. federal income tax purposes if its issue price is less than its stated redemption price at maturity by more than a de minimis amount. A debt instrument's stated redemption price at maturity includes all principal and interest payable over the term of the debt instrument. If the debt instrument's stated interest is only "payable-in-kind," the debt instrument's stated redemption price at maturity will exceed its issue price, resulting in OID. Since the PIK Notes' stated interest is payable in kind, a Holder generally (i) will be required to include the OID in gross income as ordinary interest income as it accrues on a constant yield to maturity basis over the term of the PIK Notes, in advance of the receipt of the Cash attributable to such OID and regardless of the Holder's method of accounting for U.S. federal income tax purposes, but (ii) will not be required to recognize additional income upon the receipt of any Cash payment on the PIK Notes that is attributable to previously accrued OID that has been included in its income.

#### (b)    Sale, Taxable Exchange, or other Taxable Disposition

Upon the disposition of the PIK Notes by sale, exchange, retirement, redemption or other taxable disposition, a Holder will generally recognize gain or loss equal to the difference, if any, between (a) the amount realized on the disposition (other than amounts attributable to accrued but untaxed interest, which will be taxed as ordinary interest income to the extent not previously so taxed) and (b) the Holder's adjusted tax basis in the PIK Notes. The calculation of a Holder's adjusted tax basis in the PIK Notes is discussed above. A Holder's adjusted tax basis will generally be increased by any accrued OID previously included in such Holder's gross income and decreased by any payments on the PIK Notes other than qualified stated interest. A Holder's gain or loss will generally constitute capital gain or loss and will be long-term capital gain or loss if the Holder has held the PIK Notes for longer than one year. Non-corporate taxpayers are generally subject to a reduced federal income tax rate on net long-term capital gains. The deductibility of capital losses is subject to certain limitations.

### E.    Certain U.S. Federal Income Tax Consequences of the Plan to Holders of Allowed Class 6A Continuing Trade Claims, Class 6C Litigation Claims, and Class 6D CFPB Claims

Pursuant to the Plan, in exchange for full and final satisfaction, settlement, release, and discharge of their Claims, each Holder of an Allowed Continuing Trade Claim, Litigation Claim, or CFPB Claim shall receive Cash, in full and final satisfaction of such Claim. Such Holder should recognize gain or loss in an amount equal to the difference between the amount of Cash received and such Holder's adjusted tax basis in its Claim. The character of any such gain or loss as capital or ordinary will be determined by a number of factors including the tax status of the Holder, whether the Claim constitutes a capital asset in the hands of the Holder, whether and to what extent the Holder had previously claimed a bad-debt deduction with respect to its Claim, and the potential application of the accrued interest and market discount rules discussed below. If any such recognized gain or loss is capital in nature, it generally would be long-term capital gain if the Holder held its Claim for more than one year at the time of the exchange.

F.      **Character of Gain or Loss**

Where gain or loss is recognized by a Holder of a Claim upon the exchange of its Allowed Claim, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including, among others, the tax status of the Holder, whether the Allowed Claim constitutes a capital asset in the hands of the Holder and how long it has been held, whether the Allowed Claim was acquired at a market discount (discussed below), whether and to what extent the Holder previously had claimed a bad debt deduction, and the nature and tax treatment of any fees, costs or expense reimbursements to which consideration is allocated.  Each Holder of an Allowed Claim is urged to consult its tax advisor to determine the character of any gain or loss recognized with respect to the satisfaction of its Allowed Claim.

Holders of Allowed Claims who recognize capital losses as a result of the distributions under the Plan will be subject to limits on their use of capital losses.  For corporate Holders, losses from the sale or exchange of capital assets may only be used to offset capital gains.  Corporate Holders who have more capital losses than can be used in a tax year may be allowed to carry over unused capital losses for the five taxable years following the capital loss year and may be allowed to carry back unused capital losses to the three taxable years that precede the capital loss year.

G.      **Market Discount**

Under the "market discount" provisions of sections 1276 through 1278 of the Tax Code, some or all of any gain realized by a Holder exchanging the debt instruments constituting its Allowed Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt constituting the surrendered Allowed Claim.

In general, a debt instrument is considered to have been acquired with "market discount" if its Holder's adjusted tax basis in the debt instrument is less than (i) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or, (ii) in the case of a debt instrument issued with "original issue discount" ("OID"), its adjusted issue price, by at least a de minimis amount (equal to 0.25 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a Holder on the exchange of debt constituting its Allowed Claim that was acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such debts were considered to be held by the Holder (unless the Holder elected to include market discount in income as it accrued).

H.      **Accrued Interest**

To the extent that any amount received by a Holder of a surrendered Allowed Claim under the Plan is attributable to accrued but unpaid interest and such amount has not previously been included in the Holder's gross income, such amount should be taxable to the Holder as ordinary interest income. Conversely, a Holder of a surrendered Allowed Claim may be able to recognize a deductible loss (or, possibly, a write-off against a reserve for worthless debts) to the extent that any accrued interest on the debt instruments constituting such claim was previously included in the Holder's gross income but was not paid in full by the Debtors.  Such loss may be ordinary; however, the tax law is unclear on this point.

The extent to which the consideration received by a Holder of a surrendered Allowed Claim will be attributable to accrued interest on the debts constituting the surrendered Allowed Claim is unclear. Certain Treasury Regulations generally treat a payment under a debt instrument first as a payment of

accrued and untaxed interest and then as a payment of principal.  Application of this rule to a final payment on a debt instrument being discharged at a discount in bankruptcy is unclear.  Pursuant to the terms of the Plan, distributions in respect of Allowed Claims are allocated first to the principal amount of such claims (as determined for U.S. federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the claims, to any portion of such claims for accrued but unpaid interest.  However, the provisions of the Plan are not binding on the IRS nor a court with respect to the appropriate tax treatment for Holders.

### I.    Limitation on Use of Capital Losses

A Holder of a Claim who recognizes capital losses as a result of the transactions undertaken pursuant to the Plan will be subject to limits on the use of such capital losses.  For a non-corporate Holder, capital losses may be used to offset any capital gains recognized (without regard to holding periods), and also ordinary income recognized to the extent of the lesser of (a) $3,000 ($1,500 for married individuals filing separate returns) or (b) the excess of such capital losses over such capital gains.  A non-corporate Holder may carry over unused capital losses recognized and apply them against future capital gains recognized and a portion of their ordinary income recognized for an unlimited number of years.  For corporate Holders, capital losses recognized may only be used to offset capital gains recognized.  A corporate Holder that recognizes more capital losses than may be used in a tax year may carry back unused capital losses to the three years preceding the capital loss year or may carry over unused capital losses for the five years following the capital loss year.

### J.    Information Reporting and Backup Withholding

The Debtors will withhold all amounts required by law to be withheld from distributions or payments.  The Debtors will comply with all applicable reporting requirements of the Tax Code.  In general, information reporting requirements may apply to distributions or payments made to a Holder of a Claim under the Plan.  In addition, backup withholding of taxes (currently at a 24% rate) will generally apply to payments in respect of an Allowed Claim under the Plan unless, in the case of a U.S. Holder, such U.S. Holder provides a properly executed IRS Form W-9 and, in the case of non-U.S. Holder, such non-U.S. Holder provides a properly executed applicable IRS Form W-8 (or otherwise establishes such non-U.S. Holder's eligibility for an exemption).

Backup withholding is not an additional tax.  Amounts withheld under the backup withholding rules may be credited against a Holder's U.S. federal income tax liability, and a Holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a federal income tax return).

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.  Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX.  THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.  ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF**

**ANY STATE, LOCAL OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

### K.    U.S. Federal Income Tax Treatment of the Creditor Trust

#### 1.    Grantor Trust

It is intended that the Creditor Trust will qualify as a "liquidating trust" under Treasury Regulation section 301.7701-4(d).  Accordingly, it is intended that the Creditor Trust will be treated as a grantor trust for U.S. federal income tax purposes, and that the Beneficiaries will be treated as grantors of such trust.

In general, a grantor trust is not a separate taxable entity.  The IRS, in Revenue Procedure 94-45, sets forth the general criteria for obtaining an advance ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan.  Consistent with the requirements of Revenue Procedure 94-45, the Creditor Trust Agreement will require all relevant parties to treat the transfer of the Creditor Trust Assets for U.S. federal income tax purposes as (i) a transfer of the Creditor Trust Assets directly to the beneficiaries in satisfaction of the Claims against the Debtors (to the extent of the value of the beneficiaries' respective interests in the applicable Creditor Trust Assets) followed by (ii) the transfer by such beneficiaries to the Creditor Trust of the Creditor Trust Assets in exchange for beneficial interests in the Creditor Trust (to the extent of the value of the beneficiaries' respective interests in the applicable Creditor Trust Assets), provided, however, that the Creditor Trust Assets will be subject to any post-Effective Date liabilities or obligations incurred by the Creditor Trust relating to the pursuit of Creditor Trust Assets.

Accordingly, the beneficiaries should be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of the Creditor Trust Assets.  The foregoing treatment should also apply, to the extent permitted by applicable law, for state and local income tax purposes.

As a grantor trust, the Creditor Trust Agreement will require all items of income, gain, loss, deduction and credit to be included in the income of the Beneficiaries, and reported on such beneficiaries' U.S. federal income tax returns as if such items had been recognized directly by the beneficiaries in the proportions in which they own beneficial interests in the Creditor Trust.

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt of an IRS private letter ruling if the Creditor Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Creditor Trustee), the Creditor Trustee may (i) timely elect to treat any portion or all of the Creditor Trust or any Creditor Trust Assets as a "disputed ownership fund" within the meaning of Treasury Regulation Section 1.468B-9 for federal income tax purposes (the "Disputed Ownership Fund") and (ii) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. Accordingly, any Disputed Ownership Fund will be subject to tax annually on a separate entity basis on any net income earned with respect to any Creditor Trust Assets held in any such Disputed Ownership Fund, and all distributions from such reserves will be treated as received by holders in respect of their Claims as if distributed by the Debtors.

No ruling is currently being requested from the IRS concerning the tax status of the Creditor Trust as a liquidating trust.  As such, there can be no assurance that the IRS would not take a contrary position to the classification of the Creditor Trust as a liquidating trust.  If the IRS were to successfully challenge the liquidating trust classification, the U.S. federal income tax consequences to the Creditor Trust and the Holders of Claims could vary from those discussed herein (including the potential for an entity level tax to be imposed on all income of the Creditor Trust).  Certain U.S. federal income tax

consequences of the Creditor Trust or portions thereof relating to Disputed Claims and being treated as a Disputed Ownership Fund are also discussed below.

## 2.  Reporting

The Creditor Trust shall comply with all tax reporting requirements, including, without limitation, filing returns for the Creditor Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a) and, in connection therewith, the Creditor Trustee may require the Beneficiaries to provide certain tax information as a condition to receipt of Distributions.  The Creditor Trustee shall also send to each beneficiary a separate statement setting forth such beneficiary's share of items of Creditor Trust income, gain, loss, deduction, or credit.  Each such Beneficiary will be required to report such items on its U.S. federal income tax return; provided, however, that any reporting under this Section is subject to the Creditor Trustee's discretion to elect to treat the Creditor Trust or any Creditor Trust Assets (in whole or in part) as a Disputed Ownership Fund, which election may alter the requirement in accordance with federal tax laws and regulations.

All taxable income and loss of the Creditor Trust will be allocated among, and treated as directly earned and incurred by, the beneficiaries with respect to such beneficiary's interest in the assets of the Creditor Trust (and not as income or loss with respect to its prior Claims), with the possible exception of any taxable income and loss allocable to any assets allocable to, or retained on account of, Disputed Claims.  The character of any income or gain and the character and ability to use any loss or loss will depend on the particular situation of the beneficiary.

The U.S. federal income tax obligations of a beneficiary with respect to its beneficial interest in the Creditor Trust are not dependent on the Creditor Trust distributing any Cash or other proceeds, subject to any portion(s) of the Creditor Trust allocable to Disputed Claims.  Thus, a beneficiary may incur U.S. federal income tax liability with respect to its allocable share of the Creditor Trust's income even if the Creditor Trust does not make a concurrent distribution to the U.S. Holder.  Beneficiaries with a beneficial interest in any PIK Notes will be treated for U.S. federal income tax purposes as if they have received such PIK Notes.  Such beneficiaries are urged to review Article XI.D of this Disclosure Statement, entitled "Certain U.S. Federal Income Tax Consequences of the Plan to Holders of Allowed Class 6B Other General Unsecured Claims" for a discussion on the tax consequences of beneficial ownership of the PIK Notes.

In general, other than in respect of amounts retained on account of Disputed Claims, a distribution of Cash by the Creditor Trust will not be separately taxable to a beneficiary of the Creditor Trust, since the beneficiary is already regarded for U.S. federal income tax purposes as owning the underlying assets (and will be taxed at the time the Cash was earned or received by the Creditor Trust). Holders are urged to consult their tax advisors regarding the appropriate U.S. federal income tax treatment of any subsequent distributions of Cash originally retained by the Creditor Trust on account of Disputed Claims.

## 3.  Valuation

After the Effective Date, but in no event later than four months after the initial (i.e., not extended) due date for timely filing of the Creditor Trust's first federal income tax return, the Creditor Trustee shall (i) determine the fair market value of the Creditor Trust Assets as of the Effective Date, based on the Creditor Trustee's good faith determination (in conjunction with guidance provided by Trust Professionals (as defined in the Credit Trust Agreement), if any); and (ii) establish appropriate means to apprise the beneficiaries of such valuation; provided, however, that no such valuation will be required if the Creditor Trustee elects to treat the Creditor Trust or the Creditor Trust Assets (in whole or in part) as a Disputed Ownership Fund. The valuation, if established pursuant to the terms of the Creditor Trust

Agreement, shall be used consistently by all Parties (including, without limitation, the Debtors, the Creditor Trust, the Creditor Trustee, and the beneficiaries) for all U.S. federal income tax purposes.

### 4.    Tax Returns

In accordance with the provisions of section 6012(b)(3) of the Internal Revenue Code (and any comparable provision of state or local tax law), the Creditor Trustee shall cause to be prepared, at the cost and expense of the Creditor Trust, the income tax returns (federal, state and local) that the Debtors are required to file (to the extent such returns have not already been filed by the Effective Date). The Creditor Trustee shall also cause to be prepared, at the cost and expense of the Creditor Trust, the income tax returns (federal, and if applicable, state and local) required to be filed on behalf of the Creditor Trust, and such returns filed on behalf of the Creditor Trust shall be consistent with the treatment of the Creditor Trust as a liquidating trust within the meaning of Treasury Regulations Section 301.7701-4(d) that is a grantor trust pursuant to Treasury Regulations Section 1.671-4(a) (other than with respect to any election by the Creditor Trustee to treat the Creditor Trust or any of the Creditor Trust Assets (in either case, in whole or in part) as a Disputed Ownership Fund), and to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. The Creditor Trustee shall timely file each such tax return with the appropriate taxing authority and shall pay out of the assets of the Creditor Trust all taxes due with respect to the period covered by each such tax return.

### 5.    Attribution of Income

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the issuance of applicable Treasury Regulations, the receipt by the Creditor Trustee of a private letter ruling if the Creditor Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Creditor Trustee), taxable income, gain, loss or deduction in respect of the Creditor Trust Assets shall be attributed to the beneficiaries in proportion to their beneficial interests in the Creditor Trust Assets. Notwithstanding anything in the Plan or Disclosure Statement, the timing of distributions shall comply with the requirements of Revenue Procedure 94-45, as determined by the Creditor Trustee in its reasonable discretion.

### 6.    Tax Identification Numbers.

The Creditor Trustee may require any beneficiary to furnish to the Creditor Trustee its employer or taxpayer identification number as assigned by the IRS (e.g., via signed W-9 or for any non-U.S. Beneficiary a W-8) or otherwise certify in writing to the Creditor Trustee's satisfaction that distributions from the Creditor Trust to the beneficiary are exempt from backup withholding. The Creditor Trustee may condition any distribution to any Beneficiary upon receipt of such identification number or exemption certification. If after reasonable inquiry and reasonable time constraints for responding (in each case, as determined by the Creditor Trustee in its sole discretion), any beneficiary fails to provide such identification number, then distributions to such beneficiary shall become undeliverable property to be made available for distribution to the remaining beneficiaries, in accordance with the terms of the Plan and the Creditor Trust Agreement.

### 7.    Annual Statements

The Creditor Trustee shall annually (for tax years in which distributions from the Creditor Trust are made) send to each beneficiary a separate statement setting forth the beneficiary's share of items of income, gain, loss, deduction or credit, and all such beneficiaries shall report such items on their federal income tax returns; provided, however, that any such reporting obligation under this subsection is subject to the Creditor Trustee's discretion to elect to treat the Creditor Trust or any of the Creditor Trust Assets (in either case, in whole or in part) as a Disputed Ownership Fund, which may impact the requirement of

such annual statements pursuant to federal tax regulations and applicable laws.

### 8. Notices

The Creditor Trustee shall distribute such notices to the beneficiaries as the Creditor Trustee determines are necessary or desirable.

### 9. Expedited Determination

The Creditor Trustee may request an expedited determination of taxes of the Debtors or of the Creditor Trust under Bankruptcy Code section 505(b) for all tax returns filed for, or on behalf of, the Debtors and the Creditor Trust for all taxable periods through the dissolution of the Creditor Trust.

### 10. Withholding

The Creditor Trustee will comply with all applicable governmental withholding requirements.

## XII.   RECOMMENDATION

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario. Accordingly, the Debtors recommend that holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

Dated:  September 20, 2023                    PGX Holdings, Inc.
                                             on behalf of itself and its debtor affiliates


                                             */s/ Chad Wallace*
                                             Chad Wallace
                                             Chief Executive Officer and President of the
                                             Debtors and Debtors in Possession

**EXHIBIT A**

**First Amended Chapter 11 Plan (Solicitation Version)**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| PGX HOLDINGS, INC., *et al.*,[1] | ) Case No. 23-10718 (CTG) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

## FIRST AMENDED JOINT CHAPTER 11 PLAN OF PGX HOLDINGS, INC. AND
## ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

**KLEHR HARRISON HARVEY BRANZBURG LLP**
Domenic E. Pacitti (DE Bar No. 3989)
Michael W. Yurkewicz (DE Bar No. 4165)
919 North Market Street, Suite 1000
Wilmington, Delaware 19801
Telephone:    (302) 426-1189
Facsimile:    (302) 426-9193
Email:    dpacitti@klehr.com
    myurkewicz@klehr.com

- and -

Morton R. Branzburg (*pro hac vice* pending)
1835 Market Street, Suite 1400
Philadelphia, Pennsylvania 19103
Telephone:    (215) 569-3007
Facsimile:    (215) 568-6603
Email:    mbranzburg@klehr.com

*Co-Counsel to the Debtors and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
601 Lexington Ave
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:    joshua.sussberg@kirkland.com

- and -

Spencer A. Winters (admitted *pro hac vice*)
Whitney C. Fogelberg (admitted *pro hac vice*)
Alison J. Wirtz (admitted *pro hac vice*)
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:    spencer.winters@kirkland.com
    whitney.fogelberg@kirkland.com
    alison.wirtz@kirkland.com

*Co-Counsel to the Debtors and Debtors in Possession*

Dated:  September 20, 2023

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  PGX Holdings, Inc. (2510); Credit Repair UK, Inc. (4798); Credit.com, Inc. (1580); Creditrepair.com Holdings, Inc. (7536); Creditrepair.com, Inc. (7680); eFolks Holdings, Inc. (5213); eFolks, LLC (5256); John C. Heath, Attorney At Law PC (8362); Progrexion ASG, Inc. (5153); Progrexion Holdings, Inc. (7123); Progrexion IP, Inc. (5179); Progrexion Marketing, Inc. (5073); and Progrexion Teleservices, Inc. (5110).  The location of the Debtors' service address for purposes of these chapter 11 cases is:  257 East 200 South, Suite 1200, Salt Lake City, Utah 84111.

**TABLE OF CONTENTS**

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW ..................................................................................................................5

    A.    Defined Terms ...........................................................................................................5
    B.    Rules of Interpretation ............................................................................................20
    C.    Computation of Time ..............................................................................................20
    D.    Governing Law ........................................................................................................20
    E.    Reference to Monetary Figures ...............................................................................21
    F.    Reference to the Debtors or the Wind-Down Debtor ..............................................21
    G.    No Substantive Consolidation; Limited Administrative Consolidation ..................21

ARTICLE II. ADMINISTRATIVE CLAIMS, DIP CLAIMS, AND PRIORITY TAX CLAIMS ...........21

    A.    General Administrative Claims ...............................................................................21
    B.    Professional Fee Claims ..........................................................................................22
    C.    DIP Claims ..............................................................................................................23
    D.    Priority Tax Claims .................................................................................................23
    E.    Payment of Statutory Fees ......................................................................................24

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ...................24

    A.    Classification of Claims and Interests ....................................................................24
    B.    Treatment of Claims and Interests ..........................................................................25
    C.    Special Provision Governing Unimpaired Claims ..................................................30
    D.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code .................30
    E.    Subordinated Claims ...............................................................................................30
    F.    Elimination of Vacant Classes; Presumed Acceptance by Non-Voting Classes ...........30
    G.    Intercompany Interests ............................................................................................30
    H.    Controversy Concerning Impairment ......................................................................31

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN ..................................................31

    A.    General Settlement of Claims and Interests ............................................................31
    B.    Restructuring Transactions ......................................................................................31
    C.    Sources of Consideration for Plan Distributions ....................................................32
    D.    Wind-Down Debtor .................................................................................................32
    E.    Liquidating Trust .....................................................................................................32
    F.    Plan Administrator ..................................................................................................34
    G.    Creditor Trustee ......................................................................................................34
    H.    Exculpation, Indemnification, Insurance, and Liability Limitation ........................34
    I.    Tax Returns .............................................................................................................35
    J.    Dissolution of the Wind-Down Debtor ...................................................................35
    K.    Statutory Committee and Cessation of Fee and Expense Payment .........................35
    L.    Cancellation of Securities and Agreements ............................................................35
    M.    Corporate Action ....................................................................................................35
    N.    Effectuating Documents; Further Transactions .......................................................36
    O.    Section 1146 Exemption .........................................................................................36
    P.    Director and Officer Liability Insurance; Other Insurance .....................................36
    Q.    Causes of Action ....................................................................................................37
    R.    Section 1145 Exemption .........................................................................................37
    S.    Global Settlement ....................................................................................................37

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ............37

    A.    Assumption and Rejection of Executory Contracts and Unexpired Leases ...................37
    B.    Indemnification Obligations ....................................................................................38

C.      Claims Based on Rejection of Executory Contracts or Unexpired Leases.....................................38
D.      Cure of Defaults for Assumed Executory Contracts and Unexpired Leases..............................39
E.      Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases...........39
F.      Insurance Policies......................................................................................................40
G.      Modifications, Amendments, Supplements, Restatements, or Other Agreements.........................40
H.      Reservation of Rights..................................................................................................40
I.      Nonoccurrence of Effective Date....................................................................................40

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS .................................................................40
A.      Timing and Calculation of Amounts to Be Distributed ......................................................40
B.      Disbursing Agent........................................................................................................41
C.      Rights and Powers of Disbursing Agent...........................................................................41
D.      Delivery of Distributions and Undeliverable or Unclaimed Distributions.................................41
E.      Compliance with Tax Requirements.................................................................................42
F.      Allocations...............................................................................................................42
G.      No Postpetition or Default Interest on Claims....................................................................42
H.      Setoffs and Recoupment...............................................................................................42
I.      No Double Payment of Claims. ....................................................................................43
J.      Claims Paid or Payable by Third Parties...........................................................................43

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND
DISPUTED CLAIMS.....................................................................................................................44
A.      Allowance of Claims....................................................................................................44
B.      Claims Administration Responsibilities............................................................................44
C.      Estimation of Claims...................................................................................................44
D.      Adjustment to Claims or Interests Without Objection .........................................................45
E.      Time to File Objections to Claims ..................................................................................45
F.      Disallowance of Claims or Interests................................................................................45
G.      Amendments to Proofs of Claims or Interests ...................................................................45
H.      No Distributions Pending Allowance...............................................................................45
I.      Distributions After Allowance........................................................................................45

ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS...........................46
A.      Final Satisfaction of Claims and Termination of Interests....................................................46
B.      Release of Liens.........................................................................................................46
C.      Releases by the Debtors...............................................................................................47
D.      Releases by the Releasing Parties. .................................................................................48
E.      Exculpation...............................................................................................................48
F.      Injunction................................................................................................................49
G.      Protections Against Discriminatory Treatment...................................................................50
H.      Reimbursement or Contribution......................................................................................50
I.      Term of Injunctions or Stays.........................................................................................50

ARTICLE IX. CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE
PLAN.......................................................................................................................................50
A.      Conditions Precedent to the Confirmation of the Plan.........................................................50
B.      Conditions Precedent to the Effective Date ......................................................................50
C.      Waiver of Conditions...................................................................................................51
D.      Effect of Failure of Conditions .....................................................................................51

ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN .....................................52
A.      Modification and Amendments.......................................................................................52
B.      Effect of Confirmation on Modifications...........................................................................52

C.    Revocation or Withdrawal of Plan.................................................................................52

ARTICLE XI. RETENTION OF JURISDICTION........................................................................52

ARTICLE XII. MISCELLANEOUS PROVISIONS......................................................................54

    A.    Immediate Binding Effect...............................................................................................54
    B.    Additional Documents....................................................................................................54
    C.    Payment of Statutory Fees..............................................................................................54
    D.    Reservation of Rights.....................................................................................................55
    E.    Successors and Assigns...................................................................................................55
    F.    Notices ............................................................................................................................55
    G.    Entire Agreement............................................................................................................58
    H.    Exhibits ...........................................................................................................................58
    I.    Non-Severability of Plan Provisions..............................................................................59
    J.    Votes Solicited in Good Faith ........................................................................................59
    K.    Closing of Chapter 11 Cases..........................................................................................59
    L.    Conflicts..........................................................................................................................59

**INTRODUCTION**

PGX Holdings, Inc. and the above-captioned debtors and debtors in possession (each, a "Debtor" and collectively, the "Debtors") propose this Plan for the resolution of the outstanding claims against, and equity interests in, the Debtors. The Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered pursuant to an order of the Bankruptcy Court. This Plan constitutes a separate chapter 11 plan for each Debtor and, unless otherwise set forth herein, the classifications and treatment of Claims and Interests apply to each individual Debtor.

Holders of Claims and Interests should refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, and historical financial information, projections, and future operations, as well as a summary and description of this Plan and certain related matters. Each Debtor is a proponent of the Plan contained herein within the meaning of section 1129 of the Bankruptcy Code.

**ARTICLE I.**
**DEFINED TERMS, RULES OF INTERPRETATION,**
**COMPUTATION OF TIME, AND GOVERNING LAW**

A.    *Defined Terms*

As used in this Plan, capitalized terms have the meanings given to them below.

1.    "***Administrative Claim***" means a Claim against a Debtor arising on or after the Petition Date and before the Effective Date for the costs and expenses of administration of the Chapter 11 Cases under sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses of preserving the Estates and operating the businesses of the Debtors incurred on or after the Petition Date and through the Effective Date; (b) Allowed Professional Fee Claims in the Chapter 11 Cases; (c) Adequate Protection Claims (as defined in the DIP Order and subject to allowance and procedures set forth in the DIP Order); and (d) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code.

2.    "***Administrative Claims Bar Date***" means the applicable deadline for Filing requests for payment of Administrative Claims (other than requests for payment of Professional Fee Claims and fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code), which shall be (a) September 7, 2023, at 4:00 p.m. prevailing Eastern Time for Administrative Claims that may have arisen, accrued, or otherwise become due and payable at any time on and subsequent to the Petition Date but on or before July 31, 2023, or (b) 45 days after the Effective Date for Administrative Claims that may have arisen, accrued, or otherwise become due and payable at any time on and subsequent to July 31, 2023.

3.    "***Administrative Claims Objection Bar Date***" means the deadline for Filing objections to requests for payment of Administrative Claims (other than requests for payment of Professional Fee Claims and fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code), which shall be the later of (1) 60 days after the Effective Date and (2) 60 days after the Filing of the applicable request for payment of the Administrative Claims; *provided* that the Administrative Claims Objection Bar Date may be extended by the Bankruptcy Court after notice and a hearing.

4.    "***Affiliate***" has the meaning set forth in section 101(2) of the Bankruptcy Code. With respect to any Entity that is not a Debtor, the term "Affiliate" shall apply to such Entity as if the Entity were a Debtor.

5.    "***Agent***" means each of, and in each case in its capacity as such, the Prepetition First Lien Agent, the Prepetition Second Lien Agent, and the DIP Agent.

6.    "***Allowed***" means with respect to any Claim or Interest, except as otherwise provided herein: (a) a Claim or Interest in a liquidated amount as to which no objection has been Filed prior to the applicable claims objection deadline and that is evidenced by a Proof of Claim or Interest, as applicable, timely Filed by the Claims Bar Date or that is not required to be evidenced by a Filed Proof of Claim or Interest, as applicable, under the Plan, the Bankruptcy

Code, or a Final Order; (b) a Claim or Interest that is listed in the Schedules as not contingent, not unliquidated, and not Disputed, and for which no Proof of Claim or Interest, as applicable, has been timely Filed in an unliquidated or a different amount; or (c) a Claim or Interest that is upheld or otherwise Allowed (i) pursuant to the Plan, (ii) in any stipulation that is approved by the Bankruptcy Court, (iii) pursuant to any contract, instrument, indenture, or other agreement entered into or assumed in connection herewith, or (iv) by Final Order of the Bankruptcy Court (including any such Claim to which the Debtors had objected or which the Bankruptcy Court had disallowed prior to such Final Order); *provided* that with respect to a Claim or Interest described in clauses (a) and (c) above, such Claim or Interest shall be considered Allowed only if and to the extent that, with respect to such Claim or Interest, no objection to the allowance thereof has been or, in the Debtors' or Wind-Down Debtor's reasonable good faith judgment may be, interposed within the applicable period of time fixed in accordance with the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim or Interest, as applicable, shall have been Allowed by a Final Order.  Except as otherwise specified in the Plan or any Final Order, and except for Secured Tax Claims or any Claim that is Secured by property of a value in excess of the principal amount of such Claims, the amount of an Allowed Claim shall not include interest on such Claim from and after the Petition Date.  For purposes of determining the amount of an Allowed Claim, there shall be deducted therefrom an amount equal to the amount of any Claim that the Debtors may hold against the Holder thereof, to the extent such Claim may be offset, recouped, or otherwise reduced under applicable law.  Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or Disputed, and for which no Proof of Claim is or has been timely Filed, is not considered Allowed and shall be deemed expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court.  Notwithstanding anything to the contrary herein, in no event shall any Intercompany Claim be deemed as Allowed for purposes of distributions hereunder.  Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes such Debtor or such Wind-Down Debtor, as applicable.  For the avoidance of doubt:  (x) the Debtors or the Wind-Down Debtor, as applicable, shall remain responsible for the allowance of any Other General Unsecured Claims; (y) a Proof of Claim or Interest Filed after the Claims Bar Date shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-Filed Claim and (z) the Debtors may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims and Interests would be allowed under applicable non-bankruptcy law.  "Allow," "Allowing," and "Allowance" shall have correlative meanings.

7.    "***Approved Budget***" shall have the same meaning ascribed to such term in the DIP Order.

8.    "***Asset Purchase Agreements***" means the Lexington Law APA and the Progrexion APA, as approved by the Sale Orders, together with all exhibits, appendices, supplements, and documents, and agreements ancillary thereto, in each case as amended, modified, or supplemented from time to time in accordance with the terms thereof.

9.    "***Assumed Executory Contracts and Unexpired Leases Schedule***" means the schedule of Executory Contracts and Unexpired Leases to be assumed by the Debtors pursuant to the Plan, if any, which shall be included in the Plan Supplement and shall be in form and substance reasonably acceptable to the Required Consenting Lenders and the applicable Purchaser, as the same may be amended, modified, or supplemented from time to time.

10.    "***Auction***" means the auction, if any, for some or all of the Debtors' assets, conducted in accordance with the Bidding Procedures.

11.    "***Available Cash***" means, collectively, all Cash on hand held by the Debtors and Wind-Down Debtor on and after the Effective Date, including the net proceeds from the Sale Transaction, the GUC Trade Settlement Cash Reserve (which, for the avoidance of doubt was provided by the Prepetition First and Second Lien Lenders from their Cash Collateral (as defined in the DIP Order) and released to the Debtors upon entry of the Sale Orders) (the proceeds of which shall be released upon Confirmation of the Plan), and the GUC Litigation Claims Settlement Cash.

12.    "***Avoidance Actions***" mean any and all avoidance, recovery, or subordination actions or remedies that may be brought by or on behalf of the Debtors or their Estates under the Bankruptcy Code or applicable non-bankruptcy law, including actions or remedies under sections 544, 547, 548, 549, 550, 551, 552, or 553 of the Bankruptcy Code.

13.     "**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 100–1532, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

14.     "**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware having jurisdiction over the Chapter 11 Cases and, to the extent of the withdrawal of reference under section 157 of the Judicial Code, the United States District Court for the District of Delaware.

15.     "**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure, promulgated under section 2075 of the Judicial Code and the general, local and chambers rules of the Bankruptcy Court.

16.     "**Bar Date Order**" means the final order entered by the Bankruptcy Court granting the *Debtors' Motion for Entry of an Order (A) Establishing Bar Dates for Filing Proofs of Claim, Including Claims Under 11 U.S.C. § 503(b)(9) and Administrative Expense Requests; (B) Approving the Form and Manner for Filing Proofs of Claim and Administrative Expense Requests; (C) Approving Notice Thereof; and (D) Granting Related Relief* [Docket No. 194] (as the same may be amended, supplemented, or modified from time to time after entry thereof), entered by the Bankruptcy Court on July 19, 2023.

17.     "**Bidding Procedures**" means the procedures governing the sale and marketing process for the Sale Transaction as approved pursuant to the Bidding Procedures Order.

18.     "**Bidding Procedures Motion**" means the *Motion of the Debtors for Entry of Orders (I)(A) Approving Bidding Procedures for Substantially All of the Debtors' Assets, (B) Authorizing the Debtors to Enter into One or More Stalking Horse Agreements and to Provide Bidding Protections Thereunder, (C) Scheduling an Auction and Approving the Form and Manner of Notice Thereof, (D) Approving Assumption and Assignment Procedures, and (E) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof; (II)(A) Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances and (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases; and (III) Granting Related Relief* [Docket No. 66].

19.     "**Bidding Procedures Order**" means the *Order (I)(A) Approving Bidding Procedures for the Sale of Substantially All of the Debtors' Assets; (B) Authorizing the Debtors to Enter into One or More Stalking Horse Agreements and to Provide Bidding Protections Thereunder; (C) Scheduling an Auction and Approving the Form and Manner of Notice Thereof; (D) Approving Assumption and Assignment Procedures; and (E) Scheduling A Sale Hearing and Approving the Form and Manner of Notice Thereof; (II)(A) Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances and (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases; and (III) Granting Related Relief* [Docket No. 331] (as may be modified, amended, or supplemented), entered by the Bankruptcy Court on August 4, 2023.

20.     "**Business Day**" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)(6)).

21.     "**Cash**" means cash and cash equivalents, including bank deposits, checks, and other similar items in legal tender of the United States of America.

22.     "**Cause of Action**" or "**Causes of Action**" means any actions, Avoidance Actions, Claims, cross claims, third-party claims, interests, damages, controversies, remedies, causes of action, debts, judgments, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, Liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, disputed or undisputed, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law or otherwise.  Causes of Action also include: (a) any rights of setoff, counterclaim, or recoupment and any claims under contracts or for breaches of duties imposed by law or in equity; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to section 362 or chapter 5 of the Bankruptcy

Code; (d) any claims or defenses, including fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state law fraudulent transfer claim.

23.  "*CFPB Action*" means the action styled Bureau of *Consumer Financial Protection v. Progrexion Marketing, Inc.*, et al., Case No. 19-CV-00298-DBP, currently pending in the United States District Court for the District of Utah and any appeals or any other recourse in connection therewith.

24.  "*CFPB Claim*" means any Claim arising under, derived from, or based upon the CFPB Action.

25.  "*CFPB Settlement Order*" means the *Stipulated Final Judgment and Order* approving the CFPB settlement [CFPB Action ECF No. 600] entered on August 30, 2023, by the United States District Court for the District of Utah.

26.  "*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code and (b) when used with reference to all Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court.

27.  "*Claim*" means any claim, as such term is defined in section 101(5) of the Bankruptcy Code, against a Debtor or a Debtor's Estate.

28.  "*Claims and Noticing Agent*" means Kurtzman Carson Consultants LLC in its capacity as claims and noticing agent for the Debtors and any successor.

29.  "*Claims Bar Date*" means, collectively, the date established by the Bankruptcy Court in the Bar Date Order by which Proofs of Claim must be Filed with respect to such Claims, other than Administrative Claims, Claims held by Governmental Units, or other Claims for which the Bankruptcy Court entered an order excluding the Holders of such Claims from the requirement of Filing Proofs of Claim.

30.  "*Claims Register*" means the official register of Claims maintained by the Claims and Noticing Agent.

31.  "*Class*" means a class of Claims or Interests as set forth in Article III of the Plan in accordance with section 1122(a) of the Bankruptcy Code.

32.  "*Committee*" means the statutory committee of unsecured creditors of the Debtors, appointed in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code by the U.S. Trustee on June 14, 2023, as set forth in the *Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 90].

33.  "*Company Parties*" means, collectively, PGX, each of its direct and indirect subsidiaries that have executed and delivered counterpart signature pages to the Restructuring Support Agreement.

34.  "*Confirmation*" means the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

35.  "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

36.  "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court to consider Confirmation of the Plan, pursuant to Bankruptcy Rule 3020(b)(2) and sections 1128 and 1129 of the Bankruptcy Code.

37.  "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, which shall be in form and substance reasonably acceptable to the Required Consenting Lenders and the Committee.

38.    "***Consenting Lenders***" means the Consenting Prepetition First Lien Lenders and the Consenting Prepetition Second Lien Lenders.

39.    "***Consenting Prepetition First Lien Lenders***" means, collectively, the holders of, or investment advisors, sub-advisors, or managers of discretionary accounts that hold Prepetition First Lien Claims that have executed and delivered counterpart signature pages to the Restructuring Support Agreement, a joinder to the Restructuring Support Agreement, or an executed form of the transfer agreement providing, among other things, that a transferee is bound by the terms of the Restructuring Support Agreement, as applicable, to counsel to the Company Parties.

40.    "***Consenting Prepetition Second Lien Lenders***" means, collectively, the holders of, or investment advisors, sub-advisors, or managers of discretionary accounts that hold Prepetition Second Lien Claims that have executed and delivered counterpart signature pages to the Restructuring Support Agreement, a joinder to the Restructuring Support Agreement, or an executed form of the transfer agreement providing, among other things, that a transferee is bound by the terms of the Restructuring Support Agreement, as applicable, to counsel to the Company Parties.

41.    "***Consenting Stakeholders***" means the Consenting Lenders and PGX TopCo, LLC.

42.    "***Consummation***" means the occurrence of the Effective Date as to the applicable Debtor.

43.    "***Continuing Trade Claim***" means any General Unsecured Claim arising from the provision of ordinary course trade, vendor, professional, or other services provided to the Debtors and that, in the Debtors' reasonable discretion (in consultation with the Committee), is expected to continue with the respective Purchaser after the consummation of the Sale Transaction or be utilized by the Wind-Down Debtor or Liquidating Trust, as applicable, to the extent not fully paid as a Critical Vendor (as defined in the Critical Vendor Order).

44.    "***Continuing Trade Claimants***" means, collectively, the Holders of Continuing Trade Claims.

45.    "***Credit Bid Amount***" means, as set forth in the Progrexion APA, a credit bid equal to (a) all obligations under the DIP Facility and (b) not less than $237,563,673.27 of the obligations under the Prepetition First Lien Credit Agreement.

46.    "***Credit Bid Transaction***" means a Sale Transaction pursuant to the Progrexion APA on account of a credit bid all of the DIP Claims and some or all of the Prepetition First Lien Claims, which credit bid is selected by the Debtors as the highest and best bid as set forth in the Bidding Procedures Order and as approved by the Bankruptcy Court pursuant to the Progrexion Sale Order.

47.    "***Creditor Trust***" means a trust established by the Debtors for the benefit of the Other GUC Claimants with the Creditor Trustee acting as trustee thereof, the governing terms of which shall be determined by the Committee, and which is funded with cash from the Debtors' cash on hand in the amount of $100,000, and which shall have the right to pursue the liquidation or monetization of the Other Assets (including collecting amounts due under or realizing upon the PIK Notes).  The Creditor Trust shall also hold the PIK Notes for distribution in accordance with the Plan.

48.    "*Creditor Trust Agreement*" means the trust agreement that documents and governs the powers, duties and responsibilities of the Creditor Trustee, which will be materially consistent with and subject to the Plan and otherwise reasonably acceptable to the Debtors and the Committee in the substance and form included in the Plan Supplement.  All Creditor Trust governance issues shall be determined by the Committee.

49.    "*Creditor Trust Assets*" means the assets transferred to the Creditor Trust on or after the Effective Date, including: (a) $100,000 of funding from the Debtors' cash on hand; (b) the PIK Notes; (c) the Other Assets; (d) any Excess Distributable Cash; and (e) a portion of GUC Litigation Claims Settlement Cash (as allocated by the Committee)].

50. "***Creditor Trustee***" means the Person appointed by the Committee to serve as trustee of the Creditor Trust, as identified in the Plan Supplement and in accordance with Article IV.G of the Plan.

51. "***Critical Vendor Order***" means the *Final Order (I) Authorizing Debtors to Pay Certain Prepetition Claims of Critical Vendors and (II) Granting Related Relief* [Docket No. 225].

52. "***Cure Claim***" means a Claim (unless waived or modified by the applicable counterparty) based upon the Debtors' defaults on an Executory Contract or Unexpired Lease at the time such Executory Contract or Unexpired Lease is assumed by the Debtors pursuant to section 365 of the Bankruptcy Code, other than with respect to a default that is not required to be cured under section 365(b)(2) of the Bankruptcy Code.

53. "***Cure Notice***" means, with respect to an Executory Contract or Unexpired Lease to be assumed under the Plan, a notice that (a) sets forth the proposed amount to be paid on account of a Cure Claim in connection with the assumption of such Executory Contract or Unexpired Lease; (b) notifies the counterparty to such Executory Contract or Unexpired Lease that such party's Executory Contract or Unexpired Lease may be assumed under the Plan; (c) sets forth the procedures for objecting to the proposed assumption or assumption and assignment of Executory Contracts and Unexpired Leases, including the proposed objection deadline, and for the resolution by the Bankruptcy Court of any such disputes; and (d) states that the proposed assignee (if applicable) has demonstrated its ability to comply with the requirements of adequate assurance of future performance of the Executory Contract(s) to be assigned, including the assignee's financial wherewithal and willingness to perform under such Executory Contract or Unexpired Lease

54. "***Debtor Release***" means the releases given on behalf of the Debtors and their Estates as set forth in Article VIII.C of the Plan.

55. "***Deficiency Claims***" means, collectively, the Prepetition First Lien Deficiency Claims and the Prepetition Second Lien Deficiency Claims.

56. "***Definitive Document***" means (a) the Confirmation Order; (b) the DIP Order; (c) the Sale Transaction Documentation; (d) all material pleadings filed by the Company Parties in connection with the Chapter 11 Cases (or related order), including the First Day Pleadings and all orders sought pursuant thereto; provided, however, that monthly or quarterly operating reports, retention applications, fee applications, fee statements, and any declarations in support thereof or related thereto shall not constitute material pleadings; and (e) any and all other deeds, agreements, filings, notifications, pleadings, orders, certificates, letters, instruments or other documents reasonably necessary or desirable to consummate and document the transactions contemplated by the Restructuring Support Agreement or the Restructuring Transactions (including any exhibits, amendments, modifications, or supplements from time to time).

57. "***DIP Agent***" means Blue Torch Finance LLC (in such capacity, together with its successors and assigns).

58. "***DIP Claims***" means all Claims arising under, derived from, based upon, or secured pursuant to the DIP Order or other DIP Facility Documents, with respect to the DIP Facility.

59. "***DIP Credit Agreement***" means that certain *Superpriority Secured Debtor-in Possession Financing Agreement*, attached as <u>Exhibit A</u> to the *Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Granting Adequate Protection, (IV) Modifying the Automatic Stay, (V) Scheduling A Final Hearing, and (VI) Granting Related Relief* [Docket No. 70] (as the same may be amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof).

60. "***DIP Facility***" means that certain debtor-in-possession financing facility documented pursuant to the DIP Facility Documents and the DIP Order.

61.　　"**DIP Facility Documents**" means the DIP Credit Agreement together with the schedules and exhibits attached thereto, and all security agreements, pledge agreements, related agreements, documents, instruments and amendments executed and delivered in connection therewith, including the DIP Order.

62.　　"**DIP Lenders**" means the banks, financial institutions, and other lenders under the DIP Credit Agreement.

63.　　"**DIP Order**" means the *Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Granting Adequate Protection, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* [Docket No. 332] (as may be modified, amended, or supplemented pursuant to a subsequent Final Order), entered by the Bankruptcy Court on August 4, 2023.

64.　　"**Disbursing Agent**" means the Debtors, Wind-Down Debtor or Creditor Trustee (as applicable), or the Entity or Entities selected by the Debtors, Wind-Down Debtor or Creditor Trustee, as applicable, to make or facilitate distributions contemplated under the Plan, including the Plan Administrator, if applicable.

65.　　"**Disclosure Statement**" means the *First Amended Disclosure Statement for the First Amended Joint Chapter 11 Plan of PGX Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, as may be amended, supplemented or modified from time to time, including all exhibits and schedules thereto and references therein that relate to the Plan, that is prepared and distributed in accordance with the Bankruptcy Code, the Bankruptcy Rules, and any other applicable law and approved by the Bankruptcy Court pursuant to the Disclosure Statement Order.  The Disclosure Statement shall be reasonably acceptable to the Committee, the DIP Lenders, the Prepetition First Lien Lenders, and the Prepetition Second Lien Lenders, and consistent with the terms of the Global Settlement Term Sheet.

66.　　"**Disclosure Statement Order**" means the *Order (I) Approving the Adequacy of the Disclosure Statement on an Interim Basis, (II) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing, (III) Approving the Solicitation and Notice Procedures, (IV) Approving the Combined Hearing Notice, and (V) Granting Related Relief* [Docket No. 478] (as may be modified, amended, or supplemented by further Final Order), entered by the Bankruptcy Court on September 16, 2023.

67.　　"**Disputed**" means, with respect to any Claim or Interest, any Claim or Interest:  (a) that is not Allowed, (b) as to which a dispute is being adjudicated by a court of competent jurisdiction in accordance with non-bankruptcy law, or (c) that is Filed in the Bankruptcy Court and not withdrawn, as to which a timely objection or request for estimation has been Filed.

68.　　"**Distributable Proceeds**" means all Cash of the Debtors or Wind-Down Debtor, as applicable, on or after the Effective Date, after giving effect to the funding of the Wind-Down Debtor Account and Professional Fee Escrow Account.

69.　　"**Distribution Record Date**" means the record date for purposes of determining which Holders of Allowed Claims or Allowed Interests are eligible to receive distributions under the Plan, which date shall be the Effective Date, or such other date as is designated in a Final Order of the Bankruptcy Court.

70.　　"**Effective Date**" means, as to the applicable Debtor, the date that is the first Business Day after the Confirmation Date on which (a) the conditions to the occurrence of the Effective Date have been satisfied or waived pursuant to Article IX.A, Article IX.B, and Article IX.C of the Plan and (b) no stay of the Confirmation Order is in effect.  Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.

71.　　"**Entity**" has the meaning set forth in section 101(15) of the Bankruptcy Code.

72.　　"**Estate**" means, as to each Debtor, the estate created on the Petition Date for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code and all property (as defined in section 541 of the Bankruptcy Code) acquired by the Debtors after the Petition Date through the Effective Date.

73.      "***Excess Distributable Cash***" means Available Cash after funding the Secured Tax Claims, Other Secured Claims, Other Priority Claims, and the funding of the amounts set forth in the Global Settlement Term Sheet, as applicable, including but not limited to the GUC Trade Settlement Cash; *provided* that any Cash placed in the Wind-Down Debtor Account, or Professional Fee Escrow Account shall not be Excess Distributable Cash, except, to the extent, following the wind down of the Chapter 11 Cases, any amounts remain in the Wind-Down Debtor Account or Professional Fee Escrow Account.

74.      "***Exculpated Parties***" means, collectively, and in each case solely in its capacity as such: (a) each of the Debtors; (b) the Independent Directors; (c) the Committee and each of its respective members; (d) the Plan Administrator; (e) the Creditor Trustee; (f) each Related Party of the Debtors, and (g) with respect to (c), (d), and (e), their respective attorneys, financial advisors, consultants, or other professionals or advisors.

75.      "***Executory Contract***" means a contract to which one or more of the Debtors is a party and that is subject to assumption or rejection under section 365 or 1123 of the Bankruptcy Code.

76.      "***Federal Judgment Rate***" means the federal judgment interest rate in effect as of the Petition Date calculated as set forth in section 1961 of the Judicial Code.

77.      "***File***" or "***Filed***" or "***Filing***" means file, filed or filing with the Bankruptcy Court in the Chapter 11 Cases, or, with respect to the filing of a Proof of Claim, the Claims and Noticing Agent.

78.      "***Final Order***" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified or amended, and as to which the time to appeal, petition for certiorari, or move for reargument, reconsideration, or rehearing has expired and no appeal, petition for certiorari, or motion for reargument, reconsideration, or rehearing has been timely taken or Filed, or as to which any appeal, petition for certiorari, or motion for reargument, reconsideration, or rehearing that has been taken or any petition for certiorari that has been or may be Filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the new trial, reargument or rehearing shall have been denied, resulted in no modification of such order or has otherwise been dismissed with prejudice.

79.      "***First Day Pleadings***" means the first-day pleadings that the Company Parties File with the Bankruptcy Court upon the commencement of the Chapter 11 Cases.

80.      "***General Unsecured Claim***" means collectively, Continuing Trade Claims, Litigation Claims, Other General Unsecured Claims, and the CFPB Claim.

81.      "*Global Settlement*" means the settlement agreement incorporated herein, which memorializes and implements the terms of the Global Settlement Term Sheet.  For the avoidance of doubt, to the extent the terms of the Global Settlement are inconsistent with the Global Settlement Term Sheet, the terms of the Global Settlement Term Sheet shall control.

82.      "*Global Settlement Term Sheet*" means that certain *Term Sheet for Plan and Settlement in Principle* attached as <u>Exhibit C</u> to the DIP Order and incorporated by reference therein.

83.      "***Governing Body***" means, in each case in its capacity as such, the board of directors, board of managers, manager, general partner, investment committee, special committee, or such similar governing body of any of the Debtors or any Wind-Down Debtor, as applicable.

84.      "***Governmental Bar Date***" means December 1, 2023, at 4:00 p.m. prevailing Eastern Time, which is the date by which Proofs of Claim must be Filed with respect to such Claims held by Governmental Units pursuant to the Bar Date Order.

85.      "***Governmental Unit***" has the meaning set forth in section 101(27) of the Bankruptcy Code.

86.     "***GUC Litigation Claims Settlement Cash***" means cash in the amount of $750,000.

87.     "***GUC Trade Settlement Cash***" means cash in the amount of $3.25 million.

88.     "***GUC Trade Settlement Cash Reserve***" shall have the same meaning ascribed to such term in the Progrexion Sale Order.  For the avoidance of doubt, the GUC Trade Settlement Cash Reserve was that certain reserve provided by the Prepetition Secured Lenders' release from the Debtors' then-existing Cash Collateral (which came solely from the Debtors' cash on hand at the time of entry of the Progrexion Sale Order) an amount equal to the GUC Trade Settlement Cash.

89.     "***Holder***" means an Entity holding a Claim against or an Interest in any Debtor.

90.     "***Impaired***" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

91.     "***Independent Directors***" means Neal Goldman, David Gibbons, Eugene Davis, and Roger Meltzer, in their capacities as current or former independent directors of certain of the Debtors.

92.     "***Intercompany Claim***" means any Claim held by a Debtor or an Affiliate of a Debtor against another Debtor arising before the Petition Date.

93.     "***Intercompany Interest***" means an Interest in a Debtor held by a Debtor or an Affiliate of a Debtor.

94.     "***Interest***" means any equity security in a Debtor as defined in section 101(16) of the Bankruptcy Code, including all issued, unissued, authorized, or outstanding shares of capital stock of the Debtors and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable, or exchangeable securities, or other agreements, arrangements, or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor whether or not arising under or in connection with any employment agreement and whether or not certificated, transferable, preferred, common, voting, or denominated "stock" or a similar security, including any Claims against any Debtor subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to any of the foregoing.

95.     "***Interim Compensation Order***" means the *Order (I) Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Retained Professionals and (II) Granting Related Relief* [Docket No. 208] (as may be modified, amended, or supplemented by further order of the Bankruptcy Court), as entered by the Bankruptcy Court on July 19, 2023.

96.     "***IRS***" means the United States Internal Revenue Service.

97.     "***Judicial Code***" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

98.     "***Lexington Law APA***" means that certain Asset Purchase Agreement, as may be amended, supplemented, or otherwise modified by the parties thereto, dated September [●], 2023, by and among Lexington Law Firm and the Lexington Law Purchaser for substantially all the assets of Lexington Law Firm, subject to the terms of Lexington Law Sale Order.

99.     "***Lexington Law Firm***" means Debtor John C. Heath, Attorney At Law PC (d/b/a Lexington Law Firm), a professional corporation incorporated under the Laws of Utah.

100.    "***Lexington Law Purchaser***" means [AcquisitionCo], whose bid for part or all of the Debtors' assets was selected by the Debtors and approved by the Lexington Law Sale Order as the highest or otherwise best bid in accordance with the Bidding Procedures Order.

101.    "***Lexington Law Sale Order***" means the order of the Bankruptcy Court approving the Sale Transaction related to the Lexington Law APA as contemplated by the Bidding Procedures Order.

102.    "***Lien***" means a lien as defined in section 101(37) of the Bankruptcy Code.

103.    "***Liquidating Trust***" shall have the meaning ascribed to such term in Article IV.E herein.

104.    "***Liquidating Trust Assets***" means any assets transferred from the Wind-Down Debtor to the Liquidating Trust in accordance with Article IV.E herein.

105.    "***Litigation Claim***" means any Claims, other than the CFPB Claim, arising under the WARN Act, class action, or other litigation claim or controversy.

106.    "***Litigation Claimant***" means any Holder of a Litigation Claim arising from pending litigation, as set forth in Global Settlement Term Sheet.

107.    "***Litigation Portion***" means the amount of the GUC Litigation Claims Settlement Cash allocated for payment and settlement solely with Litigation Claimants, which is acceptable to the Committee.

108.    "***Litigation Settlement***" means the settlement with the Litigation Claimants in full and final settlement of all controversies and claims as consented to by the Committee or the Creditor Trustee, as applicable.

109.    "***Other Assets***" means, collectively, the remaining assets of any of the Debtors excluded from the Sale Transaction.  For the avoidance of doubt, Other Assets shall not include any of the Transferred Causes of Action.

110.    "***Other General Unsecured Claim***" means any General Unsecured Claim that is not a Continuing Trade Claim, a Litigation Claim, or the CFPB Claim.

111.    "***Other GUC Claimants***" means, collectively, Holders of Allowed Other General Unsecured Claims.  The Prepetition First and Second Lien Lenders shall not constitute Other GUC Claimants for purposes of any distributions or other payments hereunder on account of their Deficiency Claims unless and until distributions are made on account of other Allowed General Unsecured Claims in the amount of $10 million, at which point the Prepetition First and Second Lien Lenders shall begin to participate in distributions Pro Rata on account of their Deficiency Claims.  For the avoidance of doubt, the Prepetition First and Second Lien Lenders shall constitute Other GUC Claimants for all purposes hereunder on account of their Deficiency Claims solely to the extent the distribution on account of other Allowed General Unsecured Claims exceeds $10 million in the aggregate (which such distribution shall include, for the avoidance of doubt, the GUC Trade Settlement Cash Reserve and including any Other Assets subsequently monetized pursuant to the terms and conditions of the Creditor Trust); provided however, that any distribution on account of the PIK Notes shall not be made on account of the Deficiency Claims.

112.    "***Other Priority Claim***" means any Claim, to the extent such Claim has not already been paid during the Chapter 11 Cases, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

113.    "***Other Secured Claim***" means any Secured Claim that is not a DIP Claim, a Prepetition First Lien Claim, Prepetition Second Lien Claim, or a Secured Tax Claim.

114.    "***Permitted Transfer***" means a transfer of all or a portion of the assets of the Wind-Down Debtor to the Liquidating Trust in accordance with Article IV.E herein.

115.    "***Person***" means a person as such term as defined in section 101(41) of the Bankruptcy Code.

116.    "***Petition Date***" means June 4, 2023, the date on which each of the Debtors commenced the Chapter 11 Cases.

117.    "*PGX*" means PGX Holdings, Inc., a company incorporated under the Laws of Delaware.

118.    "*PIK Notes*" means, collectively the two (2) tranches of subordinated, unsecured notes to be issued by the Progrexion Purchaser or a subsidiary thereto, each tranche shall be in the principal amount of $250,000 and accruing at a 5% yearly PIK interest.  All PIK Notes shall mature 5 years after the Effective Date and shall be subordinate to all current and future indebtedness of the issuer; *provided*, that the PIK Notes may be repaid in the first two (2) years at a 20% discount.  For the avoidance of doubt, the PIK Notes shall not (a) be guaranteed by the Lexington Law Purchaser or its subsidiaries nor (b) include any covenants or information rights.

119.    "*Plan*" means this *First Amended Joint Chapter 11 Plan of PGX Holdings, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, as may be altered, amended, modified, or supplemented from time to time.  Any Filed Plan shall be reasonably acceptable to the Committee, the DIP Lenders, the Prepetition First Lien Lenders, and the Prepetition Second Lien Lenders, and consistent with the terms of the Global Settlement Term Sheet.

120.    "*Plan Administrator*" means the Person or Entity designated by the Debtors in consultation with the Committee, who will be disclosed at or prior to the Confirmation Hearing, to have all powers and authorities set forth in Article IV.F of this Plan.

121.    "*Plan Distribution*" means a payment or distribution to Holders of Allowed Claims in accordance with the Plan.

122.    "*Plan Supplement*" means the compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan (as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code and Bankruptcy Rules) to be Filed by the Debtors no later than the Plan Supplement Filing Date, including the following to the extent applicable: (a) Rejected Executory Contracts and Unexpired Leases Schedule, (b) Assumed Executory Contracts and Unexpired Leases Schedule, (c) Schedule of Retained Causes of Action, (d) any necessary documentation related to the Sale Transactions, (e)(i) the identity of the Creditor Trustee and (ii) the terms of the governing agreement of the Creditor Trust, (f) the Litigation Portion of the GUC Litigation Claims Settlement Cash, and (g) the PIK Notes.

123.    "*Plan Supplement Filing Date*" means, the date that is (a) seven days prior to the earlier of (i) the Voting Deadline or (ii) the deadline to object to Confirmation of the Plan or (b) such later date as may be approved by the Bankruptcy Court.

124.    "*Prepetition First Lien Agent*" means Blue Torch Finance LLC, in its capacity as administrative agent and collateral agent under the Prepetition First Lien Credit Agreement, or any successor administrative agent or collateral agent as permitted by the terms set forth in the Prepetition First Lien Credit Agreement.

125.    "*Prepetition First Lien Claims*" means any Claims arising under, derived from, or based upon the Prepetition First Lien Loans under the Prepetition First Lien Credit Agreement.

126.    "*Prepetition First Lien Credit Agreement*" means that certain Prepetition First Lien Credit Agreement, dated as of September 29, 2014, as amended, supplemented, or modified from time to time, by and among PGX Holdings, Inc., the Prepetition First Lien Lenders, and the Prepetition First Lien Agent.

127.    "*Prepetition First Lien Deficiency Claim*" means any Prepetition First Lien Claim that is not a Secured Claim.

128.    "*Prepetition First Lien Lenders*" means, collectively, the banks, financial institutions, and other lenders party to the Prepetition First Lien Credit Agreement from time to time, each solely in their capacity as such.

129.    "*Prepetition First Lien Loans*" means loans outstanding under the Prepetition First Lien Credit Agreement.

130.     "***Prepetition Loan Claims***" means the Prepetition First Lien Claims and the Prepetition Second Lien Claims.

131.     "***Prepetition Loan Documents***" means the Prepetition First Lien Credit Agreement and Prepetition Second Lien Credit Agreement and all other agreements, documents, and instruments related thereto, including any guaranty agreements, pledge and collateral agreements, intercreditor agreements, and other security agreements.

132.     "***Prepetition Second Lien Agent***" means Prospect Capital Corporation, in its capacity as administrative agent and collateral agent under the Prepetition Second Lien Credit Agreement, or any successor administrative agent or collateral agent as permitted by the terms set forth in the Prepetition Second Lien Credit Agreement.

133.     "***Prepetition Second Lien Claims***" means any Claims arising under, derived from, or based upon the Prepetition Second Lien Loans under the Prepetition Second Lien Credit Agreement.

134.     "***Prepetition Second Lien Credit Agreement***" means that certain Prepetition Second Lien Credit Agreement, dated as of September 29, 2014, as amended, supplemented, or modified from time to time, by and among PGX Holdings, Inc., the Prepetition Second Lien Lender, and the Prepetition Second Lien Agent.

135.     "***Prepetition Second Lien Deficiency Claim***" means any Prepetition Second Lien Claim that is not a Secured Claim.

136.     "***Prepetition Second Lien Lenders***" means, collectively, the banks, financial institutions, and other lenders party to the Prepetition Second Lien Credit Agreement from time to time, each solely in their capacity as such.

137.     "***Prepetition Second Lien Loans***" means loans outstanding under the Prepetition Second Lien Credit Agreement.

138.     "***Prepetition Secured Lenders***" means, collectively, the Prepetition First and Second Lien Lenders.

139.     "***Priority Claims***" means, collectively, Priority Tax Claims and Other Priority Claims.

140.     "***Priority Tax Claim***" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code that is not otherwise a Secured Tax Claim.

141.     "***Pro Rata***" means the proportion that an Allowed Claim or an Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that Class, unless otherwise indicated.

142.     "***Professional***" means an Entity: (a) retained pursuant to a Bankruptcy Court order in accordance with sections 327 or 1103 of the Bankruptcy Code and to be compensated for services rendered and expenses incurred pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

143.     "***Professional Fee Claim***" means a Claim by a Professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code.

144.     "***Professional Fee Escrow Account***" means an interest-bearing account funded by the Debtors at a third-party bank with Cash on the Effective Date in an amount equal to the Professional Fee Escrow Amount.

145.     "***Professional Fee Escrow Amount***" means the aggregate amount of Professional Fee Claims and other unpaid fees and expenses that the Professionals estimate they have incurred or will incur in rendering services to the Debtors as set forth in Article II.B.3 of the Plan.

146.     "***Progrexion APA***" means that certain Asset Purchase Agreement, as amended, supplemented, or otherwise modified by the parties thereto, dated September [●], 2023,  by and among, on the one hand, Debtors PGX Holdings, Inc.; Progrexion Holdings, Inc.; Credit.com, Inc.; eFolks Holdings, Inc.; Creditrepair.com Holdings, Inc.; Progrexion ASG, Inc.; Progrexion IP, Inc.; Progrexion Marketing, Inc.; Progrexion Teleservices, Inc.; eFolks, LLC; Creditrepair.com, Inc.; and Credit Repair UK, Inc. and, on the other hand, the Progrexion Purchaser for substantially all the assets of the Sellers (as defined therein), subject to the terms of the Progrexion Sale Order.

147.     "***Progrexion Purchaser***" means [Lender AcquisitionCo LLC], whose bid for part or all of the Debtors' assets was selected by the Debtors and approved by the Progrexion Sale Order as the highest or otherwise best bid in accordance with the Bidding Procedures Order.

148.     "***Progrexion Sale Order***" means the order of the Bankruptcy Court approving the Sale Transaction related to the Progrexion APA as contemplated by the Bidding Procedures Order.

149.     "***Proof of Claim***" means a written proof of Claim Filed against any of the Debtors in the Chapter 11 Cases by the Claims Bar Date, the Administrative Claims Objection Bar Date, or the Governmental Bar Date, as applicable.

150.     "***Purchasers***" means, collectively, the Lexington Law Purchaser and the Progrexion Purchaser, as selected by the Debtors and approved by the Bankruptcy Court as the highest or otherwise best bids in accordance with the Bidding Procedures Order.

151.     "***Reinstate***," "***Reinstated***," or "***Reinstatement***" means with respect to Claims and Interests, that the Claim or Interest shall be rendered unimpaired in accordance with section 1124 of the Bankruptcy Code.

152.     "***Rejected Executory Contracts and Unexpired Leases Schedule***" means the schedule of Executory Contracts and Unexpired Leases to be rejected by the Debtors pursuant to the Plan, which schedule shall be included in the Plan Supplement, as the same may be amended, modified, or supplemented from time to time.

153.     "***Related Party***" means, each of, and in each case in its capacity as such, current and former directors, managers, officers, investment committee members, special committee members, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals and advisors. For the avoidance of doubt, the members of each Governing Body are Related Parties of the Debtors.

154.     "***Released Party***" means, each of, and in each case in its capacity as such: (a) the Debtors; (b) the Wind-Down Debtor; (c) the Plan Administrator; (d) each Consenting Stakeholder; (e) the Agent; (f) all Holders of Claims; (g) all Holders of Interests; (h) the Purchasers; (i) the Committee and its members (in their capacity as Committee members); (j) the Creditor Trust (including the Creditor Trustee on behalf of the Creditor Trust); (k) each current and former Affiliate of each Entity in clause (a) through the following clause (l); and (l) each Related Party of each Entity in clause (a) through this clause (l); *provided* that any Holder of a Claim or Interest that opts out of the releases contained in the Plan shall not be a Released Party.

155.     "***Releasing Parties***" means, each of, and in each case in its capacity as such: (a) the Debtors; (b) the Wind-Down Debtor; (c) the Plan Administrator; (d) each Consenting Stakeholder; (e) the Agent; (f) all Holders of Claims; (g) all Holders of Interests; (h) the Purchasers; (i) the Committee and its members (in their capacity as Committee members); (j) the Creditor Trust (including the Creditor Trustee on behalf of the Creditor Trust); (k) each current and former Affiliate of each Entity in clause (a) through the following clause (l); and (l) each Related Party of each Entity in clause (a) through this clause (l) for which such Affiliate or Entity is legally entitled to bind such Related Party to the releases contained in the Plan under applicable law; *provided, however*, that in each case, an Entity shall not be a Releasing Party if it: (x) elects to opt out of the release contained in the Plan; or (y) timely objects to the Third-Party Release and such objection is not withdrawn before Confirmation.

156.    "***Required Consenting Lenders***" means, as of the relevant date, Consenting Lenders holding at least 50.01% of the aggregate outstanding principal amount of the Prepetition First Lien Loans and the Prepetition Second Lien Loans that are held by all Consenting Lenders.

157.    "***Restructuring Support Agreement***" means that certain Restructuring Support Agreement, dated as of June 4, 2023, by and among the Debtors and certain Holders of Claims and Interests, including all exhibits and schedules attached thereto, as may be amended in accordance with its terms.

158.    "***Restructuring Transactions***" means the transactions described in Article IV.B of the Plan.

159.    "***Retained Causes of Action***" means any Causes of Action that vest in the Wind-Down Debtor on the Effective Date and for the avoidance of doubt, Retained Causes of Action shall not include any of the Transferred Causes of Action or any Causes of Action that are settled, released, or exculpated under the Plan, including as part of the claims reconciliation process.

160.    "***Sale Closing***" means the closing of the transactions contemplated by the Asset Purchase Agreements.

161.    "***Sale Orders***" means, collectively, the Progrexion Sale Order and the Lexington Law Sale Order.

162.    "***Sale Transaction***" means the sale of all or substantially all of the Debtor's assets to the applicable Purchaser(s) as set forth in the Asset Purchase Agreements.

163.    "***Sale Transaction Documentation***" means all motions, filings, documents, and agreements related to the Sale Transaction, including without limitation, the Asset Purchase Agreements, the Sale Orders, the Bidding Procedures, the Bidding Procedures Motion, and the Bidding Procedures Order.

164.    "***Schedule of Retained Causes of Action***" means the schedule of certain Causes of Action of the Debtors that are not released, waived, or transferred pursuant to the Plan, as the same may be amended, modified, or supplemented from time to time by the Debtors.

165.    "***Schedules***" means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code, the official bankruptcy forms, and the Bankruptcy Rules, as such schedules may be amended, modified, or supplemented from time to time.

166.    "***Section 510(b) Claim***" means any Claim subject to subordination under section 510(b) of the Bankruptcy Code; provided that a Section 510(b) Claim shall not include any Claim subject to subordination under section 510(b) of the Bankruptcy Code arising from or related to an Interest.  For the avoidance of doubt, neither DIP Claims nor Prepetition Loan Claims are, and shall not be, Section 510(b) Claims.

167.    "***Secured***" means when referring to a Claim: (a) secured by a Lien on collateral in which the applicable Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in such Debtor's interest in such collateral or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or (b) Allowed pursuant to the Plan as a Secured Claim.

168.    "***Secured Tax Claim***" means any Secured Claim that, absent its secured status would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.

169.    "***Securities Act***" means the Securities Act of 1933, 15 U.S.C. §§ 77a-77aa, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

170.    "*Security*" means a security as defined in section 2(a)(1) of the Securities Act.

171.    "*Tax Code*" means the United States Internal Revenue Code of 1986, as amended.

172.    "*Third-Party Release*" means the release given by the Releasing Parties to the Released Parties as set forth in Article VIII.C and Article VIII.D of the Plan.

173.    "*Transferred Causes of Action*" means any and all Causes of Action held by the Debtors that were transferred to the Purchasers pursuant to the Sale Transaction.

174.    "*Treasury Regulations*" means the regulations promulgated under the Tax Code by the United States Department of the Treasury.

175.    "*U.S. Trustee*" means the Office of the United States Trustee for the District of Delaware.

176.    "*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 or section 1123 of the Bankruptcy Code.

177.    "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

178.    "*Unused Critical Vendor Cash*" means, the extent to which the aggregate amount of the Debtors' payment of prepetition amounts on account of Critical Vendor Claims (as defined in the Critical Vendor Order) in accordance with the Approved Budget is less than $3.624 million.  The Debtors shall make all payments on account of Critical Vendor Claims (as defined in the Critical Vendor Order) consistent with the $3.624 million aggregate amount of such Claims set forth in the Approved Budget.

179.    "*Voting Deadline*" means 4:00 p.m. (prevailing Eastern Time) on October 20, 2023.

180.    "*WARN Act*" means the Worker Adjustment and Retraining Notification Act of 1988, as amended, and the rules and regulations promulgated thereunder.

181.    "*Wind-Down Budget*" means the wind-down budget funding the wind-down of the Debtors estates, in an amount no less than $2.625 million, acceptable to the Debtors, the DIP Lenders, and the Committee, to be held in escrow by the DIP Agent and to be released only upon the closing of the Sale Transaction, which shall automatically be increased on a dollar for dollar basis to the extent, as of the date of the consummation of the Sale Transaction, the Debtors have capital in excess of the amount set forth in the then-approved budget; *provided, however*, such that in no event shall the wind-down budget exceed $3,000,000.  Notwithstanding the foregoing or anything to the contrary herein, the Wind-Down Budget shall be funded in accordance with the budget Filed at Docket No. 255, and the use of the Wind-Down Budget shall be subject to the Committee's consent.

182.    "*Wind-Down Debtor*" means the Debtor or Debtors or any successor or successors thereto after the Effective Date responsible for winding down the Debtors' Estates and implementing the terms of the Plan.

183.    "*Wind-Down Debtor Account*" means the Debtors' bank account or accounts used to fund all expenses and payments required to be made by the Wind-Down Debtor, which account will be funded on the Effective Date with Available Cash in the Wind-Down Debtor Account Amount.  Following the wind down of the Chapter 11 Cases, any remaining amounts in the Wind-Down Debtor Account shall be Excess Distributable Cash.  For the avoidance of doubt, the Wind-Down Debtor Account shall become property of the Wind-Down Debtor on the Effective Date.

184.    "*Wind-Down Debtor Account Amount*" means $2,625,000, plus any amounts budgeted to be utilized under the DIP Facility but not actually utilized by the Debtors as of the Effective Date, minus any amounts used to fund the Professional Fee Escrow Account or otherwise reserved or used by the Plan Administrator to fund the wind down of the Debtors' Estates in accordance with the Wind-Down Budget.

185.    "***Wind-Down Debtor Assets***" means all of the remaining assets of the Debtors' Estates following the consummation of the Sale Transaction excluding (a) the GUC Trade Settlement Cash Reserve and (b) the Other Assets.

B.    *Rules of Interpretation*

For purposes of this Plan:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, restated, supplemented, or otherwise modified in accordance with the Plan or Confirmation Order, as applicable; (4) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (6) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (7) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (8) subject to the provisions of any contract, certificate of incorporation, bylaw, instrument, release, or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with, applicable federal law, including the Bankruptcy Code and the Bankruptcy Rules, or, if no rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules) or otherwise specifically stated, the laws of the State of Delaware, without giving effect to the principles of conflict of laws; (9) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (10) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (11) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (12) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (13) any effectuating provisions may be interpreted by the Wind-Down Debtor in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, and such interpretation shall be conclusive; (14) any references herein to the Effective Date shall mean the Effective Date or as soon as reasonably practicable thereafter; (15) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; (16) all references herein to consent, acceptance, or approval shall be deemed to include the requirement that such consent, acceptance, or approval be evidenced by a writing, which may be conveyed by counsel for the respective parties that have such consent, acceptance, or approval rights, including by electronic mail; and (17) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

C.    *Computation of Time*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.  Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

D.    *Governing Law*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of Delaware, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided* that corporate

or limited liability company governance matters relating to the Debtors or the Wind-Down Debtor, as applicable, not incorporated in Delaware shall be governed by the laws of the state of incorporation or formation of the relevant Debtor or the Wind-Down Debtor, as applicable.

E.      *Reference to Monetary Figures*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided herein.

F.      *Reference to the Debtors or the Wind-Down Debtor*

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or the Wind-Down Debtor shall mean the Debtors and the Wind-Down Debtor, as applicable, to the extent the context requires.

G.      *No Substantive Consolidation; Limited Administrative Consolidation*

Although for purposes of administrative convenience and efficiency the Plan has been Filed as a joint plan for each of the Debtors and presents together Classes of Claims against, and Interests in, the Debtors, the Plan does not provide for the substantive consolidation of any of the Debtors except for the limited purposes set forth herein. The entry of the Confirmation Order shall constitute the approval, pursuant to section 105(a) of the Bankruptcy Code, effective as of the Effective Date, of the limited consolidation of each of the Debtors, and their respective estates, solely for voting, confirmation, and distribution purposes under the Plan.  This limited consolidation shall not affect (other than for purposes related to funding distributions under the Plan) (a) the legal and organizational structure of the Debtors, (b) defenses to any Causes of Action or requirements for any third party to establish mutuality to assert a right of setoff, and (c) distributions out of any insurance policies or proceeds of such policies.

## ARTICLE II.
## ADMINISTRATIVE CLAIMS, DIP CLAIMS, AND PRIORITY TAX CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, DIP Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III.

A.      *General Administrative Claims*

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors or the Wind-Down Debtor, as applicable, to the extent an Allowed Administrative Claim has not already been paid in full or otherwise satisfied during the Chapter 11 Cases, each Holder of an Allowed Administrative Claim (other than Holders of Professional Fee Claims, the DIP Claims, and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Allowed Administrative Claim in an amount of Cash equal to the amount of the unpaid portion of such Allowed Administrative Claim in accordance with the following:  (1) if such Administrative Claim is Allowed on or prior to the Effective Date, no later than 30 days after the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction or course of business giving rise to such Allowed Administrative Claim, without any further action by the Holder of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by the Holder of such Allowed Administrative Claim and the Debtors or the Wind-Down Debtor, as applicable; or (5) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court.

Except with respect to Administrative Claims that are Professional Fee Claims, DIP Claims, or subject to section 503(b)(1)(D) of the Bankruptcy Code, and unless previously Filed, requests for payment of Administrative Claims must be Filed and served on the Wind-Down Debtor no later than the Administrative Claims Bar Date pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order. Objections to such requests must be Filed and served on the Wind-Down Debtor and the requesting party by the Administrative Claims Objection Bar Date. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules, and prior Bankruptcy Court orders, the Allowed amounts, if any, of Administrative Claims shall be determined by, and satisfied in accordance with an order that becomes a Final Order of, the Bankruptcy Court.

Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims that do not File and serve such a request by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors, the Wind-Down Debtor, or their property, and such Administrative Claims shall be deemed discharged as of the Effective Date without the need for any objection from the Wind-Down Debtor or any notice to or action, order, or approval of the Bankruptcy Court. Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with the Bankruptcy Court with respect to an Administrative Claim previously Allowed.

B.    *Professional Fee Claims*

1.    Final Fee Applications and Payment of Professional Fee Claims

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than sixty (60) days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules, and prior Bankruptcy Court orders. The Wind-Down Debtor shall pay the amount of the Allowed Professional Fee Claims owing to the Professionals in Cash to such Professionals, including from funds held in the Professional Fee Escrow Account, when such Professional Fee Claims are Allowed by entry of an order of the Bankruptcy Court.

2.    Professional Fee Escrow Account

As soon as is reasonably practicable after the Confirmation Date and no later than the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals and for no other Entities until all Professional Fee Claims Allowed by the Bankruptcy Court have been indefeasibly paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court. No Liens, Claims, or Interests shall encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Escrow Account in any way. Funds held in the Professional Fee Escrow Account shall not be considered property of the Estates of the Debtors or the Wind-Down Debtor.

The amount of Allowed Professional Fee Claims owing to the Professionals shall be paid in Cash to each such Professional by the Debtors or the Wind-Down Debtor, as applicable, from the funds held in the Professional Fee Escrow Account or the Wind-Down Debtor Account, as applicable, as soon as reasonably practicable after such Professional Fee Claims are Allowed by an order of the Bankruptcy Court; *provided* that the Debtors' and the Wind-Down Debtor's obligations to pay Allowed Professional Fee Claims shall not be limited nor be deemed limited to funds held in the Professional Fee Escrow Account. When all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court, any remaining funds held in the Professional Fee Escrow Account shall promptly be paid to the Wind-Down Debtor and constitute part of the Wind-Down Debtor Assets without any further notice to or action, order, or approval of the Bankruptcy Court.

3.    Professional Fee Escrow Amount

The Professionals shall provide a reasonable and good-faith estimate of their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date projected to be outstanding as of the Effective Date, and shall deliver such estimate to the Debtors no later than five (5) days before the anticipated Effective Date; *provided* that such estimate shall not be considered or deemed an admission or limitation with respect to the amount of the fees and expenses that are the subject of the Professional's final request for payment of Professional Fee Claims and such Professionals are not bound to any extent by the estimates.  If a Professional does not provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional.  The total aggregate amount so estimated as of the Effective Date shall be utilized by the Debtors to determine the amount to be funded to the Professional Fee Escrow Account, *provided* that the Wind-Down Debtor shall use Cash on hand or from the Wind-Down Debtor Account to increase the amount of the Professional Fee Escrow Account to the extent fee applications are Filed after the Effective Date in excess of the amount held in the Professional Fee Escrow Account based on such estimates.

4.    Post-Confirmation Fees and Expenses

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors or the Wind-Down Debtor.  The Debtors and Wind-Down Debtor (as applicable) shall pay, within ten (10) Business Days after submission of a detailed invoice to the Debtors or Wind-Down Debtor (as applicable), with a copy to the Committee, such reasonable claims for compensation or reimbursement of expenses incurred by the Professionals of the Debtors and Wind-Down Debtor (as applicable).  If the Debtors or Wind-Down Debtor (as applicable) dispute the reasonableness of any such invoice, the Debtors or Wind-Down Debtor (as applicable) or the affected professional may submit such dispute to the Bankruptcy Court for a determination of the reasonableness of any such invoice, and the disputed portion of such invoice shall not be paid until the dispute is resolved.  Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code or the Interim Compensation Order in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

C.    *DIP Claims*

Pursuant to the Sale Orders, the DIP Claims were assumed by the Progrexion Purchaser in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, each Allowed DIP Claim as of consummation of the Sale Transaction, and the Debtors have no further obligation to the DIP Lenders or any other party with respect to the DIP Claims, except to the extent otherwise set forth herein.  Pursuant to the Sale Orders, all Liens and security interests granted to secure the Allowed DIP Claims were terminated and of no further force and effect without any further notice to or action, order, or approval of the Bankruptcy Court.  For the avoidance of doubt, and notwithstanding anything to the contrary herein, any requests for payment or reimbursement of expenses issued by a professional pursuant to the DIP Order are not required to be Filed or served, and shall not be subject to review, other than as contemplated by the DIP Order.

D.    *Priority Tax Claims*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

E.    *Payment of Statutory Fees*

All fees payable pursuant to section 1930(a) of the Judicial Code, including fees and expenses payable to the U.S. Trustee, as determined by the Bankruptcy Court, will be paid by the Plan Administrator in accordance with the Wind-Down Budget, for each quarter (including any fraction thereof) until the Chapter 11 Case of the Wind-Down Debtor is converted, dismissed, or closed, whichever occurs first.

# ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.    *Classification of Claims and Interests*

Except for the Claims addressed in Article II hereof, all Claims and Interests are classified in the Classes set forth in this Article III for all purposes, including voting, Confirmation, and distributions pursuant to the Plan and in accordance with section 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or an Interest is classified in a particular Class only to the extent that such Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of such Claim or Interest qualifies within the description of such other Classes.  A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The classification of Claims and Interests against each Debtor pursuant to the Plan is as set forth below.  The Plan shall apply as a separate Plan for each of the Debtors, and the classification of Claims and Interests set forth herein shall apply separately to each of the Debtors.  All of the potential Classes for the Debtors are set forth herein.

| Class | Claim/Interest | Status | Voting Rights |
|-------|----------------|--------|---------------|
| 1 | Secured Tax Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 3 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 4 | Prepetition First Lien Claims | Impaired | Entitled to Vote |
| 5 | Prepetition Second Lien Claims | Impaired | Entitled to Vote |
| 6A | Continuing Trade Claims | Impaired | Entitled to Vote |
| 6B | Other General Unsecured Claims | Impaired | Entitled to Vote |
| 6C | Litigation Claims | Impaired | Entitled to Vote |
| 6D | CFPB Claim | Impaired | Entitled to Vote |
| 7 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| 8 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| 9 | Interests in PGX | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 10 | Interests in Lexington Law Firm | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 11 | 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

B.    *Treatment of Claims and Interests*

Subject to Article VI hereof, each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, compromise, settlement, and release of, and in exchange for such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Debtors and the Holder of such Allowed Claim or Allowed Interest, as applicable.  Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the later of the Effective Date and the date such Holder's Claim or Interest becomes an Allowed Claim or Allowed Interest or as soon as reasonably practicable thereafter.

1.    <u>Class 1 – Secured Tax Claims</u>

(a)    *Classification*:  Class 1 consists of all Secured Tax Claims.

(b)    *Treatment*:  Except to the extent that a Holder of an Allowed Secured Tax Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, and release of and in exchange for such Secured Tax Claim, on or as soon as reasonably practicable after the later to occur of (i) the Effective Date and (ii) the date such Claim becomes Allowed (or as otherwise set forth in the Plan), each Holder of a Secured Tax Claim shall receive, at the option of the Plan Administrator:

(i)    payment in full in Cash of such Holder's Allowed Secured Tax Claim, or

(ii)    equal semi-annual Cash payments commencing as of the Effective Date or as soon as reasonably practicable thereafter and continuing for five years, in an aggregate amount equal to such Allowed Secured Tax Claim, together with interest at the applicable non-default rate under non-bankruptcy law, subject to the option of the Plan Administrator to prepay the entire amount of such Allowed Secured Tax Claim during such time period.

(c)    *Voting*:  Class 1 is Unimpaired under the Plan.  Holders of Secured Tax Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

2.    <u>Class 2 – Other Secured Claims</u>

(a)    *Classification*:  Class 2 consists of all Other Secured Claims.

(b)    *Treatment*:  Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, and release of and in exchange for such Allowed Other Secured Claim, on or as soon as reasonably practicable after the Effective Date, in full and final satisfaction, compromise, settlement, and release of and in exchange for such Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim shall receive, at the option of the applicable Debtor or Wind-Down Debtor:

(i)    payment in full in Cash of such Holder's Allowed Other Secured Claim;

(ii)    the collateral securing such Holder's Allowed Other Secured Claim;

(iii)    Reinstatement of such Holder's Allowed Other Secured Claim; or

(iv)    such other treatment rendering such Holder's Allowed Other Secured Claim Unimpaired.

(c)     *Voting*:  Class 2 is Unimpaired under the Plan.  Holders of Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

3.     Class 3 – Other Priority Claims

(a)     *Classification*:  Class 3 consists of all Other Priority Claims.

(b)     *Treatment*:  Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, and release of and in exchange for such Allowed Other Priority Claim, on or as soon as reasonably practicable after the later to occur of (i) the Effective Date and (ii) the date such Claim becomes Allowed (or as otherwise set forth in the Plan), each Holder of an Administrative, Priority or Priority Tax Claim will either be satisfied in full, in Cash, or otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

(c)     *Voting*:  Class 3 is Unimpaired under the Plan.  Holders of Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

4.     Class 4 – Prepetition First Lien Claims

(a)     *Classification*:  Class 4 consists of all Prepetition First Lien Claims.

*Treatment*:  After payment in full in Cash of all Administrative and Priority Claims and Other Priority Claims and funding of the Wind-Down Budget, in full and final satisfaction, compromise, settlement, release and discharge of its Claim (unless the applicable Holder agrees to less favorable treatment), the Holders of Prepetition First Lien Claims shall be entitled to their Pro Rata share of the Distributable Proceeds, if any, up to the Allowed amount of such Prepetition First Lien Claims, less the Credit Bid Amount; *provided* that the Prepetition First Lien Deficiency Claims shall be subordinated and junior to all Allowed General Unsecured Claims for purposes of distributions under the Plan; *provided*, *further* that such subordination shall be capped at $10 million distributed to Holders of Allowed General Unsecured Claims under the Plan (which distribution shall include, for the avoidance of doubt, the GUC Trade Settlement Cash Reserve and any Other Assets subsequently monetized pursuant to the terms and conditions of the Creditor Trust), after which the Prepetition Secured Lenders shall receive their Pro Rata share of any distribution to Holders of Other General Unsecured Claims on account of such Deficiency Claims (except for any distribution on account of the PIK Notes) and shall constitute Other GUC Claimants on account of such Prepetition First Lien Deficiency Claims.

(b)     *Voting*:  Class 4 is Impaired under the Plan.  Holders of Prepetition First Lien Claims are entitled to vote to accept or reject the Plan.

5.     Class 5 – Prepetition Second Lien Claims

(a)     *Classification*:  Class 5 consists of all Prepetition Second Lien Claims.

(b)     *Treatment*:  After payment in full in Cash of all Administrative and Priority Claims, Other Priority Claims, and Prepetition First Lien Claims, and funding of the Wind-Down Budget, in full and final satisfaction, compromise, settlement, release and discharge of its Claim (unless the applicable Holder agrees to less favorable treatment), the Holders of Prepetition

Second Lien Claims shall be entitled to their Pro Rata share of the Distributable Proceeds, if any, up to the Allowed amount of such Prepetition Second Lien Claims, less the Credit Bid Amount; *provided* that the Prepetition Second Lien Deficiency Claims shall be subordinated and junior to all Allowed General Unsecured Claims for purposes of distributions under the Plan; *provided*, *further* that such subordination shall be capped at $10 million distributed to Holders of Allowed General Unsecured Claims under the Plan (which distribution shall include, for the avoidance of doubt, the GUC Trade Settlement Cash Reserve and including any Other Assets subsequently monetized pursuant to the terms and conditions of the Creditor Trust), after which the Prepetition Secured Lenders shall receive their Pro Rata share of any distribution to Holders of Other General Unsecured Claims on account of such Deficiency Claims (except for any distribution on account of the PIK Notes) and shall constitute Other GUC Claimants on account of such Deficiency Claims.

(c)      *Voting*:  Class 5 is Impaired under the Plan.  Holders of Prepetition Second Lien Claims are entitled to vote to accept or reject the Plan.

6.      Class 6A – Continuing Trade Claims

(a)      *Classification:*  Class 6A consists of all Continuing Trade Claims.

(b)      *Treatment:*  Except to the extent that a Holder of a Continuing Trade Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, compromise, settlement, and release of and in exchange for such Allowed Continuing Trade Claim, each Holder of an Allowed Continuing Trade Claim who has not otherwise been paid in full under the Critical Vendor Order shall be paid in Cash its Pro Rata share of (i) cash in the amount of $3.25 million; (ii) the unused Wind-Down Budget; and (iii) Unused Critical Vendor Cash.

(c)      *Voting:*  Class 6A is Impaired under the Plan.  Holders of Allowed Continuing Trade Claims are entitled to vote to accept or reject the Plan.

7.      Class 6B – Other General Unsecured Claims

(a)      *Classification:*  Class 6B consists of all Other General Unsecured Claims.

(b)      *Treatment*:  Except to the extent that a Holder of an Other General Unsecured Claim agrees to less favorable treatment (including but not limited to the subordination of Deficiency Claims as set forth in herein), in full and final satisfaction, compromise, settlement, and release of and in exchange for such Other General Unsecured Claim, each Holder of an Allowed Other General Unsecured Claim shall receive its Pro Rata share of the beneficial interest in the Creditor Trust and as beneficiary of the Creditor Trust shall receive, on a distribution date, their Pro Rata share of net Cash derived from the Creditor Trust Assets available for distribution on each such distribution date as provided under the Plan and Creditor Trust Agreement, including:

(i)      A portion of the GUC Litigation Claims Settlement Cash (as allocated by the Committee in its sole discretion and to be disclosed in the Plan Supplement);

(ii)      the PIK Notes;

(iii)      proceeds of Other Assets; and

(iv)      the Excess Distributable Cash, if any (collectively, the "Other General Unsecured Claim Proceeds");

*provided* that if Class 6C (Litigation Claims) is an accepting Class, the Committee, in its sole discretion, may allocate to Holders of such claims a portion of the GUC Litigation Claims Settlement Cash to be disclosed in the Plan Supplement that would otherwise have been distributed to Class 6B (Other General Unsecured Claims).

(c)     *Voting:*   Class 6B is Impaired under the Plan.  Holders of Allowed Other General Unsecured Claims are entitled to vote to accept or reject the Plan.

8.     Class 6C – Litigation Claims

(a)     *Classification:*  Class 6C consists of all Litigation Claims.

(b)     *Treatment:*  If Class 6C is an accepting Class, except to the extent that a Holder of a Litigation Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, and release of and in exchange for such Litigation Claim, each Holder of a Litigation Claim shall receive its Pro Rata share of a portion of the GUC Litigation Claims Settlement Cash (as allocated by the Committee in its sole discretion and to be disclosed in the Plan Supplement); *provided* that, if the Class of Litigation Claims is not an accepting Class, then such Holders of Litigation Claims shall receive their Pro Rata share of the Other General Unsecured Claim Proceeds on a *pari passu* basis as Holders of Other General Unsecured Claims.

(c)     *Voting:*  Class 6C is Impaired under the Plan.  Holders of Allowed Litigation Claims are entitled to vote to accept or reject the Plan.

9.     Class 6D – CFPB Claim

(a)     *Classification:*  Class 6D consists of the CFPB Claim.

(b)     *Treatment:*  Except to the extent that the Holder of the CFPB Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, and release of and in exchange for such CFPB Claim, the Holder of the CFPB Claim shall receive $50,000 of the GUC Litigation Claims Settlement Cash.

(c)     *Voting:*  Class 6D is Impaired under the Plan.  The Holder of the Allowed CFPB Claim is entitled to vote to accept or reject the Plan.

10.     Class 7 – Intercompany Claims

(a)     *Classification*:  Class 7 consists of all Intercompany Claims.

(b)     *Treatment*:  Allowed Intercompany Claims, to the extent not assumed pursuant to the terms of the Sale Orders, shall, at the election of the applicable Debtor, be (a) Reinstated, (b) converted to equity, (c) otherwise set off, settled, distributed, contributed, cancelled, or released, or (d) otherwise addressed at the option of the Wind-Down Debtor without any distribution; *provided, however*, such election shall not adversely affect the treatment provided to Classes 6A, 6B, 6C, and 6D.

(c)     *Voting*:  Holders of Intercompany Claims are either Unimpaired, and such Holders of Intercompany Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code, or Impaired, and such Holders of Intercompany Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Holders of Intercompany Claims are not entitled to vote to accept or reject the Plan.

11.    <u>Class 8 – Intercompany Interests</u>

(a)    *Classification:*  Class 8 consists of all Intercompany Interests.

(b)    *Treatment*:  Allowed Intercompany Interests shall, at the election of the applicable Debtor, be (a) Reinstated or (b) set off, settled, addressed, distributed, contributed, merged, cancelled, or released, or (c) otherwise addressed at the option of the Wind-Down Debtor without any distribution; *provided, however*, such election shall not adversely affect the treatment provided to Classes 6A, 6B, 6C, and 6D.

(c)    *Voting*:  Holders of Intercompany Interests are either Unimpaired, and such Holders of Intercompany Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code, or Impaired, and such Holders of Intercompany Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Holders of Intercompany Interests are not entitled to vote to accept or reject the Plan.

12.    <u>Class 9 – Interests in PGX</u>

(a)    *Classification:*  Class 9 consists of all Interests in PGX.

(b)    *Treatment*:  Interests in PGX shall be discharged, canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and Holders of Interests in PGX will not receive any distribution on account of such Interests.

(c)    *Voting:*  Class 9 is Impaired under the Plan.  Holders of Interests in PGX are conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

13.    <u>Class 10 – Interests in Lexington Law Firm</u>

(a)    *Classification:*  Class 10 consists of all Interests in Lexington Law Firm.

(b)    *Treatment*:  Interests in Lexington Law Firm shall be discharged, canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and Holders of Interests in Lexington Law Firm will not receive any distribution on account of such Interests.

(c)    *Voting:*  Class 10 is Impaired under the Plan.  Holders of Interests in Lexington Law Firm are conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

14.    <u>Class 11 – Section 510(b) Claims</u>

(a)    *Classification:*  Class 11 consists of all Section 510(b) Claims.

(b)    *Allowance:*  Notwithstanding anything to the contrary herein, a Section 510(b) Claim, if any such Claim exists, may only become Allowed by Final Order of the Bankruptcy Court. The Debtors are not aware of any valid Section 510(b) Claim and believe that no such Section 510(b) Claim exists.

(c)    *Treatment*:  Allowed Section 510(b) Claims, if any, shall be discharged, canceled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and Holders of Allowed Section 510(b) Claims will not receive any distribution on account of such Allowed Section 510(b) Claims.

(d) *Voting:*  Class 11 is Impaired under the Plan.  Holders (if any) of Section 510(b) Claims are conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.  Therefore, such Holders (if any) are not entitled to vote to accept or reject the Plan.

C.  *Special Provision Governing Unimpaired Claims*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Wind-Down Debtor's rights in respect of any Claims that are Unimpaired, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Claims that are Unimpaired.  Unless otherwise Allowed, Claims that are Unimpaired shall remain Disputed Claims under the Plan.

D.  *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by one or more of the Classes entitled to vote pursuant to Article III.B herein.  The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Debtors reserve the right to modify the Plan in accordance with Article X herein to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

E.  *Subordinated Claims*

Except as expressly provided herein, the allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors and the Wind-Down Debtor reserve the right to reclassify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

F.  *Elimination of Vacant Classes; Presumed Acceptance by Non-Voting Classes*

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court in an amount greater than zero as of the date of the Confirmation Hearing shall be considered vacant and deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

G.  *Intercompany Interests*

To the extent Reinstated under the Plan, distributions on account of Intercompany Interests are not being received by Holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience, for the ultimate benefit of the Purchasers, and in exchange for the Debtors' and Wind-Down Debtor's agreement under the Plan to provide management services to certain other Debtors and Wind-Down Debtor, to use certain funds and assets as set forth in the Plan to make certain distributions and satisfy certain obligations of certain other Debtors and Wind-Down Debtor to the Holders of certain Allowed Claims.

H.    *Controversy Concerning Impairment*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

# ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

A.    *General Settlement of Claims and Interests*

As discussed in detail in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code, Bankruptcy Rule 9019 (as applicable), and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, or otherwise resolved pursuant to the Plan, including the terms of the Global Settlement and incorporates the terms of the Global Settlement Term Sheet, as further modified herein.  The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, including the Global Settlement, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates.  Subject to Article VI hereof, all distributions made to Holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

B.    *Restructuring Transactions*

On or before the Effective Date, the applicable Debtors or the Wind-Down Debtor shall enter into any transaction and shall take any actions as may be necessary or appropriate to effect the transactions described herein, including, as applicable, consummation of the Sale Transaction pursuant to the Asset Purchase Agreements, the issuance of all certificates and other documents required to be issued pursuant to the Plan, one or more intercompany mergers, consolidations, amalgamations, arrangements, continuances, restructurings, conversions, dispositions, dissolutions, transfers, liquidations, spinoffs, intercompany sales, purchases, or other corporate transactions (collectively, the "Restructuring Transactions").  The actions to implement the Restructuring Transactions may include:  (1) the execution and delivery of appropriate agreements or other documents of merger, consolidation, amalgamation, arrangement, continuance, restructuring, conversion, disposition, dissolution, transfer, liquidation, spinoff, sale, or purchase containing terms that are consistent with the terms of the Plan and Asset Purchase Agreements and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable Entities agree; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, formation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provincial law; and (4)  all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with the Plan.  The Debtors and the Wind-Down Debtor, as applicable, shall be authorized to implement the Plan and/or the Restructuring Transactions in the manner most tax efficient to the Purchasers, the DIP Agent and the Debtors, as determined by the Debtors in their business judgment and with the consent of the DIP Agent and the Purchasers, given the totality of the circumstances, and with the consent of the Committee insofar as such implementation may impact or affect the Wind-Down Budget.  The Confirmation Order shall, and shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, contemplated by, or necessary to effectuate the Plan.

C.      *Sources of Consideration for Plan Distributions*

The Debtors and Wind-Down Debtor, as applicable, shall fund the distributions and obligations under the Plan with Available Cash from the Wind-Down Budget held in the Wind-Down Debtor Account, as applicable, on the Effective Date. Sources to fund the distributions and obligations under the Plan include cash from the Creditor Trust in the amount of $100,000, from the GUC Trade Settlement Cash in the amount of $3.25 million, and from the GUC Litigation Claims Settlement Cash in the amount of $750,000 (of which $50,000 will be paid to the Holder of the Allowed CFPB Claim on account of the CFPB Claim as set forth in Article III). As indicated in Article II, pursuant to the Sale Orders, the DIP Claims have been satisfied in full in connection with the Sale Transaction.

D.      *Wind-Down Debtor*

The Debtors shall continue in existence after the Effective Date as the Wind-Down Debtor solely for the purposes of (l) winding down the Debtors' businesses and affairs as expeditiously as reasonably possible and liquidating any assets held by the Wind-Down Debtor, if any, (2) resolving any Disputed Claims, (3) paying or otherwise satisfying Allowed Claims, (4) filing appropriate tax returns, and (5) administering the Plan in an efficacious manner. The Wind-Down Debtor shall be deemed to be substituted as the party-in-lieu of the Debtors in all matters, including (x) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court and (y) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court, in each case without the need or requirement for the Plan Administrator to File motions or substitutions of parties or counsel in each such matter; *provided, however*, that the Creditor Trustee shall have the rights, powers and authority as provided in Article IV.G herein and in the Creditor Trust Agreement, and shall be substituted as the party-in-lieu of the Debtors in all matters as provided in Article IV.G herein and in the Creditor Trust Agreement.

On the Effective Date, the Wind-Down Debtor Assets shall vest in the Wind-Down Debtor for the primary purpose of liquidating the Wind-Down Debtor Assets and winding down the Debtors' Estates, with no objective to continue or engage in the conduct of a trade or business. The Wind-Down Debtor will, in an expeditious but orderly manner, liquidate and convert to Cash the Wind-Down Debtor Assets, make timely distributions pursuant to the Plan and Confirmation Order, and not unduly prolong its duration. Such assets shall be held free and clear of all Liens, Claims, and interests of Holders of Claims and Interests, except as otherwise provided in the Plan. The Wind-Down Debtor shall be deemed to be fully bound by the terms of the Plan and the Confirmation Order.

E.      *Liquidating Trust*

Notwithstanding anything to the contrary herein, the Plan Administrator, in his or her discretion, may transfer all or any portion of the assets of the Wind-Down Debtor to the Liquidating Trust, which shall be a "liquidating trust" as that term is used under section 301.7701-4(d) of the Treasury Regulations. For the avoidance of doubt, in the event of a Permitted Transfer, the provisions set forth in Article IV.Q herein shall continue to govern all matters associated with the prosecution, settlement, or collection upon any Retained Causes of Action transferred to the Liquidating Trust. The Liquidating Trust shall be established for the primary purpose of liquidating the Liquidating Trust's assets, reconciling claims asserted against the Wind-Down Debtor, and distributing the proceeds thereof in accordance with the Plan, with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the purpose of the Liquidating Trust. Upon the transfer of the Wind-Down Debtor's assets to the Liquidating Trust, the Wind-Down Debtor will have no reversionary or further interest in or with respect to the assets of the Liquidating Trust. To the extent beneficial interests in the Liquidating Trust are deemed to be "securities" as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and applicable state securities laws, the Debtors intend that the exemption provisions of section 1145 of the Bankruptcy Code will apply to such beneficial interests. Prior to any Permitted Transfer, the Plan Administrator may designate trustee(s) for the Liquidating Trust for the purposes of administering the Liquidating Trust. The reasonable costs and expenses of the trustee(s) shall be paid from the Liquidating Trust.

1.      Liquidating Trust Treatment

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, the Debtors expect to treat the Liquidating Trust as a "liquidating trust" under section 301.7701-4(d) of the Treasury Regulations and a grantor trust under section 671 of the Tax Code, and the trustee of any Liquidating Trust will take a position on

the Liquidating Trust's tax return accordingly. For U.S. federal income tax purposes, the transfer of assets to the Liquidating Trust will be deemed to occur as (a) a first-step transfer of the Liquidating Trust Assets to the Holders of the applicable Claims, and (b) a second-step transfer by such Holders to the Liquidating Trust.

No request for a ruling from the IRS will be sought on the classification of the Liquidating Trust. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the Liquidating Trust. If the IRS were to successfully challenge the classification of the Liquidating Trust as a grantor trust, the federal income tax consequences to the Liquidating Trust and the Liquidating Trust beneficiaries could vary from those discussed in the Plan (including the potential for an entity-level tax). For example, the IRS could characterize the Liquidating Trust as a so-called "complex trust" subject to a separate entity-level tax on its earnings, except to the extent that such earnings are distributed during the taxable year.

As soon as possible after the transfer of the Liquidating Trust Assets to the Liquidating Trust, the trustee(s) of the Liquidating Trust shall make a good faith valuation of the Liquidating Trust Assets. This valuation will be made available from time to time, as relevant for tax reporting purposes. Each of the Debtors, the trustee(s) of the Liquidating Trust, and the holders of Claims receiving interests in the Liquidating Trust shall take consistent positions with respect to the valuation of the Liquidating Trust Assets, and such valuations shall be utilized for all U.S. federal income tax purposes.

Allocations of taxable income of the Liquidating Trust among the Liquidating Trust beneficiaries shall be determined by reference to the manner in which an amount of cash equal to such taxable income would be distributed (were such cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Liquidating Trust had distributed all its assets (valued at their tax book value) to the Liquidating Trust beneficiaries, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Liquidating Trust. Similarly, taxable loss of the Liquidating Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining Liquidating Trust Assets. The tax book value of the Liquidating Trust Assets shall equal their fair market value on the date of the transfer of the Liquidating Trust Assets to the Liquidating Trust, adjusted in accordance with tax accounting principles prescribed by the Tax Code, applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

The Liquidating Trust shall in no event be dissolved later than five (5) years from the creation of such Liquidating Trust unless the Bankruptcy Court, upon motion within the six (6) month period prior to the fifth (5th) anniversary (or within the six (6) month period prior to the end of an extension period), determines that a fixed period extension (not to exceed five (5) years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to the trustee(s) of the Liquidating Trust that any further extension would not adversely affect the status of the trust as a liquidating trust for U.S. federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Liquidating Trust Assets.

The Liquidating Trust will file annual information tax returns with the IRS as a grantor trust pursuant to section 1.671-4(a) of the Treasury Regulations that will include information concerning certain items relating to the holding or disposition (or deemed disposition) of the Liquidating Trust Assets (e.g., income, gain, loss, deduction and credit). Each Liquidating Trust beneficiary holding a beneficial interest in the Liquidating Trust will receive a copy of the information returns and must report on its federal income tax return its share of all such items. The information provided by the Liquidating Trust will pertain to Liquidating Trust beneficiaries who receive their interests in the Liquidating Trust in connection with the Plan.

2.    Disputed Ownership Fund Treatment

With respect to any of the assets of the Liquidating Trust that are subject to potential disputed claims of ownership or uncertain distributions, or to the extent "liquidating trust" treatment is otherwise unavailable or not elected to be applied with respect to the Liquidating Trust, the Debtors intend that such assets will be subject to disputed ownership fund treatment under section 1.468B-9 of the Treasury Regulations, that any appropriate elections with respect thereto shall be made, and that such treatment will also be applied to the extent possible for state and local tax purposes. Under such treatment, a separate federal income tax return shall be filed with the IRS for any such account. Any taxes (including with respect to interest, if any, earned in the account) imposed on such account shall

be paid out of the assets of the respective account (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes).

F.    *Plan Administrator*

On the Effective Date, the authority, power, and incumbency of the persons acting as directors and officers of each of the Debtors shall be deemed to have been terminated and such persons shall be deemed to have resigned, solely in their capacities as such, and the Plan Administrator shall be appointed by each Debtor as the sole director and the sole officer of such Wind-Down Debtor and shall succeed to the powers of such Debtor's directors and officers. The Plan Administrator shall be the sole representative of, and shall act for each Wind-Down Debtor in the same fiduciary capacity as applicable to a board of managers and officers, subject to the provisions hereof (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same), except as applicable to the Creditor Trustee as provided in Article IV.G herein and in the Creditor Trust Agreement  For the avoidance of doubt, the foregoing shall not limit the authority of each Wind-Down Debtor or the Plan Administrator, as applicable, to continue the employment of any former director or officer.

The Plan Administrator shall have the right to retain the services of attorneys, accountants, and other professionals that, in the discretion of the Plan Administrator, are necessary to assist the Plan Administrator in the performance of his or her duties.  The reasonable fees and expenses of such professionals shall be paid by the Wind-Down Debtor, upon the monthly submission of statements to the Plan Administrator and in accordance with the Wind-Down Budget.  The payment of the reasonable fees and expenses of the Plan Administrator's retained professionals shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court.

G.    *Creditor Trustee*

The Committee shall have the right in its sole discretion, but not the obligation, to appoint the Creditor Trustee at any time prior to the Plan Supplement Filing Date.  If so appointed, the Creditor Trust will be established on the Effective Date and governed by the terms of the Creditor Trust Agreement, and the cash from the Debtors' cash on hand in the amount of $100,000, Excess Distributable Cash, and the PIK Notes shall be transferred, and the Other Assets and all rights to pursue the liquidation and/or monetization of the Other Assets (including collecting amounts due under or realizing upon the PIK Notes), shall be deemed transferred, to the Creditor Trust free and clear of all Claims, Liens, encumbrances, charges, and other interests without any further action of any of the Debtors, the Plan Administrator on behalf of the Wind-Down Debtor, the Committee, the Creditor Trustee, or any employees, officers, directors, members, partners, shareholders, agents, advisors, or representatives of the Debtors or the Wind-Down Debtor.  The Creditor Trustee's duties, powers, responsibilities, and compensation will be established by the Creditor Trust Agreement.  Pursuant to Bankruptcy Code section 1123(b)(3), the Creditor Trustee shall be deemed the appointed representative to liquidate and/or monetize the Other Assets, collect amounts due under or realize upon the PIK Notes, and effectuate all distributions as detailed in the Creditor Trust Agreement, and the Creditor Trustee shall be granted standing, authority, power and right to assert, prosecute and/or settle or take any other actions necessary to effectuate those duties and all other duties as detailed in the Creditor Trust Agreement based upon its powers as a bankruptcy appointed representative of the Debtors' Estates with the same or similar abilities possessed by bankruptcy or insolvency trustees, receivers, examiners, conservators, liquidators, rehabilitators, creditors' committees, or similar officials or entities.

H.    *Exculpation, Indemnification, Insurance, and Liability Limitation*

The Plan Administrator, the Creditor Trustee, and all professionals retained by the Plan Administrator and the Creditor Trustee, each in their capacities as such, shall be deemed exculpated and indemnified, except for fraud, willful misconduct, or gross negligence, in all respects by each Wind-Down Debtor.  The Plan Administrator and the Creditor Trustee may each obtain, at the expense of the Wind-Down Debtor, commercially reasonable liability or other appropriate insurance with respect to the indemnification obligations of the Wind-Down Debtor.  The Plan Administrator and the Creditor Trustee may rely upon written information previously generated by the Debtors.

I.      *Tax Returns*

After the Effective Date, the Plan Administrator shall complete and file all final or otherwise required federal, state, and local tax returns for each of the Debtors and the Wind-Down Debtor, and, pursuant to section 505(b) of the Bankruptcy Code, may request an expedited determination of any unpaid tax liability of such Debtor or its Estate for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws.

J.      *Dissolution of the Wind-Down Debtor*

Upon a certification to be Filed with the Bankruptcy Court by the Plan Administrator of all distributions having been made and completion of all its duties under the Plan and entry of a final decree closing the last of the Chapter 11 Cases, each Wind-Down Debtor shall be deemed to be dissolved without any further action by such Wind-Down Debtor, including the filing of any documents with the secretary of state for the state in which each such Wind-Down Debtor is formed or any other jurisdiction.  The Plan Administrator, however, shall have authority to take all necessary actions to dissolve each Wind-Down Debtor in and withdraw each Wind-Down Debtor from applicable states.

K.      *Statutory Committee and Cessation of Fee and Expense Payment*

On the Effective Date, any statutory committee appointed in the Chapter 11 Cases, including the Committee, shall dissolve and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases, except in connection with applications for compensation and objections thereto.  The Wind-Down Debtor shall no longer be responsible for paying any fees or expenses incurred by any statutory committee, including the Committee, after the Effective Date, except in connection with (a) applications for payment of any fees or expenses for services rendered prior to the Effective Date that are Allowed by the Bankruptcy Court; and (b) objections to applications for payment of fees and expenses rendered prior to the Effective Date.

L.      *Cancellation of Securities and Agreements*

On the Effective Date, except as otherwise specifically provided for in the Plan:  (1) the obligations of the Debtors under the Prepetition Loan Documents and any other certificate, Security, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Interest (except (i) such certificates, notes, or other instruments or documents evidencing indebtedness or obligation of or ownership interest in the Debtors that are Reinstated pursuant to the Plan and (ii) any indemnification obligations set forth in Article V.B hereof) shall be cancelled solely as to the Debtors and their affiliates, and the Wind-Down Debtor shall not have any continuing obligations thereunder; and (2) the obligations of the Debtors and their affiliates pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, indentures, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligation of or ownership interest in the Debtors that are specifically Reinstated pursuant to the Plan) shall be released and discharged.  Notwithstanding the foregoing, no executory contract or unexpired lease that (i) has been, or will be, assumed pursuant to Section 365 of the Bankruptcy Code or (ii) relating to a Claim that was paid in full prior to the Effective Date, shall be terminated or cancelled on the Effective Date.

M.      *Corporate Action*

Upon the Effective Date, all actions contemplated under the Plan, regardless of whether taken before, on or after the Effective Date, shall be deemed authorized and approved in all respects, including:  (1) selection of the Plan Administrator and Creditor Trustee; (2) implementation of the Restructuring Transactions; (3) consummation of the Sale Transaction under the Asset Purchase Agreements; (4) funding of all applicable escrows and accounts; and (5) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date).  All matters provided for in the Plan or deemed necessary or desirable by the Debtors before, on, or after the Effective Date involving the corporate structure of the Debtors or the Wind-Down Debtor, and any corporate action required by the

Debtors or the Wind-Down Debtor in connection with the Plan or corporate structure of the Debtors or Wind-Down Debtor shall be deemed to have occurred and shall be in effect on the Effective Date, without any requirement of further action by the security holders, directors, managers, or officers of the Debtors or the Wind-Down Debtor. Before, on, or after the Effective Date, the appropriate officers of the Debtors or the Wind-Down Debtor, as applicable, shall be authorized to issue, execute, and deliver the agreements and documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Wind-Down Debtor. The authorizations and approvals contemplated by this Article IV.M shall be effective notwithstanding any requirements under non-bankruptcy law.

N.      *Effectuating Documents; Further Transactions*

On and after the Effective Date, the Plan Administrator, the DIP Agent, the Prepetition First Lien Agent and the Prepetition Second Lien Agent may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, the Confirmation Order and the Restructuring Transactions, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan or the Confirmation Order.

O.      *Section 1146 Exemption*

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to the Wind-Down Debtor, the Creditor Trust or to any other Person or from the Wind-Down Debtor to the Liquidating Trust or any other Person) of property under the Plan or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, equity security, property, or other interest in the Debtors or the Wind-Down Debtor; (2) the Restructuring Transactions; (3) any Sale Transaction; (4) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (5) the making, assignment, or recording of any lease or sublease; or (6) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate or bulk transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forgo the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

P.      *Director and Officer Liability Insurance; Other Insurance*

On or before the Effective Date, the Debtors shall purchase (to the extent not already purchased) and maintain directors, officers, managers, and employee liability tail coverage for the six-year period following the Effective Date on terms no less favorable than the Debtors' existing director, officer, manager, and employee coverage and with an aggregate limit of liability upon the Effective Date of no less than the aggregate limit of liability under the existing director, officer, manager, and employee coverage upon placement. Reasonable directors and officers insurance policies shall remain in place in the ordinary course during the Chapter 11 Cases and from and after the Effective Date.

Any directors and officers insurance policies shall be assumed by the Debtors on behalf of the applicable Debtor and assigned to the Wind-Down Debtor effective as of the Effective Date, pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such insurance policy previously was rejected by the Debtors or the Debtors' Estates pursuant to a Bankruptcy Court order or is the subject of a motion to reject pending on the Effective Date, and coverage

for defense and indemnity under any such policies shall remain available to all individuals within the definition of "Insured" in any such policies.

In addition, on and after the Effective Date, all officers, directors, agents, or employees who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of any directors and officers insurance policy in effect or purchased as of the Effective Date for the full term of such policy regardless of whether such officers, directors, agents, and/or employees remain in such positions on or after the Effective Date, in each case, to the extent set forth in such policies.

Q.    *Causes of Action*

Pursuant to the Sale Transaction Documentation, the Debtors assigned and transferred to the Purchasers all of the Transferred Causes of Action pursuant to the Sale Transaction Documentation in connection with the Sale Transactions and in accordance with the Sale Orders.  For the avoidance of doubt, the Debtors or the Plan Administrator, as applicable, will retain the right to enforce the terms of the Sale Transaction Documentation. Retained Causes of Action shall initially remain with the Debtors and shall immediately vest with the Creditor Trust as of the Effective Date.

R.    *Section 1145 Exemption*

Pursuant to section 1145 of the Bankruptcy Code and, to the extent that section 1145 of the Bankruptcy Code is inapplicable, section 4(a)(2) of the Securities Act, the issuance of any Interests pursuant to the Plan is exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable United States, state, or local law requiring registration for offer or sale of a security or registration or licensing of an issuer of, underwriter of, or broker or dealer in, a security.  As long as the exemption to registration under section 1145 of the Bankruptcy Code is applicable, Interests issued pursuant to the Plan are not "restricted securities" (as defined in rule 144(a)(3) under the Securities Act) and are freely tradable and transferable by any initial recipient thereof that (x) is not an "affiliate" of the Wind-Down Debtor (as defined in rule 144(a)(1) under the Securities Act), (y) has not been such an "affiliate" within 90 days of such transfer, and (z) is not an entity that is an "underwriter" as defined in section 1145(b) of the Bankruptcy Code.

S.    *Global Settlement*

The Plan implements the Global Settlement and incorporates the terms of the Global Settlement Term Sheet by reference as though fully stated herein.  The Global Settlement is a compromise and settlement of numerous issues and disputes between and among the Debtors, the Committee, the DIP Lenders, and the Prepetition First and Second Lien Lenders, designed to achieve a reasonable and effective resolution of the Chapter 11 Cases.  Except as otherwise expressly set forth herein, the Global Settlement constitutes a settlement of all potential issues and Claims between and among the Debtors, the Committee, the DIP Lenders, and the Prepetition First and Second Lien Lenders.  The Global Settlement shall be effectuated in accordance with the following terms.  Continuing Trade Claims, Litigation Claims, and Other General Unsecured Claims shall receive the treatment set forth in Article III herein. The Debtors shall establish the Creditor Trust which, for the avoidance of doubt, shall be funded solely with cash from the Debtors' cash on hand in the amount of $100,000 and which shall have the right to pursue the monetization of the Other Assets (including collecting amounts due under or realizing upon, the PIK Notes).  The Creditor Trust shall also hold the PIK Notes for beneficial distribution in accordance with this Article IV.S of the Plan.  The identity of the Creditor Trustee and the terms of the governing agreement of the Creditor Trust shall be determined by the Committee and provided in the Plan Supplement.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.    *Assumption and Rejection of Executory Contracts and Unexpired Leases*

On the Effective Date, except as otherwise provided herein or in the Sale Orders, each Executory Contract or Unexpired Lease not previously assumed, assumed and assigned, or rejected shall be deemed automatically rejected,

pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease: (1) is identified on the Assumed Executory Contracts and Unexpired Leases Schedule; (2) is the subject of a motion to assume (or assume and assign) such Executory Contract that is pending on the Confirmation Date; (3) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan; (4) is a directors and officers insurance policy; (5) is the Asset Purchase Agreements; or (6) is to be assumed by the Debtors and assigned to the Purchasers in connection with the Sale Transaction and pursuant to the Sale Transaction Documents.

Entry of the Confirmation Order by the Bankruptcy Court shall constitute a Final Order approving the assumptions, assumptions and assignments, or rejections of the Executory Contracts or Unexpired Leases pursuant to the Plan; *provided* that neither the Plan nor the Confirmation Order is intended to or shall be construed as limiting the Debtors' authority under the Sale Orders to assume and assign Executory Contracts and Unexpired Leases to the Purchasers pursuant to the Asset Purchase Agreements.  Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date by a Final Order but may be withdrawn, settled, or otherwise prosecuted by the Wind-Down Debtor.  Each Executory Contract and Unexpired Lease assumed pursuant to this Article V.A of the Plan or by any order of the Bankruptcy Court, which has not been assigned to a third party prior to the Confirmation Date, shall revest in and be fully enforceable by the Wind-Down Debtor in accordance with its terms, except as such terms are modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law.

Notwithstanding anything to the contrary in the Plan or the Sale Transaction Documents, the Debtors, the Wind-Down Debtor, the Purchasers and the Plan Administrator, as applicable, reserve the right to alter, amend, modify, or supplement the Assumed Executory Contracts and Unexpired Leases Schedule and the Rejected Executory Contracts and Unexpired Leases Schedule identified in this Article V of the Plan and in the Plan Supplement at any time through and including ninety (90) days after the Effective Date.  The Debtors or the Wind-Down Debtor, as applicable, shall provide notice of any amendments to the Rejected Executory Contracts and Unexpired Leases Schedule or the Assumed Executory Contracts and Unexpired Leases Schedule to the parties to the Executory Contracts or Unexpired Leases affected thereby.  For the avoidance of doubt, this Article V relates to Executory Contracts or Unexpired Leases other than such agreements assumed, assumed and assigned, or rejected in accordance with the terms of the Sale Orders.

B.      *Indemnification Obligations.*

Subject to the occurrence of the Effective Date, to the fullest extent permitted by applicable law, the obligations of the Debtors as of the Effective Date to indemnify, defend, reimburse, or limit the liability of the current and former directors, managers, officers, employees, attorneys, other professionals and agents of the Debtors, and such current and former directors', managers', and officers' respective Affiliates, respectively, against any Claims or Causes of Action under any indemnification provisions or applicable law, shall survive Confirmation, shall be assumed by the Debtors on behalf of the applicable Debtor and assigned to the Wind-Down Debtor or the Liquidating Trust, as applicable, which shall be deemed to have assumed the obligation, and will remain in effect after the Effective Date if such indemnification, defense, reimbursement, or limitation is owed in connection with an event occurring before the Effective Date.

C.      *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court within thirty (30) days after the later of (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, (2) the effective date of such rejection, or (3) the Effective Date.  **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Wind-Down Debtor, the Estates, the Creditor Trust, the Liquidating Trust (if any), the Purchasers, or their respective property without the need for any objection by the Wind-Down Debtor or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the**

**Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in a Proof of Claim to the contrary, unless otherwise ordered by the Bankruptcy Court.** All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III of the Plan or such other treatment as agreed to by the Wind-Down Debtor and the Holder of such Claim.

D.      *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases*

Any monetary defaults under an assumed Executory Contract or Unexpired Lease, as reflected on the Cure Notice, shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Claim in Cash on the Effective Date, subject to the limitations described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.  In the event of a dispute regarding (1) the amount of any payments to cure such a default, (2) the ability of the Wind-Down Debtor or any assignee, as applicable, to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving the assumption.

At least fourteen (14) days before the Confirmation Hearing, the Debtors shall distribute, or cause to be distributed, Cure Notices of proposed assumption or assumption and assignment and proposed amounts of Cure Claims to the applicable third parties.  **Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or assumption and assignment or related cure amount must be Filed, served, and <u>actually</u> <u>received</u> by the Debtors at least seven days before the Confirmation Hearing.**  Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption or assumption and assignment or cure amount will be deemed to have assented to such assumption or assumption and assignment and cure amount.  Notwithstanding anything herein to the contrary, in the event that any Executory Contract or Unexpired Lease is removed from the Rejected Executory Contracts and Unexpired Leases Schedule after such 14-day deadline, a Cure Notice of proposed assumption or assumption and assignment and proposed amounts of Cure Claims with respect to such Executory Contract or Unexpired Lease will be sent promptly to the counterparty thereof and a noticed hearing set to consider whether such Executory Contract or Unexpired Lease can be assumed or assumed and assigned.

If the Bankruptcy Court determines that the Allowed Cure Claim with respect to any Executory Contract or Unexpired Lease is greater than the amount set forth in the applicable Cure Notice, the Debtors or Wind-Down Debtor, as applicable, may add such Executory Contract or Unexpired Lease to the Rejected Executory Contracts and Unexpired Leases Schedule, in which case such Executory Contract or Unexpired Lease will be deemed rejected as the Effective Date.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary (solely to the extent agreed between the Debtors and the counterparty to an applicable Executory Contract or Unexpired Lease), including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the date that the Debtors assume such Executory Contract or Unexpired Lease.  Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

E.      *Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases*

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors or the Wind-Down Debtor, as applicable, under such Executory Contracts or Unexpired Leases.  In particular, notwithstanding any non-bankruptcy law to the contrary, the Wind-Down Debtor expressly reserves and does not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations with respect to goods previously purchased by the Debtors pursuant to rejected Executory Contracts or Unexpired Leases.

*F.      Insurance Policies*

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan.  Unless otherwise provided in the Plan, on the Effective Date, (a) the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims and (b) such insurance policies and any agreements, documents, or instruments relating thereto shall revest in the Wind-Down Debtor.  For the avoidance of doubt, this Article V.F does not apply to insurance policies or any agreements, documents, or instruments relating thereto that were transferred to the Purchasers in the Sale Transaction.

*G.      Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

*H.      Reservation of Rights*

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Rejected Executory Contracts and Unexpired Leases Schedule, the Assumed Executory Contracts and Unexpired Leases Schedule, or any other exhibit, schedule or annex, nor anything contained in the Plan or Plan Supplement, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that the Wind-Down Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Wind-Down Debtor, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease under the Plan.

*I.      Nonoccurrence of Effective Date*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

*A.      Timing and Calculation of Amounts to Be Distributed*

Unless otherwise provided in the Plan or the Confirmation Order, on the Effective Date (or if a Claim is not an Allowed Claim or on the Effective Date, on the date that such Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), or as soon as is reasonably practicable thereafter, each Holder of an Allowed Claim (as applicable) shall receive the full amount of the distributions that the Plan provides for Allowed Claims (as applicable) in the applicable Class.

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day but shall be deemed to have been completed as of the required date.  If and to the extent that

there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII hereof.  Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

B.      *Disbursing Agent*

Distributions under the Plan shall be made by the Disbursing Agent.  The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  Additionally, in the event that the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Wind-Down Debtor.

C.      *Rights and Powers of Disbursing Agent*

1.      Powers of the Disbursing Agent

The Disbursing Agent shall be empowered to:  (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan and the Confirmation Order; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities (in accordance with the Wind-Down Budget); and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan or the Confirmation Order, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof; *provided, however,* that the Debtors or the Wind-Down Debtor, as applicable, shall maintain the Claims Register.

2.      Expenses Incurred on or After the Effective Date

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and out-of-pocket expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and out-of-pocket expense reimbursement claims (including reasonable attorney fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Wind-Down Debtor in accordance with the Wind-Down Budget.

D.      *Delivery of Distributions and Undeliverable or Unclaimed Distributions*

1.      Record Date for Distribution.

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date.  If a Claim, other than one based on a publicly traded Security is transferred twenty (20) or fewer days before the Distribution Record Date, distributions shall be made to the transferee only to the extent practical and, in any event, only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

2.      Delivery of Distributions

Except as otherwise provided herein, the Disbursing Agent shall make distributions to Holders of Allowed Claims (as applicable) as of the Distribution Record Date at the address for each such Holder as indicated on the Debtors' records as of the date of any such distribution; *provided* that the manner of such distributions shall be determined at the discretion of the Disbursing Agent; *provided further*, that the address for each Holder of an Allowed Claim shall be deemed to be the address set forth in any Proof of Claim Filed by that Holder.  Distributions to Holders of Allowed Prepetition Loan Claims shall be consistent with the DIP Order and the Prepetition Loan Documents.

3. <u>Minimum Distributions</u>

Notwithstanding any other provision of the Plan, the Disbursing Agent will not be required to make distributions of Cash less than $100 in value, and each such Claim to which this limitation applies shall be discharged pursuant to Article VIII and its Holder is forever barred pursuant to Article VII from asserting that Claim against the Debtors or their respective property.

4. <u>Undeliverable Distributions and Unclaimed Property</u>

In the event that any distribution to any Holder of an Allowed Claim (as applicable) is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the Effective Date. After such date, all unclaimed property or interests in property shall revert to the Wind-Down Debtor automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial, or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder of Claims to such property in property shall be discharged and forever barred.

E.   *Compliance with Tax Requirements*

In connection with the Plan, to the extent applicable, the Debtors and the Wind-Down Debtor, as applicable, shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Debtors and the Wind-Down Debtor, as applicable, reserve the right to allocate all distributions made under the Plan in compliance with applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

F.   *Allocations*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to the remainder of the Claims, including any Claims for accrued but unpaid interest.

G.   *No Postpetition or Default Interest on Claims*

Unless otherwise specifically provided for in the Plan, the Confirmation Order or the DIP Order, or required by applicable bankruptcy and non-bankruptcy law, (a) postpetition and/or default interest shall not accrue or be paid on any Claims, and (b) no Holder of a Claim shall be entitled to (i) interest accruing on or after the Petition Date on any such Claim or (ii) interest at the contract default rate, as applicable.

H.   *Setoffs and Recoupment*

Except as expressly provided in this Plan and the DIP Order, the Wind-Down Debtor may, pursuant to section 553 of the Bankruptcy Code, setoff and/or recoup against any Plan distributions to be made on account of any Allowed Claim, any and all claims, rights, and Causes of Action that the Wind-Down Debtor may hold against the Holder of such Allowed Claim to the extent such setoff or recoupment is either (1) agreed in amount among the Wind-Down Debtor and the Holder of the Allowed Claim or (2) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; *provided*, that neither the failure to effectuate a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by the Wind-Down Debtor or its successor of any and all claims, rights, and Causes of Action that the Wind-Down Debtor or its successor may possess against the applicable Holder. In no event shall any Holder of a Claim to recoup such Claim against any claim, right, or Cause of Action of

the Debtors or the Wind-Down Debtor, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors in accordance with Article XII.F of the Plan on or before the Effective Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment. Notwithstanding anything to the contrary herein, in no event shall any Holder of a Claim be entitled to setoff any such Claim against any Purchaser following consummation of the Sale Transaction except as provided for in the Asset Purchase Agreements.

I.      *No Double Payment of Claims*.

To the extent that a Claim is Allowed against more than one Debtor's Estate, there shall be only a single recovery on account of that Allowed Claim, but the Holder of an Allowed Claim against more than one Debtor may recover distributions from all co-obligor Debtors' Estates until the Holder has received payment in full on the Allowed Claims. No Holder of an Allowed Claim shall be entitled to receive more than payment in full of its Allowed Claim, and each Claim shall be administered and treated in the manner provided by the Plan only until payment in full on that Allowed Claim.

J.      *Claims Paid or Payable by Third Parties*

1.      <u>Claims Paid by Third Parties</u>

The Debtors or the Wind-Down Debtor, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or the Wind-Down Debtor. Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or the Wind-Down Debtor on account of such Claim, such Holder shall, within fourteen (14) days of receipt thereof, repay or return the distribution to the applicable Debtor or the Wind-Down Debtor, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Debtor or the Wind-Down Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the fourteen (14) day grace period specified above until the amount is repaid.

2.      <u>Claims Payable by Third Parties</u>

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim, then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3.      <u>Applicability of Insurance Policies</u>

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

**ARTICLE VII.**
**PROCEDURES FOR RESOLVING CONTINGENT,**
**UNLIQUIDATED AND DISPUTED CLAIMS**

A.      *Allowance of Claims*

After the Effective Date, the Wind-Down Debtor or the Plan Administrator, as applicable, shall have and retain any and all rights and defenses such Debtor had with respect to any Claim or Interest immediately before the Effective Date except as otherwise provided herein with regard to the Creditor Trust.  The Debtors may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable non-bankruptcy law.

B.      *Claims Administration Responsibilities*

Except as otherwise specifically provided in the Plan or the Confirmation Order, after the Effective Date, the Plan Administrator shall have the sole authority:  (1) to File, withdraw, or litigate judgment objections to Claims or Interests; (2) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.  For the avoidance of doubt, except as otherwise provided herein, from and after the Effective Date, the Wind-Down Debtor shall have and retain any and all rights and defenses such Debtor had immediately prior to the Effective Date with respect to any Disputed Claim or Interest, including the Retained Causes of Action pursuant to Article IV.Q of the Plan. For the further avoidance of doubt, prior to the Effective Date any Litigation Settlement or other settlement of any Litigation Claim shall be subject to the consent of the Committee (which consent shall not be unreasonably withheld), and on and after the Effective Date such consent rights shall belong to the Creditor Trustee.

The Debtors up to the Effective Date, and the Wind-Down Debtor on and after the Effective Date, shall be responsible and obligated to maintain the Claims Register, to administer and adjust the Claims Register in regard to allowance of Claims, and to coordinate with the Creditor Trustee to facilitate any distributions to be made by the Creditor Trustee pursuant to Article IV.G herein and the Creditor Trust Agreement.  The Debtors or the Wind-Down Debtor, as applicable, may with the consent of the Committee or the Creditor Trustee (which consent shall not be unreasonably withheld), as applicable, maintain the retention of the Claims and Noticing Agent and develop a budget for compensation of the Claims and Noticing Agent following the Effective Date to be incorporated with the Wind-Down Budget.

C.      *Estimation of Claims*

Before, on, or after the Effective Date, the Debtors, the Wind-Down Debtor, or the Plan Administrator, as applicable, may (but is not required to) at any time request that the Bankruptcy Court estimate the amount of any Claim pursuant to applicable law, including, without limitation pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the pendency of any appeal relating to such objection.  Notwithstanding any provision to the contrary in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any Claim or Interest, such estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions and discharge) and may be used as evidence in any supplemental proceedings, and the Wind-Down Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest.

D.      *Adjustment to Claims or Interests Without Objection*

Any Claim or Interest that has been paid or satisfied, or any Claim or Interest that has been amended or superseded, cancelled or otherwise expunged (including pursuant to the Plan or the Confirmation Order), may be adjusted or expunged (including on the Claims Register, to the extent applicable) by the Wind-Down Debtor after notice to the Holder of such Claim (or such Holder's known counsel) (email sufficient), but without any further notice to or action, order or approval of the Bankruptcy Court.

E.      *Time to File Objections to Claims*

Any objections to Claims shall be Filed on or before the later of (1) one-hundred eighty (180) days after the Effective Date and (2) such other period of limitation as may be specifically fixed by a Final Order of the Bankruptcy Court, subject to a notice and objection period, for objecting to such Claims. For the avoidance of doubt, Administrative Claims are subject to the Administrative Claims Objection Bar Date and the period of limitation set forth herein shall not apply to Administrative Claims.

F.      *Disallowance of Claims or Interests*

Any Claims or Interests held by Entities from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code, or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims or Interests may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Wind-Down Debtor. All Claims Filed on account of an indemnification obligation to a director, officer, or employee shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such indemnification obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan after notice to the Holder of such Claim, but without any further notice to or action, order, or approval of the Bankruptcy Court.

**Except as otherwise provided herein, as agreed to by the Debtor or the Wind-Down Debtor, as applicable, or as ordered otherwise by the Bankruptcy Court, any and all Proofs of Claim Filed after the Claims Bar Date shall be deemed disallowed and expunged as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless on or before the Confirmation Hearing such late Proof of Claim has been deemed timely Filed by a Final Order.**

G.      *Amendments to Proofs of Claims or Interests*

On or after the applicable bar date, a Proof of Claim or Interest may not be Filed or amended without the prior written authorization of the Bankruptcy Court or the applicable Debtor or Wind-Down Debtor, as applicable. Absent such authorization, any new or amended Claim or Interest Filed shall be deemed disallowed in full and expunged without any further action.

H.      *No Distributions Pending Allowance*

Notwithstanding any other provision of the Plan or the Confirmation Order, if any portion of a Claim or Interest is a Disputed Claim or Interest, as applicable, no payment or distribution provided under the Plan shall be made on account of such Claim or Interest unless and until such Disputed Claim or Interest becomes an Allowed Claim or Interest.

I.      *Distributions After Allowance*

To the extent that a Disputed Claim or Interest ultimately becomes an Allowed Claim or Allowed Interest, distributions (if any) shall be made to the Holder of such Allowed Claim or Allowed Interest (as applicable) in accordance with the provisions of the Plan and the Confirmation Order. As soon as reasonably practicable after the

date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim or Disputed Interest becomes a Final Order, the Disbursing Agent shall provide to the Holder of such Claim or Interest the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any interest, dividends, or accruals to be paid on account of such Claim or Interest unless required under applicable bankruptcy law.

## ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.      *Final Satisfaction of Claims and Termination of Interests*

To the maximum extent provided by section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the Confirmation Order, or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Wind-Down Debtor), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by current or former employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (1) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan.

B.      **Release of Liens**

**Except as otherwise provided in the Plan, the Plan Supplement, Confirmation Order, or any contract, instrument, release, or other agreement or document created pursuant to the Plan or Confirmation Order, immediately following the making of all distributions to be made to an applicable Holder pursuant to the Plan and, in the case of a Secured Claim, including, for the avoidance of doubt, any Prepetition Loan Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to reinstate in accordance with Article III.B.2 hereof, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, compromised, and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert automatically to the applicable Debtor and its successors and assigns.  Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Wind-Down Debtor to evidence the release of such Lien and/or security interest, including the execution, delivery, and Filing or recording of such releases. The presentation or Filing of the Confirmation Order to or with any federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to, effect, the termination of such Liens.**

**To the extent that any Holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan or the Confirmation Order, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, then as soon as reasonably practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Debtors or the Wind-Down Debtor that are necessary or desirable to record or effectuate the cancelation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Wind-Down Debtor shall be entitled to make any such filings or recordings on such Holder's behalf.**

C.      *Releases by the Debtors*

Notwithstanding anything contained in the Plan or the Confirmation Order to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, upon entry of the Confirmation Order and effective as of the Effective Date, to the fullest extent permitted by applicable law, each Released Party is, and is deemed hereby to be, fully, conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors, the Wind-Down Debtor, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, including any Estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, including any derivative claims, asserted or assertable on behalf of any of the Debtors, the Wind-Down Debtor, or their Estates, that any such Entity would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against or Interest in a Debtor, the Wind-Down Debtor, or other Entity, or that any Holder of any Claim against or Interest in a Debtor, the Wind-Down Debtor, or other Entity could have asserted on behalf of the Debtors or the Wind-Down Debtor, based on or relating to, or in any manner arising from, in whole or in part, the Debtors or the Wind Down Debtor (including the Debtors' and the Wind-Down Debtor's capital structure, management, ownership, or operation thereof or otherwise), the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor or the Wind-Down Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, the purchase, sale, or rescission of any security of the Debtors or the Wind-Down Debtor, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors or the Wind-Down Debtor), intercompany transactions between or among a Debtor, the Wind-Down Debtor, or an affiliate of a Debtor and another Debtor, the Wind-Down Debtor, or affiliate of a Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Plan Supplement, the Sale Transaction, the DIP Credit Agreement, the Prepetition First Lien Credit Agreement, the Prepetition Second Lien Credit Agreement, any other Definitive Document or any Restructuring Transaction, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Plan Supplement, the Sale Transaction, any other Definitive Document, any of the Restructuring Transactions, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release: (1) any obligations arising on or after the Effective Date (solely to the extent such obligation does not arise from any acts or omissions prior to the Effective Date) of any party or Entity under the Plan, the Confirmation Order, or any post-Effective Date transaction contemplated by the Plan or the Restructuring Transactions, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the Restructuring Transactions; or (2) any matters retained by the Debtors and the Wind-Down Debtor pursuant to the Schedule of Retained Causes of Action.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (1) in exchange for the good and valuable consideration provided by the Released Parties, including, the Released Parties' contribution to facilitating the Restructuring Transactions and implementing the Plan; (2) a good faith settlement and compromise of the Claims released by the Debtor Release; (3) in the best interests of the Debtors, the Wind-Down Debtor, and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for a hearing; and (6) a bar to any of the Debtors, the Wind-Down Debtor, or the Debtors' Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release.

D.      *Releases by the Releasing Parties.*

Except as otherwise expressly set forth in this Plan or the Confirmation Order, effective as of the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is, and is deemed hereby to be, fully, conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each Releasing Party from any and all claims and Causes of Action, whether known or unknown, including any derivative claims, asserted or assertable on behalf of any of the Debtors, the Wind-Down Debtor, or the Estates, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to or in any manner arising from, in whole or in part, the Debtors or the Wind-Down Debtor (including the Debtors' and the Wind-Down Debtor's capital structure, management, ownership, or operation thereof or otherwise), the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor or the Wind-Down Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, the purchase, sale, or rescission of any security of the Debtors or the Wind-Down Debtor, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted by the Debtors or the Wind-Down Debtor), intercompany transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Plan Supplement, the Sale Transaction, the DIP Credit Agreement, the Prepetition First Lien Credit Agreement, the Prepetition Second Lien Credit Agreement any other Definitive Document or any Restructuring Transaction, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Plan Supplement, the Sale Transaction, any other Definitive Document, any of the Restructuring Transactions, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

Notwithstanding anything to the contrary in the foregoing, the Third-Party Release does not release (1) any obligations arising on or after the Effective Date (solely to the extent such obligation does not arise from any acts or omissions prior to the Effective Date) of any party or Entity under the Plan, the Confirmation Order, or any post-Effective Date transaction contemplated by the Plan or the Restructuring Transactions, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the Restructuring Transactions; or (2) the rights of any Holder of Allowed Claims to receive distributions under the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (1) consensual; (2) essential to the Confirmation of the Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties; (4) a good faith settlement and compromise of the Claims released by the Third-Party Release; (5) in the best interests of the Debtors, the Wind-Down Debtor, and the Estates; (6) fair, equitable, and reasonable; (7) given and made after due notice and opportunity for a hearing; and (8) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the Third-Party Release.

E.      *Exculpation*

Except as otherwise specifically provided in the Plan or the Confirmation Order, no Exculpated Party shall have or incur any liability for, and each Exculpated Party shall be released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to or arising out of the Chapter 11 Cases prior to the Effective Date, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the Sale Transaction, the Plan, the Plan Supplement, any other Definitive Document, or any Restructuring Transaction, or any contract, instrument, release or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Plan

Supplement, the Sale Transaction, any other Definitive Document, any of the Restructuring Transactions, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of the Sale Transaction, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a Final Order to have constituted gross negligence, willful misconduct, or actual fraud. The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. Notwithstanding anything to the contrary in the foregoing, the exculpation set forth above does not exculpate any obligations arising on or after the Effective Date of any Person or Entity under the Plan, any post-Effective Date transaction contemplated by the Restructuring Transactions, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

F.     *Injunction*

Effective as of the Effective Date, all Entities that have held, hold, or may hold Claims, Interests, or Causes of Actions that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Wind-Down Debtor, the Exculpated Parties, or the Released Parties: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Actions; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Actions; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Actions; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Actions unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a claim or interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Actions released, settled or subject to exculpation pursuant to the Plan. Notwithstanding anything to the contrary in the foregoing, the injunction set forth above does not enjoin the enforcement of any obligations arising on or after the Effective Date of any Person or Entity under the Plan, any post-Effective Date transaction contemplated by the Restructuring Transactions, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, managers, principals, and direct and indirect Affiliates, in their capacities as such, shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan. Each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in this Article VIII.F.

No Person or Entity may commence or pursue a Claim or Cause of Action of any kind against the Debtors, the Wind-Down Debtor, the Exculpated Parties, or the Released Parties that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Claim or Cause of Action subject to Article VIII.C, Article VIII.D, and Article VIII.E hereof, without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable Claim of any kind, and (ii) specifically authorizing such Person or Entity to bring such Claim or Cause of Action against any such Debtor, Wind-Down Debtor, Exculpated Party, or Released Party.

**The Bankruptcy Court will have sole and exclusive jurisdiction to adjudicate the underlying colorable Claim or Causes of Action.**

G.      *Protections Against Discriminatory Treatment*

To the maximum extent provided by section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Wind-Down Debtor or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Wind-Down Debtor, or another Entity with whom the Wind-Down Debtor has been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

H.      *Reimbursement or Contribution*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date: (1) such Claim has been adjudicated as non-contingent or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

I.      *Term of Injunctions or Stays*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

**ARTICLE IX.**
**CONDITIONS PRECEDENT TO CONFIRMATION**
**AND CONSUMMATION OF THE PLAN**

A.      *Conditions Precedent to the Confirmation of the Plan*

It shall be a condition precedent to the Confirmation of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.C hereof:

1.      The Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been Filed in form and substance reasonably acceptable to the Company Parties, the Required Consenting Lenders, and solely to the limited extent explicitly provided herein, the Committee; and

2.      The Bankruptcy Court shall have entered a Confirmation Order with respect to the Plan in form and substance reasonably acceptable to the Company Parties, the Required Consenting Lenders, and the Committee.

B.      *Conditions Precedent to the Effective Date*

It shall be a condition to the Effective Date of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.C hereof:

1.      The Bankruptcy Court shall have entered the Confirmation Order (and such order shall be a Final Order) which shall

(a)      authorize the Debtors to take all actions necessary to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with the Plan;

(b)      decree that the provisions of the Confirmation Order and the Plan are nonseverable and mutually dependent;

(c)      authorize the Debtors, as applicable or necessary, to the extent not previously authorized by the Sale Orders, to: (i) implement the Restructuring Transactions, including the Sale Transaction; (ii) make all distributions required under the Plan; and (iii) enter into any agreements, transactions, and sales of property as set forth in the Plan Supplement;

(d)      authorize the implementation of the Plan in accordance with its terms; and

(e)      provide that, pursuant to section 1146 of the Bankruptcy Code, the assignment or surrender of any lease or sublease, and the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of assets contemplated under the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax;

2.   the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan;

3.   the Professional Fee Escrow Account shall have been established and funded with the Professional Fee Escrow Amount;

4.   the final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been Filed in a manner consistent in all material respects with the Plan and shall be in form and substance acceptable to the Debtors; and

5.   the Debtors shall have implemented the Restructuring Transactions and all transactions contemplated herein, in a manner consistent in all respects with the Plan, pursuant to documentation acceptable to the Debtors.

*C.*      *Waiver of Conditions*

The conditions to Confirmation and to Consummation set forth in Article IX may be waived by the Debtors, subject to the consent of the Committee and the Required Consenting Lenders (in each case, which consent shall not be unreasonably withheld), without notice, leave, or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan.

*D.*      *Effect of Failure of Conditions*

If the Consummation of the Plan does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any Claims by the Debtors, any Holders, or any other Entity; (2) prejudice in any manner the rights of the Debtors, any Holders, or any other Entity; or (3) constitute an admission, acknowledgment, offer or undertaking by the Debtors, any Holders, or any other Entity in any respect. Notwithstanding the foregoing, the non-Consummation of the Plan shall not require or result in the voiding, rescission, reversal, or unwinding of the Sale Transaction under the Asset Purchase Agreements or the revocation of the Debtors' authority under the Sale Orders to consummate such Sale Transaction.

**ARTICLE X.**
**MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN**

A.      *Modification and Amendments*

Except as otherwise specifically provided in the Plan or the Confirmation Order, the Debtors, after consultation with the Committee, reserve the right, with the consent of the Required Consenting Lenders (which consent shall not be unreasonably withheld), to modify the Plan whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not re-solicit votes on such modified Plan, *provided*, such modification is consistent with the Global Settlement Term Sheet or does not adversely impact the treatment of Classes 6A, 6B, 6C, or 6D.  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 (as well as those restrictions on modifications set forth in the Plan), the Debtors expressly reserve their respective rights to revoke or withdraw, to alter, amend or modify the Plan with respect to such Debtor, one or more times, before or after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend or modify the Plan, or remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan; *provided*, *however*, that the Debtors or the Wind-Down Debtor, as the case may be, shall not amend or modify the Plan in a manner that adversely affects the treatment of any Class of Claims and/or Interests without resoliciting such Class of Holders of Claims or Interests.

B.      *Effect of Confirmation on Modifications*

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

C.      *Revocation or Withdrawal of Plan*

The Debtors, subject to the consent of the Committee and the Required Consenting Lenders (in each case, which consent shall not be unreasonably withheld), reserve the right to revoke or withdraw the Plan before the Confirmation Date and to File subsequent chapter 11 plans.  If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of the Claims or Interests or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of such Debtor, any Holder, or any other Entity; (c) constitute an admission, acknowledgement, offer or undertaking of any sort by such Debtor, any Holder, or any other Entity; or (d) modify or alter the terms of the Global Settlement Term Sheet.

**ARTICLE XI.**
**RETENTION OF JURISDICTION**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.      allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.      decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.      resolve any matters related to (for the avoidance of doubt, notwithstanding whether such treatment arises under the terms of the Plan or the Sale Orders):  (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cure Claims pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Wind-Down Debtor amending, modifying or supplementing, after the Effective Date, pursuant to Article V, the Executory Contracts and Unexpired Leases to be assumed or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory, expired, or terminated;

4.      ensure that distributions to Holders of Allowed Claims and Interests are accomplished pursuant to the provisions of the Plan;

5.      adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.      adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

7.      enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan, the Plan Supplement, or the Disclosure Statement;

8.      enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

9.      resolve any cases, controversies, suits or disputes that may arise in connection with the interpretation of the Sale Orders;

10.     resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with Consummation, including interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

11.     issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

12.     resolve any cases, controversies, suits, disputes or Causes of Action with respect to the releases, injunctions and other provisions contained in Article VIII, and enter such orders as may be necessary or appropriate to implement such releases, injunctions and other provisions;

13.     resolve any cases, controversies, suits, disputes or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim for amounts not timely repaid pursuant to Article VI.J.1;

14.     enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

15.     determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

16.     enter an order or final decree concluding or closing any of the Chapter 11 Cases;

17.      adjudicate any and all disputes arising from or relating to distributions under the Plan;

18.      consider any modifications of the Plan, to cure any defect or omission or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

19.      determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

20.      hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Confirmation Order, or the Sale Orders, including disputes arising under agreements, documents, or instruments executed in connection therewith;

21.      hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Restructuring Transactions, whether they occur before, on or after the Effective Date;

22.      hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

23.      hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions, and releases granted in connection with and under the Plan, including under Article VIII;

24.      enforce all orders previously entered by the Bankruptcy Court; and

25.      hear any other matter not inconsistent with the Bankruptcy Code.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

A.    *Immediate Binding Effect*

Subject to Article IX.A and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Wind-Down Debtor, and any and all Holders of Claims or Interests (irrespective of whether their Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

B.    *Additional Documents*

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors or Wind-Down Debtor, as applicable, and all Holders receiving distributions pursuant to the Plan and all other parties in interest may, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.    *Payment of Statutory Fees*

All fees payable pursuant to section 1930(a) of the Judicial Code, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid by the Wind-Down Debtor (or the Disbursing Agent on behalf of the Wind-Down Debtor) for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

D.      *Reservation of Rights*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur.  None of the Filing of the Plan, any statement or provision contained in the Plan or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders unless and until the Effective Date has occurred.

E.      *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

F.      *Notices*

To be effective, all notices, requests and demands to or upon the Debtors shall be in writing (including by facsimile transmission).  Unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed to the following:

1.      <u>If to the Debtors, to:</u>

PGX Holdings, Inc.
257 East 200 South, Suite 1200
Salt Lake City, Utah 84111
Attention:      Eric Kamerath
Email address:   ekamerath@ekamlaw.com

-and-

John C. Heath, Attorney At Law PC
P.O. Box 1173
Salt Lake City, Utah 84110
Attention:      John C. Heath
Email address:   jch@johnheathlaw.com

with copies (which shall not constitute notice) to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attention:      Joshua A. Sussberg, P.C.
Email address:   joshua.sussberg@kirkland.com

-and-

Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, Illinois 60654
Attention:      Spencer A. Winters
                Whitney Fogelberg
                Alison J. Wirtz
Email address:   spencer.winters@kirkland.com
                whitney.fogelberg@kirkland.com

alison.wirtz@kirkland.com

-and-

Klehr Harrison Harvey Branzburg LLP
919 North Market Street, Suite 1000
Wilmington, Delaware 19801
Attention:      Domenic E. Pacitti
                Michael W. Yurkewicz
Email address:  dpacitti@klehr.com
                myurkewicz@klehr.com

-and-

Klehr Harrison Harvey Branzburg LLP
1835 Market Street, Suite 1400
Philadelphia, Pennsylvania 19103
Attention:      Morton R. Branzburg
Email address:  mbranzburg@klehr.com

2.    If to the Committee, to:

Morris James LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
Attention:      Eric J. Monzo
                Brya M. Keilson
                Jason S. Levin
Email address:  emonzo@morrisjames.com
                bkeilson@morrisjames.com
                jlevin@morrisjames.com

-and-

ArentFox Schiff LLP
1301 Avenue of the Americas, 42nd Floor
New York, NY 10019
Attention:      Andrew I. Silfen
                Beth M. Brownstein
Email address:  andrew.silfen@afslaw.com
                beth.brownstein@afslaw.com

-and-

ArentFox Schiff LLP
800 Boylston Street, 32nd Floor
Boston, MA 02199
Attention:      Justin A. Kesselman
Email address:  justin.kesselman@afslaw.com

3.    If to the Prepetition First Lien Lenders or DIP Lenders, to:

Blue Torch Finance LLC
c/o Blue Torch Capital LP
150 East 58th Street, 39th Floor

New York, New York 10155
Email address:    BlueTorchAgency@alterdomus.com

with copies to:

King & Spalding LLP
1185 Avenue of the Americas, 34th Floor
New York, New York 10036
Attention:        Roger Schwartz
                  Robert Nussbaum
                  Michelle Muscara
Email address:    rschwartz@kslaw.com
                  rnussbaum@kslaw.com
                  mmuscara@kslaw.com

        -and-

King & Spalding LLP
110 N. Wacker Drive, Suite 3800
Chicago, IL 60606
Attention:        Geoffrey King
Email address:    gking@kslaw.com

        -and-

Morris, Nichols, Arsht & Tunnell LLP
1201 N. Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Attention:        Robert J. Dehney
                  Matthew B. Harvey
                  Michael A. Ingrassia
Email address:    rdehney@morrisnichols.com
                  mharvey@morrisnichols.com
                  mingrassia@morrisnichols.com

4.    If to the Prepetition Second Lien Lenders, to:

        Prospect Capital Corporation
        10 East 40th Street, 42nd Floor
        New York, New York 10016
        Attention:        General Counsel
                          Jason Wilson
        Email address:    jwilson@prospectcap.com

        with copies to:

        Proskauer Rose LLP
        Eleven Times Square
        New York, NY  10036-8299
        Attention:        David M. Hillman
        Email address:    dhillman@proskauer.com

        -and-

Proskauer Rose LLP
2029 Century Park East, Suite 2400
Los Angeles, CA 90067-3010
Attention:        Peter J. Young
Email address:    PYoung@proskauer.com

-and-

Proskauer Rose LLP
70 West Madison, Suite 3800
Chicago, IL 60602-4342
Attention:        Libbie B. Osaben
Email address:    LOsaben@proskauer.com

-and-

Morris, Nichols, Arsht & Tunnell LLP
1201 N. Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Attention:        Robert J. Dehney
                  Matthew B. Harvey
                  Michael A. Ingrassia
Email address:    rdehney@morrisnichols.com
                  mharvey@morrisnichols.com
                  mingrassia@morrisnichols.com

5.     <u>If to the United States Trustee, to:</u>

            Office of the United States Trustee
            for the District of Delaware,
            844 King Street, Suite 2207
            Wilmington, Delaware 19801
            Attention:        Jane Leamy
            Email address:    Jane.M.Leamy@usdoj.gov

After the Effective Date, the Wind-Down Debtor may notify Entities that, in order to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

G.     *Entire Agreement*Except as otherwise indicated, the Plan and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

H.     *Exhibits*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the website of the Claims and Noticing Agent at https://www.kccllc.net/pgx or the Bankruptcy Court's website at http://www.deb.uscourts.gov/. To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

I.        *Non-Severability of Plan Provisions*

The provisions of the Plan, including its release, injunction, exculpation and compromise provisions, are mutually dependent and non-severable.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is:  (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the consent of the Debtors, consistent with the terms set forth herein; and (3) non-severable and mutually dependent, *provided* that, notwithstanding the inclusion of the Asset Purchase Agreements or any documents ancillary thereto in the Plan Supplement, the Sale Transaction contemplated in the Asset Purchase Agreements is severable from the Plan and the Confirmation Order, and the non-Confirmation or non-Consummation of the Plan shall not require or result in the voiding, rescission, reversal, or unwinding of the Sale Transaction contemplated in the Asset Purchase Agreements or the revocation of the Debtors' authority under the Sale Orders to consummate such Sale Transaction.

J.       *Votes Solicited in Good Faith*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan and, therefore, no such parties will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan or any previous plan.

K.       *Closing of Chapter 11 Cases*

The Wind-Down Debtor shall, promptly after the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order necessary to close the Chapter 11 Cases.

L.       *Conflicts*

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects.  In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant provision in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document or in the Confirmation Order).  In the event of an inconsistency between the Confirmation Order and the Plan or Plan Supplement, the Confirmation Order shall control.

PGX Holdings, Inc.


By:     */s/ Chad Wallace*
Name:   Chad Wallace
Title:  Chief Executive Officer and President, PGX Holdings, Inc.

**<u>EXHIBIT B</u>**

**Liquidation Analysis**

**Liquidation Analysis**

**1) Introduction**

PGX Holdings, Inc. and its Debtor Affiliates (the "Debtors"), with the assistance of their restructuring, legal, and financial advisors, have prepared this hypothetical liquidation analysis (the "Liquidation Analysis"), which involves the assumed wind-down of the Debtors. The Liquidation Analysis is prepared in connection with the *First Amended Joint Chapter 11 Plan of PGX Holdings, Inc. and its Debtor Affiliates* (as amended, supplemented, or modified from time to time, the "Plan") and related disclosure statement (as amended, supplemented, or modified from time to time, the "Disclosure Statement") pursuant to chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").[1]

The Liquidation Analysis permits parties in interest to evaluate whether the Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code, also referred to as the "best interests of creditors" test. Under this test, the Bankruptcy Court must find, as a condition to confirmation of the Plan, that each Holder of an Impaired Claim against or Interest in the Debtors either (i) has accepted the Plan or (ii) will receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the amount that such Person would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. *See* 11 U.S.C. § 1129(a)(7). To demonstrate that the proposed Plan satisfies the "best interests of creditors" test under section 1129(a)(7) of the Bankruptcy Code, the Debtors, with the assistance of their advisors, have prepared the following Liquidation Analysis, which is based upon certain assumptions discussed in the Disclosure Statement and in the accompanying notes to the Liquidation Analysis.

To demonstrate satisfaction of the "best interests" test, the Debtors have:

   i)    estimated the cash proceeds (the "Liquidation Proceeds") a chapter 7 trustee (the "Chapter 7 Trustee") would generate if the Debtors' Chapter 11 Cases were converted to a case under chapter 7 of the Bankruptcy Code and the assets of such Debtors' Estates were liquidated;

   ii)   determined the distribution (the "Liquidation Distribution") each Holder of a Claim or Interest would receive from the Liquidation Proceeds under the priority scheme dictated under chapter 7 of the Bankruptcy Code; and

   iii)  compared each Holder's Liquidation Distribution to such holder's distribution under the Plan if it were confirmed and consummated.

Accordingly, asset values discussed herein may differ from amounts referred to in the Plan and the Disclosure Statement.

**2) Process and Assumption Overview**

The Liquidation Analysis was prepared by legal entity. The basis of the Liquidation Analysis is the Debtors' remaining cash balance and assets as of October 27, 2023 (the "Conversion Date") and the net costs to execute the administration of the wind down of the Estates. The Liquidation Analysis assumes that the Debtors would commence a chapter 7 liquidation on or about the Conversion Date under the supervision of a court-appointed Chapter 7 Trustee. The Liquidation Analysis reflects the wind down and liquidation of substantially all of the Debtors' remaining assets and the distribution of available proceeds to the Claim Holders during the period after the Conversion Date. The hypothetical chapter 7 recoveries set forth in this Liquidation Analysis were determined through multiple steps, as set forth below.

THE DEBTORS BELIEVE THAT ANY ANALYSIS OF A HYPOTHETICAL LIQUIDATION IS NECESSARILY SPECULATIVE. THERE ARE A NUMBER OF ESTIMATES AND ASSUMPTIONS UNDERLYING THE LIQUIDATION ANALYSIS THAT ARE INHERENTLY SUBJECT TO SIGNIFICANT UNCERTAINTIES AND CONTINGENCIES BEYOND THE CONTROL OF THE DEBTORS OR A CHAPTER 7 TRUSTEE. NEITHER THE ANALYSIS, NOR THE FINANCIAL INFORMATION ON WHICH IT IS BASED, HAS BEEN EXAMINED OR REVIEWED BY INDEPENDENT ACCOUNTANTS IN ACCORDANCE WITH STANDARDS PROMULGATED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS. NEITHER THE DEBTORS NOR THEIR ADVISORS MAKE ANY REPRESENTATION OR WARRANTY THAT THE ACTUAL RESULTS WOULD NOT VARY MATERIALLY FROM THE HYPOTHETICAL RESULTS PRESENTED IN THE LIQUIDATION ANALYSIS. ACTUAL RESULTS COULD VARY MATERIALLY.

---

[1]    Undefined terms used herein shall have the meaning ascribed to such term as in the Plan.

THIS LIQUIDATION ANALYSIS IS A HYPOTHETICAL EXERCISE THAT HAS BEEN PREPARED FOR THE SOLE PURPOSE OF PRESENTING A REASONABLE GOOD FAITH ESTIMATE OF THE PROCEEDS THAT WOULD BE REALIZED IF THE DEBTORS WERE LIQUIDATED IN ACCORDANCE WITH CHAPTER 7 OF THE BANKRUPTCY CODE AS OF THE PLAN EFFECTIVE DATE.  THIS LIQUIDATION ANALYSIS SHOULD NOT BE USED FOR ANY OTHER PURPOSE. THIS LIQUIDATION ANALYSIS DOES NOT PURPORT TO BE A VALUATION OF THE DEBTORS' ASSETS AS A GOING CONCERN, AND THERE MAY BE A SIGNIFICANT DIFFERENCE BETWEEN THIS LIQUIDATION ANALYSIS AND THE VALUES THAT MAY BE REALIZED OR CLAIMS GENERATED IN AN ACTUAL LIQUIDATION.

NOTHING CONTAINED IN THIS LIQUIDATION ANALYSIS IS INTENDED TO BE, OR CONSTITUTES, A CONCESSION, ADMISSION, OR ALLOWANCE OF ANY CLAIM BY THE DEBTORS.  THE ACTUAL AMOUNT OF PRIORITY OF ALLOWED CLAIMS IN THE CHAPTER 11 CASES COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH AND USED IN THIS LIQUIDATION ANALYSIS.

THE DEBTORS RESERVE ALL RIGHTS TO SUPPLEMENT, MODIFY, OR AMEND THE ANALYSIS SET FORTH HEREIN.

The Debtors prepared this Liquidation Analysis on the following basis:

i) The Debtors assume that the sale of substantially all of their assets to the Purchasers is consistent with the Asset Purchase Agreements and Sale Orders under both scenarios, and will have been consummated prior to the chapter 7 conversion.

ii) The Liquidation Analysis assumes the administration to wind down the entities, file final tax returns, and make distribution to creditors is estimated to take 12 to 15 months for the Chapter 7 Trustee to complete.

iii) All accrued and unpaid fees of Estate professionals incurred through the closing of the Sale Transaction (the "Closing") are assumed to have been funded into the Professional Fee Escrow Account prior to Closing.  Any incremental fees incurred from Closing through the Conversion Date are assumed to be covered by the Carve-Out (as defined in the DIP Order) for Professional Fees and any excess from the Professional Fee Escrow Account.  In the chapter 7 scenario, fees of Estate professionals will likely exceed the available Wind-Down Budget funds.

iv) In resolution of the Committee's objections to the DIP Motion, Bidding Procedures Motion, Greenhill Retention Application, and related matters, the Debtors, the DIP Lenders, the Prepetition First Lien Lenders, the Prepetition Second Lien Lenders, and the Committee entered into the Global Settlement, memorialized in the Global Settlement Term Sheet attached to the DIP Order.  The Global Settlement Term Sheet states that in the event that the Chapter 11 Cases are converted, the GUC Trade Settlement Cash Reserve shall be preserved for the benefit of all Holders of General Unsecured Claims but that other stakeholders' rights to object to such preservation of the GUC Trade Settlement Cash are fully preserved.  For the purpose of this Liquidation Analysis, the Debtors assume that the terms of the Global Settlement Term Sheet are not in full force and effect.  However, in the event of a chapter 7 conversion, the rights of the Parties to the Global Settlement Term Sheet to seek to enforce the settlements embodied therein are fully preserved.

**Global Notes to the Liquidation Analysis**

1) *Dependence on assumptions*.  The Liquidation Analysis depends on a number of estimates and assumptions.  Although developed and considered reasonable by the management and the advisors of the Debtors, the assumptions are inherently subject to uncertainties and contingencies beyond the control of the Debtors or their management.  The Liquidation Analysis is also based on the Debtors' best judgment of how numerous decisions in the liquidation process would be resolved.  Accordingly, there can be no assurance that the values reflected in the Liquidation Analysis would be realized if the Debtors were, in fact, to undergo such a liquidation and actual results would vary materially and adversely from those contained herein.

2) *Dependence on forecasted financials*.  This Liquidation Analysis contains numerous estimates that are still under review and it remains subject to further legal and accounting analysis.

3) *Chapter 7 liquidation process*.  The liquidation of the Debtors' assets is assumed to be completed over a 12 to 15 month period.  During this time, the Chapter 7 Trustee would hold a 341 creditors meeting, and work on administrative

activities such as the resolution of litigation cases against the Estates and final creditor distributions needed to complete the wind down of the Estates.

4) *Chapter 7 Proceeds.* This liquidation assumes all the Debtors' assets have been acquired in the Sale Transaction. Any other recoveries (*i.e.*, preference claims) are deemed to be immaterial and excluded from the overall analysis. Any available net Liquidation Proceeds would be allocated to Holders of Claims in strict priority in accordance with section 726 of the Bankruptcy Code.

5) *Avoidance Actions and Preference Claims.* As part of the Sale Transaction, the Purchasers purchased all litigation claims held by the Debtors, including avoidance actions and preference claims, and the purchase of these assets was approved, as set forth in the Sale Orders and Asset Purchase Agreements. As such, in the chapter 7 scenario the Debtors assume that the Sale Transaction has closed and the Chapter 7 Trustee does not have the right to pursue any preference claims.

6) *Claim Estimates.* In preparing this Liquidation Analysis, the Debtors have preliminarily estimated an amount of Claims based upon a review of the Debtors' estimated balance sheet and Claims filed to date. Prepetition First Lien Claims are estimated to include principal and accrued but unpaid interest and fees. The Prepetition Second Lien Claims estimate is based upon the inclusion of accrued PIK principal and interest accrual provided by the Debtors' books and records. The estimate of the amount of Claims set forth in this Liquidation Analysis should not be relied upon for any other purpose, including, without limitation, any determination of the value of any distribution to be made on account of claims under the Plan. The actual amount of Claims could be materially different from the amount of Claims estimated in the Liquidation Analysis. Additionally, this analysis does not include estimates for tax consequences, Federal, state, and foreign that may be triggered upon the liquidation; tax consequences could be material, and may also be eligible to receive administrative or priority payment status. Priority Claims would be paid in full from the Liquidation Proceeds before the balance would be made available to General Unsecured Claims.

7) *Distribution of Net Liquidation Proceeds to Claimants.* Any available net Liquidation Proceeds would be allocated to Holders of Claims in strict priority. Under the absolute priority rule, no junior creditor would receive any Liquidation Distribution until all senior creditors are paid in full, and no equity holder would receive any Liquidation Distribution until all creditors are paid in full. The assumed Liquidation Distribution to creditors and interest holders as reflected in the Liquidation Analysis is estimated in accordance with the absolute priority rule.

## 3) Conclusion

The determination of hypothetical Liquidation Proceeds from this liquidation is a highly uncertain process involving the extensive use of estimates and assumptions, which, while considered reasonable by the Debtors and the Debtors' advisors, are inherently subject to significant business, economic, and competitive uncertainties and contingencies beyond the control of the Debtors.

The Debtors have not had an opportunity to fully evaluate potential Claims against the Debtors or to adjudicate such Claims before the Bankruptcy Court. Accordingly, the amount of the final Allowed Claims against the Estates could be materially different from the Claim amounts used in this Liquidation Analysis. Additionally, asset values discussed herein may be different than amounts referred to in the Plan. The estimated liquidation recoveries and proceeds waterfall are presented herein as a summary of each individual debtor with their estimated recoveries.

The Debtors determined, as summarized in the table below, upon the Effective Date, that the Plan will provide all creditors and equity holders with a recovery (if any) that is not less than what they would otherwise receive pursuant to a liquidation of the Debtors under chapter 7 of the Bankruptcy Code, and thus believe the Plan satisfies the requirement of section 1129(a)(7) of the Bankruptcy Code.

## STANDALONE AGGREGATED LEGAL ENTITIES LIQUIDATION ANALYSIS

**PGX Holdings, Inc. & Lexington Law**
**Aggregated Legal Entities**
**Liquidation Analysis**
*USD $000's*

| | Notes | Chapter 11 Plan Scenario — Estimated Recovery - % Low | Mid | High | Estimated Liquidation Value Low | Mid | High | Hypothetical Chapter 7 Scenario — Estimated Recovery - % Low | Mid | High | Estimated Liquidation Value Low | Mid | High |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Gross Liquidation Proceeds** | | | | | | | | | | | | | |
| **UCC Settlement Proceeds** | | | | | | | | | | | | | |
| GUC Trade Settlement Cash | [1] | | | | $ 3,250.0 | $ 3,250.0 | $ 3,250.0 | | | | $ - | $ - | $ - |
| GUC Litigation Claims Settlement Cash | [2] | | | | 750.0 | 750.0 | 750.0 | | | | - | - | - |
| First PIK Notes | [3] | | | | 98.5 | 123.4 | 155.3 | | | | - | - | - |
| Second PIK Notes | [3] | | | | 98.5 | 123.4 | 155.3 | | | | - | - | - |
| **Total Settlement Proceeds Available for GUCs** | [4] | | | | $ 4,236.2 | $ 4,285.9 | $ 4,349.6 | | | | $ - | $ - | $ - |
| **Wind-Down Budget Funding** | [5] | | | | $ 2,625.0 | $ 2,625.0 | $ 2,625.0 | | | | $ 2,625.0 | $ 2,625.0 | $ 2,625.0 |
| **Carve-Out Funding** | [6] | | | | - | - | - | | | | 1,050.0 | 1,050.0 | 1,050.0 |
| **Total Liquidation Proceeds before Costs** | | | | | $ 6,861.2 | $ 6,910.9 | $ 6,974.6 | | | | $ 3,675.0 | $ 3,675.0 | $ 3,675.0 |
| **Chapter 7 Liquidation Adjustments** | | | | | | | | | | | | | |
| Chapter 7 Trustee | [7] | | | | - | - | - | | | | (3,089.2) | (2,837.5) | (2,543.4) |
| Chapter 7 Professionals | [8] | | | | - | - | - | | | | (1,144.1) | (1,144.1) | (1,144.1) |
| Estate Professional Fees | [5,9] | | | | (1,684.4) | (1,684.4) | (1,684.4) | | | | - | - | - |
| Other Administrative Costs | [5,10] | | | | (901.5) | (901.5) | (901.5) | | | | - | - | - |
| **Total Chapter 7 Liquidation Adjustments** | | | | | (2,585.9) | (2,585.9) | (2,585.9) | | | | (4,233.3) | (3,981.6) | (3,687.5) |
| **Total Net Liquidation Proceeds** | | | | | $ 39.1 | $ 39.1 | $ 39.1 | | | | $ - | $ - | $ - |
| **Net Estimated Proceeds Available for Distribution** | | | | | $ 4,236.2 | $ 4,285.9 | $ 4,349.6 | | | | | | |

| | Notes | Total Estimated Claim Low | Mid | High | Total Recovery - % Low | Mid | High | Total Recovery - $ Low | Mid | High | Total Recovery - % Low | Mid | High | Total Recovery - $ Low | Mid | High |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Secured Claims** | [11] | | | | | | | | | | | | | | | |
| First Lien Term Loan | | 25,000.0 | 25,000.0 | 25,000.0 | - | - | - | - | - | - | - | - | - | $ - | $ - | $ - |
| Second Lien Term Loan | | 184,526.1 | 184,526.1 | 184,526.1 | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Estimated Secured Claims** | | $ 209,526.1 | $ 209,526.1 | $ 209,526.1 | - | - | - | $ - | $ - | $ - | - | - | - | $ - | $ - | $ - |
| **Estimated Funds Available for Distribution to Unsecured Claims** | | | | | | | | $ 4,236.2 | $ 4,285.9 | $ 4,349.6 | | | | $ - | $ - | $ - |
| **Unsecured Claims** | [12] | | | | | | | | | | | | | | | |
| Trade Vendors General Unsecured Claims | | 6,375.0 | 4,650.9 | 2,926.9 | 51.6% | 70.7% | 100.0% | 3,289.1 | 3,289.1 | 2,926.9 | | | | | | |
| CFPB Claim General Unsecured Claims | | 2,660,926.5 | 2,660,926.5 | 2,660,926.5 | 0.0% | 0.0% | 0.0% | 50.0 | 50.0 | 50.0 | | | | | | |
| WARN Act Claims | | 18,517.0 | 18,517.0 | 18,517.0 | 1.4% | 2.6% | 3.8% | 250.0 | 475.0 | 700.0 | | | | | | |
| TCPA Class Action Lawsuit Claims | | 170,615.5 | 85,307.8 | - | 0.3% | 0.5% | - | 582.4 | 415.4 | - | | | | | | |
| Executory Contract Rejection | | 18,960.4 | 11,567.1 | 6,273.8 | 0.3% | 0.5% | 10.7% | 64.7 | 56.3 | 672.8 | | | | | | |
| First Lien Term Loan Deficiency Claims | | 25,000.0 | 25,000.0 | 25,000.0 | | | | - | - | - | | | | | | |
| Second Lien Term Loan Deficiency Claims | | 184,526.1 | 184,526.1 | 184,526.1 | | | | - | - | - | | | | | | |
| **Total Estimated Unsecured Claims** | | $ 3,084,920.4 | $ 2,990,495.3 | $ 2,898,170.2 | 0.1% | 0.2% | 0.2% | $ 4,236.2 | $ 4,285.9 | $ 4,349.6 | - | - | - | $ - | $ - | $ - |
| **Intercompany Claims** | [13] | | | | | | | | | | | | | | | |
| Intercompany Claims | | - | - | - | | | | - | - | - | | | | | | |
| **Equity Interests** | [13] | | | | | | | | | | | | | | | |
| Equity Interests | | - | - | - | | | | - | - | - | | | | | | |
| **Total Estimated Claims** | | $ 3,294,446.5 | $ 3,200,021.4 | $ 3,107,696.2 | - | - | - | $ 4,236.2 | $ 4,285.9 | $ 4,349.6 | - | - | - | $ - | $ - | $ - |

4

**Specific Notes to the Liquidation Analysis:**

(1)  Subject to an acceptable Plan framework, holders of trade, vendor, service provider, and professional unsecured claims that will continue with the Successful Bidders after the Sale Transaction and that are not fully paid as Critical Vendors shall be paid and satisfied on a pro rata basis under a Plan from the aggregate of (i) cash in the amount of $3.25 million ("GUC Trade Settlement Cash"); (ii) the unused Wind-Down Budget; and (iii) any unused amounts from the Debtors' $3.624 million Critical Vendor budget.

(2)  Subject to an acceptable Plan framework, and contingent upon the Litigation Claimants supporting and voting to accept the Plan, the Litigation Claimants shall collectively receive a portion of the $750,000 (the "GUC Litigation Claims Settlement Cash") to be disclosed in the Plan Supplement.

(3)  Other GUC Claimants shall also receive their pro rata share of two tranches of unsecured notes (for the avoidance of doubt, through certain interests in the Creditor Trust) to be issued by the Progrexion Purchaser, each in the principal amount of $250,000 and accruing at a 5% yearly PIK interest (the "PIK Notes"). The PIK Notes shall mature 5 years after the Effective Date of the Plan and shall be subordinate to all current and future indebtedness of the issuer; *provided*, that the PIK Notes may be repaid in the first two years at a 20% discount.

(4)  Total settlement proceeds available for General Unsecured Claims are assumed to be retained by the Purchasers and no longer available for distribution to the Holders of General Unsecured Claims in a chapter 7 scenario.

(5)  Amount is based on the approved Wind-Down Budget in the Asset Purchase Agreements and the Sale Orders. The chapter 7 scenario assumes the Sale Transaction closes and the case is converted thereafter.

(6)  Carve-Out funds are assumed to pay the Estate professional fees up to $1.0 million.

(7)  The Chapter 7 Trustee's statutory commissions related to monetizing assets would be considered immaterial in the hypothetical Liquidation Analysis. For the analysis, the fees incurred by the Chapter 7 Trustee for the administration services provided in the wind down of the Debtor's Estates are captured in the chapter 7 professional fees.

(8)  Chapter 7 professionals are assumed to be engaged for 12 to 15 months to assist the trustee manage the claim reconciliation process, final tax filings, potential distributions, and administrative wind down matters of the Estates. Actual amounts and applicable time periods may vary.

(9)  Estimate of professional fees includes costs incurred during the wind-down process. The chapter 11 scenario assumes Estate professionals continue for 12 months from the Closing of the Sale Transaction. The chapter 7 scenario assumes Estate professionals continue for 4 weeks after the Conversion Date to transition working knowledge and background of the case to the chapter 7 trustee's professionals. Estate professionals are assumed to be funded by the Carve-Out funds. Actual amounts and applicable time periods may vary.

(10)  The chapter 7 scenario assumes the costs associated with Estate professionals' fees are sufficient for transitioning of existing institutional knowledge to chapter 7 professionals. In the hypothetical liquidation scenario, costs potentially incurred under any potential transition services agreement ("TSA") are not currently included. However, incremental wind-down costs would be incurred if a TSA is needed from the Buyer's acquired resources, including vendor reconciliation support, tax filing support, or technology infrastructure.

(11)  Total Allowed Claims under the credit bid are approximately $282.3 million (DIP, Bridge Loan, DIP Roll-up, principal under the Prepetition First Lien Loan, accrued prepetition interest, and applicable premium of 2%). The credit bid for the PGX assets was $257.5 million; resulting in an estimated remaining secured claim of approximately $25.0 million for the Prepetition First Lien Loan and the full balance of the Prepetition Second Lien Loans (principal and accrued PIK) of approximately $184.5 million. Subject to an acceptable Plan, all Deficiency Claims of the Prepetition Secured Lenders shall be subordinated and junior to the claims of all Allowed General Unsecured Claims for purposes of distributions under the Plan. Subordination is capped at first $10 million of distributed value to Allowed General Unsecured Claims; after which the Prepetition Secured Lenders shall receive their pro rata share of any distribution to Holders of Other

General Unsecured Claims on account of such Deficiency Claims. In a chapter 7 scenario, the Claims of the Prepetition Secured Lenders would have a higher priority to General Unsecured Claims.

(12)   Estimate of General Unsecured Claims: Claims reflected in the Liquidation Analysis are aligned with the General Unsecured Claims in the Plan.   In the chapter 7 scenario, the Holders of Allowed General Unsecured Claims are subordinated to Secured Claims.  Therefore, the chapter 7 scenario assumes that there would be no Liquidation Distribution for General Unsecured Claims. In the chapter 11 Scenario, General Unsecured Claims are subject to final reconciliation in accordance with the Plan and Global Settlement set forth in the DIP Order.

(13)   Intercompany Claims / Intercompany Interests / Interests in PGX / Interests in Lexington Law Firm:  The Liquidation Analysis assumes Intercompany Claims, Intercompany Interests, Interests in PGX, and Interests in Lexington Law Firm are subordinated to other General Unsecured Claims.  Therefore, in the chapter 7 scenario, there would be no Liquidation Distribution for Intercompany Claims, Intercompany Interests, Interests in PGX, and Interests in Lexington Law Firm. Interests.