**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| PGX HOLDINGS, INC., *et al.*,[1] | ) | Case No. 23-10718 (CTG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Related to Docket Nos. 468 and 570** |

**DECLARATION OF CHAD WALLACE, CHIEF EXECUTIVE OFFICER OF PGX
HOLDINGS, INC., IN SUPPORT OF CONFIRMATION OF THE SECOND AMENDED
JOINT CHAPTER 11 PLAN OF PGX HOLDINGS, INC. AND ITS AFFILIATED
DEBTORS PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

I, Chad Wallace, hereby declare under penalty of perjury:[2]

1.      I am the Chief Executive Officer and President of PGX Holdings, Inc. and certain

of its affiliated debtors and debtors in possession (collectively, with their Debtor affiliates,

the "Debtors" and, together with their non-Debtor affiliate CreditCo Limited, but excluding their

Debtor affiliate Lexington Law Firm, "PGX").   PGX Holdings, Inc. is a private company based

in Salt Lake City, Utah, organized under the laws of Delaware, and a debtor and debtor in

possession in the above-captioned cases along with 11 of its direct and indirect subsidiaries.

Additional information regarding my background and qualifications is set forth in the *Declaration*

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:   PGX Holdings, Inc. (2510); Credit Repair UK, Inc. (4798); Credit.com, Inc. (1580); Creditrepair.com Holdings, Inc. (7536); Creditrepair.com, Inc. (7680); eFolks Holdings, Inc. (5213); eFolks, LLC (5256); John C. Heath, Attorney At Law PC (8362); Progrexion ASG, Inc. (5153); Progrexion Holdings, Inc. (7123); Progrexion IP, Inc. (5179); Progrexion Marketing, Inc. (5073); and Progrexion Teleservices, Inc. (5110).   The location of the Debtors' service address for purposes of these chapter 11 cases is:  257 East 200 South, Suite 1200, Salt Lake City, Utah 84111.

[2]      Capitalized terms used but not defined herein have the meaning ascribed to such terms in the *Second Amended Joint Chapter 11 Plan of PGX Holdings, Inc. and Its Affiliated Debtors Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 570] (as may be modified, amended, or supplemented, the "Plan"), applicable Asset Purchase Agreement, or the Confirmation Order, as applicable.

*of Chad Wallace, Chief Executive Officer of PGX Holdings, Inc., in Support of Debtors'*
*Chapter 11 Petitions and First Day Motions* [Docket No. 12].

2.      In my capacity as CEO, I am very familiar with the above-captioned Debtors'
day-to-day operations, business affairs, and books and records, as well as the Debtors'
restructuring efforts.  Accordingly, I am familiar with the terms of the Plan as well as its
negotiation and development.

3.      Except as otherwise indicated, all matters set forth in this declaration
(the "Declaration") are based on:  (a)  my personal knowledge of the Debtors' business operations,
my review of relevant information provided to me by other members of the Debtors' management
and the Debtors' professional advisors; (b) my opinion based upon my experience, knowledge,
and information concerning the Debtors' operations; and (c) my review of relevant documents.  If
I were called upon to testify, I could and would testify competently to the facts set forth herein.

I.      **General Background and the Development of the Plan.**

4.      The Plan is the product of extensive, good-faith, arm's-length negotiations among
the Debtors, their lenders, the Purchaser, and the official committee of unsecured creditors
(the "Committee"), with all parties working towards an outcome that maximizes the value of the
Debtors' Estates for the benefit of their stakeholders.  The Plan is designed to bring an orderly and
efficient conclusion to these Chapter 11 Cases.

5.      On August 24, 2023, the Debtors filed an initial version of the Plan [Docket
No. 410].    After discussions with various stakeholders, including the Committee, on
September 15, 2023, the Debtors filed the first amended version of the Plan [Docket No. 466].
On September 16, 2023, the Bankruptcy Court entered a disclosure statement order [Docket
No. 478] (the "Disclosure Statement Order"), approving the Disclosure Statement on an interim

basis, establishing a schedule for Plan confirmation, and scheduling a combined hearing on final approval of the Disclosure Statement and confirmation of the Plan.  On September 20, 2023, the Debtors filed the version of the first amended Disclosure Statement [Docket No. 488] and first amended Plan [Docket No. 486], each as used for purposes of solicitation.

6.       The Bankruptcy Court approved the Debtors' methods to solicit, receive, and tabulate votes to accept the Plan.  In accordance with these approved Solicitation and Voting Procedures, the Debtors caused the Holders of Claims entitled to vote to receive service of the Solicitation Packages that included (a) the Disclosure Statement Order; (b) the Combined Hearing Notice to consider (i) approval of the Disclosure Statement on a final basis and (ii) Confirmation of the Plan; (c) a cover letter describing the contents of the Solicitation Package and urging the Holders of Claims in the Voting Classes to vote to accept the Plan; (d) the applicable form of Ballot, in substantially the form of the Ballot; and (e) additional documents that the Bankruptcy Court ordered to be made available.  In accordance with these approved Solicitation and Voting Procedures, the Debtors also caused the Holders of Claims and Interests not entitled to vote on the confirmation of the Plan to receive service of the Non-Voting Status Notice that included the applicable Non-Voting Status Notice, which included an opt-out form, and additional documents that the Bankruptcy Court ordered to be made available (together, the "Non-Voting Package").  It is my understanding that on or about September 22, 2023, the Debtors caused the Claims and Noticing Agent, Kurtzman Carson Consultants LLC ("KCC"), to begin service of the (a) Solicitation Packages to Holders of Claims entitled to vote on the Plan, as of the Voting Record Date, and (b) Non-Voting Package to Holders of Claims and Interests not entitled to vote on the Plan, each in accordance with the provisions of the Disclosure Statement Order.  It is also my

understanding that KCC completed the distribution of the Solicitation Packages and Non-Voting Packages within the time required by the Disclosure Statement Order.

7.     In accordance with the Disclosure Statement Order, the Debtors filed the Combined Hearing Notice on September 19, 2023 [Docket No. 483].  KCC provided service of the Combined Hearing Notice beginning on September 20, 2023 [Docket No. 560].  The Debtors also caused the Combined Hearing Notice to be published in the *USA Today* (National Edition) on September 25, 2023 [Docket No. 499].

8.     On October 13, 2023, the Debtors filed with the Bankruptcy Court the initial version of the *Plan Supplement* [Docket No. 546], which included, as applicable, the (a) Rejected Executory Contracts and Unexpired Leases Schedule; (b) Assumed Executory Contracts and Unexpired Leases Schedule, (c) Schedule of Retained Causes of Action; (d) any necessary documentation related to the Sale Transactions; (e) the identity of the Creditor Trustee and the terms of the governing agreement of the Creditor Trust; (f) the Litigation Portion of the GUC Litigation Claims Settlement Cash; and (g) the initial draft of the form of PIK Notes.  Also on October 13, 2023, the Debtors filed with the Bankruptcy Court the *Notice of Filing of Plan Supplement* [Docket No. 547].

9.     Concurrently with this Declaration, the Debtors have (or will) file (or caused to be filed) with the Bankruptcy Court (a) their second amended Plan [Docket No. 570], which incorporates changes in accordance with subsequent comments the Debtors received to the Plan, including those from the Office of the United States Trustee, the United States on behalf of the CFPB, and counsel to the Debtors' surety bond provider, (b) a brief in support of confirmation, and (c) the second Plan Supplement.  The Debtors have also caused KCC to file its report of plan voting [Docket No. 569] (the "Voting Report").

10.     As discussed herein, I believe that the prompt confirmation and consummation of the Plan is in the best interest of the Debtors, their creditors, and all other parties in interest, and that, accordingly, the Bankruptcy Court should confirm the Plan.

### The Plan Satisfies the Requirements for Confirmation

11.     For the reasons detailed below and with the assistance of the Debtors' advisors, I believe the Plan satisfies the applicable Bankruptcy Code requirements for confirmation of a chapter 11 plan.  Specifically, it is my understanding that the Plan:  (a) complies with all applicable provisions of the Bankruptcy Code as required by section 1129(a)(1) of the Bankruptcy Code, including sections 1122 and 1123 of the Bankruptcy Code; (b) satisfies the mandatory requirements of section 1123(a) of the Bankruptcy Code; and (c) is consistent with section 1123(b) of the Bankruptcy Code.  I have set forth the reasons for such belief below, except where such compliance is apparent on the face of the Plan, the Plan Supplement, and the related documents or where it will be the subject of evidence introduced at the Confirmation Hearing.

## I.     The Plan Satisfies Each Requirement for Confirmation.

### A.     The Plan Complies with the Applicable Provisions of the Bankruptcy Code (Section 1129(a)(1)).

12.     It is my understanding that the Plan complies with 11 U.S.C. § 1129(a)(1), which requires the Plan to comply with 11 U.S.C. §§ 1122 and 1123 in all respects.

#### 1.     The Plan's Classification of Claims and Interests Under Section 1122.

13.     Article III.B of the Plan provides for the separate classification of Claims and Interests as follows:

| Class | Claim/Interest | Status | Voting Rights |
|-------|----------------|--------|---------------|
| 1 | Secured Tax Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 3 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 4 | Prepetition First Lien Claims | Impaired | Entitled to Vote |
| 5 | Prepetition Second Lien Claims | Impaired | Entitled to Vote |
| 6A | Continuing Trade Claims | Impaired | Entitled to Vote |

| 6B | Other General Unsecured Claims | Impaired | Entitled to Vote |
|---|---|---|---|
| 6C | Litigation Claims | Impaired | Entitled to Vote |
| 6D | CFPB Claim | Impaired | Entitled to Vote |
| 7 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| 8 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| 9 | Interests in PGX | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 10 | Interests in Lexington Law Firm | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 11 | 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

14.    I believe each Class is composed of substantially similar Claims or Interests, and each instance of separate classifications of similar Claims and Interests was based on valid business, factual, and legal reasons. No classification has been made for purposes of gerrymandering votes.

15.    First, dissimilar Claims and Interests are not classified together under the Plan. Generally speaking, the classification scheme follows the Debtors' capital structure. For example, debt and equity are classified separately, and secured debt is classified separately from unsecured debt. It is my understanding that other aspects of the classification scheme reasonably recognize the different legal or factual nature of Claims or Interests.

16.    Specifically, the Plan separately classifies Claims in Class 1 to reflect the priority of such Claims under section 507(a) of the Bankruptcy Code and separately classifies Other Secured Claims in Class 2 and Other Priority Claims in Class 3 based on their distinct legal nature. Class 4 consists of claims arising under the Prepetition First Lien Claims, whereas Class 5 consists of Prepetition First Lien Claims. Class 6A Continuing Trade Claims, Class 6B Other General Unsecured Claims, Class 6C Litigation Claims, and Class 6D CFPB Claim are separately classified due to the differences in the underlying nature of the Claims in each such Class. Class 7 Intercompany Claims are separately classified because they do not involve third-party creditors, and Class 8 Intercompany Interests are separately classified from Class 9 Interests in PGX and Class 10 Interests in Lexington Law Firm because they arise from intercompany transactions and

do not impact recoveries to third parties.  Finally, Class 11 Section 510(b) Claims are separately classified to reflect the treatment of such Claims under section 510(b) of the Bankruptcy Code.

17.    It is my understanding that valid factual and legal reasons exist for separately classifying the various Classes of Claims and Interests created under the Plan.  In each instance, the Plan classifies Claims based upon their different rights and attributes.  Additionally, each of the Claims or Interests in each particular Class is substantially similar to the other Claims or Interests in such Class.  Accordingly, I believe the Plan fully complies with and satisfies section 1122 of the Bankruptcy Code.

### 2. The Plan Satisfies the Mandatory Requirements of Section 1123(a) of the Bankruptcy Code.

18.    I have been advised that the Plan satisfies the six applicable[3] requirements set forth in section 1123(a) of the Bankruptcy Code because:

- Article III of the Plan designates classes of claims and interests;

- Article III of the Plan identifies unimpaired classes of claims and interests;

- Article III of the Plan specifies treatment of impaired classes of claims and interests;

- Article III of the Plan provides the same treatment for each claim or interest of a particular class, unless the holder of a particular claim agrees to a less favorable treatment of such particular claim or interest;

- Article IV of the Plan provides adequate means for its implementation, including by providing for, among other things, consummation of the Restructuring Transactions and the appointment of a Plan Administrator and Creditor Trustee;

- Article IV.D of the Plan is consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of the company's officers and directors by appointing the Plan Administrator as the sole manager and officer of the Wind-Down Debtors who shall succeed to the powers of manager and directors.

---

[3] It is my understanding that, because the Debtors are not issuing any new securities under the Plan, the confirmation requirements set forth in section 1123(a)(6) of the Bankruptcy Code are inapplicable to these Chapter 11 Cases.  In addition, section 1123(a)(8) of the Bankruptcy Code is only applicable to individual debtors.

**B.      The Discretionary Contents of the Plan Are Appropriate and Should Be Approved.**

19.      It is my understanding that the Plan includes various discretionary provisions that are consistent with section 1123(b) of the Bankruptcy Code.  For example, the Plan provides for a general settlement of Claims and Interests, impairs certain Classes of Claims and Interests and leaves others Unimpaired, proposes treatment for Executory Contracts and Unexpired Leases, provides a structure for Claim allowance and disallowance and establishes a distribution process for the satisfaction of Allowed Claims entitled to distributions under the Plan.  In addition, the Plan contains provisions implementing certain releases and exculpations, and permanently enjoining certain causes of action.

20.      I believe each of these provisions are appropriate because, among other things, they (a) are the product of arm's-length negotiations, (b) have been critical to obtaining the support of the various constituencies for the Plan, (c) are given for valuable consideration, (d) are fair and equitable and in the best interests of the Debtors, these Estates, and these Chapter 11 Cases, and (e) are consistent with the relevant provisions of the Bankruptcy Code and Third Circuit law.  Such provisions are discussed in turn below but, in summary, satisfy the requirements of section 1123(b).

**1.    The Plan's Release, Exculpation, and Injunction Provisions Satisfy Section 1123(b) of the Bankruptcy Code.**

21.      The Plan includes certain releases, an exculpation provision, and an injunction provision.  I believe these discretionary provisions are proper because, among other things, they are the product of extensive good-faith, arm's-length negotiations, are supported by the Debtors and their constituents, and, as I have been advised, are consistent with applicable precedent.

a.      **The Debtor Release in the Plan Is Appropriate**.

22.      I believe that the Debtor Release is appropriate, justified, in the best interests of the stakeholders, and an integral part of the Plan.  Article VIII.B of the Plan provides for certain releases by the Debtors, the Wind-Down Debtor, their Estates, and certain Related Parties of any and all Claims and Causes of Action, including any derivative claims, the Debtors could assert against each of the Released Parties (the "<u>Debtor Release</u>").

23.      I believe that the Debtor Release meets the applicable standard because it is fair, reasonable, and in the best interests of the Debtors' Estates.  ***First***, an identity of interest exists between the Debtors and the parties to be released.  Each of the Released Parties, as a stakeholder and critical participant in the Plan process, shares a common goal with the Debtors in seeing the Plan succeed and would have been unlikely to participate in the negotiations and compromises that led to the ultimate formation of the Plan without the Debtor Release.  Like the Debtors, these parties seek to confirm the Plan and implement the Restructurings Transactions contemplated therein.  Moreover, with respect to certain of the releases—*e.g.*, those releasing the Debtors' current and former directors, officers, affiliates, and principals—there is a clear identity of interest supporting the release because the Debtors will assume certain indemnification obligations under the Plan that will be honored by the Wind-Down Debtor.  Thus, a lawsuit commenced by the Debtors (or derivatively on behalf of the Debtors) against certain individuals would effectively be a lawsuit against the Wind-Down Debtor itself.

24.      ***Second***, the substantial contributions are clear.  The Released Parties played an integral role in the formation of the Plan and have expended significant time and resources analyzing and negotiating the issues present in these Chapter 11 Cases to reach a value-maximizing chapter 11 plan.  Moreover, the Released Parties have expended time and resources analyzing and

negotiating the issues presented by the Debtors' capital structure and the material barriers to the resolution thereof.  Here, the value contributed by the Released Parties is certainly substantial. Without the contributions of each of these parties, the Plan and the ultimate success of these Chapter 11 Cases would not be possible.

25.     ***Third***, the Debtor Release is essential to the successful resolution of these Chapter 11 Cases because it constitutes an integral term of the Plan.  Indeed, absent the Debtor Release, it is highly unlikely the Released Parties would have agreed to support the Plan and the restructuring transactions contemplated therein.  As described above, each of the Released Parties contributed substantial value to these Chapter 11 Cases and did so with the understanding that they would receive releases from the Debtors.  In the absence of these parties' support, the Debtors would not be in a position to confirm the Plan and emerge from chapter 11.  The Debtor Release, therefore, is essential to the Debtors' successful resolution of these Chapter 11 Cases.

26.     ***Fourth***, no party in interest has contested the debtor release of any hypothetical claims, and as evidenced by the Voting Report and noted herein, parties voting in Class 6A and 6B have unanimously voted to approve the Plan.  Given the critical nature of the Debtor Release and the Plan's overall support, the Debtors submit that the releases are proper.

27.     ***Fifth***, the Plan provides for meaningful consideration under the circumstances for all creditors potentially giving up colorable claims under the releases.  As demonstrated by the Liquidation Analysis attached to the Disclosure Statement, the Plan provides for meaningful recoveries for the Classes affected by the Debtor Release—recoveries that would be unavailable absent the Plan.

28.     I believe the Debtors have satisfied the business judgment standard in granting the Debtor Release under the Plan.  The Debtor Release easily meets the applicable standard because they are fair, reasonable, and in the best interests of the Debtors' Estates.

### b.     The Third-Party Release Is Wholly Consensual.

29.     In addition to the Debtor Release, the Plan provides for certain releases by certain Holders of Claims and Interests.  Specifically, Article VIII.C of the Plan provides that each Releasing Party shall release any and all Claims and Causes of Action such parties could assert against the Debtors, the Wind-Down Debtor, and the Released Parties (the "Third-Party Release" and, together with the Debtor Release, the "Releases").  The Releasing Parties include, among others, the Prepetition First Lien Lenders, the Prepetition Second Lien Lenders, the Committee and its members (in their capacity as Committee members), Agent, the Purchasers, all Holders of Claims or Interests who have not opted out, the Wind-Down Debtor, the Plan Administrator, and the Creditor Trust, including the Creditor Trustee on behalf of the Creditor Trust.  I believe the Third-Party Release is consensual and integral to the Plan, and I have been advised that they are consistent with established Third Circuit law.

30.     I believe the Third-Party Release is consensual.  All parties in interest had ample opportunity to evaluate and opt out of the Third-Party Release by objecting to the Third-Party Release or by electing to opt out from the Third-Party Release.  Importantly, the ballots distributed to Holders of Claims entitled to vote on the Plan quoted the entirety of the Third-Party Release, clearly informing Holders of Claims entitled to vote of the steps they should take if they disagreed with the scope of the release and provided a method to opt out from the Third-Party Release even if a party voted in favor of the Plan.  Similarly, the Non-Voting Status Notices distributed to Holders of Claims and Interests not entitled to vote on the Plan also quoted the entirety of the

Third-Party Release, clearly informing Holders of Claims and Interests not entitled to vote of the steps they should take if they wished to elect to opt out from the Third-Party Release. Thus, affected parties received notice of the Third-Party Release, including the option to opt out of the Third-Party Release. As such, I believe the Third-Party Release is a consensual release of all Holders of Claims or Interests who did not object or provide an opt out election in accordance with the terms of the Disclosure Statement Order.

31.     Moreover, I believe the Third-Party Release is fair and necessary to the success of these Chapter 11 Cases, and that fair consideration is given in exchange for the release.

32.     The circumstances of these Chapter 11 Cases warrant the Third-Party Release because it is critical to the success of the Plan, and it is fair and appropriate. Without the efforts of the Released Parties both in providing the DIP Financing and actively participating in the Sale Transactions and Plan negotiations, the Debtors would not been able to consummate a value-maximizing Sale Transaction for the benefit of all stakeholders and an orderly post-sale wind down through the Plan. In addition, many of the Released Parties have been instrumental in supporting these Chapter 11 Cases and facilitating a smooth administration thereof. Finally, throughout the entire case and all these negotiations, the Debtors' directors and officers steadfastly maintained their duties to maximize value for the benefit of all stakeholders, investing countless hours both pre- and postpetition.

33.     Moreover, the third parties bound by the Releases have received sufficient consideration in exchange for the release of their Claims against the Released Parties to justify the Third-Party Release. The Released Parties have made massive concessions and commitments that will allow the Debtors to maximize the value of their Estates. The Released Parties have been active and important participants in the development of the Plan and have expended significant

time and resources analyzing and negotiating the issues presented by the Debtors' capital structure and the material barriers to the resolution thereof.  In addition to significant concessions under the Plan, the Released Parties made the contributions as discussed above, each in exchange for, among other things, the Third-Party Release.

34.     Accordingly, for all of the above reasons, I believe that the Debtors have a good-faith basis for including the Releases in the Plan.  I further believe that the Third-Party Release is reasonable and appropriate in light of the unique circumstances of these Chapter 11 Cases and satisfies all applicable requirements of the Bankruptcy Code.

**C.     The Exculpation Provision Is Appropriate.**

35.     Article VIII.D of the Plan provides for the exculpation of the Exculpated Parties. I believe the exculpation is fair and appropriate under the facts and circumstances of these Chapter 11 Cases.  The Plan's exculpation provision is the product of arm's-length negotiations, was critical to obtaining the support of various constituencies for the Plan, and, as part of the Plan, has received support from the Debtors' stakeholders.  The exculpation provision was important to the development of a feasible, confirmable Plan, and the Exculpated Parties participated in these Chapter 11 Cases in reliance upon the protections afforded to those constituents by the exculpation.

36.     The Exculpated Parties have participated in good faith in formulating and negotiating the Plan as it relates to the Debtors, and they should be entitled to protection from exposure to any lawsuits filed by disgruntled creditors or other unsatisfied parties.  Here, the Debtors and their officers, directors, and professionals actively negotiated with Holders of Claims and Interests across the Debtors' capital structure in connection with the Plan and these Chapter 11 Cases.  Such negotiations were extensive, and the resulting agreements were implemented in good faith with a high degree of transparency, and as a result, the Plan enjoys support from the requisite

Holders of Claims entitled to vote.  The Exculpated Parties played a critical role in negotiating, formulating, and implementing the Disclosure Statement and the solicitation process, the Plan, the Asset Purchase Agreements, and related documents in furtherance of the Debtors' chapter 11 efforts.  Furthermore, the Exculpation is limited to acts during these Chapter 11 Cases and does not extend beyond such time period.

37.     Additionally, the promise of exculpation played a significant role in facilitating Plan negotiations.  All of the Exculpated Parties played a key role in developing the Plan that paved the way for a successful resolution of these Chapter 11 Cases, and likely would not have been so inclined to participate in the plan process without the promise of exculpation.  It is my understanding that Exculpation for parties participating in the plan process is appropriate where plan negotiations could not have occurred without protection from liability.

38.     Accordingly, I had been advised that under the circumstances, particularly where the Plan, including the exculpation provision, is supported by the requisite voting Classes in these Chapter 11 Cases, it is appropriate for the Bankruptcy Court to approve the exculpation provision, and to find that the Exculpated Parties have acted in good faith and in compliance with the law.

**D.     The Plan Complies with Section 1123(d) of the Bankruptcy Code.**

39.     Article V.D of the Plan provides for the satisfaction of all monetary defaults under each Executory Contract and Unexpired Lease assumed pursuant to the Plan by payment of the default amount, subject to the terms and conditions of the Plan, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.  The Debtors, in accordance with the Disclosure Statement Order and the Plan, distributed notices of proposed assumption under the Plan to the applicable third parties.  These notices included procedures for objecting to the proposed assumptions under the Plan of Executory Contracts and Unexpired

Leases and any Cure Claim, as well as a process for resolving any disputes concerning the foregoing with the Bankruptcy Court.

40.      Accordingly, it is my understanding that the Plan complies with section 1123(d) of the Bankruptcy Code.

**E.      The Debtors Have Complied with the Applicable Provisions of the Bankruptcy Code (Section 1129(a)(2)).**

41.      It is my understanding that the Debtors have satisfied section 1129(a)(2) of the Bankruptcy Code, which requires the plan proponent to comply with the applicable provisions of the Bankruptcy Code.  As set forth below, I have been advised that the Debtors have complied with these provisions, including sections 1125 and 1126 of the Bankruptcy Code, as well as Bankruptcy Rules 3017 and 3018, by distributing the Disclosure Statement and soliciting acceptances of the Plan through their Claims and Noticing Agent in accordance with the Disclosure Statement Order.

**2.      The Debtors Have Complied with the Disclosure and Solicitation Requirements of Section 1125.**

42.      Before the Debtors solicited votes on the Plan, the Bankruptcy Court approved the Disclosure Statement on an interim basis in accordance with section 1125(a)(1).  The Bankruptcy Court also approved the contents of the Solicitation Packages provided to Holders of Claims entitled to vote on the Plan, the non-voting materials provided to parties not entitled to vote on the Plan, and the relevant dates for voting and objecting to the Plan.  As stated in the Voting Report, the Debtors, through the Claims and Noticing Agent, complied with the content and delivery requirements of the Disclosure Statement Order, thereby satisfying sections 1125(a) and (b) of the Bankruptcy Code.  It is my understanding that the Debtors also satisfied section 1125(c) of the Bankruptcy Code, which provides that the same disclosure statement must be transmitted to each

holder of a claim or interest in a particular Class.  Here, the Debtors caused the Combined Hearing Notice, including instructions on how to obtain the Plan and the Disclosure Statement without a fee through the Debtors' restructuring website or for a fee at the Bankruptcy Court's PACER website, to be transmitted to voting parties and all parties in interest.  Moreover, at all times, the Debtors and their advisors acted in good faith and took appropriate actions in compliance with the Bankruptcy Code in connection with the solicitation of the Plan.

43.     Based on the foregoing, it is my understanding that the Debtors have complied in all respects with the solicitation requirements of section 1125 of the Bankruptcy Code and the Disclosure Statement Order, and no party has asserted otherwise.

### 3. The Debtors Have Satisfied the Plan Acceptance Requirements of Section 1126.

44.     The Debtors solicited votes only from the Voting Classes, holders of Allowed Claims and Interests in Classes 4, 5, 6A, 6B, 6C, and 6D, because each of these Classes is Impaired and entitled to receive a distribution under the Plan.

45.     The Voting Report, summarized above, reflects the results of the voting process in accordance with section 1126 of the Bankruptcy Code.  As set forth in the Voting Report and summarized above, Classes 4, 5, 6A, and 6B have each voted unanimously to accept the Plan, Class 6C voted to reject the Plan, and Class 6D did not cast a vote.  Additionally, as discussed below, the Debtors have satisfied the requirements of section 1129(a)(10) of the Bankruptcy Code and will be able to "cram down" Class 6C, which voted to reject the Plan, pursuant to section 1129(b) of the Bankruptcy Code.  Based on the foregoing, I believe that the Debtors have satisfied the requirements of section 1129(a)(2), and no party has asserted otherwise.

F.     **The Plan Has Been Proposed in Good Faith and Not by Any Means Forbidden by Law (Section 1129(a)(3)).**

46.     I believe the Plan was proposed with honesty, good intentions, and a desire to maximize the value of the Debtors' business.  Throughout these cases, the Debtors worked to build consensus among their various stakeholders.  The Plan and the process leading up to its formulation are the result of extensive arm's-length negotiations among the Debtors, their lenders, the Purchaser, the Committee, and other parties in interest.  Throughout the negotiation of the Plan and these cases, the Debtors have upheld their fiduciary duties to stakeholders and protected the interests of all constituents with an even hand.

47.     Accordingly, I have been advised that the Plan fully complies with and satisfies all of the requirements of section 1129(a)(3) of the Bankruptcy Code.

G.     **The Plan Provides for Court Approval of Certain Administrative Payments (Section 1129(a)(4)).**

48.     It is my understanding that all payments made or to be made by the Debtors for services or for costs or expenses in connection with these Chapter 11 Cases prior to the Effective Date, including all budgeted Professional Fee Claims, have been approved by, or are subject to approval of, the Bankruptcy Court.  Article II.B of the Plan provides that all final requests for payment of Professional Fee Claims shall be filed no later than 60 days after the Effective Date for determination by the Bankruptcy Court, after notice and a hearing, in accordance with the procedures established by the Bankruptcy Court.  Therefore, it is my understanding that the Plan complies with the requirements of section 1129(a)(4) of the Bankruptcy Code.

H.     **Post-Emergence Board Composition Has Been Appropriately Disclosed and Is Consistent with Public Policy (Section 1129(a)(5)).**

49.     The Plan provides for a Plan Administrator.  The Plan provides that the Plan Administrator will act on behalf of the Wind-Down Debtor in the same fiduciary capacity as

applicable to a board of managers and officers and also provides that on the Confirmation Date, the authority, power, and incumbency of the persons acting as managers and officers of the Wind-Down Debtor shall be deemed to have resigned, solely in their capacities as such.  At that time, Matthew Henry will be appointed as the sole manager and sole officer of the Wind-Down Debtor.

50.    In addition, I have been advised that the Plan satisfies section 1129(a)(5)(B) of the Bankruptcy Code because the Debtors will publicly disclose the identities and affiliations of all insiders, if any, that the Wind-Down Debtor will employ or retain at or prior to the Confirmation Hearing in compliance with the Bankruptcy Code.

51.    Accordingly, I believe the above facts and circumstances comply with all of the elements of section 1129(a)(5) of the Bankruptcy Code.

**I.    The Plan Does Not Require Governmental Approval of Rate Changes (Section 1129(a)(6)).**

52.    It is my understanding that there is no governmental regulatory commission that has jurisdiction over the Debtors' or the Wind-Down Debtor's rates.

**J.    The Plan Is in the Best Interests of Creditors and Interest Holders (Section 1129(a)(7)).**

53.    The Debtors' advisors assisted with the preparation of the liquidation analysis that was filed as Exhibit B to the Disclosure Statement (the "Liquidation Analysis") to determine the respective value of distributions (if any) that Holders of Claims and Interests would receive on account of such Claims and Interests if the Debtors were to be liquidated under chapter 7 of the Bankruptcy Code.  The Liquidation Analysis was completed with the direct involvement of people under my direct supervision.  I am familiar with the methods used, and the conclusions reached, in the preparation of the Liquidation Analysis.  It is my understanding that the Liquidation Analysis represents the Debtors' best estimate of the cash proceeds, net of liquidation-related costs that

would be available for distribution to the Holders of Claims and Interests if the Debtors were to be liquidated under chapter 7 of the Bankruptcy Code.

54.     The Liquidation Analysis was based on a variety of assumptions, which are detailed in the notes to the Liquidation Analysis, and which I believe are reasonable under the circumstances.   The Liquidation Analysis represents an estimate of recovery values and percentages based upon a hypothetical liquidation if the Bankruptcy Court were to convert the Debtors' chapter 11 cases to a proceeding under chapter 7 of the Bankruptcy Code and a chapter 7 trustee were to proceed to convert the Debtors' assets into cash.   The Liquidation Analysis demonstrates that recoveries under the Plan are at least as high as they would be in a hypothetical liquidation.   Accordingly, I believe that the Plan satisfies section 1129(a)(7) because creditors are getting more out of the Plan than they would in a chapter 7 liquidation.

**K.     The Plan Can Be Confirmed Notwithstanding the Requirements of Section 1129(a)(8).**

55.     As will be discussed in greater detail below, I have been advised that Class 4 (Prepetition First Lien Claims), Class 5 (Prepetition Second Lien Claims), Class 6A (Continuing Trade Claims), Class 6B (Other General Unsecured Claims), Class 6C (Litigation Claims) voted to accept the Plan and Class 6D (CFPB Claim) did not vote on the Plan.   Moreover, it is my understanding that Holders of Claims and Interests in Class 9 (Interests in PGX), Class 10 (Interests in Lexington Law Firm), and Class 11 (Section 510(b) Claims) are deemed to have rejected the Plan and, thus, were not entitled to vote.   Notwithstanding that Classes 9, 10, and 11 are deemed to reject the Plan, it is my understanding that the Plan is confirmable because it satisfies section 1129(b) of the Bankruptcy Code.

**L.      The Plan Complies with Statutorily Mandated Treatment of Administrative and Priority Tax Claims (Section 1129(a)(9)).**

56.      The Plan generally provides that each holder of an Allowed Administrative Claim will receive  (unless otherwise agreed by such Holder and the Debtors or the Wind-Down Debtors, as applicable) Cash equal to the amount of the unpaid portion of such Allowed Administrative Claim in accordance with the following:  to the extent an Allowed Administrative Claim has not already been paid in full or otherwise satisfied during the Chapter 11 Cases, each Holder of an Allowed Administrative Claim (other than Holders of Professional Fee Claims, the DIP Claims, and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Allowed Administrative Claim in an amount of Cash equal to the amount of the unpaid portion of such Allowed Administrative Claim in accordance with the following: (1) if such Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction or course of business giving rise to such Allowed Administrative Claim, without any further action by the Holder of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by the Holder of such Allowed Administrative Claim and the Debtors or the Wind-Down Debtor, as applicable; or (5) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court.

57.     Except with respect to Administrative Claims that are Professional Fee Claims, DIP Claims, or subject to section 503(b)(1)(D) of the Bankruptcy Code, and unless previously Filed, requests for payment of Administrative Claims must be Filed and served on the Wind-Down Debtor no later than the Administrative Claims Bar Date pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order.

58.     As described below, I believe that the Debtors have sufficient cash on hand to pay for all such claims that are liabilities of the estate.  It is my understanding that, because the Plan provides for specified Cash payments to Holders of Claims entitled to priority under section 507(a), it is in compliance with section 1129(a)(9) of the Bankruptcy Code.

**M.      At Least One Impaired Class of Claims Has Accepted the Plan, Excluding the Acceptance of Insiders (Section 1129(a)(10)).**

59.     I have been informed that section 1129(a)(10) of the Bankruptcy Code is an alternative to the requirement set forth in section 1129(a)(8) of the Bankruptcy Code that each class of claims or interests must either accept a plan or be unimpaired under the plan.  It provides that if a class of claims is impaired under a plan, at least one impaired class of claims must accept the plan, excluding acceptance by any insider.  As set forth in the Voting Report, the Debtors have obtained the requisite acceptance to confirm the Plan, independent of any insiders' votes. Therefore, it is my belief that the Plan fully complies with and satisfies all of the requirements of section 1129(a)(10) of the Bankruptcy Code.

**N.      The Plan Is Feasible (Section 1129(a)(11)).**

60.     I believe the Plan satisfies the feasibility requirements of section 1129(a)(11) of the Bankruptcy Code by providing that the Debtors will be able to satisfy all of their obligations under the Plan.

61.     Under the Plan, the Debtors and Wind-Down Debtor, as applicable, shall fund the distributions and obligations under the Plan with Available Cash held by the Debtors or in reserves, and the Wind-Down Debtor Account, as applicable, on the Effective Date.  As indicated in Article II of the Plan, pursuant to the Sale Orders, the DIP Claims have been satisfied in connection with the Sale Transactions.

62.     Under my supervision, the Debtors and their advisors have thoroughly analyzed their ability to meet their obligations under the Plan.  The Debtors sized the wind-down contribution contemplated by the Asset Purchase Agreements as a result of that analysis.  More specifically, the Debtors' Available Cash is sufficient to pay all known administrative expense claims pursuant to section 1129(a)(9) with approximately $2.625 million available to fund wind-down costs.  Because the Purchasers assumed a majority of contracts that generated administrative claims (and therefore needs to pay obligations under such contracts as part of cure), I believe this estimate is reasonable and conducted with the appropriate estimates and reserves for risk.  Based on this analysis, the Wind-Down Debtor will have sufficient funds to satisfy all requirements and obligations under the Plan.

63.     I further believe that escrowing amounts for unsupported, alleged WARN Act claims is not necessary in these cases since those alleged claims are subject to viable affirmative defenses.

64.     Detailed facts relevant to the viable defenses are set out in the *Opening Brief in Support of Defendants' Motion for Summary Judgment* filed at ECF No. 17 on the docket styled as *Kirsten Hansen v. PGX Holdings, Inc., et al.*, Adv. Proc. No. 23-50396 (CTG) (Bankr. D. Del. Aug. 4, 2023) (the "WARN Action"), at ¶¶ 5-69, and my Supplemental Declaration in Support of the Motion [WARN Action Docket No. 18], both of which are incorporated by reference.

65.     As relevant here, on May 2, 2019, the CFPB sued the Debtors in Utah (the "CFPB Litigation").  Over the next two years, the Debtors and the CFPB litigated extensively the CFPB claims and the United States Supreme Court granted certiorari on the constitutionality of the CFPB in a case separate from the CFPB Litigation.

66.     On March 10, 2023, the District Court unexpectedly entered summary judgment in favor of the CFPB on Count 1 in the CFPB Litigation, setting up a potential damages exposure for the Debtors of more than $2.7 billion, should the CFPB prevail on its requested relief in the near-term.

67.     On March 17, 2023, the Debtors requested to draw the $30 million balance of an existing facility (the "December 2022 Facility") to supplement their revenue so they could cover operating expenses, including payroll, and make a $7.7 million interest payment that was due March 31, 2023, on the Prepetition Facilities.

68.     The $30 million in additional funding available under the December 2022 Facility would have also allowed the Debtors to continue business operations for several months.

69.     On March 24, 2023, Prospect did not fund the Debtors' request, stating that the borrowers had not satisfied all conditions under the December 2022 Facility and related documents.

70.     On March 29, 2023, the Debtors replied demanding that Prospect fund the $30 million draw because they had not defaulted under the Second Lien Facility and failure to receive those funds would cause the Debtors to shut down operations.

71.     On Friday, March 31, 2023, the lenders did not fund the $30 million draw under the December 2022 Facility.  Instead, the PGX credit parties negotiated a short forbearance agreement with the prepetition lenders and skipped the $7.7 million interest payment that was due

on March 31, 2023. The parties entered into successive forbearance agreements with respect to the Prepetition Facilities effective through June 4, 2023 (collectively, the "Forbearance Agreements"). With the Forbearance Agreements in place, the parties focused on a more comprehensive restructuring transaction to be effectuated through a chapter 11 process.

72.     Throughout the CFPB Litigation, the Debtors worked on alternative business models that would address the CFPB's concerns.

73.     Those efforts continued until April 4, 2023, when the Tenth Circuit denied the Debtors' motion for interlocutory appeal and lifted its stay of the March 10 Order.

74.     Between April 5 and 6, 2023, some of the Debtors shut down nearly 80% of their operations while conducting the first round of employee layoffs as follows: (a) Progrexion Teleservices, Inc. laid off a total of 800 employees at 8 facilities located throughout 7 states; (b) Progrexion ASG, Inc., laid off 77 employees at 7 facilities located throughout 6 states; and (c) Progrexion Marketing, Inc. laid off 14 employees who worked out of its Salt Lake City, Utah facility.

75.     Concurrently, Lexington Law began mothballing operations in advance of the chapter 11 process given that the PGX Defendants could no longer support Lexington Law's practice.

76.     On May 11, 2023, Lexington Law laid off 123 employees who worked in Arizona and Utah; Progrexion ASG, Inc. laid off an additional 13 employees at two locations; and CreditRepair.com, Inc. laid off 15 employees at its facilities in Salt Lake City, Utah (the "Second Layoffs").

77.     At all relevant times, including as of February 4, 2023, the Debtors were seeking financing, including in the form of the balance of the December 2022 Facility, had a realistic

opportunity of securing that financing, and the financing would have been sufficient to give the Debtors enough cushion to retain their employees.  Moreover, the Debtors reasonably believed that sending WARN notices as of February 4, 2023, would preclude that financing.

78.    Moreover, given how long the CFPB Litigation had been pending, the challenges to the CFPB's constitutionality, and that the Utah District Court had twice denied dispositive motions in the CFPB Litigation, the Debtors did not expect that the Utah District Court would enter a partial summary judgment ruling in favor of the CFPB, that the Utah District Court and the Tenth Circuit would refuse to stay the order, and that the lenders under the December 2022 Facility would refuse to fund the balance of the December 2022 Facility.

79.    It is my understanding that terminated employees each received required notices under the WARN Act and that the Debtors have asserted, among other things, affirmative defense of unforeseen business circumstances and faltering business conditions.

80.    Accordingly, based on the information above, I believe that the Plan is feasible.

**O.    The Plan Provides for Payment of All Fees Under 28 U.S.C. § 1930 (Section 1129(a)(12)).**

81.    It is my understanding that Article XII.C of the Plan provides that the Debtors shall pay all fees and applicable interest under section 1930(a) of the Judicial Code and 31 U.S.C. § 3717, as applicable, as determined by the Bankruptcy Court, for each quarter (including any fraction thereof) until these Chapter 11 Cases are converted, dismissed, or closed, whichever

occurs first.  Accordingly, it is my understanding that the Plan fully complies with and satisfies the requirements of section 1129(a)(12) of the Bankruptcy Code.

> **P.    Non-Applicability of Certain Sections (11 U.S.C. §§ 1129(a)(13), (14), (15), and (16)).**

82.    It is my understanding that sections 1129(a)(13) through 1129(a)(16) of the Bankruptcy Code do not apply to the Plan because the Debtors have no obligation to pay retiree benefits and because, the Debtors are not subject to domestic support obligations, are not "individuals," and are moneyed, business, or commercial corporations, and no party has asserted otherwise.

> **Q.    The Plan Complies with the Other Provisions of Section 1129 of the Bankruptcy Code (Section 1129(c)–(e)).**

83.    It is my understanding that the Plan satisfies the remaining provisions of section 1129 of the Bankruptcy Code.  Section 1129(c), prohibiting confirmation of multiple plans, is not implicated because there is only one proposed chapter 11 plan.  Moreover, the Plan has not been filed for the purpose of avoidance of taxes or the application of section 5 of the Securities Act.  In addition, no party that is a governmental unit, or any other entity, has requested that the Bankruptcy Court decline to confirm the Plan on the grounds that the principal purpose of the Plan is the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act.  The Plan was proposed in good faith and not by any means forbidden by law.  I believe the Debtors filed the Plan to accomplish their objective of efficiently and responsibly providing recoveries to their stakeholders.  Accordingly, I believe that the Debtors have satisfied the requirements of section 1129(d) of the Bankruptcy Code.

84.     Lastly, it is my understanding that section 1129(e) of the Bankruptcy Code is inapplicable because none of the Debtors' chapter 11 cases is a "small business case." Thus, the Plan satisfies the Bankruptcy Code's mandatory confirmation requirements.

**R.     The Plan Satisfies the Requirements of Section 1129(b) of the Bankruptcy Code.**

85.     Class 4 (Prepetition First Lien Claims), Class 5 (Prepetition Second Lien Claims), Class 6A (Continuing Trade Claims), and Class 6B (Other General Unsecured Claims), voted to accept the Plan, Class 6C (Litigation Claims) voted to reject the Plan, and Class 6D (CFPB Claim) did not vote on the Plan. Moreover, it is my understanding that Holders of Claims and Interests in Class 9 (Interests in PGX), Class 10 (Interests in Lexington Law Firm), and Class 11 (Section 510(b) Claims) are deemed to have rejected the Plan and, thus, were not entitled to vote. In addition, Holders of Claims and Interests in Class 7 (Intercompany Claims) and Class 8 (Intercompany Interests) may be conclusively deemed to reject the Plan based on the Debtors' ultimate determination to maintain or cancel these intercompany claims and interests. It is my understanding that nonetheless, as set forth below, the Plan does not unfairly discriminate and is "fair and equitable," and therefore satisfies the requirements under section 1129(b) of the Bankruptcy Code.

**4.     The Plan Does Not Unfairly Discriminate with Respect to Impaired Classes That Have Not Voted to Accept the Plan.**

86.     I believe that the Plan's treatment of those Classes that are deemed to reject the Plan is proper and not "unfair" because Holders of Claims and Interests with similar legal rights will not be receiving materially different treatment under the Plan. As I discussed above, the Plan's classification scheme categorizes Claims and Interests based on their priority within the Debtors' capital structure, their differing legal nature, and their respective rights against the Debtors.

Further, Claims and Interests in the Classes deemed to reject the Plan are not similarly situated to any other Classes, given their distinctly different legal character from all other Claims and Interests. Accordingly, I believe that the Plan does not discriminate unfairly with respect to Classes of Claims and Interests that are deemed to reject the Plan.

### 5. The Plan Is Fair and Equitable.

87. I believe the Plan is "fair and equitable" to Holders of Claims and Interests in those Classes that were deemed to reject the Plan because the Plan satisfies the absolute priority rule with respect to each of these non-accepting Impaired Classes. Specifically, no holder of any junior claim or interest will receive or retain any property under the Plan on account of such junior claim or interest.

88. In addition, to the extent that Intercompany Interests are Reinstated under the Plan, it is my understanding that distributions on account of Intercompany Interests are not being received by Holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience, for the ultimate benefit of all parties in interest. Accordingly, I believe that any reinstatement of Intercompany Interests will have no economic substance.

89. Therefore, I believe the Plan is fair and equitable with respect to the all Impaired Classes of Claims and Interests and satisfies section 1129(b) of the Bankruptcy Code.

## II. The Waiver of a Stay of the Confirmation Order and the Proposed Modifications to the Plan Are Appropriate.

### A. Cause Exists to Waive a Stay of the Confirmation Order.

90. I have been advised that cause exists for waiving the stay of the entry of the Confirmation Order such that the Confirmation Order will be effective immediately upon its entry. As noted above, the Debtors have undertaken great efforts to facilitate their exit from chapter 11

as soon as practicable. Each day the Debtors remain in chapter 11 they incur significant administrative and professional costs.

**B.     Modifications to the Plan.**

91.     It is my understanding that the Debtors made certain modifications to the Plan in response to comments from stakeholders, including the Committee, U.S. Trustee, the United States on behalf of the CFPB, and counsel to a surety bond provider, and including to the terms of the Releases. I understand that such modifications do not adversely impact creditors who have not consented to such modified treatment. I believe that the changes are permissible modifications to the Plan and are supported by the Debtors, and do not reflect material differences to recoveries of each affected class—*i.e.*, no holder is "likely" to reconsider its acceptance.

*[Remainder of page intentionally left blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated:  October 25, 2023                    Respectfully submitted,


_/s/ Chad Wallace_
Chad Wallace
Chief Executive Officer